# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICKY A. SHAW,** | : |
| **Plaintiff** | : |
| | : **CIVIL ACTION NO. 09-359** |
| **v.** | : |
| | : |
| **CUMBERLAND TRUCK** | : |
| **EQUIPMENT CO.,** | : **JURY TRIAL DEMANDED** |
| | : |
| **Defendant** | : |

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**GOLDBERG KATZMAN, P.C.**

Michael J. Crocenzi, Esquire
PA I.D. No.: 66255
320 Market Street
P.O. Box 1268
Harrisburg, PA 17108-1268
Phone: (717) 234-4161
Fax: (717) 234-6810
Email: mjc@goldbergkatzman.com

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**..................................................................................ii

I.  **STATEMENT OF FACTS**..........................................................................1

II.  **STATEMENT OF ISSUES PRESENTED**..................................................1

    A.    **Has Shaw established that he is a disabled person within the meaning of the ADA?**..........................................................1

    B.    **Has Shaw established that CTE violated the ADA by not engaging in an interactive process when he requested an accommodation and then refusing to accommodate him?**.............1

    C.    **Has Shaw established that CTE retaliated against him because he requested an accommodation?**.......................................1

III.  **ARGUMENT**.............................................................................................2

    A.    **Shaw has established that he is a disabled person within the meaning of the ADA.**........................................................2

    B.    **Shaw has produced sufficient evidence to establish that CTE failed to provide him with an accommodation.**....................20

    C.    **Shaw has established that CTE retaliated against him because he  requested an accommodation.**.....................................21

IV.  **CONCLUSION**.........................................................................................22

# TABLE OF AUTHORITIES

**Cases**

Adams v. Commonwealth of Pennsylvania, 2009 WL 2707601*5 footnote 6
  (M.D. Pa. 2009).................................................................................................. 3

Eshelman v. Agere Systems, Inc., 397 F.Supp. 2nd 557 (E.D. Pa. 2005).................. 3

Keys v. City of Philadelphia, 2005 WL 3234847*3 (E.D. Pa. 2005) ...................... 16

Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778 (3rd Cir. 1998)..................... 6

Pinegar v. Shinseki, 665 F.Supp.2d 487 (M.D. Pa. 2009) ................................... 4, 5

Snyder v. Norfolk Southern Railway Corporation, 463 F.Supp. 2nd 528
  (E.D. Pa. 2006), *affirmed by* 2008 WL 857634 (3rd Cir. 2008)................ 9, 11, 12

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296 (3d. Cir. 1999) .............................. 2

Tice v. Center Area Transportation Authority, 247 F.3d 506 (3rd Cir. 2001)......... 13

Toyota Motor Manufacturing, Inc. v. Williams, 534 U.S. 184 (2002).................... 3

Williams v. Philadelphia Housing Authority Police Department, 380 F.3d
  751 (3rd Cir. 2004)........................................................................ 8, 20, 21, 22

**Statutes**

42 U.S.C. 12102(2).................................................................................................. 2

**Other Authorities**

United States Department of Labor Dictionary of Occupational Titles, Code
  921.683-050 ........................................................................................................ 7

**Regulations**

29 C.F.R §1630.2(j)(3)(i) ........................................................................................ 6

29 C.F.R. §1630.2(i)........................................................................................ 3, 4, 6

# I.   STATEMENT OF FACTS

Because the Defendant's (hereinafter "CTE") statement of facts consisted of its statement of material facts pursuant to Local Rule 56.1, the Plaintiff, (hereinafter "Shaw") refers the Court to his response to Defendant's statement of material facts.

# II.   STATEMENT OF ISSUES PRESENTED

**A.    Has Shaw established that he is a disabled person within the meaning of the ADA?**
(Answer: Yes)

    **1.    Has Shaw established that CTE regarded him as substantially limited in the major life activity of walking?**
(Answer: Yes)

    **2.    Has Shaw established that CTE regarded him as substantially limited in the major life activity of working?**
(Answer: Yes)

    **3.    Is the <u>McDonnell Douglas</u> burden shifting framework inapplicable because Shaw has produced direct evidence of discrimination?**
(Answer: Yes)

**B.    Has Shaw established that CTE violated the ADA by not engaging in an interactive process when he requested an accommodation and then refusing to accommodate him?**
(Answer: Yes)

**C.    Has Shaw established that CTE retaliated against him because he requested an accommodation?**
(Answer: Yes)

## III.  ARGUMENT

### A.  Shaw has established that he is a disabled person within the meaning of the ADA.

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: "(1)he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d. Cir. 1999).  In footnote #53 on page 14 of its brief, CTE concedes that Shaw is able to prove the last two elements of a *prima facie* case of ADA discrimination for purposes of the Motion for Summary Judgment. Therefore, the contest concerns whether Shaw is a disabled person within the meaning of the ADA.

