```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
                    HARRISBURG DIVISION

RICKY A. SHAW,              : CASE NO.
              Plaintiff     : 1:09-CV-00359
        vs.                 :
CUMBERLAND TRUCK            :
EQUIPMENT COMPANY,          : Harrisburg, PA
              Defendant     : 16 May 2011
........................:   9:30 a.m.


        TRANSCRIPT OF CIVIL JURY TRIAL, DAY 1
    BEFORE THE HONORABLE CHRISTOPHER C. CONNER
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:

    Michael J. Crocenzi, Esq.
    Goldberg Katzman, P.C.
    320 Market Street
    Harrisburg, PA 17101
    (717) 234-4161

    Peter J. Russo, Esq.
    Law Offices of Peter J. Russo, P.C.
    5006 East Trindle Road, Suite 100
    Mechanicsburg, PA 17050
    (717) 591-1755

For the Defendant:

    Veronica Winter Saltz, Esq.
    Saltz Polisher, P.C.
    993 Old Eagle School Road, #412
    Wayne, PA 19087
    (610) 964-3333

Court Reporter:

    Wesley J. Armstrong, RMR
    Official Court Reporter
    U.S. Courthouse
    228 Walnut Street
    Harrisburg, PA 17108
    (717) 542-5569
```

I N D E X
Ricky Shaw vs. Cumberland Truck Equipment Co.
1:09-CV-00359
Civil Jury Trial, Day 1
16 May 2011


**PROCEEDINGS**

Page

Preliminary instructions by the Court          3

Opening statement by Mr. Crocenzi             20

Opening statement by Ms. Saltz                33

**PLAINTIFF WITNESSES**

Charles Hoffman:

Direct examination by Mr. Crocenzi            44
Cross examination by Ms. Saltz                58
Redirect by Mr. Crocenzi                      73
Examination by the Court                      77


John Patrick Whitmire:

Direct examination Mr. Russo                  80
Cross examination by Ms. Saltz               116
Redirect by Mr. Russo                        129
Recross by Ms. Saltz                         132


Reading of deposition of Tim Kline           140

Bryan Sheldon:

Direct examination by Mr. Crocenzi           144
Cross examination by Mr. Saltz               160
Redirect by Mr. Crocenzi                177, 191
Recross by Ms. Saltz                         190

1          **P R O C E E D I N G S**

2          (Civil jury selection from 9:30 to 10:40

3     a.m.)

4          THE COURT: Is counsel satisfied with jury

5     selection and prepared to proceed with trial?

6          MR. CROCENZI: Yes, Your Honor.

7          MS. SALTZ: The defense is, Your Honor.

8          THE COURT: Very good.  Ms. McKinney, would

9     you swear in the jury?

10         (The jury was sworn at 10:41 a.m.)

11         THE COURT: Ladies and gentlemen, for those

12    of you who were not selected, please again thank

13    you for your participation in today's voir dire

14    process.  I would ask you at this time to return

15    to the seventh floor.  Please make sure you

16    bring with you all of your belongings, and thank

17    you for your participation.  You will receive

18    further instructions on the seventh floor.

19         (Brief pause.)

20         THE COURT: Counsel, I have some preliminary

21    instructions that I will give to the jury.  Then

22    we will take a break and start with opening

23    statements.

24         MR. CROCENZI: Thank you.

25         MS. SALTZ: Thank you, Your Honor.

1        THE COURT: Ladies and gentlemen, you have

2   now been sworn in as the jury in this case, and

3   before we begin the trial itself I have some

4   preliminary instructions about these proceedings

5   and about your conduct and duties as jurors.

6   The case will proceed as follows.  First each

7   side may make opening statements.  What is said

8   in opening statements is not evidence but is

9   simply an outline to help you understand what

10  each party expects the evidence to show.

11       A party is not required to make an opening

12  statements.  After the opening statements

13  counsel for Mr. Shaw will present evidence in

14  support of Mr. Shaw's claims, and counsel for

15  Cumberland Truck Equipment Company may cross

16  examine the witnesses presented by Mr. Shaw.

17  At the conclusion of Mr. Shaw's case counsel for

18  Cumberland Truck Equipment Company may introduce

19  its evidence and counsel for Mr. Shaw may cross

20  examine witnesses that are introduced by

21  Cumberland Truck Equipment Company.  The parties

22  in this case may present the testimony of a

23  witness by reading from their deposition

24  transcript.

25       A deposition is the sworn testimony of a

1   witness taken before trial, and it is entitled

2   to the same consideration as if the witness had

3   testified at trial.  After all of the evidence

4   is presented counsel may make closing arguments

5   explaining what they believe the evidence has

6   shown.  What is said in closing arguments is not

7   evidence.

8        Finally, I'll instruct you on the law that

9   you are to apply in reaching your verdict and

10  you will then decide the case.  By your verdict

11  you will decide disputed issues of fact.  I will

12  decide all questions of the law that arise

13  during the course of the trial.  Before you

14  begin your deliberations at the close of the

15  case I will instruct you in more detail on the

16  law that you must follow and apply.  It will be

17  your duty to find from the evidence what the

18  facts are.  You and you alone will be the judges

19  of the facts.  You will then have to apply those

20  facts to the law as the court will give it to

21  you, and you must follow that law whether you

22  agree with it or not.

23       The evidence from which you will find the

24  facts will consist of the testimony of the

25  witnesses, the documents and other things

1   received into the record as exhibits, and any

2   facts that the lawyers agree to, or stipulate

3   to, or that the court may instruct you to find.

4   When I said admitted into evidence or received

5   into evidence, I mean that the particular

6   statement or exhibit may be considered by you in

7   making the decisions that you must make at the

8   end of the case.

9        When I have sustained an objection I am

10  excluding that evidence from this trial for a

11  good reason.  When you hear that I have

12  overruled an objection I am permitting that

13  evidence to be admitted.  If you are instructed

14  that some item of evidence is received only for

15  a limited purpose, you must follow that

16  instruction.  Certain things are not evidence

17  and must not be considered by you.  First,

18  statements, arguments, and questions by lawyers

19  are not evidence.  Second, objections to

20  questions are not evidence.  Third, testimony

21  that the court has excluded or told you to

22  disregard is not evidence and must not be

23  considered.  Fourth, anything that you may have

24  seen or heard outside the courtroom is not

25  evidence and must be disregarded.  You are to

1   decide the case solely on the evidence presented

2   here in the courtroom.

3       Because you will be asked to decide the

4   facts of this case you should give careful

5   attention to the testimony and evidence as it is

6   being presented.  At the end of the trial you

7   will have to make your decision based on what

8   you recall of the evidence.  If you are unable

9   to hear a witness or a lawyer, please raise your

10  hand immediately and I will see that this is

11  corrected.  If you wish, you may take notes

12  during the presentation of the evidence, the

13  summations of the attorneys, and at the

14  conclusion of evidence and during my

15  instructions to you on the law.

16      My courtroom deputy will arrange for pens,

17  pencils, and paper, and remember that your notes

18  are for your own personal use.  They are not to

19  be given or read to anyone else.  As you can see

20  we have a court reporter here who will be

21  transcribing the testimony during the course of

22  the trial, but you will not have a written

23  transcript to consult during your deliberations.

24  Therefore please pay close attention to the

25  testimony as it is given.  You should not

1   consider your notes that you or your fellow

2   jurors may take as some sort of written

3   transcript.  Instead, as you listen to the

4   testimony keep in mind that you will be relying

5   on your recollection of that testimony during

6   your deliberations.

7      There are some other specific points to

8   keep in mind about note taking.  First, note

9   taking is permitted, not required.  Each of you

10  may take notes, but no one is required to take

11  notes.  Second, be brief.  Do not try to

12  summarize all the testimony.  Notes are for the

13  purpose of refreshing your memory.  They are

14  particularly helpful when dealing with

15  measurements, times, distances, identities, and

16  relationships.  Overuse of note taking may be

17  distracting.  You must determine the credibility

18  of witnesses, so you must observe the demeanor

19  and appearance of each person on the witness

20  stand.  Note taking must not distract you from

21  that task.

22     If you wish to make a note, you need not

23  sacrifice the opportunity to make important

24  observation.  You may make your note after

25  having made an observation.  Also, do not use

1    your notes or any other jurors' notes as

2    authority to persuade fellow jurors in your

3    deliberations.  Give no more or less weight to

4    the views of the fellow juror because that juror

5    did or did not take note.  Your notes are not

6    official transcripts.

7         They are not evidence and they are by no

8    moans a complete outline of the proceedings or a

9    list of the highlights in the trial.  They are

10   valuable, if at all, only as a way to refresh

11   your memory.  Your memory is what you should be

12   relying on when it comes time to deliberate and

13   render your verdict in this case.  You therefore

14   are not to use your notes as authority to

15   persuade fellow jurors of what the evidence was

16   during the trial.  Notes are not to be use in

17   place of the evidence.

18        Fourth, and finally, do not take your notes

19   away from court.  When the court is in recess

20   for a break or for lunch, take your notes with

21   your to the jury room.  If you leave the

22   building your notes must remain in the jury

23   room, and at the end of each day my courtroom

24   deputy will secure your notes overnight and

25   return them to you the following morning.  When

 1    this case ends after you have had an opportunity

 2    to use your notes during the course of

 3    deliberations a court officer will collect and

 4    destroy them to protect the secrecy and

 5    integrity of your deliberations.

 6        Ladies and gentlemen, it will be up to you

 7    to decide which witnesses to believe, which

 8    witnesses not to believe, and how much of any

 9    witness's testimony to accept or to reject.  I

10    will instruct you at the end of the trial about

11    determining the credibility or the believability

12    of the witnesses.  During the trial please keep

13    an open mind, and you should not form or express

14    any opinion about the case until you have heard

15    all of the testimony and all of the evidence,

16    the closing arguments, and my instructions to

17    you on the law.  From time to time during the

18    course of the trial I may make rulings on

19    objections or motions.  Lawyers have a duty to

20    object when the other side offers testimony or

21    evidence that the lawyer believes is not

22    admissible at trial.

23        You should not be unfair or partial against

24    a lawyer or the lawyer's client because the

25    lawyer has made objections.  If I sustain or

1    uphold an objection to a question that goes

2    unanswered by the witness, you should not draw

3    any inferences or conclusions from the question

4    itself.  You should not infer or conclude from

5    any ruling or other comment that I may make that

6    I have any opinions on the merits of this case

7    favoring one side or the other.  I do not favor

8    one side or the other.

9         Nothing that the court may say or do during

10   the course of the trial is intended to indicate

11   or should be taken by you as indicating what

12   your verdict should be.  During the trial it may

13   be necessary for me to speak with counsel out of

14   your hearing either by having a conference at

15   the bench while you're present in the courtroom

16   or by calling a recess.  The purpose of these

17   conferences is to decide how certain evidence is

18   to be treated under the rules of evidence and to

19   avoid confusion and error.  We will do our best

20   to keep the number and length of these

21   conferences to a minimum, but my main point in

22   raising this is there may be some need for

23   flexibility on your part so that we can address

24   these evidentiary issues.  If we do ask you, if

25   we do take a recess and ask you to wait in the

1    jury deliberation room, please keep in mind that

2    we are in the courtroom working while you are

3    not here and we're doing our level best to move

4    this case forward as expeditiously as possible

5    within the confines of the rules of evidence.

6        Finally, to ensure fairness you as jurors

7    must obey the following rules.  First, do not

8    talk among yourselves about this case or about

9    anyone involved in it until the end of the case

10   when you go into the jury room to decide on your

11   verdict.  Second, do not talk with anyone else

12   about this case or about anyone involved in it

13   until the trial has ended and you have been

14   discharged as jurors.  Anyone else includes

15   members of your family and your friends.  You

16   may tell people that you are a juror, but do not

17   tell them anything else about the case, and you

18   can tell them that you have a very strict

19   presiding judge who requires you to obey that

20   order, and this is a fairly new instruction, but

21   you may also not communicate about this case via

22   the internet, you may not blog or tweet about

23   the case or events surrounding the case or your

24   jury service.

25        Do not send an e-mail to anyone conveying

1    your jury experience or information about this

2    case, and do not use Facebook or other social

3    networking websites to discuss your jury service

4    or issues involved in this case, and I can

5    assure you that if you do, the attorneys will

6    find out about it and then I'll find out about

7    it.  If anyone should try to talk to you about

8    the case please bring it to my attention

9    promptly.

10          Third, during the trial you should not

11   speak to any of the parties, lawyers, or

12   witnesses involved in this case about any

13   subject.  You should not even pass the time of

14   day with them.  Any contact between you and an

15   individual associated with a party in this case

16   may be interpreted, rightly or wrongly, as

17   reflecting an improper prejudice against the

18   other side, and you must take care to avoid

19   this.  Please keep in mind that the individuals

20   associated with this case, including the

21   parties, witnesses, and lawyers are subject to

22   the same rules.  So when you see them at a

23   recess or pass them in the hallway or outside

24   the courthouse and they do not speak to you,

25   they are not being rude or unfriendly.  They are

1   simply following my instructions.

2      Fourth, do not listen to any news stories

3   or articles about this case or anyone involved

4   in it.  Fifth, do not undertake any research or

5   make any investigation about this case on your

6   own.  This includes research via the internet.

7   Many of you have cell phones, blackberries, or

8   other handheld devices that may allow you to

9   access websites, including Google.  You may not

10  use these devices or websites to do your own

11  research about matters discussed in court, and

12  the purpose of this instruction is not to

13  withhold any information from you.

14      There are many rules that govern what

15  evidence the parties may present to you, and

16  you must decide this case based solely on the

17  evidence that those rule allow you to hear.  So

18  to reiterate, do not perform any research on

19  your own, including research from online

20  sources.  Finally, do not form any opinion until

21  all of the evidence is in.  Do not allow

22  sympathy or prejudice to influence you.  The law

23  demands that you consider all of the evidence

24  presented and that you render solely on the

25  basis of that evidence a just verdict according

1  to the instructions that I give you.  Keep an

2  open mind until you start your deliberations at

3  the end of the case.

4      This is a civil case.  Mr. Shaw is the

5  party who brought this lawsuit.  Cumberland

6  Truck Equipment Company is the party against

7  whom the lawsuit has been filed.  Mr. Shaw has

8  the burden of proving his case by what is called

9  the preponderance of the evidence.  That means

10  that Mr. Shaw must prove to you in light of all

11  of the evidence that what he claims is more

12  likely so than not so.  To say it differently,

13  if you were to put the evidence favorable to

14  Mr. Shaw and the evidence favorable to

15  Cumberland Truck Equipment Company on opposite

16  sides of the scales of justice, Mr. Shaw would

17  have to make the scales tip somewhat on his

18  side.  If Mr. Shaw fails to meet this burden the

19  verdict must be for Cumberland Truck Equipment

20  Company.

21      You may have heard the term beyond a

22  reasonable doubt.  That is a stricter burden of

23  proof that applies to criminal cases.  It does

24  not apply in civil cases such as this, so you

25  should put it out of your mind.  In this case

1    Mr. Shaw claims that Cumberland Truck Equipment

2    Company discriminated against him on the basis

3    of a perceived disability, failed to accommodate

4    that disability that it perceived him as having,

5    and retaliated against him for requesting

6    accommodation.

7         Cumberland Truck Equipment Company denies

8    Mr. Shaw's allegations.  I will give you

9    detailed instructions on the law at the end of

10   the case.  For now just keep in mind that at the

11   end of the trial you will be asked to resolve

12   whether Cumberland Truck Equipment Company

13   engaged in action that was adverse to Mr. Shaw

14   as a result of perceived disability or as an act

15   of retaliation for Mr. Shaw's request for

16   accommodation.  The trial will begin immediately

17   after our break, and as I said I anticipate that

18   it will last three to four days.  I want to

19   before excusing you for a brief break give you

20   some idea of our schedule.  We will return with

21   opening statements by the parties, and then I

22   assume we will be taking a lunch break.  Our

23   lunch break will be taken at approximately 12:15

24   for about an hour, and we'll do that each day.

25        We will take a 15-minute break in the

1   morning and a 15-minute break in the afternoon.

2   The morning break will be at approximately

3   10:30.   The afternoon break will be at

4   approximately 2:30 or 3:00.   We'll conclude each

5   day at approximately 5:00, and that depends on

6   where we are with a particular witness.   If we

7   finish a witness at 4:45 we may not put another

8   witness on the witness stand depending upon the

9   anticipated length of that particular

10  individual's testimony.

11          Tomorrow we will be starting at 9:00 a.m.,

12  and every day thereafter we will be starting at

13  9:00 a.m.   So please try to arrive in the jury

14  deliberation room at approximately 8:45 and give

15  yourself some time for to deal with traffic

16  situations, and I recognize that some of you are

17  traveling from some distance and we very much

18  appreciate that, and if you run into an unusual

19  circumstance, please don't speed, drive safely,

20  and we'll wait for you, believe me, if we need

21  to.   So that is our anticipated schedule.   That

22  will give you an opportunity to contact any

23  family members either during this break coming

24  up or over the lunch hour or when you arrive at

25  home at the end of today's proceedings and give

1    them some idea as to what they can anticipate in

2    terms of your absence from home or from

3    employment.

4        At this time we'll take a 15-minute break.

5    We'll return at 11:20 for opening statements of

6    the parties.  Ms. McKinney, at this time you may

7    escort the jury.  Ladies and gentlemen, please

8    make sure that you have all your belongings in

9    the courtroom, and Ms. McKinney will take you to

10   your new sort of home base for the next several

11   days.  Ms. McKinney, please escort the jury.  We

12   are in recess until 11:20.  Counsel, please

13   stay.

14       (Jury recessed at 11:01 a.m.)

15       THE COURT: Counsel, I just wanted to ask if

16   you have any demonstrative exhibits for purposes

17   of your opening statements, have you had an

18   opportunity to exchange them with each other or

19   view them, and are there any issues with respect

20   to the demonstrative exhibits?

21       MR. CROCENZI: The one I want to show the

22   jury is Mr. Shaw's last performance evaluation.

23   Defense counsel, she didn't seem to have any

24   objection to that.

25       THE COURT: All right.

1        MR. CROCENZI: Also I just was reminded that

2    I will be referencing page 22 of Tim Kline's

3    deposition transcript.  If you recall Mr. Kline

4    passed away --

5        THE COURT: Is deceased.

6        MR. CROCENZI: -- and we will be reading his

7    transcript.  There are portions that we have not

8    been able to agree on and we need a ruling on

9    some objections by defense counsel, but that

10   page is not part of that problem.

11       THE COURT: All right, understood, and

12   Ms. Saltz?

13       MS. SALTZ: I guess I'm a little confused.

14   That's not part of the opening then, that page?

15       THE COURT: That page is, but the pages that

16   involve instructions, involve disputes are not

17   part of the opening.

18       MS. SALTZ: I would have an objection to

19   actually reading from the transcript until the

20   transcript has been introduced into evidence and

21   the jury has heard it.  I have no problem with

22   referencing what the information is contained in

23   it, but I do have an action to actually reading

24   from the dependent transcript in the opening.

25       THE COURT: All right.  I don't see any

1  problem with it.  I'm going to allow it, given

2  the fact that this particular page of the

3  transcript is not subject to an objection.  So I

4  will allow it.  And, Ms. Saltz, do you have any

5  exhibits that you intend to use during the

6  course of your openings?

7       MS. SALTZ: No Your Honor.

8       THE COURT: All right.  Very good.  We're in

9  recess until 11:20.  Oh, counsel?  No more than

10 45 minutes for an opening.

11      MR. CROCENZI: Oh, my.  That's not going to

12 be a problem.

13      MS. SALTZ: That won't be a problem.  Thank

14 you, Your Honor.

15      (Recess taken from 11:03 to 11:25 a.m.)

16      THE COURT: Please be seated.  Ladies and

17 gentlemen, as I indicated to you before our

18 recess now is the time for opening statements of

19 the parties.  The party who bears the burden of

20 proof in this case, the plaintiff, will proceed

21 first, and therefore the court will turn to

22 Mr. Crocenzi and invite him to address the jury.

23 Mr. Crocenzi, you may now address the jury.

24      MR. CROCENZI: Thank you, Your Honor.  May

25 it please the court, counsel, ladies and

1   gentlemen of the jury.  Good morning.  This case

2   is about a guy who was a hardworking, valuable

3   employee until his employer, without any warning

4   to him, told him to go home and shut him out of

5   work.  This guy liked to work, he wanted to

6   work, he was able to work until his employer's

7   false fears ended it all. This case is about our

8   guy Mr. Shaw and how his employer, Cumberland

9   Truck Equipment Company, violated the Americans

10  With Disabilities act and shut him out of work.

11       It's February 2007, and Ricky is a

12  warehouse worker at Cumberland Truck's location

13  in Carlisle.  Cumberland Truck sells truck

14  parts.  Ricky works in what is called Warehouse

15  B, because there are two warehouses at the

16  Carlisle location.  Ricky had been working as a

17  warehouse worker at Carlisle for approximately

18  six and a half years.  Ricky's primary job is to

19  take incoming products and put it in the right

20  place in the warehouse and keep the warehouse

21  organized.  He's on the forklift about half the

22  day.

23       Now, Ricky's knees are not normal.  He has

24  arthritis, but the arthritis doesn't prevent him

25  from working full-time.  He adapts, he climbs

1   stairs more cautiously, he uses the cane in the

2   morning to help him get around.  You will hear

3   that his supervisors thought he was doing a good

4   job, they were giving him good performance

5   evaluations, and nobody had an issue with

6   Ricky's job productivity.  That is until one

7   member of the Cumberland Truck management team

8   incorrectly assumed that Ricky was a danger to

9   himself and others in the work place.

10      You will meet Charles Hoffman, who is the

11  director of parts operations at Cumberland Truck

12  and a member of that Cumberland Truck management

13  team.  Mr. Hoffman oversees the warehouse

14  operations at Cumberland Truck.  Mr. Hoffman

15  doesn't work in the warehouse.  He works in an

16  office across the parking lot from the

17  warehouse.  In January, February of 2007

18  Mr. Hoffman sees Ricky walking across the

19  parking lot from Warehouse B to the office,

20  and Mr. Hoffman forms an impression that Ricky

21  is struggling to make it across.

22      He also then forms an impression that Ricky

23  cannot do his job as a warehouse worker and is a

24  danger to himself and others in the warehouse.

25  Now, Judge Conner at the end of this case will

 1    give you certain instructions about the law, and

 2    one of those instructions will be that the

 3    Americans With Disabilities Act, what we call

 4    the ADA, makes it illegal for an employer to

 5    prevent an employee from working based on that

 6    employer's false fears or perceptions that an

 7    employee has substantial difficulty performing

 8    a major life activity like walking or working.

 9    We believe we will prove during this trial that

10    Cumberland Truck had false fears, false

11    impressions about Ricky's ability to walk and

12    work.

13         So what did Mr. Hoffman and the Cumberland

14    Truck management team do?  You will hear

15    testimony from Mr. Hoffman that he then went to

16    go see Bryan Sheldon, who is the corporate

17    controller for Cumberland Truck and also

18    oversees the human resources department at the

19    company.  Mr. Sheldon, without even talking to

20    Ricky about his ability to do this job in the

21    warehouse, just sends, agrees to send him, makes

22    a decision to send him for a physical

23    examination at Concentra Medical Center in

24    Mechanicsburg.  That's where Cumberland Truck

25    sends its employees for pre-employment

physicals.

     So on February 26th, 2007 Ricky shows up
for work at Warehouse B just like any other day
and plans to put in a full day, just like he has
been for the last six and a half years.  When he
arrives at work he is greeted by Brenda Hoffman.
Brenda Hoffman is the director of human
resources at the company and she reports
directly to Bryan Sheldon.  She tells Ricky that
he needs to go for a physical examination at
Concentra immediately.  Ricky thinks this is a
strange request, because nobody at Cumberland
Truck has told him that he is having difficulty
doing his job and Ricky doesn't think he is
having any problems doing his job.

     Well, like a good employee he goes, he
takes a form with him that Brenda Hoffman gave
him, and he shows up at the Mechanicsburg
Concentra location.  Now, at Concentra he is
examined by a physician's assistant.  The
physician's assistant goes over some of the job
duties with Ricky and then performs a short
physical examination of Ricky.

     Ricky takes a form with him back to
Cumberland Truck and when he arrives he's

1  promptly greeted by Brenda Hoffman.  She tells

2  him that in Cumberland Truck's opinion that he

3  has failed the physical, that he is no longer

4  able to work, and that he needs to go home and

5  apply for short term disability benefits.  Ricky

6  is shocked.  He cannot believe that he failed a

7  physical examination for a job he has been

8  performing for so long and so well according to

9  his supervisors.

10      At the end of this case Judge Conner will

11  also instruct you that Ricky has the burden of

12  proof that he was able to do the essential

13  functions of his job with or without an

14  accommodation.  So we're going to take a close

15  look at what information Cumberland Truck

16  provided to Concentra Medical Center in February

17  of 2007, and we're also going to take a closer

18  look at what happened during the physical exam

19  in February and two other examinations that

20  occurred in April of 2007 and September of 2007.

21      Throughout this trial there will, you're

22  going to see evidence like this, a job analysis

23  or a job description, and this is the form that

24  Cumberland Truck provided to Concentra for them

25  to review with Ricky when they sent him there on

1    February 26th, 2007.  We believe we will prove

2    that this job analysis is inaccurate.  It did

3    not match all of the job duties and the actual

4    job duties that Ricky was performing on a

5    day-to-day basis.  You will hear testimony that

6    this job analysis was developed by a few members

7    of the Cumberland Truck management team.  They

8    did not ask Ricky for any input.  They did not

9    ask any warehouse worker for input.  They did

10   not even ask the supervisor of the warehouse for

11   any input in developing this form, and this is

12   the only information that Cumberland Truck

13   provided to the medical providers at Concentra.

14   We believe that this is frankly bogus and

15   doesn't match anything that Ricky did at the job

16   in an accurate fashion.

17        So what else happened at these Concentra

18   exams?  We will prove that Cumberland Truck

19   didn't provide any type of weights or

20   representative materials to Concentra so they

21   could have Ricky lift them.  He didn't lift

22   anything during that exam.  He didn't carry

23   anything during that examination.  The

24   physicians at Cumberland Truck -- or Concentra

25   didn't send him for what's called a functional

1    capacity evaluation to measure his physical

2    capabilities.  Again they were only looking at a

3    job analysis form that we believe does not

4    accurately and does not match Ricky's actual job

5    duties on a day-to-day basis.  We're also going

6    to show you this exhibit during this trial.  I

7    should have moved that before I put it on.  All

8    right.  There we go, sorry about that.  This is

9    Ricky's last performance evaluation.  Mr. Kline,

10   who was Ricky's direct supervisor in the

11   warehouse, completed and reviewed the

12   application with Ricky on January 10th, 2007.

13        You will see that Mr. Kline gave Ricky good

14   or very good marks in all eleven categories.  In

15   the productivity category, which is supposed to

16   evaluate an employee's volume of work

17   efficiently in a specified period of time,

18   Mr. Kline says, "Gets done what he physically

19   can," but if you notice he puts down a score of

20   79, which is at the top end of the good

21   category, and there is nothing in this job

22   performance evaluation which indicates that

23   Ricky is having any physical problems performing

24   his job as a warehouse worker in Warehouse B.

25        Now, tragically Mr. Kline died last year,

1   but before he passed away we were able to take

2   his testimony under oath at a deposition at my

3   office on January 12th, 2010, and we're going to

4   be reading this deposition transcript into the

5   record for you at some point during this trial.

6   So after Brenda Hoffman tells Ricky that he's no

7   longer able to work at Cumberland Truck, that he

8   needs to apply for short term disability

9   benefits, Ricky goes home the next day and takes

10  a look at the paperwork that Mrs. Hoffman gave

11  to him.

12       He thinks about his options, and Ricky is a

13  hard worker.  He knows he can do this job just

14  like he has been for the last six and a half

15  years.  He declines to take the short term

16  disability benefits.  So what does Ricky do?

17  Ricky will tell you that the next day he shows

18  up for work at Warehouse B just like any other

19  day.  The guy wants to work.  He likes working

20  at Cumberland Truck.  He's able to work at

21  Cumberland Truck.  He works there for about an

22  hour and a half until the Cumberland Truck

23  management team tells him to go home once again.

24       He hasn't been back to work at Cumberland

25  Truck since.  Ricky is very frustrated at this

1    point.  He knows he can do this job.  He knows

2    that he just needs to get the accurate

3    information to Concentra.  So he fires off a

4    letter to Cumberland Truck Equipment Company,

5    and you're going to see a copy of that letter

6    during the course of this trial, and in that

7    letter Ricky tells Cumberland Truck that look,

8    just have this Cumberland Truck job analysis

9    form match my actual job duties.  Cumberland

10   Truck refuses to do it.  This is what the law

11   calls a request for a reasonable accommodation.

12   Cumberland Truck refuses.  They tell him he

13   still needs to apply for that short term

14   disability benefit because that's the only money

15   he's going to get from them.  He's not going to

16   be able to earn a paycheck because he's not

17   working.

18        Ricky will tell you that he steadfastly

19   refused to apply for that short term disability

20   benefits for a number of weeks, but by the, by

21   April of 2007 Ricky, without a paycheck, is

22   having his bills pile up on him, and he needs to

23   do something.  So Ricky will tell you that he

24   really had no choice at that point because

25   Cumberland Truck was shutting him out, so he

1   applied for the short term disability benefit.

2   He first goes back to Concentra thinking they'll

3   fill out the physician part of the form for him,

4   but they refuse and say no, we're not going to

5   do it.  So Ricky will tell you that he went to

6   see his orthopaedic physician, Dr. Oplinger, at

7   Appalachian Orthopaedics.  Dr. Oplinger had been

8   treating Ricky for his knee condition for a few

9   months.  Ricky sends the form to Dr. Oplinger

10   with a letter explaining his situation and

11   asking Dr. Oplinger, "Can you fill out this form

12   for me?  I'd appreciate it."

13        Dr. Oplinger up until this point had not

14   disabled Ricky from work.  He had not placed any

15   restrictions on him.  But when Dr. Oplinger gets

16   the form, he fills it out for Ricky indicating

17   that Ricky is capable of performing sedentary

18   work or sit down work, and Ricky qualifies and

19   receives the short term disability benefit.

20   Because Ricky is still not permitted to go back

21   to work for Cumberland Truck Ricky decides well,

22   better look for work some place else.

23        So he tries.  Applies for a few jobs, he

24   goes back to the employment agencies where he

25   had worked through prior to landing his job at

1   Cumberland Truck.  He's not offered any

2   employment.  There's nothing available for him,

3   and Ricky will tell you that it's tough for a 55

4   Year Old Army grunt to find a job in this tough

5   economy.  The short term disability benefits

6   were going to end in a year.  Ricky will testify

7   that toward the end of that year he was once

8   again facing financial distress.  So he once

9   again analyzes his options.  He had gone to a

10  physical exam at Concentra in April of 2007 and

11  once again in September of 2007, but because

12  Cumberland Truck only said this is what you have

13  to look at, doctors and nothing else, it was a

14  foregone conclusion that Ricky wasn't going to

15  pass that physical and he wasn't going to be

16  permitted to work at Cumberland Truck.  They

17  were a foregone conclusion.

18       Ricky decides that he needs to apply for

19  social security disability benefits from the

20  federal government.  He completes the

21  application and some questionnaires, submits the

22  claim, and the federal government grants it.

23  Now, Cumberland Truck will argue that when Ricky

24  applied for social security disability that his

25  damages in this case should be cut off at that

1  point because he was, he claims that he was

2  unable to work, but we're going to take a look

3  at the social security disability application

4  and paperwork, and nowhere on there does Ricky

5  say, "I'm totally disabled, I can't work at

6  all," and the judge, Judge Conner will instruct

7  you at the end of the case that Ricky is able to

8  receive social security disability benefits and

9  also recover money in this lawsuit so long as

10 Ricky is able to explain his representations or

11 comments to the social security disability

12 administration.

13      Again we will show that there is no

14 conflict and that Ricky never indicated to them

15 that he was unable to work in any capacity.

16 Ricky served our country faithfully for 21 years

17 as an infantry man in the Army, serving both

18 stateside and overseas.  When he retired from

19 the Army he settled in Carlisle.  He bounced

20 around for, with a few temporary jobs or through

21 temporary agencies until he landed this job at

22 Cumberland Truck.  It was a great fit for Ricky.

23 He was good at it.  He liked to work there.  He

24 wanted to work there.  He was able to work

25 there.  He planned to work there until he

1    retired.

2        Ricky hasn't lived an extravagant

3    lifestyle, but he carved out a good life for

4    himself after he retired from the Army, a life

5    that included working at Cumberland Truck, a

6    part of his life at Cumberland Truck snuffed

7    out.  My co-counsel Pete Russo, who you met

8    earlier during voir dire, will be back up at the

9    end of this trial during closing arguments and

10   he will ask you to return a verdict for Ricky.

11   Thanks again for your time and your attention.

12       THE COURT: Thank you, Mr. Crocenzi.

13   Ms. Saltz, you may address the jury.

14       MS. SALTZ: Thank you, Your Honor.  Ladies

15   and gentlemen, good morning.  One thing, counsel

16   don't often agree on many things, that's why

17   we're on opposite ends of this case, but the one

18   thing that Mr. Crocenzi and I will agree on, and

19   that is that Ricky Shaw is a good worker.  He's

20   a hard worker.  Cumberland liked Ricky Shaw.  He

21   was a knowledgeable employee.  He did a great

22   job.  Also I should take this moment to thank

23   him for the service on behalf of Cumberland and

24   myself that he gave to his country.  Honest guy.

25   Hardworking guy.  Good guy.  Cumberland wanted

1   Ricky Shaw as an employee.

2       In fact, let's take this story back to when

3   Ricky first came to Cumberland and he was

4   offered a job as a warehouse worker.  It's a

5   heavy truck parts warehouse, and you're going to

6   hear testimony of what goes on in that

7   warehouse. The carrying, the lifting, the

8   climbing, the bending, the squatting, and when

9   he came to Cumberland his employment was

10  conditioned on a physical, and he took that

11  physical and the physical came back and it

12  showed that he had no depth perception in the

13  left eye and little vision in the left eye.

14      When that information was given to Brenda

15  Hoffman, because his employment was contingent

16  on that physical she said it's not part of the

17  responsibilities or duties, we want to hire this

18  employee, and they hired Ricky Shaw.  Soon after

19  Ricky started working in the warehouse he had an

20  accident, a work accident.  He had to go out on

21  medical leave.  When he returned from medical

22  leave released by the physician the company

23  worked with him to get him to where he needed to

24  be back to full duty again.

25      This is back in about 2000, and Cumberland

1  Truck had benefits that they gave to their

2  employees.  They have benefits that are required

3  by law, which is something you may or may not

4  have heard of, the Family Medical Leave Act,

5  which protects the employee's job when they're

6  taking care of someone, a family member that may

7  be ill or having an illness themselves.  They

8  also offer their employees disability benefits,

9  again in the event of something happens that

10 they have some sort of income.

11     Well, sadly in 2005 Ricky had, his wife was

12 ill and Brenda Hoffman had given him the form

13 for the Family Medical Leave Act in the event he

14 needed to take care of her.  So these were not

15 new forms that he had not seen before.  This is

16 something the company has offered and has to

17 offer according to law, and also the disability

18 benefits they choose to offer their employees.

19 Ricky Shaw worked in the warehouse, as we said a

20 knowledgeable, hard worker.

21     Never did he tell anyone in 2006, 2007,

22 that he had any kind of medical condition.

23 Never told management that he needed any kind of

24 accommodation.  He just kept on doing his job.

25 At certain different points in the very first

1  period at the end of 2006 you will hear from the

2  evidence, and early 2007, he was observed by

3  different managers on different occasions, slow

4  reflexes, looking like he was struggling.

5  Mr. Hoffman we will hear from, his window sits,

6  faces the parking lot, and you have the

7  warehouse to your right about eighty feet

8  distance, and then you have the main building.

9  About half a dozen times he saw Mr. Shaw

10 struggling to walk across eighty feet.

11     It was difficult for him, and that's what

12 he observed.  He didn't have any perception, he

13 didn't know anything about his medical

14 condition.  In fact, none of the managers did.

15 Ricky never revealed anything about, you know,

16 if he was having an issue with his knees or

17 anything else,  asking for any type of

18 accommodation, but he was observed struggling,

19 observed struggling walking across that parking

20 lot.

21     Finally by the sixth time Mr. Hoffman spoke

22 to Mr. Whitmire, who you will hear from, and

23 they went to Mr. Sullivan concerned.  Concerned

24 for Mr. Shaw.  Now, because usually employees

25 will come and say hey, I'm having a difficulty

 1    here, a medical issue or whatever, I need a

 2    little accommodation or this is what's going on,

 3    but Mr. Shaw never did, and they were confronted

 4    with a situation what do we do with an employee

 5    that is liked, is respected, is a hard worker,

 6    but apparently now just by observation they

 7    didn't know anything other than what they saw

 8    was struggling to walk across eighty feet of a

 9    parking lot, coming into a building and sitting

10    down, sitting on a forklift when asked to get

11    products and saying someone else can get that

12    product.

13          Something was going on here.  Well,

14    Cumberland Truck is in the business of heavy

15    truck parts.  They're not medical professionals.

16    They didn't know what was happening, but what

17    they had was Mr. Shaw's best interests in mind.

18    They wanted to know is he okay, and also

19    considering the fact that he's dealing with

20    heavy truck parts they had to be concerned about

21    their other employees as well.  So not knowing

22    what was going on, only seeing that he was

23    struggling to walk, after advice from counsel,

24    after sitting in meetings and talking and

25    discussing what would be the best thing to do

1   for him, they decided they would let a medical

2   doctor make the determination, and the job

3   description that Mr. Crocenzi talked about has

4   two parts it, as most job descriptions do,

5   especially when you're dealing with warehouse

6   work.  You have the written out duties of a job

7   description, and then you have the physical

8   requirements of a job description.

9          Now, there will be testimony from Mr. Shaw

10   that he did not want the physical duties of that

11   job description changed.  When he said he wanted

12   that job description to match, he wanted the

13   things that he had become more in terms of doing

14   as far as the product itself, but not the

15   physical.  In fact, Mr. Shaw himself will

16   testify that, you know, he was able to pick up

17   140 pounds, 120 pounds.  So the job description

18   had a central component to it, and that was

19   based on management who worked in the warehouse

20   knowing what the physical requirements are of

21   that job, and you will hear about them, but it

22   was essentially lifting up to seventy pounds

23   frequently, as with any warehouse, climbing,

24   climbing portable stairs, climbing steps,

25   lifting, bending, squatting, walking, standing,

1    eight hours a day.

2        So they sent Mr. Shaw to Concentra and he

3    was examined by Dr. Walker, who went through the

4    physical requirements of the job description and

5    found that Mr. Shaw at that point, February

6    26th, 2007 was not able to do the essential

7    duties of his job.  He couldn't squat,

8    difficulty bending, climbing, he couldn't lift,

9    he couldn't carry, standing, walking.  They

10   provided that, Dr. Walker provided that

11   information to Brenda Hoffman, at which point

12   Ms. Hoffman told Mr. Shaw he would have to go

13   out on a medical leave of absence, and that was

14   based on what a medical doctor, after examining

15   him, determined, at which point Mr. Shaw was

16   given the forms for Family Medical Leave Act for

17   disability benefits.

18       These were benefits offered to him by the

19   company.  No nobody could force him to take the

20   benefits.  It was his choice.  They were

21   offered, the paperwork was offered to him.  They

22   wanted Mr. Shaw to come back.  You will hear,

23   you will see a lot of the information has been

24   documented in letters, both letters that

25   Mr. Shaw wrote to Cumberland and letters that

1    Ms. Hoffman wrote to Mr. Shaw, and in every

2    letter written to Mr. Shaw the company wrote,

3    "When your condition improves, come back."

4    Mr. Shaw's own doctor, Dr. Oplinger, who you

5    will see a video of, we're taking his testimony

6    tomorrow and we'll present it by video, filled

7    out a form in which he said that Mr. Shaw could

8    not stand, could not walk, could not carry,

9    could not lift.  All he could do is sit down

10   work.  Sedentary.  His own doctor.

11       Mr. Shaw went back again for a second

12   independent exam in April.  Again that exam

13   came back that he was unable to do the essential

14   duties, official duties of that job.  He went

15   back again in September, and again an

16   independent doctor said he just can't do it.

17   He can't stand for more than, you know, five

18   minute intervals, he can't walk, you know, more

19   than thirty minute intervals.  These are medical

20   doctors that made this decision.

21       Now, there's also been testimony that

22   Mr. Shaw had an opportunity to have a knee

23   replacement in April of `07 and chose to delay

24   that until `09 that could have brought him back

25   to work sooner.  At that point with him having

1   not been fit for duty they, Cumberland, kept his

2   job open.  They continued to keep his job open

3   for almost seven months.  The other employees in

4   the warehouse worked overtime to meet his duties

5   so that they were hoping that his condition

6   would improve and he could come back to work.

7   Now, Mr. Shaw also did apply for social security

8   benefits, and in that form in his own writing,

9   both handwritten and typewritten, he admitted

10  that he lost his job because of his bad knees

11  and bad back that prevented him from being able

12  to work per OSHA requirements.  He knew that.

13      Even in his letter to Cumberland early on

14  was the first time he disclosed what his medical

15  condition was and that he could never pass that

16  physical.  Now, as far as accommodation goes,

17  Mr. Shaw met with Mr. Sheldon at one point.  The

18  two of them met and they talked, and Mr. Sheldon

19  talked about possibly doing something else other

20  than the warehouse, and Mr. Shaw did not want to

21  hear of this.  He wanted his job in the

22  warehouse.  That's the job he wanted.  That's

23  the job he wanted to go back to, even though the

24  doctors said he couldn't do that job.  They

25  talked about the possibility, Mr. Sheldon then

1    offered to him take this job, just take the job

2    description to your doctor, have your doctor

3    tell Dr. Walker pick another doctor to have him

4    examined.  He didn't do that.  Mr. Shaw didn't

5    go to his doctor, who was an orthopaedic

6    surgeon, and say, "Hey, they're saying I can't

7    do this.  What do you think, Dr. Oplinger?  Can

8    I do this job?"  He didn't come back with that.

9        The reason?  Because Dr. Oplinger in April

10   of `07 said he can't do that job.  Right now

11   physically he could not meet those requirements.

12   The job was held open for seven months.  At the

13   end of that seven months Cumberland at that

14   point terminated Mr. Shaw's employment, and in

15   the letter that they sent him terminating his

16   employment they said to him, "When your

17   condition improves, any time your condition

18   improves, reapply.  Come back to us.  We want

19   you to come back as an employee," and he never

20   did.

21       Even after Mr. Shaw had knee replacement

22   surgery he never did come back.  There was no

23   accommodation other than having other people do

24   Mr. Shaw's job, and he didn't want to do a sit

25   down job.  He wanted to just work in the

1   warehouse, but to work in that warehouse based

2   on his not being able to, and you will hear the

3   testimony, to meet those physical requirements,

4   it could have endangered Mr. Shaw and it could

5   have endangered another employee.  It was almost

6   a powder keg to be waiting for that moment, and

7   that is what this case is all about, a

8   hardworking employee who management observed,

9   just observed, didn't know what the condition

10  was, having difficulty walking.  Sent him for a

11  medical exam to discover that he wasn't fit for

12  duty.  Wanted him to come back time, and time

13  and time again and even offered him to come back

14  at any time that his condition improved, and

15  that's the testimony of this case.  Thank you.

16      THE COURT: All right.  Thank you very much,

17  Ms. Saltz.  Ladies and gentlemen, we will take

18  our lunch break at this time.  We'll break for

19  an hour and fifteen minutes.  Please try to

20  return at approximately ten after 1:00, and

21  we'll reconvene at 1:15 for the first witness in

22  the case.  Please recall all of my earlier

23  instructions and refrain from any conversations

24  among yourselves or with anyone else about what

25  you have seen and heard so far.  As I said to

```
1    you earlier you will have that opportunity, but

2    not until the time of final deliberation.  We're

3    in lunch recess until 1:15.  Ms. McKinney, you

4    may escort the jury.

5         (Lunch recess from 11:58 a.m. to 1:20 p.m.)

6         THE COURT: Please be seated.  Mr. Crocenzi,

7    would you call your first witness?

8         MR. CROCENZI: Yes.  Charles Hoffman.

9         THE COURT: All right.  Mr. Hoffman, please

10   step forward.

11        MR. CROCENZI: Your Honor, I noticed that

12   there are other prospective Cumberland Truck

13   witnesses in the gallery and I would --

14        THE COURT: You request sequestration?

15        MR. CROCENZI: Yes.

16        THE COURT: Yes, Ms. Saltz, if you would

17   please ask the other witnesses to remain seated

18   outside.  Thanks very much.

19        (Charles Hoffman was called to testify and

20   was sworn by the courtroom deputy.)

21        COURTROOM DEPUTY: Please be seated and

22   state your full name for the record.

23        THE WITNESS: Charles J. Hoffman.

24        MR. CROCENZI:

25     Q. Good afternoon, Mr. Hoffman.
```

1      **A.** Hi.

2         MS. SALTZ: Your Honor, may I ask if

3    Mr. Crocenzi could just -- he's right in my line

4    of vision of the witness.  Thank you.

5         THE COURT: Ms. Saltz, please feel free to

6    move around the courtroom to the extent you need

7    to.

8         MS. SALTZ: Thank you, Your Honor.

9      **Q.** Mr. Hoffman, are you employed with

10   Cumberland Truck Equipment Company?

11     **A.** Yes.

12     **Q.** How long have you worked for Cumberland

13   Truck?

14     **A.** Ive worked for them two times actually.

15   Since 1998 recently.

16     **Q.** What was your position with the company in

17   2007?

18     **A.** I was director of parts operations.

19     **Q.** How long had you -- or had you held that

20   position by 2007?

21     **A.** How long?

22     **Q.** How long by that point?

23     **A.** Ten years.

24     **Q.** Now, what is the business of Cumberland

25   Truck Equipment Company?

1    A. Cumberland Truck is, we're a wholesale

2    distributor of truck parts, you know, the big

3    Class A trucks, and we have ten locations in

4    Pennsylvania and we were a wholesale

5    distributor, so we purchased from the

6    manufacturer and then we distribute that product

7    to garages and fleets and things like that.

8    Q. You primarily work at the Carlisle

9    location, is that right?

10   A. That's where my office is, yes.

11   Q. Was that your home office in 2007?

12   A. Yes.

13   Q. You directly oversee the warehouse

14   operations for Cumberland Truck, including the

15   warehouses at the Carlisle location?

16   A. I'm responsible for all the warehouse

17   operations, yes.

18   Q. You do not work in the warehouses, is that

19   correct?

20   A. Not on a daily basis, no.

21   Q. Now, in your position as director of parts

22   operation you reported directly to the owners of

23   Cumberland Truck, is that correct?

24   A. Yes.

25   Q. And you had people that reported to you at

1  that time in the organization, is that correct?

2  **A.** Yes.

3  **Q.** Did Mr. Kline report directly to you?

4  **A.** No.  He actually reported to Pat Whitmire.

5  **Q.** What was Mr. Whitmire's position in 2007?

6  **A.** He was the parts and logistics manager for

7  the Carlisle location, which is one of our ten

8  locations.

9  **Q.** How many warehouses were there at the

10 Carlisle location in 2007?

11 **A.** Two.

12 **Q.** Did you call them Warehouse A and

13 Warehouse B?

14 **A.** Yes.

15 **Q.** Warehouse B was the larger of the two

16 warehouses, is that correct?

17 **A.** Yes.

18 **Q.** And we've also mentioned Bryan Sheldon

19 earlier during opening statements.  Mr. Sheldon

20 is the corporate controller, is that right?

21 **A.** Yes.

22 **Q.** He was the corporate controller back in

23 `07, too?

24 **A.** Yes, did Mr. Sheldon.

25 **Q.** Did Mr. Sheldon report directly to the

1    owners like yourself?

2      A. Yes.

3      Q. Was there a management team at the Carlisle

4    location which consisted of you, Mr. Sheldon,

5    Mr. Whitmire, and Brenda Hoffman?

6      A. I'm not sure.  Not a team there, not in the

7    way that we like meet every week or anything

8    like that, no.  That wasn't a team.

9      Q. But those were the management personnel at

10    the Carlisle location?

11      A. Some of the management personnel, yes.

12      Q. Mrs. Hoffman was the director of human

13    resources --

14      A. Yes.

15      Q. -- in `07?

16      A. Yes.

17      Q. Is she related to you at all?

18      A. No.  I get that a lot though, right.

19      Q. All right.  You're familiar with Ricky

20    Shaw, is that correct?

21      A. Yes.

22      Q. And Ricky Shaw worked in Warehouse B at

23    Carlisle, is that correct?

24      A. That's correct.

25      Q. And by 2007 Ricky had been working at the

1  warehouse for about six, six and a half years,

2  is that right?

3    **A.** Yes, sounds about right.

4    **Q.** Mr. Kline worked in the warehouse with

5  Mr. Shaw on a daily basis, is that right?

6    **A.** Yes.

7    **Q.** Now, your office was not located in the

8  warehouse, it was on a different part of the

9  property of Carlisle, is that right?

10    **A.** That's correct, yes.  That was in the other

11  building.

12    **Q.** And there is a parking lot that separated

13  your office from Warehouse B, is that right?

14    **A.** That's right.

15    **Q.** Now, isn't it true that you would also

16  visit Warehouse B a couple of times a month, a

17  couple of times a month to check on things or

18  find something?

19    **A.** More than that, but yes, regularly.

20    THE COURT: I hate to interrupt, but could

21  you maybe give us a handle on where Warehouse A

22  was in relation to your office and Warehouse B,

23  or am I jumping ahead?

24    MR. CROCENZI: No, that's all right.  We'll

25  take it here, Your Honor.

1          THE WITNESS: They were right next to each

2     other.  Warehouse A had our corporate offices

3     and service department and some other things all

4     in one building, and then there was a sixty or

5     seventy foot long parking lot and then there's

6     another bigger warehouse where Ricky worked.  My

7     office was on the same side as Warehouse B, so

8     if I looked out my window I would be looking at

9     the other warehouse.  Is that kind of what

10    you're asking for?

11         THE COURT: What I'm wondering is --

12         THE WITNESS: I can draw it for you or

13    something.

14         THE COURT: -- did you work in Warehouse A?

15         THE WITNESS: No, I worked in the corporate

16    office.

17         THE COURT: Which is part of -- but

18    I thought --

19         THE WITNESS: It's in the same building as

20    Warehouse A.

21         THE COURT: Okay.  All right.

22         THE WITNESS: Yeah, it's all the same

23    building, yes.

24         THE COURT: That's what I thought.  Okay.

25         BY MR. CROCENZI:

1   Q. When you came over to Warehouse B you were

2   only there for short periods of time?  Five, ten

3   minutes?

4   A. Yeah, a few minutes at a time.

5   Q. Every time that you came over to Warehouse

6   B you wouldn't see Ricky, right?

7   A. No.

8   Q. There would be times that you would come

9   over and he was doing something and you didn't

10  see him?

11  A. That's true.

12  Q. Okay.  I'm going to show you what is marked

13  as Plaintiff's Exhibit 9.

14      (Brief pause.)

15  Q. This is titled "Job Analysis, Cumberland

16  Truck Equipment Company."  Do you see that,

17  Mr. Hoffman?

18  A. Yes.

19  Q. And you provided some input for this job

20  analysis form, is that right?

21  A. That's correct.

22  Q. And I believe you had provided information

23  on the tools, equipment utilized for the

24  position of warehouse workers, is that right?

25  A. That's correct.

1    Q. You also provided information regarding the

2    duties block, which is on page 1, is that right?

3    A. Yes.

4    Q. You didn't have any input regarding the

5    physical requirements which are listed at the

6    bottom of page 1 and through page 2, is that

7    right?

8    A. No.

9    Q. No, you didn't have any input or --

10    A. No, I didn't outline this document or

11    anything if that's what you're asking.

12    Q. That's what I'm asking.  Regarding the

13    physical requirements.

14    A. No.

15    Q. Okay.  When you provided some input on the

16    tools equipment utilized and the duties, did you

17    solicit any input from Ricky Shaw?

18    A. No.

19    Q. I'm going to turn your attention now to

20    January, February 2007.  Did you see Ricky

21    walking across that parking lot from Warehouse B

22    to your office building?

23    A. From time to time, yes.

24    Q. You saw him approximately six times, is

25    that right?

1    A. Well, I saw him many more times than that,

2    but a few times where I noticed that he was

3    taking a long time to come across the parking

4    lot.

5    Q. And is it your recollection that Ricky was

6    walking slow and with a limp?  Is that what you

7    recall?

8    A. He had a limp that I remember, yes, and he

9    was walking slow, yes.

10   Q. He wasn't using a cane, was he?

11   A. Not that I remember, no.

12   Q. And you didn't notice him taking any

13   breaks, did you?

14   A. He would stop every once in a while coming

15   across the parking lot.

16   Q. It was your impression that he was

17   struggling to make it across, is that right?

18   A. Yes.

19   Q. Now, after you saw this did you then meet

20   with Pat Whitmire and Bryan Sheldon?

21   A. Well, not initially I did not.  I mean,

22   every once in a while we all have problems, so

23   it's, you know, the first time I saw him I

24   didn't go asking questions.

25   Q. Okay, but in February of 2007 did you then

1    meet with Mr. Whitmire and Mr. Sheldon?

2      **A.** I believe so, yes.

3      **Q.** Did you express your impression that Ricky

4    was struggling to make it across that parking

5    lot?

6      **A.** Yes.

7      **Q.** Didn't you also tell them that you believed

8    Ricky was a danger to himself and others working

9    in the warehouse?

10     **A.** I didn't say that I believed he was.  I

11   said I wanted to make sure that he was not.

12     **Q.** You had concerns that Ricky didn't have

13   fast reflexes --

14     **A.** That's correct.

15     **Q.** -- and therefore wasn't, might be a danger

16   to others or himself in the warehouse, is that

17   right?

18     **A.** That's correct.

19     **Q.** Do you remember appearing at my office for

20   your deposition, Mr. Hoffman?

21     **A.** Yes.

22     **Q.** And that was held on January 11th, 2010?

23     **A.** Roughly, yes.

24     **Q.** At the beginning of the deposition you were

25   asked to give an oath to tell the truth at that

1  deposition, is that right?

2  **A.** Yes.

3  **Q.** We were there for about an hour, I was

4  asking you some questions about what you knew

5  about this case?

6  **A.** Yes.

7  **Q.** And do you remember me asking you questions

8  that you were concerned whether Ricky was a

9  Danger to himself and others in the warehouse?

10  **A.** Not specifically.

11  **Q.** Let me refer you to page 15, line 17, and I

12  asked you this question, "Did you ever make a

13  comment to Mr. Sheldon or Mr. Whitmire that you

14  were concerned that Ricky was a danger to

15  himself or to others in the warehouse?"  And

16  you answered, "I believe that I did."

17  **A.** Okay.

18  **Q.** So you did believe that Ricky was a danger

19  to himself and others based on your impression

20  of him?

21  **A.** Well, I guess if that's what I said then I

22  must have said that to you, yes.

23  **Q.** Did you ever speak with Ricky about your

24  impressions of him?

25  **A.** Not specifically, no.

1    Q. Did you ever speak with Tim Kline after

2    your meeting with Mr. Whitmire and Mr. Sheldon

3    about your impressions of Ricky Shaw?

4    A. I either did before or after I talked to

5    Pat.

6    Q. Again I'm referencing back to your

7    deposition testimony on January 11th, 2010,

8    and I asked you that same question during that

9    deposition.

10        MS. SALTZ: Objection, Your Honor.

11        MR. CROCENZI: Page 11, line 21.

12        THE COURT: Hold on one second.

13        MS. SALTZ: Your Honor, if counsel is going

14   to be using the deposition, the witness does not

15   have a copy of that deposition to reference what

16   the question and answer is.

17        MR. CROCENZI: I'll be glad to show it to

18   him.

19        THE COURT: All right.  Very good.

20        BY MR. CROCENZI:

21   Q. Mr. Hoffman, I'm going to show you page 11

22   from your transcript from your deposition, and

23   I'm referencing line 21.

24   A. Okay.

25   Q. If you could read that?

1          (Brief pause.)

2      **A.** Okay.

3      **Q.** Okay?

4      **A.** Uh-huh.

5      **Q.** And I asked you, "Did you ever speak with

6   his immediate supervisor Tim Kline about Ricky

7   Shaw taking a long time to walk from the

8   warehouse to the office and back?"  And you

9   answered, "No."

10     **A.** Right.

11     **Q.** Okay.  Mr. Hoffman, there was no incident

12  that happened that was a danger to Ricky or

13  others in the warehouse while he was employed at

14  Cumberland Truck, isn't that true?

15     **A.** Not that I'm aware of no.

16     **Q.** Okay.  Prior to your meeting with

17  Mr. Whitmire and Mr. Sheldon in February of 2007

18  you had received no complaints from any employee

19  about Ricky's productivity in the warehouse?

20     **A.** No.

21     **Q.** And you didn't receive any complaints about

22  him allegedly using a cane to operate a

23  forklift?

24     **A.** No.

25     **Q.** Never heard that, is that true?  You never

1   heard that?

2     **A.** No, I never heard that.

3     **Q.** And you never had any complaints about his

4   productivity?

5     **A.** No.

6     **Q.** And prior to this meeting with Whitmire and

7   Sheldon you received no complaints from any

8   employee about Ricky having any difficulty

9   lifting, is that right?

10    **A.** Not that I recall.

11    **Q.** Okay, and you never had any complaints

12   about Ricky having difficulty carrying?

13    **A.** No, not that I recall.

14    **Q.** Never had any complaints about Ricky having

15   difficulty standing for long periods of time?

16    **A.** Not that I remember, no.

17    **Q.** Never received any complaints about Ricky

18   having difficulty bending?

19    **A.** Not that I remember, no.

20    **Q.** You didn't have any complaints from any

21   employee about Ricky having difficulty

22   squatting?

23    **A.** Not that I remember, no.

24       MR. CROCENZI: Thank you.  That's all I

25   have.

1      THE COURT: Ms. Saltz?

2      MS. SALTZ: Thank you, Your Honor.

3      (Brief pause.)

4      CROSS EXAMINATION BY MS. SALTZ:

5    Q. Good afternoon, Mr. Hoffman.

6    A. Hello.

7    Q. Mr. Hoffman, would you turn to Exhibit 9?

8  Is that in front of you?

9    A. Yes.

10   Q. Would you take a look at that, please, and

11 counsel was asking questions about this job

12 analysis.

13   A. Yes.

14   Q. Would you take a look at the section marked

15 "Physical Requirements"?

16   A. Okay.

17   Q. And I believe it goes on for two pages.

18   A. Yes.

19   Q. Okay, would you take a look at all those

20 sections, please?

21   A. Okay.

22   Q. Is there anything inaccurate as to what the

23 requirements are of a warehouse worker in terms

24 of the physical requirements?

25      (Brief pause.)

1          MR. CROCENZI: Objection, Your Honor.  There

2    hasn't been any foundation laid that Mr. Hoffman

3    knows about the specific requirements of a

4    warehouse worker at Carlisle Warehouse B.  He

5    testified he doesn't work in the warehouse.  He

6    also testified he didn't have any input in

7    developing that part of the job analysis.

8          THE COURT: All right.

9      Q.  I can clarify that, Your Honor.

10   Mr. Hoffman, did you work in the warehouse at

11   any point?

12     A.  Oh, yes.

13     Q.  How long did you work in the warehouse?

14     A.  Well, I've been in the industry since 1976.

15   I've held warehouse puller positions, forklift

16   driver, delivery driver, warehouse manager, just

17   about -- I mean, that's why I'm director of

18   operations.  I've done everything in the

19   operations of our kind of business.

20     Q.  And was that for Cumberland?

21     A.  At sometimes, yes.

22     Q.  Could you just describe for the jury what

23   goes on in Warehouse B based on your own

24   experience and knowledge of that job?

25     A.  Well, in Warehouse B, and in Warehouse A

1  both, product comes from, again from the

2  manufacturer.  We'll get a truckload of brake

3  drums or mixed product, and the warehouse job

4  requires that that product gets unloaded from

5  the truck.  Usually it's run down an aisle of

6  the warehouse and the product is checked in and

7  verified that what we got billed for is what we

8  actually received.

9       At that point what we'll do is we'll have

10  designated locations for all that product, and

11  it may go into the other warehouse, it might

12  stay in the warehouse it's received at, which is

13  usually Warehouse B, and the product is put away

14  in those locations.  From that point forward we

15  get orders from our other branches for that same

16  kind of product and we have to fill those orders

17  for the branches.  So sometimes we'll be

18  receiving product and putting it away.

19  Sometimes we'll be pulling product for our other

20  branches or for other customers directly from

21  that branch, and that stuff, that product will

22  then be put on pallets or in crates or bins,

23  depending on what size it is, and then it will

24  be sorted for each particular branch that it's

25  going to that night or the next day or whatever,

1    and then labeled and shipped out.

2       Q. You mentioned brake drums.

3       A. Yes.

4       Q. How much do brake drums weigh

5    approximately?

6       A. Average is 110 pounds.

7       Q. What other kind of product -- I mean, you

8    referred to it as product and for those of us

9    that don't know what the kind of products

10   that --

11      A. Everything from lamps or light bulbs that

12   weigh practically nothing to clutches that weigh

13   two hundred pounds and cylinder heads that weigh

14   three or four hundred pounds.

15      Q. Now, with regard to -- you testified that

16   you did not complete this, you didn't create

17   this job analysis form.

18      A. That's correct.

19      Q. Is it accurate though where it states that

20   lifting is up to seventy pounds frequently?

21      A. Yes.

22      Q. So you would in the course of the day as a

23   warehouse worker you would have to lift about

24   seventy pounds?

25      A. Regularly, yes.

1   Q. What about occasionally up to 150 pounds?

2   A. Yes.  Preferably with help, but yes.

3   Q. So there would always be two people that

4   you would prefer having lift --

5   A. Right.

6   Q. Over what weight, sir?  What would be like

7   the weight where you would want to see two

8   people lifting?

9   A. Well, any -- any, like a brake drum order,

10   usually what we'll require everyone to do is

11   load it, you don't want to go any more than two

12   or three high because obviously you lift them up

13   high it's pretty tough on you.  So if you were

14   doing a clutch or you were doing a lot of brake

15   drums we usually would ask that you get help to

16   do that.  A supervisor wouldn't stand over a

17   warehouse worker and make sure that you did

18   that, but it's recommended.

19   Q. And then as far as carrying, you would have

20   to carry that product from one location to

21   another?

22   A. Yeah.  Again, you know, if you were pulling

23   a brake drum order for a branch you're going to

24   have to take brake drums off of one pallet, put

25   them on another pallet.  If a customer comes in

1  and needs product directly you may have to pick

2  that brake drum up and put it in the back of

3  their pickup truck or something like that.

4    Q. And also the same kind of weight

5  requirement for carrying up to seventy pounds

6  frequently?

7    **A.** Yes.

8    Q. Occasionally up to 150 pounds?

9    **A.** Yes.

10    Q. A lot of sitting in that job?

11    **A.** No.

12    Q. How long are you on your feet usually?

13    **A.** Oh, pretty much the whole eight hours.  I

14  mean, you'll occasionally be on the forklift.

15  Most often you're on a forklift when a truck of,

16  again a truckload of drums or a truckload comes

17  in, one of the warehouse operators will jump on

18  a forklift and unload that truck, and if we're

19  loading a truck for one of our branches the same

20  thing, they'll get on a forklift and they'll

21  load the truck up.

22    Q. Now, is anyone in the warehouse designated

23  as the forklift driver?

24    **A.** No.

25    Q. So that anybody working in the warehouse,

1   and that's Warehouse B, would have to know how

2   to operate a forklift?

3   **A.** Everyone has to be forklift certified and

4   everyone has to drive forklifts, yes.

5   **Q.** And approximately what percentage of the

6   time would someone be using a forklift in that

7   warehouse during just a day, an eight hour day?

8   **A.** Probably 20 percent.

9   **Q.** And the rest of the time would be walking,

10   standing?

11   **A.** Yeah, pushing carts or pallet jack or

12   moving stuff up, helping, you know, off of one

13   skid, putting it on another, checking product

14   in, putting, stacking products on a shelf, and

15   just warehouse work.

16   **Q.** Are there stairs in that warehouse?

17   **A.** Yes.

18   **Q.** How many sets of stairs?  One?  Two?

19   **A.** Two.

20   **Q.** Is there also any kind -- when you say, I

21   envision when you say putting stuff on

22   shelves --

23   **A.** Yes.

24   **Q.** -- is there a need for like a portable

25   ladder or a staircase to use?

1    A. Yes.  There's probably five portable

2    ladders, rolling ladders in the warehouse.

3    Q. And that requires climbing obviously?

4    A. Yes.

5    Q. Now, with regard to lifting, is there any

6    need for bending or squatting to do that?

7    A. Yes.

8    Q. Is there a proper mechanism by which one

9    lifts products?

10   A. Well, yes.  I mean again, you know, we try

11   to make sure that all the warehouse workers know

12   proper lifting techniques.  When you're lifting

13   a brake drum or something like that you should

14   squat down and lift with your legs, not your

15   back.  You know, typical standard ways to lift

16   product, or anything.

17   Q. Now, you testified with regard to having

18   observed Mr. Shaw walking across that parking

19   lot.  How many times approximately did you see

20   him before you said something?

21   A. Probably five or six times.

22   Q. And what was it that finally made you

23   decide that you needed to talk to someone?

24   A. Well, again, you know, I'm in that office

25   regularly and I would observe Ricky coming

1    across and sometimes it would take him ten or

2    fifteen minutes to walk that eighty feet, and

3    the other times I also noticed that when I was

4    in the warehouse I would occasionally witness

5    Ricky on a forklift and he was hesitant to do

6    anything else in my opinion, you know, he wanted

7    to stay on the forklift, which is not, we do

8    everything in the warehouse, you know, it's not

9    just, you know, we don't have specific forklift

10   operators, and he basically needed to pull

11   orders and not use a forklift.  So that's when I

12   said something.

13       Q. What dangers were you concerned about?

14       A. Well, the biggest thing I didn't want Ricky

15   to get hurt lifting or, you know, squatting or

16   doing anything that you normally have to do in

17   the warehouse.  Secondly I was worried about

18   when he was on the forklift, which is what he

19   was doing most of the time, having to take your

20   foot off the brake or off the gas and put it on

21   the brake quickly.  I mean we have a lot of

22   people, including myself, walking in and out of

23   the warehouse, going down different aisles.  If

24   you come around that corner and there's someone

25   standing there, you got to take your foot off

1  the gas and put it on the brake pretty quick,

2  and I was concerned that Ricky would have a

3  problem doing that.

4    Q. Now, when you did go, who did you go to

5  first after -- when you finally made the

6  decision that you needed to say something who

7  did you go to?

8    A. I believe it was Pat.  I'm pretty sure I

9  talked to Pat Whitmire first because Pat is

10  responsible for daily operations of both of the

11  warehouses, that we oversaw both warehouses.

12  Tim Kline worked directly for him, and I

13  interact with Pat more because he's in the

14  same building as I am and not in Warehouse B.

15  I believe I talked to him first.

16    Q. And what did you say to him, do you

17  remember?

18    A. I don't remember specifically.  Something

19  to the effect that I think Ricky is having some

20  difficulty and we better find out what's going

21  on.  I don't know exactly what I said.

22    Q. And then after you spoke to Pat what did

23  you do next?

24    A. I basically talked to Pat to get his

25  opinion and both of us agreed that we had to

 1    find out what was going on with Ricky, and

 2    that's when we went to Bryan, because he was

 3    overseeing human resources at the time, to make

 4    sure that, you know, we did what we were

 5    supposed to do so we went and saw Bryan.

 6      Q. And when you went to see Bryan what was

 7    your concern at that time?

 8      A. Well, the same concerns that I expressed

 9    earlier, you know, first of all whether or not

10    Ricky would hurt himself, and secondly whether

11    or not he would hurt somebody else if he was on

12    the forklift, and whether or not he could

13    actually do what needed to be done in the

14    warehouse position.

15      Q. Now, prior to going to Bryan to discuss

16    it with him, had Ricky ever come to you and

17    discussed with you any kind of medical condition

18    that he had?

19      A. No.

20      Q. Did he ever come to you and ask for any

21    kind of accommodation to do his job?

22      A. No.

23      Q. Did he ever indicate to you that he was

24    having any kinds of medical problems or concerns

25    about being able to do his job?

1     **A.** No.

2     **Q.** Now, after you met with Bryan do you

3     remember what happened in that first meeting?

4     **A.** I don't specifically, no.  I believe that

5     he told us that, oh, I have to have a doctor

6     evaluate him and see if he can continue to do

7     the job that he's required to do.  I'm pretty

8     sure -- I mean, again I don't know the specific

9     wording of what happened, but that was the gist

10    of it from what I remember.

11    **Q.** And did you meet one time only or did you

12    meet several times to discuss the situation as

13    to --

14    **A.** I believe myself I only talked to Bryan

15    once specifically about Ricky before he went to

16    the doctors.

17    **Q.** And did you ever find out after he went to

18    the doctors what his medical condition was?

19    **A.** Did I find out?  No.

20    **Q.** And what did you learn after he went to

21    that medical exam?

22    **A.** That the evaluation that the doctor gave

23    him said that he was not --

24        MR. CROCENZI: Objection.  Hearsay.

25        MS. SALTZ: Well, it's again --

1        THE COURT: Not a party admission?

2        MS. SALTZ: Right.  I just stopped to think

3    for a moment.  Let me strike, thank you.

4        THE COURT: Sustained.

5        BY MS. SALTZ:

6    Q. Did someone advise you that -- how did you

7    come to find out if Ricky was coming back to

8    work or not?

9    A. Either Brenda Hoffman or Bryan Sheldon told

10   me that the evaluation --

11       MR. CROCENZI: Objection about what the

12   evaluation said.  I think he can testify about

13   what they said about Ricky coming back to work

14   or not but not about the evaluation itself.

15       THE COURT: All right.

16   Q. Let me ask you this question.  Do you even

17   know what the evaluation said?

18   A. I do now, yes.

19   Q. But then, not what you know now, then did

20   you know at that time?

21   A. I did not see the evaluation, no, not at

22   that time.

23   Q. What did you know at that time?

24   A. I knew what either Bryan Sheldon or Brenda

25   Hoffman told me about the evaluation.

1    Q. Did they tell you Ricky was coming back to

2    work?

3    A. No.

4    Q. Did they tell you that Ricky failed the

5    exam?

6    A. Yes.

7    Q. What kind of a worker was Mr. Shaw?

8    A. Mr. Shaw was a good worker in my opinion.

9    Q. Were you sorry to have lost him?

10   A. I am, yes.  You know, he did, Ricky did a

11   very good job for us.  When we moved, we moved

12   one of our big locations in Johnstown a few

13   years, two or three years before that, and I had

14   to work 32 days straight, but my crews came up

15   from Carlisle to do that and Ricky was, Ricky

16   did a heck of a job then, and I was directly

17   responsible at that time.  That's why I know

18   that versus, you know, later on when he was

19   working directly under Tim Kline.

20   Q. Did you want him to come back?

21   A. Yes.

22   Q. When Mr. Shaw went out on medical leave you

23   were aware he did go out on medical leave?

24   A. Yes.

25   Q. When he went out on medical leave did you

1   replace him?

2     **A.** No, not right away.

3     **Q.** Do you know how many months went by before

4   you replaced him?

5     **A.** It was five or six months.  It was a long

6   time and, you know, we didn't know, I know that

7   I know that he was going to different doctors

8   and trying to get things sorted out.  So the job

9   was left open until we had a final disposition

10  of what his status was.

11    **Q.** Were you aware that he had gone to two more

12  fit for duty exams?

13    **A.** I wasn't specifically aware of the times

14  that he was going to different doctors, no.

15    **Q.** And would you have taken Ricky back?

16    **A.** Yes.

17    **Q.** Would you take him back today?

18    **A.** Sure.

19       MS. SALTZ: I have no further questions.

20       THE COURT: Anything further, Mr. Crocenzi?

21       MR. CROCENZI: Yes, Your Honor, some

22  follow-up questions.

23       REDIRECT BY MR. CROCENZI:

24    **Q.** Mr. Hoffman, you didn't regularly work in

25  Warehouse B at Carlisle, is that right?

1    A. Not in my present position, no.

2    Q. Your position as director of parts

3  operations?

4    A. No.

5    Q. I think your testimony regarding the

6  working in the warehouse was at some other

7  location at some other time during your

8  employment with Cumberland Truck?

9    A. That's correct.

10    Q. Mr. Kline was the supervisor who worked

11  side by side with Ricky at Warehouse B, is that

12  right?

13    A. Yes.

14    Q. Now, isn't it true that Ricky could have

15  been on the forklift more than the 20 percent,

16  you indicated a typical warehouse worker would

17  spend on the forklift?

18    A. Could he have been?  Sure.  He could have

19  been.

20    Q. Because Mr. Kline was overseeing the direct

21  operations of Warehouse B, he could have had

22  Ricky working on that forklift more than 20

23  percent of the time, is that right?

24    A. He could have.

25    Q. Isn't it true that a warehouse worker can

1    also sit to look at paperwork?

2      **A.** Yes.  A lot of times when a large order

3    will come in we'll usually have two warehouse

4    workers, one will be actually checking in the

5    product, the other person will be checking the

6    paperwork off, you know, or whatever.

7      **Q.** When you testified that you saw Ricky on

8    the forklift and it was your impression he was

9    hesitant to get off the forklift --

10     **A.** Yes.

11     **Q.** -- did you ever write him up, give him a

12   reprimand at all about that?

13     **A.** I spoke to him about the one situation,

14   yes.

15     **Q.** Did you ever give a written reprimand?

16     **A.** No.

17     **Q.** Did you ever speak with Mr. Kline about

18   that incident with the forklift?

19     **A.** Not that I recall, no.

20     **Q.** During the time you were in the warehouse

21   this January-February time period we're talking

22   about --

23     **A.** Uh-huh.

24     **Q.** -- did you see Ricky have any trouble

25   operating the forklift?

1     A. No.

2     Q. It's also true that in Warehouse B

3  warehouse workers would have carts available to

4  carry heavy items from one location to the next?

5     A. Yes.

6     Q. They also had pallet jacks?

7     A. Yes.

8     Q. Now, the product was typically stored on a

9  wooden pallet, is that right?

10    A. For the most part, yes, probably 70 percent

11 of the product over there.

12    Q. Can you describe for the jury what a pallet

13 is?

14    A. Yeah, a pallet is, it's basically a roughly

15 four foot by four foot square wooden structure

16 that holds heavy products.  So they, you know,

17 it would -- like you can put a forklift under it

18 to lift it or a pallet jack, which is just a

19 hand operated jack for lifting a pallet up and

20 moving the product around or putting it up on a

21 shelf or something like that.

22    Q. And a pallet jack is something that's on

23 the ground that has forks on it that's able to

24 get into the pallet?

25    A. Right.

1    Q. And you're able to use a hydraulic lift --

2    A. Right.

3    Q. -- to lift the pallet off the ground?

4    A. Just enough to move it.  You can't use it

5    to put product up on the shelf or anything like

6    that, yeah.

7    Q. That's what a forklift is for?

8    A. That's right.

9    Q. Okay.  Was there a stool in Warehouse B

10   where a person could sit and check paperwork for

11   products when they came in?

12   A. There is a stool by the receiving desk.

13        MR. CROCENZI: That's all I have, Your

14   Honor.  Thank you.

15        THE COURT: The pallet jack is on wheels

16   though?

17        THE WITNESS: Yes.

18        THE COURT: You can move the pallet once

19   it's lifted in the air, you can move it --

20        THE WITNESS: Right.  A pallet has slots

21   underneath it and a pallet jack just two forks.

22   So when you slide it under the pallet itself the

23   two wheels in the back go into this slot.  So

24   when you jack it up then those wheels will push

25   everything up.

1       THE COURT: But it's kind of bulky and hard

2   to move.  Isn't it easier to move it with a

3   forklift than a pallet jack?

4       THE WITNESS: Oh, yeah.  Yeah, a forklift

5   obviously has an engine and, you know, a pallet

6   jack you got to pull it or push it to make it go

7   wherever you want it to go.

8       THE COURT: All right.  Anything further,

9   Ms. Saltz?

10      MS. SALTZ: No, Your Honor.  Thank you.

11      THE COURT: All right.  Thank you very much,

12  you may step down.

13      THE WITNESS: Thank you.

14      THE COURT: Your next witness, Mr. Russo?

15      MR. RUSSO: Our next witness is

16  Mr. Whitmire.

17      THE COURT: All right.

18      MS. SALTZ: Your Honor, is Mr. Hoffman

19  released at this point?

20      THE COURT: Any need for recall at this

21  time?

22      MR. CROCENZI: Not at this time, no.

23      THE COURT: Is he a possible rebuttal

24  witness?  If he is then he should be excused at

25  least outside the courtroom.

1        MR. CROCENZI: Yes.  He could be a possible

2   rebuttal witness.

3        THE COURT: All right.  Very well.

4        MR. CROCENZI: But as far as today is

5   concerned we don't see any further --

6        THE COURT: All right, you're released for

7   today, but you may be, just recognize you may be

8   recalled.

9        THE WITNESS: Okay.

10       THE COURT: Thank you.

11       MR. CROCENZI: And, Your Honor, because of

12  the multiple days of the trial can we have an

13  instruction that the witnesses, since they are

14  sequestered here, wouldn't be talking about the

15  case if they go back to the office?

16       THE COURT: Well, that's really a subject

17  for examination.

18       MR. CROCENZI: Okay.

19       THE COURT: You can find out if those

20  conversations have taken place.

21       MR. CROCENZI: Thank you.

22       THE COURT: I'm not going to prohibit them

23  from having conversations, but obviously fertile

24  ground for cross examination.

25       (John Patrick Whitmire was called to

1    testify and was sworn by the courtroom deputy.)

2         COURTROOM DEPUTY: Please be seated and

3    state your full name for the record.

4         THE WITNESS: John Patrick Whitmire.

5         DIRECT EXAMINATION BY MR. RUSSO:

6      Q. Good afternoon, Mr. Whitmire.

7      A. Good afternoon.

8      Q. Could you tell us what your position at

9    Cumberland Truck is?

10     A. I'm the eastern regional operations

11   manager.

12     Q. Have you held any other positions with

13   Cumberland Truck?

14     A. Yes.  The parts manager and the parts

15   logistics manager.

16     Q. And when did you start with Cumberland

17   Truck?

18     A. February of 2002.

19     Q. Had you ever worked for Cumberland Truck

20   prior to that?

21     A. Yes, two times before that.

22     Q. And when did you first begin working with

23   Cumberland Truck?

24     A. June of 1986 I believe.

25     Q. And that first employment with Cumberland

1   Truck did you hold any other positions?

2     **A.** No, I was a warehouse worker.

3     **Q.** Okay.  Was that similar to the position

4   that Ricky Shaw had?

5     **A.** No.  We were much smaller then.

6     **Q.** Okay.  We've come to the conclusion that

7   there are two warehouses, a Warehouse A and a

8   Warehouse B at Cumberland Truck in Carlisle.

9   Is that correct?

10    **A.** Correct.

11    **Q.** What's the difference between the two

12  warehouses?

13    **A.** Warehouse A primarily houses our small

14  parts.  Warehouse B warehouses our bulk parts.

15    **Q.** At some point were you a supervisor of one

16  or more of those warehouses?

17    **A.** Yes, both.

18    **Q.** And when was that?

19    **A.** 2004 I believe.

20    **Q.** Until when?

21    **A.** 2011, January of this year.

22    **Q.** Can you describe for us the physical layout

23  of Warehouse B?

24    **A.** You walk in the door there's pallet racks

25  under a deck level no more than ten feet high,

1    and then we have I think there's about eight

2    aisles of racks that are twenty foot high,

3    fifteen foot high, excuse me.

4       Q. Is there a second level of racks?

5       A. Yes.

6       Q. And how high is that second level of racks?

7       A. Second level of racks is probably ten foot.

8       Q. So at the height of the second rack is it

9    twenty feet?

10      A. Well, it's setting on top of a deck, so

11   there's a ten foot underneath and a ten foot on

12   the top.

13      Q. Okay.  Do you know Ricky Shaw?

14      A. Yes, I do.

15      Q. And how do you know Ricky?

16      A. He worked for me.

17      Q. Had he been somebody who worked for you his

18   entire duration with Cumberland Truck?

19      A. Ricky was there when I came back.

20      Q. And what was his position?

21      A. He worked in Warehouse B.

22      Q. Was there a title for the job that he held?

23      A. No.  Just a Warehouse B worker.

24      Q. Who was Ricky's immediate supervisor in

25   2002?

1      **A.** Tim Kline.

2      **Q.** Through 2007 did that ever change?

3      **A.** No, I don't think so.

4      **Q.** And who was Tim Kline's supervisor?

5      **A.** Until 2004 it was Chuck Hoffman and then it

6      was me and then it was me.

7      **Q.** Did you supervise anyone else at Cumberland

8      Truck?

9      **A.** Yeah, I had the whole parts operation in

10     Carlisle.

11     **Q.** Where was your office located?

12     **A.** In Building A at the parts counter.

13     **Q.** Was that near Mr. Hoffman's office?

14     **A.** No.

15     **Q.** And physically where was it in comparison

16     to Mr. Hoffman's office?

17     **A.** He was in the back of the building, I was

18     in the front of the building.

19     **Q.** Same building, just opposite ends?

20     **A.** Yeah.

21     **Q.** And this building is separate from the

22     warehouse, a separate structure from the

23     warehouse, isn't that correct?

24     **A.** From Warehouse B, that's correct.

25     **Q.** Has your office always been in that

location?

**A.** Yes.

**Q.** And how often would you find yourself in Warehouse B?

**A.** A couple of times a day as needed.

**Q.** Give me an example, why would you need to be in Warehouse B?

**A.** If I had to check inventory, a discrepancy in shipping or whatever needed.

**Q.** And when you went to Warehouse B to do these things that you just mentioned, typically how long would you be in the warehouse?

**A.** It varied.  Until I was done doing what I needed to do.  It could have been two hours, it could have been five minutes.

**Q.** Did you ever spend all day in the warehouse?

**A.** Yes.

**Q.** Was that a frequent occurrence?

**A.** No.  When we did the pallet rack move project or the mezzanine project I was there all day.

**Q.** How many employees did you have in Warehouse B in 2006?

**A.** I believe twelve.  38 employees total, so

1    I'm really not sure.

2      Q. At that point you were running two shifts,

3    is that correct?

4      A. Yes.

5      Q. How many people were on that first shift?

6      A. In Warehouse B?

7      Q. Yes.

8      A. It would have been ten of them.

9      Q. And was Ricky on that first shift in

10   Warehouse B?

11     A. Yes.

12     Q. Had you ever had the opportunity to perform

13   the warehouse worker in Warehouse B in Carlisle?

14     A. Yes.

15     Q. And when did you do that?

16     A. When needed.

17     Q. And was that something you did as part of

18   your supervisory duties, you just pitched in

19   when it was needed?

20     A. I just pitched in and did what needed to be

21   done.

22     Q. How much of your time would you say you did

23   this job of warehouse worker?

24     A. Five percent.  I don't know how to answer

25   the question.  It depended.

1    Q. Okay.  Did you ever lift anything while you

2  were working in Warehouse B?

3    A. Yes.

4    Q. And what was the heaviest item you had to

5  lift?

6    A. The heaviest thing I lifted was probably

7  125 pounds.

8    Q. And what's the heaviest item that a

9  warehouse worker would lift unassisted?

10    A. It depended on the warehouse worker.

11    Q. Okay.  How about Ricky Shaw?

12    A. He could lift a house.

13        (Brief pause.)

14    Q. Typically would an employee in the

15  warehouse have to carry an item?

16    A. Sometimes, yes.

17    Q. And how far would they carry an item?

18    A. They could carry it from the front to the

19  back of the warehouse.

20    Q. And what's that distance?

21    A. A hundred feet.

22    Q. Do you require -- do you recall giving your

23  deposition in Mr. Crocenzi's office on July

24  11th, 2010?

25    A. Yes, I do.

1    Q. And I'm going to show you a copy of your

2    deposition transcript.

3         THE COURT: Mr. Russo, could you give the

4    page number for --

5    Q. I'm sorry, it's page number 10, line -- or

6    page number 8, line number 10.  Page number 8,

7    line number 10.  In fact it's highlighted in

8    that deposition.  Take a moment to review that.

9    A. Okay.

10   Q. Does that refresh your recollection about

11   an answer to the question about the heaviest

12   item that somebody would lift unassisted?

13   A. That's what's stipulated in the

14   requirements when we run an ad.

15   Q. I'm not quite sure I understand that

16   question, or that answer.  What's stipulated in

17   the ad?

18   A. You'd have to at least lift 65 pounds

19   unassisted.

20   Q. That's what you advertised --

21   A. Yes.

22   Q. -- in public newspapers for people who want

23   this job?

24   A. Yes.

25   Q. So is that different than what actually

1   happened?

2      A. Sometimes, yes.

3      Q. Is it different than the actual job

4   requirement?

5      A. No.

6      Q. Are there any implements available or tools

7   available for warehouse workers to use when

8   they're trying to move or carry an item?

9      A. Yes.

10     Q. For example what's available?

11     A. Forklift.  A hand truck.  A cart.  Pallet

12  jack.

13     Q. Have you seen your subordinates using those

14  items when moving or carrying things?

15     A. Yes.

16     Q. Have you ever used those items when you've

17  moved things?

18     A. Yes.

19        (Brief pause.)

20     Q. I'm going to show you what has been marked

21  as Plaintiff's Exhibit Number 9, which is titled

22  the job analysis.  Mr. Whitmire, have you ever

23  seen that document before?

24     A. Yes.

25     Q. And you didn't contribute any information

1    to the creation of that document, is that

2    correct?

3      A. No.

4      Q. This document indicates that lifting is

5    required occasionally up to 150 pounds, is that

6    correct?

7      A. Yes.

8      Q. Now, that's different than what you just

9    told us you advertise in newspapers?

10     A. That's lifted with assistance.

11     Q. So in this job analysis is it your

12   interpretation that lifting 150 pounds

13   occasionally means you're supposed to lift 150

14   pounds occasionally with assistance?

15     A. Yes.

16     Q. And then the lifting requirement on this

17   document also says that you need to lift

18   frequently seventy pounds.  Is that an accurate

19   description of what's required of a warehouse

20   worker?

21     A. Yes.

22     Q. And again based on your testimony that you

23   just gave us I would assume that you also expect

24   people to lift seventy pounds with assistance?

25     A. Yes.

1    Q. Carrying is the next category, carrying

2    occasionally 150 pounds.  Is that an accurate

3    description of what a warehouse worker does?

4    A. No.

5    Q. What's accurate?

6    A. That depends on the employee, on the

7    person.

8    Q. So it varies?

9    A. Uh-huh.

10   Q. What about carrying weight or carrying

11   something up to seventy pounds frequently?

12   A. Again it depends on the employee.

13   Q. So is your testimony that's not really

14   accurate for what a warehouse worker does?

15   A. Yes.

16   Q. And again safe to assume that if I can't

17   lift it by myself, that for any worker you'd

18   expect them to do it with assistance if they're

19   going to carry it?

20   A. Yep.

21   Q. Okay.  Did you ever see Ricky Shaw prior to

22   February 26th, 2007 have any trouble lifting

23   items?

24   A. No.

25   Q. Did you ever see Ricky have any trouble

1   carrying items?

2     **A.** No.

3     **Q.** Standing.  Did you ever see Ricky have any

4   trouble standing?

5     **A.** No, not standing.

6     **Q.** How about bending?

7     **A.** Yes.

8     **Q.** And when did you see him having trouble

9   bending?

10    **A.** You want the date?

11    **Q.** Time frame.

12    **A.** He was -- I don't know the time frame.

13    **Q.** And when you say bending, Ricky is not so

14  small, bending that he couldn't touch his toes?

15  Bending that -- describe what problems you saw.

16    **A.** Just bending down like he was moving a

17  spring or something.  I don't really recall the

18  whole particulars of the incident.

19    **Q.** So are you thinking of one incident or

20  there's multiple and that's the only one you can

21  think of?

22    **A.** That's the only one I can think of.

23    **Q.** And again time frame, any feel for when

24  that happened?

25    **A.** I have no clue.

1    Q. Did you ever discipline him for not being

2    able to bend?

3    A. No.

4    Q. Was this something that you felt was truly

5    Ricky not being to perform his duties?

6    A. No.

7    Q. So he was able to perform his duties?

8    A. Uh-huh.

9       THE COURT: I'm sorry, you have to give

10   verbal responses.

11   A. Yes.  Sorry.  Yes.

12   Q. What about squatting?  How much squatting

13   does your typical warehouse worker do?

14   A. Again it depends on what they're pulling.

15   Q. I'm sorry, depends on what they're --

16   A. It depends on what parts they're

17   retrieving.

18   Q. Okay.  Had you ever seen Ricky having

19   trouble prior to 2007 with squatting?

20   A. Yes.

21   Q. Again time frame?

22   A. I believe it was the same time.

23   Q. At that point did you think that it caused

24   Ricky to be unable to perform his duties?

25   A. No.

1    Q. How about climbing?  Have you ever seen any

2    difficulties with Ricky climbing?

3    A. No.

4    Q. How about walking?

5    A. Yes.

6    Q. Tell me about walking.  What difficulties

7    did you see with Ricky walking?

8    A. He just looked like it labored for him to

9    walk.  It was hard for him to walk at times.  It

10   wasn't a constant thing.

11       (Brief pause.)

12   Q. I'm going to call your attention to what's

13   been marked as Plaintiff's Exhibit Number 6.

14   Have you ever seen what's Plaintiff's Exhibit

15   Number 6 before?

16   A. Yes.

17   Q. And when did you see that?

18   A. When I was hired --

19   Q. Let me strike that and ask you, had you

20   seen that prior to this litigation?

21   A. Yes.

22   Q. And what is that document?

23   A. It's what's in our policy manual.

24   Q. And is it fair to say this is a job

25   description of the distribution warehouse

1    worker?

2      **A.** Yes.

3      **Q.** Did you have any input into the creation of

4    this document?

5      **A.** No.

6      **Q.** Putting that aside for a second, did you

7    ever create a job description for this warehouse

8    worker position?

9      **A.** No.

10     **Q.** Are you sure about that?

11     **A.** Not that I recall, no.

12         (Brief pause.)

13     **Q.** Do you recall, do you have a job

14    description for your employees?

15     **A.** Yes.

16     **Q.** And what is your job description for the

17    employees?

18     **A.** As far as which employees?

19     **Q.** Warehouse workers, I apologize.

20     **A.** That is the job description for the

21    warehouse employees.

22     **Q.** Okay.  Do you recall creating your own

23    warehouse worker job description that you

24    provided to HR at some point?

25     **A.** No, I don't recall that.

1    Q. Mr. Whitmire, I'm going to call your

2    attention to page 12 of your deposition which

3    was on January 11th, 2010, and page 12, line 13.

4    Can you take a moment, just read through that

5    highlighted section?

6    A. Page 12?

7    Q. Yes.

8        (Brief pause.)

9    A. Yes.

10   Q. Does that refresh your memory about talking

11   with us about another job description that you

12   physically created?

13   A. No.

14   Q. Okay.

15       (Brief pause.)

16   Q. In front of you you have exhibit,

17   Plaintiff's Exhibit Number 9 and Plaintiff's

18   Exhibit Number 6.

19   A. Okay.

20   Q. As a supervisor of Warehouse B who

21   supervises warehouse workers, which job

22   description is more accurate?

23       (Brief pause.)

24   A. Both of them.

25   Q. They're both accurate?

1    A. Uh-huh, yes.

2    Q. Would you agree with me that Plaintiff's

3    Exhibit Number 6 it says nothing about climbing?

4    A. No.

5    Q. You would not agree with me?

6    A. No, it says nothing about climbing.

7        THE COURT: So yes, you would agree with

8    that?

9    A. Yes, I would agree with you.

10   Q. And would you agree with me that

11   Plaintiff's Number 6 says nothing about

12   squatting?

13   A. Yes, I agree with you.

14   Q. Nor does it say anything about bending?

15   A. Yes.

16   Q. Nor does it say anything about a

17   requirement about walking?

18   A. Yes.

19   Q. Again no requirement with respect to

20   standing?

21   A. Yes.

22   Q. And no requirement with respect to

23   carrying?

24   A. Yes.

25   Q. How, there is a requirement which says you

1   may have to I believe lift up to 150 pounds on

2   an occasional basis and seventy pounds on a

3   frequent basis, is that correct?

4     **A.** Yes.

5     **Q.** Do you believe that Ricky was a qualified

6   employee based on his job skills and abilities?

7     **A.** Yes.

8     **Q.** And do you believe that Ricky could perform

9   those duties?

10    **A.** Yes.

11    **Q.** Do you believe that he was qualified to do

12   the job based on what you physically saw of him?

13    **A.** Yes.

14    **Q.** And based on what you physically saw of him

15   did you believe that he was able to do the job?

16    **A.** Yes.

17    **Q.** At some point did you consider him to be

18   the lead receiver in Warehouse B?

19    **A.** I didn't.  Mr. Kline did.

20    **Q.** And what would that mean to Mr. Kline or to

21   anyone else?

22    **A.** He primarily did the shipping and

23   receiving.

24    **Q.** And what's primarily involved in shipping

25   and receiving?

1   A. Pulling the orders, loading the truck,

2   unloading the truck.

3   Q. Is that primarily accomplished by using a

4   forklift?

5   A. If one needed, yes.

6   Q. Okay.  When Ricky would take the product

7   off of a truck with a forklift, what would

8   happen to it at that point?

9   A. He would put it in the staging area to be

10  checked in and received.

11  Q. And when you say checked in for staging or

12  receiving, what does that mean to us?

13  A. They would unload the truck, put it in an

14  area, and then when we got time we checked it in

15  and received it in our inventory and then put it

16  away.

17  Q. So when you check in and receive it into

18  your inventory, are you taking a bill of lading

19  or some document and checking off to make sure

20  you got different parts?

21  A. Yes.

22  Q. And are they're physically computer entered

23  into an inventory system?

24  A. Yes.

25  Q. And is that all done in Warehouse B?

1    **A.** No.

2    **Q.** Where is that done?

3    **A.** The warehouse work is done in Warehouse B.

4    The receiving is done in the front office.

5    **Q.** And the front office part, is that the

6    actual putting inventory into the computer?

7    **A.** Yes.

8    **Q.** So everything we talked about is done in

9    Warehouse B except putting it into the computer?

10   **A.** Yes.

11   **Q.** What's the time frame in which Mr. Kline

12   believed Ricky was the lead receiver?

13   **A.** I don't have the time frame.  I guess 2007.

14   **Q.** Once all that's checked in and received is

15   it then put on shelves?

16   **A.** Yes.

17   **Q.** Is that accomplished again using a

18   forklift?

19   **A.** It depends.  Some is done with a hand

20   truck, some is done with a pallet jack.

21   **Q.** So it depends on where it needs to go and

22   what kind of item it is?

23   **A.** Yep, yes.

24   **Q.** In February of 2007 did you see Ricky

25   lifting items?

1    **A.** Yes.

2    **Q.** And what was the biggest item you saw him

3    lift?

4    **A.** I don't recall the item.  It could have

5    been anything.

6    **Q.** Was he lifting seventy pounds?

7    **A.** I'm sure he was.

8    **Q.** Was he lifting a hundred pounds?

9    **A.** Again I'm sure he was.  Knowing Ricky I

10   really didn't witness him, any particular thing

11   comes to mind.

12   **Q.** Do you think Ricky at that point could have

13   lifted 150 pounds occasionally?

14   **A.** Probably if he wanted to, head.

15   **Q.** Was he able to lift those things by himself

16   if he wanted to?

17   **A.** Yes.

18   **Q.** How about carrying things?  At that point

19   in February of 2007 did you see Ricky carrying

20   items in the warehouse?

21   **A.** I'm sure I did.  I don't recall anything

22   specific.

23   **Q.** You're not going to be able to recall any

24   kind of items he --

25   **A.** No.

1    Q. Would you agree that the items probably

2  weighed in excess of 65 pounds?

3    A. I'm sure they did.

4    Q. In general Cumberland Truck what kind of

5  items weighed 65 pounds?

6    A. Cases of oil, certain brake drums.  There's

7  a number of parts.

8    Q. And are the weights of these items

9  identified in catalogs or billing ladles or

10  something of that nature?

11    A. Most of them are in catalogs, yes.

12    Q. Again in February of 2007 you told us that

13  you saw difficulty with Ricky walking, is that

14  correct?

15    A. Yes.

16    Q. But the rest of the items which are on

17  Exhibit 9 you didn't see him having any

18  difficulty performing?

19    A. No.  No.

20    Q. Did you ever discipline Ricky for any

21  concerns that you had with walking?

22    A. No.

23    Q. Ever put any notes in his personnel file

24  about that?

25    A. Not that I recall, no.

1    **Q.** Were you a part of Ricky's evaluation

2  process?

3    **A.** No.

4    **Q.** Did you approve his evaluation?

5    **A.** Yes.

6    **Q.** And when did you begin to approve Ricky's

7  evaluation?

8    **A.** When I took over the warehouse in 2004.

9    **Q.** I'm going to show you we've marked as

10  Plaintiff's Number 3 for identification.  Can

11  you identify what that is?

12    **A.** It's an evaluation.

13    **Q.** And is that your signature --

14    **A.** Yes.

15    **Q.** -- on the fourth page?

16    **A.** Yes.

17    MR. RUSSO: I would like to publish

18  Plaintiff's Exhibit 3 to the jury.

19    THE COURT: Any objections?

20    MS. SALTZ: No objection.

21    THE COURT: You may.

22    BY MR. RUSSO:

23    **Q.** Ladies and gentlemen, hopefully you see in

24  front of you on the screen a document.  If you

25  can't let us know and we'll make sure the

1    screens are turned on.  And, Mr. Whitmire, is

2    that your signature where it says "approved by"?

3      A. Yes.

4        THE COURT: For the record, Mr. Russo, this

5    is page 4?

6      Q. This is page 4, yes, and what I'm going to

7    do, Mr. Whitmire, is I'm going to go through the

8    pages and show you page 1 and then I'm going to

9    go through page 2, and, Mr. Whitmire, the way it

10   appears as though this is sort of a document

11   that you'd almost read side by side, page 2 and

12   page 3.  It looks like that there's a category

13   on the left-hand side and then performance

14   categories, is that correct?

15     A. Uh-huh.

16     Q. And I'm going to show the next page, which

17   is the actual scores that were provided.

18     A. Yes.

19     Q. Was there anything within those scores that

20   raised concern for you?

21     A. No.

22     Q. Then I'm going to show you the comments

23   section, and again did you make any comments on

24   this evaluation?

25     A. Yes.

1    Q. And where were they?

2    A. Both comments were mine.

3    Q. Where I just marked the spot, is that your

4    comment?

5    A. Both comments, yes.

6    Q. Those two, correct?

7    A. Correct, yes.

8    Q. Would you agree that the 2004 evaluation

9    was acceptable?

10   A. Yes.

11   Q. Good even?

12   A. Good.

13       (Brief pause.)

14   Q. I'm going to show you what we have marked

15   as P-4.  Can you identify what P-4 is?

16   A. Another evaluation.

17   Q. And this is for the next year, correct?

18   A. Yes.

19   Q. Do you know is this a true and correct copy

20   of that document?

21   A. Yes.

22   Q. This one does not bear your signature,

23   correct?

24   A. No.

25   Q. Would you have approved this one?

1      A. Apparently I didn't.

2      Q. It's your belief, your testimony you did

3   not?

4      A. I did not.

5      Q. Okay.  With what you see in Plaintiff's 4

6   would it have raised any concerns for you?

7      A. No.

8      Q. And appears to be a good evaluation as

9   well?

10     A. Yes.

11     Q. Okay.  I'm going to show you what's been

12   premarked as Plaintiff's Exhibit Number 5.  Can

13   you identify what Plaintiff's Exhibit Number 5

14   is?

15     A. An evaluation.

16     Q. This was Mr. Shaw's final evaluation

17   correct?

18     A. I believe so, yes.

19     Q. And is that your signature in the lower

20   right-hand corner of page 2?

21     A. Yes, it is.

22        MR. RUSSO: Your Honor, I request to publish

23   this to the jury as well.

24        THE COURT: Any objection?

25        MS. SALTZ: No objection.

1       THE COURT: You may.

2       BY MR. RUSSO:

3    Q. Mr. Whitmire, I'm going to show you the

4  first page.  On this first page do you see

5  anything that concerns you as a supervisor?

6    A. No.

7    Q. And number 2 lists productivity?

8    A. Uh-huh.

9    Q. And he has a score of 79, is that correct?

10   A. Yes.

11   Q. And there it says, "I believe gets done

12  what he physically can."  Is that also correct?

13   A. Yes.

14   Q. And a score of 79, is that just the top end

15  of the good range, just below the very good?

16   A. Yes.

17   Q. Mr. Whitmire, this is page 2 of Exhibit

18  Number 5 on the lower right-hand corner, is that

19  your signature?

20   A. Yes.

21   Q. And next to that is that the signature of

22  the Ricky's supervisor, Mr. Kline?

23   A. Yes.

24   Q. Within this second page is there anything

25  here that concerns you about his evaluation?

1    A. No.

2    Q. Again it's a good evaluation?

3    A. Yes.

4    Q. And the date of this evaluation, January

5    11th, 2007, is that correct?  I'm sorry, January

6    10th, 2007.  I believe that's in the lower

7    left-hand corner --

8    A. Yes.

9    Q. -- of Mr. Kline's signature?

10   (Brief pause.)

11   Q. Mr. Whitmire, did you ever receive any

12   complaints about Ricky seeming to be intoxicated

13   or dizzy or being under the effects of some kind

14   of medication?

15   A. No.

16   Q. Did you ever see Ricky walking with a cane?

17   A. Yes.

18   Q. And when was this?

19   A. When he was in the warehouse.  I can't tell

20   you an exact time, I don't know.

21   Q. Was it from the first day Ricky began

22   working with Cumberland Truck?

23   A. No.

24   Q. Was it toward the end of his employment

25   with Cumberland Truck?

1    **A.** Yes.

2    **Q.** Did you ever talk to him about his cane?

3    **A.** I don't know specifically about the cane.

4  I knew we talked about his knees.

5    **Q.** When did you talk to him about his knees?

6    **A.** Towards the end.

7    **Q.** Okay.  What do you recall about the

8  conversation regarding Ricky's knees?

9    **A.** Just his knees were bothering him.  I told

10 him to take it easy.

11   **Q.** What did you mean by that?

12   **A.** Not to overdo himself.

13   **Q.** Expressing a concern?

14   **A.** Yes.

15   **Q.** Did you ever tell him that he couldn't use

16 his cane at work?

17   **A.** No.

18   **Q.** To the best of your knowledge is there any

19 prohibition at Cumberland Truck about using

20 canes?

21   **A.** Not to my knowledge, no.

22   **Q.** Did you ever find it necessary to tell

23 Ricky to stop working because of anything you

24 saw him having difficulty doing?

25   **A.** No.

1  Q. And I would assume also you never told him

2  to stop working because he had difficulty

3  walking?

4  A. No.

5  Q. To the best of your knowledge did Ricky

6  ever ask you to change any of his job duties?

7  A. No.

8  Q. Did you get any reports from Mr. Kline

9  indicating that Ricky was having difficulty

10  performing his work duties?

11  A. The only reports I got from Mr. Kline was

12  that Ricky had trouble going up and down the

13  steps and other employees were pulling carts for

14  him.

15  Q. Did you ever get any complaints or concerns

16  from Mr. Kline that Ricky wasn't productive as

17  an employee?

18  A. No.

19  Q. Who did you report to?

20  A. Chuck Hoffman.

21  Q. And where was Bryan Sheldon in your chain

22  of command?

23  A. Bryan is the controller.

24  Q. So would he be above Mr. Hoffman?

25  A. He's equal to Mr. Hoffman.

1    Q. And you didn't report to Mr. Sheldon, you

2    reported directly to Mr. Hoffman?

3    A. Yes.

4    Q. Did you ever speak to Mr. Hoffman or

5    Mr. Sheldon about your concerns, your

6    observations with Ricky?

7    A. I spoke with Mr. Sheldon.

8    Q. When did you do that?

9    A. The day we sent him for the evaluation.

10    Q. When you spoke with Mr. Sheldon on the day

11    that you sent Ricky to his evaluation, that

12    would have been February 27th, February 26th,

13    2007, is that correct?

14    A. I believe so, yes.

15    Q. At that point did you tell anybody about

16    the conversations that you had with Ricky about

17    his knees?

18    A. Not that I recall.

19    Q. And do you remember what you may have said

20    to Mr. Sheldon at that point?

21    A. Chuck Hoffman came to me and said he

22    witnessed Ricky having problem walking across

23    the parking lot.

24    Q. So fair to say you didn't report this, but

25    somebody sought you out, Mr. Hoffman, to say

1   hey, I'm seeing problems, what are you seeing?

2     A. Yes.

3     Q. So together you went to talk to

4   Mr. Sheldon?

5     A. Yes.

6     Q. Do you remember what was said to

7   Mr. Sheldon at that point?

8     A. Other than what I just said, he had looked

9   like he was really laboring to walk across the

10   parking lot and at that point we were going to

11   send him for an evaluation.

12     Q. At that point you had no other

13   conversations with Mr. Sheldon about Ricky,

14   is that correct?

15     A. Not that I recall, no.

16     Q. And you had no other conversations with

17   Mr. Hoffman about Ricky?

18     A. No, not that I recall.

19     Q. Do you know whether Mr. Sheldon and

20   Mr. Hoffman had additional conversations prior

21   to that?

22     A. I don't know that.

23     Q. Do you remember anything Mr. Hoffman said

24   at that meeting?

25     A. Other than he witnessed him he could barely

1   walk across the parking lot.

2      Q. Did he give you a time frame or incidences?

3      A. No.  Just that time.

4      Q. To the best of your knowledge Mr. Hoffman

5   knew of one event?

6      A. To my recollection, yes.

7      Q. At that point you said it seemed that there

8   was a decision that was made to send him to

9   Concentra?

10      A. Yes.

11      Q. Do you know who made that decision?

12      A. Bryan Sheldon.

13      Q. Did you agree with that decision?

14      A. Yes.

15      Q. Why?

16      A. Because if he had trouble walking he needed

17   to get checked out.

18      Q. But you had witnessed this before?

19      A. Not to that extent, no.

20      Q. But this was the first time that you felt

21   it had risen to a level that needed somebody

22   else's intercession?

23      A. From what I was being told, yes.

24      Q. And I'm sorry, you said from what you were

25   being told?

 1    **A.** Yes.

 2    **Q.** And what were you being told that raised

 3    your concern?

 4    **A.** That he could barely make it across the

 5    parking lot.

 6    **Q.** But you didn't see that?

 7    **A.** No.

 8    **Q.** At some point Ricky was told about this

 9    evaluation, correct?

10    **A.** Yes.

11    **Q.** Did you tell him?

12    **A.** I don't remember.  I don't believe so.

13    **Q.** Do you remember talking to Ricky at all

14    about the evaluation itself?

15    **A.** I don't remember.  I'm sure I did, but I

16    don't remember the conversation.

17    **Q.** Okay.  Do you remember Ricky's reaction to

18    you when you talked to him about it?

19    **A.** No.

20    **Q.** Did you send anything to Concentra with

21    Ricky when he left that day?

22    **A.** No.

23    **Q.** Do you know if anybody else did?

24    **A.** I'm sure Brenda did, but I didn't.

25    **Q.** Does Cumberland Truck have a safety

1   committee?

2     **A.** Yes.

3     **Q.** What's their function in your opinion?

4     **A.** They review the issues within our entire

5   company.

6     **Q.** Safety issues?

7     **A.** And take them to the owners and make

8   decisions on what they want to do.

9     **Q.** Did you ask the safety committee to get

10  involved in Ricky Shaw's situations before

11  sending him to Concentra?

12    **A.** I don't think we had the safety committee

13  at that time.

14    **Q.** When was the safety committee created?

15    **A.** I'm not sure.

16    **Q.** Had you ever seen Ricky operate the

17  forklift with a cane?

18    **A.** No, I haven't.

19    **Q.** Did you hear that from somebody at some

20  point?

21    **A.** Yes.

22    **Q.** Do you remember who you heard that from?

23    **A.** Mr. Kline.

24    **Q.** Mr. Kline?  Do you remember when that

25  allegation was lodged?

1   **A.** I heard it after the, after we sent him to

2   Concentra, so I can't tell you when it happened.

3   **Q.** Do you know if Mr. Kline disciplined Ricky

4   for it?

5   **A.** I don't know that.

6   **Q.** You're the manager, would you have signed

7   off on a disciplinary action?

8   **A.** Probably, yes.

9   **Q.** But you never signed off on a disciplinary

10  action which indicated Mr. Shaw was operating a

11  forklift with a cane?

12  **A.** No.

13  **Q.** Do you have anything to do with raises that

14  are given to warehouse workers in Warehouse B?

15  **A.** Just recommendations.

16  **Q.** And in 2007, 8, and 9 was it recommended

17  that warehouse workers get a raise?

18  **A.** Yes, depending on the warehouse worker.

19  **Q.** And it's typically the cost of living index

20  what's used as the gauge?

21  **A.** Yes.

22  **Q.** Do you recall what the average rate of

23  increase was for warehouse workers during that

24  time period?

25  **A.** 2 and a half, 3 percent.

1    Q. And fair that every one of the warehouse

2  workers at that point got a raise?

3    A. Yes.

4       MR. RUSSO: I have nothing further, Your

5  Honor.

6       THE COURT: Cross?

7       CROSS EXAMINATION BY MS. SALTZ:

8    Q. Thank you, Your Honor.  Mr. Whitmire, where

9  is your office in location to Warehouse B?

10    A. Now?

11    Q. At the time in 2007.

12    A. In the front of the building at the parts

13  counter.

14    Q. Okay, and from your location could you see

15  that back parking lot between the warehouse and

16  the office?

17    A. No.

18    Q. How often were you in the warehouse on a

19  daily basis?

20    A. As needed.

21    Q. Okay.  Were there days that you were not in

22  the warehouse?

23    A. Yes.

24    Q. And during the times that you were in the

25  warehouse, approximately how long would you be

1   in the warehouse?

2      A. It could be five minutes, it could be five

3   hours, depending on the situation.

4      Q. And would that happen on a weekly basis,

5   monthly basis, where you would spend five hours

6   in the warehouse?

7      A. Probably a monthly basis on the five hours,

8   yes.

9      Q. Now, Tim Kline was the manager of Warehouse

10  B?

11     A. Yes.

12     Q. And he reported directly to you?

13     A. Yes.

14     Q. At any point at the end of 2006, early

15  2007, did Mr. Kline come to you and tell you

16  that Ricky Shaw was having problems?

17     A. No.

18     Q. Doing his job?

19     A. No.

20     Q. If Mr. Shaw was having problems doing his

21  job was he required to come to you with that

22  information?

23     A. Yes.

24     Q. What kind of a manager was Mr. Kline?

25     A. Not a good one.

1    Q. After the situation with Mr. Shaw not being

2    able to return to work based on that exam, was

3    any action taken against Mr. Kline?

4    A. Not for that, no.

5    Q. The fact that he didn't disclose to you

6    what was going on in the warehouse with regard

7    to Mr. Shaw, did that play any part in any kind

8    of action with regard to Mr. Kline?

9    A. No.

10   Q. Was he demoted?

11   A. Yes.

12   Q. Why was he demoted?

13   A. Because he wasn't to my standard of a

14   supervisor.

15   Q. And what was it that he wasn't doing that

16   wasn't up to your standard?

17   A. His job.

18   Q. In what way?

19   A. He was lazy.

20   Q. Now, in talking about the two, you still

21   have Number 6 and Number 9 up there, Plaintiff's

22   Exhibit 6 and Plaintiff's Exhibit 9?

23   A. Which one is 9?

24   Q. 9 is the job analysis.

25   A. Yes.

1    Q. And 6 is the assigned duties on page 2.

2    A. Yes.

3    Q. Turn to page 2 on Number 6.

4    A. Okay.

5    Q. Mr. Russo was asking you questions, I

6    believe the question he asked you is that which

7    one of these job descriptions is accurate and

8    you said they both are.

9    A. Okay.

10   Q. Do you recall saying that?

11   A. Yes.

12   Q. Okay.  Let's take a look at the one that

13   says Number 6.  Now, on there with the exception

14   of heavy lifting are there any physical

15   requirements under assigned duties, a section

16   physical requirements?

17   A. All of them.

18   Q. They all require physical requirements?

19   A. Uh-huh.

20   Q. But they're not set out here as to what

21   those requirements are?

22   A. Other than 11, the heavy lifting.

23   Q. Okay.  Tell me what's physically required

24   in pulling customer orders.

25   A. Carrying, lifting, bending, squatting,

1  depending on the parts and where they're

2  located.

3     Q. And what you say depending on the parts,

4  meaning how big or how small the parts are?

5     A. Yes.

6     Q. And where they're located, meaning either

7  up on a shelves or on pallets in a truck --

8     A. Yes.

9     Q. -- in a warehouse?  Yes?

10     A. Yes.

11     Q. Load and unload delivery trucks.  What

12  physical requirements are required for that?

13     A. The same.

14     Q. All right.  Accurately checking the stock

15  orders from branch and from vendors.  What do

16  you need to do for that?

17     A. The same.

18     Q. Immediately inform manager of any

19  discrepancy.  Obviously you have to walk over

20  and tell a manager?

21     A. Yes.

22     Q. Fill and maintain stock shelves.  What's

23  required for that?

24     A. The same as 1, 2, and 3.

25     Q. Deliver parts as required using company

1   vehicle, that means sometimes you have to drive?

2      A. Yes.

3      Q. There is some answering phones, pulling

4   orders?

5      A. Yes.

6      Q. Operating forklift, we talked about that.

7   Housekeeping duties, what kind of housekeeping

8   duties?

9      A. Picking up skids, sweeping the floor,

10  whatever needs done.

11     Q. What do you mean by picking up skids?

12     A. If you have empty skid pallets on the floor

13  we stage them in a trailer for disposal.

14     Q. You got to bend down, pick them up, and

15  carry them?

16     A. Yes.

17     Q. Cleaning and straightening of shelves.

18  What's required for that?

19     A. The same thing.  You have to move parts

20  around, face parts, bring old stuff to the

21  front.

22     Q. Do you have to climb ladders or stairs for

23  any of this?

24     A. Some, yes.

25     Q. So there is, these are just the written

1    descriptions of what's being done, but you're

2    telling us what the physical responsibilities

3    are?

4      A. Yes.

5      Q. All right, let's take a look at the

6    physical requirements on D-9.  And I'm sorry,

7    Mr. Whitmire, I was a little confused by your

8    testimony when you were being asked as to the

9    lifting and carrying requirement.  I believe you

10   said there was a 65 pounds is what's expected of

11   someone being able to lift on their own?

12     A. That's the minimum requirement.

13     Q. Okay, so 65, 70 pounds?

14     A. Yes.

15     Q. All right, and as far as occasional lifting

16   up to 150 pounds, somebody could lift 150

17   pounds?

18     A. Yes.

19     Q. On their own?

20     A. Yes.

21     Q. Unassisted?

22     A. Yes.

23     Q. Okay.  So I think what I got a little

24   confused, and help me with this, is that when

25   you were testifying after these lifting and

1   carrying requirements, you kept on saying it's

2   based on the individual.

3     A. Yes.

4     Q. Okay.  So that means you may have a

5   warehouse worker that can only lift fifty pounds

6   unassisted, and another warehouse worker that

7   could lift 140 pounds unassisted?

8     A. The warehouse workers can at least lift 65

9   pound.

10    Q. Okay.  They have to lift at least 65

11  pounds?

12    A. Yes.

13    Q. And they have to carry at least 65 pounds?

14    A. Yes.

15    Q. Okay.  Anything over that 65 pound mark is

16  really up to the individual?

17    A. Yes.

18    Q. I mean, there comes a point in time when

19  you want them to use judgement as to having an

20  assistant helping them?

21    A. Yes.

22    Q. Okay.  So does the fact that someone can

23  lift up to 140 pounds, that's okay, that means

24  they can do it without somebody helping them?

25    A. Yes.

1    Q. Now, you also talked about forklifts, hand

2    trucks, carts, and pallet jacks.  All right,

3    forklift obviously, that's where you sit in it

4    and you drive it, right?

5    A. Yes.

6    Q. Hand truck?

7    A. Is a two-wheeled dolly.

8    Q. What do you, how do you -- what's the

9    physical, physically what do I have to do the

10   use the hand truck?

11   A. Be able to pull it back and push it or pull

12   it.

13   Q. Walk with it?

14   A. Yes.

15   Q. Cart.  What about a cart?  What do you need

16   to do physically with a cart?

17   A. Be able to lift a product onto the cart and

18   push it?

19   Q. What's a cart look like?  This is just for

20   my sake and the jury's sake just so I can get a

21   picture.

22   A. It's a four-wheeled cart.  Some have two

23   shelves to it.  It's probably 30 by 42, 40,

24   depending on the cart.

25   Q. Is it like a flatbed?

1     **A.** Yes.

2     **Q.** That's what I'm imagining, a handle with a

3     flatbed?

4     **A.** Yes, there's different style of carts, but

5     that's one of them, yes.

6     **Q.** And then you have one that has like two

7     shelves on it?

8     **A.** Yes.

9     **Q.** So you have to actually pick up the product

10    from somewhere and then put it onto the cart?

11    **A.** Yes.

12    **Q.** So that requires bending, squatting?

13    **A.** Yes.

14    **Q.** And you have to push that cart?

15    **A.** Yes.

16    **Q.** Pallet jack I think we talked about.

17    That's the same thing, you have to, it's a walk

18    behind?

19    **A.** Yes.

20    **Q.** You got to use both hands to operate a

21    pallet jack?

22    **A.** Yes.

23    **Q.** It's got the forks, so the product, you

24    have to again physically walk behind it?

25    **A.** Yes, or pull it.

1   Q. You worked in the warehouse, right?

2   A. Yes.

3   Q. How many hours are you on your feet

4   standing, standing, walking?

5   A. Probably 90 percent of it.

6   Q. So you're constantly moving around doing

7   something?

8   A. Yes.

9   Q. Climbing up stairs, coming down stairs,

10   walking around, walking to and from the main

11   building?

12   A. Yes.

13   Q. Now, you said you noticed yourself that

14   Mr. Shaw was having some difficulty.

15   A. Yes.

16   Q. Now, the time frame, was that before he was

17   sent for the exam?

18   A. Yes.

19   Q. Was that closer to that time frame?

20   A. I don't recall.  It could have been a year

21   before that, I don't recall.

22   Q. Okay.  Now, what was it -- strike that.

23   Let me ask it this way.  When Mr. Hoffman came

24   to you, what did he say to you?

25   A. That Ricky had problems walking across the

1    parking lot, looked like he would barely make

2    it.

3       Q. And that's about eighty feet between those

4    two buildings?

5       A. Roughly, yes.

6       Q. Did that cause you concern?

7       A. Yes.

8       Q. Tell me why it caused you concern.

9       A. Because obviously he was in pain.

10      Q. And the fact that --

11      A. A lot of pain.

12      Q. Excuse me?

13      A. A lot of pain.

14      Q. All right, and the fact that he was in

15   pain, why was that a concern?

16      A. Because we cared about Ricky.

17      Q. And what was your concern about Ricky?

18      A. That he can't walk.

19      Q. And how would that, how did it impact with

20   his doing his job?

21      A. Because he could end up seriously hurting

22   himself.

23      Q. In what way?

24      A. He could drop a part on him.

25      Q. I'm sorry?

1    A. He could drop a part on him.  He could drop

2    it on his toe.  He could -- there's numerous

3    things that could happen.

4    Q. What about was there any concern with him

5    climbing up and down the steps?

6    A. Not to me, no.

7    Q. Do you know if he could climb or not?

8    A. Again after we sent him I heard that they

9    were giving him assistance so he didn't have to

10   go up and down the steps, which was fine with

11   me.

12   Q. Who did you hear that he was getting

13   assistance from?

14   A. Tim Kline.

15   Q. So after he was sent to be examined

16   Mr. Kline came to you and talked about what was

17   going on in that warehouse prior to the exam?

18   A. That, yes.

19   Q. What else did Mr. Kline tell you?

20   A. That was about it, that he was struggling

21   to walk.

22   Q. And you said that -- what about with regard

23   to other workers in the warehouse?  Was there

24   concern for you as to Mr. Shaw's struggling to

25   walk?

1    A. Well, yes.

2    Q. Why was that a concern?

3    A. Because if he was on a forklift and not

4  able to move his knee and can't stop it, it he

5  could've ran into somebody or knocked a rack

6  over or there's numerous things that could

7  happen.

8    Q. How important is squatting in that job?

9    A. As important as any other one.

10   Q. You got to squat to pick up products?

11   A. Some, yes.

12     MS. SALTZ: I have no further questions.

13     THE COURT: Mr. Russo, anything further.

14     REDIRECT BY MR. RUSSO:

15   Q. Please, Your Honor.  Mr. Whitmire, on

16  Exhibit Number 6, which is the warehouse worker

17  job description, you told counsel that in the

18  assigned duties that you would need to lift and

19  walk and bend, is that correct?

20   A. Yes.

21   Q. And that's this one?

22   A. Yes.  I'm trying to find it here, I'm

23  sorry.

24   Q. That's okay.  You said you would have to

25  lift and walk and bend, correct?

1    A. Yes.

2    Q. And that's not in that document, you're

3    just saying in essence these are the things you

4    probably would have to do to get that part of

5    the job done.

6    A. Yes.

7    Q. Now, if I have to lift something and walk

8    it, and you described to your counsel that you

9    would have to lift something and put it on the

10   cart so you could use the cart, correct?

11   A. Yes.

12   Q. Is it fair to say I could take a forklift,

13   lift the product to the level of the cart, and

14   slide it onto the cart?

15   A. Yes.

16   Q. And use the cart to walk?

17   A. Yes, you could.

18   Q. So it's not necessarily true that I need to

19   be able to bend, lift, squat or do all those

20   things, but if I took an item onto a forklift,

21   made it parallel to the cart, and slid it

22   across, I could get to the same point?

23   A. It depends on where the part's at.

24   Q. True.

25   A. We have narrow aisles that you can't get a

1  forklift into.

2     Q. True, but it's possible to do it the way I

3  described?

4     A. As long as you're not in a narrow aisle,

5  yes.

6     Q. On top of that counsel talked about hand

7  carts and the hand jack.

8     A. Uh-huh.

9     Q. The end result of all of these mechanisms

10  is to move something, correct?

11     A. Yes.

12     Q. And again assuming I'm not using a narrow

13  hallway, I could accomplish the same task from a

14  forklift?

15     A. Yes.

16     Q. Is there any prohibition that stops Ricky

17  Shaw from doing whatever he needed to do to move

18  an item?

19     A. No.

20     Q. Is there any prohibition that would stop

21  Ricky Shaw to use whatever method he could to do

22  the items that are assigned duties on this lift?

23     A. No.

24     Q. You talked about there was concern about

25  Ricky seriously hurting himself.

1    **A.** Yes.

2    **Q.** Did anyone ever report an incident to you

3    where Ricky was in danger of seriously hurting

4    himself?

5    **A.** Other than I believe he hit a pallet rack a

6    time or two.

7    **Q.** And that happens on a regular basis, right?

8    **A.** Yes.

9    **Q.** Did you ever see anything where Ricky was

10    in danger of seriously injuring himself?

11    **A.** No.

12    MR. RUSSO: I have nothing further, Your

13    Honor.

14    THE COURT: Anything further?

15    RECROSS BY MS. SALTZ:

16    **Q.** I do, Your Honor.  Mr. Whitmire, is it your

17    testimony that in performing the duties of a

18    warehouse worker in Warehouse B that Mr. Shaw

19    would rarely have to walk, stand, squat, lift,

20    and carry?

21    **A.** No, he could do all of them things.

22    **Q.** He would have to do all those things, so

23    the fact that counsel said couldn't he use a

24    forklift to do this and couldn't he use that --

25    **A.** He could use a forklift to lift it on the

1    cart.  He'd still have to push the cart, walk

2    with the cart, and take it off the cart.  I just

3    answered his question.

4      Q. Understood.  I just wanted to make sure

5    that you weren't saying that that job could be

6    done completely sitting down?

7      A. No, it cannot.

8         MS. SALTZ: That's all I have, thank you.

9         MR. RUSSO: Nothing else, Your Honor.

10        THE COURT: And I have no questions.

11   You may step down.  Thank you very much,

12   Mr. Whitmire.

13        THE WITNESS: Thank you.

14        THE COURT: Ladies and gentlemen, let's take

15   our afternoon break at this time.  Please recall

16   my instructions that you refrain from any

17   conversations among yourselves about what you

18   have seen and heard so far in the courtroom.

19   You will have an opportunity to do that, but not

20   until final deliberation.  We'll take a

21   15-minute break, let's reconvene at ten after

22   3:00 and we'll continue with the plaintiff's

23   case in chief.  Ms. McKinney, you may escort the

24   jury.  We're in recess until 3:10.

25        (Recess taken from 2:53 to 3:14 p.m.)

1       THE COURT: I understand from Ms. McKinney

2   that counsel had some scheduling matters that

3   you wanted to address or --

4       MR. CROCENZI: No, just a preliminary

5   procedure issue, Your Honor.  I have Joseph

6   Sembrot from my office who will read the part of

7   Mr. Kline in the deposition transcript.  We just

8   wanted to find out how we wanted to indicate

9   that on the record.

10      THE COURT: I'm happy to advise the jury as

11  to the fact that he'll simply be reading the

12  matter, reading the role of Mr. Kline for the

13  record.

14      MR. CROCENZI: Okay.

15      MR. RUSSO: We do, Your Honor, it seems as

16  though we have to read Mr. Kline's testimony

17  into the record, which we expect to take an

18  hour, we would be calling Mr. Kline next --

19  Mr. Sheldon, I'm sorry, after the deposition,

20  and Mr. Sheldon was released.  So we either are

21  looking at on a break are going to be forced to

22  take our witnesses out of order.

23      MR. CROCENZI: Have him come back?  He's

24  only in Carlisle.

25      THE COURT: Who released him?

1          MS. SALTZ: Well, the problem is, Your Honor

2    when counsel gave the line-up of their

3    witnesses, they indicated Mr. Hoffman,

4    Mr. Whitmire, Ms. Hoffman, and then the Kline

5    deposition, which would have taken up the entire

6    afternoon, followed by Mr. Sheldon tomorrow

7    morning, followed by Mr. Shaw, then they have

8    Mr. Kearn, and then followed by Dr. Walker.

9    That was the line-up that was given this

10   morning.  So based on that line-up we weren't

11   getting to Mr. Sheldon today, and now I'm being

12   told that that was, they misspoke but

13   unfortunately  didn't tell me that they had

14   misspoken or clarified it with me, and then

15   switched the order of Ms. Hoffman and Mr. Kline.

16          THE COURT: All right.  Well, he's been

17   released.  The bottom line is you shouldn't have

18   released him until we could have confirmed what

19   the schedule was, but he's no longer here.  Can

20   he be recalled?  Let's just him called on his

21   cell phone and bring him back so we can get that

22   in.

23          MR. CROCENZI: Carlisle is only a half hour

24   away.

25          THE COURT: If this is going to take an hour

1    we'll get him here and we'll still be able to

2    accomplish this.

3        MS. SALTZ: I don't have a problem, Your

4    Honor.  The only thing I ask is that as long as

5    I know what's, you know, if that's the way we're

6    going then I'm assuming we're going to begin

7    with Ms. Hoffman tomorrow morning.

8        MR. CROCENZI: Yes, that's fine.  That's

9    correct.

10        MS. SALTZ: And then followed by Mr. Shaw,

11   Mr. Kearn, and then Dr. Walker.

12        MR. RUSSO: Dr. Walker.

13        MR. CROCENZI: We have Brenda -- wait, let's

14   make sure we have this right.

15        THE COURT: Well, let's go off the record

16   for this, Wes.

17        (Discussion held off the record.)

18        THE COURT: While we were off the record we

19   discussed the reading of Mr. Kline's deposition

20   transcript.  It's my understanding that counsel

21   have agreed that the entire transcript can be

22   read into the record and that that will, and

23   that any objections that were raised on the

24   transcript can be withdrawn.  Is that an

25   accurate statement of your understanding?

1      MR. CROCENZI: Yes, Your Honor.

2      MS. SALTZ: Yes, Your Honor.

3      THE COURT: And so when you get to the

4  portion where objections have been raised you're

5  simply going to skip over those objections, is

6  that correct?

7      MR. CROCENZI: No, we're going to read that

8  part of the testimony.

9      THE COURT: Oh, you're going to also read

10  the objections?

11      MS. SALTZ: No, no objections.  Just the

12  portion of the testimony that at one point was

13  objected to that.

14      THE COURT: Oh, all right.

15      MS. SALTZ: So that will be read through

16  cleanly then.

17      THE COURT: All right.  Essentially the

18  objections will be extricated from the reading.

19      MS. SALTZ: That is correct.

20      THE COURT: All right.  Very good.

21      MR. CROCENZI: And I need to provide a

22  cleaner copy of the transcript for an exhibit

23  because right now we do have portions that are

24  marked "need ruling".  Obviously now that the

25  objections have been withdrawn we can submit a

1    clean copy tomorrow.

2         THE COURT: All right.  That would be fine.

3    Are you ready for the jury?

4         MR. RUSSO: Your Honor, Plaintiff's Exhibits

5    3 and 5 were admitted, published through ELMO.

6    We'd like to publish hard copies to the jury.

7    How would you like us to go about that given

8    that ELMO didn't lend itself to a three-page

9    document?

10        THE COURT: Well, if you were going to

11   publish them, Mr. Russo, you should have done it

12   while the witness was on the stand.

13        MR. RUSSO: Okay.

14        THE COURT: I don't want you to publish them

15   without a question pending or a witness on the

16   stand.

17        MR. RUSSO: We can publish them again with

18   Mr. Kline's testimony.  They're all exhibits in

19   his deposition anyway.

20        THE COURT: Very well.  Any objection?

21        MS. SALTZ: No objection, Your Honor.

22        THE COURT: All right.  Ms. McKinney, would

23   you escort the jury?  And, Ms. McKinney, do you

24   have those exhibits as being admitted?

25        COURTROOM DEPUTY: I do not.  I have them as

```
1    introduced.

2        THE COURT: Yes, I have them as introduced

3    but not as admitted.

4        MR. RUSSO: Okay.  Well, no, we didn't move

5    for any admissions.

6        THE COURT: Yes, I don't think any of the

7    exhibits have been admitted yet, and if you

8    intend to do that and use them in Mr. Kline's

9    deposition, then let's do it before we put

10   Mr. Sembrot on the stand.  Okay?

11       MR. RUSSO: Yes.

12       (Brief pause.)

13       (Jury seated at 3:23 p.m.)

14       THE COURT: Please be seated.  Ladies and

15   gentlemen, counsel and I met briefly after the

16   break and we are now going to proceed with the

17   reading of a deposition transcript.  I think I

18   mentioned this in my preliminary instructions,

19   but this is for Mr. Kline, who is deceased, and

20   his testimony will be read into the record, and

21   the individual who is reading Mr. Kline's part

22   of the deposition transcript, we'll put him on

23   the witness stand, is Mr. Sembrot, he is with

24   Mr. Crocenzi's office, and he'll simply take the

25   witness stand and read those answers that were
```

1    given by Mr. Kline during the deposition when it

2    was taking place, and what is the date of the

3    deposition?

4         MR. CROCENZI: January 12th, 2010.

5         THE COURT: All right.  January 12th, 2010.

6    As I said to you previously, it is sworn

7    testimony and you can accept it in the same

8    manner and fashion with which you would accept

9    testimony if it were being given live in the

10   courtroom.  Mr. Sembrot, if you would like to

11   step forward?

12        MR. CROCENZI: Your Honor, would you like a

13   copy of the transcript?

14        THE COURT: No, that's not necessary, and

15   it's not necessary that Mr. Sembrot be sworn in.

16   Mr. Crocenzi, you may proceed.

17        MR. CROCENZI: Thank you.

18        (The deposition of Tim Kline was read into

19   the record beginning at 3:26 p.m.)

20        MR. CROCENZI: Your Honor, at this time we'd

21   like to publish plaintiff's exhibits?

22        THE COURT: Ladies and gentlemen, various

23   exhibits were introduced during the course of

24   this deposition.  We would like to show them to

25   you so you're able to put the testimony in

1   context as it relates to the various exhibits,

2   and we've already discussed this with defense

3   counsel, Ms. Saltz has no objection, so you may

4   publish.

5           MR. CROCENZI: Your Honor, may I approach

6   the jury?  I do have only two copies.

7           THE COURT: That would be fine.

8           MR. CROCENZI: Thank you.

9           THE COURT: Yes, ladies and gentlemen, if

10   you would please review them individually and

11   pass them along, we're just going to take a

12   break while you do this so that you're not

13   distracted from the deposition testimony as it

14   is being given.  I think for the record we

15   should have a motion for their admission,

16   Mr. Crocenzi.

17           MR. CROCENZI: Thank you.  I'll move for the

18   admission of P-1 at this time, Your Honor.

19           THE COURT: Both documents?

20           MR. CROCENZI: Right.  Well, they're one and

21   the same.

22           THE COURT: That's right.  Any objection,

23   Ms. Saltz?

24           MS. SALTZ: No objection.

25           THE COURT: All right.  It is admitted.

1           (Brief pause.)

2           (Deposition continued at 3:38 p.m.)

3           MR. CROCENZI: Again I would like to publish

4    Plaintiff's Exhibit 2, please.

5           THE COURT: Any objection?

6           MS. SALTZ: No objection.

7           THE COURT: Would you move for its admission

8    as well?

9           MR. CROCENZI: Yes, I would move for

10   admission of Plaintiff's Exhibit 2.

11          THE COURT: Any objection?

12          MS. SALTZ: No, Your Honor.  In fact I

13   believe there's two other performance

14   evaluations that --

15          THE COURT: Move them all in?

16          MS. SALTZ: Move them all in.  We have no

17   objections to any of the performance

18   evaluations.

19          MR. CROCENZI: Thank you.  I move for the

20   admission of P-1 through P-5, which are the

21   performance evaluations.

22          THE COURT: All right.  They are all

23   admitted without objection.

24          MR. CROCENZI: Thank you.

25          THE COURT: To speed things along why don't

1   we after the first person gets through with 2004

2   we can move through --

3        MR. CROCENZI: Sure.

4        THE COURT: Or is that 2003?

5        JUROR: 2004.

6        THE COURT: 2004?  Then we'll do 2005, and

7   you can read through that portion of the

8   transcript after we get through all of the

9   exhibits.

10        (Brief pause.)

11        MR. CROCENZI: I'm showing the jury P-3.

12        (Brief pause.)

13        MR. CROCENZI: P-4.

14        (Brief pause.)

15        MR. CROCENZI: And P-5.

16        THE COURT: And, ladies and gentleman, these

17   exhibits will be made available to you during

18   the time of final deliberations, so it's

19   probably not necessary that you make notes

20   regarding them.

21        (Brief pause.)

22        THE COURT: All right, Mr. Crocenzi, I

23   believe the jury has finished their review of

24   these exhibits.  You may continue.

25        (Reading of the deposition of Tim Kline

1    continued at 3:48 p.m.)

2         MR. CROCENZI: That's it.

3         THE COURT: All right. Thank you very much.

4         MR. CROCENZI: I call Bryan Sheldon.

5         MS. SALTZ: He's here.

6         THE COURT: All right.  Good afternoon,

7    Mr. Sheldon.  If you would please step forward,

8    and the courtroom deputy will administer the

9    oath.

10        (Bryan Sheldon was called to testify and

11   was sworn by the courtroom deputy.)

12        COURTROOM DEPUTY: Please be seated and

13   state your full name for the record.

14        THE WITNESS: Bryan, B-R-Y-A-N, Sheldon,

15   S-E-H-L-D-O-N.

16        MR. CROCENZI: You'll have to give me a

17   second after all that reading, Your Honor.

18        (Brief pause.)

19        DIRECT EXAMINATION BY MR. CROCENZI:

20   Q. Thank you.  Good afternoon, Mr. Sheldon.

21   A. Good afternoon.

22   Q. You are the corporate controller for

23   Cumberland Truck Equipment Company, is that

24   correct?

25   A. I am.

1    Q. How long have you served in that position?

2    A. Sixteen and a half years.

3    Q. Now, Cumberland Truck Equipment Company

4    sells truck parts, is that correct?

5    A. As well as heavy duty trucks and service

6    work on heavy duty trucks.

7    Q. In 2007 Cumberland Truck had over two

8    hundred employees all of its combined

9    operations, is that right?

10   A. That's correct.

11   Q. And you are engaged in business that takes

12   you across state lines, either you receive

13   product from other states or you're shipping

14   product out to other states?

15   A. Also correct.

16   Q. Part of your job duties in `07 as the

17   corporate controller, you supervised the human

18   resources department, is that correct?

19   A. Yes.

20   Q. Now, Brenda Hoffman was the director of

21   human resources in 2007, is that right?

22   A. Correct.

23   Q. You reported directly to the owners?

24   A. I did.

25   Q. I want to ask you just a few questions here

 1    at the beginning concerning pay raises to

 2    employees at Cumberland Truck, and pay raises

 3    were given in general in 2007 of about 3.2

 4    percent, is that right?

 5      A. I wouldn't know the exact percentage, but

 6    it sounds reasonable.

 7      Q. In 2008 there was another pay raise in

 8    general of about 3 percent?

 9      A. Okay.

10      Q. Does that sound about right?

11      A. Yes, it certainly would.

12      Q. Cumberland Truck also had a 401-K matching

13    program in place in 2007?

14      A. That is correct.

15      Q. And do they continue to have that program

16    in place up to the present day?

17      A. We do.

18      Q. Can you explain to the jury how that

19    matching program works?

20      A. Certainly.  It is of any employee who

21    decides to contribute to the 401-K program, we

22    match fifty cents on each dollar contribution up

23    to 6 percent of their salary or wages.

24    Therefore if somebody contributes 3 percent, we

25    would contribute a percent and a half.  If

1  somebody contributes 6 percent, we would

2  contribute 3 percent.

3     Q. Has that percentage changed at all from

4  2007?

5     A. No, it has not.

6     Q. You didn't supersize the warehouse

7  operations in Carlisle?

8     A. No.

9     Q. You didn't work with Ricky Shaw in

10  Warehouse B at the Carlisle location?

11     A. I worked in the Carlisle location, but I

12  did not work directly with Mr. Shaw.

13     Q. You were located in the corporate office

14  where Chuck Hoffman's office was located?

15     A. That's correct.

16     Q. Now, on occasion you would come over to

17  Warehouse B maybe once a week for a few minutes

18  to check on something or get information about

19  something, is that right?

20     A. That's correct.  I had the responsibility

21  of overseeing our warranty department, and our

22  warranty department is located in Warehouse B.

23     Q. Now, during the time you came over for a

24  few minutes about once a week did you always see

25  Ricky Shaw doing his job at the warehouse?

1    **A.** No, not always.

2    **Q.** I want to turn your attention to February

3    of 2007.  Did you have a meeting with Chuck

4    Hoffman and Pat Whitmire concerning Ricky Shaw's

5    employment with the company?

6    **A.** Yes.

7    **Q.** And during that meeting isn't it true that

8    Chuck Hoffman told you that he observed

9    Mr. Hoffman struggling to walk across a parking

10   lot?

11   **A.** It was either Chuck or Pat that brought it

12   to my attention.  I'm not positive which one.

13   **Q.** And isn't it true that Chuck Hoffman told

14   you that he observed Ricky using a cane when he

15   saw him walking across the parking lot?

16   **A.** That is what was discussed, yes.

17   **Q.** After hearing this information from Chuck

18   Hoffman or Pat Whitmire did you form an

19   impression that Ricky was going to have

20   difficulty performing his job?

21   **A.** I wasn't sure what Ricky was dealing with,

22   but it would seem to me that somebody who was

23   using a cane to traverse a parking lot would

24   certainly have trouble carrying objects in our

25   warehouse, yes.

1   Q. And you were concerned that Ricky was a

2   danger to himself or others in the warehouse?

3   A. Well, that's certainly a possibility.

4   Q. Did you also have a conversation with Tim

5   Kline about that time?

6   A. Not immediately, no.

7   Q. Did Mr. Kline report to you anything about

8   Ricky using a cane to operate a forklift?

9   A. Not at that time.

10   Q. When did he mention that to you?

11   A. It's my recollection that Mr. Kline

12   mentioned that to me after Ricky was put on

13   medical leave.

14   Q. So after the February 26th, `07 examination

15   at Concentra?

16   A. Yes, after that examination.

17   Q. And it's your testimony that Mr. Kline came

18   to you after that examination and said that

19   Ricky was using a cane to operate a forklift?

20   A. That is my recollection, yes.

21   Q. Prior to these meetings in February 2007

22   with Pat, the meeting with Pat Whitmire and

23   Chuck Hoffman, had you received any complaints

24   of Ricky's job performance?

25   A. Me personally?

Q. Yes.

A. No.

Q. Did you receive any reports about Ricky dropping items in the warehouse?

A. We have in our personnel file which I oversee obviously we have some incident reports that have reported that, but they weren't brought to me, you know, to my attention and said Ricky is doing a bad job or anything like that.

Q. Isn't it true that the incidents that you are referring to were items where Ricky had an accident with the forklift?

A. I believe that's one of them.  I mean, I don't recall those, they really didn't factor into any of the decision making that we made.

Q. Fair enough.  Isn't it true that other employees in the warehouse have had accidents involving a forklift?

A. Absolutely, yes.

Q. Did any employee report to you by February 2007 that Ricky was having difficulty lifting anything?

A. No.

Q. Anybody report any incidents that Ricky was

1    a danger to himself while working in the

2    warehouse?

3        A. No.

4        Q. Any reports that Ricky was a danger to

5    somebody else in the warehouse?

6        A. No.

7        Q. In fact you thought highly of Ricky, you

8    thought he was an exemplary employee?

9        A. I did.

10       Q. He actually had better knowledge than Tim

11   Kline about how that warehouse should be

12   operated?

13       A. That's correct.

14       Q. He was efficient?

15       A. Yes.

16       Q. A valuable employee of Cumberland Truck?

17       A. Yes.

18       Q. Now, after your meeting with Chuck Hoffman

19   and Pat Whitmire you made a decision to send

20   Ricky for a physical examination, is that right?

21       A. That's correct.

22       Q. Now, prior to making the decision to send

23   Ricky to Concentra Medical Center did you meet

24   with Ricky to discuss your concerns?

25       A. I did not meet with Ricky, no.

1    Q. Did you discuss with Ricky any -- well, let

2    me strike that.  Let me talk first about

3    Concentra Medical Center.  Cumberland Truck has

4    a relationship with Concentra Medical Center

5    where you send employees or prospective

6    employees to them for pre-employment physicals,

7    is that right?

8    A. That's correct.

9    Q. Do you also send employees to Concentra if

10   they're injured on the job?  Concentra is part

11   of your panel physician where they, the employee

12   needs to treat with Concentra?

13   A. That is also correct.

14   Q. Do you also send employees to Concentra for

15   drug and alcohol screenings?

16   A. Yes, we do.

17   Q. Now, how long have you had this type of

18   relationship with Concentra?

19   A. Honestly I don't know when Concentra, but

20   it's been for several years.  Obviously we still

21   use them, so it's been a long-term relationship.

22   Q. I'm going to show you what has been

23   identified as Exhibit 9, Plaintiff's Exhibit 9.

24   A. Okay.

25        (Brief pause.)

1    Q. Have you had a chance to look at that?

2    A. Uh-huh.

3    Q. Okay.  This is the form that was sent with

4    Mr. Shaw when he went for the physical

5    examination at Concentra on February 26th, 2007,

6    is that right?

7    A. This is the completed form that was

8    returned actually.

9    Q. Okay.

10    A. Not -- the form was blank when it was Sent

11    except for the first section was filled out.

12    Q. Okay.  Other than the handwriting that

13    somebody at Concentra put on there, that was the

14    form that was sent?

15    A. That looks like it, yes.

16    Q. Okay.  Now, this form was developed in 2003

17    or 2004 as part of an unrelated worker's

18    compensation case, is that right?

19    A. Yes.

20    Q. Your worker's compensation carrier was

21    involved in helping to draft that document for

22    Cumberland Truck, is that right?

23    A. Well, no, they didn't help to draft the

24    document for Cumberland.  When we were dealing

25    with a worker's comp issue a form similar to

1   this one came to us from the worker's comp

2   company to be filled out for an evaluation of

3   that particular injury.  We then modified the

4   form and adopted it and used it for a cases like

5   these for when we sent somebody for a job

6   analysis or evaluation.

7     Q. Looking at the physical requirements which

8   start on page 1 and continue through page 2 of

9   the document?

10    A. Uh-huh.

11    Q. Did you provide any input into the physical

12   requirements listed on this job --

13    A. No, sir.

14    Q. -- description?  Do you know who did?

15    A. It would have been developed by our parts

16   department headed up by Chuck Hoffman.

17    Q. To the best of your knowledge did anybody

18   at Concentra solicit the input from any of the

19   warehouse workers about the physical

20   requirements listed on this job analysis form?

21    A. I'm sorry?

22    Q. Sure, I can repeat that again.  To the best

23   of your knowledge did anybody at Cumberland

24   Truck ask the employees in the warehouse for

25   their input on the physical requirements for the

1   job which should be listed on this job analysis?

2   **A.** Ask our general staff for the knowledge?

3   **Q.** Yes.

4   **A.** Or for their input on this?

5   **Q.** Yes.

6   **A.** I wouldn't know, but I don't believe so.

7   **Q.** Did you ever, did anybody at Cumberland

8   Truck consult Ricky Shaw about what should be

9   included on the physical requirements of this

10   job analysis form?

11   **A.** No, sir, I don't believe so.  Not to the

12   best of my knowledge.

13   **Q.** Do you know whether anybody at Cumberland

14   Truck gave the completed job analysis form when

15   you're done modifying it, did they ever give it

16   to Ricky Shaw?

17   **A.** No, sir.

18   **Q.** Did they give it to any warehouse worker?

19   **A.** Not prior to him being involved in the

20   evaluation.

21   **Q.** Yes.

22   **A.** Okay.

23   **Q.** So prior to February 26th, `07 it's your

24   testimony that Ricky Shaw did not receive this

25   job analysis form?

1    A. That's correct.

2    Q. And it's your testimony also that no other

3  warehouse worker received the completed job

4  analysis form?

5    A. Well, this would be part of physical exams,

6  so it wasn't developed for Ricky's case.  It was

7  developed prior to that.  So I would feel

8  certain that this form was seen by other

9  warehouse employees along the way prior to Ricky

10 receiving the form.

11   Q. If they had to get some kind of medical

12 evaluation?

13   A. That's correct.

14   Q. But in general it's not included in any

15 kind of employment packet or personnel manual

16 that the employee gets upon hire?

17   A. No.

18   Q. Okay.  Did you direct Brenda Hoffman to

19 tell Mr. Shaw on February 26th, 2007 that he had

20 to go to Concentra Medical Center for the

21 evaluation?

22   A. I don't know the exact date, but yes, that

23 was part of this event process.

24   Q. Okay.  So the chain of command was that

25 you made the decision, then you instructed your

1   subordinate Mrs. Hoffman to then instruct Ricky

2   to go for the exam?

3      A. That is correct.

4      Q. Okay.  Did you meet with Ricky at some

5   point after he returned from the Concentra

6   medical examination on February 26th?

7      A. I don't believe that I met with Ricky until

8   sometime after that.  I did not go over the

9   evaluation with Ricky, or I don't remember going

10   over the evaluation with Ricky immediately when

11   he came back.

12      Q. Would it be correct that you met with Ricky

13   two days later on February 28th, 2007?

14      A. I know that I met with Ricky the date that

15   he came in to work to start work after we had

16   put him on medical leave, yes.

17      Q. Did you give Brenda Hoffman any

18   instructions after Ricky went to the Concentra

19   medical examination?

20      A. How so?

21      Q. Well, how did you get the report from

22   Concentra Medical Center after the physical

23   examination?

24      A. I received a report I believe from Brenda

25   Hoffman.

1    Q. Okay.  So when you said that you, the

2    company put Ricky on medical leave, isn't it

3    true that you instructed Brenda Hoffman to offer

4    Ricky family medical leave?

5    A. Absolutely.

6    Q. And you also instructed her that Ricky

7    should, needs to apply for short-term disability

8    benefits?

9    A. That would be my recommendation, yes.

10   I can't force him to ask for short-term

11   disability.

12   Q. Two days later you said Ricky then came

13   back to work?

14   A. He came in and clocked in and started

15   working in Warehouse B, yes.

16   Q. Do you know how long he worked before you

17   stopped him from working?

18   A. Honestly I don't.  I don't think he was

19   working more than about a half an hour.

20   Q. Isn't it true that Ricky was upset that

21   Cumberland Truck was no longer allowing him to

22   work in Warehouse B?

23   A. Absolutely, that's true.

24   Q. And isn't it true that Ricky during that

25   meeting told you he was physically able to do

1  his job as a warehouse worker?

2  **A.** Yes, Ricky's opinion was that he was able

3  to do the job.

4  **Q.** And isn't it true that during that meeting

5  Ricky told you that why are you bringing this

6  issue up now when he had been working for years

7  at Cumberland Truck?

8  **A.** It is true he asked that question.

9  **Q.** Did he also tell you that by not allowing

10  him to work he feared that his physical

11  condition would get worse?

12  **A.** Also true.

13  **Q.** He also told you during this meeting that

14  because of his eating habits and his activities

15  that if he had a sedentary lifestyle, by not

16  working his condition would get worse?

17  **A.** Well, that's a choice.  Yes, sir.

18  **Q.** And you in fact were surprised by Ricky's

19  reaction that he wanted to continue working at

20  Cumberland Truck instead of taking the

21  short-term disability?

22  **A.** Yes, sir, quite surprised.

23  MR. CROCENZI: That's all I have.  Thank

24  you.

25  THE COURT: Ms. Saltz, any examination?

1      MS. SALTZ: Yes, Your Honor, thank you.

2      CROSS EXAMINATION BY MS. SALTZ:

3    Q. Let's pick up that last question. Why were

4  you surprised?

5    A. Well, I was surprised because I had

6  personally observed Ricky trying to traverse a

7  parking lot and having great physical difficulty

8  and apparent pain in doing so.  When he's

9  offered a company paid short-term disability

10  policy to improve health and well-being, I was

11  quite surprised that he didn't take advantage or

12  didn't want to take advantage of that program.

13    Q. And I believe, Mr. Sheldon, you testified

14  that you cannot force an employee to go out on

15  disability.

16    A. No.

17    Q. And that's a benefit that's offered by the

18  company?

19    A. That is a benefit, yes, it is a company

20  paid benefit we provide for all of our

21  employees.

22    Q. I'm going to take you back to the beginning

23  of the situation, start filling in some blanks

24  without just a yes or no.

25    A. Okay.

1    Q. Could you explain to the jury how you came

2   -- well, let me strike that.  Let me ask this

3   question first.  Did you yourself observe

4   Mr. Shaw having difficulty?

5    A. After I had the conversation with Pat and

6   Chuck I did pay attention when I saw Ricky

7   working as to how he moved about and utilized

8   his cane on our property, yes.

9    Q. Okay, and then once Mr. Hoffman and

10  Mr. Whitmire came to you, Mr. Hoffman told you

11  what he saw, then you started observing

12  yourself?

13   A. Yes.

14   Q. Can you explain to the jury the process

15  after that point.  What did you -- I take it you

16  took the lead on going forward in trying to

17  decide how to handle the situation?

18   A. Right.  This is an unusual circumstance.

19  I mean, we have an employee who's been a

20  long-term employee, a respected member of our

21  organization, and he's obviously having physical

22  difficulties.  At that point how do you deal

23  with that?  You know, he's -- it's not something

24  that happened immediate and we weren't sure what

25  he was dealing with.  I mean is he dealing a

1  bout of gout or is he dealing with something

2  more serious?  There are lots of rules out

3  there, HIPAA and FMLA and all kinds of medical

4  rules, and even the owners of our company are

5  not allowed to have employee medical records at

6  this date, you know, you can't discriminate

7  against anybody based on medical records and so

8  on.  So that information is held very tightly

9  and it's very secretive in today's employment

10 process.

11  Q. Let me stop you right there and then I'll

12 let you continue.  At any time prior to

13 Mr. Hoffman coming to you with Mr. Whitmire did

14 Ricky ever come to you, Mr. Shaw come to you and

15 disclose to you that he had some kind of medical

16 issue or condition?

17  A. Only when he was originally hired and he

18 was involved in a worker's comp incident, I

19 believe it was in 2000, where a brake drum I

20 believe struck his shin, I'm not sure if it was

21 right or left, and he had to have some time off

22 work for that particular incident, and then he

23 came back under some restricted duties for a

24 little while and eventually he was released to

25 full duties.

1    Q. Did he come back with a release from a

2    physician saying that he could come back to work

3    with restrictions?

4    **A.** Yes.

5    Q. And did you accommodate those restrictions

6    based on the doctor telling you what those

7    restrictions had to be?

8    **A.** Yes, we did.

9    Q. And then you worked with him to get him to

10   full duty?

11   **A.** Yes.

12   Q. And he did get there at some point?

13   **A.** Yes.

14   Q. So other than that as he moved closer to

15   the end of 2006/2007, were you aware of any

16   other medical conditions that Mr. Shaw had?

17   **A.** No.

18   Q. Now, at any time did he ever ask for any

19   accommodations, putting aside the worker's comp

20   injury?

21   **A.** No.

22   Q. And you explained that after you now you

23   had your own observation, Mr. Hoffman and

24   Mr. Whitmire came to you, what did you do next?

25   **A.** What we did was we decided to send --

1    actually we consulted our attorney.  We have a

2    group of attorneys here in Harrisburg that we

3    consult with when we get into issues that we

4    don't know exactly how to handle.  So frankly

5    Brenda and I called the attorney and explained

6    the situation and got --

7         THE COURT: Hold on.  Hold on.

8         MR. CROCENZI: I'm going to object at this

9    point, Your Honor.

10    **Q.** Don't tell us what the attorney said.

11    **A.** Right, I understand, but we got his opinion

12    on the matter.

13         MS. SALTZ: Okay.

14         MR. CROCENZI: Well, Your Honor, I'm even

15    going to object to any of that testimony.

16         MS. SALTZ: I'm moving away from that, Your

17    Honor.

18         THE COURT: Okay.

19         MR. CROCENZI: And the reason is because

20    throughout this case and in Mr. Shaw's

21    deposition the defense asserted the attorney

22    client privilege, and so therefore they can't

23    rely now upon advice of counsel to exonerate

24    themselves.

25         THE COURT: All right.  Very well.  We're

1    going to move on.

2        BY MS. SALTZ:

3    Q. We're going to move on.

4    A. Okay.

5    Q. Now, did you meet with Brenda to discuss

6    the situation with her?

7    A. Right.

8    Q. Okay.

9    A. I met with Brenda.

10   Q. I mean Ms. Hoffman.

11   A. Right.

12   Q. The two of you decided to send Mr. Shaw for

13   an exam?

14   A. That's correct.

15   Q. Now, Concentra is the, is an independent

16   facility?

17   A. Concentra is an independent facility.

18   Q. It's not owned by Cumberland?

19   A. No.  We don't own them.  We don't invest in

20   them.  We don't have any shares or any stocks or

21   anything but a relationship where we utilize

22   them for medical reasons.

23   Q. Okay, and at the time that Mr. Shaw was

24   sent did you have any knowledge, perception,

25   idea as to whether or not he would be able to do

his job?

   **A.** I mean, I observed him using a cane to walk.  So I had some idea that he was dealing with a medical issue or he wouldn't have gone. Aside from that I didn't know what he was dealing with.  I had no indication of whether he was dealing with a temporary situation or a permanent one.

   **Q.** Did you have any idea as to whether or not he'd be able to come back to work after that exam?

   **A.** No, I did not.

   **Q.** Now, after his examination I believe you testified that it was Ms. Hoffman that reported to you what the results were?

   **A.** That's correct.

   **Q.** Did you ever see the actual report itself?

   **A.** This job analysis report?  Yes.

   **Q.** As completed by Concentra?  Don't tell me what's on it.

   **A.** That's correct.

   **Q.** As completed by Concentra?

   **A.** That is correct.

   **Q.** What happened next?

   **A.** Well, we decided that based upon what was

1   on the evaluation that Mr. Shaw was not able to

2   perform the job duties that he had been assigned

3   to do, and I instructed Brenda to put him on

4   medical leave until he was able to come back

5   with restrictions or else-wise.

6     Q. Now, have you, has Cumberland ever put

7   other employees on medical leave?

8     A. No, not to the best of my knowledge.  I

9   mean, other than if somebody came to us first,

10  you know, and said, "I have a particular

11  difficulty and, you know, I need to have

12  restrictions or, you know, I need to have

13  accommodations," but this is the reverse effect,

14  you know.  We initiated the process.  In every

15  other case I've ever dealt with the employee has

16  initiated the process.

17    Q. So it was unusual in that regard?

18    A. Very unusual.

19    Q. Okay.  So now when Mr. Shaw was placed on

20  medical leave he still had a job?

21    A. Yes, absolutely.

22    Q. And what was Cumberland's intent?

23    A. To get him back as quickly as possible

24  because he was a --

25    Q. Because he was a good employee?

1    **A.** Yes.

2    **Q.** And Cumberland tries to keep good

3    employees?

4    **A.** They're hard to find.

5    **Q.** Now, you testified that a couple of days

6    later he came back on his own to work.  He was

7    told he was on medical leave.

8    **A.** Uh-huh.

9    **Q.** And to take that time to deal with whatever

10   the situation was.

11   **A.** That's correct.

12   **Q.** Now, at that time did you know what the

13   problem was?

14   **A.** No.

15   **Q.** You still did not know?

16   **A.** No, I did not know.

17   **Q.** You didn't know whether it was temporary or

18   how long it would take to resolve or when he

19   could come back?

20   **A.** I did not know.

21   **Q.** So a couple of days later he comes back and

22   clocks in, you didn't even know he's clocking

23   in?

24   **A.** That's correct.

25   **Q.** What happened after you discovered that he

 1   had clocked in to work?

 2     **A.** I asked I believe it was Brenda, but I

 3   asked somebody other than myself to bring him

 4   over to the conference room so we could sit down

 5   and talk about it, but we needed to stop him

 6   from working as he was on medical leave.

 7     **Q.** Before we get to that conversation, what

 8   were you -- let me strike that and ask it this

 9   way.  Did you have concerns as to why he could

10   not continue working in the warehouse?

11     **A.** What do you mean concerns?

12     **Q.** Based on his, based on the report back from

13   Concentra why you would not let him work in that

14   warehouse.

15     **A.** Based upon the report he was not able to

16   perform the duties as assigned, and frankly

17   based upon the report I felt as though he could

18   either injure himself or injure a coworker.

19     **Q.** Did you meet with Mr. Shaw after he was

20   told to stop working?

21     **A.** I did.

22     **Q.** Was it just you and him in that room?

23     **A.** I believe it was him, myself, and Brenda,

24   Ms. Hoffman.

25     **Q.** Here you're free to say what Mr. Shaw says.

1   Tell the jury the conversation as it unfolded

2   between you and Mr. Shaw.

3       A. Obviously Mr. Shaw was quite upset that he

4   was pulled off the job and he expressed to me

5   that it would be my fault, Cumberland's fault,

6   if he continued to get worse medically,

7   physically, because the only exercise he got was

8   the exercise that he performed while he was

9   working in our warehouse, that he lived a

10  sedentary lifestyle outside of our warehouse,

11  and he enjoyed food and the fact of the matter

12  was that he was only going to get worse if he

13  weren't able to continue to work at our facility

14  during the day.

15      Q. And how did you respond to that?

16      A. I said, "Ricky, it's your choice, you know,

17  your lifestyle outside of Cumberland is a

18  choice, but we can't have you working inside the

19  warehouse in, with the current restrictions or

20  the performance problems that we have here,"

21  performance being the inability to move around

22  physically.

23      Q. Did he ever ask for any accommodations?

24      A. No.

25      Q. Did he ever suggest anything to you --

1    **A.** Not.

2    **Q.** -- at this, at this conversation as to how

3    he could do his job?

4    **A.** No.  He said that he felt as though he was

5    doing his job and that we were being ridiculous

6    for taking him off work.

7    **Q.** Did he discuss with you anything with

8    regard to or did you bring up to him what the

9    doctor said?

10   **A.** We had his copy of the evaluation, yes.

11   **Q.** And did he disagree with that?

12   **A.** To some extent yes, but not -- he admitted,

13   wholeheartedly he admitted that he had problems

14   with mobility and that his mobility would only

15   continue to get worse if he weren't able to work

16   in the warehouse.

17   **Q.** Did you at any time discuss with him having

18   his own doctor examine him or another doctor

19   examine him?

20   **A.** Yes.

21   **Q.** Tell the jury about that.

22   **A.** As part of this conversation I offered to

23   reevaluate Ricky at any point where he thought

24   he would be able to pass the physical exam

25   enough to even give us restrictions that we

1    could work within.  I offered to allow him to

2    work with Concentra and his own physician,

3    because at that point he expressed that his own

4    physician he felt would give him a clean bill of

5    health, okay, and to pick another doctor if they

6    needed, you know, if he felt it was necessary to

7    go to an independent docker doctor that both

8    parties could agree upon, not just somebody, you

9    know, not his own physician, but somebody

10   independent of Concentra and his own physician

11   if he felt that would be necessary to get the

12   job done, you know, to get a restriction that we

13   could work within or a clean bill of health.

14     Q. Did he ever do that?

15     A. He did take us up on getting a follow-up

16   physical exam, and I'm not sure if that was with

17   Concentra or with somebody else, and I believe

18   that was several months after this meeting, but

19   not immediately, no.

20     Q. Did you talk to him also, did you and he

21   ever discuss about the physical requirements?

22   There's been a lot of testimony in the case as

23   to what the physical requirements are of that

24   job.  Did you discuss with him what those

25   physical requirements were?

1    **A.** No, not specifically, not in detail.

2    **Q.** Did you talk with him about modifying those

3    if he felt they weren't accurate in any way?

4    **A.** I offered that if he felt that those, that

5    these things were, you know, prohibitive or that

6    they were unreasonable, that we would certainly

7    look at each one individually and -- but he

8    didn't say that any one particular requirement

9    on the sheet was of, you know, concern.  He just

10   simply thought that the whole sheet was not just

11   for what he was doing in the warehouse.

12   **Q.** Did he give, offer you anything in terms of

13   why it wasn't just anything specific in terms of

14   what --

15   **A.** No, he didn't, he didn't pick out any

16   particular one, and I did offer to go through

17   them and modify them with not just simply

18   because that was what Ricky's opinion was, but

19   modify them in a group setting with everybody

20   and we could agree upon different terms if these

21   weren't the accurate ones.  I mean, I wasn't

22   involved in doing this evaluation, but I could

23   get the parties together and have the authority

24   to get the parties together to openly discuss

25   every one of the details.

1  Q. Did you talk to him about other possible

2  employment within Cumberland?

3  A. Not at this point.

4  Q. That was a --

5  A. But that was a, that was a separate meeting

6  later, yes.

7  Q. So after this meeting where you had -- how

8  did you leave it?  How was the meeting finally

9  left?

10  A. Well, we didn't part, he was not very happy

11  when we parted that meeting.  He thought we were

12  being frankly ridiculous, and I simply ended the

13  meeting and told him that after he felt as

14  though he could pass the physical examine, you

15  know, he could certainly take another physical

16  exam that the company would pay for.

17  Q. Did you meet with him again?

18  A. It was several weeks to two months later

19  when, yes, when Ricky came in after a letter,

20  after I received a letter, I made a phone call

21  to Ricky, and yes, we did have an additional

22  meeting.

23  Q. You received a letter from him.

24  A. I received a letter from him, yeah.

25  Q. Asking for a meeting?

1    **A.** I don't remember what was in, I honestly

2    don't remember.  I remember receiving the

3    letter, but I don't remember exactly what was in

4    the letter.

5    **Q.** And who was at that meeting?

6    **A.** I believe just Ricky and I.

7    **Q.** Okay, and what went on in that meeting if

8    you could tell the jury?

9    **A.** We discussed what Ricky would be able to do

10   for the company, if he wasn't able to do the

11   warehouse position were there other jobs that

12   could be done, and Ricky put his hands out to me

13   and he said, "Look at these hands.  These are

14   not hands that can type on a computer.  These

15   are not hands that can do desk work." He said,

16   "I want my warehouse job back."

17   **Q.** And at that point he still had not received

18   medical clearance to return to work?

19   **A.** That's correct.

20   **Q.** How did that meeting end?

21   **A.** On better terms than our first meeting,

22   than the previous meeting ended, but still Ricky

23   felt as though he should be allowed back in the

24   warehouse and back doing the job that he was

25   doing before the way he was, felt that he was

1    doing it, you know, previously.  His physical

2    health at that particular juncture, I mean he

3    came in with a cane again.  He was obviously,

4    his mobility hadn't improved from, you know, in

5    moving around the office space.  So I didn't

6    feel though there was really much else to talk

7    about when, you know, after the incident with

8    "look at my hands."

9      Q. How long did you keep his job open for?

10     A. I believe from February I think it was

11   September that we filled his position and sent

12   him a letter stating as such.

13     Q. And who was working that position in the

14   interim?  Did you have anybody replacing him

15   during that period of time?

16     A. You know, that would be part of the

17   operations peoples' jobs.  I know that we were

18   shipping parts the whole time, so I didn't

19   really deal with how Ricky's duties were covered

20   in that area.

21     Q. If Mr. Shaw had gotten a medical clearance

22   to come back to work even with accommodations,

23   would you have taken him back?

24     A. Yes.

25     Q. And when you terminated his employment in

1   September was he invited to reapply back to the

2   company again?

3      **A.** He was.

4      **Q.** At any time?

5      **A.** Yes.

6      **Q.** Would you take him back today day if you

7   could?

8      **A.** My vote would be to take him back.  In my

9   opinion he was a very good employee.

10     **Q.** So as long as he could do the physical

11  aspects of the job you'd take him back today?

12     **A.** I would, yes.

13        MS. SALTZ: I have no further questions.

14        THE COURT: Mr. Crocenzi?

15        REDIRECT BY MR. CROCENZI:

16     **Q.** Did you ever give Ricky Shaw any paperwork,

17  paperwork that indicated he was on a medical

18  leave of absence?

19     **A.** Yes.

20     **Q.** What exactly did you give him?

21     **A.** I didn't personally give it to him.

22     **Q.** Okay.  What did your department give him?

23     **A.** FMLA paperwork.  Paperwork to sign up for

24  the disability program that Cumberland Truck

25  provided.  Anything else, any of the standard

1    forms that were part of that event process.

2      Q. Okay.  You told us that in your opinion

3    short-term disability is optional for an

4    employee, is that right?

5      A. That's correct.  They don't have to sign

6    up.

7      Q. And FMLA is optional, too, obviously?

8      A. Yes.  You have to sign up, you have to

9    request FMLA leave.

10     Q. Was there anything put in his personnel

11   file that indicated Ricky Shaw is on medical

12   leave?

13     A. I don't know if there's, that terminology

14   appears anywhere in his personnel file.

15     Q. Now, you testified that you had some

16   concerns about asking Ricky about his physical

17   condition.  Now, I understand your concern was

18   that you thought that because of privacy you

19   couldn't ask about his diagnosis.  In fact, you

20   said, "I really still don't know what his

21   medical diagnosis was," am I right?

22     A. I still today don't know what his diagnosis

23   was.

24     Q. Isn't that different, Mr. Sheldon, rather

25   than asking one of your valuable employees,

1   "What's going on, Ricky?  Having trouble doing

2   your job?"  Couldn't you have asked him that?

3     A. I don't feel as though it's my place to do

4   that, no, and I haven't done that with any

5   employee, nor do I think I would in the future.

6     Q. Okay.  Well, this guy you've already

7   claimed was a valuable employee, you'd want him

8   back if he could pass his physical examination,

9   and yet you're telling us that you didn't care

10  enough to go up to him and say, "Ricky, I've

11  noticed you might be having some problems.  Do

12  you want to talk about it or is there something

13  we can do for you?"  You didn't do that, did

14  you?

15    A. It's not a matter of not caring.

16    Q. But you didn't do it, did you, Mr. Sheldon?

17    A. No, nor in the future do I believe I would

18  do that.

19    Q. And you also mentioned that after you got

20  the report from Concentra in February of 2007

21  you thought that Ricky was a danger to himself

22  and others.  In fact, you had formed that

23  opinion even before you sent him for that

24  physical exam in February of 2007, right?

25    A. I didn't form any opinion.

1    Q. Didn't you tell us earlier that you thought

2   based on what Mr. Hoffman was telling you that

3   Ricky could be a danger to himself and others in

4   that warehouse?

5    A. What I thought was that we had to get to

6   the bottom of why an employee who is responsible

7   for carrying and lifting and moving heavy

8   objects was unable to walk across the parking

9   lot without the use of a cane.

10    Q. Right, and part of your concern was that

11   Ricky could be a danger to himself and others

12   because there are heavy parts in that warehouse,

13   right?

14    A. That is certainly a concern.

15    Q. During this second meeting with Ricky I

16   think that you said occurred after September of

17   `07, just before you sent the letter out to him

18   terminating his employment?

19    A. I don't believe it was as far as September.

20   I think that was June time frame.

21    Q. June of `07?

22    A. Somewhere in there, yes.

23    Q. And did you offer him a job at all during

24   that meeting?

25    A. I asked Ricky what he thought he would be

1   able to do aside from the warehouse position.

2   Yes, I was prepared to talk to him about doing

3   something else for Cumberland Truck Equipment

4   Company.

5   Q. Did you offer him a job during that

6   meeting?

7   A. There was no job to be offered.  When I

8   don't even know what he feels as though he is

9   able to do outside the warehouse position, I

10  can't offer a job that's yet I don't know the

11  parameters for.

12  Q. Isn't it true that there was no vacant

13  position at Cumberland Truck in June of 2007

14  that Ricky was qualified to do?

15  A. I don't know if there was a job or was not

16  a job available at that particular juncture,

17  because we never got that far.

18  Q. Did you interact with your attorneys in

19  providing a response to the EEOC when Mr. Shaw

20  filed that charge?

21      MS. SALTZ: Objection.

22      THE COURT: Okay.  Please approach.

23      (Side bar at 4:53 p.m.)

24      MS. SALTZ: The objection is you cannot

25  bring in the EEOC documents, response documents,

1  into the case, and I would have done the

2  research had I known in advance that this was

3  going to be an exhibit.  I mean, it's not being

4  used for impeachment.  It is not --

5       THE COURT: Well, I think it is being used

6  for impeachment.

7       MR. CROCENZI: That's what I'm using it for

8  because I want to see if Mr. Sheldon

9  communicated with the attorneys and provided

10  information and a response, and in this response

11  it says there were no vacant positions at CTE.

12       MS. SALTZ: First it would have to be

13  established by foundation that he wrote this

14  response --

15       THE COURT: Or contributed.

16       MS. SALTZ: -- or contributed to it, and

17  once that's established then you can get to the

18  next step, but not without that, and if that's

19  why you're using it then I don't have a problem

20  with it, but I don't want the reference to the

21  EEOC, you know, to the extent that --

22       THE COURT: Why don't you just say agency

23  proceedings.  Okay?

24       MS. SALTZ: Thank you, Your Honor.

25       THE COURT: You bet.

1          (Side bar concluded at 4:54 p.m.)

2          BY MR. CROCENZI:

3      Q. Did you work with your corporate attorneys

4   and provide any information in connection with

5   agency proceedings?

6      A. I did.

7      Q. And in fact your attorneys were McNees,

8   Wallace & Nurick, is that right?

9      A. That's correct.

10     Q. And with the agency proceedings your

11  company had to provide a response to the agency,

12  right?

13     A. I would assume so, yes.

14     Q. And so as part of that process you were

15  giving information to your attorneys and helped

16  formulate a response for the agency proceedings?

17     A. We would have to exchange information,

18  certainly.

19         MR. CROCENZI: Okay.  Well, in a letter from

20  McNees, Wallace & Nurick to the agency, I'd like

21  you to read from page 6 regarding whether a

22  position was available.

23         THE COURT: And, Mr. Crocenzi, can we have

24  the date of that correspondence for the record?

25         MR. CROCENZI: Sure.

1        (Brief pause.)

2        MS. SALTZ: The objection is still

3   foundation, Your Honor, in terms of showing the

4   witness first the statement and seeing if he in

5   fact made that statement.

6        THE COURT: I think that is what he's

7   intending to do.

8        MS. SALTZ: Before reading it to the jury.

9        THE COURT: Well, I agree.  Let's find out

10  if he participated in the preparation of this

11  document either by providing information or

12  consulting with the attorneys, and so your

13  objection is sustained, Ms. Saltz --

14       MS. SALTZ: Thank you, Your Honor.

15       THE COURT: -- with respect to foundation,

16  but, Mr. Crocenzi, you can lay the foundation by

17  showing the witness this exhibit.

18       MR. CROCENZI: For the record the letter is

19  dated June 24th, 2008.  Mr. Sheldon, I'm showing

20  you the letter I've been talking about dated

21  June 24th, 2008 from McNees, Wallace & Nurick.

22  Can you take a minute to review that document,

23  and then I'm going to ask you some questions.

24       THE WITNESS: Okay.

25       (Brief pause.)

1        THE COURT: Mr. Crocenzi, could we identify

2    this as a plaintiff's exhibit?  I know this was

3    not previously marked, is that correct?

4        MR. CROCENZI: That's correct.

5        THE COURT: All right, and you are at --

6        MR. CROCENZI: We had premarked seventeen,

7    correct.

8        THE COURT: All right.  Let's identify this

9    as Plaintiff's Exhibit Number 18.

10       MR. CROCENZI: Thank you.

11       (Brief pause.)

12       THE COURT: Mr. Crocenzi, I believe the

13   witness has concluded his review.

14       MR. CROCENZI: Thank you, Your Honor.

15       BY MR. CROCENZI:

16    Q. Mr. Sheldon, did you -- after reviewing

17   that letter did you contribute any of the

18   information in that letter to your attorneys so

19   they could respond as part of the agency

20   proceedings?

21    A. Yes.

22    Q. Now, turning to page 6 of this letter, and

23   the third paragraph, can you read that paragraph

24   specifically for me now?  To yourself.

25    A. Okay.

1            (Brief pause.)

2     Q. Did you contribute information to your

3  attorney so they could provide information to

4  the agency on that particular issue in that

5  paragraph?

6     A. The same as I've contributed all along,

7  yes.

8     Q. All right, and isn't it true that in this

9  letter your attorneys on behalf of Cumberland

10  Truck indicate that there were no vacant

11  positions at CTE during the time period for

12  which Mr. Shaw would qualify that he could

13  perform?  And the time period of this letter is

14  February 26th, `07 to September 17th, `07.

15  Would you like to look at it again?

16     A. That isn't any different than I've already

17  explained.

18     Q. Okay.  So there were -- I think it is,

19  Mr. Sheldon.  This letter says that there were

20  no vacant positions at CTE during this time

21  period, which is 2-26-07 to 9-17-07.

22     A. Okay.

23     Q. Is that your testimony today?

24     A. That there were no vacant positions?

25     Q. Yes.

1    A. There were no vacant warehouse positions,

2    which was with my discussion with Ricky was the

3    only job he was willing to accept.

4    Q. Okay.  Well, again this letter says, "At no

5    point between 2-26-07 and 9-17-07 did Mr. Shaw

6    express any desire or willingness to work any

7    position other than his heavy duty warehouse

8    worker position.  Regardless, there existed no

9    vacant position at CTE during this time period

10   for which Mr. Shaw was qualified that he could

11   perform."

12   A. That is correct.

13   Q. And that information is correct?

14   A. If he's only willing to do a warehouse

15   position work because of the size of his hands

16   or otherwise, then there isn't a position

17   available that he would be able to perform,

18   that's correct.

19   Q. But, Mr. Sheldon, isn't that different,

20   you're telling us that Ricky is the one that

21   took him out of the running for some kind of

22   duties, but this letter says regardless of

23   whether --

24        MS. SALTZ: Objection.

25        THE COURT: Hold on one second.  Let him

1    finish the question and then you may object.

2      Q. Regardless of whether he could do the

3    warehouse job position, your company is

4    indicating that there were no vacant positions

5    at CTE that he was qualified to do.

6      MS. SALTZ: Objection.  Argumentative, asked

7    and answered several times.

8      THE COURT: All right, I'll allow it one

9    more time. You may respond.

10     A. If Mr. Shaw is only willing to work the

11   position that he had previously, and he is not

12   qualified to do that position because of

13   mobility problems, then there would be no vacant

14   position for which he would be qualified.

15     Q. And is that testimony that you just gave in

16   this letter that we looked at together?

17     A. I'm not following.

18     Q. Your qualification, your explanation, is

19   that spelled out in this letter?

20     A. I didn't write the letter.  I contributed

21   information to the letter.  An attorney wrote

22   that letter on our behalf.  How he chose to

23   choose his words I can't answer for the

24   attorney.  I apologize, but I can't answer for

25   the attorney.

1    Q. Didn't Mr. Shaw give you a letter on

2  2-28-07 expressing his desire to continue

3  working at Cumberland Truck?

4    A. I don't know the dates of the letters, but

5  Mr. Shaw wrote several letters.

6    Q. I'm going to show you Plaintiff's Exhibit

7  11.

8     (Brief pause.)

9    Q. Have you had a chance to review that

10  letter?

11    A. I have.

12    Q. It's a letter from Ricky Shaw to Brenda

13  Hoffman dated 2-28-07, is that right?

14    A. That's correct.

15    Q. On page 2, first paragraph, do you see

16  where I'm at?

17    A. Page 2, first paragraph, yes, sir.

18    Q. You testified earlier that Ricky didn't

19  request any kind of accommodation.

20    A. Okay.

21    Q. And can you read the last two sentences of

22  that first paragraph on page 2?  Read it out

23  loud for the jury, please.

24    A. "You can modify my job description as

25  warehouse receiver to fit what I really can do.

1   You can leave the situation as it is and has

2   been for a very long time."

3        MR. CROCENZI: That's all I have.

4        THE COURT: Ms. Saltz?

5        RECROSS BY MS. SALTZ:

6    Q. Yes, Your Honor.  Looking at Plaintiff's

7   Exhibit 11, what's the date of the letter?

8    A. February 28th, 2007.

9    Q. And is that the same day that you met with

10  Mr. Shaw when he went back to work again?

11   A. It would very well be about the same time

12  period, yes.  I don't know which day we met with

13  Mr. Shaw, but it was certainly in that time

14  frame.

15   Q. Did he bring this letter to you?

16   A. I believe he brought it to Brenda.  He

17  didn't bring it directly to me, but I believe he

18  brought it to Brenda and that's where I received

19  it from, or saw it the first time.

20   Q. And the sentence that counsel had you read,

21  "You can modify my job description as warehouse

22  receiver to fit what I really do," is that what

23  you discussed with him in that meeting?

24   A. No.  I actually was willing to discuss not

25  modifying the job description itself because his

1   job was what his job was, but actually modifying

2   his duties in order that he would be able to

3   perform them with accommodations.  There's a big

4   difference to just modifying a job description

5   to try to make paperwork look good as opposed to

6   doing what in reality you have to do, and that

7   is make sure that your worker can do the job

8   that he's supposed to be doing.

9        MS. SALTZ: That's all I have, Your Honor.

10  Thank you.

11       REDIRECT BY MR. CROCENZI:

12    Q. A couple of follow-up, Your Honor, if you

13  can indulge me.  Mr. Sheldon, isn't the

14  paperwork you talked about, Exhibit 9, the only

15  paperwork that you sent to Concentra Medical

16  Center as part of Ricky's evaluation?

17    A. Is the job analysis Exhibit 9?

18    Q. Yes.

19    A. This is unmarked, I apologize.  Yes, the

20  only paperwork Ricky received to take to

21  Concentra was the job analysis form.  Now, this

22  is the original job analysis as given to him

23  prior to any of these meetings.

24    Q. I understand that.

25    A. This is also the same job analysis that I

1   offered to allow him to modify with a group in

2   order that it would be conforming to his opinion

3   of what his job was.

4     Q. Okay, so I didn't quite understand your

5   testimony.  You said that you were willing to

6   change his job, you were willing to change what

7   he did or his job duties, but you weren't

8   willing to change the paperwork.  Is that what

9   you said?

10    A. No.  What I said was by changing the

11  paperwork to make things look good doesn't

12  change the reality.  The reality was he was

13  struggling to do the warehouse position.

14    Q. But, sir, isn't it true that Ricky was

15  asking you to change the paperwork to fit what

16  he actually did in the warehouse?

17    A. What he actually did in the warehouse is on

18  this paperwork.

19      MR. CROCENZI: Thank you.  That's all I

20  have.

21      MS. SALTZ: I have no further questions.

22      THE COURT: All right, I have no questions.

23  You may step down, Mr. Sheldon.  Thank you.

24      THE WITNESS: Thank you.

25      THE COURT: Mr. Crocenzi, we should probably

1    have a motion for the admission of Exhibits 9,

2    I believe maybe 6 and 9?

3        MR. CROCENZI: Yes.  We've been talking a

4    good bit about 9, and I think 6 was also one of

5    the exhibits Mr. Whitmire identified.  So I'll

6    move for admission at this point for both of

7    those exhibits.

8        MS. SALTZ: I object to the admission of

9    Exhibit 9.  I do not object to Exhibit 6.  The

10   reason for Exhibit 9 is because it is a filled

11   out form that hasn't been, it's not -- and no

12   one has identified it.  However, Defendant's D-1

13   is the job analysis without the handwriting on

14   it.

15       MR. CROCENZI: That's correct, Your Honor.

16       THE COURT: All right.

17       MS. SALTZ: So I would have no objection as

18   to the admission of D-1 for the purpose at this

19   point.

20       THE COURT: All right.  Any objection to

21   Plaintiff's Exhibit 6?

22       MS. SALTZ: No.

23       THE COURT: All right.  Plaintiff's Exhibit

24   6 is admitted.  Defendant's Exhibit Number 1 is

25   also admitted, and we'll defer ruling on your

1    motion to admit Defendant's -- or Plaintiff's

2    Exhibit 9 pending I'm assuming the medical

3    information?

4         MR. CROCENZI: Dr. Walsh, right.

5         THE COURT: Very well.  At this time it's

6    5:10, I think we should conclude today's

7    proceedings.  Thank you, ladies and gentlemen,

8    for staying past our anticipated time of

9    conclusion.  This happens on occasion and I

10   promise I'll let you go early on a day or two as

11   well to make it up to you.  Please recall all of

12   my earlier instructions and refrain from any

13   independent research, any tweeting about what

14   you have seen and heard in today's proceedings.

15   Go home, get a good night's sleep, and come back

16   prepared to start tomorrow at 9:00 a.m., and

17   please drive safely home.  Ms. McKinney, you may

18   escort the jury.  We are in recess until 9:00

19   tomorrow morning.  Counsel, please stay.

20        (Jury recessed at 5:11 p.m.)

21        THE COURT: Please be seated.  This can be

22   off the record.

23        (Off the record.)

24        THE COURT: Very good.  We'll see you

25   tomorrow morning at 9:00 a.m.

1          (Court adjourned at 5:12 p.m.)

1   Ricky A. Shaw vs. Cumberland Truck Equipment Co.

2   1:09-CV-00359

3   Jury Trial Proceedings, Day 1

4   16 May 2011

5

6

7

8   I hereby certify that the proceedings

9   and evidence are contained fully and accurately

10  in the notes taken by me on the trial of the

11  above case, and that this copy is a correct

12  transcript of the same.

13

14

15   s/ Wesley J. Armstrong

16   _____

17   Wesley J. Armstrong

18   Registered Merit Reporter

19

20

21

22   The foregoing certification of this

23  transcript does not apply to any reproduction by

24  any means unless under the direct control and/or

25  supervision of the certifying reporter.

**#**

**#412** [1] - 1:20

**0**

**07** [11] - 40:23,
42:10, 47:23, 48:15,
145:16, 149:14,
155:23, 180:17,
180:21, 186:14
**09** [1] - 40:24

**1**

**1** [9] - 1:7, 2:2, 52:2,
52:6, 103:8, 120:24,
154:8, 193:24, 196:3
**10** [3] - 87:5, 87:6,
87:7
**100** [1] - 1:16
**10:30** [1] - 17:3
**10:40** [1] - 3:2
**10:41** [1] - 3:20
**10th** [2] - 27:12,
107:6
**11** [5] - 56:11, 56:21,
119:22, 189:7, 190:7
**110** [1] - 62:6
**116** [1] - 2:16
**11:01** [1] - 18:14
**11:03** [1] - 20:15
**11:20** [3] - 18:5,
18:12, 20:9
**11:25** [1] - 20:15
**11:58** [1] - 44:5
**11th** [5] - 54:22,
56:7, 86:24, 95:3,
107:5
**12** [3] - 95:2, 95:3,
95:6
**120** [1] - 38:17
**125** [1] - 86:7
**129** [1] - 2:17
**12:15** [1] - 16:23
**12th** [3] - 28:3,
140:4, 140:5
**13** [1] - 95:3
**132** [1] - 2:17
**140** [4] - 2:19, 38:17,
123:7, 123:23
**144** [1] - 2:21
**15** [1] - 55:11
**15-minute** [4] -
16:25, 17:1, 18:4,
133:21
**150** [10] - 63:1, 64:8,
89:5, 89:12, 89:13,
90:2, 97:1, 100:13,
122:16
**16** [3] - 1:5, 2:3,

**196:4
160** [1] - 2:21
**17** [1] - 55:11
**17050** [1] - 1:16
**17101** [1] - 1:13
**17108** [1] - 1:25
**177** [1] - 2:22
**17th** [1] - 186:14
**18** [1] - 185:9
**190** [1] - 2:22
**19087** [1] - 1:20
**191** [1] - 2:22
**1976** [1] - 60:14
**1986** [1] - 80:24
**1998** [1] - 45:15
**1:00** [1] - 43:20
**1:09-CV-00359** [3] -
1:3, 2:2, 196:2
**1:15** [2] - 43:21, 44:3
**1:20** [1] - 44:5

**2**

**2** [16] - 52:6, 103:9,
103:11, 105:20,
106:7, 106:17,
115:25, 119:1, 119:3,
120:24, 142:4,
142:10, 154:8,
189:15, 189:17,
189:22
**2-26-07** [2] - 186:21,
187:5
**2-28-07** [2] - 189:2,
189:13
**20** [4] - 2:8, 65:8,
74:15, 74:22
**2000** [2] - 34:25,
162:19
**2002** [2] - 80:18,
82:25
**2003** [2] - 143:4,
153:16
**2004** [8] - 81:19,
83:5, 102:8, 104:8,
143:1, 143:5, 143:6,
153:17
**2005** [2] - 35:11,
143:6
**2006** [4] - 35:21,
36:1, 84:24, 117:14
**2006/2007** [1] -
163:15
**2007** [51] - 21:11,
22:17, 24:2, 25:17,
25:20, 26:1, 27:12,
29:21, 31:10, 31:11,
35:21, 36:2, 39:6,
45:17, 45:20, 46:11,
47:5, 47:10, 48:25,

52:20, 53:25, 57:17,
83:2, 90:22, 92:19,
99:13, 99:24, 100:19,
101:12, 107:5, 107:6,
110:13, 115:16,
116:11, 117:15,
145:7, 145:21, 146:3,
146:13, 147:4, 148:3,
149:21, 150:22,
153:5, 156:19,
157:13, 179:20,
179:24, 181:13, 190:8
**2008** [3] - 146:7,
184:19, 184:21
**2010** [7] - 28:3,
54:22, 56:7, 86:24,
95:3, 140:4, 140:5
**2011** [4] - 1:5, 2:3,
81:21, 196:4
**21** [3] - 32:16, 56:11,
56:23
**22** [1] - 19:2
**228** [1] - 1:24
**234-4161** [1] - 1:14
**24th** [2] - 184:19,
184:21
**26th** [11] - 24:2, 26:1,
39:6, 90:22, 110:12,
149:14, 153:5,
155:23, 156:19,
157:6, 186:14
**27th** [1] - 110:12
**28th** [2] - 157:13,
190:8
**2:30** [1] - 17:4
**2:53** [1] - 133:25

**3**

**3** [10] - 2:7, 102:10,
102:18, 103:12,
115:25, 120:24,
138:5, 146:8, 146:24,
147:2
**3.2** [1] - 146:3
**30** [1] - 124:23
**32** [1] - 72:14
**320** [1] - 1:13
**33** [1] - 2:9
**38** [1] - 84:25
**3:00** [2] - 17:4,
133:22
**3:10** [1] - 133:24
**3:14** [1] - 133:25
**3:23** [1] - 139:13
**3:26** [1] - 140:19
**3:38** [1] - 142:2
**3:48** [1] - 144:1

**4**

**4** [3] - 103:5, 103:6,
105:5
**40** [1] - 124:23
**401-K** [2] - 146:12,
146:21
**42** [1] - 124:23
**44** [1] - 2:12
**45** [1] - 20:10
**4:45** [1] - 17:7
**4:53** [1] - 181:23
**4:54** [1] - 183:1

**5**

**5** [4] - 105:12,
105:13, 106:18, 138:5
**5006** [1] - 1:16
**542-5569** [1] - 1:25
**55** [1] - 31:3
**58** [1] - 2:12
**591-1755** [1] - 1:17
**5:00** [1] - 17:5
**5:10** [1] - 194:4
**5:11** [1] - 194:20
**5:12** [1] - 195:1

**6**

**6** [20] - 93:13, 93:15,
95:18, 96:3, 96:11,
118:21, 118:22,
119:1, 119:3, 119:13,
129:16, 146:23,
147:1, 183:21,
185:22, 193:2, 193:4,
193:9, 193:21, 193:24
**610** [1] - 1:21
**65** [9] - 87:18, 101:2,
101:5, 122:10,
122:13, 123:8,
123:10, 123:13,
123:15

**7**

**70** [2] - 76:10, 122:13
**717** [3] - 1:14, 1:17,
1:25
**73** [1] - 2:13
**77** [1] - 2:13
**79** [1] - 27:20, 106:9,
106:14

**8**

**8** [3] - 87:6, 115:16
**80** [1] - 2:16
**8:45** [1] - 17:14

**9**

**9** [20] - 51:13, 59:7,
88:21, 95:17, 101:17,
115:16, 118:21,
118:22, 118:23,
118:24, 152:23,
191:14, 191:17,
193:1, 193:2, 193:4,
193:9, 193:10, 194:2
**9-17-07** [2] - 186:21,
187:5
**90** [1] - 126:5
**964-3333** [1] - 1:21
**993** [1] - 1:20
**9:00** [5] - 17:11,
17:13, 194:16,
194:18, 194:25
**9:30** [2] - 1:6, 3:2

**A**

**a.m** [10] - 1:6, 3:3,
3:10, 17:11, 17:13,
18:14, 20:15, 44:5,
194:16, 194:25
**abilities** [1] - 97:6
**ability** [2] - 23:11,
23:20
**able** [47] - 19:8, 21:6,
25:4, 25:12, 28:1,
28:7, 28:20, 29:16,
32:7, 32:10, 32:24,
38:16, 39:6, 41:11,
43:2, 69:25, 76:23,
77:1, 92:2, 92:7,
97:15, 100:15,
100:23, 118:2,
122:11, 124:11,
124:17, 129:4,
130:19, 136:1,
140:25, 158:25,
159:2, 165:25,
166:10, 167:1, 167:4,
169:15, 170:13,
171:15, 171:24,
175:9, 175:10, 181:1,
181:9, 187:17, 191:2
**absence** [3] - 18:2,
39:13, 177:18
**absolutely** [4] -
150:20, 158:5,
158:23, 167:21
**accept** [4] - 10:9,
140:7, 140:8, 187:3
**acceptable** [1] -
104:9
**access** [1] - 14:9
**accident** [3] - 34:20,
150:13
**accidents** [1] -

150:18

**accommodate** [2] - 16:3, 163:5

**accommodation** [11] - 16:6, 16:16, 25:14, 29:11, 35:24, 36:18, 37:2, 41:16, 42:23, 69:21, 189:19

**accommodations** [5] - 163:19, 167:13, 170:23, 176:22, 191:3

**accomplish** [2] - 131:13, 136:2

**accomplished** [2] - 98:3, 99:17

**according** [3] - 14:25, 25:8, 35:17

**accurate** [13] - 26:16, 29:2, 62:19, 89:18, 90:2, 90:5, 90:14, 95:22, 95:25, 119:7, 136:25, 173:3, 173:21

**accurately** [3] - 27:4, 120:14, 196:9

**Act** [4] - 23:3, 35:4, 35:13, 39:16

**act** [2] - 16:14, 21:10

**action** [6] - 16:13, 19:23, 115:7, 115:10, 118:3, 118:8

**activities** [1] - 159:14

**activity** [1] - 23:8

**actual** [7] - 26:3, 27:4, 29:9, 88:3, 99:6, 103:17, 166:17

**ad** [2] - 87:14, 87:17

**ADA** [1] - 23:4

**adapts** [1] - 21:25

**additional** [2] - 111:20, 174:21

**address** [5] - 11:23, 20:22, 20:23, 33:13, 134:3

**adjourned** [1] - 195:1

**administer** [1] - 144:8

**administration** [1] - 32:12

**admissible** [1] - 10:22

**admission** [10] - 71:1, 141:15, 141:18, 142:7, 142:10, 142:20, 193:1, 193:6, 193:8, 193:18

**admissions** [1] - 139:5

**admit** [1] - 194:1

**admitted** [13] - 6:4, 6:13, 41:9, 138:5, 138:24, 139:3, 139:7, 141:25, 142:23, 171:12, 171:13, 193:24, 193:25

**adopted** [1] - 154:4

**advance** [1] - 182:2

**advantage** [2] - 160:11, 160:12

**adverse** [1] - 16:13

**advertise** [1] - 89:9

**advertised** [1] - 87:20

**advice** [2] - 37:23, 164:23

**advise** [2] - 71:6, 134:10

**afternoon** [11] - 17:1, 17:3, 44:25, 59:5, 80:6, 80:7, 133:15, 135:6, 144:6, 144:20, 144:21

**agencies** [2] - 30:24, 32:21

**agency** [8] - 182:22, 183:5, 183:10, 183:11, 183:16, 183:20, 185:19, 186:4

**agree** [17] - 5:22, 6:2, 19:8, 33:16, 33:18, 96:2, 96:5, 96:7, 96:9, 96:10, 96:13, 101:1, 104:8, 112:13, 172:8, 173:20, 184:9

**agreed** [2] - 68:25, 136:21

**agrees** [1] - 23:21

**ahead** [1] - 49:23

**air** [1] - 77:19

**aisle** [2] - 61:5, 131:4

**aisles** [3] - 67:23, 82:2, 130:25

**alcohol** [1] - 152:15

**allegation** [1] - 114:25

**allegations** [1] - 16:8

**allegedly** [1] - 57:22

**allow** [8] - 14:8, 14:17, 14:21, 20:1, 20:4, 172:1, 188:8, 192:1

**allowed** [2] - 162:5, 175:23

**allowing** [2] - 158:21, 159:9

**almost** [3] - 41:3, 43:5, 103:11

**alone** [1] - 5:18

**Americans** [2] - 21:9,

23:3

**analysis** [25] - 25:22, 26:2, 26:6, 27:3, 29:8, 51:20, 59:12, 60:7, 62:17, 88:22, 89:11, 118:24, 154:6, 154:20, 155:1, 155:10, 155:14, 155:25, 156:4, 166:18, 191:17, 191:21, 191:22, 191:25, 193:13

**Analysis** [1] - 51:15

**analyzes** [1] - 31:9

**answer** [6] - 56:16, 85:24, 87:11, 87:16, 188:23, 188:24

**answered** [4] - 55:16, 57:9, 133:3, 188:7

**answering** [1] - 121:3

**answers** [1] - 139:25

**anticipate** [2] - 16:17, 18:1

**anticipated** [2] - 17:9, 17:21, 194:8

**anyway** [1] - 138:19

**apologize** [3] - 94:19, 188:24, 191:19

**Appalachian** [1] - 30:7

**apparent** [1] - 160:8

**appearance** [1] - 8:19

**APPEARANCES** [1] - 1:10

**appearing** [1] - 54:19

**application** [3] - 27:12, 31:21, 32:3

**applied** [2] - 30:1, 31:24

**applies** [2] - 15:23, 30:23

**apply** [12] - 5:9, 5:16, 5:19, 15:24, 25:5, 28:8, 29:13, 29:19, 31:18, 41:7, 158:7, 196:23

**appreciate** [2] - 17:18, 30:12

**approach** [2] - 141:5, 181:22

**approve** [2] - 102:4, 102:6

**approved** [2] - 103:2, 104:25

**April** [6] - 25:20, 29:21, 31:10, 40:12, 40:23, 42:9

**area** [3] - 98:9, 98:14, 176:20

**argue** [1] - 31:23

**argumentative** [1] - 188:6

**arguments** [5] - 5:4, 5:6, 6:18, 10:16, 33:9

**arise** [1] - 5:12

**Armstrong** [3] - 1:23, 196:15, 196:17

**Army** [1] - 31:4, 32:17, 32:19, 33:4

**arrange** [1] - 7:16

**arrive** [2] - 17:13, 17:24

**arrives** [2] - 24:6, 24:25

**arthritis** [2] - 21:24

**articles** [1] - 14:3

**aside** [4] - 94:6, 163:19, 166:5, 181:1

**aspects** [1] - 177:11

**asserted** [1] - 164:21

**assigned** [6] - 119:1, 119:15, 129:18, 131:22, 167:2, 169:16

**assistance** [6] - 89:10, 89:14, 89:24, 90:18, 128:9, 128:13

**assistant** [3] - 24:20, 24:21, 123:20

**associated** [2] - 13:15, 13:20

**assume** [5] - 16:22, 89:23, 90:16, 109:1, 183:13

**assumed** [1] - 22:8

**assuming** [3] - 131:12, 136:6, 194:2

**assure** [1] - 13:5

**attention** [11] - 7:5, 7:24, 13:8, 33:11, 52:19, 93:12, 95:2, 148:2, 148:12, 150:8, 161:6

**attorney** [8] - 164:1, 164:5, 164:10, 164:21, 186:3, 188:21, 188:24, 188:25

**attorneys** [11] - 7:13, 13:5, 164:2, 181:18, 182:9, 183:3, 183:7, 183:15, 184:12, 185:18, 186:9

**authority** [3] - 9:2, 9:14, 173:23

**available** [4] - 31:2, 76:3, 88:6, 88:7, 88:10, 143:17,

181:16, 183:22, 187:17

**average** [2] - 62:6, 115:22

**avoid** [2] - 11:19, 13:18

**aware** [4] - 57:15, 72:23, 73:11, 73:13, 163:15

**B**

**bad** [3] - 41:10, 41:11, 150:9

**bar** [2] - 181:23, 183:1

**barely** [3] - 111:25, 113:4, 127:1

**base** [1] - 18:10

**based** [23] - 7:7, 14:16, 23:5, 38:19, 39:14, 43:1, 55:19, 60:23, 89:22, 97:6, 97:12, 97:14, 118:2, 123:2, 135:10, 162:7, 163:6, 166:25, 169:12, 169:15, 169:17, 180:2

**basis** [13] - 14:25, 16:2, 26:5, 27:5, 46:20, 49:5, 97:2, 97:3, 116:19, 117:4, 117:5, 117:7, 132:7

**bear** [1] - 104:22

**bears** [1] - 20:19

**become** [1] - 38:13

**BEFORE** [1] - 1:8

**began** [1] - 107:21

**begin** [6] - 4:3, 5:14, 16:16, 80:22, 102:6, 136:6

**beginning** [4] - 54:24, 140:19, 146:1, 160:22

**behalf** [3] - 33:23, 186:9, 188:22

**behind** [2] - 125:18, 125:24

**belief** [1] - 105:2

**believability** [1] - 10:11

**believes** [1] - 10:21

**belongings** [2] - 3:16, 18:8

**below** [1] - 106:15

**bench** [1] - 11:15

**bend** [5] - 92:2, 121:14, 129:19, 129:25, 130:19

**bending** [14] - 34:8,

38:25, 39:8, 58:18, 66:6, 91:6, 91:9, 91:13, 91:14, 91:15, 91:16, 96:14, 119:25, 125:12
**benefit** [6] - 29:14, 30:1, 30:19, 160:17, 160:19, 160:20
**benefits** [16] - 25:5, 28:9, 28:16, 29:20, 31:5, 31:19, 32:8, 35:1, 35:2, 35:8, 35:18, 39:17, 39:18, 39:20, 41:8, 158:8
**best** [11] - 11:19, 12:3, 37:17, 37:25, 108:18, 109:5, 112:4, 154:17, 154:22, 155:12, 167:8
**bet** [1] - 182:25
**better** [4] - 30:2, 68:20, 151:10, 175:21
**between** [6] - 13:14, 81:11, 116:15, 127:3, 170:2, 187:5
**beyond** [1] - 15:21
**big** [4] - 46:2, 72:12, 120:4, 191:3
**bigger** [1] - 50:6
**biggest** [2] - 67:14, 100:2
**bill** [3] - 98:18, 172:4, 172:13
**billed** [1] - 61:7
**billing** [1] - 101:9
**bills** [1] - 29:22
**bins** [1] - 61:22
**bit** [1] - 193:4
**blackberries** [1] - 14:7
**blank** [1] - 153:10
**blanks** [1] - 160:23
**block** [1] - 52:2
**blog** [1] - 12:22
**bogus** [1] - 26:14
**bothering** [1] - 108:9
**bottom** [3] - 52:6, 135:17, 180:6
**bounced** [1] - 32:19
**bout** [1] - 162:1
**brake** [14] - 61:2, 62:2, 62:4, 63:9, 63:14, 63:23, 63:24, 64:2, 66:13, 67:20, 67:21, 68:1, 101:6, 162:19
**branch** [4] - 61:21, 61:24, 63:23, 120:15
**branches** [1] - 61:15, 61:17, 61:20, 64:19

**break** [19] - 3:22, 9:20, 16:17, 16:19, 16:22, 16:23, 16:25, 17:1, 17:2, 17:3, 17:23, 18:4, 43:18, 133:15, 133:21, 134:21, 139:16, 141:12
**breaks** [1] - 53:13
**Brenda** [27] - 24:6, 24:7, 24:17, 25:1, 28:6, 34:14, 35:12, 39:11, 48:5, 71:9, 71:24, 113:24, 136:13, 145:20, 156:18, 157:17, 157:24, 158:3, 164:5, 165:5, 165:9, 167:3, 169:2, 169:23, 189:12, 190:16, 190:18
**Brief** [27] - 3:19, 51:14, 57:1, 59:3, 59:25, 86:13, 88:19, 93:11, 94:12, 95:8, 95:15, 95:23, 104:13, 107:10, 139:12, 142:1, 143:10, 143:12, 143:14, 143:21, 144:18, 152:25, 184:1, 184:25, 185:11, 186:1, 189:8
**brief** [2] - 8:11, 16:19
**briefly** [1] - 139:15
**bring** [9] - 3:16, 13:8, 121:20, 135:21, 169:3, 171:8, 181:25, 190:15, 190:17
**bringing** [1] - 159:5
**brought** [6] - 15:5, 40:24, 148:11, 150:8, 190:16, 190:18
**BRYAN** [1] - 144:14
**Bryan** [19] - 2:20, 23:16, 24:9, 47:18, 53:20, 69:2, 69:5, 69:6, 69:15, 70:2, 70:14, 71:9, 71:24, 109:21, 109:23, 112:12, 144:4, 144:10, 144:14
**building** [15] - 9:22, 36:8, 37:9, 49:11, 50:4, 50:19, 50:23, 52:22, 68:14, 83:17, 83:18, 83:19, 83:21, 116:12, 126:11
**Building** [1] - 83:12
**buildings** [1] - 127:4

**bulbs** [1] - 62:11
**bulk** [1] - 81:14
**bulky** [1] - 78:1
**burden** [5] - 15:8, 15:18, 15:22, 20:19, 25:11
**business** [4] - 37:14, 45:24, 60:19, 145:11
**BY** [19] - 50:25, 56:20, 59:4, 71:5, 73:23, 80:5, 102:22, 106:2, 116:7, 129:14, 132:15, 144:19, 160:2, 165:2, 177:15, 183:2, 185:15, 190:5, 191:11

**C**

**cane** [17] - 22:1, 53:10, 57:22, 107:16, 108:2, 108:3, 108:16, 114:17, 115:11, 148:14, 148:23, 149:8, 149:19, 161:8, 166:2, 176:3, 180:9
**canes** [1] - 108:20
**cannot** [5] - 22:23, 25:6, 133:7, 160:14, 181:24
**capabilities** [1] - 27:2
**capable** [1] - 30:17
**capacity** [2] - 27:1, 32:15
**care** [4] - 13:18, 35:6, 35:14, 179:9
**cared** [1] - 127:16
**careful** [1] - 7:4
**caring** [1] - 179:15
**Carlisle** [23] - 21:13, 21:16, 21:17, 32:19, 46:8, 46:15, 47:7, 47:10, 48:3, 48:10, 48:23, 49:9, 60:4, 72:15, 73:25, 81:8, 83:10, 85:13, 134:24, 135:23, 147:7, 147:10, 147:11
**carrier** [1] - 153:20
**carry** [13] - 26:22, 39:9, 40:8, 63:20, 76:4, 86:15, 86:17, 86:18, 88:8, 90:19, 121:15, 123:13, 132:20
**carrying** [18] - 34:7, 58:12, 63:19, 64:5, 88:14, 90:1, 90:10, 91:1, 96:23, 100:18,

100:19, 119:25, 122:9, 123:1, 148:24, 180:7
**cart** [20] - 88:11, 124:15, 124:16, 124:17, 124:19, 124:22, 124:24, 125:10, 125:14, 130:10, 130:13, 130:14, 130:16, 130:21, 133:1, 133:2
**carts** [6] - 65:11, 76:3, 109:13, 124:2, 125:4, 131:7
**carved** [1] - 33:3
**case** [56] - 4:2, 4:6, 4:17, 4:22, 5:10, 5:15, 6:8, 7:1, 7:4, 9:13, 10:1, 10:14, 11:6, 12:4, 12:8, 12:9, 12:12, 12:17, 12:21, 12:23, 13:2, 13:4, 13:8, 13:12, 13:13, 13:15, 13:20, 14:3, 14:5, 14:16, 15:3, 15:4, 15:8, 15:25, 16:10, 20:20, 21:1, 21:7, 22:25, 25:10, 31:25, 32:7, 33:17, 43:7, 43:15, 43:22, 55:5, 79:15, 133:23, 153:18, 156:6, 164:20, 167:15, 172:22, 182:1, 196:11
**CASE** [1] - 1:3
**cases** [4] - 15:23, 15:24, 101:6, 154:4
**catalogs** [2] - 101:9, 101:11
**categories** [2] - 27:14, 103:14
**category** [4] - 27:15, 27:21, 90:1, 103:12
**caused** [2] - 92:23, 127:8
**cautiously** [1] - 22:1
**cell** [2] - 14:7, 135:21
**Center** [8] - 23:23, 25:16, 151:23, 152:3, 152:4, 156:20, 157:22, 191:16
**central** [1] - 38:18
**cents** [1] - 146:22
**certain** [6] - 6:16, 11:17, 23:1, 35:25, 101:6, 156:8
**certainly** [9] - 146:11, 146:20, 148:24, 149:3, 173:6, 174:15, 180:14,

183:18, 190:13
**certification** [1] - 196:22
**certified** [1] - 65:3
**certify** [1] - 196:8
**certifying** [1] - 196:25
**chain** [2] - 109:21, 156:24
**chance** [2] - 153:1, 189:9
**change** [7] - 83:2, 109:6, 192:6, 192:8, 192:12, 192:15
**changed** [2] - 38:11, 147:3
**changing** [1] - 192:10
**charge** [1] - 181:20
**Charles** [5] - 2:11, 22:10, 44:8, 44:19, 44:23
**check** [5] - 49:17, 77:10, 84:8, 98:17, 147:18
**checked** [6] - 61:6, 98:10, 98:11, 98:14, 99:14, 112:17
**checking** [5] - 65:13, 75:4, 75:5, 98:19, 120:14
**chief** [1] - 133:23
**choice** [5] - 29:24, 39:20, 159:17, 170:16, 170:18
**choose** [2] - 35:18, 188:23
**chose** [2] - 40:23, 188:22
**CHRISTOPHER** [1] - 1:8
**chuck** [2] - 109:20, 110:21
**Chuck** [11] - 83:5, 147:14, 148:3, 148:8, 148:11, 148:13, 148:17, 149:23, 151:18, 154:16, 161:6
**circumstance** [2] - 17:19, 161:18
**Civil** [1] - 2:2
**civil** [3] - 3:2, 15:4, 15:24
**CIVIL** [1] - 1:7
**claim** [1] - 31:22
**claimed** [1] - 179:7
**claims** [4] - 4:14, 15:11, 16:1, 32:1
**clarified** [1] - 135:14
**clarify** [1] - 60:9

**Class** [1] - 46:3

**clean** [3] - 138:1, 172:4, 172:13

**cleaner** [1] - 137:22

**cleaning** [1] - 121:17

**cleanly** [1] - 137:16

**clearance** [2] - 175:18, 176:21

**client** [2] - 10:24, 164:22

**climb** [1] - 121:22, 128:7

**climbing** [12] - 34:8, 38:23, 38:24, 39:8, 66:3, 93:1, 93:2, 96:3, 96:6, 126:9, 128:5

**climbs** [1] - 21:25

**clocked** [2] - 158:14, 169:1

**clocking** [1] - 168:22

**clocks** [1] - 168:22

**close** [3] - 5:14, 7:24, 25:14

**closer** [3] - 25:17, 126:19, 163:14

**closing** [4] - 5:4, 5:6, 10:16, 33:9

**clue** [1] - 91:25

**clutch** [1] - 63:14

**clutches** [1] - 62:12

**co** [1] - 33:7

**Co** [2] - 2:1, 196:1

**co-counsel** [1] - 33:7

**collect** [1] - 10:3

**combined** [1] - 145:8

**coming** [9] - 17:23, 37:9, 53:14, 66:25, 71:7, 71:13, 72:1, 126:9, 162:13

**command** [2] - 109:22, 156:24

**comment** [3] - 11:5, 55:13, 104:4

**comments** [5] - 32:11, 103:22, 103:23, 104:2, 104:5

**committee** [4] - 114:1, 114:9, 114:12, 114:14

**communicate** [1] - 12:21

**communicated** [1] - 182:9

**comp** [4] - 153:25, 154:1, 162:18, 163:19

**COMPANY** [1] - 1:5

**company** [21] - 23:19, 24:8, 34:22, 35:16, 39:19, 40:2, 45:16, 114:5, 120:25,

148:5, 154:2, 158:2, 160:9, 160:18, 160:19, 162:4, 174:16, 175:10, 177:2, 183:11, 188:3

**Company** [17] - 4:15, 4:18, 4:21, 15:6, 15:15, 15:20, 16:2, 16:7, 16:12, 21:9, 29:4, 45:10, 45:25, 51:16, 144:23, 145:3, 181:4

**comparison** [1] - 83:15

**compensation** [2] - 153:18, 153:20

**complaints** [11] - 57:18, 57:21, 58:3, 58:7, 58:11, 58:14, 58:17, 58:20, 107:12, 109:15, 149:23

**complete** [2] - 9:8, 62:16

**completed** [6] - 27:11, 153:7, 155:14, 156:3, 166:19, 166:22

**completely** [1] - 133:6

**completes** [1] - 31:20

**component** [1] - 38:18

**computer** [4] - 98:22, 99:6, 99:9, 175:14

**Concentra** [46] - 23:23, 24:11, 24:19, 25:16, 25:24, 26:13, 26:17, 26:20, 26:24, 29:3, 30:2, 31:10, 39:2, 112:9, 113:20, 114:11, 115:2, 149:15, 151:23, 152:3, 152:4, 152:9, 152:10, 152:12, 152:14, 152:18, 152:19, 153:5, 153:14, 153:18, 156:20, 157:5, 157:18, 157:22, 165:15, 165:17, 166:19, 166:22, 169:13, 172:2, 172:10, 172:17, 172:19, 191:15, 191:21

**concern** [16] - 69:7, 103:20, 108:13, 113:3, 127:6, 127:8, 127:15, 127:17,

128:4, 128:24, 129:2, 131:24, 173:9, 178:17, 180:10, 180:14

**concerned** [9] - 36:23, 37:20, 55:8, 55:14, 67:13, 68:2, 79:5, 149:1

**concerning** [2] - 146:1, 148:4

**concerns** [13] - 54:12, 69:8, 69:24, 101:21, 105:6, 106:5, 106:25, 109:15, 110:5, 151:24, 169:9, 169:11, 178:16

**conclude** [3] - 11:4, 17:4, 194:6

**concluded** [2] - 183:1, 185:13

**conclusion** [6] - 4:17, 7:14, 31:14, 31:17, 81:6, 194:9

**conclusions** [1] - 11:3

**condition** [16] - 30:8, 35:22, 36:14, 40:3, 41:5, 41:15, 42:17, 43:9, 43:14, 69:17, 70:18, 159:11, 159:16, 162:16, 178:17

**conditioned** [1] - 34:10

**conditions** [1] - 163:16

**conduct** [1] - 4:5

**conference** [2] - 11:14, 169:4

**conferences** [2] - 11:17, 11:21

**confines** [1] - 12:5

**confirmed** [1] - 135:18

**conflict** [1] - 32:14

**conforming** [1] - 192:2

**confronted** [1] - 37:3

**confused** [3] - 19:13, 122:7, 122:24

**confusion** [1] - 11:19

**connection** [1] - 183:4

**Conner** [3] - 22:25, 25:10, 32:6

**CONNER** [1] - 1:8

**consider** [3] - 8:1, 14:23, 97:17

**consideration** [1] - 5:2

**considered** [3] - 6:6, 6:17, 6:23

**considering** [1] - 37:19

**consist** [1] - 5:24

**consisted** [1] - 48:4

**constant** [1] - 93:10

**constantly** [1] - 126:6

**consult** [3] - 7:23, 155:8, 164:3

**consulted** [1] - 164:1

**consulting** [1] - 184:12

**contact** [2] - 13:14, 17:22

**contained** [2] - 19:22, 196:9

**context** [1] - 141:1

**contingent** [1] - 34:15

**continue** [11] - 70:6, 133:22, 143:24, 146:15, 154:8, 159:19, 162:12, 169:10, 170:13, 171:15, 189:2

**continued** [4] - 41:2, 142:2, 144:1, 170:6

**contribute** [6] - 88:25, 146:21, 146:25, 147:2, 185:17, 186:2

**contributed** [4] - 182:15, 182:16, 186:6, 188:20

**contributes** [2] - 146:24, 147:1

**contribution** [1] - 146:22

**control** [1] - 196:24

**controller** [6] - 23:17, 47:20, 47:22, 109:23, 144:22, 145:17

**conversation** [8] - 108:8, 113:16, 149:4, 161:5, 169:7, 170:1, 171:2, 171:22

**conversations** [8] - 43:23, 79:20, 79:23, 110:16, 111:13, 111:16, 111:20, 133:17

**conveying** [1] - 12:25

**copies** [2] - 138:6, 141:6

**copy** [9] - 29:5, 56:15, 87:1, 104:19,

137:22, 138:1, 140:13, 171:10, 196:11

**corner** [4] - 67:24, 105:20, 106:18, 107:7

**corporate** [9] - 23:16, 47:20, 47:22, 50:2, 50:15, 144:22, 145:17, 147:13, 183:3

**correct** [78] - 46:19, 46:23, 47:1, 47:16, 48:20, 48:23, 48:24, 49:10, 51:21, 51:25, 54:14, 54:18, 62:18, 74:9, 81:9, 81:10, 83:23, 83:24, 85:3, 89:2, 89:6, 97:3, 101:14, 103:14, 104:6, 104:7, 104:17, 104:19, 104:23, 105:17, 106:9, 106:12, 107:5, 110:13, 111:14, 113:9, 129:19, 129:25, 130:10, 131:10, 136:9, 137:6, 137:19, 144:24, 145:4, 145:10, 145:15, 145:18, 145:22, 146:14, 147:15, 147:20, 151:13, 151:21, 152:8, 152:13, 156:1, 156:13, 157:3, 157:12, 165:14, 166:16, 166:21, 166:23, 168:11, 168:24, 175:19, 178:5, 183:9, 185:3, 185:4, 185:7, 187:12, 187:13, 187:18, 189:14, 193:15, 196:11

**corrected** [1] - 7:11

**correspondence** [1] - 183:24

**cost** [1] - 115:19

**could've** [1] - 129:5

**counsel** [31] - 3:4, 3:20, 4:13, 4:14, 4:17, 4:19, 5:4, 11:13, 18:12, 18:15, 18:23, 19:9, 20:9, 20:25, 33:7, 33:15, 37:23, 56:13, 59:11, 129:17, 130:8, 131:6, 132:23, 134:2, 135:2, 136:20, 139:15, 141:3, 164:23, 190:20, 194:19

**counter** [2] - 83:12, 116:13

**country** [2] - 32:16, 33:24

**couple** [6] - 49:16, 49:17, 84:5, 168:5, 168:21, 191:12

**course** [9] - 5:13, 7:21, 10:2, 10:18, 11:10, 20:6, 29:6, 62:22, 140:23

**COURT** [132] - 1:1, 3:4, 3:8, 3:11, 3:20, 4:1, 18:15, 18:25, 19:5, 19:11, 19:15, 19:25, 20:8, 20:16, 33:12, 43:16, 44:6, 44:9, 44:14, 44:16, 45:5, 49:20, 50:11, 50:14, 50:17, 50:21, 50:24, 56:12, 56:19, 59:1, 60:8, 71:1, 71:4, 71:15, 73:20, 77:15, 77:18, 78:1, 78:8, 78:11, 78:14, 78:17, 78:20, 78:23, 79:3, 79:6, 79:10, 79:16, 79:19, 79:22, 87:3, 92:9, 96:7, 102:19, 102:21, 103:4, 105:24, 106:1, 116:6, 129:13, 132:14, 133:10, 133:14, 134:1, 134:10, 134:25, 135:16, 135:25, 136:15, 136:18, 137:3, 137:9, 137:14, 137:17, 137:20, 138:2, 138:10, 138:14, 138:20, 138:22, 139:2, 139:6, 139:14, 140:5, 140:14, 140:22, 141:7, 141:9, 141:19, 141:22, 141:25, 142:5, 142:7, 142:11, 142:15, 142:22, 142:25, 143:4, 143:6, 143:16, 143:22, 144:3, 144:6, 159:25, 164:7, 164:18, 164:25, 177:14, 181:22, 182:5, 182:15, 182:22, 182:25, 183:23, 184:6, 184:9, 184:15, 185:1, 185:5, 185:8, 185:12, 187:25, 188:8, 190:4, 192:22, 192:25,

193:16, 193:20, 193:23, 194:5, 194:21, 194:24

**court** [11] - 5:20, 6:3, 6:21, 7:20, 9:19, 10:3, 11:9, 14:11, 20:21, 20:25

**Court** [5] - 1:22, 1:23, 2:7, 2:13, 195:1

**courthouse** [1] - 13:24

**Courthouse** [1] - 1:24

**COURTROOM** [4] - 44:21, 80:2, 138:25, 144:12

**courtroom** [15] - 6:24, 7:2, 7:16, 9:23, 11:15, 12:2, 18:9, 44:20, 45:6, 78:25, 80:1, 133:18, 140:10, 144:8, 144:11

**covered** [1] - 176:19

**coworker** [1] - 169:18

**crates** [1] - 61:22

**create** [2] - 62:16, 94:7

**created** [2] - 95:12, 114:14

**creating** [1] - 94:22

**creation** [2] - 89:1, 94:3

**credibility** [2] - 8:17, 10:11

**crews** [1] - 72:14

**criminal** [1] - 15:23

**Crocenzi** [23] - 1:12, 2:8, 2:12, 2:13, 2:21, 2:22, 20:22, 20:23, 33:12, 33:18, 38:3, 44:6, 45:3, 73:20, 140:16, 141:16, 143:22, 177:14, 183:23, 184:16, 185:1, 185:12, 192:25

**CROCENZI** [77] - 3:6, 3:24, 18:21, 19:1, 19:6, 20:11, 20:24, 44:8, 44:11, 44:15, 44:24, 49:24, 50:25, 56:11, 56:17, 56:20, 58:24, 60:1, 70:24, 71:11, 73:21, 73:23, 77:13, 78:22, 79:1, 79:4, 79:11, 79:18, 79:21, 134:4, 134:14, 134:23, 135:23, 136:8, 136:13, 137:1, 137:7, 137:21, 140:4,

140:12, 140:17, 140:20, 141:5, 141:17, 142:3, 142:9, 142:19, 142:24, 143:3, 143:11, 143:13, 143:15, 144:2, 144:4, 144:16, 159:23, 164:8, 164:14, 164:19, 177:15, 182:7, 183:2, 183:19, 183:25, 184:18, 185:4, 185:6, 185:10, 185:14, 185:15, 190:3, 191:11, 192:19, 193:3, 193:15, 194:4

**cROCENZI** [2] - 141:8, 144:19

**Crocenzi's** [2] - 86:23, 139:24

**Cross** [3] - 2:12, 2:16, 2:21

**CROSS** [3] - 59:4, 116:7, 160:2

**cross** [4] - 4:15, 4:19, 79:24, 116:6

**CTE** [5] - 182:11, 186:11, 186:20, 187:9, 188:5

**CUMBERLAND** [1] - 1:4

**Cumberland** [111] - 2:1, 4:15, 4:18, 4:21, 15:5, 15:15, 15:19, 16:1, 16:7, 16:12, 21:8, 21:12, 21:13, 22:7, 22:11, 22:14, 23:10, 23:13, 23:17, 23:24, 24:12, 24:25, 25:2, 25:15, 25:24, 26:7, 26:12, 26:18, 26:24, 28:7, 28:20, 28:21, 28:22, 28:24, 29:4, 29:7, 29:8, 29:9, 29:12, 29:25, 30:21, 31:1, 31:12, 31:16, 31:23, 32:22, 33:5, 33:6, 33:20, 33:23, 33:25, 34:3, 34:9, 34:25, 37:14, 39:25, 41:1, 41:13, 42:13, 44:12, 45:10, 45:12, 45:24, 46:1, 46:14, 46:23, 51:15, 57:14, 60:20, 74:8, 80:9, 80:13, 80:16, 80:19, 80:23, 80:25, 81:8, 82:18, 83:7, 101:4, 107:22,

107:25, 108:19, 113:25, 144:23, 145:3, 145:7, 146:2, 146:12, 151:16, 152:3, 153:22, 153:24, 154:23, 155:7, 155:13, 158:21, 159:7, 159:20, 165:18, 167:6, 168:2, 170:17, 174:2, 177:24, 181:3, 181:13, 186:9, 189:3, 196:1

**Cumberland's** [2] - 167:22, 170:5

**current** [1] - 170:19

**customer** [2] - 63:25, 119:24

**customers** [1] - 61:20

**cut** [1] - 31:25

**cylinder** [1] - 62:13

# D

**D-1** [2] - 193:12, 193:18

**D-9** [1] - 122:6

**daily** [4] - 46:20, 49:5, 68:10, 116:19

**damages** [1] - 31:25

**danger** [15] - 22:8, 22:24, 54:8, 54:15, 55:14, 55:18, 57:12, 132:3, 132:10, 149:2, 151:1, 151:4, 179:21, 180:3, 180:11

**Danger** [1] - 55:9

**dangers** [1] - 67:13

**date** [8] - 91:10, 107:4, 140:2, 156:22, 157:14, 162:6, 183:24, 190:7

**dated** [3] - 184:19, 184:20, 189:13

**dates** [1] - 189:4

**DAY** [1] - 1:7

**day-to-day** [2] - 26:5, 27:5

**days** [9] - 16:18, 18:11, 72:14, 79:12, 116:21, 157:13, 158:12, 168:5, 168:21

**deal** [4] - 17:15, 161:22, 168:9, 176:19

**dealing** [11] - 8:14, 37:19, 38:5, 148:21, 153:24, 161:25, 162:1, 166:3, 166:6, 166:7

**dealt** [1] - 167:15

**deceased** [2] - 19:5, 139:19

**decide** [11] - 5:10, 5:11, 5:12, 7:1, 7:3, 10:7, 11:17, 12:10, 14:16, 66:23, 161:17

**decided** [4] - 38:1, 163:25, 165:12, 166:25

**decides** [3] - 30:21, 31:18, 146:21

**decision** [11] - 7:7, 23:22, 40:20, 68:6, 112:8, 112:11, 112:13, 150:16, 151:19, 151:22, 156:25

**decisions** [2] - 6:7, 114:8

**deck** [2] - 81:25, 82:10

**declines** [1] - 28:15

**Defendant** [2] - 1:5, 1:18

**Defendant's** [2] - 193:12, 194:1

**defendant's** [1] - 193:24

**defense** [5] - 3:7, 18:23, 19:9, 141:2, 164:21

**defer** [1] - 193:25

**delay** [1] - 40:23

**deliberate** [1] - 9:12

**deliberation** [4] - 12:1, 17:14, 44:2, 133:20

**deliberations** [8] - 5:14, 7:23, 8:6, 9:3, 10:3, 10:5, 15:2, 143:18

**deliver** [1] - 120:25

**delivery** [2] - 60:16, 120:11

**demands** [1] - 14:23

**demeanor** [1] - 8:18

**demonstrative** [2] - 18:16, 18:20

**demoted** [2] - 118:10, 118:12

**denies** [1] - 16:7

**department** [7] - 23:18, 50:3, 145:18, 147:21, 147:22, 154:16, 177:22

**depended** [2] - 85:25, 86:10

**dependent** [1] - 19:24

**deposition** [34] - 2:19, 4:23, 4:25, 19:3, 28:2, 28:4, 54:20, 54:24, 55:1, 56:7, 56:9, 56:14, 56:15, 56:22, 86:23, 87:2, 87:8, 95:2, 134:7, 134:19, 135:5, 136:19, 138:19, 139:9, 139:17, 139:22, 140:1, 140:3, 140:18, 140:24, 141:13, 142:2, 143:25, 164:21

**depth** [1] - 34:12

**deputy** [6] - 7:16, 9:24, 44:20, 80:1, 144:8, 144:11

**DEPUTY** [4] - 44:21, 80:2, 138:25, 144:12

**describe** [4] - 60:22, 76:12, 81:22, 91:15

**described** [2] - 130:8, 131:3

**description** [25] - 25:23, 38:3, 38:7, 38:8, 38:11, 38:12, 38:17, 39:4, 42:2, 89:19, 90:3, 93:25, 94:7, 94:14, 94:16, 94:20, 94:23, 95:11, 95:22, 129:17, 154:14, 189:24, 190:21, 190:25, 191:4

**descriptions** [2] - 38:4, 119:7, 122:1

**designated** [2] - 61:10, 64:22

**desire** [2] - 187:6, 189:2

**desk** [2] - 77:12, 175:15

**destroy** [1] - 10:4

**detail** [2] - 5:15, 173:1

**detailed** [1] - 16:9

**details** [1] - 173:25

**determination** [1] - 38:2

**determine** [1] - 8:17

**determined** [1] - 39:15

**determining** [1] - 10:11

**developed** [5] - 26:6, 153:16, 154:15, 156:6, 156:7

**developing** [2] - 26:11, 60:7

**devices** [2] - 14:8,

14:10

**diagnosis** [3] - 178:19, 178:21, 178:22

**died** [1] - 27:25

**difference** [2] - 81:11, 191:4

**different** [16] - 35:25, 36:3, 49:8, 67:23, 73:7, 73:14, 87:25, 88:3, 89:8, 98:20, 125:4, 173:20, 178:24, 186:16, 187:19

**differently** [1] - 15:12

**difficult** [1] - 36:11

**difficulties** [3] - 93:2, 93:6, 161:22

**difficulty** [22] - 23:7, 24:13, 36:25, 39:8, 43:10, 58:8, 58:12, 58:15, 58:18, 58:21, 68:20, 101:13, 101:18, 108:24, 109:2, 109:9, 126:14, 148:20, 150:22, 160:7, 161:4, 167:11

**dire** [2] - 3:13, 33:8

**Direct** [3] - 2:12, 2:16, 2:21

**DIRECT** [2] - 80:5, 144:19

**direct** [4] - 27:10, 74:20, 156:18, 196:24

**directly** [15] - 24:9, 46:13, 46:22, 47:3, 47:25, 61:20, 64:1, 68:12, 72:16, 72:19, 110:2, 117:12, 145:23, 147:12, 190:17

**director** [8] - 22:11, 24:7, 45:18, 46:21, 48:12, 60:17, 74:2, 145:20

**Disabilities** [2] - 21:10, 23:3

**disability** [26] - 16:3, 16:4, 16:14, 25:5, 28:8, 28:16, 29:14, 29:19, 30:1, 30:19, 31:5, 31:19, 31:24, 32:3, 32:8, 32:11, 35:8, 35:17, 39:17, 158:7, 158:11, 159:21, 160:9, 160:15, 177:24, 178:3

**disabled** [2] - 30:14, 32:5

**disagree** [1] - 171:11

**discharged** [1] - 12:14

**disciplinary** [2] - 115:7, 115:9

**discipline** [2] - 92:1, 101:20

**disciplined** [1] - 115:3

**disclose** [2] - 118:5, 162:15

**disclosed** [1] - 41:14

**discover** [1] - 43:11

**discovered** [1] - 168:25

**discrepancy** [2] - 84:8, 120:19

**discriminate** [1] - 162:6

**discriminated** [1] - 16:2

**discuss** [12] - 13:3, 69:15, 70:12, 151:24, 152:1, 165:5, 171:7, 171:17, 172:21, 172:24, 173:24, 190:24

**discussed** [7] - 14:11, 69:17, 136:19, 141:2, 148:16, 175:9, 190:23

**discussing** [1] - 37:25

**Discussion** [1] - 136:17

**discussion** [1] - 187:2

**disposal** [1] - 121:13

**disposition** [1] - 73:9

**disputed** [1] - 5:11

**disputes** [1] - 19:16

**disregard** [1] - 6:22

**disregarded** [1] - 6:25

**distance** [3] - 17:17, 36:8, 86:20

**distances** [1] - 8:15

**distract** [1] - 8:20

**distracted** [1] - 141:13

**distracting** [1] - 8:17

**distress** [1] - 31:8

**distribute** [1] - 46:6

**distribution** [1] - 93:25

**distributor** [2] - 46:2, 46:5

**DISTRICT** [3] - 1:1, 1:1, 1:8

**DIVISION** [1] - 1:2

**dizzy** [1] - 107:13

**docker** [1] - 172:7

**doctor** [17] - 38:2, 39:14, 40:4, 40:10, 40:16, 42:2, 42:3, 42:5, 70:5, 70:22, 163:6, 171:9, 171:18, 172:5, 172:7

**doctors** [7] - 31:13, 40:20, 41:24, 70:16, 70:18, 73:7, 73:14

**document** [18] - 52:10, 88:23, 89:1, 89:4, 89:17, 93:22, 94:4, 98:19, 102:24, 103:10, 104:20, 130:2, 138:9, 153:21, 153:24, 154:9, 184:11, 184:22

**documented** [1] - 39:24

**documents** [4] - 5:25, 141:19, 181:25

**dollar** [1] - 146:22

**dolly** [1] - 124:7

**done** [23] - 27:18, 60:18, 69:13, 84:13, 85:21, 98:25, 99:2, 99:3, 99:4, 99:8, 99:19, 99:20, 106:11, 121:10, 122:1, 130:5, 133:6, 138:11, 155:15, 172:12, 175:12, 179:4, 182:1

**door** [1] - 81:24

**doubt** [1] - 15:22

**down** [19] - 27:19, 30:18, 37:10, 40:9, 42:25, 61:5, 66:14, 67:23, 78:12, 91:16, 109:12, 121:14, 126:9, 128:5, 128:10, 133:6, 133:11, 169:4, 192:23

**dozen** [1] - 36:9

**Dr** [16] - 30:6, 30:7, 30:9, 30:11, 30:13, 30:15, 39:3, 39:10, 40:4, 42:3, 42:7, 42:9, 135:8, 136:11, 136:12, 194:4

**draft** [2] - 153:21, 153:23

**draw** [2] - 11:2, 50:12

**drive** [5] - 17:19, 65:4, 121:1, 124:4, 194:17

**driver** [3] - 60:16, 64:23

**drop** [3] - 127:24, 128:1

**dropping** [1] - 150:4

**drug** [1] - 152:15

**drum** [5] - 63:9, 63:23, 64:2, 66:13, 162:19

**drums** [7] - 61:3, 62:2, 62:4, 63:15, 63:24, 64:16, 101:6

**duration** [1] - 82:18

**during** [47] - 5:13, 7:12, 7:14, 7:21, 7:23, 8:5, 9:16, 10:2, 10:12, 10:17, 11:9, 11:12, 13:10, 17:23, 20:5, 23:9, 25:18, 26:22, 26:23, 27:6, 28:5, 29:6, 33:8, 33:9, 47:19, 56:8, 65:7, 74:7, 75:20, 115:23, 116:24, 140:1, 140:23, 143:17, 147:23, 148:7, 158:24, 159:4, 159:13, 170:14, 176:15, 180:15, 180:23, 181:5, 186:11, 186:20, 187:9

**duties** [38] - 4:5, 24:22, 26:3, 26:4, 27:5, 29:9, 34:17, 38:6, 38:10, 39:7, 40:14, 41:4, 52:2, 52:16, 85:18, 92:5, 92:7, 92:24, 97:9, 109:6, 109:10, 119:1, 119:15, 121:7, 121:8, 129:18, 131:22, 132:17, 145:16, 162:23, 162:25, 167:2, 169:16, 176:19, 187:22, 191:2, 192:7

**duty** [10] - 5:17, 10:19, 34:24, 41:1, 43:12, 73:12, 145:5, 145:6, 163:10, 187:7

**E**

**e-mail** [1] - 12:25

**Eagle** [1] - 1:20

**early** [4] - 36:2, 41:13, 117:14, 194:10

**earn** [1] - 29:16

**easier** [1] - 78:2

**East** [1] - 1:16

**eastern** [1] - 80:10

**easy** [1] - 108:10

**eating** [1] - 159:14

**economy** [1] - 31:5
**EEOC** [3] - 181:19,
181:25, 182:21
**effect** [2] - 68:19,
167:13
**effects** [1] - 107:13
**efficient** [1] - 151:14
**efficiently** [1] - 27:17
**eight** [4] - 39:1,
64:13, 65:7, 82:1
**eighty** [5] - 36:7,
36:10, 37:8, 67:2,
127:3
**either** [11] - 11:14,
17:23, 56:4, 71:9,
71:24, 120:6, 134:20,
145:12, 148:11,
169:18, 184:11
**eleven** [1] - 27:14
**ELMO** [2] - 138:5,
138:8
**else-wise** [1] - 167:5
**employed** [2] - 45:9,
57:13
**employee** [36] - 21:3,
23:5, 23:7, 24:16,
33:21, 34:1, 34:18,
37:4, 42:19, 43:5,
43:8, 57:18, 58:8,
58:21, 86:14, 90:6,
90:12, 97:6, 109:17,
146:20, 150:21,
151:8, 151:16,
152:11, 156:16,
160:14, 161:19,
161:20, 162:5,
167:15, 167:25,
177:9, 178:4, 179:5,
179:7, 180:6
**employee's** [2] -
27:16, 35:5
**employees** [27] -
23:25, 35:2, 35:8,
35:18, 36:24, 37:21,
41:3, 84:23, 84:25,
94:14, 94:17, 94:18,
94:21, 109:13, 145:8,
146:2, 150:18, 152:5,
152:6, 152:9, 152:14,
154:24, 156:9,
160:21, 167:7, 168:3,
178:25
**employer** [3] - 21:3,
21:8, 23:4
**employer's** [2] -
21:6, 23:6
**employment** [18] -
18:3, 23:25, 30:24,
31:2, 34:9, 34:15,
42:14, 42:16, 74:8,

80:25, 107:24, 148:5,
152:6, 156:15, 162:9,
174:2, 176:25, 180:18
**empty** [1] - 121:12
**end** [26] - 6:8, 7:6,
9:23, 10:10, 12:9,
15:3, 16:9, 16:11,
17:25, 22:25, 25:10,
27:20, 31:6, 31:7,
32:7, 33:9, 36:1,
42:13, 106:14,
107:24, 108:6,
117:14, 127:21,
131:9, 163:15, 175:20
**endangered** [2] -
43:4, 43:5
**ended** [4] - 12:13,
21:7, 174:12, 175:22
**ends** [3] - 10:1,
33:17, 83:19
**engaged** [2] - 16:13,
145:11
**engine** [1] - 78:5
**enjoyed** [1] - 170:11
**ensure** [1] - 12:6
**entered** [1] - 98:22
**entire** [4] - 82:18,
114:4, 135:5, 136:21
**entitled** [1] - 5:1
**envision** [1] - 65:21
**equal** [1] - 109:25
**Equipment** [19] - 2:1,
4:15, 4:18, 4:21, 15:6,
15:15, 15:19, 16:1,
16:7, 16:12, 21:9,
29:4, 45:10, 45:25,
51:16, 144:23, 145:3,
181:3, 196:1
**equipment** [2] -
51:23, 52:16
**EQUIPMENT** [1] -
1:5
**error** [1] - 11:19
**escort** [6] - 18:7,
18:11, 44:4, 133:23,
138:23, 194:18
**especially** [1] - 38:5
**Esq** [3] - 1:12, 1:15,
1:19
**essence** [1] - 130:3
**essential** [3] - 25:12,
39:6, 40:13
**essentially** [2] -
38:22, 137:17
**established** [2] -
182:13, 182:17
**evaluate** [2] - 27:16,
70:6
**evaluation** [40] -
18:22, 27:1, 27:9,

27:22, 70:22, 71:10,
71:12, 71:14, 71:17,
71:21, 71:25, 102:1,
102:4, 102:7, 102:12,
103:24, 104:8,
104:16, 105:8,
105:15, 105:16,
106:25, 107:2, 107:4,
110:9, 110:11,
111:11, 113:9,
113:14, 154:2, 154:6,
155:20, 156:12,
156:21, 157:9,
157:10, 167:1,
171:10, 173:22,
191:16
**evaluations** [4] -
22:5, 142:14, 142:18,
142:21
**event** [5] - 35:9,
35:13, 112:5, 156:23,
178:1
**events** [1] - 12:23
**eventually** [1] -
162:24
**evidence** [45] - 4:8,
4:10, 4:13, 4:19, 5:3,
5:5, 5:7, 5:17, 5:23,
6:4, 6:5, 6:10, 6:13,
6:14, 6:16, 6:19, 6:20,
6:22, 6:25, 7:1, 7:5,
7:8, 7:12, 7:14, 9:7,
9:15, 9:17, 10:15,
10:21, 11:17, 11:18,
12:5, 14:15, 14:17,
14:21, 14:23, 14:25,
15:9, 15:11, 15:13,
15:14, 19:20, 25:22,
36:2, 196:9
**evidentiary** [1] -
11:24
**exact** [3] - 107:20,
146:5, 156:22
**exactly** [4] - 68:21,
164:4, 175:3, 177:20
**exam** [18] - 25:18,
26:22, 31:10, 40:12,
43:11, 70:21, 72:5,
118:2, 126:17,
128:17, 157:2,
165:13, 166:11,
171:24, 172:16,
174:16, 179:24
**EXAMINATION** [5] -
59:4, 80:5, 116:7,
144:19, 160:2
**examination** [24] -
2:12, 2:12, 2:16, 2:16,
2:21, 2:21, 23:23,
24:10, 24:23, 25:7,

26:23, 79:17, 79:24,
149:14, 149:16,
149:18, 151:20,
153:5, 157:6, 157:19,
157:23, 159:25,
166:13, 179:8
**Examination** [1] -
2:13
**examinations** [1] -
25:19
**examine** [5] - 4:16,
4:20, 171:18, 171:19,
174:14
**examined** [4] -
24:20, 39:3, 42:4,
128:15
**examining** [1] -
39:14
**example** [4] - 84:6,
88:10
**exams** [3] - 26:18,
73:12, 156:5
**except** [2] - 99:9,
153:11
**exception** [1] -
119:13
**excess** [1] - 101:2
**exchange** [2] -
18:18, 183:17
**excluded** [1] - 6:21
**excluding** [1] - 6:10
**excuse** [2] - 82:3,
127:12
**excused** [1] - 78:24
**excusing** [1] - 16:19
**exemplary** [1] -
151:8
**exercise** [2] - 170:7,
170:8
**Exhibit** [32] - 51:13,
59:7, 88:21, 93:13,
93:14, 95:17, 95:18,
96:3, 101:17, 102:18,
105:12, 105:13,
106:17, 118:22,
129:16, 142:4,
142:10, 152:23,
185:9, 189:6, 190:7,
191:14, 191:17,
193:9, 193:10,
193:21, 193:23,
193:24, 194:2
**exhibit** [7] - 6:6,
27:6, 95:16, 137:22,
182:3, 184:17, 185:2
**Exhibits** [2] - 138:4,
193:1
**exhibits** [15] - 6:1,
18:16, 18:20, 20:5,
138:18, 138:24,

139:7, 140:21,
140:23, 141:1, 143:9,
143:17, 143:24,
193:5, 193:7
**existed** [1] - 187:8
**exonerate** [1] -
164:23
**expect** [2] - 89:23,
90:18, 134:17
**expected** [1] -
122:10
**expects** [1] - 4:10
**expeditiously** [1] -
12:4
**experience** [2] -
13:1, 60:24
**explain** [2] - 32:10,
146:18, 161:1, 161:14
**explained** [3] -
163:22, 164:5, 186:17
**explaining** [2] - 5:5,
30:10
**explanation** [1] -
188:18
**express** [3] - 10:13,
54:3, 187:6
**expressed** [2] - 69:8,
170:4, 172:3
**expressing** [1] -
108:13, 189:2
**extent** [4] - 45:6,
112:19, 171:12,
182:21
**extravagant** [1] -
33:2
**extricated** [1] -
137:18
**eye** [2] - 34:13

**F**

**face** [1] - 121:20
**Facebook** [1] - 13:2
**faces** [1] - 36:6
**facility** [3] - 165:16,
165:17, 170:13
**facing** [1] - 31:8
**fact** [21] - 5:11, 20:2,
34:2, 36:14, 37:19,
38:15, 87:7, 118:5,
123:22, 127:10,
127:14, 132:23,
134:11, 142:12,
151:7, 159:18,
170:11, 178:19,
179:22, 183:7, 184:5
**factor** [1] - 150:15
**facts** [6] - 5:18, 5:19,
5:20, 5:24, 6:2, 7:4
**failed** [4] - 16:3,

25:3, 25:6, 72:4
**fails** [1] - 15:18
**fair** [5] - 93:24,
110:24, 116:1,
130:12, 150:17
**fairly** [1] - 12:20
**fairness** [1] - 12:6
**faithfully** [1] - 32:16
**false** [4] - 21:7, 23:6,
23:10
**familiar** [1] - 48:19
**family** [4] - 12:15,
17:23, 35:6, 136:18
**Family** [3] - 35:4,
35:13, 39:16
**far** [11] - 38:14,
41:16, 43:25, 63:19,
79:4, 86:17, 94:18,
122:15, 133:18,
180:19, 181:17
**fashion** [2] - 26:16,
140:8
**fast** [1] - 54:13
**fault** [2] - 170:5
**favor** [1] - 11:7
**favorable** [2] - 15:13,
15:14
**favoring** [1] - 11:7
**feared** [1] - 159:10
**fears** [3] - 21:7, 23:6,
23:10
**February** [32] -
21:11, 22:17, 24:2,
25:16, 25:19, 26:1,
39:5, 52:20, 53:25,
57:17, 75:21, 80:18,
90:22, 99:24, 100:19,
101:12, 110:12,
148:2, 149:14,
149:21, 150:21,
153:5, 155:23,
156:19, 157:6,
157:13, 176:10,
179:20, 179:24,
186:14, 190:8
**federal** [2] - 31:20,
31:22
**feet** [10] - 36:7,
36:10, 37:8, 64:12,
67:2, 81:25, 82:9,
86:21, 126:3, 127:3
**fellow** [4] - 8:1, 9:2,
9:4, 9:15
**felt** [12] - 92:4,
112:20, 169:17,
171:4, 172:4, 172:6,
172:11, 173:3, 173:4,
174:13, 175:23,
175:25
**fertile** [1] - 79:23

**few** [10] - 26:6, 30:8,
30:23, 32:20, 51:4,
53:2, 72:12, 145:25,
147:17, 147:24
**fifteen** [3] - 43:19,
67:2, 82:3
**fifth** [1] - 14:4
**fifty** [2] - 123:5,
146:22
**file** [4] - 101:23,
150:5, 178:11, 178:14
**filed** [2] - 15:7,
181:20
**fill** [4] - 30:3, 30:11,
61:16, 120:22
**filled** [5] - 40:6,
153:11, 154:2,
176:11, 193:10
**filling** [1] - 160:23
**fills** [1] - 30:16
**final** [5] - 44:2, 73:9,
105:16, 133:20,
143:18
**finally** [8] - 5:8, 9:18,
12:6, 14:20, 36:21,
66:22, 68:5, 174:8
**financial** [1] - 31:8
**fine** [4] - 128:10,
136:8, 138:2, 141:7
**finish** [2] - 17:7,
188:1
**finished** [1] - 143:23
**fires** [1] - 29:3
**first** [37] - 4:6, 6:17,
8:8, 12:7, 20:21, 30:2,
34:3, 35:25, 41:14,
43:21, 44:7, 53:23,
68:5, 68:9, 68:15,
69:9, 70:3, 80:22,
80:25, 85:5, 85:9,
106:4, 107:21,
112:20, 143:1, 152:2,
153:11, 161:3, 167:9,
175:21, 182:12,
184:4, 189:15,
189:17, 189:22,
190:19
**fit** [7] - 32:22, 41:1,
43:11, 73:12, 189:25,
190:22, 192:15
**five** [11] - 40:17,
51:2, 66:1, 66:21,
73:5, 84:15, 85:24,
117:2, 117:5, 117:7
**flatbed** [2] - 124:25,
125:3
**fleets** [1] - 46:7
**flexibility** [1] - 11:23
**floor** [4] - 3:15, 3:18,
121:9, 121:12

**FMLA** [4] - 162:3,
177:23, 178:7, 178:9
**follow** [5] - 5:16,
5:21, 6:15, 73:22,
172:15, 191:12
**follow-up** [3] - 73:22,
172:15, 191:12
**followed** [4] - 135:6,
135:7, 135:8, 136:10
**following** [4] - 9:25,
12:7, 14:1, 188:17
**follows** [1] - 4:6
**food** [1] - 170:11
**foot** [10] - 50:5,
67:20, 67:25, 76:15,
82:2, 82:3, 82:7,
82:11
**FOR** [1] - 1:1
**force** [3] - 39:19,
158:10, 160:14
**forced** [1] - 134:21
**foregoing** [1] -
196:22
**foregone** [2] - 31:14,
31:17
**forklift** [48] - 21:21,
37:10, 57:23, 60:15,
64:14, 64:15, 64:18,
64:20, 64:23, 65:2,
65:3, 65:6, 67:5, 67:7,
67:9, 67:11, 67:18,
69:12, 74:15, 74:17,
74:22, 75:8, 75:9,
75:18, 75:25, 76:17,
77:7, 78:3, 78:4,
98:7, 98:4, 98:7,
99:18, 114:17,
115:11, 121:6, 124:3,
129:3, 130:12,
130:20, 131:1,
131:14, 132:24,
132:25, 149:8,
149:19, 150:13,
150:19
**forklifts** [2] - 65:4,
124:1
**forks** [3] - 76:23,
77:21, 125:23
**form** [35] - 10:13,
14:20, 24:17, 24:24,
25:23, 26:11, 27:3,
29:9, 30:3, 30:9,
30:11, 30:16, 35:12,
40:7, 41:8, 51:20,
62:17, 148:18, 153:3,
153:7, 153:10,
153:14, 153:16,
153:25, 154:4,
154:20, 155:10,
155:14, 155:25,

156:4, 156:8, 156:10,
179:25, 191:21,
193:11
**formed** [1] - 179:22
**forms** [5] - 22:20,
22:22, 35:15, 39:16,
178:1
**formulate** [1] -
183:16
**forward** [6] - 12:4,
44:10, 61:14, 140:11,
144:7, 161:16
**foundation** [5] -
60:2, 182:13, 184:3,
184:15, 184:16
**four** [5] - 16:18,
62:14, 76:15, 124:22
**four-wheeled** [1] -
124:22
**fourth** [4] - 6:23,
9:18, 14:2, 102:15
**frame** [11] - 91:11,
91:12, 91:23, 92:21,
99:11, 99:13, 112:2,
126:16, 126:19,
180:20, 190:14
**frankly** [4] - 26:14,
164:4, 169:16, 174:12
**free** [2] - 45:5,
169:25
**frequent** [2] - 84:19,
97:3
**frequently** [5] -
38:23, 62:20, 64:6,
89:18, 90:11
**friends** [1] - 12:15
**front** [9] - 59:8,
83:18, 86:18, 95:16,
99:4, 99:5, 102:24,
116:12, 121:21
**frustrated** [1] - 28:25
**full** [8] - 21:25, 24:4,
34:24, 44:22, 80:3,
144:13, 162:25,
163:10
**full-time** [1] - 21:25
**fully** [1] - 196:9
**function** [1] - 114:3
**functional** [1] - 26:25
**functions** [1] - 25:13
**future** [2] - 179:5,
179:17

**G**

**gallery** [1] - 44:13
**garages** [1] - 46:7
**gas** [2] - 67:20, 68:1
**gauge** [1] - 115:20
**general** [5] - 101:4,

146:3, 146:8, 155:2,
156:14
**gentleman** [1] -
143:16
**gentlemen** [14] -
3:11, 4:1, 10:6, 18:7,
20:17, 21:1, 33:15,
43:17, 102:23,
133:14, 139:15,
140:22, 141:9, 194:7
**gist** [1] - 70:9
**given** [6] - 7:19,
7:25, 20:1, 34:14,
35:12, 39:16, 115:14,
135:9, 138:7, 140:1,
140:9, 141:14, 146:3,
191:22
**glad** [1] - 56:17
**Goldberg** [1] - 1:12
**Google** [1] - 14:9
**gout** [1] - 162:1
**govern** [1] - 14:14
**government** [2] -
31:20, 31:22
**grants** [1] - 31:22
**great** [3] - 32:22,
33:21, 160:7
**greeted** [2] - 24:6,
25:1
**ground** [3] - 76:23,
77:3, 79:24
**group** [3] - 164:2,
173:19, 192:1
**grunt** [1] - 31:4
**guess** [3] - 19:13,
55:21, 99:13
**guy** [8] - 21:2, 21:5,
21:8, 28:19, 33:24,
33:25, 179:6

**H**

**habits** [1] - 159:14
**half** [12] - 21:18,
21:21, 24:5, 28:14,
28:22, 36:9, 49:1,
115:25, 135:23,
145:2, 146:25, 158:19
**hallway** [2] - 13:23,
131:13
**hand** [13] - 7:10,
76:19, 88:11, 99:19,
103:13, 105:20,
106:18, 107:7, 124:1,
124:6, 124:10, 131:6,
131:7
**handheld** [1] - 14:8
**handle** [4] - 49:21,
125:2, 161:17, 164:4
**hands** [7] - 125:20,

175:12, 175:13, 175:14, 175:15, 176:8, 187:15

**handwriting** [2] - 153:12, 193:13

**handwritten** [1] - 41:9

**happy** [2] - 134:10, 174:10

**hard** [8] - 28:13, 33:20, 35:20, 37:5, 78:1, 93:9, 138:6, 168:4

**hardworking** [3] - 21:2, 33:25, 43:8

**HARRISBURG** [1] - 1:2

**Harrisburg** [4] - 1:5, 1:13, 1:25, 164:2

**hate** [1] - 49:20

**head** [1] - 100:14

**headed** [1] - 154:16

**heads** [1] - 62:13

**health** [4] - 160:10, 172:5, 172:13, 176:2

**hear** [16] - 6:11, 7:9, 14:17, 22:2, 23:14, 26:5, 34:6, 36:1, 36:5, 36:22, 38:21, 39:22, 41:21, 43:2, 114:19, 128:12

**heard** [14] - 6:24, 10:14, 15:21, 19:21, 35:4, 43:25, 57:25, 58:1, 58:2, 114:22, 115:1, 128:8, 133:18, 194:14

**hearing** [2] - 11:14, 148:17

**hearsay** [1] - 70:24

**heaviest** [4] - 86:4, 86:6, 86:8, 87:11

**heavy** [12] - 34:5, 37:14, 37:20, 76:4, 76:16, 119:14, 119:22, 145:5, 145:6, 180:7, 180:12, 187:7

**heck** [1] - 72:16

**height** [1] - 82:8

**held** [8] - 42:12, 45:19, 54:22, 60:15, 80:12, 82:22, 136:17, 162:8

**hello** [1] - 59:6

**help** [6] - 4:9, 22:2, 63:2, 63:15, 122:24, 153:23

**helped** [1] - 183:15

**helpful** [1] - 8:14

**helping** [4] - 65:12,

123:20, 123:24, 153:21

**hereby** [1] - 196:8

**hesitant** [2] - 67:5, 75:9

**hi** [1] - 45:1

**high** [6] - 63:12, 63:13, 81:25, 82:2, 82:3, 82:6

**highlighted** [2] - 87:7, 95:5

**highlights** [1] - 9:9

**highly** [1] - 151:7

**himself** [22] - 22:9, 22:24, 33:4, 38:15, 54:8, 54:16, 55:9, 55:15, 55:19, 69:10, 100:15, 108:12, 127:22, 131:25, 132:4, 132:10, 149:2, 151:1, 169:18, 179:21, 180:3, 180:11

**HIPAA** [1] - 162:3

**hire** [2] - 34:17, 156:16

**hired** [3] - 34:18, 93:18, 162:17

**hit** [1] - 132:5

**Hoffman** [81] - 2:11, 22:10, 22:13, 22:14, 22:18, 22:20, 23:13, 23:15, 24:6, 24:7, 24:17, 25:1, 28:6, 28:10, 34:15, 35:12, 36:5, 36:21, 39:11, 39:12, 40:1, 44:8, 44:9, 44:19, 44:23, 44:25, 45:9, 48:5, 48:12, 51:17, 54:20, 56:21, 57:11, 59:5, 59:7, 60:2, 60:10, 71:9, 71:25, 73:24, 78:18, 83:5, 109:20, 109:24, 109:25, 110:2, 110:4, 110:21, 110:25, 111:17, 111:20, 111:23, 112:4, 126:23, 135:3, 135:4, 135:15, 136:7, 145:20, 148:4, 148:8, 148:9, 148:13, 148:18, 149:23, 151:18, 154:16, 156:18, 157:1, 157:17, 157:25, 158:3, 161:9, 161:10, 162:13, 163:23, 165:10, 166:14, 169:24, 180:2, 189:13

**Hoffman's** [3] -

83:13, 83:16, 147:14

**Hold** [2] - 56:12, 164:7

**hold** [3] - 81:1, 164:7, 187:25

**holds** [1] - 76:16

**home** [10] - 17:25, 18:2, 18:10, 21:4, 25:4, 28:9, 28:23, 46:11, 194:15, 194:17

**honest** [1] - 33:24

**honestly** [3] - 152:19, 158:18, 175:1

**Honor** [54] - 3:6, 3:7, 3:25, 20:7, 20:14, 20:24, 33:14, 44:11, 45:2, 45:8, 49:25, 56:10, 56:13, 59:2, 60:1, 60:9, 73:21, 77:14, 78:10, 78:18, 79:11, 105:22, 116:5, 116:8, 129:15, 132:13, 132:16, 133:9, 134:5, 134:15, 135:1, 136:4, 137:1, 137:2, 138:4, 138:21, 140:12, 140:20, 141:5, 141:18, 142:12, 144:17, 160:1, 164:9, 164:14, 164:17, 182:24, 184:3, 184:14, 185:14, 190:16, 191:9, 191:12, 193:15

**HONORABLE** [1] - 1:8

**hopefully** [1] - 102:23

**hoping** [1] - 41:5

**hour** [10] - 16:24, 17:24, 28:22, 43:19, 55:3, 65:7, 134:18, 135:23, 135:25, 158:19

**hours** [7] - 39:1, 64:13, 84:14, 117:3, 117:5, 117:7, 126:3

**house** [1] - 86:12

**housekeeping** [2] - 121:7

**houses** [1] - 81:13

**HR** [1] - 94:24

**human** [6] - 23:18, 24:7, 48:12, 69:3, 145:17, 145:21

**hundred** [5] - 62:13, 62:14, 86:21, 100:8, 145:8

**hurt** [3] - 67:15, 69:10, 69:11

**hurting** [3] - 127:21, 131:25, 132:3

**hydraulic** [1] - 77:1

**I**

**idea** [5] - 16:20, 18:1, 165:25, 166:3, 166:9

**identification** [1] - 102:10

**identified** [4] - 101:9, 152:23, 193:5, 193:12

**identify** [5] - 102:11, 104:15, 105:13, 185:1, 185:8

**identities** [1] - 8:15

**ill** [2] - 35:7, 35:12

**illegal** [1] - 23:4

**illness** [1] - 35:7

**imagining** [1] - 125:2

**immediate** [3] - 57:6, 82:24, 161:24

**immediately** [7] - 7:10, 16:16, 24:11, 120:18, 149:6, 157:10, 172:19

**impact** [1] - 127:19

**impeachment** [2] - 182:4, 182:6

**implements** [1] - 88:6

**important** [3] - 8:23, 129:8, 129:9

**impression** [7] - 22:20, 22:22, 53:16, 54:3, 55:19, 75:8, 148:19

**impressions** [3] - 23:11, 55:24, 56:3

**improper** [1] - 13:17

**improve** [2] - 41:6, 160:10

**improved** [2] - 43:14, 176:4

**improves** [3] - 40:3, 42:17, 42:18

**IN** [1] - 1:1

**inability** [1] - 170:21

**inaccurate** [2] - 26:2, 59:22

**incidences** [1] - 112:2

**incident** [9] - 57:11, 75:18, 91:18, 91:19, 132:2, 150:6, 162:18, 162:22, 176:7

**incidents** [2] - 150:11, 150:25

**included** [2] - 33:5, 155:9, 156:14

**includes** [2] - 12:14, 14:6

**including** [5] - 13:20, 14:9, 14:19, 46:14, 67:22

**income** [1] - 35:10

**incoming** [1] - 21:19

**incorrectly** [1] - 22:8

**increase** [1] - 115:23

**independent** [7] - 40:12, 40:16, 165:15, 165:17, 172:7, 172:10, 194:13

**index** [1] - 115:19

**indicate** [4] - 11:10, 69:23, 134:8, 186:10

**indicated** [7] - 20:17, 32:14, 74:16, 115:10, 135:3, 177:17, 178:11

**indicates** [2] - 27:22, 89:4

**indicating** [4] - 11:11, 30:16, 109:9, 188:4

**indication** [1] - 166:6

**individual** [4] - 13:15, 123:2, 123:16, 139:21

**individual's** [1] - 17:10

**individually** [2] - 141:10, 173:7

**individuals** [1] - 13:19

**indulge** [1] - 191:13

**industry** [1] - 60:14

**infantry** [1] - 32:17

**infer** [1] - 11:4

**inferences** [1] - 11:3

**influence** [1] - 14:22

**inform** [1] - 120:18

**information** [27] - 13:1, 14:13, 19:22, 25:15, 26:12, 29:3, 34:14, 39:11, 39:23, 51:22, 52:1, 88:25, 117:22, 147:18, 148:17, 162:8, 182:10, 183:4, 183:15, 183:17, 184:11, 185:18, 186:2, 186:3, 187:13, 188:21, 194:3

**initiated** [2] - 167:14, 167:16

**injure** [2] - 169:18

**injured** [1] - 152:10

**injuring** [1] - 132:10

**injury** [2] - 154:3, 163:20

**input** [14] - 26:8, 26:9, 26:11, 51:19, 52:4, 52:9, 52:15, 52:17, 60:6, 94:3, 154:11, 154:18, 154:25, 155:4

**inside** [1] - 170:18

**instead** [2] - 8:3, 159:20

**instruct** [7] - 5:8, 5:15, 6:3, 10:10, 25:11, 32:6, 157:1

**instructed** [5] - 6:13, 156:25, 158:3, 158:6, 167:3

**instruction** [4] - 6:16, 12:20, 14:12, 79:13

**instructions** [17] - 2:7, 3:18, 3:21, 4:4, 7:15, 10:16, 14:1, 15:1, 16:9, 19:16, 23:1, 23:2, 43:23, 133:16, 139:18, 157:18, 194:12

**integrity** [1] - 10:5

**intend** [2] - 20:5, 139:8

**intended** [1] - 11:10

**intending** [1] - 184:7

**intent** [1] - 167:22

**interact** [2] - 68:13, 181:18

**intercession** [1] - 112:22

**interests** [1] - 37:17

**interim** [1] - 176:14

**internet** [2] - 12:22, 14:6

**interpretation** [1] - 89:12

**interpreted** [1] - 13:16

**interrupt** [1] - 49:20

**intervals** [2] - 40:18, 40:19

**intoxicated** [1] - 107:12

**introduce** [1] - 4:18

**introduced** [5] - 4:20, 19:20, 139:1, 139:2, 140:23

**inventory** [5] - 84:8, 98:15, 98:18, 98:23, 99:6

**invest** [1] - 165:19

**investigation** [1] - 14:5

**invite** [1] - 20:22

**invited** [1] - 177:1

**involve** [2] - 19:16

**involved** [11] - 12:9, 12:12, 13:4, 13:12, 14:3, 97:24, 114:10, 153:21, 155:19, 162:18, 173:22

**involving** [1] - 150:19

**issue** [9] - 22:5, 36:16, 37:1, 134:5, 153:25, 159:6, 162:16, 166:4, 186:4

**issues** [7] - 5:11, 11:24, 13:4, 18:19, 114:4, 114:6, 164:3

**item** [12] - 6:14, 86:4, 86:8, 86:15, 86:17, 87:12, 88:8, 99:22, 100:2, 100:4, 130:20, 131:18

**items** [15] - 76:4, 88:14, 88:16, 90:23, 91:1, 99:25, 100:20, 100:24, 101:1, 101:5, 101:8, 101:16, 131:22, 150:4, 150:12

**itself** [9] - 4:3, 11:4, 66:7, 71:24, 77:22, 113:14, 138:8, 166:17, 190:25

---

## J

**jack** [14] - 65:11, 76:18, 76:19, 76:22, 77:15, 77:21, 77:24, 78:3, 78:6, 88:12, 99:20, 125:16, 125:21, 131:7

**jacks** [2] - 76:6, 124:2

**January** [13] - 22:17, 27:12, 28:3, 52:20, 54:22, 56:7, 75:21, 81:21, 95:3, 107:4, 107:5, 140:4, 140:5

**January-February** [1] - 75:21

**Job** [1] - 51:15

**job** [152] - 21:18, 22:4, 22:6, 22:23, 23:20, 24:14, 24:15, 24:21, 25:7, 25:13, 25:22, 25:23, 26:2, 26:3, 26:4, 26:6, 26:15, 27:3, 27:4, 27:21, 27:24, 28:13, 29:1, 29:8, 29:9, 30:25, 31:4, 32:21, 33:22, 34:4, 35:5, 35:24, 38:2, 38:4,

38:6, 38:8, 38:11, 38:12, 38:17, 38:21, 39:4, 39:7, 40:14, 41:2, 41:10, 41:21, 41:22, 41:23, 41:24, 42:1, 42:8, 42:10, 42:12, 42:24, 42:25, 51:19, 59:11, 60:7, 60:24, 61:3, 62:17, 64:10, 69:21, 69:25, 70:7, 72:11, 72:16, 73:8, 82:22, 85:23, 87:23, 88:3, 88:22, 89:11, 93:24, 94:7, 94:13, 94:16, 94:20, 94:23, 95:11, 95:21, 97:6, 97:12, 97:15, 109:6, 117:18, 117:21, 118:17, 118:24, 119:7, 127:20, 129:8, 129:17, 130:5, 133:5, 145:16, 147:25, 148:20, 149:24, 150:9, 152:10, 154:5, 154:12, 154:20, 155:1, 155:10, 155:14, 155:25, 156:3, 159:1, 159:3, 166:1, 166:18, 167:2, 167:20, 170:4, 171:3, 171:5, 172:12, 172:24, 175:16, 175:24, 176:9, 177:11, 179:2, 180:23, 181:5, 181:7, 181:10, 181:15, 181:16, 187:3, 188:3, 189:24, 190:21, 190:25, 191:1, 191:4, 191:7, 191:17, 191:21, 191:22, 191:25, 192:3, 192:6, 192:7, 193:13

**jobs** [4] - 30:23, 32:20, 175:11, 176:17

**John** [3] - 21:18, 79:25, 80:4

**Johnstown** [1] - 72:12

**Joseph** [1] - 134:5

**JUDGE** [1] - 1:8

**Judge** [3] - 22:25, 25:10, 32:6

**judge** [2] - 12:19, 32:6

**judgement** [1] - 123:19

**judges** [1] - 5:18

**July** [1] - 86:23

**jump** [1] - 64:17

**jumping** [1] - 49:23

**juncture** [2] - 176:2, 181:16

**June** [6] - 80:24, 180:20, 180:21, 181:13, 184:19, 184:21

**juror** [3] - 9:4, 12:16

**JUROR** [1] - 143:5

**jurors** [6] - 4:5, 8:2, 9:2, 9:15, 12:6, 12:14

**jurors'** [1] - 9:1

**JURY** [1] - 1:7

**Jury** [2] - 2:2, 196:3

**jury** [47] - 3:2, 3:4, 3:9, 3:10, 3:21, 4:2, 9:21, 9:22, 12:1, 12:10, 12:24, 13:1, 13:3, 17:13, 18:7, 18:11, 18:14, 18:22, 19:21, 20:22, 20:23, 21:1, 33:13, 44:4, 60:22, 76:12, 102:18, 105:23, 133:24, 134:10, 138:3, 138:6, 138:23, 139:13, 141:6, 143:11, 143:23, 146:18, 161:1, 161:14, 170:1, 171:21, 175:8, 184:8, 189:23, 194:18, 194:20

**jury's** [1] - 124:20

**justice** [1] - 15:16

---

## K

**Katzman** [1] - 1:12

**Kearn** [2] - 135:8, 136:11

**keep** [11] - 8:4, 8:8, 10:12, 11:20, 12:1, 13:19, 16:10, 21:20, 41:2, 168:2, 176:9

**Keep** [1] - 15:1

**keg** [1] - 43:6

**kept** [3] - 35:24, 41:1, 123:1

**kind** [25] - 35:22, 35:23, 50:9, 60:19, 61:16, 62:7, 62:9, 64:4, 65:20, 69:17, 69:21, 72:7, 78:1, 99:22, 100:24, 101:4, 107:13, 117:24, 118:7, 121:7, 156:11, 156:15, 162:15, 187:21, 189:19

**kinds** [2] - 69:24,

162:3

**Kline** [48] - 2:19, 19:3, 27:9, 27:13, 27:18, 27:25, 47:3, 49:4, 56:1, 57:6, 68:12, 72:19, 74:10, 74:20, 75:17, 83:1, 97:19, 97:20, 99:11, 106:22, 109:8, 109:11, 109:16, 113:24, 114:24, 115:3, 117:9, 117:15, 117:24, 118:3, 118:8, 128:14, 128:16, 128:19, 134:7, 134:12, 134:18, 135:4, 135:15, 139:19, 140:1, 140:18, 143:25, 149:5, 149:7, 149:11, 149:17, 151:11

**Kline's** [8] - 19:2, 83:4, 107:9, 134:16, 136:19, 138:18, 139:8, 139:21

**knee** [4] - 30:8, 40:22, 42:21, 129:4

**knees** [8] - 21:23, 36:16, 41:10, 108:4, 108:5, 108:8, 108:9, 110:17

**knocked** [1] - 129:5

**knowing** [3] - 37:21, 38:20, 100:9

**knowledge** [12] - 60:24, 108:18, 108:21, 109:5, 112:4, 151:10, 154:17, 154:23, 155:2, 155:12, 165:24, 167:8

**knowledgeable** [2] - 33:21, 35:20

**known** [1] - 182:2

**knows** [4] - 28:13, 29:1, 60:3

---

## L

**labeled** [1] - 62:1

**labored** [1] - 93:8

**laboring** [1] - 111:9

**ladder** [1] - 65:25

**ladders** [1] - 66:2, 121:22

**ladies** [13] - 3:11, 10:6, 18:7, 20:16, 20:25, 43:17, 102:23, 133:14, 139:14, 140:22, 141:9, 143:16, 194:7

**Ladies** [2] - 4:1,

33:14
**lading** [1] - 98:18
**ladles** [1] - 101:9
**laid** [1] - 60:2
**lamps** [1] - 62:11
**landed** [1] - 32:21
**landing** [1] - 30:25
**large** [1] - 75:2
**larger** [1] - 47:15
**last** [8] - 16:18,
18:22, 24:5, 27:9,
27:25, 28:14, 160:3,
189:21
**Law** [1] - 1:15
**law** [13] - 5:8, 5:12,
5:16, 5:20, 5:21, 7:15,
10:17, 14:22, 16:9,
23:1, 29:10, 35:3,
35:17
**lawsuit** [3] - 15:5,
15:7, 32:9
**lawyer** [4] - 7:9,
10:21, 10:24, 10:25
**lawyer's** [1] - 10:24
**lawyers** [5] - 6:2,
6:18, 10:19, 13:11,
13:21
**lay** [1] - 184:16
**layout** [1] - 81:22
**lazy** [1] - 118:19
**lead** [3] - 97:18,
99:12, 161:16
**learn** [1] - 70:20
**least** [5] - 78:25,
87:18, 123:8, 123:10,
123:13
**Leave** [3] - 35:4,
35:13, 39:16
**leave** [21] - 9:21,
34:21, 34:22, 39:13,
72:22, 72:23, 72:25,
149:13, 157:16,
158:2, 158:4, 167:4,
167:7, 167:20, 168:7,
169:6, 174:8, 177:18,
178:9, 178:12, 190:1
**left** [8] - 34:13, 73:9,
103:13, 107:7,
113:21, 162:21, 174:9
**left-hand** [2] -
103:13, 107:7
**legs** [1] - 66:14
**lend** [1] - 138:8
**length** [2] - 11:20,
17:9
**less** [1] - 9:3
**letter** [36] - 29:4,
29:5, 29:7, 30:10,
40:2, 41:13, 42:15,
174:19, 174:20,

174:23, 174:24,
175:3, 175:4, 176:12,
180:17, 183:19,
184:18, 184:20,
185:17, 185:18,
185:22, 186:9,
186:13, 186:19,
187:4, 187:22,
188:16, 188:19,
188:20, 188:21,
188:22, 189:1,
189:10, 189:12,
190:7, 190:15
**letters** [5] - 39:24,
39:25, 189:4, 189:5
**level** [7] - 12:3,
81:25, 82:4, 82:6,
82:7, 112:21, 130:13
**life** [4] - 23:8, 33:3,
33:4, 33:6
**lifestyle** [1] - 33:3,
159:15, 170:10,
170:17
**lift** [42] - 26:21, 39:8,
40:9, 62:23, 63:4,
63:12, 66:14, 66:15,
76:18, 77:1, 77:3,
86:1, 86:5, 86:9,
86:12, 87:12, 87:18,
89:13, 89:17, 89:24,
90:17, 97:1, 100:3,
100:15, 122:11,
122:16, 123:5, 123:7,
123:8, 123:10,
123:23, 124:17,
129:18, 129:25,
130:7, 130:9, 130:13,
130:19, 131:22,
132:19, 132:25
**lifted** [4] - 77:19,
86:6, 89:10, 100:13
**lifting** [26] - 34:7,
38:22, 38:25, 58:9,
62:20, 63:8, 66:5,
66:12, 67:15, 76:19,
89:4, 89:12, 89:16,
90:22, 99:25, 100:6,
100:8, 119:14,
119:22, 119:25,
122:9, 122:15,
122:25, 150:22, 180:7
**lifts** [1] - 66:9
**light** [2] - 15:10,
62:11
**likely** [1] - 15:12
**limited** [1] - 6:15
**limp** [2] - 53:6, 53:8
**line** [2] - 45:3,
55:11, 56:11, 56:23,
87:5, 87:6, 87:7, 95:3,

135:2, 135:9, 135:10,
135:17
**line-up** [3] - 135:2,
135:9, 135:10
**lines** [1] - 145:12
**list** [1] - 9:9
**listed** [4] - 52:5,
154:12, 154:20, 155:1
**listen** [2] - 8:3, 14:2
**lists** [1] - 106:7
**litigation** [1] - 93:20
**live** [1] - 140:9
**lived** [2] - 33:2, 170:9
**living** [1] - 115:19
**load** [3] - 63:11,
64:21, 120:11
**loading** [2] - 64:19,
98:1
**located** [7] - 49:7,
83:11, 120:2, 120:6,
147:13, 147:14,
147:22
**location** [17] - 21:12,
21:16, 24:19, 46:9,
46:15, 47:7, 47:10,
48:4, 48:10, 63:20,
74:7, 76:4, 84:1,
116:9, 116:14,
147:10, 147:11
**locations** [5] - 46:3,
47:8, 61:10, 61:14,
72:12
**lodged** [1] - 114:25
**logistics** [2] - 47:6,
80:15
**long-term** [2] -
152:21, 161:20
**Look** [1] - 175:13
**look** [20] - 25:15,
25:18, 28:10, 29:7,
30:22, 31:13, 32:2,
59:10, 59:14, 59:19,
75:1, 119:12, 122:5,
124:19, 153:1, 173:7,
176:8, 186:15, 191:5,
192:11
**looked** [5] - 50:8,
93:8, 111:8, 127:1,
188:16
**looking** [6] - 27:2,
36:4, 50:8, 134:21,
154:7, 190:6
**looks** [2] - 103:12,
153:15
**lost** [2] - 41:10, 72:9
**loud** [1] - 189:23
**lower** [3] - 105:19,
106:18, 107:6
**lunch** [6] - 9:20,
16:22, 16:23, 17:24,

43:18, 44:3
**Lunch** [1] - 44:5

## M

**mail** [1] - 12:25
**main** [3] - 11:21,
36:8, 126:10
**maintain** [1] - 120:22
**major** [1] - 23:8
**man** [1] - 32:17
**management** [11] -
22:7, 22:12, 23:14,
26:7, 28:23, 35:23,
38:19, 43:8, 48:3,
48:9, 48:11
**manager** [10] - 47:6,
60:16, 80:11, 80:14,
80:15, 115:6, 117:9,
117:24, 120:18,
120:20
**managers** [2] - 36:3,
36:14
**manner** [1] - 140:8
**manual** [2] - 93:23,
156:15
**manufacturer** [2] -
46:6, 61:2
**mark** [1] - 123:15
**marked** [9] - 51:12,
59:14, 88:20, 93:13,
102:9, 104:3, 104:14,
137:24, 185:3
**Market** [1] - 1:13
**marks** [1] - 27:14
**match** [6] - 26:3,
26:15, 27:4, 29:9,
38:12, 146:22
**matching** [2] -
146:12, 146:19
**materials** [1] - 26:20
**matter** [4] - 134:12,
164:12, 170:11,
179:15
**matters** [2] - 14:11,
134:2
**McKinney** [10] - 3:8,
18:6, 18:9, 18:11,
44:3, 133:23, 134:1,
138:22, 138:23,
194:17
**McNees** [3] - 183:7,
183:20, 184:21
**mean** [23] - 6:5,
53:21, 60:17, 62:7,
64:14, 66:10, 67:21,
70:8, 97:20, 98:12,
108:11, 121:11,
123:18, 150:14,
161:19, 161:25,

165:10, 166:2, 167:9,
169:11, 173:21,
176:2, 182:3
**meaning** [2] - 120:4,
120:6
**means** [6] - 15:9,
89:13, 121:1, 123:4,
123:23, 196:24
**measure** [1] - 27:1
**measurements** [1] -
8:15
**Mechanicsburg** [3] -
1:16, 23:24, 24:18
**mechanism** [1] -
66:8
**mechanisms** [1] -
131:9
**medical** [45] - 26:13,
34:21, 35:22, 36:13,
37:1, 37:15, 38:1,
39:13, 39:14, 40:19,
41:14, 43:11, 69:17,
69:24, 70:18, 70:21,
72:22, 72:23, 72:25,
149:13, 156:11,
157:6, 157:16,
157:19, 158:2, 158:4,
162:3, 162:5, 162:7,
162:15, 163:16,
165:22, 166:4, 167:4,
167:7, 167:20, 168:7,
169:6, 175:18,
176:21, 177:17,
178:11, 178:21, 194:2
**Medical** [1] - 23:23,
25:16, 35:4, 35:13,
39:16, 151:23, 152:3,
152:4, 156:20,
157:22, 191:15
**medically** [1] - 170:6
**medication** [1] -
107:14
**meet** [16] - 15:18,
22:10, 41:4, 42:11,
43:3, 48:7, 53:19,
54:1, 70:11, 70:12,
151:23, 151:25,
157:4, 165:5, 169:19,
174:17
**meeting** [29] - 56:2,
57:16, 58:6, 70:3,
111:24, 148:3, 148:7,
149:22, 151:18,
158:25, 159:4,
159:13, 172:18,
174:5, 174:7, 174:8,
174:11, 174:13,
174:22, 174:25,
175:5, 175:7, 175:20,
175:21, 175:22,

180:15, 180:24,
181:6, 190:23
  **meetings** [3] - 37:24,
149:21, 191:23
  **member** [4] - 22:7,
22:12, 35:6, 161:20
  **members** [3] - 12:15,
17:23, 26:6
  **memory** [4] - 8:13,
9:11, 95:10
  **mention** [1] - 149:10
  **mentioned** [6] -
47:18, 62:2, 84:11,
139:18, 149:12,
179:19
  **Merit** [1] - 196:18
  **merits** [1] - 11:6
  **met** [11] - 33:7,
41:17, 41:18, 70:2,
139:15, 157:7,
157:12, 157:14,
165:9, 190:9, 190:12
  **method** [1] - 131:21
  **mezzanine** [1] -
84:21
  **Michael** [1] - 1:12
  **MIDDLE** [1] - 1:1
  **might** [3] - 54:15,
61:11, 179:11
  **mind** [10] - 8:4, 8:8,
10:13, 12:1, 13:19,
15:2, 15:25, 16:10,
37:17, 100:11
  **mine** [1] - 104:2
  **minimum** [2] - 11:21,
122:12
  **minute** [3] - 40:18,
40:19, 184:22
  **minutes** [9] - 20:10,
43:19, 51:3, 51:4,
67:2, 84:15, 117:2,
147:17, 147:24
  **misspoke** [1] -
135:12
  **misspoken** [1] -
135:14
  **mixed** [1] - 61:3
  **moans** [1] - 9:8
  **mobility** [4] - 171:14,
176:4, 188:13
  **modified** [1] - 154:3
  **modify** [5] - 173:17,
173:19, 189:24,
190:21, 192:1
  **modifying** [5] -
155:15, 173:2,
190:25, 191:1, 191:4
  **moment** [5] - 33:22,
43:6, 71:3, 87:8, 95:4
  **money** [2] - 29:14,

32:9
  **month** [2] - 49:16,
49:17
  **monthly** [2] - 117:5,
117:7
  **months** [8] - 30:9,
41:3, 42:12, 42:13,
73:3, 73:5, 172:18,
174:18
  **morning** [11] - 9:25,
17:1, 17:2, 21:1, 22:2,
33:15, 135:7, 135:10,
136:7, 194:19, 194:25
  **most** [5] - 38:4,
64:15, 67:19, 76:10,
101:11
  **motion** [3] - 141:15,
193:1, 194:1
  **motions** [1] - 10:19
  **move** [25] - 12:3,
45:6, 77:4, 77:18,
77:19, 78:2, 84:20,
88:8, 121:19, 129:4,
131:10, 131:17,
139:4, 141:17, 142:7,
142:9, 142:15,
142:16, 142:19,
143:2, 165:1, 165:3,
170:21, 193:6
  **moved** [6] - 27:7,
72:11, 88:17, 161:7,
163:14
  **moving** [6] - 65:12,
76:20, 88:14, 91:16,
126:6, 164:16, 176:5,
180:7
  **MR** [96] - 3:6, 3:24,
18:21, 19:1, 19:6,
20:11, 20:24, 44:8,
44:11, 44:15, 44:24,
49:24, 50:25, 56:11,
56:17, 56:20, 58:24,
60:1, 70:24, 71:11,
73:21, 73:23, 77:13,
78:15, 78:22, 79:1,
79:4, 79:11, 79:18,
79:21, 80:5, 102:17,
102:22, 105:22,
106:2, 116:4, 129:14,
132:12, 133:9, 134:4,
134:14, 134:15,
134:23, 135:23,
136:8, 136:12,
136:13, 137:1, 137:7,
137:21, 138:4,
138:13, 138:17,
139:4, 139:11, 140:4,
140:12, 140:17,
140:20, 141:5, 141:8,
141:17, 141:20,

142:3, 142:9, 142:19,
142:24, 143:3,
143:11, 143:13,
143:15, 144:2, 144:4,
144:16, 144:19,
159:23, 164:8,
164:14, 164:19,
177:15, 182:7, 183:2,
183:19, 183:25,
184:18, 185:4, 185:6,
185:10, 185:14,
185:15, 190:3,
191:11, 192:19,
193:3, 193:15, 194:4
  **MS** [60] - 3:7, 3:25,
19:13, 19:18, 20:7,
20:13, 33:14, 45:2,
45:8, 56:10, 56:13,
59:2, 59:4, 70:25,
71:2, 71:5, 73:19,
78:10, 78:18, 102:20,
105:25, 116:7,
129:12, 132:15,
133:8, 135:1, 136:3,
136:10, 137:2,
137:11, 137:15,
137:19, 138:21,
141:24, 142:6,
142:12, 142:16,
144:5, 160:1, 160:2,
164:13, 164:16,
165:2, 177:13,
181:21, 181:24,
182:12, 182:16,
182:24, 184:2, 184:8,
184:14, 187:24,
188:6, 190:5, 191:9,
192:21, 193:8,
193:17, 193:22
  **multiple** [2] - 79:12,
91:20
  **must** [7] - 5:16,
5:21, 6:7, 6:15, 6:17,
6:22, 6:25, 8:17, 8:18,
8:20, 9:22, 12:7,
13:18, 14:16, 15:10,
15:19, 55:22

**N**

  **name** [3] - 44:22,
80:3, 144:13
  **narrow** [3] - 130:25,
131:4, 131:12
  **nature** [1] - 101:10
  **near** [1] - 83:13
  **necessarily** [1] -
130:18
  **necessary** [7] -
11:13, 108:22,
140:14, 140:15,

143:19, 172:6, 172:11
  **need** [19] - 8:22,
11:22, 17:20, 19:8,
37:1, 45:6, 65:24,
66:6, 78:20, 84:6,
89:17, 120:16,
124:15, 129:18,
130:18, 137:21,
137:24, 167:11,
167:12
  **needed** [20] - 34:23,
35:14, 35:23, 66:23,
67:10, 68:6, 69:13,
84:5, 84:9, 84:14,
85:16, 85:19, 85:20,
98:5, 112:16, 112:21,
116:20, 131:17,
169:5, 172:6
  **needs** [12] - 24:10,
25:4, 28:8, 29:2,
29:13, 29:22, 31:18,
64:1, 99:21, 121:10,
152:12, 158:7
  **networking** [1] - 13:3
  **never** [18] - 32:14,
35:21, 35:23, 36:15,
37:3, 41:15, 42:19,
42:22, 57:25, 58:2,
58:3, 58:11, 58:14,
58:17, 109:1, 115:9,
181:17
  **new** [3] - 12:20,
18:10, 35:15
  **news** [1] - 14:2
  **newspapers** [2] -
87:22, 89:9
  **next** [17] - 18:10,
28:9, 28:17, 50:1,
61:25, 68:23, 76:4,
78:14, 78:15, 90:1,
103:16, 104:17,
106:21, 134:18,
163:24, 166:24,
182:18
  **night** [1] - 61:25
  **night's** [1] - 194:15
  **NO** [1] - 1:3
  **nobody** [3] - 22:5,
24:12, 39:19
  **none** [1] - 36:14
  **normal** [1] - 21:23
  **normally** [1] - 67:16
  **note** [7] - 8:8, 8:16,
8:20, 8:22, 8:24, 9:5
  **notes** [19] - 7:11,
7:17, 8:1, 8:10, 8:11,
8:12, 9:1, 9:5, 9:14,
9:16, 9:18, 9:20, 9:22,
9:24, 10:2, 101:23,
143:19, 196:10

  **nothing** [11] - 11:9,
27:21, 31:2, 31:13,
62:12, 96:3, 96:6,
96:11, 116:4, 132:12,
133:9
  **notice** [2] - 27:19,
53:12
  **noticed** [5] - 44:11,
53:2, 67:3, 126:13,
179:11
  **nowhere** [1] - 32:4
  **number** [10] - 11:20,
29:20, 87:4, 87:5,
87:6, 87:7, 101:7,
106:7
  **Number** [18] - 88:21,
93:13, 93:15, 95:17,
95:18, 96:3, 96:11,
102:10, 105:12,
105:13, 106:18,
118:21, 119:3,
119:13, 129:16,
193:6, 193:24
  **numerous** [2] -
128:2, 129:6
  **Nurick** [3] - 183:8,
183:20, 184:21

**O**

  **oath** [3] - 28:2,
54:25, 144:9
  **obey** [2] - 12:7,
12:19
  **object** [6] - 10:20,
164:8, 164:15, 188:1,
193:8, 193:9
  **objected** [1] - 137:13
  **objection** [30] - 6:9,
6:12, 11:1, 18:24,
19:18, 20:3, 56:10,
60:1, 70:24, 71:11,
102:20, 105:24,
105:25, 138:20,
138:21, 141:3,
141:22, 141:24,
142:5, 142:6, 142:11,
142:23, 181:21,
181:24, 184:2,
184:13, 187:24,
188:6, 193:17, 193:20
  **objections** [13] -
6:19, 10:19, 10:25,
19:9, 102:19, 136:23,
137:4, 137:5, 137:10,
137:11, 137:18,
137:25, 142:17
  **objects** [2] - 148:24,
180:8
  **observation** [4] -
8:24, 8:25, 37:6,

163:23

**observations** [1] - 110:6

**observe** [3] - 8:18, 66:25, 161:3

**observed** [11] - 36:2, 36:12, 36:18, 36:19, 43:8, 43:9, 66:18, 148:8, 148:14, 160:6, 166:2

**observing** [1] - 161:11

**obviously** [14] - 63:12, 66:3, 78:5, 79:23, 120:19, 124:3, 127:9, 137:24, 150:6, 152:20, 161:21, 170:3, 176:3, 178:7

**occasion** [2] - 147:16, 194:9

**occasional** [2] - 97:2, 122:15

**occasionally** [9] - 63:1, 64:8, 64:14, 67:4, 89:5, 89:13, 89:14, 90:2, 100:13

**occasions** [1] - 36:3

**occurred** [2] - 25:20, 180:16

**occurrence** [1] - 84:19

**OF** [2] - 1:1, 1:7

**offer** [9] - 35:8, 35:17, 35:18, 158:3, 173:12, 173:16, 180:23, 181:5, 181:10

**offered** [15] - 31:1, 34:4, 35:16, 39:18, 39:21, 42:1, 43:13, 160:9, 160:17, 171:22, 172:1, 173:4, 181:7, 192:1

**offers** [1] - 10:20

**office** [29] - 22:16, 22:19, 28:3, 46:10, 46:11, 49:7, 49:13, 49:22, 50:7, 50:16, 52:22, 54:19, 57:8, 66:24, 79:15, 83:11, 83:13, 83:16, 83:25, 86:23, 99:4, 99:5, 116:9, 116:16, 134:6, 139:24, 147:13, 147:14, 176:5

**officer** [1] - 10:3

**offices** [1] - 50:2

**Offices** [1] - 1:15

**Official** [1] - 1:23

**official** [2] - 9:6, 40:14

**often** [4] - 33:16, 64:15, 84:3, 116:18

**oil** [1] - 101:6

**old** [1] - 121:20

**Old** [2] - 1:20, 31:4

**once** [13] - 28:23, 31:7, 31:8, 31:11, 53:14, 53:22, 70:15, 77:18, 99:14, 147:17, 147:24, 161:9, 182:17

**one** [57] - 8:10, 11:7, 11:8, 18:21, 22:6, 23:2, 33:15, 33:17, 41:17, 47:7, 50:4, 56:12, 63:20, 63:24, 64:17, 64:19, 65:12, 65:18, 66:8, 70:11, 72:12, 75:4, 75:13, 76:4, 81:15, 91:19, 91:20, 91:22, 98:5, 104:22, 104:25, 112:5, 116:1, 117:25, 118:23, 119:7, 119:12, 125:5, 125:6, 129:9, 129:21, 137:12, 141:20, 148:12, 150:14, 154:1, 166:8, 173:7, 173:8, 173:16, 173:25, 178:25, 187:20, 187:25, 188:8, 193:4, 193:12

**ones** [1] - 173:21

**online** [1] - 14:19

**open** [7] - 10:13, 15:2, 41:2, 42:12, 73:9, 176:9

**Opening** [2] - 2:8, 2:9

**opening** [14] - 3:22, 4:7, 4:8, 4:11, 4:12, 16:21, 18:5, 18:17, 19:14, 19:17, 19:24, 20:10, 20:18, 47:19

**openings** [1] - 20:6

**openly** [1] - 173:24

**operate** [6] - 57:22, 65:2, 114:16, 125:20, 149:8, 149:19

**operated** [2] - 76:19, 151:12

**operating** [3] - 75:25, 115:10, 121:6

**operation** [2] - 46:22, 83:9

**operations** [14] - 22:11, 22:14, 45:18, 46:14, 46:17, 60:18, 60:19, 68:10, 74:3, 74:21, 80:10, 145:9,

147:7, 176:17

**operators** [2] - 64:17, 67:10

**opinion** [15] - 10:14, 14:20, 25:2, 67:6, 68:25, 72:8, 114:3, 159:2, 164:11, 173:18, 177:9, 178:2, 179:23, 179:25, 192:2

**opinions** [1] - 11:6

**oplinger** [2] - 30:6, 30:9

**Oplinger** [7] - 30:7, 30:11, 30:13, 30:15, 40:4, 42:7, 42:9

**opportunity** [8] - 8:23, 10:1, 17:22, 18:18, 40:22, 44:1, 85:12, 133:19

**opposed** [1] - 191:5

**opposite** [3] - 15:15, 33:17, 83:19

**optional** [2] - 178:3, 178:7

**options** [2] - 28:12, 31:9

**order** [8] - 12:20, 63:9, 63:23, 75:2, 134:22, 135:15, 191:2, 192:2

**orders** [7] - 61:15, 61:16, 67:11, 98:1, 119:24, 120:15, 121:4

**organization** [2] - 47:1, 161:21

**organized** [1] - 21:21

**original** [1] - 191:22

**originally** [1] - 162:17

**orthopaedic** [2] - 30:6, 42:5

**Orthopaedics** [1] - 30:7

**OSHA** [1] - 41:12

**otherwise** [1] - 187:16

**outline** [3] - 4:9, 9:8, 52:10

**outside** [7] - 6:24, 13:23, 44:18, 78:25, 170:10, 170:17, 181:9

**overdo** [1] - 108:12

**overnight** [1] - 9:24

**overruled** [1] - 6:12

**oversaw** [1] - 68:11

**overseas** [1] - 32:18

**oversee** [2] - 46:13, 150:6

**overseeing** [3] - 69:3, 74:20, 147:21

**oversees** [2] - 22:13, 23:18

**overtime** [1] - 41:4

**overuse** [1] - 8:16

**own** [19] - 7:18, 14:6, 14:10, 14:19, 40:4, 40:10, 41:8, 60:23, 94:22, 122:11, 122:19, 163:23, 165:19, 168:6, 171:18, 172:2, 172:3, 172:9, 172:10

**owned** [1] - 165:18

**owners** [5] - 46:22, 48:1, 114:7, 145:23, 162:4

**P**

**P-1** [2] - 141:18, 142:20

**P-3** [1] - 143:11

**P-4** [3] - 104:15, 143:13

**P-5** [2] - 142:20, 143:15

**P.C** [3] - 1:12, 1:15, 1:19

**p.m** [10] - 44:5, 133:25, 139:13, 140:19, 142:2, 144:1, 181:23, 183:1, 194:20, 195:1

**PA** [5] - 1:5, 1:13, 1:16, 1:20, 1:25

**packet** [1] - 156:15

**page** [42] - 2:5, 19:2, 19:10, 19:14, 19:15, 20:2, 52:2, 52:6, 55:11, 56:11, 56:21, 87:4, 87:5, 87:6, 95:2, 95:3, 95:6, 102:15, 103:5, 103:6, 103:8, 103:9, 103:11, 103:12, 103:16, 105:20, 106:4, 106:17, 106:24, 119:1, 119:3, 138:8, 154:8, 183:21, 185:22, 189:15, 189:17, 189:22

**pages** [3] - 19:15, 59:17, 103:8

**paid** [2] - 160:9, 160:20

**pain** [5] - 127:9, 127:11, 127:13, 127:15, 160:8

**pallet** [27] - 63:24, 63:25, 65:11, 76:6,

76:9, 76:12, 76:14, 76:18, 76:19, 76:22, 76:24, 77:3, 77:7, 77:15, 77:18, 77:20, 77:21, 77:22, 78:3, 78:5, 81:24, 84:20, 88:11, 99:20, 124:2, 125:16, 125:21, 132:5

**pallets** [3] - 61:22, 120:7, 121:12

**panel** [1] - 152:11

**paper** [1] - 7:17

**paperwork** [18] - 28:10, 32:4, 39:21, 75:1, 75:6, 77:10, 177:16, 177:17, 177:23, 191:5, 191:14, 191:15, 191:20, 192:8, 192:11, 192:15, 192:18

**paragraph** [6] - 185:23, 186:5, 189:15, 189:17, 189:22

**parallel** [1] - 130:21

**parameters** [1] - 181:11

**parking** [23] - 22:16, 22:19, 36:6, 36:19, 37:9, 49:12, 50:5, 52:21, 53:3, 53:15, 54:4, 66:18, 110:23, 111:10, 112:1, 113:5, 116:15, 122:17, 148:9, 148:15, 148:23, 160:7, 180:8

**part** [34] - 11:23, 19:10, 19:14, 19:17, 30:3, 33:6, 34:16, 49:8, 50:17, 60:7, 76:10, 85:17, 99:5, 102:1, 118:7, 127:24, 128:1, 130:4, 134:6, 137:8, 139:21, 145:16, 152:10, 153:17, 156:5, 156:23, 171:22, 174:10, 176:16, 178:1, 180:10, 183:14, 185:19, 191:16

**part's** [1] - 130:23

**parted** [1] - 174:11

**partial** [1] - 10:23

**participated** [1] - 184:10

**participation** [2] - 3:13, 3:17

**particular** [14] - 6:5,

**17**:6, 17:9, 20:2, 61:24, 100:10, 154:3, 162:22, 167:10, 173:8, 173:16, 176:2, 181:16, 186:4

**particularly** [1] - 8:14

**particulars** [1] - 91:18

**parties** [10] - 4:21, 13:11, 13:21, 14:15, 16:21, 18:6, 20:19, 172:8, 173:23, 173:24

**parts** [31] - 21:14, 22:11, 34:5, 37:15, 37:20, 38:4, 45:18, 46:2, 46:21, 47:6, 74:2, 80:14, 81:14, 83:9, 83:12, 92:16, 98:20, 101:7, 116:12, 120:1, 120:3, 120:4, 120:25, 121:19, 121:20, 145:4, 154:15, 176:18, 180:12

**party** [7] - 4:10, 4:11, 13:15, 15:5, 15:6, 20:19, 71:1

**pass** [8] - 13:13, 13:23, 31:15, 41:15, 141:11, 171:24, 174:14, 179:8

**passed** [2] - 19:4, 28:1

**past** [1] - 194:8

**Pat** [16] - 47:4, 53:20, 56:5, 68:8, 68:9, 68:13, 68:22, 68:24, 148:4, 148:11, 148:18, 149:22, 151:19, 161:5

**Patrick** [3] - 2:15, 79:25, 80:4

**pause** [27] - 3:19, 51:14, 57:1, 59:3, 59:25, 86:13, 88:19, 93:11, 94:12, 95:8, 95:15, 95:23, 104:13, 107:10, 139:12, 142:1, 143:10, 143:12, 143:14, 143:21, 144:18, 152:25, 184:1, 184:25, 185:11, 186:1, 189:8

**pay** [6] - 7:24, 146:1, 146:2, 146:7, 161:6, 174:16

**paycheck** [2] - 29:16, 29:21

**pencils** [1] - 7:17

**pending** [2] - 138:15, 194:2

**Pennsylvania** [1] - 46:4

**PENNSYLVANIA** [1] - 1:1

**pens** [1] - 7:16

**people** [9] - 12:16, 42:23, 46:25, 63:3, 63:8, 67:22, 85:5, 87:22, 89:24

**peoples'** [1] - 176:17

**per** [1] - 41:12

**perceived** [3] - 16:3, 16:4, 16:14

**percent** [14] - 65:8, 74:15, 74:23, 76:10, 85:24, 115:25, 126:5, 146:4, 146:8, 146:23, 146:24, 146:25, 147:1, 147:2

**percentage** [3] - 65:5, 146:5, 147:3

**perception** [3] - 34:12, 36:12, 165:24

**perceptions** [1] - 23:6

**perform** [12] - 14:18, 85:12, 92:5, 92:7, 92:24, 97:8, 167:2, 169:16, 186:13, 187:11, 187:17, 191:3

**performance** [11] - 18:22, 22:4, 27:9, 27:22, 103:13, 142:13, 142:17, 142:21, 149:24, 170:20, 170:21

**performed** [1] - 170:8

**performing** [9] - 23:7, 25:8, 26:4, 27:23, 30:17, 101:18, 109:10, 132:17, 148:20

**performs** [1] - 24:22

**period** [10] - 27:17, 36:1, 75:21, 115:24, 176:15, 186:11, 186:13, 186:21, 187:9, 190:12

**periods** [2] - 51:2, 58:15

**permanent** [1] - 166:8

**permitted** [3] - 8:9, 30:20, 31:16

**permitting** [1] - 6:12

**person** [5] - 8:19,

**75**:5, 77:10, 90:7, 143:1

**personal** [1] - 7:18

**personally** [2] - 149:25, 160:6, 177:21

**personnel** [7] - 48:9, 48:11, 101:23, 150:5, 156:15, 178:10, 178:14

**persuade** [2] - 9:2, 9:15

**Pete** [1] - 33:7

**Peter** [2] - 1:15, 1:15

**phone** [2] - 135:21, 174:20

**phones** [2] - 14:7, 121:3

**physical** [56] - 23:22, 24:10, 24:23, 25:3, 25:7, 25:18, 27:1, 27:23, 31:10, 31:15, 34:10, 34:11, 34:16, 38:7, 38:10, 38:15, 38:20, 39:4, 41:16, 43:3, 52:5, 52:13, 59:24, 81:22, 119:14, 119:16, 119:18, 120:12, 122:2, 122:6, 124:9, 151:20, 153:4, 154:7, 154:11, 154:19, 154:25, 155:9, 156:5, 157:22, 159:10, 160:7, 161:21, 171:24, 172:16, 172:21, 172:23, 172:25, 174:14, 174:15, 176:1, 177:10, 178:16, 179:8, 179:24

**Physical** [1] - 59:15

**physically** [15] - 27:18, 42:11, 83:15, 95:12, 97:12, 97:14, 98:22, 106:12, 119:23, 124:9, 124:16, 125:24, 158:25, 170:7, 170:22

**physicals** [2] - 24:1, 152:6

**physician** [9] - 30:3, 30:6, 34:22, 152:11, 163:2, 172:2, 172:4, 172:9, 172:10

**physician's** [2] - 24:20, 24:21

**physicians** [1] - 26:24

**pick** [9] - 38:16, 42:3, 64:1, 121:14, 125:9, 129:10, 160:3, 172:5,

**173**:15

**picking** [2] - 121:9, 121:11

**pickup** [1] - 64:3

**picture** [1] - 124:21

**pile** [1] - 29:22

**pitched** [2] - 85:18, 85:20

**place** [9] - 9:17, 21:20, 22:9, 30:22, 79:20, 140:2, 146:13, 146:16, 179:3

**placed** [2] - 30:14, 167:19

**plaintiff** [1] - 20:20

**Plaintiff** [2] - 1:3, 1:11

**PLAINTIFF** [1] - 2:10

**plaintiff's** [4] - 133:22, 140:21, 185:2, 193:23

**Plaintiff's** [24] - 51:13, 88:21, 93:13, 93:14, 95:17, 96:2, 96:11, 102:10, 102:18, 105:5, 105:12, 105:13, 118:21, 118:22, 138:4, 142:4, 142:10, 152:23, 185:9, 189:6, 190:6, 193:21, 194:1

**planned** [1] - 32:25

**plans** [1] - 24:4

**play** [1] - 118:7

**point** [50] - 11:21, 28:5, 29:1, 29:24, 30:13, 32:1, 39:5, 39:11, 39:15, 40:25, 41:17, 42:14, 45:22, 60:11, 61:9, 61:14, 78:19, 81:15, 85:2, 92:23, 94:24, 97:17, 98:8, 100:12, 100:18, 110:15, 110:20, 111:7, 111:10, 111:12, 112:7, 113:8, 114:20, 116:2, 117:14, 123:18, 130:22, 137:12, 157:5, 161:15, 161:22, 163:12, 164:9, 171:23, 172:3, 174:3, 175:17, 187:5, 193:6, 193:19

**points** [2] - 8:7, 35:25

**policy** [2] - 93:23, 160:10

**Polisher** [1] - 1:19

**portable** [3] - 38:24,

**65**:24, 66:1

**portion** [3] - 137:4, 137:12, 143:7

**portions** [2] - 19:7, 137:23

**position** [30] - 45:16, 45:20, 46:21, 47:5, 51:24, 69:14, 74:1, 74:2, 80:8, 81:3, 82:20, 94:8, 145:1, 175:11, 176:11, 176:13, 181:1, 181:9, 181:13, 183:22, 187:7, 187:8, 187:9, 187:15, 187:16, 188:3, 188:11, 188:12, 188:14, 192:13

**positions** [9] - 60:15, 80:12, 81:1, 182:11, 186:11, 186:20, 186:24, 187:1, 188:4

**positive** [1] - 148:12

**possibility** [2] - 41:25, 149:3

**possible** [6] - 12:4, 78:23, 79:1, 131:2, 167:23, 174:1

**possibly** [1] - 41:19

**pound** [2] - 123:9, 123:15

**pounds** [36] - 38:17, 38:22, 62:6, 62:13, 62:14, 62:20, 62:24, 63:1, 64:5, 64:8, 86:7, 87:18, 89:5, 89:12, 89:14, 89:18, 89:24, 90:2, 90:17, 97:1, 97:2, 100:6, 100:8, 100:13, 101:2, 101:5, 122:10, 122:13, 122:16, 122:17, 123:5, 123:7, 123:11, 123:13, 123:23

**powder** [1] - 43:6

**practically** [1] - 62:12

**pre** [2] - 23:25, 152:6

**pre-employment** [2] - 23:25, 152:6

**prefer** [1] - 63:4

**preferably** [1] - 63:2

**prejudice** [2] - 13:17, 14:22

**Preliminary** [1] - 2:7

**preliminary** [4] - 3:20, 4:4, 134:4, 139:18

**premarked** [2] - 105:12, 185:6

**preparation** [1] - 184:10

**prepared** [3] - 3:5, 181:2, 194:16

**preponderance** [1] - 15:9

**present** [7] - 4:13, 4:22, 11:15, 14:15, 40:6, 74:1, 146:16

**presentation** [1] - 7:12

**presented** [5] - 4:16, 5:4, 7:1, 7:6, 14:24

**presiding** [1] - 12:19

**pretty** [5] - 63:13, 64:13, 68:1, 68:8, 70:7

**prevent** [2] - 21:24, 23:5

**prevented** [1] - 41:11

**previous** [1] - 175:22

**previously** [4] - 140:6, 176:1, 185:3, 188:11

**primarily** [5] - 46:8, 81:13, 97:22, 97:24, 98:3

**primary** [1] - 21:18

**privacy** [1] - 178:18

**privilege** [1] - 164:22

**problem** [11] - 19:10, 19:21, 20:1, 20:12, 20:13, 68:3, 110:22, 135:1, 136:3, 168:13, 182:19

**problems** [13] - 24:15, 27:23, 53:22, 69:24, 91:15, 111:1, 117:16, 117:20, 126:25, 170:20, 171:13, 179:11, 188:13

**procedure** [1] - 134:5

**proceed** [5] - 3:5, 4:6, 20:20, 139:16, 140:16

**Proceedings** [1] - 196:3

**PROCEEDINGS** [1] - 2:5

**proceedings** [11] - 4:4, 9:8, 17:25, 182:23, 183:5, 183:10, 183:16, 185:20, 194:7, 194:14, 196:8

**process** [9] - 3:14, 102:2, 156:23, 161:14, 162:10,

167:14, 167:16, 178:1, 183:14

**product** [31] - 37:12, 38:14, 46:6, 61:1, 61:3, 61:4, 61:6, 61:10, 61:13, 61:16, 61:18, 61:19, 61:21, 62:7, 62:8, 63:20, 64:1, 65:13, 66:16, 75:5, 76:8, 76:11, 76:20, 77:5, 98:6, 124:17, 125:9, 125:23, 130:13, 145:13, 145:14

**productive** [1] - 109:16

**productivity** [5] - 22:6, 27:15, 57:19, 58:4, 106:7

**products** [8] - 21:19, 37:11, 62:9, 65:14, 66:9, 76:16, 77:11, 129:10

**professionals** [1] - 37:15

**program** [6] - 146:13, 146:15, 146:19, 146:21, 160:12, 177:24

**prohibit** [1] - 79:22

**prohibition** [3] - 108:19, 131:16, 131:20

**prohibitive** [1] - 173:5

**project** [2] - 84:21

**promise** [1] - 194:10

**promptly** [2] - 13:9, 25:1

**proof** [3] - 15:23, 20:20, 25:12

**proper** [2] - 66:8, 66:12

**property** [2] - 49:9, 161:8

**prospective** [2] - 44:12, 152:5

**protect** [1] - 10:4

**protects** [1] - 35:5

**prove** [4] - 15:10, 23:9, 26:1, 26:18

**provide** [7] - 26:19, 137:21, 154:11, 160:20, 183:4, 183:11, 186:3

**provided** [13] - 25:16, 25:24, 26:13, 39:10, 51:19, 51:22, 52:1, 52:15, 94:24, 103:17, 177:25, 182:9

**providers** [1] - 26:13

**providing** [2] - 181:19, 184:11

**proving** [1] - 15:8

**public** [1] - 87:22

**publish** [9] - 102:17, 105:22, 138:6, 138:11, 138:14, 138:17, 140:21, 141:4, 142:3

**published** [1] - 138:5

**pull** [5] - 67:10, 78:6, 124:11, 125:25

**pulled** [1] - 170:4

**puller** [1] - 60:15

**pulling** [7] - 61:19, 63:22, 92:14, 98:1, 109:13, 119:24, 121:3

**purchased** [1] - 46:5

**purpose** [5] - 6:15, 8:13, 11:16, 14:12, 193:18

**purposes** [1] - 18:16

**push** [6] - 77:24, 78:6, 124:11, 124:18, 125:14, 133:1

**pushing** [1] - 65:11

**put** [32] - 15:13, 15:25, 17:7, 21:19, 24:4, 27:7, 61:13, 61:22, 63:24, 64:2, 67:20, 68:1, 76:17, 77:5, 98:9, 98:13, 98:15, 99:15, 101:23, 125:10, 130:9, 139:9, 139:22, 140:25, 149:12, 153:13, 157:16, 158:2, 167:3, 167:6, 175:12, 178:10

**puts** [1] - 27:19

**putting** [9] - 61:18, 65:13, 65:14, 65:21, 76:20, 94:6, 99:6, 99:9, 163:19

## Q

**qualification** [1] - 188:18

**qualified** [7] - 97:5, 97:11, 181:14, 187:10, 188:5, 188:12, 188:14

**qualifies** [1] - 30:18

**qualify** [1] - 186:12

**questionnaires** [1] - 31:21

**questions** [17] - 5:12, 6:18, 6:20, 53:24, 55:4, 55:7,

59:11, 73:19, 73:22, 119:5, 129:12, 133:10, 145:25, 177:13, 184:23, 192:21, 192:22

**quick** [1] - 68:1

**quickly** [2] - 67:21, 167:23

**quite** [5] - 87:15, 159:22, 160:11, 170:3, 192:4

## R

**rack** [4] - 82:8, 84:20, 129:5, 132:5

**racks** [5] - 81:24, 82:2, 82:4, 82:6, 82:7

**raise** [4] - 7:9, 115:17, 116:2, 146:7

**raised** [5] - 103:20, 105:6, 113:2, 136:23, 137:4

**raises** [3] - 115:13, 146:1, 146:2

**raising** [1] - 11:22

**ran** [1] - 129:5

**range** [1] - 106:15

**rarely** [1] - 132:19

**rate** [1] - 115:22

**rather** [1] - 178:24

**reaching** [1] - 5:9

**reaction** [2] - 113:17, 159:19

**read** [19] - 7:19, 56:25, 95:4, 103:11, 134:6, 134:16, 136:22, 137:7, 137:9, 137:15, 139:20, 139:25, 140:18, 143:7, 183:21, 185:23, 189:21, 189:22, 190:20

**Reading** [1] - 2:19

**reading** [14] - 4:23, 19:6, 19:19, 19:23, 28:4, 134:11, 134:12, 136:19, 137:18, 139:17, 139:21, 143:25, 144:17, 184:8

**ready** [1] - 138:3

**reality** [3] - 191:6, 192:12

**really** [14] - 29:24, 79:16, 85:1, 90:13, 91:17, 100:10, 111:9, 123:16, 150:15, 176:6, 176:19, 178:20, 189:25, 190:22

**reapply** [2] - 42:18, 177:1

**reason** [4] - 6:11, 42:9, 164:19, 193:10

**reasonable** [3] - 15:22, 29:11, 146:6

**reasons** [1] - 165:22

**rebuttal** [2] - 78:23, 79:2

**recalled** [2] - 79:8, 135:20

**receive** [8] - 3:17, 32:8, 57:21, 98:17, 107:11, 145:12, 150:3, 155:24

**received** [20] - 6:1, 6:4, 6:14, 57:18, 58:7, 58:17, 61:8, 61:12, 98:10, 98:15, 99:14, 149:23, 156:3, 157:24, 174:20, 174:23, 174:24, 175:17, 190:18, 191:20

**receiver** [4] - 97:18, 99:12, 189:25, 190:22

**receives** [1] - 30:19

**receiving** [6] - 61:18, 77:12, 97:23, 97:25, 98:12, 99:4, 156:10, 175:2

**recently** [1] - 45:15

**recess** [12] - 9:19, 11:16, 11:25, 13:23, 18:12, 20:9, 20:18, 44:3, 44:5, 133:24, 133:25, 194:18

**Recess** [1] - 20:15

**recessed** [2] - 18:14, 194:20

**recognize** [2] - 17:16, 79:7

**recollection** [6] - 8:5, 53:5, 87:10, 112:6, 149:11, 149:20

**recommendation** [1] - 158:9

**recommendations** [1] - 115:15

**recommended** [2] - 63:18, 115:16

**reconvene** [2] - 43:21, 133:21

**record** [20] - 6:1, 28:5, 44:22, 80:3, 103:4, 134:9, 134:13, 134:17, 136:15, 136:17, 136:18, 136:22, 139:20, 140:19, 141:14,

144:13, 183:24, 184:18, 194:22, 194:23
**records** [2] - 162:5, 162:7
**recover** [1] - 32:9
**RECROSS** [2] - 132:15, 190:5
**Recross** - 2:17, 2:22
**REDIRECT** [4] - 73:23, 129:14, 177:15, 191:11
**Redirect** [3] - 2:13, 2:17, 2:22
**reevaluate** [1] - 171:23
**refer** [1] - 55:11
**reference** [2] - 56:15, 182:20
**referencing** [4] - 19:2, 19:22, 56:6, 56:23
**referred** [1] - 62:8
**referring** [1] - 150:12
**reflecting** [1] - 13:17
**reflexes** [2] - 36:4, 54:13
**refrain** [3] - 43:23, 133:16, 194:12
**refresh** [3] - 9:10, 87:10, 95:10
**refreshing** [1] - 8:13
**refuse** [1] - 30:4
**refused** [1] - 29:19
**refuses** [2] - 29:10, 29:12
**regard** [8] - 62:15, 66:5, 66:17, 118:6, 118:8, 128:22, 167:17, 171:8
**regarding** [7] - 52:1, 52:4, 52:12, 74:5, 108:8, 143:20, 183:21
**regardless** [3] - 187:8, 187:22, 188:2
**regional** [1] - 80:10
**Registered** [1] - 196:18
**regular** [1] - 132:7
**regularly** [4] - 49:19, 62:25, 66:25, 73:24
**reiterate** [1] - 14:18
**reject** [1] - 10:9
**related** [1] - 48:17
**relates** [1] - 141:1
**relation** [1] - 49:22
**relationship** [4] - 152:4, 152:18, 152:21, 165:21

**relationships** [1] - 8:16
**release** [1] - 163:1
**released** [8] - 34:22, 78:19, 79:6, 134:20, 134:25, 135:17, 135:18, 162:24
**rely** [1] - 164:23
**relying** [2] - 8:4, 9:12
**remain** [2] - 9:22, 44:17
**remember** [27] - 7:17, 53:8, 53:11, 54:19, 55:7, 58:16, 58:19, 58:23, 68:17, 68:18, 70:3, 70:10, 110:19, 111:6, 111:23, 113:12, 113:13, 113:15, 113:16, 113:17, 114:22, 114:24, 157:9, 175:1, 175:2, 175:3
**reminded** [1] - 19:1
**render** [2] - 9:13, 14:24
**repeat** [1] - 154:22
**replace** [1] - 73:1
**replaced** [1] - 73:4
**replacement** [2] - 40:23, 42:21
**replacing** [1] - 176:14
**report** [17] - 47:3, 47:25, 109:19, 110:1, 110:24, 132:2, 149:7, 150:21, 150:25, 157:21, 157:24, 166:17, 166:18, 169:12, 169:15, 169:17, 179:20
**reported** [8] - 46:22, 46:25, 47:4, 110:2, 117:12, 145:23, 150:7, 166:14
**reporter** [2] - 7:20, 196:25
**Reporter** [3] - 1:22, 1:23, 196:18
**reports** [6] - 24:8, 109:8, 109:11, 150:3, 150:6, 151:4
**representations** [1] - 32:10
**representative** [1] - 26:20
**reprimand** [2] - 75:12, 75:15
**reproduction** [1] - 196:23

**request** [7] - 16:15, 24:12, 29:11, 44:14, 105:22, 178:9, 189:19
**requesting** [1] - 16:5
**require** [3] - 63:10, 86:22, 119:18
**required** [13] - 4:11, 8:9, 8:10, 35:2, 70:7, 89:5, 89:19, 117:21, 119:23, 120:12, 120:23, 120:25, 121:18
**requirement** [10] - 64:5, 88:4, 89:16, 96:17, 96:19, 96:22, 96:25, 122:9, 122:12, 173:8
**Requirements** [1] - 59:15
**requirements** [27] - 38:8, 38:20, 39:4, 41:12, 42:11, 43:3, 52:5, 52:13, 59:23, 59:24, 60:3, 87:14, 119:15, 119:16, 119:18, 119:21, 120:12, 122:6, 123:1, 154:7, 154:12, 154:20, 154:25, 155:9, 172:21, 172:23, 172:25
**requires** [4] - 12:19, 61:4, 66:3, 125:12
**research** [7] - 14:4, 14:6, 14:11, 14:18, 14:19, 182:2, 194:13
**resolve** [2] - 16:11, 168:18
**resources** [6] - 23:18, 24:8, 48:13, 69:3, 145:18, 145:21
**respect** [4] - 18:19, 96:19, 96:22, 184:15
**respected** [2] - 37:5, 161:20
**respond** [3] - 170:15, 185:19, 188:9
**response** [7] - 181:19, 181:25, 182:10, 182:14, 183:11, 183:16
**responses** [1] - 92:10
**responsibilities** [2] - 34:17, 122:2
**responsibility** [1] - 147:20
**responsible** [4] - 46:16, 68:10, 72:17, 180:6

**rest** [2] - 65:9, 101:16
**restricted** [1] - 162:23
**restriction** [1] - 172:12
**restrictions** [8] - 30:15, 163:3, 163:5, 163:7, 167:5, 167:12, 170:19, 171:25
**result** [2] - 16:14, 131:9
**results** [1] - 166:15
**retaliated** [1] - 16:5
**retaliation** [1] - 16:15
**retired** [3] - 32:18, 33:1, 33:4
**retrieving** [1] - 92:17
**return** [8] - 3:14, 9:25, 16:20, 18:5, 33:10, 43:20, 118:2, 175:18
**returned** [3] - 34:21, 153:8, 157:5
**revealed** [1] - 36:15
**reverse** [1] - 167:13
**review** [8] - 25:25, 87:8, 114:4, 141:10, 143:23, 184:22, 185:13, 189:9
**reviewed** [1] - 27:11
**reviewing** [1] - 185:16
**Ricky** [235] - 2:1, 21:11, 21:14, 21:16, 22:8, 22:18, 22:20, 22:22, 23:20, 24:2, 24:9, 24:11, 24:14, 24:22, 24:23, 24:24, 25:5, 25:11, 25:25, 26:4, 26:8, 26:15, 26:21, 27:12, 27:13, 27:23, 28:6, 28:9, 28:12, 28:16, 28:17, 28:25, 29:7, 29:18, 29:21, 29:23, 30:5, 30:8, 30:9, 30:14, 30:16, 30:17, 30:18, 30:20, 30:21, 31:3, 31:6, 31:14, 31:18, 31:23, 32:4, 32:7, 32:10, 32:14, 32:16, 32:22, 33:2, 33:10, 33:19, 33:20, 34:1, 34:3, 34:18, 34:19, 35:11, 35:19, 36:15, 48:19, 48:22, 48:25, 50:6, 51:6, 52:17, 52:20, 53:5, 54:3, 54:8, 54:12, 55:8,

55:14, 55:18, 55:23, 56:3, 57:6, 57:12, 58:8, 58:12, 58:14, 58:17, 58:21, 66:25, 67:5, 67:14, 68:2, 68:19, 69:1, 69:10, 69:16, 70:15, 71:7, 71:13, 72:1, 72:4, 72:10, 72:15, 73:15, 74:11, 74:14, 74:22, 75:7, 75:24, 81:4, 82:13, 82:15, 85:9, 86:11, 90:21, 90:25, 91:3, 91:13, 92:5, 92:18, 92:24, 93:2, 93:7, 97:5, 97:8, 98:6, 99:12, 99:24, 100:9, 100:12, 100:19, 101:13, 101:20, 107:12, 107:16, 107:21, 108:23, 109:5, 109:9, 109:12, 109:16, 110:6, 110:11, 110:16, 110:22, 111:13, 111:17, 113:8, 113:13, 113:21, 114:10, 114:16, 115:3, 117:16, 126:25, 127:16, 127:17, 131:16, 131:21, 131:25, 132:3, 132:9, 147:9, 147:25, 148:4, 148:14, 148:19, 148:21, 149:1, 149:8, 149:12, 149:19, 150:3, 150:9, 150:12, 150:22, 150:25, 151:4, 151:7, 151:20, 151:23, 151:24, 151:25, 152:1, 155:8, 155:16, 155:24, 156:9, 157:1, 157:4, 157:7, 157:9, 157:10, 157:12, 157:14, 157:18, 158:2, 158:4, 158:6, 158:12, 158:20, 158:24, 159:5, 160:6, 161:6, 162:14, 170:16, 171:23, 174:19, 174:21, 175:6, 175:9, 175:12, 175:22, 177:16, 178:11, 178:16, 179:1, 179:10, 179:21, 180:3, 180:11, 180:15, 180:25, 181:14, 187:2, 187:20, 189:12,

189:18, 191:20,
192:14, 196:1
**RICKY** [1] - 1:3
**ricky** [1] - 82:19
**Ricky's** [21] - 21:18,
21:23, 22:6, 23:11,
27:4, 27:9, 27:10,
57:19, 82:24, 102:1,
102:6, 106:22, 108:8,
113:17, 149:24,
156:6, 159:2, 159:18,
173:18, 176:19,
191:16
**ridiculous** [2] -
171:5, 174:12
**right-hand** [2] -
105:20, 106:18
**rightly** [1] - 13:16
**risen** [1] - 112:21
**RMR** [1] - 1:23
**Road** [2] - 1:16, 1:20
**role** [1] - 134:12
**rolling** [1] - 66:2
**room** [7] - 9:21, 9:23,
12:1, 12:10, 17:14,
169:4, 169:22
**roughly** [3] - 54:23,
76:14, 127:5
**rude** [1] - 13:25
**rule** [1] - 14:17
**rules** [7] - 11:18,
12:5, 12:7, 13:22,
14:14, 162:2, 162:4
**ruling** [3] - 11:5,
19:8, 193:25
**ruling"** [1] - 137:24
**rulings** [1] - 10:18
**run** [3] - 17:18, 61:5,
87:14
**running** [2] - 85:2,
187:21
**russo** [3] - 2:17,
133:9, 138:13
**RUSSO** [15] - 78:15,
80:5, 102:17, 102:22,
105:22, 106:2, 116:4,
129:14, 132:12,
134:15, 136:12,
138:4, 138:17, 139:4,
139:11
**Russo** [10] - 1:15,
1:15, 2:16, 33:7,
78:14, 87:3, 103:4,
119:5, 129:13, 138:11

## S

**S-E-H-L-D-O-N** [1] -
144:15
**sacrifice** [1] - 8:23

**sadly** [1] - 35:11
**safe** [1] - 90:16
**safely** [2] - 17:19,
194:17
**safety** [5] - 113:25,
114:6, 114:9, 114:12,
114:14
**sake** [1] - 124:20
**salary** [1] - 146:23
**Saltz** [17] - 1:19,
1:19, 2:12, 2:21, 2:22,
19:12, 20:4, 33:13,
43:17, 45:5, 59:1,
78:9, 141:3, 141:23,
159:25, 184:13, 190:4
**SALTZ** [60] - 3:7,
3:25, 19:13, 19:18,
20:7, 20:13, 33:14,
45:2, 45:8, 56:10,
56:13, 59:2, 59:4,
70:25, 71:2, 71:5,
73:19, 78:10, 78:18,
102:20, 105:25,
116:7, 129:12,
132:15, 133:8, 135:1,
136:3, 136:10, 137:2,
137:11, 137:15,
137:19, 138:21,
141:24, 142:6,
142:12, 142:16,
144:5, 160:1, 160:2,
164:13, 164:16,
165:2, 177:13,
181:21, 181:24,
182:12, 182:16,
182:24, 184:2, 184:8,
184:14, 187:24,
188:6, 190:5, 191:9,
192:21, 193:8,
193:17, 193:22
**saltz** [4] - 2:9, 2:16,
2:17, 44:16
**satisfied** [1] - 3:4
**saw** [18] - 36:9, 37:7,
52:24, 53:1, 53:19,
53:23, 69:5, 75:7,
91:15, 97:12, 97:14,
100:2, 101:13,
108:24, 148:15,
161:6, 161:11, 190:19
**scales** [2] - 15:16,
15:17
**schedule** [3] - 16:20,
17:21, 135:19
**scheduling** [1] -
134:2
**School** [1] - 1:20
**score** [3] - 27:19,
106:9, 106:14
**scores** [2] - 103:17,

103:19
**screen** [1] - 102:24
**screenings** [1] -
152:15
**screens** [1] - 103:1
**seated** [9] - 20:16,
44:6, 44:17, 44:21,
80:2, 139:13, 139:14,
144:12, 194:21
**second** [14] - 6:19,
1:18, 3:11, 40:11,
56:12, 82:4, 82:6,
82:7, 82:8, 94:6,
106:24, 144:17,
180:15, 187:25
**secondly** [2] - 67:17,
69:10
**secrecy** [1] - 10:4
**secretive** [1] - 162:9
**section** [5] - 59:14,
95:5, 103:23, 119:15,
153:11
**sections** [1] - 59:20
**secure** [1] - 9:24
**security** [6] - 31:19,
31:24, 32:3, 32:8,
32:11, 41:7
**sedentary** [4] -
30:17, 40:10, 159:15,
170:10
**see** [43] - 7:10, 7:19,
13:22, 19:25, 23:16,
25:22, 27:13, 29:5,
30:6, 39:23, 40:5,
51:6, 51:10, 51:16,
52:20, 63:7, 66:19,
69:6, 70:6, 71:21,
75:24, 79:5, 90:21,
90:25, 91:3, 91:8,
93:7, 93:17, 99:24,
100:19, 101:17,
102:23, 105:5, 106:4,
107:16, 113:6,
116:14, 132:9,
147:24, 166:17,
182:8, 189:15, 194:24
**seeing** [4] - 37:22,
111:1, 184:4
**seem** [1] - 18:23,
148:22
**seeming** [1] - 107:12
**sees** [1] - 22:18
**selected** [1] - 3:12
**selection** [1] - 3:2,
3:5
**sells** [2] - 21:13,
145:4
**Sembrot** [5] - 134:6,
139:10, 139:23,
140:10, 140:15

**send** [14] - 12:25,
23:21, 23:22, 26:25,
111:11, 112:8,
113:20, 151:19,
151:22, 152:5, 152:9,
152:14, 163:25,
165:12
**sending** [1] - 114:11
**sends** [3] - 23:21,
23:25, 30:9
**sent** [18] - 25:25,
39:2, 42:15, 43:10,
110:9, 110:11, 115:1,
126:17, 128:8,
128:15, 153:3,
153:14, 154:5,
165:24, 176:11,
179:23, 180:17,
191:15
**Sent** [1] - 153:10
**sentence** [1] -
190:20
**sentences** [1] -
189:21
**separate** [3] - 83:21,
83:22, 174:5
**separated** [1] - 49:12
**September** [8] -
25:20, 31:11, 40:15,
176:11, 177:1,
180:16, 180:19,
186:14
**sequestered** [1] -
79:14
**sequestration** [1] -
44:14
**serious** [1] - 162:2
**seriously** [4] -
127:21, 131:25,
132:3, 132:10
**served** [2] - 32:16,
145:1
**service** [5] - 12:24,
13:3, 33:23, 50:3,
145:5
**serving** [1] - 32:17
**set** [1] - 119:20
**sets** [1] - 65:18
**setting** [2] - 82:10,
173:19
**settled** [1] - 32:19
**seven** [3] - 41:3,
42:12, 42:13
**seventeen** [1] -
185:6
**seventh** [2] - 3:15,
3:18
**seventy** [10] - 38:22,
50:5, 62:20, 62:24,
64:5, 89:18, 89:24,

90:11, 97:2, 100:6
**several** [7] - 18:10,
70:12, 152:20,
172:18, 174:18,
188:7, 189:5
**shares** [1] - 165:20
**Shaw** [98] - 2:1, 4:13,
4:16, 4:19, 15:4, 15:7,
15:10, 15:14, 15:16,
15:18, 16:1, 16:13,
21:8, 33:19, 33:20,
34:1, 34:18, 35:19,
36:9, 36:24, 37:3,
38:9, 38:15, 39:2,
39:5, 39:12, 39:15,
39:22, 39:25, 40:1,
40:2, 40:7, 40:11,
40:22, 41:7, 41:17,
41:20, 42:4, 42:21,
43:4, 48:20, 48:22,
49:5, 52:17, 56:3,
57:7, 66:18, 72:7,
72:8, 72:22, 81:4,
82:13, 86:11, 90:21,
115:10, 117:16,
117:20, 118:1, 118:7,
126:14, 131:17,
131:21, 132:18,
135:7, 136:10, 147:9,
147:12, 147:25,
153:4, 155:8, 155:16,
155:24, 156:19,
161:4, 162:14,
163:16, 165:12,
165:23, 167:1,
167:19, 169:19,
169:25, 170:2, 170:3,
176:21, 177:16,
178:11, 181:19,
186:12, 187:5,
187:10, 188:10,
189:1, 189:5, 189:12,
190:10, 190:13, 196:1
**SHAW** [1] - 1:3
**Shaw's** [14] - 4:14,
4:17, 16:8, 16:15,
18:22, 37:17, 40:4,
42:14, 42:24, 105:16,
114:10, 128:24,
148:4, 164:20
**sheet** [2] - 173:9,
173:10
**Sheldon** [45] - 2:20,
23:16, 24:9, 41:17,
41:18, 41:25, 47:18,
47:19, 47:24, 47:25,
48:4, 53:20, 54:1,
55:13, 56:2, 57:17,
58:7, 71:9, 71:24,
109:21, 110:5,

110:10, 110:20, 111:4, 111:7, 111:13, 111:19, 112:12, 134:20, 135:6, 135:11, 144:4, 144:7, 144:10, 144:14, 144:20, 160:13, 179:16, 182:8, 184:19, 185:16, 186:19, 187:19, 191:13, 192:23

**sheldon** [5] - 23:19, 110:1, 110:7, 134:19, 178:24

**shelf** [3] - 65:14, 76:21, 77:5

**shelves** [7] - 65:22, 99:15, 120:7, 120:22, 121:17, 124:23, 125:7

**shift** [2] - 85:5, 85:9

**shifts** [1] - 85:2

**shin** [1] - 162:20

**shipped** [1] - 62:1

**shipping** [5] - 84:9, 97:22, 97:24, 145:13, 176:18

**shocked** [1] - 25:6

**short** [15] - 24:22, 25:5, 28:8, 28:15, 29:13, 29:19, 30:1, 30:19, 31:5, 51:2, 158:7, 158:10, 159:21, 160:9, 178:3

**short-term** [5] - 158:7, 158:10, 159:21, 160:9, 178:3

**show** [19] - 4:10, 18:21, 27:6, 32:13, 51:12, 56:17, 56:21, 87:1, 88:20, 102:9, 103:8, 103:16, 103:22, 104:14, 105:11, 106:3, 140:24, 152:22, 189:6

**showed** [1] - 34:12

**showing** [4] - 143:11, 184:3, 184:17, 184:19

**shown** [1] - 5:6

**shows** [3] - 24:2, 24:18, 28:17

**shut** [2] - 21:4, 21:10

**shutting** [1] - 29:25

**Side** [2] - 181:23, 183:1

**side** [12] - 4:7, 10:20, 11:7, 11:8, 13:18, 15:18, 50:7, 74:11, 103:11, 103:13

**sides** [1] - 15:16

**sign** [3] - 177:23, 178:5, 178:8

**signature** [7] - 102:13, 103:2, 104:22, 105:19, 106:19, 106:21, 107:9

**signed** [2] - 115:6, 115:9

**similar** [2] - 81:3, 153:25

**simply** [8] - 4:9, 14:1, 134:11, 137:5, 139:24, 173:10, 173:17, 174:12

**sit** [7] - 30:18, 40:9, 42:24, 75:1, 77:10, 124:3, 169:4

**sits** [1] - 36:5

**sitting** [5] - 37:9, 37:10, 37:24, 64:10, 133:6

**situation** [13] - 30:10, 37:4, 70:12, 75:13, 117:3, 118:1, 160:23, 161:17, 164:6, 165:6, 166:7, 168:10, 190:1

**situations** [2] - 17:16, 114:10

**six** [8] - 21:18, 24:5, 28:14, 49:1, 52:24, 66:21, 73:5

**sixteen** [1] - 145:2

**sixth** [1] - 36:21

**sixty** [1] - 50:4

**size** [2] - 61:23, 187:15

**skid** [2] - 65:13, 121:12

**skids** [2] - 121:9, 121:11

**skills** [1] - 97:6

**skip** [1] - 137:5

**sleep** [1] - 194:15

**slid** [1] - 130:21

**slide** [2] - 77:22, 130:14

**slot** [1] - 77:23

**slots** [1] - 77:20

**slow** [3] - 36:3, 53:6, 53:9

**small** [3] - 81:13, 91:14, 120:4

**smaller** [1] - 81:5

**snuffed** [1] - 33:6

**social** [2] - 13:2, 31:19, 31:24, 32:3, 32:8, 32:11, 41:7

**solely** [3] - 7:1, 14:16, 14:24

**solicit** [2] - 52:17, 154:18

**someone** [8] - 35:6, 37:11, 65:6, 66:23, 67:24, 71:6, 122:11, 123:22

**sometime** [1] - 157:8

**sometimes** [7] - 60:21, 61:17, 61:19, 67:1, 86:16, 88:2, 121:1

**somewhat** [1] - 15:17

**somewhere** [2] - 125:10, 180:22

**soon** [1] - 34:18

**sooner** [1] - 40:25

**sorry** [13] - 27:8, 72:9, 87:5, 92:9, 92:11, 92:15, 107:5, 112:24, 122:6, 127:25, 129:23, 134:19, 154:21

**sort** [4] - 8:2, 18:10, 35:10, 103:10

**sorted** [2] - 61:24, 73:8

**sought** [1] - 110:25

**sound** [1] - 146:10

**sounds** [2] - 49:3, 146:6

**sources** [1] - 14:20

**space** [1] - 176:5

**specific** [6] - 8:7, 60:3, 67:9, 70:8, 100:22, 173:13

**specifically** [9] - 55:10, 55:25, 68:18, 70:4, 70:15, 73:13, 108:3, 173:1, 185:24

**specified** [1] - 27:17

**speed** [2] - 17:19, 142:25

**spelled** [1] - 188:19

**spend** [3] - 74:17, 84:16, 117:5

**spot** [1] - 104:3

**spring** [1] - 91:17

**square** [1] - 76:15

**squat** [5] - 39:7, 66:14, 129:10, 130:19, 132:19

**squatting** [2] - 34:8, 38:25, 58:22, 66:6, 67:15, 92:12, 92:19, 96:12, 119:25, 125:12, 129:8

**stacking** [1] - 65:14

**staff** [1] - 155:2

**stage** [1] - 121:13

**staging** [2] - 98:9, 98:11

**staircase** [1] - 65:25

**stairs** [7] - 22:1, 38:24, 65:16, 65:18, 121:22, 126:9

**stand** [11] - 8:20, 17:8, 40:8, 40:17, 63:16, 132:19, 138:12, 138:16, 139:10, 139:23, 139:25

**standard** [4] - 66:15, 118:13, 118:16, 177:25

**standing** [11] - 38:25, 39:9, 58:15, 65:10, 67:25, 91:3, 91:4, 91:5, 96:20, 126:4

**start** [7] - 3:22, 15:2, 80:16, 154:8, 157:15, 160:23, 194:16

**started** [3] - 34:19, 158:14, 161:11

**starting** [2] - 17:11, 17:12

**state** [4] - 44:22, 80:3, 144:13, 145:12

**statement** [6] - 2:8, 2:9, 6:6, 136:25, 184:4, 184:5

**statements** [11] - 3:23, 4:7, 4:8, 4:12, 6:18, 16:21, 18:5, 18:17, 20:18, 47:19

**states** [3] - 62:19, 145:13, 145:14

**STATES** [2] - 1:1, 1:8

**stateside** [1] - 32:18

**stating** [1] - 176:12

**status** [1] - 73:10

**stay** [4] - 18:13, 61:12, 67:7, 194:19

**staying** [1] - 194:8

**steadfastly** [1] - 29:18

**step** [7] - 44:10, 78:12, 133:11, 140:11, 144:7, 182:18, 192:23

**steps** [4] - 38:24, 109:13, 128:5, 128:10

**still** [13] - 29:13, 30:20, 118:20, 133:1, 136:1, 152:20, 167:20, 168:15, 175:17, 175:22, 178:20, 178:22, 184:2

**stipulate** [1] - 6:2

**stipulated** [2] - 87:13, 87:16

**stock** [2] - 120:14, 120:22

**stocks** [1] - 165:20

**stool** [2] - 77:9, 77:12

**stop** [5] - 53:14, 108:23, 109:2, 129:4, 131:20, 162:11, 169:5, 169:20

**stopped** [2] - 71:2, 158:17

**stops** [1] - 131:16

**stored** [1] - 76:8

**stories** [1] - 14:2

**story** [1] - 34:2

**straight** [1] - 72:14

**straightening** [1] - 121:17

**strange** [1] - 24:12

**Street** [2] - 1:13, 1:24

**strict** [1] - 12:18

**stricter** [1] - 15:22

**strike** [6] - 71:3, 93:19, 126:22, 152:2, 161:2, 169:8

**struck** [1] - 162:20

**structure** [2] - 76:15, 83:22

**struggling** [13] - 22:21, 36:4, 36:10, 36:18, 36:19, 37:8, 37:23, 53:17, 54:4, 128:20, 128:24, 148:9, 192:13

**stuff** [4] - 61:21, 61:52, 65:21, 121:20

**style** [1] - 125:4

**subject** [4] - 13:13, 13:21, 20:3, 79:16

**submit** [1] - 137:25

**submits** [1] - 31:21

**subordinate** [1] - 157:1

**subordinates** [1] - 88:13

**substantial** [1] - 23:7

**suggest** [1] - 170:25

**Suite** [1] - 1:16

**Sullivan** [1] - 36:23

**summarize** [1] - 8:12

**summations** [1] - 7:13

**supersize** [1] - 147:6

**supervise** [1] - 83:7

**supervised** [1] - 145:17

**supervises** [1] - 95:21

**supervision** [1] - 196:25
**supervisor** [12] - 26:10, 27:10, 57:6, 63:16, 74:10, 81:15, 82:24, 83:4, 95:20, 106:5, 106:22, 118:14
**supervisors** [2] - 22:3, 25:9
**supervisory** [1] - 85:18
**support** [1] - 4:14
**supposed** [4] - 27:15, 69:5, 89:13, 191:8
**surgeon** [1] - 42:6
**surgery** [1] - 42:22
**surprised** [5] - 159:18, 159:22, 160:4, 160:5, 160:11
**surrounding** [1] - 12:23
**sustain** [1] - 10:25
**sustained** [3] - 6:9, 71:4, 184:13
**swear** [1] - 3:9
**sweeping** [1] - 121:9
**switched** [1] - 135:15
**sworn** [8] - 3:10, 4:2, 4:25, 44:20, 80:1, 140:6, 140:15, 144:11
**sympathy** [1] - 14:22
**system** [1] - 98:23

**T**

**task** [2] - 8:21, 131:13
**team** [8] - 22:7, 22:13, 23:14, 26:7, 28:23, 48:3, 48:6, 48:8
**techniques** [1] - 66:12
**temporary** [4] - 32:20, 32:21, 166:7, 168:17
**ten** [12] - 43:20, 45:23, 46:3, 47:7, 51:2, 67:1, 81:25, 82:7, 82:11, 85:8, 133:21
**term** [16] - 15:21, 25:5, 28:8, 28:15, 29:13, 29:19, 30:1, 30:19, 31:5, 152:21, 158:7, 158:10, 159:21, 160:9, 161:20, 178:3

**terminated** [2] - 42:14, 176:25
**terminating** [2] - 42:15, 180:18
**terminology** [1] - 178:13
**terms** [8] - 18:2, 38:13, 59:23, 173:12, 173:13, 173:20, 175:21, 184:3
**testified** [11] - 5:3, 60:5, 60:6, 62:15, 66:17, 75:7, 160:13, 166:14, 168:5, 178:15, 189:18
**testify** [6] - 31:6, 38:16, 44:19, 71:12, 80:1, 144:10
**testifying** [1] - 122:25
**testimony** [47] - 4:22, 4:25, 5:24, 6:20, 7:5, 7:21, 7:25, 8:4, 8:5, 8:12, 10:9, 10:15, 10:20, 17:10, 23:15, 26:5, 28:2, 34:6, 38:9, 40:5, 40:21, 43:3, 43:15, 56:7, 74:5, 89:22, 90:13, 105:2, 122:8, 132:17, 134:16, 137:8, 137:12, 138:18, 139:20, 140:7, 140:9, 140:25, 141:13, 149:17, 155:24, 156:2, 164:15, 172:22, 186:23, 188:15, 192:5
**THE** [150] - 1:1, 1:1, 1:8, 3:4, 3:8, 3:11, 3:20, 4:1, 18:15, 18:25, 19:5, 19:11, 19:15, 19:25, 20:8, 20:16, 33:12, 43:16, 44:6, 44:9, 44:14, 44:16, 44:23, 45:5, 49:20, 50:1, 50:11, 50:12, 50:14, 50:15, 50:17, 50:19, 50:21, 50:22, 50:24, 56:12, 56:19, 59:1, 60:8, 71:1, 71:4, 71:15, 73:20, 77:15, 77:17, 77:18, 77:20, 78:1, 78:4, 78:8, 78:11, 78:13, 78:14, 78:17, 78:23, 78:23, 79:3, 79:6, 79:9, 79:10, 79:16, 79:19, 79:22, 80:4, 87:3, 92:9, 96:7,

102:19, 102:21, 103:4, 105:24, 106:1, 116:6, 129:13, 132:14, 133:10, 133:13, 133:14, 134:1, 134:10, 134:25, 135:16, 135:25, 136:15, 136:18, 137:3, 137:9, 137:14, 137:17, 137:20, 138:2, 138:10, 138:14, 138:20, 138:22, 139:2, 139:6, 139:14, 140:5, 140:14, 140:22, 141:7, 141:9, 141:19, 141:22, 141:25, 142:5, 142:7, 142:11, 142:15, 142:22, 142:25, 143:4, 143:6, 143:16, 143:22, 144:3, 144:6, 144:14, 159:25, 164:7, 164:18, 164:25, 177:14, 181:22, 182:5, 182:15, 182:22, 182:25, 183:23, 184:6, 184:9, 184:15, 184:24, 185:1, 185:5, 185:8, 185:12, 187:25, 188:8, 190:4, 192:22, 192:24, 192:25, 193:16, 193:20, 193:23, 194:5, 194:21, 194:24
**themselves** [2] - 35:7, 164:24
**thereafter** [1] - 17:12
**therefore** [6] - 7:24, 9:13, 20:21, 54:15, 146:24, 164:22
**thinking** [2] - 30:2, 91:19
**thinks** [2] - 24:11, 28:12
**third** [3] - 6:20, 13:10, 185:23
**thirty** [1] - 40:19
**three** [5] - 16:18, 62:14, 63:12, 72:13, 138:8
**three-page** [1] - 138:8
**throughout** [2] - 25:21, 164:20
**tightly** [1] - 162:8
**Tim** [14] - 2:19, 19:2, 56:1, 57:6, 68:12, 72:19, 83:1, 83:4,

117:9, 128:14, 140:18, 143:25, 149:4, 151:10
**tip** [1] - 15:17
**title** [1] - 82:22
**titled** [2] - 51:15, 88:21
**today** [8] - 73:17, 79:4, 79:7, 135:11, 177:6, 177:11, 178:22, 186:23
**today's** [5] - 3:13, 17:25, 162:9, 194:6, 194:14
**toe** [1] - 128:2
**toes** [1] - 91:14
**together** [4] - 111:3, 173:23, 173:24, 188:16
**tomorrow** [8] - 17:11, 40:6, 135:6, 136:7, 138:1, 194:16, 194:19, 194:25
**took** [5] - 34:10, 102:8, 130:20, 161:16, 187:21
**tools** [3] - 51:23, 52:16, 88:6
**top** [5] - 27:20, 82:10, 82:12, 106:14, 131:6
**total** [1] - 84:25
**totally** [1] - 32:5
**touch** [1] - 91:14
**tough** [3] - 31:3, 31:4, 63:13
**toward** [2] - 31:7, 107:24
**towards** [1] - 108:6
**traffic** [1] - 17:15
**tragically** [1] - 27:25
**trailer** [1] - 121:13
**transcribing** [1] - 7:21
**TRANSCRIPT** [1] - 1:7
**transcript** [23] - 4:24, 7:23, 8:3, 19:3, 19:7, 19:19, 19:20, 19:24, 20:3, 28:4, 56:22, 87:2, 134:7, 136:20, 136:21, 136:24, 137:22, 139:17, 139:22, 140:13, 143:8, 196:12, 196:23
**transcripts** [1] - 9:6
**traveling** [1] - 17:17
**traverse** [2] - 148:23, 160:6
**treat** [1] - 152:12

**treated** [1] - 11:18
**treating** [1] - 30:8
**Trial** [2] - 2:2, 196:3
**TRIAL** [1] - 1:7
**trial** [28] - 3:5, 4:3, 5:1, 5:3, 5:13, 6:10, 7:6, 7:22, 9:9, 9:16, 10:10, 10:12, 10:18, 10:22, 11:10, 11:12, 12:13, 13:10, 16:11, 16:16, 23:9, 25:21, 27:6, 28:5, 29:6, 33:9, 79:12, 196:10
**tries** [2] - 30:23, 168:2
**Trindle** [1] - 1:16
**trouble** [10] - 75:24, 90:22, 90:25, 91:4, 91:8, 92:19, 109:12, 112:16, 148:24, 179:1
**truck** [21] - 21:13, 34:5, 37:15, 37:20, 46:2, 61:5, 64:3, 64:15, 64:18, 64:19, 64:21, 88:11, 98:1, 98:2, 98:7, 98:13, 99:20, 120:7, 124:6, 124:10, 145:4
**Truck** [93] - 2:1, 4:15, 4:18, 4:21, 15:6, 15:15, 15:19, 16:1, 16:7, 16:12, 21:9, 21:13, 22:7, 22:11, 22:12, 22:14, 23:10, 23:14, 23:17, 23:24, 24:13, 24:25, 25:15, 25:24, 26:7, 26:12, 26:18, 26:24, 28:7, 28:20, 28:21, 28:22, 28:25, 29:4, 29:7, 29:8, 29:10, 29:12, 29:25, 30:21, 31:1, 31:12, 31:16, 31:23, 32:22, 33:5, 33:6, 35:1, 37:14, 44:12, 45:10, 45:13, 45:25, 46:1, 46:14, 46:23, 51:16, 57:14, 74:8, 80:9, 80:13, 80:17, 80:19, 80:23, 81:1, 81:8, 82:18, 83:8, 101:4, 107:22, 107:25, 108:19, 113:25, 144:23, 145:3, 145:7, 146:2, 146:12, 151:16, 152:3, 153:22, 154:24, 155:8, 155:14, 158:21, 159:7, 159:20,

177:24, 181:3,
181:13, 186:10,
189:3, 196:1
**TRUCK** [1] - 1:4
**Truck's** [2] - 21:12,
25:2
**truckload** [3] - 61:2,
64:16
**trucks** [5] - 46:3,
120:11, 124:2, 145:5,
145:6
**true** [25] - 49:15,
51:11, 57:14, 57:25,
74:14, 74:25, 76:2,
104:19, 130:18,
130:24, 131:2, 148:7,
148:13, 150:11,
150:17, 158:3,
158:20, 158:23,
158:24, 159:4, 159:8,
159:12, 181:12,
186:8, 192:14
**truly** [1] - 92:4
**truth** [1] - 54:25
**try** [6] - 8:11, 13:7,
17:13, 43:19, 66:10,
191:5
**trying** [5] - 73:8,
88:8, 129:22, 160:6,
161:16
**turn** [5] - 20:21,
52:19, 59:7, 119:3,
148:2
**turned** [1] - 103:1
**turning** [1] - 185:22
**tweet** [1] - 12:22
**tweeting** [1] - 194:13
**twelve** [1] - 84:25
**twenty** [2] - 82:2,
82:9
**two** [40] - 21:15,
25:19, 38:4, 41:18,
45:14, 47:11, 47:15,
59:17, 62:13, 63:3,
63:7, 63:11, 65:18,
65:19, 72:13, 73:11,
75:3, 77:21, 77:23,
80:21, 81:7, 81:11,
84:14, 85:2, 104:6,
118:20, 124:7,
124:22, 125:6, 127:4,
132:6, 141:6, 142:13,
145:7, 157:13,
158:12, 165:12,
174:18, 189:21,
194:10
**two-wheeled** [1] -
124:7
**type** [4] - 26:19,
36:17, 152:17, 175:14

**typewritten** [1] - 41:9
**typical** [3] - 66:15,
74:16, 92:13
**typically** [4] - 76:8,
84:11, 86:14, 115:19

## U

**U.S** [1] - 1:24
**unable** [6] - 7:8,
32:2, 32:15, 40:13,
92:24, 180:8
**unanswered** [1] -
11:2
**unassisted** [6] -
86:9, 87:12, 87:19,
122:21, 123:6, 123:7
**under** [11] - 11:18,
28:2, 72:19, 76:17,
77:22, 81:25, 107:13,
119:15, 162:23,
196:24
**underneath** [2] -
77:21, 82:11
**understood** [2] -
19:11, 133:4
**undertake** [1] - 14:4
**unfair** [1] - 10:23
**unfolded** [1] - 170:1
**unfortunately** [1] -
135:13
**unfriendly** [1] -
13:25
**UNITED** [2] - 1:1, 1:8
**unless** [1] - 196:24
**unload** [3] - 64:18,
98:13, 120:11
**unloaded** [1] - 61:4
**unloading** [1] - 98:2
**unmarked** [1] -
191:19
**unreasonable** [1] -
173:6
**unrelated** [1] -
153:17
**unusual** [4] - 17:18,
161:18, 167:17,
167:18
**up** [63] - 10:6, 17:24,
24:2, 24:18, 28:18,
29:22, 30:13, 33:8,
38:16, 38:22, 62:20,
63:1, 63:12, 64:2,
64:5, 64:8, 64:21,
65:12, 72:14, 73:22,
75:11, 76:19, 76:20,
77:5, 77:24, 77:25,
89:5, 90:11, 97:1,
109:12, 118:16,
118:21, 120:7, 121:9,

121:11, 121:14,
122:16, 123:16,
123:23, 125:9, 126:9,
127:21, 128:5,
128:10, 129:10,
135:2, 135:5, 135:9,
135:10, 146:16,
146:22, 154:16,
159:6, 160:3, 171:8,
172:15, 177:23,
178:6, 178:8, 179:10,
191:12, 194:11
**uphold** [1] - 11:1
**upset** [2] - 158:20,
170:3
**uses** [1] - 22:1
**utilize** [1] - 165:21
**utilized** [3] - 51:23,
52:16, 161:7

## V

**vacant** [9] - 181:12,
182:11, 186:10,
186:20, 186:24,
187:1, 187:9, 188:4,
188:13
**valuable** [5] - 9:10,
21:2, 151:16, 178:25,
179:7
**varied** [1] - 84:13
**varies** [1] - 90:8
**various** [2] - 140:22,
141:1
**vehicle** [1] - 121:1
**vendors** [1] - 120:15
**verbal** [1] - 92:10
**verdict** [8] - 5:9,
5:10, 9:13, 11:12,
12:11, 14:25, 15:19,
33:10
**verified** [1] - 61:7
**Veronica** [1] - 1:19
**versus** [1] - 72:18
**via** [2] - 12:21, 14:6
**video** [2] - 40:5, 40:6
**view** [1] - 18:19
**views** [1] - 9:4
**violated** [1] - 21:9
**vision** [2] - 34:13,
45:4
**visit** [1] - 49:16
**voir** [2] - 3:13, 33:8
**volume** [1] - 27:16
**vote** [1] - 177:8
**vs** [3] - 1:4, 2:1,
196:1

## W

**wages** [1] - 146:23

**wait** [3] - 11:25,
17:20, 136:13
**waiting** [1] - 43:6
**walk** [29] - 23:11,
36:10, 37:8, 37:23,
40:8, 40:18, 57:7,
67:2, 81:24, 93:9,
111:9, 112:1, 120:19,
124:13, 125:17,
125:24, 127:18,
128:21, 128:25,
129:19, 129:25,
130:7, 130:16,
132:19, 133:1, 148:9,
166:3, 180:8
**walker** [5] - 39:3,
42:3, 135:8, 136:11,
136:12
**Walker** [1] - 39:10
**walking** [27] - 22:18,
23:8, 36:19, 38:25,
39:9, 43:10, 52:21,
53:6, 53:9, 65:9,
66:18, 67:22, 93:4,
93:6, 93:7, 96:17,
101:13, 101:21,
107:16, 109:3,
110:22, 112:16,
126:4, 126:10,
126:25, 148:15
**Wallace** [3] - 183:8,
183:20, 184:21
**Walnut** [1] - 1:24
**Walsh** [1] - 194:4
**wants** [1] - 28:19
**warehouse** [164] -
21:12, 21:17, 21:20,
22:13, 22:15, 22:17,
22:23, 22:24, 23:21,
26:9, 26:10, 27:11,
27:24, 34:4, 34:5,
34:7, 34:19, 35:19,
36:7, 38:5, 38:19,
38:23, 41:4, 41:20,
41:22, 43:1, 46:13,
46:16, 47:15, 49:1,
49:4, 49:8, 50:2, 50:6,
50:9, 51:24, 54:9,
54:16, 55:9, 55:15,
57:8, 57:13, 57:19,
59:23, 60:4, 60:5,
60:10, 60:13, 60:15,
60:16, 61:3, 61:6,
61:11, 61:12, 62:23,
63:17, 64:17, 64:22,
64:25, 65:7, 65:15,
65:16, 66:2, 66:11,
67:4, 67:8, 67:17,
67:23, 69:14, 74:6,
74:16, 74:25, 75:3,

75:20, 76:3, 81:2,
81:13, 81:14, 83:22,
83:23, 84:12, 84:17,
85:13, 85:23, 86:9,
86:10, 86:15, 86:19,
88:7, 89:19, 90:3,
90:14, 92:13, 93:25,
94:7, 94:19, 94:21,
94:23, 95:21, 99:3,
100:20, 102:8,
107:19, 115:14,
115:17, 115:18,
115:23, 116:1,
116:15, 116:18,
116:22, 116:25,
117:1, 117:6, 118:6,
120:9, 123:5, 123:6,
123:8, 126:1, 128:17,
128:23, 129:16,
132:18, 147:6,
147:25, 148:25,
149:2, 150:4, 150:18,
151:2, 151:5, 151:11,
154:19, 154:24,
155:18, 156:3, 156:9,
159:1, 169:10,
169:14, 170:9,
170:10, 170:19,
171:16, 173:11,
175:11, 175:16,
175:24, 180:4,
180:12, 181:1, 181:9,
187:1, 187:7, 187:14,
188:3, 189:25,
190:21, 192:13,
192:16, 192:17
**Warehouse** [58] -
21:14, 22:19, 24:3,
27:24, 28:18, 47:12,
47:13, 48:22, 49:13,
49:16, 49:21, 49:22,
50:7, 50:14, 50:20,
51:1, 51:5, 52:21,
60:4, 60:23, 60:25,
61:13, 65:1, 68:14,
73:25, 74:11, 74:21,
76:2, 77:9, 81:7, 81:8,
81:23, 82:21, 82:23,
83:24, 84:4, 84:7,
84:10, 84:24, 85:6,
85:10, 85:13, 86:2,
95:20, 97:18, 98:25,
99:3, 99:9, 115:14,
116:9, 117:9, 132:18,
147:10, 147:17,
147:22, 158:15,
158:22
**warehouses** [11] -
21:15, 46:15, 46:18,
47:9, 47:16, 68:11,
81:7, 81:12, 81:14,

81:16
   **warning** [1] - 21:3
   **warranty** [2] - 147:21, 147:22
   **Wayne** [1] - 1:20
   **ways** [1] - 66:15
   **websites** [3] - 13:3, 14:9, 14:10
   **week** [3] - 48:7, 147:17, 147:24
   **weekly** [1] - 117:4
   **weeks** [2] - 29:20, 174:18
   **weigh** [4] - 62:4, 62:12, 62:13
   **weighed** [2] - 101:2, 101:5
   **weight** [5] - 9:3, 63:6, 63:7, 64:4, 90:10
   **weights** [2] - 26:19, 101:8
   **well-being** [1] - 160:10
   **Wes** [1] - 136:16
   **Wesley** [3] - 1:23, 196:15, 196:17
   **wheeled** [2] - 124:7, 124:22
   **wheels** [3] - 77:15, 77:23, 77:24
   **whitmire** [2] - 36:22, 54:1
   **Whitmire** [35] - 2:15, 47:4, 48:5, 53:20, 55:13, 56:2, 57:17, 58:6, 68:9, 78:16, 79:25, 80:4, 80:6, 88:22, 95:1, 103:1, 103:7, 103:9, 106:3, 106:17, 107:11, 116:8, 122:7, 129:15, 132:16, 133:12, 135:4, 148:4, 148:18, 149:22, 151:19, 161:10, 162:13, 163:24, 193:5
   **Whitmire's** [1] - 47:5
   **whole** [5] - 64:13, 83:9, 91:18, 173:10, 176:18
   **wholeheartedly** [1] - 171:13
   **wholesale** [2] - 46:1, 46:4
   **wife** [1] - 35:11
   **willing** [7] - 187:3, 187:14, 188:10, 190:24, 192:5, 192:6, 192:8

   **willingness** [1] - 187:6
   **window** [2] - 36:5, 50:8
   **Winter** [1] - 1:19
   **wise** [1] - 167:5
   **wish** [2] - 7:11, 8:22
   **withdrawn** [2] - 136:24, 137:25
   **withhold** [1] - 14:13
   **witness** [27] - 4:23, 5:1, 5:2, 7:9, 8:19, 11:2, 17:6, 17:7, 17:8, 43:21, 44:7, 45:4, 56:14, 67:4, 78:14, 78:15, 78:24, 79:2, 100:10, 138:12, 138:15, 139:23, 139:25, 184:4, 184:17, 185:13
   **WITNESS** [16] - 44:23, 50:1, 50:12, 50:15, 50:19, 50:22, 77:17, 77:20, 78:4, 78:13, 79:9, 80:4, 133:13, 144:14, 184:24, 192:24
   **witness's** [1] - 10:9
   **witnessed** [3] - 110:22, 111:25, 112:18
   **WITNESSES** [1] - 2:10
   **witnesses** [14] - 4:16, 4:20, 5:25, 8:18, 10:7, 10:8, 10:12, 13:12, 13:21, 44:13, 44:17, 79:13, 134:22, 135:3
   **wondering** [1] - 50:11
   **wooden** [2] - 76:9, 76:15
   **wording** [1] - 70:9
   **words** [1] - 188:23
   **worker** [43] - 21:12, 21:17, 22:23, 26:9, 27:24, 28:13, 33:19, 33:20, 34:4, 35:20, 37:5, 59:23, 60:4, 62:23, 63:17, 72:7, 72:8, 74:16, 74:25, 81:2, 82:23, 85:13, 85:23, 86:9, 86:10, 89:20, 90:3, 90:14, 90:17, 92:13, 94:1, 94:8, 94:23, 115:18, 123:5, 123:6, 129:16, 132:18, 155:18, 156:3, 159:1, 187:8,

191:7
   **worker's** [6] - 153:17, 153:20, 153:25, 154:1, 162:18, 163:19
   **workers** [14] - 51:24, 66:11, 75:4, 76:3, 88:7, 94:19, 95:21, 115:14, 115:17, 115:23, 116:2, 123:8, 128:23, 154:19
   **works** [4] - 21:14, 22:15, 28:21, 146:19
   **worried** [1] - 67:17
   **worse** [5] - 159:11, 159:16, 170:6, 170:12, 171:15
   **write** [2] - 75:11, 188:20
   **writing** [1] - 41:8
   **written** [6] - 7:22, 8:2, 38:6, 40:2, 75:15, 121:25
   **wrongly** [1] - 13:16
   **wrote** [6] - 39:25, 40:1, 40:2, 182:13, 188:21, 189:5

## Y

   **Year** [1] - 31:4
   **year** [6] - 27:25, 31:6, 31:7, 81:21, 104:17, 126:20
   **years** [11] - 21:18, 24:5, 28:15, 32:16, 45:23, 49:1, 72:13, 145:2, 152:20, 159:6
   **yourself** [7] - 17:15, 48:1, 84:3, 126:13, 161:3, 161:12, 185:24
   **yourselves** [3] - 12:8, 43:24, 133:17