Shaw claims that he is a disabled person based on the "regarded as" definition of disability under the ADA.  42 U.S.C. 12102(2).  To prove that CTE regarded him as disabled, Shaw must demonstrate that: 1) despite having no impairment at all, CTE erroneously believed that Shaw had an impairment that substantially limited one or more of his major life activities; or 2) he had a non-limiting impairment that CTE mistakenly believed limited one or more of his major life activities.  Even an innocent misrepresentation

2

based on nothing more than a simple mistake of fact as to the severity of Shaw's impairment can be sufficient to satisfy the statutory definition of a perceived disability. The relevant inquiry relates to the perception, or intent, of CTE, not whether Shaw was actually disabled at the time. *See* Eshelman v. Agere Systems, Inc., 397 F.Supp. 2nd 557, 563 (E.D. Pa. 2005).

**1.    CTE regarded Shaw as being disabled in the major life activity of walking.**

Major life activities are "those activities that are of central importance to daily life." Toyota Motor Manufacturing, Inc. v. Williams, 534 U.S. 184, 197 (2002). The regulations define major life activities as "caring for oneself, performing manual tasks, **walking**, seeing, hearing, speaking, breathing, learning, and working. (emphasis added). 29 C.F.R. §1630.2(i).[1]

Interestingly, the EEOC interpretive guidelines address how an impairment can substantially limit the major life activity of walking. It states:

> Alternatively, an impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as

---

[1] The level of deference to be given to the EEOC's regulations and interpretive guidelines regarding the definition of "disabled" remains undecided. However, the courts in this district have routinely applied the EEOC's guidelines. Adams v. Commonwealth of Pennsylvania, 2009 WL 2707601*5 footnote 6 (M.D. Pa. 2009).

compared to the average person in the general population's ability to perform that same major life activity. Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking.

29 C.F.R. §1630.2(i) Appendix to part 1630.

In <u>Pinegar v. Shinseki</u>, 665 F.Supp.2d 487 (M.D. Pa. 2009), the plaintiff testified that walking the length of her driveway was a chore, that it was difficult to walk up steps, and that at some point she could hardly walk. Judge Connor found this evidence was sufficient to allow a jury to decide whether the plaintiff was substantially limited in the major life activity of walking. <u>Id.</u> at 499.

Shaw admitted that because of his arthritic left knee, he had some difficulty walking in the morning hours at work and usually used his cane for assistance. (Shaw Exh. A. 24:23-25:2). However, he walked as much as he had to for his job. (Shaw Exh. A 24:1-2). His impairment did not substantially limit his walking. However, CTE mistakenly believed that Shaw's non-limiting impairment substantially limited Shaw's major life activity of walking. Brian Sheldon testified that Chuck Hoffman reported to him in February 2007 that he saw Shaw trying to cross the parking lot from warehouse B to the office. Mr. Hoffman told Mr. Sheldon that Shaw was unable

to navigate the 150 yard parking lot without taking several breaks and he had to use a cane. (Shaw Exh. E. 17:22-18:8). Pat Whitmyer recalled a meeting with Chuck Hoffman and Brian Sheldon to discuss Shaw's physical impairment. Whitmyer testified that Chuck Hoffman told Sheldon during this meeting that Shaw could barely make it across the parking lot to the office. (Shaw Exh. F 31:20-23). Chuck Hoffman testified that he told Sheldon that Shaw was struggling to do his job because of his difficulty walking. (Shaw Exh. C 15:8-9). Based on this information, CTE and specifically Sheldon mistakenly believed that Shaw's non-limiting impairment substantially limited his walking.[2]

Based on the EEOC's Guidelines and Pinegar, Shaw has established a *prima facie* case that CTE regarded him as being substantially limited in his major life activity of walking. CTE's Motion for Summary Judgment on this issue should be dismissed.

### 2.    CTE regarded Shaw as substantially limited in the major life activity of working.

If the Court does not find that Shaw has presented sufficient evidence that CTE regarded him as being substantially limited in the

---

[2] Sheldon was the primary decision maker. He recommended to send Shaw for an examination and then prohibited him from working. (Shaw Exh. E 30:14-19, Shaw Exh. C 13:11-16, Shaw Exh. E 53:8-16).

major life activity of walking, then Shaw has presented sufficient evidence to prove a *prima facie* case that CTE regarded him as being substantially limited in the major life activity of working.[3] According to the regulations, working is a major life activity. 29 C.F.R. §1630.2(i). The regulations state that an individual is substantially limited in the major life activity of working if there is a significant restriction in the ability "to perform either a class of jobs or a broad range or jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R §1630.2(j)(3)(i). "This approach requires a court to consider the individual's training, skills and abilities in order to evaluate whether the particular impairment constitutes for the particular person a significant barrier to employment." Mondzelewski, 162 F.3d at 784.

Shaw is a high school graduate. After spending twenty-one years in the army, holding the rank from E1-E7, Shaw worked various labor-type positions until CTE hired him in 2000. (Shaw Exh. A 7-8).

---

[3] There is a two-step process to determine whether an individual is substantially limited in a major life activity. First, a court must determine whether the individual is substantially limited in any major life activity other than working. If the individual has such a limitation, the inquiry ends. However, if the individual has no such limitation, then the court must decide whether the individual is substantially limited in the major life activity of working. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783-84 (3rd Cir. 1998).

As the regulations instruct, this type of background is important in determining whether CTE regarded Shaw as being substantially limited from performing either a class of jobs or a broad range of jobs compared to the average person having comparable training, skills, and abilities.

It is quite clear that CTE considered Shaw substantially limited from performing the class of job as forklift operator. The United States Department of Labor lists forklift operator as a class of job. *See* United States Department of Labor Dictionary of Occupational Titles, Code 921.683-050. Shaw spent about fifty (50) percent of his day operating a forklift. (Shaw Exh. A. 20:14-15). Sheldon testified that Tim Kline told him that Shaw was using a cane to push the pedals to operate the forklift. (Shaw Exh. E. 38:10-16). Tim Kline testified, however, that he never saw Shaw operate a forklift with a cane and no one ever reported such an incident to him. (Shaw Exh. D. 37:5-6:37:15-17). In fact, Kline testified that Sheldon told him about Shaw using a cane to operate the forklift. (Shaw Exh. D. 37:2-14). Chuck Hoffman testified that he was not even aware of the forklift issue. (Shaw Exh. C. 14:22-24). Pat Whitmyer testified that he never saw Shaw use a cane to operate a forklift. He heard about the incident, but

7

did not remember from whom. (Shaw Exh. F. 37:2-17). Brenda Hoffman testified that during a meeting with the management team, the team discussed how Shaw was using a cane to operate a forklift. Brenda Hoffman testified that this incident is a "very huge safety issue." (Shaw Exh. B. 17:1-6;18:1-10). Shaw vehemently denied ever using a cane to operate the forklift. (Shaw Exh. A. 25:3-5).

After reviewing this testimony, it is quite clear that no one at CTE ever witnessed Shaw using a cane to operate the forklift. This unfounded and false rumor, however, convinced the management team that Shaw was unable to operate a forklift, thus disqualifying him from performing this class of job. See Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 764 (3rd Cir. 2004) (Plaintiff was significantly restricted from her ability to perform the class of job as police officer because her mental impairment precluded her from carrying a firearm).

Not only did CTE regard Shaw as substantially limited in performing the class of job as forklift operator, it also regarded him as substantially limited from performing a broad range of laboring jobs. Brenda Hoffman, CTE's HR Manager and part of CTE's management team, testified that Shaw could only do computer work where he

could sit down. (Shaw Exh. B. 31:21-24). Again, this was based on a mistaken perception of Shaw's physical capabilities. Brenda Hoffman's mistaken perception that Shaw was limited to performing computer work at a desk could reasonably convince a jury that CTE considered Shaw to be substantially limited in performing the broad range of jobs as a laborer, which is exactly the kind of jobs Shaw has held most of his adult life. Because CTE considered Shaw to be substantially limited in performing a broad class of jobs, i.e. labor-type positions, Shaw has met his burden in proving a *prima facie* case. CTE's Motion for Summary Judgment on this issue should be denied.

CTE relies heavily upon the Third Circuit's opinion in <u>Snyder v. Norfolk Southern Railway Corporation</u>, 463 F.Supp. 2nd 528 (E.D. Pa. 2006), *affirmed by* 2008 WL 857634 (3rd Cir. 2008). <u>Snyder</u> is distinguishable from the present case. In <u>Snyder</u>, the Plaintiff was a locomotive engineer for Norfolk Southern. Norfolk required its locomotive engineers to undertake a physical examination every three years in order to assess the engineer's ability to safely operate a locomotive. The Plaintiff's physical exam revealed the existence of coronary heart disease stemming from a heart attack. The Plaintiff's cardiologist then sent documentation to Norfolk indicating that the

Plaintiff had some underlying ischemia. Norfolk's physician determined that the Plaintiff could not safely operate a locomotive because the risk of sudden incapacitation, collapse or even sudden death from his condition could lead to an accident with potentially catastrophic results. When the Plaintiff eventually produced test results showing that his ischemia had resolved, Norfolk allowed him to return to work as a locomotive engineer.

The Plaintiff filed suit alleging that Norfolk violated the ADA. Specifically, the Plaintiff claimed that he had a non-limiting impairment, i.e. ischemia that Norfolk mistakenly regarded as being an impairment that substantially limited him in the major life activity of pumping and circulating blood. In ruling for Norfolk, the Court noted that Norfolk had a manual that guided its physicians in determining whether a locomotive engineer could work in a safety sensitive position. As a general rule, an engineer must have a stress test performed on him that indicates no ischemia, prior to qualification. Because the Plaintiff had ischemia, Norfolk's physicians simply deferred to the manual and disqualified the Plaintiff from performing work in the safety sensitive position of a locomotive engineer.

In the present case, the Plaintiff was not a locomotive engineer for a major commercial railway, which is a safety sensitive position. Because of a locomotive engineer is a highly safety sensitive position, the Court in <u>Snyder</u> deferred to Norfolk's medical guidelines regarding whether an individual was fit for duty. Second, there is no evidence that CTE had medical guidelines in place prior to Shaw's examination on February 27, 2007 to determine whether he had a medical condition that precluded him from working as a warehouse laborer for CTE.  CTE simply gave a job description to Concentra Medical Center.  It provided no other guidance or information to Concentra.  Third, CTE did not have a regular program of having its employees submit to physical examinations to determine whether they were fit for duty.  In direct contrast to the situation in <u>Snyder</u>, CTE deviated from its normal physical exam procedures in the present case. Mr. Sheldon testified that CTE only requires examinations when an employee has been off work for an accident or illness and wants to return to work.  (Shaw Exh. E 20:7-21:17).  CTE does not require employees to submit to annual physical examinations. (<u>Id</u>.). In Shaw's case, he had been continuously working for CTE up until the day CTE required him to submit to the examination on February 27, 2007.

11

In <u>Snyder</u>, the Court focused on the medical testimony that ischemia can lead to incapacitation or collapse, which would be devastating if it happened to a locomotive engineer. CTE has produced no such medical evidence in this case to substantiate its unfounded fears that Shaw was a danger to himself and others. There is no factual evidence that Shaw was ever involved in an incident in which he was a danger to himself or others while working at CTE. (Shaw Exh. E 22:20-23:13). As discussed above, there is no evidence that Shaw ever operated a forklift with his cane because he was unable to operate the foot controls. Despite Tim Kline's testimony that Shaw was having difficulty lifting items, it never affected Shaw's productivity. (Shaw Exh. D 28:7-11, Shaw Exh. C 20:15-21). Shaw never dropped anything. (Shaw Exh. D 32:17-21). Shaw never tripped. (Shaw Exh. D 31:3). He was an exemplary employee. (Shaw Exh. E 28:24-29:2). CTE may argue that it had altruistic reasons for having Shaw submit to a physical examination on February 27, 2007, but a jury can reasonably conclude that there was absolutely no justification for the February 27, 2007 examination except for CTE's unfounded fears and stereotype against Shaw.

CTE also argues that the ADA permitted it to have Shaw submit to the February 27, 2007 physical examination to determine Shaw's physical impairments and whether he should continue working as a warehouse worker.   CTE is correct that a physical examination in and of itself is not evidence that an employer regarded an employee as being disabled pursuant to the ADA.   However, as the Third Circuit articulated in <u>Tice v. Center Area Transportation Authority</u>, 247 F.3d 506 (3rd Cir. 2001) circumstances surrounding the exam can lead a jury to conclude the employer regarded the employee as disabled.  It stated:

> The important point is that the request and surrounding circumstances [regarding an IME] must establish that the employee was 'regarded as' disabled within the meaning of the ADA. So, for example, if it turned out that the employer's examination was not limited to an assessment of those potential impairments that had occasioned the examination in the first place, but instead became a wide ranging assessment of mental or physical debilitation, such evidence might be highly probative as to the nature of the employer's perception. Further, a request for an examination, taken in conjunction with evidence suggesting that the employer had no reasonable basis for harboring doubts about the employee's ability to do his or her job in the first place, might also be probative as to the nature of the employer's regard. <u>Id</u>. at 516.

13

In the present case, Chuck Hoffman's report to Brian Sheldon about Shaw's alleged inability to walk across the parking lot was the impetus to have Shaw submit to a physical examination at Concentra. (Shaw Exh. E 24:3-10). However, instead of limiting the physical examination at Concentra to evaluating Shaw's ability to walk, CTE had Concentra review whether Shaw could perform all the physical requirements of the warehouse worker position. Therefore, this wide ranging assessment of Shaw's physical capabilities rather than just an assessment of his walking, will be highly probative to a jury concerning the nature of CTE's perception of Shaw's physical capabilities. Furthermore, as argued above, a jury can reasonably conclude that there was no reasonable basis for CTE to have Shaw even submit to a wide ranging assessment of his physical capabilities on February 27, 2007. CTE's management team had no evidence that Shaw was a danger to himself or others. Instead of even talking to Shaw about his alleged walking difficulties, CTE made a unilateral decision to immediately have Shaw submit to a physical examination. What is even more amazing is that CTE did not give any information to Concentra except the job description. It did not provide Concentra with any representative materials that Shaw could lift and carry during

the physical examination. (Shaw Exh. E 51:2-4). No physician or physician's assistant ever came to CTE to personally witness the position being performed. (Shaw Exh. E 50:15-19). According to Shaw, the so called "physical examination" consisted of the physician's assistant asking Shaw to bend and touch his toes, and squat. (Shaw Exh. A 38:1-3, 38:13-14). If CTE really wanted to discover Shaw's physical capabilities because it was concerned about his safety and the safety of others at CTE, it would have sent Shaw for a functional capacity evaluation. A functional capacity evaluation would have provided some objective measure of Shaw's physical capabilities.

3.    **The McDonnell Douglas burden shifting framework does not apply because Shaw has produced direct evidence of discrimination.**

CTE argues that the McDonnell Douglas burden shifting framework for Title VII cases applies to this particular ADA action. CTE did not terminate Shaw because of poor performance issues or any other reason unrelated to its false perception of Shaw's non-limiting impairment. CTE prohibited Shaw from continuing to work as of February 27, 2007 because it regarded him as being disabled under the ADA and eventually terminated his employment on

15

September 17, 2007 because it continued to regard him as being disabled. As the Court stated in <u>Keys v. City of Philadelphia</u>, "The McDonnell Douglas burden-shifting test is inapt in this case which involves direct evidence of discrimination. Defendants terminated Plaintiffs from their positions as police officers for the City of Philadelphia upon determining that Plaintiff's are [permanently and partially disabled]. Thus, Defendants' actions do not serve as a pretext for discrimination, but rather as direct evidence as discrimination. Without using the McDonnell Douglas burden-shifting test, Plaintiffs may still establish discrimination based upon their disability under the ADA." <u>Keys v. City of Philadelphia</u>, 2005 WL 3234847*3 (E.D. Pa. 2005). Therefore, CTE's argument that it had a legitimate, non-discriminatory reason for terminating Shaw's employment is irrelevant. Furthermore, CTE's argument that Shaw has the burden to prove pretext is also irrelevant.

CTE cannot simply shield itself from liability by relying upon Concentra Medical Center's determination that Shaw was not qualified to perform the position of warehouse worker. As discussed earlier, CTE regarded Shaw as being substantially limited in his major life activities of walking and working. CTE's unfounded and false

16

misperceptions of the severity of Shaw's walking abilities was the reason CTE sent Shaw for a physical examination at Concentra Medical Center on February 27, 2007. This was not a routine examination. It did not even fall within CTE's normal practice and procedure of having employees submit to a physical examination. The examination at Concentra Medical Center is just the fruit of the poisonous tree i.e. CTE's violation of the ADA.

Furthermore, there are material issues of fact regarding the legitimacy of the physical examinations at Concentra Medical Center. Shaw testified that a physician's assistant by the name of Peter, not Dr. Walker, conducted the initial physical examination on February 27, 2007. During the physical examinations, Shaw did not do anything other than try to bend to touch his toes and try to squat. CTE never sent any representative materials to Concentra to have Shaw lift or carry. No physician from Concentra ever visited CTE. CTE never sent Shaw for a functional capacity evaluation. The health care practitioners at Concentra simply spoke with Shaw regarding whether he could perform or not perform certain activities listed on the job description supplied by CTE. Shaw testified that he disagreed with the health care practitioners' opinions set forth on the job descriptions

regarding his capabilities. Shaw testified that the physician's assistant on February 27, 2007 never even asked him whether he was capable of lifting up to 150 lbs. occasionally and up to 70 lbs. frequently. (Shaw Exh. A. 35:3-7). Shaw did not know why the physician's assistant indicated on the form that he was unable to lift occasionally up to 150 lbs. and frequently up to 70 lbs. (Shaw Exh. A. 34:4-7).

Regarding the April 2007 physical examination, Shaw testified that he had no idea why Dr. Walker indicated that Shaw was only able to stand in one place for five seconds. (Shaw Exh. A. 63:22-25). Shaw disagreed with Dr. Walker's note that Shaw was unable to carry 75 lbs. frequently. (Shaw Exh. A. 65:2-6). Shaw also testified that he could bend as frequently as necessary for his position. (Shaw Exh. A. 65:12-13). Shaw clearly testified that the physician's assistant and Dr. Walker were wrong about him failing the physical examination because he had been doing his job for years with no complaints. (Shaw Exh. A 42:14-19). Therefore, there is a clear factual dispute regarding what Shaw shared with the physicians about his physical capabilities.

In additional to the factual dispute about what Shaw told the healthcare practitioners at Concentra Medical Center, there is a factual

dispute regarding whether the job description accurately described Shaw's position at CTE.   First, the job description is internally inconsistent regarding the lifting requirement.   Under the duties section on page one of the job description, it states that an employee must be able lift up to 120+ lbs. unassisted.   In the physical requirements section, however, the employee is required to lift up to 150 lbs. on an occasional basis and up to 70 lbs. on a frequent basis. (Shaw Exh. G, H, I).

CTE's employees gave inconsistent responses regarding the lifting requirement for the position.   Sheldon testified that an employee would be required to lift 25-50 lbs. on a regular basis and up to 100 lbs. on an occasional basis. (Shaw Exh. E. 11:12-17).   Pat Whitmyer testified that the heaviest item a warehouse worker had to lift was 65 lbs.   (Shaw Exh. F. 8:10-15).   Tim Kline testified that an employee should not lift or carry anything more than 40-50 lbs. (Shaw Exh. D. 22:12-21).   Shaw testified that hardly anybody could lift up to 120 lbs. unassisted. (Shaw Exh. A. 33:1-9).   Furthermore, contrary to the job description sent to Concentra, Shaw testified that his actual job did not require twisting. (Shaw Exh. A. 93:23-24).   His job did not require him to squat. (Shaw Exh. A. 94:8-10).   His job did

not require him to climb. (Shaw Exh. A. 94:11-13). Because there are disputed material facts about the accuracy of the job description as it pertained to Shaw's job at CTE, CTE's Motion for Summary Judgment should be denied.[4]

**B.    Shaw has produced sufficient evidence to establish that CTE failed to provide him with an accommodation.**

CTE argues that Shaw has failed to establish a *prima facie* case for failure to accommodate because Shaw did not prove that he has a disability pursuant to the ADA. It cites to Shaw's deposition testimony that he did not consider himself to be disabled. As argued above, Shaw has shown sufficient evidence to prove that he was disabled based on the "regarded as" definition. The 3rd Circuit established in Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751 (3rd Cir. 2004) that an employee who is disabled under the "regarded as" definition under the ADA is entitled to the interactive process and a reasonable accommodation. Once again, because Shaw is proceeding under the "regarded as" definition of the ADA,

---

[4] CTE argued that Shaw testified that he believed CTE pushed him out of his job because of a management purge at warehouse B. The McDonnell Douglas burden shifting framework does not apply. Furthermore, with the "regarded as" disability standard, Shaw's perception of why CTE prohibited him from working on February 27, 2007 is irrelevant. The relevant inquiry is CTE's perception of Shaw's disability. Finally, the CTE management team admitted that Shaw's removal from warehouse B had nothing to do with removing Kline as warehouse supervisor. (Shaw Exh. F 40).

his perception of his disability status is irrelevant.  The focus is on the employer's attitude and perception of the employee's disability.  CTE never even initiated the interactive processes required by the ADA and <u>Williams</u>. Sheldon never asked Shaw about his physical condition before he sent him for the physical examination on February 27, 2007.  (Shaw Exh. E 30:20-24). Shaw never even saw the job description that CTE provided to Concentra. (Shaw Exh. A 32:12-14).    CTE never discussed with Shaw what accommodations would be appropriate for him after the February 27, 2007 examination.  (Shaw Exh. E 57:12-59:20). In his letter of February 28, 2007, Shaw indicated that he wanted to continue working in the job that he had been performing without any difficulty for years.  (Shaw Exh. K).  He wanted CTE to change its written job description as provided to Concentra to match his actual job duties as the lead receiver in warehouse B. (<u>Id.</u>). CTE never considered his request.  It just ignored him, prohibited him from working, forced him to apply for short-term disability benefits, and eventually fired him.  Therefore, CTE's Motion for Summary Judgment on the failure to provide an accommodation claim should be denied.

**C.    Shaw has established that CTE retaliated against him because he requested an accommodation.**

Requesting an accommodation is a protected activity pursuant to the ADA. <u>Williams v. Philadelphia Housing Authority Police Department</u>, 380 F.3d 751,

759 (3rd Cir. 2004). Shaw requested an accommodation in his letters dated February 28, 2007 and May 17, 2007. Specifically, Shaw wanted CTE to change the job description provided to Concentra to match his actual job duties. CTE retaliated against him by continuing to prohibit him from returning to work. It was a continuous retaliatory act, which culminated in CTE firing Shaw on September 17, 2007. Shaw has shown a prima facie case of retaliation and CTE's Motion for Summary Judgment on this count should be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, CTE's Motion for Summary Judgment should be denied.

Respectfully submitted,
**GOLDBERG KATZMAN, P.C.**

By:    */S/ Michael J. Crocenzi, Esquire*
Michael J. Crocenzi, Esquire
PA I.D. No.: 66255
320 Market Street, P.O. Box 1268
Harrisburg, PA 17108-1268
Phone: (717) 234-4161/Fax: (717) 234-6808
Email: mjc@goldbergkatzman.com
*Attorneys for Plaintiff Ricky Shaw*

March 19, 2010

188555.1

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of March, 2010, I caused the foregoing document to be filed via ECF and that Michael J. Crocenzi, Esquire, is a filing user under the ECF system.  Upon the electronic filing of a pleading or other document, the ECF system will automatically generate and send a Notice of Electronic Filing to all filing users associated with this case.  Electronic service by the Court of the Notice of Electronic Filing constitutes service of the filed document and no additional service upon the filing user is required.

Alyssa N. Pianelli, Esquire
Saltz Polisher P.C.
993 Old Eagle School Road, Suite 412
Wayne, PA  19086

**GOLDBERG KATZMAN, P.C.**

By:  */S/ Michael J. Crocenzi, Esquire*
      Michael J. Crocenzi, Esquire
      PA I.D. No.: 66255
      320 Market Street
      P.O. Box 1268
      Harrisburg, PA 17108-1268
      Phone: (717) 234-4161
      Fax: (717) 234-6808
      Email: mjc@goldbergkatzman.com