```
 1           IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                   HARRISBURG DIVISION

 3   RICKY A. SHAW,           : CASE NO.
                 Plaintiff    : 1:09-CV-00359
 4           vs.              :
     CUMBERLAND TRUCK         :
 5   EQUIPMENT COMPANY,       : Harrisburg, PA
                 Defendant    : 18 May 2011
 6   ........................: 9:32 a.m.

 7
            TRANSCRIPT OF CIVIL JURY TRIAL, DAY 3
 8      BEFORE THE HONORABLE CHRISTOPHER C. CONNER
              UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11   For the Plaintiff:

12       Michael J. Crocenzi, Esq.
         Goldberg Katzman, P.C.
13       320 Market Street
         Harrisburg, PA 17101
14       (717) 234-4161

15       Peter J. Russo, Esq.
         Law Offices of Peter J. Russo, P.C.
16       5006 East Trindle Road, Suite 100
         Mechanicsburg, PA 17050
17       (717) 591-1755

18   For the Defendant:

19       Veronica Winter Saltz, Esq.
         Saltz Polisher, P.C.
20       993 Old Eagle School Road, #412
         Wayne, PA 19087
21       (610) 964-3333

22   Court Reporter:

23       Wesley J. Armstrong, RMR
         Official Court Reporter
24       U.S. Courthouse
         228 Walnut Street
25       Harrisburg, PA 17108
         (717) 542-5569
```

1

**I N D E X**
**Ricky Shaw vs. Cumberland Truck Equipment Co.**

2
**1:09-CV-00359**
**Civil Jury Trial, Day 3**

3
**18 May 2011**

4

5

**PROCEEDINGS**

Page

6
**PLAINTIFF WITNESSES**

7
Dr. Andrew Walker, M.D.:

8
Direct examination by Mr. Crocenzi          3
Cross examination by Ms. Saltz             54
9
Redirect by Mr. Crocenzi                   72

10
Ricky Shaw:

11
Continued cross by Ms. Saltz               74
Redirect by Mr. Russo                 143, 155
12
Recross by Ms. Saltz                      152

13
Charles L. Kern:

14
Direct examination by Mr. Crocenzi        160
Cross examination by Ms. Saltz            187
15
Redirect by Mr. Crocenzi                  205
Examination by the Court                  207
16

17
Defendant's Rule 50 motion                209

18
**DEFENSE WITNESSES**

19
Chad Staller:

20
Direct examination by Ms. Saltz           221
Cross examination by Mr. Crocenzi         237
21
Redirect by Ms. Saltz                     254

22

23

24

25

3

**P R O C E E D I N G S**

1

2      THE COURT: Good morning.  Please be seated.

3  Ladies and gentlemen, we were going to proceed

4  with Mr. Shaw's testimony and I know that

5  defense counsel had a number of questions, but

6  because our next witness is a medical doctor

7  we've agreed to take him out of order, and I

8  believe that the examination of this gentleman

9  will be relatively short.  So we'll take care of

10  him, get him on his way so he can see his

11  patients, and we'll return with Mr. Shaw.  All

12  right?  Ms. McKinney, would you swear in the

13  doctor?

14      (Dr. Andrew Walker, M.D. was called to

15  testify and was sworn by the courtroom deputy.)

16      COURTROOM DEPUTY: Please be seated and

17  state your full name for the record.

18      THE WITNESS: Andrew Walker.

19      DIRECT EXAMINATION BY MR. CROCENZI:

20  Q.  Dr. Walker, good morning.

21  A.  Good morning.

22  Q.  I'd first like to talk about your

23  credentials.  You are a medical doctor, is that

24  correct?

25  A.  Correct.

4

1    Q. And can you tell the jury your background

2    in terms of your education, beginning with

3    college and working your way through medical

4    school, residency, and so forth.

5    A. No college.  It's not a joke.  Medical

6    school started in Poland.  We don't have a

7    college system, so you jump over after high

8    school, but it's equivalent.  Medical diploma

9    obtained in the 1990.  Board certified in

10   internal medicine, practice the clinical

11   medicine since up to residency.  Running office

12   clinic service as a hospitalist, and since 19 --

13   no, since 2003 medical director of the

14   occupational medicine and urgent care system.

15   Q. Where did you receive your medical diploma

16   from?

17   A. University of Medical Academy in Krakow,

18   Poland.

19   Q. Did you do your residency training in the

20   United States or in Poland?

21   A. Former polyclinic medical center residency

22   program.

23   Q. What was the residency program in?

24   A. Internal medicine.

25   Q. Now, you said that since 2003 you have been

1  a medical director of an urgent care center, is

2  that correct?

3    **A.** That is correct.

4    **Q.** What is the name of that center?

5    **A.** Concentra Medical Center.

6    **Q.** What are your duties as medical director of

7  Concentra?

8    **A.** Clinical care and daily operations.

9    **Q.** Where is Concentra located?

10   **A.** My center is located at the Rosemont Park

11  off Wesley Drive in Mechanicsburg.

12   **Q.** Are you licensed to practice medicine in

13  the Commonwealth of Pennsylvania?

14   **A.** Correct.

15   **Q.** Can you tell the jury how Concentra

16  operates, meaning what type of patients you see,

17  how many employees you have?  Just give us a

18  sense of the day-to-day operations.

19   **A.** Concentra is a national company currently

20  operating probably about 400 to 450 clinics like

21  mine all over the country in probably in 45

22  states.  Part of the operation is occupational

23  medicine.  Part of the operation is the

24  traditional urgent care.  It's like a small

25  emergency room without the support of the

1    hospital.

2      Q. What kind of emergencies do you see?

3      A. It's a broad spectrum, anything from simple

4    cuts and the sinus infections to heart attacks

5    and a rupture of the aortas.  Some of them can

6    be managed and discharged from our clinic.  Some

7    of them have to be transferred to the hospital.

8      Q. In addition to the urgent care that you

9    just described for us do you have patients who

10   just make appointments for treatment for

11   nonemergency cases?

12     A. In case of -- the simple answer is yes.

13   Some patients, returning patients still under

14   the urgent care principles, some of them are

15   returning scheduled like for example in

16   occupational medicine where we manage some

17   occupational medicine related, work related

18   injuries.

19     Q. Is your Concentra different than like a

20   family doctor, community family doctor where

21   you're treating people from childhood through

22   adulthood for a variety of problems?

23     A. That is correct.  In general terms

24   Concentra medical centers do not provide the

25   chronic care.  The model is more based on

 1    emergency medicine treatment with additional of

 2    the fact that we still are scheduling patients

 3    for follow-ups if necessary if certain issues

 4    have to be secured or better secured in our

 5    center than in office of family doctor.

 6      Q. All right.  Now, doctor, do you, does

 7    Concentra have any relationship with companies

 8    in the surrounding area regarding treatment for

 9    their employees?

10      A. That is correct.

11      Q. Can you describe for the jury that

12    relationship?

13      A. The goal of occupational medicine -- I'm

14    going to take it back.  In the state of

15    Pennsylvania employees -- sorry, employers, i.e.

16    the owner of a company or a corporation has the

17    right to select a panel of physicians to which

18    their injured employee will be directed in case

19    of any work related injury.  Concentra is on a

20    panel of many local companies, the work sites.

21    The way it works is at the moment when the

22    injury happens you don't need any scheduled

23    appointment.  The injured employee is sent

24    immediately, or that's the presumption, to

25    Concentra, and the employee is not going to be,

1   this patient is not going to be turned down

2   because there is no appointment scheduled.  At

3   the moment the injured employee comes in, it's

4   like an emergency room, they will be seen that

5   day.

6   Q. And do you provide other services to

7   companies in the area besides treating injured

8   workers?

9   A. Yeah.  Okay, I see where the question is

10  going.  There's a full spectrum of different

11  other services that we provide to those

12  companies.  This may be preemployment physical,

13  annual physical examinations, DOT/CDL truck

14  driver certification, marine certifications,

15  emergency personnel certifications, anything

16  that would be put under the umbrella of physical

17  examination of the prospective or current

18  employee.

19  Q. What about drug testing?  Do you do that,

20  too?

21  A. Correct.

22  Q. Do you know whether Concentra at your

23  location in Mechanicsburg has that kind of

24  relationship you just described for us with a

25  company called Cumberland Truck Equipment

1    Company?

2      A. Correct.

3      Q. Correct, you know that that is the case?

4      A. That is correct.

5      Q. I'm going to show you what has already been

6    admitted as Plaintiff's Exhibit 7.  It should

7    come up on your screen there, doctor.

8    Disregarding what's handwritten on the form now,

9    doctor, can you identify that form for us?

10     A. Yes.  That's a form with which the patient

11   comes to our office if it's directed by the

12   company for any particular reason.  This form

13   has in the right middle section the indication

14   what is the purpose of the visit.  In this

15   particular case the indication is that the

16   patient is for a physical examination.

17     Q. Do you provide these kind of forms to the

18   employers you have relationships with?

19     A. Correct.

20     Q. Thank you.  Doctor, I want to ask you some

21   questions about the personnel that are at

22   Concentra.  Obviously you're the medical

23   director.  The time frame we're dealing with is

24   2007.  So can you describe to the jury what kind

25   of personnel you had employed at Concentra and

1    what they did there?

2         THE COURT: You're talking specific to the

3    Wesley Drive Rossmoyne Business Center location?

4      Q. Yes, Your Honor.   Thank you.

5      A. Usually there is, we have about 1 or 1.5

6    provider in a sense it's either just one solo

7    physician at the particular time.   At certain

8    points there might be another physician.   There

9    might be occasionally a physician assistant,

10   nurse practitioner, and then there's a mid-level

11   staff, the support staff.   We're talking about

12   medical assistants, nurses, radiologist,

13   technician, physical therapists, that's pretty

14   much --

15     Q. Okay.   In 2007 did you have a physician

16   assistant working out of the Mechanicsburg

17   office with you?

18     A. Correct.

19     Q. Do you remember his or her name?

20     A. Yes.   It's the Shelley Latsha.   As I recall

21   now it's going to be --

22         THE COURT: L-A-T-S-H-A?

23     A. Yeah, that's pretty much it.

24     Q. And what about a nurse practitioner?   Did

25   you have one employed in `07?

1    **A.** If there was a nurse practitioner, that

2    particular gentleman is floating between

3    offices.  So occasionally he can work in my

4    office or one in the four other Concentra

5    offices in central Pennsylvania.

6    **Q.** Do you remember his name?

7    **A.** Scott.

8    **Q.** Is Shelley a woman or a man?

9    **A.** Shelley is a female, correct.

10   **Q.** For the physician's assistants can you

11   describe for the jury what role you have in

12   supervising them with their work duties at

13   Concentra?

14   **A.** Any time if they have any questions

15   regarding the process of examination findings on

16   examination or determination that they have to

17   render they have a right to approach me and we

18   can discuss it.

19   **Q.** Can you describe for the jury what

20   authority the physician assistant has in

21   conducting a physical examination of somebody

22   who comes to Concentra?

23   **A.** They have the same right to perform the

24   physical examination as they are trained and by

25   the nature of their schooling to do that.

1    Q. Do they do the physical examinations on

2    their own or are you with them during the

3    physical examination?

4    A. They are doing the physical examination

5    their own.

6    Q. At the end of the physical examination what

7    role do you have in reviewing any paperwork or

8    meeting with the patient?

9    A. It varies from case to case.  In some cases

10   if they have questions about the decision they

11   are going to be making or any findings that

12   they, their findings, they are discussing those

13   helping them to make the decision.

14   Q. An if they don't have any questions, what

15   happens then?

16   A. They are signing the document and document

17   is, it depends now what type of examination it

18   was.  Was this the okay examination, fitness for

19   duty examination, it's filed and the information

20   is provided to the employer who requested this

21   information.

22   Q. Do you have any requirement for signing off

23   on any physical examinations after the physician

24   assistant completes the physical examination and

25   makes a determination?

1     **A.** It varies from type of examination to type

2     of examination and from company to company.

3     **Q.** Do you know if Cumberland Truck had any

4     requirement for you to sign off on any of the

5     examinations of their employees?

6     **A.** Not to my recollection.

7     **Q.** Doctor, do you have the records for

8     Mr. Shaw in front of you?

9     **A.** Correct.

10    **Q.** You brought those from your office today?

11    **A.** Correct.

12    **Q.** When was the first time your office

13    examined Mr. Shaw?

14    **A.** February 26th, `07.

15    **Q.** Did you conduct the examination of Mr. Shaw

16    on that date?

17    **A.** Negative.

18    **Q.** Do you know who did based on your review?

19    **A.** Shelley Latsha, the PA, physician

20    assistant.

21    **Q.** Were you present at all during any of the

22    history taking that the physician's assistant

23    did on February 26th, 2007?

24    **A.** Negative.

25    **Q.** Were you part of any of the physical

1  examination?

2  **A.** Negative.

3  **Q.** Do you know whether any x-rays were taken

4  of Mr. Shaw during that February 26th, 2007

5  appointment?

6  **A.** No.

7  **Q.** Were there any x-rays taken?

8  **A.** No, negative.

9  **Q.** Sorry, thank you.

10  THE COURT: I'm sorry, you do know and there

11  were no x-rays taken?

12  **A.** I know that there were no x-rays taken.

13  THE COURT: Thank you.

14  **Q.** Based on your review of the records that

15  you have in front of you did you have any

16  medical records for Mr. Shaw available to

17  Concentra during the time of the examination

18  on 2-26-07?

19  **A.** Let's see.  One moment.  Not at that time.

20  **Q.** Does your record indicate whether anybody

21  from Concentra contacted any of Mr. Shaw's

22  treating physicians during the 2-26-07

23  examination?

24  **A.** No.

25  **Q.** Did Concentra contact Cumberland Truck

1   Equipment Company or any representative of that

2   company before performing the physical

3   examination?

4      A. The simple answer to this question is no.

5   It's the communication goes in the opposite

6   directions, the company is contacting us and

7   requesting the examination.

8      Q. And in fact you received what I showed you

9   earlier, which is P-7, the authorization for

10  treatment?

11     A. Correct.  That's the authorization for

12  physical examination.  It's not for treatment.

13     Q. Okay.  So when you received this and

14  Mr. Shaw shows up, that gives Concentra

15  permission then to do the examination, is that

16  correct?

17     A. Correct.

18     Q. Now, for these kinds of examinations does

19  the employee need to have an appointment with

20  Concentra?

21     A. Most of the time not.

22     Q. They just show up?

23     A. Correct.

24     Q. Doctor, I'm going to show you what has been

25  marked for identification as P-8.  Can you

1    identify P-8 for us, please?

2      A. Correct.  It's the cover sheet of the

3    records for any visit.

4      Q. Is that a typical form that Concentra uses?

5      A. Correct.

6      Q. Is that the form that was used for

7    Mr. Shaw's appointment on 2-26-07?

8      A. Correct.

9      Q. What does that form indicate regarding the

10   contact with Cumberland Truck after the exam?

11     A. There is the information that the record

12   was faxed to the above number and that should

13   be, yes, it's right over here, 249-9058.

14     Q. Does Concentra typically fax results to the

15   company after a physical examinations?

16     A. It's either faxed or it is transferred

17   electronically.  In this particular case the

18   indication is it was faxed.

19     Q. Thank you.  Did Concentra receive any

20   direction other than what you saw on the

21   authorization treatment form from Concentra

22   regarding the physical examination of Mr. Shaw?

23       THE COURT: You mean from Cumberland Truck?

24     Q. From Cumberland, I'm sorry.  Basically did

25   Cumberland Truck give you any direction about

1  how to do the examination other than what you

2  saw on that authorization form?

3     A. Let me double check.

4     Q. Sure.

5     A. No.  Correction, just to clarify this.

6     Q. Uh-huh.

7     A. The purpose of this examination was the

8  fitness for duty as it's indicated in the lower

9  portion of this document you just handed to

10 me.  It's quite particular physical examination,

11 it's not an annual physical examination,

12 preemployment.  It's called a fitness for

13 duty.  So it might be that there was a phone

14 communication that indicated that this is what's

15 supposed to be.

16    Q. Do you have any record in your notes of

17 that phone conversation that might have

18 occurred?

19    A. Negative.

20    Q. Did the physician's assistant that

21 conducted the examination on 2-26-07 keep notes

22 of the history that Mr. Shaw provided?

23    A. Correct.

24    Q. Did the physician's assistant also describe

25 findings upon physical examination in the notes?

1    A. Correct.

2    Q. I'll show you what has been marked as P-9.

3      (Brief pause.)

4    Q. Doctor, before I get to P-9, if you could

5  review your record of the physician's

6  assistant's history and findings?  Do you see

7  that in front of you in the record?

8    A. Correct.

9    Q. At the bottom it has physician's signature

10  and there is looks like two signatures, is that

11  right?  Not on P-9 but on your actual treatment

12  record.  Do you have that?

13    A. In the end of the whole, yes, the last page

14  of it.

15    Q. Let me show it to you just so we're sure

16  we're looking at the same thing.

17    A. Oh, yes.  Correct.

18    Q. Do you have that in your record?  I'd like

19  you to refer to it.

20    A. Okay.

21    Q. Do you see at the bottom it has signatures?

22    A. That's correct.

23    Q. And whose is the first signature we see?

24    A. There's no question the last signature is

25  mine.  I'm going to, I have to make a correction

1    over here to my previous statement as far as the

2    physician assistant, and I do apologize for

3    this.  I was reviewing many records this

4    morning.  This physician assistant's name is

5    Jeffrey Hollenback, H-O-L-L-E-N-B-A-C-K.

6      Q. He was a physician's assistant?

7      A. Physician assistant, correct.

8      Q. Employed at Concentra at that time?

9      A. Correct.

10     Q. So when you testified earlier that it was

11   Shelley that did the examination, you're now

12   correcting the record?

13     A. That was a mistake.

14     Q. All right.  Thank you.  You indicated

15   earlier that your signature appears next to

16   Mr. Hollenback's signature, is that right?

17     A. Correct.

18     Q. Do you have any recollection as you sit

19   here today of this physical examination of

20   Mr. Shaw or the circumstances surrounding it?

21     A. No, my memory is not that current, I'm

22   sorry.

23     Q. Is there any indication in this notation

24   that Jeffrey Hollenback had any questions for

25   you after completing the physical examination of

1    Mr. Shaw?

2      A. Negative.

3      Q. Do you remember as you sit here today

4    whether Mr. Hollenback asked you for any

5    direction or advice after completing his

6    physical examination of Mr. Shaw?

7      A. Negative.  I can't say that he has any

8    questions, but the presence of my signature

9    indicates that the case was discussed with me.

10     Q. Do you remember what Mr. Hollenback

11   discussed with you?

12     A. In detail, no.

13     Q. All right.  I'm back to P-9 that I handed

14   to you earlier.  Do you have that in front of

15   you now?  Thank you.  Do you know whether

16   Cumberland Truck requested that Concentra

17   complete this job analysis form as part of its

18   examination of Mr. Shaw in 2-26-07?

19     A. Correct.

20     Q. Did in fact they ask you to complete this

21   job analysis form?

22     A. Correct.

23     Q. In February of 2007 did the Concentra

24   location where you worked at, Mechanicsburg,

25   have anything on site to have a patient lift

1  something?

2     **A.** Yes, and that was not part of the

3  examination.

4     **Q.** Did it have anything on site to have a

5  patient carry some weights so you could

6  determine how much a patient could carry?

7     **A.** That is correct.  That was not part of the

8  examination.

9     **Q.** Did it have anything on site where a person

10  could climb stairs so you could analyze and

11  determine a person's ability to climb stairs?

12     **A.** Correct.  That was not part of the

13  requested examination.

14     **Q.** Did you have anything on site that would

15  allow the person to push or pull something so

16  you could analyze their ability to do that

17  activity?

18     **A.** Same answer, yes, and not part of the

19  requested examination.

20     **Q.** Did you have anything on site to have a

21  person control foot controls so you could

22  analyze how they could do that?

23     **A.** It's not exactly a simulation, but this

24  part of the examination is the functional

25  capacity evaluation is available, and again it's

1    not part of the requested examination.

2       Q. Sir, you see some handwriting now on this

3    P-9, is that correct?

4       A. Correct.

5       Q. Can you tell us whose handwriting that is?

6       A. That's the handwriting of the physician

7    assistant.

8       Q. And on page 3 there is a block for a

9    physician's signature.  Do you see that?

10      A. That is the third page.

11      Q. Third page, thank you.  Can you identify

12   the signatures in that block, please?

13      A. It's the signature of a physician

14   assistant, and the second one is my signature.

15      Q. Do you recognize the person who signed the

16   form?

17      A. That's the signature of Jeffrey Hollenback.

18      Q. Were you -- did you discuss this job

19   analysis form with Mr. Shaw before he left

20   Concentra on 2-26-07?

21      A. Negative.

22      Q. Did you review the job analysis form prior

23   to Mr. Shaw leaving Concentra on 2-26-07?

24      A. The job analysis was reviewed by me, but I

25   can't say what it is was when Mr. Shaw was still

1    on premises or he left.

2        Q. Was the job analysis completed, meaning the

3    handwritten parts for Mr. Hollenback, on the

4    form at the time you reviewed it?

5        A. That is correct.

6        Q. Did you discuss this job analysis form with

7    Mr. Hollenback before you signed it?

8        A. Yes.

9        Q. Do you know what you discussed with him?

10       A. No, that's not part of the record.

11       Q. You don't remember anything as you sit here

12   today?

13       A. No recollection.

14           MR. CROCENZI: Can you turn to page 2 of

15   that job analysis form, please?  Your Honor, at

16   this point I move for the admission of P-9 and

17   ask that it be published to the jury so they can

18   follow along in the testimony.

19           THE COURT: All right.  Any objection?

20           MS. SALTZ: No objection, Your Honor.

21           THE COURT: It is admitted and it may be

22   published to the jury.

23           BY MR. CROCENZI:

24       Q. Doctor, at the top there's the category

25   called standing.  Do you see that?

1    A. Yes, I have it on screen.

2    Q. Are you able to read what Mr. Hollenback

3  wrote in the standing category?

4    A. Most of the things.  The standing category

5  he was able to stand for limited minutes.

6    Q. Would you agree that statement is based on

7  something Mr. Shaw told Mr. Hollenback?

8    A. It's usually a combination.  The decision

9  is based on what the patient is telling us about

10  his or her abilities and the limited physical

11  examination.

12    Q. Under the walking category, can you read

13  that for us, please?

14    A. Able to walk for limited minute intervals.

15    THE COURT: You're referring to limited

16  minute.  It looks to me like a number, 30

17  minutes.

18    (Brief pause.)

19    THE WITNESS: I have to agree that it might

20  be a possibility.  If you look for it --

21    THE COURT: All right.  You're unsure.

22    THE WITNESS: I'm unsure.  I'm quite unsure.

23    THE COURT: Thank you.

24    BY MR. CROCENZI:

25    Q. Now, the rest of these categories, the

1   comments from Mr. Hollenback, would they be

2   based on comments or information that Mr. Shaw

3   provided to him during that examination?

4     **A.** Again it's a combination of physical

5   examination and statements of the patient.

6       (Brief pause.)

7     **Q.** Let me turn now to the third page.  Can you

8   identify whose handwriting is in the first block

9   above the signature?

10    **A.** That's the handwriting of the physician

11  assistant Jeffrey Hollenback.

12    **Q.** Was that handwriting on the form at the

13  time that you reviewed it?

14    **A.** Yes.

15    **Q.** Are you able to read that for us, please?

16    **A.** "Unable to perform job duties at this time

17  due to," and I have to say he had difficulties

18  of, "gait, climbing, and lifting according to

19  job description."

20    **Q.** You say gait, climb, and lifting?

21    **A.** Yes, the third line is gait, climb, and

22  lifting.  Lift.

23    **Q.** What does -- do you know what

24  Mr. Hollenback meant by gait?

25    **A.** Ambulation.  Walking.

1        THE COURT: To me it looks like, "Unable to

2    perform job duties at this time due to inability

3    to squat, climb, and lift according to job

4    description."

5    A. The first word on the third line could be

6    either gait or squat.  I cannot tell.

7    Q. Doctor, is there a notation in your record

8    about somebody at Concentra speaking with

9    Cumberland Truck after the exam to let them know

10   the results?

11   A. That is correct.

12   Q. And just so we're on the same page, here's

13   my copy.  Is that what you have.  Can you

14   recognize that handwriting for us, please?

15   A. Again it's authenticated by the physician

16   assistant Jeff Hollenback.

17   Q. Does your signature appear anywhere on this

18   form?

19   A. Negative.

20   Q. And is this a form that's typically

21   completed by Concentra after exam to note how

22   examination findings were communicated to the

23   employer?

24   A. Yeah, we call it a communication sheet in

25   the sense if there's anything communicated with

 1   the company, it may be documented on this form,

 2   correct.

 3        THE COURT: Is there an exhibit number on

 4   this?

 5        MR. CROCENZI: No, Your Honor, but we can

 6   make, I think it might be part of the

 7   defendant's, but we can --

 8        MS. SALTZ: Part of Defendant's Exhibit 4.

 9        MR. CROCENZI: I can have him identify it

10   now.  We already did, so --

11        THE COURT: Well, it's a question of whether

12   or not you intend to introduce it into the

13   record.

14        MR. CROCENZI: No, I had no intention.  I

15   just wanted to ask a couple more follow-up

16   questions.

17        THE COURT: Not a problem.

18        BY MR. CROCENZI:

19   Q.  Dr. Walker, did you contact Cumberland

20   Truck after the examination of Mr. Shaw on

21   2-26-07?

22   A.  Negative.

23   Q.  Turning now to the second page of that job

24   analysis form, P-9?

25        (Brief pause.)

1    Q. Do you see the category of squatting,

2    fourth from the bottom?

3    A. Correct.

4    Q. Does that job analysis form indicate how

5    far an employee at Cumberland Truck,

6    specifically Mr. Shaw, would have to squat to

7    do the job as a warehouse worker?

8    A. The check mark is indicating frequently.

9    Q. Does it indicate how far the person needs

10   to squat down?

11   A. That is correct, it does not.

12   Q. And the one below that, climbing, is there

13   anything on that form that indicates how much

14   Mr. Shaw would have to climb, how many steps?

15   A. Negative.

16   Q. And, Dr. Walker, regarding the lifting

17   category on the first page, does that form

18   indicate how Mr. Shaw would need to lift,

19   meaning from the floor, from the waist,

20   overhead, any of those kind of details?

21   A. Negative.

22   Q. As a medical doctor do you have an opinion

23   whether it would make a difference if a person

24   needed to lift something from the floor as

25   compared to lifting it from a waist high level?

1    **A.** That is correct.   That can create a

2    difference.

3    **Q.** What would be the difference?

4    **A.** Depending on the type of medical problem

5    that that particular patient has, some would be

6    able to lift something from the ground zero from

7    the floor to the certain level and not pass that

8    particular level, while other patients with

9    different medical problems, musculoskeletal

10   problems, would be able to lift only from for

11   example desk top level higher, but they are not

12   able to bend down to pick up something from the

13   floor.   So there is a difference between one

14   condition and another.

15   **Q.** From a medical perspective, however, is it

16   easier or harder for the human body to lift

17   something from the floor or from waist height,

18   if that item weighs the same of course?

19   **A.** For an average healthy individual it's the,

20   on average it's easier to lift something from

21   the elevation than from the floor.

22   **Q.** Now, there's a requirement here, carrying,

23   the second one.   Does this form indicate how far

24   Mr. Shaw would have to carry any item at his

25   work place?

1    **A.** Negative.

2    **Q.** As a medical doctor do you have an opinion

3    whether it would make a difference if someone

4    has to carry something a few feet versus longer

5    distance?

6    **A.** That's correct.  That creates a difference.

7    **Q.** Why is that such a difference, doctor?

8    **A.** The carrying a longer distance is on

9    average for any individual might be more

10   difficult than a shorter distance.

11   **Q.** Turning to page 2 again, the fifth one up

12   is bending.  Do you see that?

13   **A.** Correct.

14   **Q.** Does this form --

15   **A.** I'm sorry?

16   **Q.** Bending.  Page 2.

17   **A.** Okay.  See from below, okay.

18   **Q.** Does that form provide you with any

19   information about how far Mr. Shaw would have

20   to bend to pick up anything?

21   **A.** Negative.

22   **Q.** You mentioned earlier in your testimony

23   that you do have some implements or devices to

24   measure a person's ability to lift and carry and

25   so forth.  I think you even used the term

1   functional capacity.  Do you have the ability to

2   perform a functional capacity evaluation at your

3   location in Mechanicsburg?

4     A. If requested, yes.

5     Q. Did you perform any type of functional

6   capacity evaluation of Mr. Shaw on 2-26-07?

7     A. Negative.  Not requested.

8     Q. Did you request of Cumberland Truck that

9   you be permitted to perform a functional

10  capacity evaluation of Mr. Shaw?

11    A. Negative.

12    Q. On page 3 of this job analysis did the

13  physician's assistant indicate any

14  accommodations for Mr. Shaw?

15    A. There is no indication.  There is no

16  information that would answer directly the

17  question about what accommodations.  There's

18  only information about inability to perform

19  certain duties.

20    Q. Thank you.  You mentioned earlier in

21  looking at that flow sheet form that information

22  was faxed to Cumberland Truck.  Would this job

23  analysis P-9 that you are described for us be

24  one of those documents that was faxed back to

25  Cumberland Truck at the conclusion of the

examination?

A. Could you repeat the question, please?

Q. Sure.  Was this job analysis form P-9 one of the documents Concentra faxed to Cumberland Truck at the conclusion of the examination?

A. That's my presumption.

Q. Just so I'm clear, before Mr. Shaw left Concentra in Mechanicsburg did you personally go over this form with Mr. Shaw before he left?

A. No.

Q. And after 2-26-07 when Mr. Hollenback had contacted Cumberland Truck to advise them of the results, is there any notation in your record that you spoke with anybody at Cumberland Truck about the results?

A. There is not a commentation of any contact from 2-26 to 4-05.

Q. Thank you.  Let's turn to that date because that's the next time that Mr. Shaw came to Concentra, is that right?

A. That's correct.

Q. And did you conduct the physical examination of Mr. Shaw on this date?

A. That is correct.

Q. Can you describe for the jury or tell the

1   jury what information you received prior to the

2   examination with Mr. Shaw on 4-5-07?

3   A. There is a copy of the office notes from

4   the office of the Appalachian Orthopaedic

5   Center.

6   Q. Would that be Dr. Oplinger?

7   A. That is correct.

8   Q. Any other information?  Let me ask you

9   this.  Did you receive another job analysis

10  form like you were presented with on --

11  A. Yes, that's correct.

12  Q. Thank you.  Dr. Walker, I'm going to show

13  you the employer's authorization for treatment

14  for this 4-5-07 examination.  Do you have that?

15  A. That is correct.

16  Q. And at the bottom left-hand corner, do you

17  see that block?

18  A. Bottom left?  Yes.

19  Q. Is that something that you completed?

20  A. No.  That's the company information

21  requesting that the reevaluation for fitness

22  for duty should be performed.

23  Q. Do you know why your name, Dr. Walker, is

24  listed there and underlined?

25  A. I can only imagine that the employer

1   requested that the examination should be

2   performed by a physician this time.

3      Q. Thank you.  Turning now to your medical

4   note on 4-5-07, do you have that in front of

5   you?

6      A. That is correct.

7      Q. Is this your handwriting?

8      A. That is correct.

9      Q. And is this the kind of note that you

10  typically keep when performing a physical

11  examination of somebody at Concentra?

12     A. Correct.

13     Q. That was completed on 4-5-07, is that

14  correct?

15     A. Correct.

16     MR. CROCENZI: Your Honor, again this is a

17  defendant's exhibit, but I would like to at

18  least show the jury it at this point.  I don't

19  know if there's going to be an objection.  It's

20  a little unwieldy because both of us were going

21  to be calling Dr. Walker as a witness, so we're

22  going back and forth.

23     THE COURT: All right.  Any objection?

24     MS. SALTZ: No objection.

25     THE COURT: All right.  You may publish it.

1          MR. CROCENZI: Thank you, Ms. Saltz.

2          BY MR. CROCENZI:

3      Q. Doctor, what history did Mr. Shaw provide

4   to you on that date?

5      A. The record indicates, "Several years of

6   left knee pain treated by ortho since 10-06 at

7   steroid injections.  Not much help.  Continued

8   working in full capacity until 2-26-07 when he

9   was directed to Concentra Medical Center for

10  first return to work physical examination.  Not

11  much change since that visit.  Occasionally

12  takes pain medications.  Pain located in the

13  lateral and medial aspect of the left knee."

14     Q. Okay.  Thank you.  And did you perform a

15  physical examination?

16     A. Correct.

17     Q. What did you note as your findings on

18  physical examination?

19     A. "Present complaint, pain in the left knee.

20  Physical examination, large frame body,

21  conscious, oriented, no acute distress.  Walks

22  with cane in the right hand.  Musculoskeletal

23  examination, left hip range of motion within

24  normal limits without pain.  Left knee tender in

25  lateral and medial area.  Range of motion within

1   normal limits with pain on flexion.  Valgus and

2   varus tests," it's V-A-R-U-S, "bring pain

3   without laxity.  Patient unable to squat

4   secondary to pain.  Circulation within normal

5   limits."

6      Q. Did you also have an opportunity to review

7   those records you received from Dr. Oplinger?

8      A. Correct.

9      Q. Did you make any notation about that

10  review?

11     A. Correct.

12     Q. What did you say in this note?

13     A. "Diagnosis as per ortho, end stage left

14  knee arthritis.  Records from Dr. Oplinger show

15  no restrictions being imposed on patient."

16     Q. Did Mr. Shaw give you any statements about

17  his ability to do his job?

18     A. That is correct.  The note indicates,

19  "Patient claims that his actual duty that he can

20  perform does not correspond with the provided

21  job description. (Discussed with the patient)"

22     Q. Now, in this note you made some mention

23  about what information you would use in

24  determining Mr. Shaw's ability to work, is

25  that correct?

1    A. That is correct.

2    Q. What was your statement concerning that

3    issue?

4    A. Could you rephrase the question, please?

5    Q. Sure.  What -- did you rely upon Mr. Shaw's

6    statement or the job analysis form that you

7    received from Cumberland Truck?

8    A. In this particular situation it looks like

9    I relied on the patient's description and

10   physical examination.  The description of the

11   job provided by the employer was also taken into

12   consideration, but since there was obviously a

13   disagreement about information provided by the

14   patient and the employer, I inserted this

15   information in the note.

16   Q. And can you read what you wrote after that

17   parentheses where it says something patient? It

18   begins with final.

19   A. Sure, quote --

20       THE COURT: Excuse me one second.  Could you

21   focus in on that a little bit more, blow it up?

22   Because I can't see it on the screen.

23       THE WITNESS: Yeah, it's --

24       THE COURT: That's it.

25       MR. CROCENZI: Got it?

1          THE WITNESS: Yeah.

2          THE COURT: That's much better.

3          MR. CROCENZI: Thank you.

4          THE WITNESS: "Final evaluation and decision

5     is made based solely on job description.

6     Patient could be employed only with

7     accommodations as specified.  (See physician

8     comments for details.)"

9       Q. And why did you make the decision that the

10    final evaluation and decision is made based

11    solely on the job description?

12      A. The expression job description in this

13    particular situation pertains to what the

14    patient is telling me about the job description

15    provided by the employer.  So in fact it's a

16    combination.

17      Q. Okay, but you say here it's based solely on

18    the job description, correct?

19      A. That's correct.

20      Q. So it's only one thing that you're relying

21    upon?

22      A. From a perspective of time I can't right

23    now say what I mentioned solely job description

24    provided by employer or job description as

25    provided by the patient.

1    THE COURT: So in other words it's one or

2  the other, but you're not sure which.

3    A. That is correct.

4    Q. Doctor, you testified earlier that your

5  Concentra center performs a lot of physical

6  examinations.  How many do you do per year, do

7  you know?

8    A. I'm not able to say how many per year.

9  I can estimate more or less how many per day.

10    Q. Okay.

11    A. Between 8:00 a.m. and 8:00 p.m. we perform

12  probably I would say between fifteen and twenty

13  different type physical examinations, plus other

14  visits, the acute visit, the injuries.

15    Q. And when I mean physical examinations, I

16  mean somebody that comes in off the street like

17  Mr. Shaw sent by the employer and they need some

18  kind of examination, whether it be preemployment

19  or fitness for duty or something like that.

20  Would your answer change based on that

21  definition?

22    A. Fitness for duty, maybe one, maybe two per

23  day.  It's what I would call educated guess.

24    Q. How about preemployment physical

25  examinations?

1   A. That's the majority of the physical

2   examination portion.

3   Q. You told us about earlier the fifteen to

4   twenty per day.

5   A. That is correct.

6   Q. Do employers typically provide you with a

7   job description, a written job description when

8   you are asked to perform your preemployment

9   physical or fitness for duty physical?

10   A. It varies.

11   Q. Can you give us a percentage of employers

12   that provide that kind of information to you?

13   A. I would say most employers do not provide

14   detailed written descriptions of the job.

15   Q. Did you contact Cumberland Truck Equipment

16   Company to get any clarification on this job

17   analysis they gave you considering Mr. Shaw told

18   you that he didn't think it was accurate?

19   A. There is information that the attempt was

20   made.

21   Q. Is there anything in your record that

22   indicates that you are received any

23   clarification?   Not that an attempt was made,

24   but that you actually received clarification

25   about the job analysis form.

1    **A.** Negative.

2    **Q.** Doctor, did you have a job analysis form

3    from Cumberland Truck when you examined Mr. Shaw

4    on 4-5-07?

5    **A.** That is correct.

6    **Q.** I'll show you what has been marked as P-13.

7    Is that the job analysis form that you completed

8    on 4-5-07?

9    **A.** That is correct.

10       MR. CROCENZI: Thank you.  Your Honor, I

11   move for the admission of P-13 and ask it that

12   be published to the jury.

13       THE COURT: Any objection?

14       MS. SALTZ: No objection.

15       THE COURT: It is admitted and it may be

16   published.

17       (Brief pause.)

18       BY MR. CROCENZI:

19   **Q.** Looking at the first category, lifting,

20   doctor, can you tell us what you wrote in that

21   category?

22   **A.** The information is "No problem."

23   **Q.** And can you read what you have under the

24   carrying category?

25   **A.** "May create problem."

1    Q. Again this is -- is this the same form that

2    the physician's assistant completed back on

3    2-24-07?  2-26, sorry, of `07.  If you want to

4    look at them, take your time.

5    A. The form is a form that's the same, the

6    issues, whether the information inputted by the

7    employer is the same.

8    Q. That's what I was getting at.  The same

9    information from the --

10   A. Those two paragraphs?  It's the same,

11   that's correct.

12   Q. Okay.  So there's still no detail regarding

13   the job requirements that we went over with that

14   2-26 job analysis, right?

15   A. That is correct.

16   Q. Can you read what you wrote under the

17   standing category?

18   A. "Able to stand in one place for five

19   seconds."

20   Q. Is that something Mr. Shaw told you during

21   that examination?

22   A. Taking under consideration the comments in

23   the end of this determination I would say yes.

24   Q. And do you know what did Mr. Shaw explain

25   to you what happened after five seconds of

1  standing?  What did he have to do?

2     A. There is no information on the form

3  regarding that.

4     Q. And under bending, can you read that for

5  the jury?  Your comment, sorry.

6     A. "Can constitute problem long-term."

7     Q. Again there's no information from

8  Cumberland Truck on this form about how far

9  Mr. Shaw would have to bend?

10    A. That is correct.

11    Q. And climbing, can you read that for us,

12  please?

13    A. "Can perform with difficulty."

14    Q. Again for climbing we don't have any

15  information, you don't have any information from

16  Cumberland Truck about how much he would have to

17  climb?

18    A. That is correct.

19    Q. The same with the squatting, no information

20  about how far he would have to squat to do his

21  job?

22    A. Correct.

23    Q. Do you know if Mr. Shaw had any devices

24  available to him at Cumberland Truck to assist

25  in his job duties?

1    A. Negative.

2    Q. This is the last page of the job analysis.

3    Again is that your handwriting?

4    A. That is correct.

5    Q. This seems fairly easy to read, but just

6    so there's no confusion can you read your

7    handwriting in that block where it has --

8    A. There's --

9    Q. Sure.

10   A. "Patient may continue employment with

11   following accommodation:  1) unable to carry up

12   to 150 pounds occasionally; 2) unable to carry

13   up to 75 pounds frequently; 3) unable to stand

14   in one place longer than five seconds; 4) unable

15   to bend frequently; 5) unable to squat at all;

16   6) may have difficulty climbing.  Discussed with

17   patient (he is in agreement).  Left message for

18   Brenda Hoffman," my signature.

19   Q. And did you have Mr. Shaw sign this form

20   indicating that he agreed with everything you

21   said in this section you read for us?

22   A. That's not required.

23   Q. But did you do it?

24   A. No.

25   Q. You indicated that you left a message for

1  Brenda Hoffman.  Do you know if you actually

2  spoke with her at some point about this

3  examination?

4     A. There's no record of that.

5     Q. Is there any record in your notes that you

6  have with you today that you discussed this

7  information that you read for us with Brenda

8  Hoffman or anybody at Cumberland Truck?

9     A. The records from that particular visit

10  indicate just that the attempt to contact Brenda

11  Hoffman was made.

12     Q. Doctor, did you have Mr. Shaw go through

13  the functional capacity evaluation that was

14  available at Concentra on 4-5-07?

15     A. No.  Those evaluations are not available

16  on a walk-in basis.  It's also important

17  information.

18     Q. Did you ask Cumberland Truck whether you

19  could have Mr. Shaw undergo a functional

20  capacity evaluation at Concentra?

21     A. Negative.

22     Q. And while we're talking about functional

23  capacity evaluations, can you describe for the

24  jury what exactly is a functional capacity as

25  basically what you had on the premises to do it?

1    **A.** The functional capacity evaluation is the

2    examination done only by specially qualified

3    physical therapists.  The tools for this

4    examination are present in most of the centers.

5    The physical therapists who are doing this are

6    not.  It's a set of physical exercises

7    simulating work environment, pushing, pulling,

8    carrying, lifting, and so on.  It's a very

9    detailed elaborate and time consuming test that

10   requires first the, usually you visit to the

11   work site by that particular physical therapist

12   to determine what are truly the job

13   responsibilities and difficulties facing that

14   particular patient.

15   **Q.** You said it's a long test.  How long does

16   it take?

17   **A.** It varies, but usually it's about one hour,

18   one hour plus, and that's my truly educated

19   guess.  I don't do it.  I don't supervise it.

20       THE COURT: Mr. Crocenzi, do you have much

21   more?

22       MR. CROCENZI: No, I have the last exam, the

23   9-17.  I can finish up with that.

24       THE COURT: All right.  Very good.

25       BY MR. CROCENZI:

1    Q. When was the next time that Mr. Shaw came

2  to Concentra?

3    A. The next visit was 9-17-07.

4    Q. Did you perform that physical examination

5  on that date?

6    A. That is correct.

7    Q. Do you have the note in front of you from

8  that examination?

9    A. Correct.

10   Q. I'm showing you the notation from 9-17-07.

11  Does that match your record that you have with

12  you today?

13   A. Correct.

14     MR. CROCENZI: Again, Your Honor, this I

15  believe is a defendant's exhibit, a 9-17-07

16  office note, I would like to move for its

17  admission and publish it to the jury while we

18  have Dr. Walker present.

19     THE COURT: This is also part of Plaintiff's

20  Exhibit 14?

21     MS. SALTZ: What exhibit?

22     (Brief pause.)

23     MS. SALTZ: I noted I have it also, this

24  part of the September analysis I discovered out

25  of Dr. Walker records which is not included as

1    part of my Exhibit D-22, but I would like it to

2    be.

3         MR. CROCENZI: I have no objection.

4         THE COURT: All right.  It is admitted and

5    it may be published to the jury, but let's have

6    it marked as Plaintiff's Exhibit 19 as it is

7    only a portion of a defendant's, or has not been

8    previously marked and it's not part of the

9    defendant's exhibits.

10        MR. CROCENZI: Thank you.

11        BY MR. CROCENZI:

12    Q. Can you read your medical history portion,

13    doctor?

14    A. Quote, "Third return to work evaluation.

15    No change in the history since 4-5-07.  See

16    prior description.  Patient scheduled by ortho

17    for Synvisc injection.  No change in symptoms."

18    Q. Any change in his complaints?

19    A. "Same as 4-5-07."

20    Q. Any change in your findings?

21    A. "No change since 4-5-07.  Employment

22    possible only with accommodations."

23    Q. And again did Cumberland Truck give you

24    that job analysis form for you to look at on --

25    A. Correct.

1    Q. -- September 17th?

2    A. Correct.

3    Q. Okay.  Did you complete that form again?

4    A. Correct.

5    Q. And this is P-14, I'll show it to you, is

6    that the form that you completed on 9-17?

7    A. That is correct.

8        MR. CROCENZI: I'll move for the admission

9    of P-14.

10       THE COURT: Any objection?

11       MS. SALTZ: No objection.

12       THE COURT: It is admitted.

13       MR. CROCENZI: May I publish it for the

14   jury, Your Honor?

15       THE COURT: You may.

16       BY MR. CROCENZI:

17   Q. Looking at the lifting category, what did

18   you write there, doctor?

19   A. "Lifting, yes (per patient)."

20   Q. What did you mean by yes?

21   A. In the sense he is able to perform the

22   lifting.

23   Q. And under carrying what did you write?

24   A. "Not for long."

25   Q. And is that something Mr. Shaw told you?

1      **A.** I have to assume that this is the result of

2    the discussion between me and Mr. Shaw and the

3    patient and my physical examination.

4      **Q.** And again is there any detail that

5    Cumberland Truck provided to you about how far

6    Mr. Shaw would have to carry things?

7      **A.** Negative.

8      **Q.** Under standing, what did you write there?

9      **A.** "Only about five minutes."

10     **Q.** Again is that something Mr. Shaw told you

11    at that appointment?

12     **A.** There is no information about it.  I can

13    only stipulate that this is a combination of,

14    yeah, what Mr. Shaw told me, and the results of

15    my examination.

16     **Q.** And walking, what did you write there?

17     **A.** "Not able to perform frequently."

18     **Q.** And under climbing what did you write?

19     **A.** "Not able."

20     **Q.** And again did you receive any information

21    from Cumberland Truck about how much Mr. Shaw

22    would have to climb, how many stairs, how often?

23     **A.** Negative.

24     **Q.** And the last page, is that your signature?

25     **A.** That is correct.

1    Q. And you say what under that in that block

2    above your signature?

3    A. "Not able to perform all required duties."

4    Q. Is there a reason why you didn't note any

5    accommodations on this form?

6    A. There's no information about it.

7    Q. What does that mean, doctor?  You don't

8    know?

9    A. I don't know.

10   Q. Okay.  Again did you talk to anybody at

11   Cumberland Truck after the 9-17-07 examination?

12   A. On the page second there is the notation,

13   "Discussed with Brenda Hoffman."

14   Q. Do you recall whether you and Ms. Hoffman

15   discussed any kind of accommodations for

16   Mr. Shaw on that day?

17   A. There is no documentation of any type of

18   this type.

19   Q. Do you have any memory as you sit here

20   today that you discussed accommodations with

21   Ms. Hoffman?

22   A. Negative.

23   Q. Do you have -- do you know whether you

24   discussed the fact that Mr. Shaw was claiming

25   that the job description that Cumberland Truck

1    provided was different than what he was doing on

2    the job?  Did you discuss that with Brenda

3    Hoffman?

4      A. There is no information of this type in the

5    records.

6      Q. Have you ever toured Warehouse B at

7    Cumberland Truck's premises in Carlisle?

8      A. I can't say that I have a recollection.

9    I tour a lot of warehouses, work places, but I

10   can't say that I toured that particular one.

11     Q. Have you ever seen Mr. Shaw, who is sitting

12   here today, performing his job at Cumberland

13   Truck?

14     A. Negative.

15     Q. Did you do a functional capacity evaluation

16   of Mr. Shaw on 9-17-07?

17     A. Negative.

18     Q. Was 9-17-07 the last time Mr. Shaw was at

19   Concentra for any purpose?

20     A. The record to my disposition indicated this

21   is the last encounter.

22     Q. You mentioned that you toured a lot of

23   warehouses.  Do you know how many you toured?

24     A. I would say annually we visit maybe four,

25   five large employment and small employment

1    sites.

2       Q. And would those include warehouse

3    positions?

4       A. That is correct.

5       Q. Have you reviewed job descriptions for

6    warehouse positions during your employment at

7    Concentra?

8       A. That is correct.

9       Q. Do you have any information about how many

10   warehouse jobs in general are in central

11   Pennsylvania, Cumberland County, where you're

12   located?

13      A. How many warehouse jobs are there?

14      Q. Right.  Are they plentiful?  Few?  What's

15   your experience?

16      A. In central Pennsylvania I would say not

17   that many compared with what we hear about other

18   states and other metropolitan areas.

19      Q. Well, in terms of the job descriptions and

20   site visits you have done what percentage are

21   warehouse type jobs?

22         MS. SALTZ: Objection, Your Honor.  There's

23   no foundation that this witness has that

24   information or where it comes from.

25         THE COURT: Sustained.  Plus we're getting a

1    little far afield here.

2        MR. CROCENZI: And I will quit for now.

3    Thanks, Your Honor.

4        THE COURT: All right.  Cross examine?  Or

5    examine?

6        CROSS EXAMINATION BY MS. SALTZ:

7    Q. Thank you, Your Honor.  Dr. Walker, the

8    physical, when you're doing a fit for duty

9    examination, that examination is based on your

10   medical examination of the patient, what the

11   patient tells you, and then based on what the

12   physical requirements of the job are?

13   A. What the patient tells me, plus my physical

14   examination, plus what the job description gives

15   me as the information.

16   Q. So when you're looking at a specific

17   physical requirement for a particular job, those

18   requirements then are based on what that

19   condition that the patient may or may not have.

20   Like let's say for instance Mr. Shaw, Mr. Shaw

21   has problems with his left knee.  So based on

22   your evaluation of him as to his left knee you

23   would then look at the physical requirements to

24   determine if he would be able to perform certain

25   duties?

1    **A.** That is correct.

2    **Q.** Okay.  So we're not looking at these

3    physical requirements in a vacuum.  We're not

4    just looking at them separately and saying can

5    someone do this or not.  It has to be based on a

6    medical condition.

7    **A.** That is correct.

8    **Q.** Okay.

9        MR. CROCENZI: I'm going to place an

10   objection if we're going to continue with the

11   leading questions, Your Honor.  We can have a

12   side bar discussion on that if you wish because

13   I think that's where it's going to continue to

14   go and I don't want to be continuing to object

15   every time to a question.

16       THE COURT: I gave you some leeway as well.

17   I'm going to give Ms. Saltz some leeway in order

18   to expedite this.  To the extent that it gets to

19   an issue that bears directly on liability or

20   damages we'll hear from you I'm sure,

21   Mr. Crocenzi.

22       MR. CROCENZI: Okay.  Thank you, Your Honor,

23   I appreciate it.

24       BY MS. SALTZ:

25   **Q.** Thank you, Your Honor.  Now, when you

1    perform a fit for duty examination, or a

2    physical assistant, what is it, the PA?  AP,

3    your practitioner?

4      A. A PA, physician assistant.

5      Q. A physician assistant, I got a little

6    tongue tied there.  When you, when that's

7    performed do you begin with the medical

8    evaluation first?  Well, tell me, how does it

9    work? I come in for a fit for duty exam, I bring

10   my form.  What do you do?

11     A. First is the history taking, i.e.

12   discussion.

13     Q. Okay.  Followed by?

14     A. Physical examination.

15     Q. Followed by?

16     A. The decision making.

17     Q. Completing the form?

18     A. That is correct.

19     Q. Now, is this form completed when the

20   patient is still there, the physical

21   requirements form?

22     A. The history.  The documentation in a sense,

23   filling out of the paperwork may be completed

24   when the patient is still on premises or maybe

25   completed later.

1    Q. Okay.  Now, I would like -- when you

2    testified that you could, on one of the

3    examinations you did not reach Ms. Hoffman, do

4    you usually leave a voice mail message?

5    A. Oh, yes.  I mean, most of the time yes.

6    Q. So it's a very detailed message?

7    A. It varies from case to case.

8    Q. Doctor, I'd like to take you through these

9    examinations, and I'll try to move very quickly

10   through them.  Would you look at the September,

11   I'm sorry, the February 26th examination?  This

12   is my first time working ELMO, so I'm going to

13   see how I do with this.  Oh, yes, it's

14   Plaintiff's Exhibit 9 and it's Defendant's

15   Exhibit 4.  All right, so in this instance with

16   Mr. Shaw, and I should begin with the medical

17   evaluation, if you could turn to the section

18   that deals with examination?

19   A. Correct.

20   Q. That's page 4, let's start there, and based

21   on this examination without reading it line by

22   line could you just summarize for the jury what

23   was the medical history, present complaint, and

24   the findings?

25   A. In the sense the note indicates, "Patient

1   here for evaluation of performance of work

2   duties, works 8 hours, 8-hour shifts, forklift

3   operator."  Then there is a medical history.  Do

4   you want me to --

5     Q. Just summarize without reading it verbatim.

6   You can just summarize it for us.

7     A. Short summary, there's a history of the

8   problem with the knee, and it was treated by an

9   orthopaedic specialist.  There are medications

10  listed that basically just of that, and there is

11  pain in the left knee.  That's the short version

12  of this.

13    Q. Could you tell me what were the current

14  medications at that time?

15    A. Lasix, Lisinoparil, Wellbutrin, Lipitor,

16  Gabapentin, and Lodine.

17    Q. Are any of the medications that you just

18  mentioned painkillers or pain medicine?

19    A. Lodine.

20    Q. Lodine?

21    A. And Gabapentin is used for chronic pain

22  management, too.

23    Q. Okay.  With regard to these medications is

24  there, are they like with any other painkillers

25  that you're not supposed to be operating

1   machinery or driving under the influence?  Do

2   they have that there?

3   **A.** I can't answer clearly yes or no because

4   any medication can cause side effects like

5   drowsiness that would create a problem for a

6   worker to operate "dangerous machinery".  That

7   particular case if there was any side effect of

8   that particular nature reported, despite the

9   fact that it's not reported in the literature,

10  if the patient is dizzy or drowsy on that

11  particular medication, yes, that might be a

12  contraindication.

13  **Q.** Now, with regard to the present complaints,

14  at that time there was complaint of pain in the

15  left knee and swelling of the both lower legs,

16  is that correct?

17  **A.** Yes, there was some, yes.  That is correct.

18  **Q.** And what were the findings on examination,

19  doctor?  Again just summarize them.

20  **A.** Yes, to summarize, limitation of range of

21  motion of the left knee, edema, swelling on both

22  lower extremities.  That's the core of them.

23  **Q.** Okay.  Now, having identified the medical

24  condition, and you signed off on this.  You have

25  reviewed it at one point in time?

1    **A.** That is correct.

2    **Q.** Okay.  Now, having performed the medical

3    examination can we now go to the physical

4    requirements of the job based on the medical

5    condition?

6    **A.** Could you please repeat the question?

7    **Q.** Sure.  You've done the medical exam.  Now

8    you have to complete the physical requirements,

9    whether this employee could do specific things.

10   **A.** Correct.

11   **Q.** And that's based on the medical, based on

12   your observation or the physician assistant's

13   observation and what the patient tells you?

14   **A.** Correct.

15   **Q.** Okay.  Now, we can go through the physical

16   requirements as noted here.  So as far as

17   lifting goes, Mr. Shaw was not able to perform

18   that, correct?

19   **A.** Correct.

20   **Q.** And that's not because he didn't have the

21   upper body capacity to lift, but it's because

22   the condition involved his legs and knees, is

23   that correct, doctor?

24        MR. CROCENZI: Objection, Your Honor.

25   Leading.  We're getting into that liability

1    issue.

2         MS. SALTZ: I'll withdraw it, I'll ask an

3    open direct question.

4         THE COURT: Very well.  Objection is

5    sustained.

6         BY MS. SALTZ:

7     Q. Doctor, with regard to lifting, why was

8    Mr. Shaw found based on the medical examination

9    observation unable to lift?

10        MR. CROCENZI: Again objection.  I'm going

11   to object at this point because Dr. Walker has

12   said he didn't do the physical examination, and

13   I'm not sure --

14        THE COURT: Well, the objection then is to

15   the foundation of the question.

16        MR. CROCENZI: To the foundation, because my

17   recollection -- well, first of all I'm clear

18   that Dr. Walker testified he didn't do the

19   physical examination and I believe he testified

20   that he wasn't sure whether he actually

21   discussed the physical examination with the

22   physician assistant.

23        THE COURT: All right.  The objection is

24   sustained.  If you want to lay a foundation we

25   could go a little further with this.

1      MS. SALTZ: I will, Your Honor.  Thank you.

2      BY MS. SALTZ:

3    Q. Doctor, if you turn to the third page of

4    that physical job analysis, your signature

5    appears on that page?

6    A. That is correct.

7    Q. And what is the purpose of your signature

8    appearing there since you did not perform this

9    examination?

10   A. In most of the cases in a situation like

11   this, in a situation where my signature is not

12   required the presence of my signature suggests,

13   indicates a reminder that this case was

14   presented to me by a physician assistant.

15   Q. And when you say presented to you by the

16   physician assistant, could you explain what is

17   meant by that, what happens when a physician

18   assistant comes to you and presents a case?

19   A. He tells me the history, findings, he tells

20   me what were the physical examination findings

21   and what was his or her decision regarding the

22   performance of the duties.

23   Q. And then you sign off on that or if you

24   disagree would he change it?

25   A. If I would disagree, if I would disagree I

1   would most likely -- it depends.  It depends

2   from situation to situation.  I would either

3   send the physician assistant to gather

4   additional information if this would be a

5   significant discrepancy or I would do the

6   examination myself.

7     Q. So the fact that you signed the February

8   26th, 2007 evaluation, is that an indication

9   that you not only discussed the case with the

10   physician assistant but concurred in the

11   findings?

12     MR. CROCENZI: Objection, leading.  He

13   already testified --

14     THE COURT: One second.

15     (Brief pause.)

16     THE COURT: Overruled.  You may answer.

17    A. As I indicated before I have not performed

18   this physical examination.

19    Q. But did you concur in the findings of this

20   examination?  Did you agree with the physician

21   assistant?

22    A. I accepted the findings.  I can't concur

23   with the physical findings since I have not seen

24   the patient.

25    Q. Fair enough.  Let me ask you this question.

1    Based on the medical examination as performed

2    and as you testified to why would the physician

3    assistant find that Mr. Shaw was unable to lift?

4         MR. CROCENZI: Objection, Your Honor.  He's

5    testified he can't answer those questions

6    because he wasn't, he can't concur with the

7    physician assistant's physical findings.

8    Q. I'll withdraw the question, Your Honor,

9    I'll try to get -- someone with a condition as

10   appearing on February 26th, 2007 as Mr. Shaw

11   did, pain in the left knee with the swelling in

12   both legs, again not physical, I'm not talking

13   about upper body ability, I'm talking about

14   below the waist, we talked about a left knee

15   problem and we talked about with leg swelling,

16   would somebody be able to lift 150 pounds

17   occasionaly if they -- strike that.  Let me go

18   back over some of the other information.  Based

19   on this evaluation, we have an individual here

20   who is unable to squat and has a very difficult

21   time bending, would they be able to lift 150

22   pounds?

23        MR. CROCENZI: Objection.  Is this a

24   hypothetical, because --

25        MS. SALTZ: This is a hypothetical.

1     MR. CROCENZI: Because, Your Honor, again

2     the doctor has already testified he cannot

3     concur with the physical examination findings of

4     the physician assistant, so I'm going to object

5     because she can't get the testimony she wants

6     because of Dr. Walker's testimony.

7         MS. SALTZ: Could we have a side bar if

8     we're going to have a lengthy discussion?

9         THE COURT: Well, all right.  Yeah, it's a

10    bit of a speaking objection, but I understand

11    what Mr. Crocenzi is saying.  The objection

12    really I would think goes more to relevance

13    because the question isn't would any individual

14    with these conditions be able to lift 150

15    pounds, it's really whether Mr. Shaw could.

16        MS. SALTZ: And that's what I'm trying to

17    get to, Your Honor, is the fact that based on

18    Mr. Shaw's medical condition as found in the

19    examination that these questions can then be

20    answered.

21        THE COURT: Well, I think what Mr. Crocenzi

22    is objecting to is whether the doctor can in

23    fact make that evaluation based upon what is

24    contained in the record, but first let's find

25    out if he can make that evaluation and then

1   secondly, if he can, what that assessment is.

2   Do you understand, doctor?  Are you able to

3   respond to counsel's questions based solely upon

4   what you read in the record because you did not

5   perform the physical examination?

6       THE WITNESS: The answer would be over here

7   I can't answer in detail because I have not

8   performed this examination.

9       THE COURT: All right.

10      MS. SALTZ: But yet, doctor, you agree that

11  by signing off that he was unable to perform the

12  duties of squatting, climbing, and lifting?

13      MR. CROCENZI: Objection.  I thought we just

14  went through this.

15      THE COURT: Sustained.

16      BY MS. SALTZ:

17   Q. One last question, doctor, just to clarify

18  for myself.  This was the information that was

19  provided to the company based on Concentra's

20  examination of this individual for that February

21  26th exam?

22   A. I'm sorry, was the question whether this

23  was the information was provided the company?

24   Q. Yes.

25   A. Yes.

1    Q. Doctor, what's an -- why would you use an

2    FCE?  When would you use an FCE?

3        THE COURT: By that you mean functional

4    capacity --

5    Q. Functional capacity evaluation.  Under what

6    circumstances?

7    A. The FCE is usually requested either by

8    attorneys or insurance companies for

9    determination of -- the name of the test is

10   saying fitness for duty.  Whether the patient

11   truly can or cannot perform certain activities.

12   Q. So it's not something usually requested by

13   an employer?

14   A. To my understanding in the state of

15   Pennsylvania an employee cannot request it.

16   Q. But I'm asking you based on what goes on at

17   Concentra is it something you find often

18   requested by employers?

19   A. It's requested usually by insurance

20   companies to my knowledge, but again I don't

21   take those requests, so I can't give you the

22   hundred percent accurate answer to this

23   question.

24   Q. All right.  Let's look at what has been,

25   let's look at your April, the exam that you

1    actually did perform in this case, the April

2    5th, 2007.  Are you with me?

3      A. Yes, correct.

4      Q. And that is Defendant's Exhibit 14.  Now,

5    doctor, you read the examination portion of, I

6    will not belabor that with you, but in this one

7    you had, Mr. Shaw disagreed with some of the job

8    descriptions or some of the physical

9    requirements of his job as you testified?

10     A. That is correct.

11     Q. So you did take, did you take -- I believe

12   you testified you took into account what

13   Mr. Shaw told you, what the physical

14   requirements of the job were, your own

15   observations, and your own examination, correct?

16     A. Correct.

17     Q. Thank you, and based on all of that you

18   determined that looking at the third page that

19   Mr. Shaw could continue in his employment with

20   the following accommodations, and those

21   accommodations were that as long as he did not

22   have to carry up to 150 pounds occasionally, he

23   didn't have to carry up to 75 pounds frequently,

24   didn't have to stand in one place longer than

25   five seconds, didn't have to bend frequently,

```
 1    and he didn't have to squat at all, and then he

 2    may have difficulty climbing, then he could do

 3    his job?

 4      A. That is correct.

 5      Q. And that's what Mr. Shaw, you went over

 6    this with Mr. Shaw because obviously he had to

 7    agree with you or disagree?

 8      A. That is correct.

 9        MS. SALTZ: I move for the admission of

10    D-14, Your Honor.

11        THE COURT: I think it is admitted, but if

12    it's not is there any objection?

13        MR. CROCENZI: No.  No objection.

14        MS. SALTZ: As a housekeeping matter I don't

15    know if D-4, whether that's Plaintiff's 9.

16        THE COURT: First D-14 is admitted, and

17    then with respect to Defendant's 4, my

18    understanding was that P-9 was in fact admitted.

19    Ms. McKinney, is P-9 admitted?

20        COURTROOM DEPUTY: P-9 is admitted, Your

21    Honor.

22        THE COURT: And that is not identical to --

23        MS. SALTZ: D-4.

24        THE COURT: -- D-4.  D-4 contains some

25    additional information.
```

1          MS. SALTZ: Correct, Your Honor.  I would

2     move --

3          THE COURT: And I don't know that we have

4     addressed the last two pages.  We have addressed

5     the next to last page, but we have not addressed

6     the last page I don't believe of D-4, am I

7     correct?

8          MR. CROCENZI: That's right, Your Honor.

9     I asked Dr. Walker, but I did not move for the

10    admission of that particular page.

11         THE COURT: All right.  Any objection to the

12    admission of D-4?

13         MR. CROCENZI: No.

14         THE COURT: It is admitted.

15         MS. SALTZ: Thank you, Your Honor.

16         BY MS. SALTZ:

17    Q. All right, Dr. Walker, I won't keep you

18    much longer.  Let's take a look at the September

19    17th --

20    A. Okay.

21    Q. Are you there?  Okay.  And this is an exam

22    that you performed yourself independently?

23    A. Correct.

24    Q. And based on that exam and discussions I

25    take it with Mr. Shaw again during that exam --

1    A. Correct.

2    Q. -- you determined that as of September

3    17th, 2007 that Mr. Shaw was not able to perform

4    all required duties, is that correct?

5    A. Correct.

6    Q. And the required duties that he was not

7    able to perform at that time consisted of only

8    able to stand for five minutes, not able to walk

9    frequently, not able to squat at all, not able

10    to climb at all, and at this point only

11    occasionally operate a forklift, is that

12    correct?  Looking at the second page, look at

13    your --

14    A. Okay.  Okay.

15    Q. Look at the second page.

16    A. Could you repeat the question?

17    Q. Sure.  You determined that he is not able

18    to perform all the required duties, correct?

19    A. Correct.

20    Q. And those required duties appear on the

21    second page?

22    A. Correct.

23    Q. And the ones that I've just gone through?

24    A. That's correct.

25       MS. SALTZ: I have no further questions,

```
 1    Your Honor.  Oh, and I move for the admission of
 2    D-22 if that hasn't been admitted.
 3        THE COURT: I recognize there may be some
 4    overlap here.  Any objection to D-22.
 5        MR. CROCENZI: That's the 9-17-07?  No.
 6        THE COURT: D-22 is admitted.
 7        REDIRECT BY MR. CROCENZI:
 8     Q. Just a couple of follow-up questions.
 9    Dr. Walker, do you also do preemployment
10    physical examinations for employees at
11    Cumberland Truck?  You meaning Concentra, Sorry.
12        MS. SALTZ: Objection, Your Honor, that's
13    outside the scope of my cross.
14        THE COURT: Overruled.
15     A. I can't answer yes and no.  Explanation,
16    I don't have in front of me the detailed
17    information about that particular company.
18    What's happening is it's almost like a
19    smorgasbord.  Some companies are sending their
20    employees to our center only for treatment of
21    acute injury, somebody injured himself and then
22    they are coming over here, I mean to Concentra,
23    but they are not sending to us preemployment
24    physical examination.  They are sending them
25    somewhere else.  Other employers are sending
```

1    preemployment physical examination but they are

2    not sending acute injuries, so I can't tell you

3    right now what's the schedule for that

4    particular company.

5         MR. CROCENZI: No further questions.

6         THE COURT: All right.  I have no questions,

7    doctor.  Thank you very much.  You may step

8    down.  And may the doctor be excused?

9         MR. CROCENZI: Before, I know you'd like to

10   have exhibits admitted before, while the witness

11   is on the stand.  We're moving for the admission

12   of P-8.  That's the flow sheet that Dr. Walker

13   identified.  If I haven't done so already I'll

14   move for it now.

15        THE COURT: All right.  Any objection?

16        MS. SALTZ: No objection.

17        THE COURT: All right.  P-8 is admitted.

18        MR. CROCENZI: Thanks, Your Honor.

19        THE COURT: Thank you very much, doctor.

20   You may be excused.

21        THE WITNESS: Thank you.

22        THE COURT: Ladies and gentlemen, we'll take

23   our morning recess at this time.  Please recall

24   all of my earlier instructions and refrain from

25   any conversations among yourselves about what

1   you have seen and heard so far.  We're in recess

2   until 11:35.  Ms. McKinney, you may escort the

3   jury.

4        (Recess taken from 11:17 to 11:37 a.m.)

5        THE COURT: Please be seated.  Mr. Shaw, I

6   remind you that you're still under oath.

7        THE WITNESS: Yes, sir.

8        THE COURT: And I think we're at cross

9   examination.  So, Ms. Saltz, if you would,

10  please?

11       CROSS EXAMINATION BY MS. SALTZ:

12    Q. Good morning, Mr. Shaw.

13    A. Good morning.

14    Q. And, Mr. Shaw, I would like to focus you

15  right now to the period from the time you were

16  hired in 2000 up to late 2006.  Okay?  Before we

17  get into late 2006, early 2007, okay?

18    A. Yes, ma'am.

19    Q. When you were hired your position was

20  warehouse worker, correct?

21    A. That is correct.

22    Q. And that title never changed?

23    A. Never changed.

24    Q. At any time?

25    A. No, it did not.

1  Q. So the fact that you were testifying

2  yesterday about this leading receiver position

3  or primary receiver, that wasn't an official

4  title?

5  A. No, it was not an official title.

6  Q. That was just part of your job duties?

7  A. Yes, ma'am.

8  Q. And when you interviewed with Mr. Kline and

9  he told you that the warehouse job was hard

10  work, correct?

11  A. Yes.

12  Q. And you would agree that dealing with heavy

13  truck parts was hard work?

14  A. Yes.

15  Q. Now, at some point in time you were even

16  able to lift up to 140 plus pounds of a brake

17  drum and take it from one pallet and toss it

18  onto another?

19  A. Yes.

20  Q. And it took eight hours of standing,

21  walking, climbing, reaching, bending, squatting

22  to do that job?

23  A. Eight hours plus.

24  Q. Eight hours plus.

25  A. Many hours overtime.

1    Q. Well, that's good, too.

2    A. Yes, it was.

3    Q. And you were able to do all of those

4  physical requirements?

5    A. Yes.

6    Q. And I'm going to hand you what has been

7  admitted as Plaintiff's Exhibit 6, and that's

8  the list of the assigned duties?

9    A. Yes, it is.

10    Q. So pulling customer orders, that's pulling

11  them off the shelves?

12    A. Yes.

13    Q. And that can be done, in some instances it

14  has to be done physically, taking the order off

15  the shelf?

16    A. Well, you pull each individual item off the

17  shelf to make up the customer order.

18    Q. And some of those items are on the second

19  floor, which you'd have to go up a staircase ate

20  to get, and some of them are on the first floor?

21    A. Yes.

22    Q. And some of the aisles are very small as

23  compared to some aisles being bigger in the

24  warehouse?

25    A. Not in our warehouse, not in the big

1   warehouse.

2      Q. Now --

3      A. They were, all the aisles were very wide.

4      Q. Okay, so you could use a forklift on the

5   first level in every single aisle?

6      A. No.

7      Q. No?  Okay.  So there were some aisles you

8   couldn't put the forklift through?

9      A. Correct.

10     Q. Okay, and you certainly couldn't use it on

11   the second floor?

12     A. No, you could not.

13     Q. So in order to get stock from the second

14   floor you'd have to go up a set of steps?

15     A. Yes.

16     Q. In fact, I was at the warehouse, there's

17   two sets of steps there.

18     A. Yes.

19     Q. There's a lot of steps.

20     A. 22.

21     Q. You counted them?

22     A. Every day.

23     Q. I probably would have, too.  All right, so

24   that's what's pulling orders means?

25     A. Yes.

1    Q. Load and unload delivery trucks, and I was

2    trying to get a good concept in my mind as to

3    what was meant by loading and unloading.  Now,

4    did you always have to use a forklift to unload

5    a truck?

6    A. No, you didn't.  You could run it on a hand

7    jack, slide it under the skid, jack it up, and

8    pull it off.

9    Q. Okay, and sometimes physically you would

10   have to take the product off the truck and put

11   it on a skid or a pallet?

12   A. Yes, you would.

13   Q. And trucks would come in there on the

14   average about maybe two, three, four times a

15   day?

16   A. Twelve, eighteen, twenty times a day.

17   Q. Every day?

18   A. Some days.  Some days we had as little as

19   four or five.

20   Q. So some days four or five, some days more?

21   A. Yes.

22   Q. And isn't it true, sir, that when the

23   trucks would come in some of the product that

24   would be unloaded from that truck would have to

25   be put up onto the second floor, like air bags?

1    A. Yes.

2    Q. And some of it would be on the first floor?

3    A. Yes.

4    Q. So if you would unload that truck you'd

5    take that product with either a hand truck or a

6    forklift, bring it into the warehouse, and then

7    physically you'd have to lift it up off of there

8    and carry it up the steps?

9    A. No.

10   Q. Well, how did you get it upstairs?

11   A. There was a eight foot wide gate at the

12   edge of the second, at the edge of the second

13   floor.  The mezzanine is what we called it.

14   They would open the gate, we would lift the skid

15   up with the forklift and set it on the second

16   floor.  Then you'd have to take a hand jack and

17   slide under the skid to pull it away from the

18   edge so you could put up another one.

19   Q. Okay, and then how would you get it up on

20   the shelves then?

21   A. Pardon?

22   Q. How would you get it up on the shelves the

23   product?

24   A. Each individually unbox it and put them on

25   the shelf or in the bin.

1    **Q.** And that would be physically you would be

2    doing that?

3    **A.** Yes, you would.

4    **Q.** You wouldn't be using any kind of truck or

5    anything?

6    **A.** You'd be using a hand cart.

7    **Q.** To put them up on the shelf?

8    **A.** No, to transport -- when you unbox it, take

9    them out of the big crates, put it on a hand

10   truck as you're checking it in, and then roll

11   the hand cart to the shelf and then physically

12   put it from the cart to the shelf.

13   **Q.** Okay, and how high would that cart be off

14   the ground?

15   **A.** About three feet.

16   **Q.** So about that much?

17   **A.** Yeah, about that.

18   **Q.** So you'd have to bend down, squat down,

19   bend down, pick it up, and put it on the shelf?

20   **A.** Yes.

21   **Q.** And how high were the shelves  up on that

22   second level?

23   **A.** Shelves were about six foot four maybe.

24   **Q.** Okay, and that would be easy for you then

25   to reach the higher ones?

1    A. It was.

2    Q. Now, would the same thing work on the first

3    level that once the product got in, it was

4    checked in, you would take it over to the shelf

5    where it belonged, and again you'd have to

6    physically put the product up on the shelf?

7    A. Yes.  In the shorter section of the

8    warehouse underneath the mezzanine.

9    Q. So that's where the bending and the

10   squatting comes in, and the lifting?

11   A. Yes.

12   Q. And that product could weigh as little as a

13   pound to as much as two hundred pounds?

14   A. No, stuff was -- upstairs and underneath

15   the mezzanine probably wouldn't weight any more

16   than fifty pounds.

17   Q. Okay.  What about on the first level?

18   A. It wasn't very heavy stuff.

19   Q. So there was no way this was a sit down

20   job.  This was a job you were constantly on the

21   move, going, going, going?

22   A. Yes.

23   Q. Busy warehouse?

24   A. Yes.

25   Q. Now, at that time before 2006 there was

1   nothing you couldn't do, is that correct?

2   **A.** I'm sorry, say again?

3   **Q.** You could do, you climbed stairs, you went

4   up the steps when you needed to, you put stuff

5   on shelves, you bent down to pick stuff off the

6   cart?

7   **A.** Yes.

8   **Q.** No problems?

9   **A.** No problems.

10  **Q.** Now, all warehouse workers, including

11  Mr. Kline as a supervisor, had to do all of

12  these things?

13  **A.** Tim Kline had to do rather less of it.  He

14  did have some office duties and other stuff to

15  do.

16  **Q.** But he still had to pull orders, had to

17  unload trucks?

18  **A.** When we needed him, yes.

19  **Q.** And then accurately checking in stock

20  orders from branch and vendors, how would that

21  be accomplished?

22  **A.** You look at each individual item or each

23  stack of similar items, count them, make sure

24  that the number of items on the skid or in the

25  box is the same number that's on the invoice you

1    have in your hand.

2        Q. So you have the invoice in your hand,

3    that's either on a skid or a pallet or whatever?

4        A. Yes.

5        Q. And then you got to bend down and make sure

6    everything coincides with the skid?

7        A. You don't have to -- you don't have to --

8    you do not have to bend down, stand there and

9    count similar items.  There's four cases here,

10   four cases there, that's sixteen.  Sixteen times

11   four is sixty something, whatever it is, and

12   then each individual, then you go the number of

13   gallons.  You don't have to bend down to look at

14   each individual box.

15       Q. Okay, so fair enough.  But you're not

16   sitting down doing this, you're standing.

17       A. You can sit down or you can stand.  I mean,

18   it's there, you're here, you sit down, you stand

19   up, it doesn't matter.

20       Q. Now, if you look on this description, again

21   I'm going down just this list, all right?  Fill

22   and maintain stock shelves.  What do we mean by

23   fill and maintain stock shelves?

24       A. Many items would come in in loose boxes.

25       Q. Okay.

1    A. Okay?  There's a big coffin box full of

2    exhaust parts, and you, after you checked them

3    in you'd have to take them out of the coffin

4    box, out of the big box and go and put them on

5    the proper shelf in the proper area.

6    Q. That coffin box thing, I don't know, did

7    somebody come up with that name, sir, or is that

8    just we just refer to a box being --

9    A. That's any warehouse, any box big enough

10   for a person to get into is a coffin box.

11   Q. Okay, that's where they'd be all loose and

12   you'd have to take them out of there?

13   A. Yes.

14   Q. You'd have to count them as well?

15   A. Yes, you have to count them.  They would

16   come in in mixed parts, you know?  Half a dozen

17   of these, a dozen of these, ten of these, one of

18   this, and it's all on the invoice and it's all

19   under loose.

20   Q. Okay, when it's loose like that, just out

21   of curiosity did you have to organize them into

22   groupings?

23   A. Yes.

24   Q. And then those grouping would then be put

25   on the shelves?

1    **A.** Yes.

2    **Q.** How did you get them to the shelves?

3    **A.** Again on carts.

4    **Q.** Just like on a flatbed type of cart?

5    **A.** A flatbed type of cart or the three foot

6    high ones, whichever one we had available.

7    **Q.** Deliver parts as required using the company

8    vehicle.  That happened sometimes?

9    **A.** That happened to me one time.

10   **Q.** Operating the forklift.  How many forklifts

11   were there at that time?

12   **A.** Initially there were three forklifts and a

13   standup order picker.  Later on we added a

14   couple of more.  Then we replaced some.  When I

15   left we only had two forklifts and one man-up.

16   That means the entire box, operator's box went

17   up, and then we had a side, side shifting, we

18   had about four, five forklifts and a man-up.  We

19   had more.

20   **Q.** Housekeeping duties.

21   **A.** Keeping broken pieces of skid off the

22   floor.  Keeping the plastic wrap from blowing

23   around in the breeze that we cut off a skid.

24   Sweeping up the excess dirt.

25   **Q.** So you had to go around and pick up stuff

1  off the warehouse floor?

2     **A.** Yes, or as you opened up a skid to make

3  sure all the scrap is away from that and go

4  throw it away.

5     **Q.** So you're walking around, you're bending,

6  picking stuff up, squatting down, whatever,

7  right?

8     **A.** Any action necessary to do the job, yes.

9     **Q.** So it was a really physical job.

10    **A.** Yes, it was.

11    **Q.** Now, you also testified yesterday with

12 regard to a work accident you had early on in

13 your career with CTE.

14    **A.** Yes.

15    **Q.** And you had to go out on a medical leave

16 for that, right.

17    **A.** Yes, I did.

18    **Q.** And you were out for about three months?

19    **A.** Yes.

20    **Q.** And before you could return to work you

21 needed a doctor's release to return to work?

22    **A.** I needed two doctor's releases to get back

23 to work.

24    **Q.** And you got those and brought them back?

25    **A.** Yes.

1    Q. But you weren't full duty when you came

2  back, were you?

3    A. Yes, I was.

4    Q. Well, meaning full-time, but were you

5  doing, I mean you jumped immediately into doing

6  full duty?

7    A. Yes, I did.

8    Q. So you had no light duty then in the

9  beginning, just to ease you --

10    A. Not after the doctors released me.

11    Q. Okay.

12    A. I had light duty earlier in the treatment

13  when the doctors were not treating me with the

14  proper problem that I had.

15    Q. And during that period of time --

16      THE COURT: Excuse me one second.  I'm sorry

17  to interrupt both of you, but, Mr. Shaw, if you

18  would just wait until Ms. Saltz completes her

19  question before you answer, because the court

20  reporter can't take down both of you speaking at

21  the same time.  I know you're anticipating her

22  question, and this happens frequently.  I'm not

23  picking on you.

24      THE WITNESS: Yes, sir.

25      THE COURT: But please pause after she

1    finishes her question and you begin your answer,

2    and obviously, Ms. Saltz, the same.  Thank you.

3         THE WITNESS: Yes, sir, I'll try.

4         BY MS. SALTZ:

5    Q. And during that period of time the company

6    stood behind you, didn't they?

7    A. Yes.

8    Q. And you went out on medical leave, you had

9    to go out on medical leave, right?

10   A. Yes, I did.

11   Q. And there's nothing wrong with going out on

12   that medical leave, was there?

13   A. No.

14   Q. Now, you've had knee pain on and off since

15   about 1986?

16   A. It started in 1986, yes.

17   Q. Now, you never told anybody at the company

18   that you had knee pain.

19   A. Is that a question or a statement?

20   Q. That's a question, that's a statement, you

21   never did, right?

22   A. Yes, I told Tim, my supervisor, my knee

23   hurt occasionally.

24   Q. Okay.  Other than Tim did you ever go to

25   Brenda, tell her that you had knee pain?  Bryan?

1    **A.** It wasn't necessary to tell them that I had

2    knee pain.

3    **Q.** Chuck?  Pat?

4    **A.** It was not necessary to tell them that I

5    had any kind of knee pain.

6    **Q.** Okay, and you also never asked any of them

7    for any kinds of accommodations, right?

8        MR. CROCENZI: Objection, Your Honor, as to

9    time frame.  Is this when the worker's comp

10   injury happened early on or is this throughout

11   his employment?

12       MS. SALTZ: We're moving through gradual

13   employment, Your Honor.

14       THE COURT: All right.  Would you rephrase?

15       MS. SALTZ: Excuse me?

16       THE COURT: Would you rephrase?  Please

17   rephrase your question.

18       BY MS. SALTZ:

19   **Q.** During -- put aside the work, we're done

20   with the work injury.

21   **A.** Okay.

22   **Q.** We're moving forward now, after 2000,

23   you're working your job.

24   **A.** Yes, ma'am.

25   **Q.** And during that period of time you never

1    said anything other than to Tim about any kind

2    of knee pain and you never said anything about

3    any kind of accommodations, right?

4      **A.** No, ma'am, I did not.

5      **Q.** You also had back problems, didn't you?

6      **A.** Occasionally, yes.

7      **Q.** You never told anybody at CTE about that?

8      **A.** There was no need.

9      **Q.** Now, before your exam with Concentra on

10   February 26th, 2007 you don't know if anybody at

11   that company considered you disabled or not,

12   right?

13     **A.** No, I did not.

14     **Q.** And before that exam on February 26th, 2007

15   you never believed or felt that anybody

16   discriminated against you?

17     **A.** No.

18     **Q.** Meaning no, you never felt that?

19     **A.** No, I never felt that, correct.

20     **Q.** In 2006 is when your knee pain started

21   getting worse, correct?

22     **A.** Yes.

23     **Q.** And that's when you started using a cane?

24     **A.** I used a cane occasionally, yes.

25     **Q.** Now, I'm going to focus you 2006, about the

1    fall of 2006 going forward.

2      **A.** Okay.

3      **Q.** Okay?  So we're both on the same, in the

4    same place.  And you were also testified

5    yesterday that at times you had to take

6    antiinflammatory medication?

7      **A.** On a daily basis, yes.

8      **Q.** What did you take?

9      **A.** One of those, Lodine I believe was the

10   antiinflammatory medication I was on at the

11   time.

12     **Q.** And you testified yesterday also that you

13   were taking at times pain medication?

14     **A.** Well, Lodine is an antiinflammatory/pain

15   medication.

16     **Q.** So that's the medication you would take

17   when you were working?

18     **A.** Yes.

19     **Q.** At that point you started slowing down a

20   bit?

21     **A.** Yes.

22     **Q.** Knee pain was getting worse?

23     **A.** Occasionally, yes.

24     **Q.** And in fact it was getting to the point

25   where you saw an orthopaedic surgeon in October

1   of 2006, right?

2       A. Yes.

3       Q. And that's Dr. Oplinger?

4       A. Dr. Oplinger, yes.

5       Q. And you were getting shots in your knees at

6   that point?

7       A. I got a shot of cortisone in my knee in

8   October.

9       Q. And Dr. Oplinger was talking to you at that

10  time, even at that time about needing a knee

11  replacement?

12      A. He went over the possibility, yes.

13      Q. And it was a bilateral knee replacement?

14  Both knees?

15      A. Not initially, no, I had no complaints in

16  my right knee.

17      Q. And the reason that you used the walking

18  stick was to give you some balance because of

19  the back problems you were having and the knee

20  problems, correct?

21      A. Yes.

22      Q. And in fact at times it was very, extremely

23  painful bending that left knee, wasn't it?

24      A. Eventually, yes, extremely.

25      Q. Plus it was getting more difficult to climb

1  stairs at that point?

2    A. A little bit slower, yes.

3    Q. And you were starting to need to sit down

4  and rest more?

5    A. No.  I took authorized breaks that were

6  given to us by, you know, the warehouse.

7    Q. Okay, and now with prolonged activity your

8  knee pain would increase, your back pain would

9  increase?

10    A. No, with prolonged activity my knee pain

11  lessened and the back pain lessened.  It was in

12  the mornings after laying up all night that my

13  knee was stiff and my back hurt.

14    Q. Now, isn't it true, Mr. Shaw, that that

15  knee pain was constant?

16    A. No, it is not true at that time.

17    Q. At what time, sir?

18    A. The time we're talking about.

19    Q. 2006/2007?

20    A. Yes, it was not constant.

21    Q. When did it become constant?

22    A. Late 2007, early 2008.

23    Q. So it was getting progressively worse,

24  whatever the condition was it was getting

25  progressively worse?

1 **A.** Yes.

2 **Q.** You testified yesterday that by the

3 afternoon from walking on the concrete you

4 needed that knee support of that cane or that

5 walking stick?

6 **A.** Occasionally near the end of the shift is

7 what I said.

8 **Q.** And that's an eight hour shift, right?

9 **A.** Yes, it is.

10 **Q.** Now, during that time of 2006, late 2006

11 into 2007 you still were responsible for doing

12 all the duties of that warehouse job, weren't

13 you?

14 **A.** Yes, I was.

15 **Q.** And it was your choice to begin operating

16 that forklift more?

17 **A.** It was not my choice.  It just happened, it

18 evolved that way.

19 **Q.** Well, you say it evolved that way, but if

20 all the warehouse workers, including Mr. Kline,

21 having to do all those duties, forklift is an

22 easy job, isn't it?

23 **A.** Well, yes, it is.

24 **Q.** Yeah.  So if I'm a warehouse worker maybe I

25 want to sit on the forklift 50 percent of the

1   time.  What made you decide that you could do

2   that?

3     A. I did not decide it.  See, item number 3 on

4   the assigned duties here, accurately checking

5   stock, order from branches and vendors, very few

6   people liked to check stuff in and put it away,

7   because some of the guys couldn't really count

8   too good and they didn't like the responsibility

9   of signing their name to the check-in form.  I

10  could count and I liked to put stuff away so it

11  was properly organized.  So it became my

12  responsibility.  If I was off for one day and I

13  came back the next there would be orders sitting

14  around from the afternoon before that came in

15  that hadn't been checked in because I wasn't

16  there.

17    Q. Okay.  2006, 2007, how many workers were in

18  that warehouse with you?

19    A. Day shift we had six, six of us that pulled

20  for vendors and stuff.

21    Q. Only six workers, you making seven?

22    A. No, six that had the responsibility of as

23  warehouse worker.  Then we had a manager mostly

24  did, who was also a warehouse worker that did

25  brake shoes, and then we had a man who did cores

1    who was also a warehouse worker, but that was

2    his specialty.

3       Q. Okay.  So there was -- how many did the

4    actual job that you were doing that's on this

5    list?

6       A. About six.

7       Q. And you made seven?

8       A. No, six including me.

9       Q. Okay.  I just wanted to clarify.  Just

10   including you?

11      A. I thought I had.

12      Q. So of the six, you're saying that five

13   people didn't like checking in orders?  I mean

14   hey --

15      A. That is correct.

16      Q. -- I'd like to sit on the forklift and

17   check in orders.  You're telling me --

18      A. Well, you don't check in orders while

19   you're sitting on the forklift.  You get off,

20   you count what's on the pallets.

21          (Brief pause.)

22      Q. I'm listening.

23      A. And then you put it away.

24      Q. And that's what you were physically doing

25   then?

1    A. Yes.

2    Q. So you were using the forklift, unloading,

3    getting off that forklift, going through that

4    stock, and actually putting it, moving it to the

5    shelves and putting it on the shelves?

6    A. Yes.

7    Q. You did that going up to the second floor,

8    too?

9    A. I put stuff up on the second floor then

10   went up to the second floor.  Some of the stuff

11   on the second floor I checked in and put away.

12   Some of it I did not.

13   Q. Isn't it true, Mr. Shaw, that you had other

14   employees in that warehouse assisting you with

15   your job duties that you were unable to

16   physically do?

17   A. Which ones are you referring to, ma'am?

18   Q. Tell me, sir.  I'm just asking that

19   question.  Did you have other employees take on

20   some of your duties that you were not physically

21   able to do?

22   A. No, I did not.

23   Q. Really?  Mr. Shaw, this is a deposition

24   that you gave on January 12th, 2010.

25   A.  Yes, ma'am.

1    Q. At that time you also took an oath to tell

2    the truth, correct?

3    A. Yes, ma'am.

4    Q. Could you turn to page 22, please?  Line 13

5    through 16.  I'll ask the question, you give the

6    answer.

7    A. Oh, there's four pages on each.  Was that

8    what we're looking at?

9    Q. We're looking at page 22.  Did you find it?

10   A. Yes, I see it.

11   Q. Go to line 13.

12   A. Line 13.

13   Q. I'll ask the question, you give me the

14   answer.  Question, "Did you ever ask any other

15   employee in the warehouse to assist you with job

16   duties that you weren't able to perform?"  What

17   is your answer?

18   A. "Why, yes, I did quite often."

19   Q. Okay.  So by asking other employees to do

20   duties that you weren't able to perform, they

21   were doing your job, weren't they?

22   A. No, they were assisting me in my job.  I

23   was not able to perform lifting up many items

24   such as fifth wheel heads, which way upwards of

25   250 pounds.  I was not able to be a four-man

1   crew to separate dollies, trailer legs that came

2   in one part number on this skid, one part number

3   on this skid, that had to be put on a central

4   skid and paired up.  I asked people to help me

5   do that because it's easier for four men to do

6   that than one man.

7   Q. You asked people to go upstairs for you to

8   pull product if you needed to?

9   A. Occasionally I did because they were faster

10  and easier for a customer that was waiting at

11  the door.

12  Q. You said you were on that forklift 50

13  percent of the time?

14  A. Could be.  Maybe 40 percent, maybe 30

15  percent some days.

16  Q. So it changed, it was based on how many --

17  A. Based on whatever duties we had to perform.

18  Q. I believe you testified, correct me if I'm

19  wrong, that you started having difficulty going

20  up those steps in 2006, September of 2006?

21  A. Could have been earlier than that.

22  Q. Now, as far as operating that forklift, you

23  said something interesting yesterday and I want

24  you to clarify it.  If you had heard that there

25  had been some testimony that no one was able to

1    confirm it, but there had been some allegation

2    that you had operated the forklift with your

3    cane, or walking stick -- let me just ask the

4    question.  That was testimony that was heard in

5    the courtroom, correct?

6      A. Pardon?

7      Q. That was testimony that you heard in the

8    courtroom?

9      A. About what?

10     Q. About an allegation that you operated that

11   forklift with a cane.

12     A. Yes.

13     Q. You testified yesterday that it was not

14   possible to operate that forklift with a cane

15   because you had one hand on the steering wheel,

16   you had one hand on the controls lifting those

17   forks up and down, right?

18     A. Yes.

19     Q. But you're not operating those forks while

20   you're driving.

21     A. Yes, you are.

22     Q. You're moving those forks up and down as

23   you're operating the forklift, sir?

24     A. Yes, you are.

25     Q. Okay.  Here's something else that I found

1   interesting.  No one testified as to how that

2   forklift could have been operated with a cane

3   except for you, sir.  Do you remember that?

4      A.  No, I do not.  I don't know what you mean.

5      Q.  Well, when you were describing the

6   situation you said you had one hand on the

7   steering wheel, one hand here, and how does

8   somebody take that cane and operate that brake.

9      A.  Oh, because the thing with the brake came

10  about during the rebuttal of my first, after I

11  made my initial complaint to the EEOC, ADA,

12  whatever it was.  The rebuttal of my complaint

13  specified six times that I used my cane to

14  utilize the brake on the forklift.

15     Q.  Okay.  So that's where that information

16  came from?

17     A.  That's where that information came from,

18  and then we took pictures to show that it

19  couldn't be done.

20     THE COURT:  All right.  Counsel, please

21  approach.

22     (Side bar at 12:06 p.m.)

23     THE COURT:  Are you going to get to a good

24  stopping point?  How much more do you have?

25     MS. SALTZ:  I have lots.  I have a lot of

1  documents to go through, I have a lot of things,

2  but I can stop whenever you want because I've

3  organized them in such a way that whenever you

4  say, it's fine.

5      THE COURT: Terrific.  All right, let's go

6  to about 12:30, quarter of 1:00, since we took a

7  short break a while back, and we'll take kind of

8  a later lunch.  I'm a little concerned about

9  this whole operating a forklift with a cane

10  issue because it came up on direct as something

11  that -- is it even an allegation in this case?

12  Are you going to present evidence that in fact

13  he was?

14      MS. SALTZ: No, but the thing is no, I

15  wasn't even going to bring it into the case

16  until it was brought in, you know, through the

17  other witnesses and stuff, but what surprised me

18  was this ability to describe clearly when no one

19  else did as to why, so I have no --

20      MR. RUSSO: And she's got the third arm

21  coming out of his chest in the description

22  yesterday.

23      THE COURT: Well, to me it's --

24      MS. SALTZ: I'm moving away from it.

25      THE COURT: To me it's a red herring, it

1   really is -- and it's irrelevant.  That's why I

2   was bringing it up, unless you were going to

3   pursue this in --

4        MS. SALTZ: No, I'm going to another area

5   right now.

6        THE COURT: All right.  Terrific.

7        MS. SALTZ: Done.  Done with that.

8        THE COURT: No problem.  All right, thank

9   you, and keep going for a while.

10        MS. SALTZ: I'll keep looking at you.

11        (Side bar concluded at 12:08 p.m.)

12        THE COURT: Ladies and gentlemen, we're

13   going to take our break a little bit later today

14   because we did have a late morning break.  We

15   kind of are pushed back maybe a half an hour, so

16   we're going to keep going for a while.  I won't

17   forget about lunch, but we're going to keep

18   going for a little bit.  Ms. Saltz?

19        BY MS. SALTZ:

20   Q. Thank you, Your Honor.  Now, you testified

21   yesterday, Mr. Shaw, that at times you needed to

22   take that antiinflammatory medication, pain

23   medication.

24   A. Yes.

25   Q. And that was during the time you were

1   working?

2      **A.** Occasionally I would take one at lunch time

3   when I ate, yes.

4      **Q.** And you didn't tell anybody at CTE that you

5   were taking pain medication, did you?

6      **A.** It wasn't anybody's business but mine and

7   my supervisor's.

8      **Q.** And yet, sir, you took pain medication, and

9   what was it that you were taking?

10     **A.** Lodine.

11     **Q.** Lodine?  And operating a forklift?

12     **A.** Yes.

13     **Q.** You're not supposed to operate machinery

14  under pain medication, are you, sir?

15     **A.** It's not a narcotic, ma'am.

16        MR. RUSSO: Objection.  Speculation.

17        THE COURT: I'm sorry, there was an

18  objection?

19        MR. RUSSO: Objection.  Calls for

20  speculation.

21        THE COURT: Overruled.  I think the answer

22  was, "It's not a narcotic."

23     **A.** It's not a narcotic.  It was high powered

24  aspirin.

25     **Q.** Okay.

1     **A.** What is -- I'm sorry.  I was going to ask

2   you a question, but I shouldn't I guess.

3     **Q.** No, I get to ask questions.

4        THE COURT: No, you shouldn't.

5     **Q.** Now let's go to the actual exam.

6     **A.** The what?

7     **Q.** The actual day of the exam with Concentra.

8     **A.** Oh, the first one?

9     **Q.** The first one.

10    **A.** Okay.

11    **Q.** You were working, you were asked to go see

12  Brenda Hoffman, right?

13    **A.** Yes.

14    **Q.** And that's when she told you that you

15  needed to go --

16    **A.** Yes.

17    **Q.** -- for the exam?  You went to the exam?

18    **A.** Yes, I did.

19    **Q.** Did you discuss anything with regard to

20  those job responsibilities with the physician

21  assistant?

22    **A.** No.  Well, yeah, I did discuss climbing

23  stairs.

24    **Q.** Okay, and then when you got back you went

25  right to Ms. Hoffman's office or --

1    A. Yes, I believe I did, yes.

2    Q. And that's when you were told that you had

3    failed the exam?

4    A. Yes.

5    Q. Now, you wrote a letter after that, right?

6    A. The next day, yes.

7    Q. The next day.  Let's take a look at what's

8    been marked and I believe admitted as

9    Plaintiff's Exhibit 11.  It's Defendant's

10   Exhibit D-7.  We'll start with the second page.

11   Let me give you this, I'm sorry, Mr. Shaw, keep

12   this opened up to D-7.  Now, I'm looking at D-7.

13   On the second page, that is your signature, sir?

14   A. Yes, it is.

15   Q. Now I'm going to ask you to turn to the

16   first page.  I just want to go over some of this

17   letter with you, as soon as I figure out how to

18   make it smaller.  Now, if you look at the first

19   sentence of that letter you wrote, "It may be

20   the opinion of Dr. Walker that I cannot perform

21   my job in my present physical condition." Right?

22   A. I wrote that, yes.

23   Q. And that was based on what Dr. Walker for

24   Concentra found that you were not able to do?

25   A. That is correct.

1    Q. And you disagreed with that doctor's

2    opinion.

3    A. Yes, I did.

4    Q. And that's in the second paragraph of the

5    letter, "I disagree with the doctor and his view

6    of what I cannot do," correct?

7    A. Yes.

8    Q. And you felt that it was because of his

9    opinion that your lifting had to do with your

10   inability to squat and lift with your legs,

11   right?

12   A. That's the only thing I could figure out

13   why they decided I couldn't lift anything.

14   Q. But you couldn't squat, right?  That was a

15   problem for you?

16   A. Well, that just depends.  I could squat.

17   I squatted down about three or four inches. I

18   couldn't go into a full baseball catcher's

19   squat.

20   Q. Okay.  Now, remember I had just asked you a

21   little bit ago about the fact that the reason

22   why you were on that forklift was that you could

23   sit as much as you can and you said no and you

24   sat during authorized breaks?

25   A. Yes.

1    Q. Take a look at the third paragraph, sir.

2    A. Third paragraph, okay.

3    Q. It says, "The fact that I'm unable to stand

4    and walk for long periods is also not a problem

5    because I sit whenever I can."  Isn't that what

6    you wrote?

7    A. And that is true.

8    Q. So you're sitting on the forklift, you're

9    sitting when you're using the computer or the

10   telephone, you're sitting on boxes of brake

11   drums when you're counting brakes?

12   A. Yes, and there was nothing wrong with that

13   and nobody had a problem with it.

14   Q. Now, you also told Ms. Hoffman at that time

15   that climbing ladders or stairs is a problem for

16   you.

17   A. Yes.  I said that.

18   Q. And it's painful.

19   A. Sometimes, yes.

20   Q. And you also in this letter are telling

21   that new condition developed, didn't it?  Last

22   paragraph?

23   A. Oh, yes.  Yeah, my left leg started

24   retaining a little bit of moisture, water,

25   fluid, whatever.

1    Q. And you also told Ms. Hoffman that you

2    would get a statement as to your ability to

3    continue working from your doctor, right?

4    A. Which I did.

5    Q. But you never gave that statement to CTE,

6    did you?

7    A. Yes, I did.

8    Q. And what document is that, sir?

9    A. Dr. Dunkelberger.

10   Q. And what did you bring them?

11   A. I brought them Section 5 of the Reliance

12   standard insurance form.

13   Q. The disability form, right?

14   A. Yes, ma'am.

15   Q. And that was not until what? April or May?

16   A. No, that was that next week I believe

17   after I seen my doctor the next time.

18   Q. What about anything from Dr. Oplinger?  You

19   didn't bring anything from him saying that you

20   could do the job, did you?

21   A. Didn't nobody told me it wasn't necessary.

22   Q. Now, Mr. Shaw, you go to an exam at

23   Concentra for Dr. Walker, he failed you, you

24   think he's wrong, right?

25   A. Yes, I did.

1    Q. And you believed sitting here telling this

2    jury, you told this jury you believed you could

3    do that job?

4    A. No, I did not believe I could do the job.

5    I had been doing the job with no complaint from

6    anybody.

7    Q. Okay, sir.  Well, let's take a look at what

8    you just said.  No complaint from anybody.  Just

9    because someone doesn't complain, are you saying

10   that it didn't matter whether it affected your

11   health negatively or that it affected another

12   coworker?

13   A. It did not affect my health negatively nor

14   did it affect another coworker.

15   Q. You're not a doctor are you, Mr. Shaw?

16   A. Pardon?

17   Q. You're not a doctor?

18   A. Well, no, I'm not a doctor.

19   Q. My question to you, sir, is if you

20   disagreed with Dr. Walker and you wanted to go

21   back to work and you believed you could do the

22   physical requirements of that job because you

23   had been doing them, you had an orthopaedic

24   surgeon, right?

25   A. Yes, I did.

1    Q. Why did you not bring something from

2    Dr. Oplinger saying "I can do the job"?

3    A. Nobody asked me to.

4    Q. Did you need someone to ask you to do that

5    to go back to work?

6    A. Dr. Oplinger is not the one that failed me

7    on the physical.

8    Q. Okay.

9    A. He had nothing to do with the physical.

10   Q. And what about accommodations?  Did you

11   need some accommodations?  Wasn't he the doctor

12   to go to to get the accommodations?

13   A. Again, ma'am, I was going the job without

14   any accommodations.

15   Q. Mr. Shaw, having people do work for you is

16   an accommodation, isn't it?

17   A. No.  It is asking for assistance when

18   necessary.  Nobody outright did anything that I

19   was supposed to do on a daily basis.

20   Q. Now, sir, on the last, on the second page

21   you wrote at the end of that first paragraph,

22   "You can leave the situation as it is and have

23   for a very long time," correct?

24   A. Yes.

25   Q. Did you want CTE, the company, to

1   completely ignore a medical opinion that you

2   could not perform certain duties of your job?

3   Is that what you wanted them to do to,

4   completely ignore Dr. Walker?

5      **A.** Yes.

6      **Q.** Because you disagreed with Dr. Walker?

7      **A.** Because I -- excuse me just a second.

8   Dr. Walker's opinion was wrong.

9      **Q.** And that was in your opinion it was wrong?

10      **A.** Yes, it was.

11      **Q.** Okay.  So you didn't think it was necessary

12   to bring your own doctor's certification to

13   return you to work?

14      **A.** I did.

15      **Q.** I'm talking Dr. Oplinger, sir.

16      **A.** Nobody asked me to bring Dr. Oplinger, I

17   brought one from Dr. Dunkelberger.

18      **Q.** Isn't it true, Mr. Shaw, that the reason

19   why you didn't bring anything back from

20   Dr. Oplinger was because Dr. Oplinger would not

21   have cleared you to --

22      MR. RUSSO: Objection.  Asked and answered.

23      **A.** Actually --

24      THE COURT: Hold it.  There's been an

25   objection.  I don't believe it has been asked

1    and answered.  The objection is overruled.  You

2    may answer.

3       A. Actually when I asked Dr. Oplinger to fill

4    out number 5, section number 5 of the Reliance

5    standard, he didn't do it because I had been

6    working at the time.

7       Q. Excuse me for being a little confused.

8       A. Okay.

9       Q. Section 5 of the form for disability,

10   correct?

11      A. Yes.

12      Q. When you give him that form you weren't

13   working though, were you?

14      A. They had just prevented me from coming to

15   work the first time that I gave him the form.

16      Q. Okay.  You told him then at the time you

17   were on medical leave, correct?

18      A. No, ma'am, I said they won't let me come to

19   work because I failed a physical.

20      Q. Okay.  What did he say?

21      A. He said because I had been working he

22   didn't feel it was necessary for him to fill it

23   out.

24      Q. But he did fill out that form, didn't he?

25      A. Eight months later he filled it out at my

1    request, my second request.

2      Q. And are you aware of what he noted in that

3    form, sir?

4      A. Which one, the --

5      Q. When he filled it out.

6      A. Yes, I am.

7      Q. And he said at that time that you could not

8    lift, carry, walk, and that you could only do

9    sedentary employment, sit down work only.  Isn't

10   that what he said, sir?

11     A. That's exactly what he said.

12     Q. Now, let's -- you didn't want, let's talk

13   about a little bit about modifications.  You

14   talked about, "You can modify my job description

15   as a warehouse receiver to fit what I really

16   do?"

17     A. That's correct.

18     Q. And what you testified yesterday in looking

19   at those duties, there wasn't anything to modify

20   there, was there?

21     A. Probably not.

22     Q. And you did not want CTE to modify the

23   physical requirements of your job, did you?

24     A. They could have modified some of the

25   physical requirements, but not by very much.

1    Q. That's not my question, sir.

2    A. Oh.

3    Q. My question is you didn't ask CTE to modify

4    any of the physical requirements of that job,

5    did you?

6    A. No.

7    Q. And you didn't want to have those physical

8    requirements modified?

9    A. Maybe.  Couldn't tell you whether I wanted

10   to or not.  It's been four years.

11   Q. Well, let's take a look at this.  Could you

12   turn to page 50 in your deposition, sir?  The

13   question was on line 17.

14       THE COURT: He's not there.

15   A. I'm here.

16   Q. Page 50, line 17.  Question, "So the

17   physical requirements were correct?"  That's in

18   the job analysis, right?

19   A. Yes.

20   Q. Okay, "But you would ask them to modify the

21   duties part of it?"  And you said, "Sure."

22   A. Sure.

23   Q. Okay.  So that leads us to another point.

24   So we've been going back and forth on this job

25   analysis, D-1.  So the physical requirements

1  listed here are the correct requirements of the

2  job .

3    **A.** Which one?

4    **Q.** I'm sorry.

5    THE COURT: He's got plaintiff's exhibit --

6    **Q.** Yeah, we're a little mixed up here between

7  the two.  D-1.

8    **A.** D-1.  Oh, okay.  What was the question on

9  this?

10    **Q.** The question is, sir, did these physical

11  requirements listed, occasional lifting up to

12  150, frequent lifting up to 70, occasional

13  sitting, frequent standing, frequent walking,

14  frequent pushing, frequent pulling, frequent

15  reaching, frequent growth grasping, occasional

16  fine manipulation, frequent twisting, frequent

17  bending, I'm sorry, occasional squatting,

18  occasional climbing, occasional foot controls,

19  and occasional driving are the proper physical

20  requirements of that job.

21    **A.** Yes, ma'am.

22    **Q.** Okay.  So now we're clear on that.  There's

23  no more controversy on that, right?

24    **A.** Okay.

25    MR. RUSSO: Your Honor, we pose an objection

1    to that.  There is, the evidence is what the

2    evidence is.  It's for the jury to decide.

3    There's been other testimony whether it is the

4    requirements or not.  Whether Mr. Shaw agrees

5    those are the requirements of the job or not --

6         THE COURT: I understand that there was some

7    editorializing and I'll just ask counsel for

8    both sides not to editorialize with respect to

9    the testimony.  You may continue.

10   Q. Thank you.  So when you wrote this letter

11   and after this letter you never asked CTE for

12   any kind of accommodation, did you?

13   A. I didn't ask that for any particular

14   accommodation.

15   Q. Okay.  Now, when you met with Brenda

16   Hoffman --

17   A. On what day?

18   Q. After that exam.

19   A. Yes, ma'am.

20   Q. She made no comment to you about being

21   disabled or regarding you as disabled, did she?

22   A. She said, "We want you to take this

23   insurance disability because we, because you

24   can't work here."

25   Q. Okay, but you were on medical leave, right?

1    **A.** No, ma'am.

2    **Q.** Just like before --

3    **A.** The term medical leave never came up until

4    months later they started referring to it as

5    medical leave.

6    **Q.** And she gave you paperwork for the

7    company's disability benefits, right?

8    **A.** The disability benefits, yes.

9    **Q.** And that was up to you whether you wanted

10   to request those disability benefits or not?

11   **A.** Well, it turned out that way.  They didn't

12   give me a choice.  They said, "You can't work

13   here, you may apply for disability."

14   **Q.** Okay.  So they said, "You can't work here

15   because Dr. Walker says that you can't meet the

16   physical requirements of your job and here's

17   paperwork on FMLA and here's paperwork on

18   disability benefits that the company offers,"

19   isn't that what happened?

20   **A.** Essentially, yes.

21       MS. SALTZ: Your Honor, this would be a good

22   stopping point.

23       THE COURT: I'd like to continue until about

24   a quarter of 1:00 if we could.

25       MS. SALTZ: No, that's fine.

1      THE COURT: All right?

2      BY MS. SALTZ:

3    Q. Now, two days later you said you had a

4  meeting with Brenda Hoffman and Bryan Sheldon,

5  right?  That's the date you dropped off this

6  letter, this letter of 2-28?

7    A. That's correct.

8    Q. And you were upset because you couldn't go

9  back to work, right?

10    A. That is correct.

11    Q. But you don't remember what else was said

12  at that meeting, do you?

13    A. Yes I do.

14    Q. Do you remember today what you said at that

15  meeting?

16    A. Pardon?

17    Q. Do you remember today what was said at that

18  meeting?

19    A. Well, not everything, but some things.

20    Q. Sir, what was said at that meeting?

21    A. Well, I asked why they thought I shouldn't

22  be able to work.  They said they felt that I was

23  a danger in the warehouse.  And I said what?

24  They said they felt that I could hurt somebody

25  or get hurt myself, and I said how, but they

1  couldn't give me an answer as to how I was a

2  danger or I could hurt somebody.  They were just

3  afraid that I might hurt somebody.

4     Q.  Now, you also, Dr. Oplinger as you agreed

5  said that you could only do sit down work.  Do

6  you disagree with him, too?

7     A.  Yes.

8     Q.  The point --

9     A.  When you're talking -- well, never mind.

10    Q.  But that was Dr. Oplinger's assessment that

11  you could only do sit down work.

12    A.  A month later when I asked him to fill it

13  out that way he did.

14    Q.  Did you ask him specifically to fill out

15  and say "I can't work"?

16    A.  I asked him to make it sound like I needed

17  a long R & R because they weren't going to let

18  me go back to work.

19    Q.  Mr. Shaw, were you asking Dr. Oplinger to

20  commit fraud?

21    A.  No.

22    Q.  So whatever Dr. Oplinger determined was

23  what he determined to be in his opinion your

24  condition at that time?

25    A.  We'll go with that, yes.

1   Q. Now, didn't the company tell you that as

2   soon as your condition improved you could come

3   back?

4   A. And I told them my condition would never

5   improve, but yes, they did.

6   Q. And they wanted you back, didn't they?

7   A. That's open to interpretation.  I'm not

8   certain they did.

9   Q. Okay.  Now, when you saw Dr. Oplinger in

10  April of 2007 that's when he told you you needed

11  a knee replacement, right?

12  A. No.  He said it was still an option.  He

13  did not say I needed the knee replacement.

14  Q. So if there's testimony from Dr. Oplinger

15  that he told you there's nothing else left to do

16  but to go forward with a knee replacement --

17  A. He said eventually, yes.

18  Q. And you decided to hold off on that knee

19  replacement?

20  A. Yes, I did.

21  Q. Even though that knee replacement could

22  have helped you get back to work?

23  A. That's open to interpretation, too.

24  There's no guarantee that a knee replacement is

25  going to make you any better.  It might lessen

1    the pain.

2       Q. But by June of 2008 you had the right knee

3    replacement, right?

4       A. Yes, I did.

5       Q. And in August of 2008 you had the left knee

6    replacement?

7       A. Yes, I did.

8       Q. In fact you were doing great after those

9    knee replacements, weren't you?

10      A. No, I wasn't.

11      Q. So Dr. Oplinger -- but there's testimony

12   here from Dr. Oplinger that you were going great

13   after those knee replacements --

14      A. What's your interpretation of great, ma'am?

15   I was walking without a cane on flat surfaces.

16      Q. And that was the first time you were

17   walking without a cane on flat surfaces, wasn't

18   it?

19      A. Pardon?

20      Q. That was the first time you were walking

21   without a cane on flat surfaces?

22         MR. RUSSO: Objection as to --

23      A. After the operation, yes.

24         MR. RUSSO: In his life?  Time frame?

25         THE COURT: All right, I think we understand

1   it's in context of recent developments.

2       MR. RUSSO: Okay.

3    Q. Now, after your knee replacement you never

4   reapplied to CTE for a job again.

5    A. That is correct.

6    Q. And they asked you to reapply, didn't they,

7   when they told you they had to finally replace

8   you?

9    A. Yes.

10   Q. You never even wanted to try to go back?

11   A. This job analysis?  Even after having

12  gotten two knee replacements I could have not

13  have passed it.  I would not have passed it as a

14  preemployment physical.  So there was no need to

15  reapply.

16   Q. Mr. Shaw, you didn't even bother to see if

17  they could accommodate you in some way, did you?

18   A. By that time this lawsuit had been started

19  and I would not have felt comfortable working

20  for them or around them.

21   Q. Okay.  Let's talk about what's been marked

22  as Plaintiff's Exhibit 10, and it's Defendant's

23  Exhibit 5.  Are you there?

24   A. I'm there.

25   Q. Would you turn to the last page, sir?  This

1    is the letter from Brenda Hoffman to you on the

2    FMLA paperwork?

3       **A.** I'm sorry, what page, ma`am?

4       **Q.** Page D-5?

5       **A.** D-5, that's where I am, and you said the

6    last page?

7       **Q.** Yes, sir.  Right here.

8       **A.** Great.

9       **Q.** Both of them here together.  You testified

10   yesterday that you could not fill this out

11   because there was no section here that applied

12   to your situation.

13      **A.** That's correct.

14      **Q.** Okay.  If you'd look at number 4?

15      **A.** Number 4?

16      **Q.** And read along with me.  "Chronic

17   conditions requiring treatment," right?

18   "Requires periodic visits for treatment by a

19   health care provider."  You testified your knee,

20   you had knee problems on and off since 1986 that

21   started getting worse in 2006 that you went to

22   see Dr. Oplinger for.  Wasn't your knee

23   condition a chronic condition, sir?

24      MR. RUSSO: Objection, Your Honor.  She's

25   asking to read one portion of a three prong test

1  for chronic condition and asking whether

2  ultimately he has a chronic condition.  She's

3  asking a question that isn't in evidence, a

4  three prong test under the statement.

5       THE COURT: The question is, "Wasn't your

6  knee condition a chronic condition?"  I think he

7  can answer that question.

8       MR. RUSSO: Okay.

9    A. Okay.  The knee condition was a chronic

10  condition.

11   Q. Okay.  Now, if you'd turn to page 2, or

12  page 1 of the form?

13   A. Page 1.

14   Q. Okay?  If you look at number C?

15   A. C.

16   Q. It says, "If the condition is a chronic

17  condition..." --

18       THE COURT: I'm sorry, I apologize.  I'm

19  having trouble following you.

20       MS. SALTZ: That's okay, Your Honor.  If you

21  look at the letter, the first page of the

22  letter, followed by the first page of the actual

23  document.

24       THE COURT: Okay, 5?

25       MS. SALTZ: It would be under Section 5.

1     THE COURT: 5-C, okay.

2     THE WITNESS: 5-C.

3     BY MS. SALTZ:

4   Q. "If the condition is a chronic condition,

5   state whether the patient is presently

6   incapacitated and a likely duration of frequency

7   of episodes of incapacity."

8   A. Yes.  That's what it says.

9   Q. So that's something that could have been

10  filled out, right?

11  A. No, ma'am.  I was not incapacitated in any

12  way other than not being able to pass D-1.

13  Q. In your opinion, sir, correct?

14  A. In my opinion, yes.

15  Q. Now, Mr. Shaw, would you --

16  A. Excuse me, hold on for a second.

17  Incapacitated, incapacity for purposes of FMLA

18  is defined to mean inability to work, attend

19  school, or perform other regular daily

20  activities due to serious health conditions,

21  treatment therefore, or recovery therefrom."

22  I was not incapacitated according to that little

23  statement right there, ma'am.

24  Q. Okay.  But there's also other aspects of

25  this form that could have been filled out by

1   your physician?

2   **A.** By which physician, ma'am?

3   **Q.** Dr. Oplinger, sir, who was treating you for

4   your knee.

5   **A.** No, he could not.

6   **Q.** Well, he filled out your disability form,

7   sir, didn't he?

8   **A.** Eventually, yes, after I asked him.  Twice.

9   **Q.** Now, Mr. Shaw, you testified yesterday that

10  you didn't want to fill out the disability, the

11  information for disability benefits?

12  **A.** That is correct.  I did not want to fill it

13  out.

14  **Q.** Because you believed you would be

15  committing fraud.

16  **A.** Yes.

17  **Q.** So when you did finally fill them out were

18  you committing fraud then?

19  **A.** Probably so.  In a strict legal sense

20  maybe.  Nobody's tested it yet though.

21  **Q.** So you, in your opinion you believed that

22  you did not have any kind of physical

23  restrictions preventing you from your job,

24  right?

25  **A.** I had no physical restrictions preventing

1    me from doing my job.

2      Q. In your opinion.

3      A. In actual fact.

4      Q. In your opinion, sir?

5      A. No, ma'am.  In actual fact I had no

6    physical restrictions.

7      Q. Based on your belief?

8      A. That's not a belief.

9         THE COURT: I think we've covered, I think

10   we've covered this ground.

11     A. It is their belief here that I did not,

12   that I could not perform my job.

13     Q. It was the doctor's belief.

14     A. It was the --

15        THE COURT: Again you don't need to respond.

16   We've covered this ground.  Let's move on.

17     Q. And so the fact is is that you nevertheless

18   filled out the disability paperwork, correct?

19     A. I eventually did, yes.

20     Q. And you also filled out paperwork for

21   worker's comp?

22     A. I requested that the case be referred to

23   worker's comp.

24     Q. And the reason for the worker's comp was

25   that you were claiming that you, again it was

1  your knee problem, right?  Knees and lower legs

2  was the problem.

3    A. If they were going to put me out of work

4  we were going to have a good reason for it.

5    Q. Were you committing fraud when you were

6  filling out the paperwork for worker's comp?

7    A. No, actually I wouldn't have been because I

8  had an existing condition aggravated by working

9  conditions, which falls under the description of

10  workman's comp.

11    Q. And you were denied workman's comp,

12  correct?

13    A. Yes, I was, because they never let me go to

14  a doctor or their orthopaedic surgeon.

15    Q. You could have gone to your orthopaedic

16  surgeon.

17    A. No, I could not have gone to my orthopaedic

18  surgeon for worker's comp.  I don't believe he

19  was on their panel.  You have to go be seen by a

20  general practitioner and then referred to an

21  orthopaedic surgeon on their physician's panel.

22  I never got to see the general practitioner

23  because the insurance company said no, this is

24  not a case, so they denied it.

25    Q. Now, Mr. Shaw, you applied for social

1   security benefits, didn't you?

2     **A.** Yes, I did.

3     **Q.** And you applied for those benefits in

4   November 21st, 2007?

5     **A.** No.

6     **Q.** Sir, would you turn to D-35, please?

7     **A.** D what?

8     **Q.** D-35.

9     **A.** D-35, okay.  Okay.

10    **Q.** And would you take a look at that first,

11  this is a letter from social security to you?

12      (Brief pause.)

13      THE COURT: I think she's just asking you to

14  identify the letter.

15    **A.** Oh.

16    **Q.** Yes, thank you, Your Honor.  It says, "On

17  November 21, 2007 we talked with you and

18  completed your application for social security

19  benefits."

20    **A.** Okay.  That's what it says.

21    **Q.** Okay.

22    **A.** I did not do anything with social security

23  until January of 2008.

24    **Q.** But at least you started the process in

25  November of 2007, you would agree with that?

1    A. No.  I didn't start anything until 2008.

2    January.

3    Q. What's the date of the letter from social

4    security, sir?

5    A. It says November 30th.

6    Q. 2007?

7    A. Okay.  I don't recall doing anything in

8    November of 2007.  Evidently I must have filled

9    something out.

10    Q. Okay.

11    A. I don't remember, really don't remember

12    doing anything until January of 2008.

13    Q. Now, Mr. Shaw, would you look at

14    Defendant's Exhibit 36, please?

15    A. Defendant's 36?

16    Q. Are you there?

17    A. I'm there.

18    Q. Now, would you just flip through these

19    pages and tell me is this your handwriting and

20    is this a typed portion of information you

21    provided to social security?

22    A. Yes, ma'am, it is.

23    Q. Now, would you turn to the third page,

24    please?

25    A. I'm there.

1    Q. If you look at number 13?

2    A. Okay.

3    Q. It says, "Any changes in cooking habits

4    since the illness, injuries, or conditions

5    began?"  Right?  Are you reading with me?

6    A. Oh, yes.  Any changes, yes.

7    Q. And you said, "Got to sit down to do most

8    things."

9    A. That's right.

10    Q. If you go down to 14-A?  "List household

11    chores, both indoors and outdoors, that you are

12    able to do," and in that second sentence, sir,

13    you wrote, "Sweeping and mopping is done by

14    local kids, as is the yard work."  So you

15    weren't doing any sweeping or mopping or yard

16    work, correct?

17    A. I hadn't been doing any sweeping or mopping

18    for years, ma'am.  Or yard work.  Local kids had

19    to make money and I was glad to let them do it.

20    Q. If you turn to the next page?  It says, "If

21    you don't do house or yard work, explain why

22    not," sir, and what did you write there,

23    Mr. Shaw?

24    A. Where are we at?

25    Q. Very top, B.

1    A. Okay.  "Can't use the broom or mop because

2  of my back."  That's why I hadn't been doing

3  sweeping and mopping for years, and what --

4    Q. Can't move, can't move -- can't mow or

5  garden?

6    A. Can't mow or garden because of my back and

7  knees.

8    Q. Now, wasn't sweeping one of the job duties

9  that you had at Cumberland in the warehouse?

10    A. Yes, ma'am, it was, but there was a

11  different kind of sweeping.

12    Q. If you'd turn to the next page, sir?  Look

13  at the section that's marked 18-C.

14    A. Okay.

15    Q. "Describe any changes in these activities

16  since the illnesses, injuries, or conditions

17  began," and what did you write here?

18    A. "I have to sit down to do most things.  I

19  can stand only by leaning on work tables or

20  stools."

21    Q. Okay.  Now, if you turn to the next page?

22    A. Next page?

23    Q. Section C, information about abilities.

24    A. Yes, ma'am.

25    Q. "Checking any of following items that your

1  illness, injuries, or conditions affect," and

2  you checked?

3      A. Lifting, squatting, bending, standing,

4  walking, sitting, kneeling, stair climbing,

5  seeing.

6      Q. Okay, and for the explanation, sir, what

7  did you write there?

8      A. "Bad knees prevent me from squatting,

9  kneeling, standing for long periods of time,

10  walking very far.  Bad back prevents me from

11  bending, standing for long periods.  Combination

12  prevents me from lifting per OSHA standard,

13  OSHA, and stair climbing.  Can't sit in a normal

14  high chair.  Right eye vision," actually that

15  should have been my left eye but they never

16  questioned me on that.

17      Q. And look at Section C.  "How far can you

18  walk before needing to stop and rest?"  What did

19  you tell social security?

20      A. I said, "About 150 feet," and crossed it

21  out and put yards.  I was going by the distance

22  of a football field, and I'm not a football fan,

23  so I really wasn't sure.

24      Q. Then it says, "If you have to rest how long

25  before you can resume walking?"  What did you

1    write?

2      A. "Four to five minutes."

3      Q. Turn to the next page, sir.

4      A. Okay.

5      Q. And at the very bottom it says for 21, "Do

6    you use any of the following?"  And you checked

7    off cane and put in walking stick, right?

8      A. Yes.

9      Q. And then would you read to the jury what

10   you wrote for, "When do you need to use these

11   aids?"

12     A. "I need the walking stick daily with the

13   bad back and bad knees.  My balance is off and

14   it helps me to remain upright.  When my back

15   spasms I use the shorter cane and walk a lot

16   slower."

17     Q. Now, if you would turn to the next page?

18         THE COURT: Before we get to that I think

19   now would be a good time for us to take our

20   lunch break.  And, Mr. Shaw, because you're on

21   cross examination I have to give you an

22   instruction that you refrain from any

23   conversations with your counsel about the

24   subject matter of your testimony.

25         THE WITNESS: Yes, I understand, sir.  Yes.

1          THE COURT: I'm not picking on you.  That's

2    a standard instruction that I give --

3          THE WITNESS: Right.

4          THE COURT: -- to witnesses on cross

5    examination.  It doesn't mean you can't speak to

6    them.  It just means you can't talk to them

7    about the substance of your testimony.

8          THE WITNESS: Right.

9          THE COURT: Ladies and gentlemen, we'll take

10   a recess for approximately one hour.  Let's

11   reconvene and we'll start our afternoon session

12   at 2:00.  So we're in recess until that time.

13   Please recall all of my earlier instructions,

14   and we'll see you back here at a little bit

15   before 2:00.  Let's try to start promptly at

16   2:00.  We're in recess.

17          (Lunch recess taken from 12:47 to 2:03

18   p.m.)

19          THE COURT: Please be seated.  Ms. Saltz,

20   you may continue.

21          MS. SALTZ: Thank you, Your Honor.

22          BY MS. SALTZ:

23    Q. Mr. Shaw, we're still on Defendant's

24   Exhibit 36.  We left off with the typewritten

25   section.

1     A. Okay.

2     Q. If you can get to it, please?  Are you

3  there?

4     A. I'm there.

5     Q. Now, you testified that this is something

6  that you typed up and you wanted to be as

7  concise as possible, correct?

8     A. Yes.

9     Q. Now, I direct you to the third bullet

10 point, "need walking stick to get around."

11 Do you see that?

12    A. Yes, I see that.

13    Q. Then take you to the sixth bullet point,

14 "he had changed the bandage on my nonhealing

15 ulcer on my right leg."

16    A. Yes.

17    Q. And a little further down it says, "I do

18 most jobs sitting.  I use a grabber to pick

19 things up."

20    A. Yes.

21    Q. Can you turn to the next page, please, sir?

22 Now, after breakfast you told social security

23 that you take your second or third pain pill?

24    A. Yes.

25    Q. The second bullet point, during your

1   shopping trip, "I take my cane or walking stick

2   but leave it in the truck if I can make it to

3   the shopping cart for support."

4     A. Yes.

5     Q. You also told social security that you

6   could only walk with support for about 45

7   minutes before the knee pain gets bad?

8     A. I did.

9     Q. And then also, "effort at bending my left

10   knee to get in the truck is extremely painful."

11     A. Yes.  Yes.

12     Q. You also told social security, "I need my

13   walking stick for support when I return home to

14   get up the steps to the door."

15     A. Yes.

16     Q. How many steps to your door, sir?

17     A. Four or five.

18     Q. Then further down, "If I set too long at my

19   computer desk my knees lock up and I need my

20   walking stick to lean on for six or seven

21   steps."  Is that true?

22     A. That is true.

23     Q. "After my shopping trip I have to sit and

24   rest my knees for a while."

25     A. This is true.

1    Q. Now, if you go to the very bottom, sir,

2    section B, number 10?  Could you read for the

3    jury what you wrote there?

4    A. The whole thing?

5    Q. Prior, right.

6    A. The whole thing?

7    Q. The bottom part where it says section B,

8    number 10.

9    A. The whole paragraph.

10    Q. Yes.

11    A. "Prior to my condition I worked in a

12    heavy..." --

13        THE COURT: Slowly.  Slowly.

14    A. I'm sorry.

15        THE COURT: No problem.

16    A. "Prior to my condition I worked in a heavy

17    duty parts warehouse.  I could lift and toss 140

18    plus pound brake drums from one pallet to

19    another.  Because I cannot bend my knees I

20    cannot lift properly per OSHA standards, which

21    is why I lost my job.  I used to go for long

22    walks in the woods, which I cannot do now.  I

23    can probably walk one-half length of a football

24    field.  Then I have to stop and rest."

25    Q. If you turn to the next page, sir?

1    **A.** Okay.

2    **Q.** Where is your pain located, that section?

3    Could you read for the jury what you wrote?

4    **A.** Let me se.  Oh, "Where is your pain

5    located?  Knee pain is from front outside.

6    Back pain is lower back."

7    **Q.** And where does it spread?  What did you

8    write?

9    **A.** "Knee pain is constant.  Back pain spreads

10   upward after prolonged activity."

11   **Q.** What activities caused you to have pain?

12   And you wrote there all those mentioned, which

13   are bending, standing, walking, temperature

14   extremes, plus sitting in one place too long,

15   is that correct?

16   **A.** That is correct.

17   **Q.** And "how often does your pain occur?"  You

18   wrote daily, at the very bottom?

19   **A.** Oh.  I'm sorry, what are we looking --

20   **Q.** It says, "How often does your pain occur?"

21   Do you see --

22   **A.** Oh, how often does your -- yeah, okay.

23   Daily.

24   **Q.** And how long does your pain last?

25   **A.** Constantly.

1     MS. SALTZ: Now, Mr. Shaw -- Your Honor, at

2  this time I would like to move for admission of

3  D-36.

4     THE COURT: Any objection?

5     MR. RUSSO: No objection, Your Honor.

6     THE COURT: All right.  It is admitted.

7     BY MS. SALTZ:

8   Q. Now, Mr. Shaw, would you turn to D-37,

9  please?

10   A. Pardon?

11   Q. D-37.  The next tab.

12   A. Okay.

13   Q. And, sir, is that a letter from the Social

14  Security Administration directed to you?

15   A. Yes, it is.

16     THE COURT: Counsel, would you please

17  approach?

18     (Side bar at 2:07 p.m.)

19     THE COURT: We have the issue now of where

20  you're going with the award.  What do you --

21     MS. SALTZ: I'm not going to admit the

22  exhibit into evidence.  I just want that he was

23  deemed under their rules to -- we will stipulate

24  to that.

25     (Discussion off the record.)

1      THE COURT: All right.  Counsel indicated

2  that they would stipulate to the fact that he

3  received social security disability benefits,

4  but I'm going to allow defense counsel to bring

5  it out on this exhibit.  My concern is the

6  dollar amounts in the exhibit.

7      MS. SALTZ: No, I'm just, he is now in one

8  sentence, I'm just introducing it and not doing

9  anything further.  Thank you.

10      THE COURT: Okay, thank you.

11      (Side bar concluded at 2:09 p.m.)

12      THE COURT: Ladies and gentlemen, we might

13  have some audio problems.  Mr. Armstrong, just

14  let me know if you have any continued problems.

15      BY MS. SALTZ:

16   Q. This letter from the Social Security

17  Administration awarded you benefits, correct?

18   A. That is correct.

19   Q. Now, could you please tell the jury based

20  on social security the date you became disabled

21  under their rules?

22   A. February 27th, 2007 is what it says here.

23      MS. SALTZ: Thank you, sir.  I have no

24  further questions, Your Honor.

25      THE COURT: All right, thank you, Ms. Saltz.

1  Mr. Russo, any redirect?

2      MR. RUSSO: A couple, Your Honor, please.

3      THE COURT: Certainly.

4      REDIRECT BY MR. RUSSO:

5  Q. Good afternoon, Ricky.  In your testimony

6  you talked about the warehouse.

7  A. Yes, sir.

8  Q. You mentioned at the end that there were

9  two forklifts and a man-up.  What's a man-up?

10  A. It's a vehicle, the operator stands in a

11  cubicle, in an enclosed cubicle.  It has a mast

12  that when you press the button the cubicle moves

13  up and, moves up and down the mast fifteen or

14  eighteen feet, I'm not sure exactly what the

15  height was.  The forks are behind the operator

16  that you have your skid on.  So the operator

17  stands there and presses the button and goes up

18  to a shelf and then gets stuff off and puts it

19  on a skid or in the box that's on the forks.

20      THE COURT: Sort of like a portable

21  dumbwaiter?

22  A. Yes, sir.  Something like that, yes.

23      THE COURT: All right.

24  Q. So this was something that you could reach

25  to the second level of racks with?

1    **A.** You could reach to the top rack.

2    **Q.** So you could go to the second level, the

3    mezzanine with it?

4    **A.** We often did, yes, sir, although we weren't

5    supposed to.

6    **Q.** So was this an alternative to using stairs?

7    **A.** No, because you're not supposed to exit the

8    man-up while it's in the air unless you're

9    climbing to get something way in the back,

10   sitting it on the mezzanine level, and exiting

11   it would not have been a good idea.

12   **Q.** Okay.

13   **A.** It could be done, but it was not a good

14   idea.

15   **Q.** Ricky, do you know if Cumberland Truck has

16   a maintenance department or a janitorial

17   department there?

18   **A.** Not for the warehouse they didn't.

19   **Q.** Okay.  So if there was a spill somebody

20   would have to clean it up or something like

21   that?

22   **A.** A warehouse worker would do it, yes.

23   **Q.** You had testified under cross examination

24   that you got worse between 2007 and 2008.

25   **A.** Yes.

1    Q. Do you remember that?  Can you tell us why

2  you got worse?

3    A. Because I wasn't working on a daily basis.

4  When you go to work you walk a little bit, you

5  stand a little bit, you bend a little bit, and

6  then you do it all over again.  During the time

7  that after I was put off from working I didn't

8  do any of that.  I did other things that

9  interested me.  Most of it was in my shop making

10  little wood projects for the local people.

11    Q. I think you indicated this, but moving

12  helped, is that right?

13    A. Yes, sir, moving helped a lot.

14    Q. I'm going to ask you, you were asked to

15  read from page 22 of your deposition transcript.

16  Can you go back to page 22?  Do you still have

17  it in front of you?

18    A. Yes, sir.

19    Q. And Ms. Saltz had you start with line 13.

20  I'm going to ask, I'll do what she did, I'm

21  going to ask you the questions and you answer.

22  Okay?

23    A. Yes, sir.

24    Q. "Did you ever ask any other employees in

25  the warehouse to assist you with job duties that

1   you weren't able to perform?"

2      A. "Why, yes, I did, quite often."

3      Q. "Can you explain to me what that would be?"

4      A. "Sure.  You get, we got in two skids of

5   twenty legs each.  Twenty legs that would go on

6   one side of the trailer.  Twenty legs would go

7   on the left side of the trailer, but we sell

8   them as sets.  So we would have to take these

9   twenty on each one and put it on a skid in the

10  middle and lay them there, two sets to a layer,

11  and the legs weighed up towards of eighty or

12  ninety pound, and it was easier for me, well,

13  actually four guys to consolidate the legs on

14  two different skids.  So yes, I asked for help

15  there."

16     Q. And I believe you continue, your answer

17  continues on page 23?

18     A. Oh, I'm sorry.  "If there was an extremely

19  heavy brake drum that I had to lift I would ask

20  for help there, but that is what you are

21  supposed to do per OSHA.  Anything that you

22  can't lift you're supposed to ask for help."

23     Q. Ricky, what you described in your

24  deposition that Ms. Saltz called your attention

25  to, that was asking for assistance, correct?

1    A. Yes, sir.

2    Q. Was that common?

3    A. It was very common, sir.

4    Q. Were you the only employee who asked for

5    assistance?

6    A. No, sir.

7    Q. In Plaintiff's Number 11 in the third

8    paragraph, can you read that for us again one

9    more time?

10   A. Third paragraph.

11   Q. Not too quickly, because the reporter needs

12   to get your words.

13   A. You mean the one starts with "the fact"?

14   Q. Yes.

15   A. Okay.  "The fact that I am unable to stand

16   or walk for long periods is also not a problem,

17   because I sit whenever I can.  I sit on the

18   forklift.  I sit when I use the computer or the

19   telephone.  I sit on boxes for brake drums when

20   I am counting incoming freight."

21   Q. When you were sitting on the forklift were

22   you working?

23   A. Yes, sir.

24   Q. Performing your duties?

25   A. Yes, sir.

1    Q. When you were sitting at the computer,

2    performing your duties?

3    A. Yes, sir?

4    Q. Working?  When you were sitting at the

5    telephone, performing your duties?

6    A. Yes, sir.

7    Q. How about when you were sitting on boxes

8    for brake drums when you were counting?

9    A. Yes, sir.

10   Q. Working?

11   A. I was working.

12   Q. Do you think that CTE considers you

13   disabled?

14   A. They asked me -- correction.  They told me

15   to apply for disability insurance.  So yes, I do

16   believe they considered me disabled.

17   Q. Ms. Saltz asked you questions about why

18   didn't you go to your doctor to try to get some

19   other statement or some other notice, statement

20   saying that you could work.  You explained that.

21   Did anybody, do you remember having a

22   conversation with Mr. Sheldon about that

23   subject, getting a doctor to certify that you

24   could go back to work?

25   A. No, sir.

1    Q. You were present for Mr. Sheldon's

2    testimony when he said, "I gave Ricky the

3    opportunity to do that"?

4    A. I believe he said he gave me the

5    opportunity to go to my doctor.

6    Q. Do you remember was he --

7    A. And he never did that.

8    Q. Okay.  You talked about your knee

9    replacement.

10   A. Yes, sir.

11   Q. That there was some discussion with

12   Dr. Oplinger in April of 2007 that a knee

13   replacement might be in the future.

14   A. That was the conversation, not a

15   recommendation.

16   Q. Why did you wait until 2008 to have your

17   knee replacement?

18   A. I didn't want to have surgery, sir.  I was

19   getting along fine without it.

20   Q. And when you say you were getting along

21   fine without it, what do you mean?

22   A. I was working fine without having to have a

23   knee replacement.

24   Q. After your knee replacement Ms. Saltz asked

25   you if you, why didn't you reapply to Cumberland

1    Truck.  Why didn't you do that?

2     A. Well, for two reason.  Number one, I could

3    not have passed their physical, their job

4    analysis at that time, and I had already started

5    this lawsuit and I wouldn't have felt

6    comfortable working for them or around them at

7    that time.

8     Q. I thought you said you could never pass

9    that job analysis.

10    A. I possibly could not have passed the job

11   analysis even back in 2000 when I first started,

12   I've never been able to squat very much.

13    Q. Describe for the jury how your physical

14   condition changed from February 26th, 2007 until

15   January 27th, 2008.

16    A. I gained about eighty pounds.  Like I said,

17   you know, I did go for walks, I tried to ride my

18   bicycle but found out that the seat wouldn't

19   hold me anymore, so I gave that up.  It was too

20   difficult anyway, but I would go for walks

21   around the trailer park I lived in.  I would go

22   a little bit up the Appalachian Trial, not very

23   far, but most of the day was spent in my little

24   wood shop making birdhouses to hang in the trees

25   for the local kids, making shelves for friends

 1   and stuff like that out of the scrap wood that I

 2   had whole boxes full of collecting, just using

 3   up that.  That's pretty much my spring and

 4   summer of 2007.

 5     Q. Do you still have Defendant's Exhibit

 6   Number 36 in front of you?

 7     A. Yes, sir.

 8     Q. And again so the record is clear, what was

 9   the date that you completed this document?

10     A. January 11th, 2008.

11     Q. Ms. Saltz, called your attention to Section

12   13, which deals with meals.

13     A. Yes, sir.

14     Q. And she had you look at that last entry

15   correct?

16     A. Yes, sir.

17     Q. What are the first two words in that entry?

18     A. Any changes, or in my answer?

19     Q. And when you saw the words "any changes,"

20   what did you understand you were describing?

21     A. My cooking.

22     Q. And was there a change in your cooking

23   abilities?

24     A. No, just to what I cooked.  I mean just

25   the --

1    Q. Okay.  The way you cooked at that time in

2  January?

3    A. Yes.

4    Q. And Ms. Saltz also called your attention to

5  Section 18, which is also on page 5.  Again it

6  says describe any changes in these activities.

7  Was that your description of the activities as

8  of that time?

9    A. Yes.

10    Q. Fair to say everything within D-36 was your

11  assessment of your abilities at that time in

12  January of 2008?

13    A. Yes, sir.

14    Q. Ricky, in Exhibit Number 36, Defense

15  Exhibit Number 36, at any point do you remember

16  filling anything out about accommodations for

17  jobs?

18    A. No, sir.

19    Q. Did they ever ask you anything about if you

20  had an accommodation could you work?

21    A. No, sir.

22    MR. RUSSO: Nothing else, Your Honor.

23    THE COURT: Any recross?

24    MS. SALTZ: Just very brief, Your Honor.

25    RECROSS BY MS. SALTZ:

1    Q. While you're on Defense Exhibit 36,

2  Mr. Shaw?

3    A. Still on 36, okay.

4    Q. Just very briefly, under Section 18,

5  hobbies and interests?

6    A. Yes, sir -- yes, ma'am.

7    Q. Just so that the jury is clear as to how

8  this question, Question A talks about what are

9  your hobbies and interests, correct?

10   A. Yes.

11   Q. Question B talks about how often and how

12 well do you do these things.

13   A. Yes.

14   Q. And Question C then goes into describing

15 any changes in these activities since the

16 illness, injury, or condition began.

17   A. Yes.

18   Q. Sir, you testified right now to the

19 previous question that since you went out on

20 medical leave because you were not working your

21 condition got worse because of the lack of

22 activity, correct?

23   A. Yes, ma'am.

24   Q. But isn't it true, Mr. Shaw, that that's

25 really something that you could have taken care

1    of for yourself?

2       A. How?

3       Q. You could have gone to your doctor and had

4    him prescribe an exercise program, isn't that

5    true, sir?  You could have gone to nutritionists

6    for a diet?  Mr. Shaw?

7       A. Could have.  Not very likely though.

8       Q. But the fact is, sir --

9       A. I didn't have the money to spend on a

10   nutritionist, but --

11      Q. Did you have medical insurance?

12         THE COURT: Were you finished with your

13   answer, sir?

14      A. Pardon?

15         THE COURT: I thought you were going to say

16   something else.  I just wondered if you were

17   finished with your answer.

18      A. Yeah.

19      Q. I apologize, I didn't mean to interrupt.

20         THE COURT: Not a problem.

21      A. Okay.  Now, where were we?

22         THE COURT: She asked you --

23      A. Go ahead.

24         THE COURT: She asked you if you had medical

25   insurance.  That was the question.

1    **A.** Yes, I had medical insurance, yes.

2    **Q.** So you could have gone to Dr. Oplinger,

3    your orthopaedic surgeon, and had him work with

4    you or a nutritionist to work with you to get

5    you into some kind of good diet and exercise

6    program, correct?

7    **A.** Possibly.

8    **Q.** So that was on you, sir, right?

9    **A.** In the end maybe, yes.

10   **Q.** Okay.  Now, Mr. Shaw, you testified that

11   because Cumberland Truck Company offered you a

12   benefit that it has for all of its employees,

13   which is a disability benefit, that it's up to

14   you to choose to take or not take depending on

15   your condition if you needed it or not.  It was

16   on that basis alone that you felt that they

17   considered you disabled, is that true?

18   **A.** And the fact they wouldn't let me work,

19   yes, ma'am.

20       MS. SALTZ: I have no further questions.

21       REDIRECT BY MR. RUSSO:

22   **Q.** A couple.  Ricky, ever try to go on a diet

23   before?

24   **A.** Yes, sir.

25   **Q.** How many times?

1  **A.** My wife had me on five or six diets in the

2  last twelve years or so.

3  **Q.** Did they ever work?

4  **A.** Pardon?

5  **Q.** Did they ever work?

6  **A.** No, sir.

7  **Q.** Did you ever try any fitness routine,

8  Ricky?

9  **A.** Yes, sir.  I tried to walking and riding

10  the bike.

11  **Q.** How did that go?

12  **A.** Not well.  You hit it and then you just

13  start slowing down, you do other things that

14  interest you.

15  **Q.** Did you try these things before in the past

16  without much success?

17  **A.** Yes, sir.

18       MR. RUSSO: Nothing else, Your Honor.

19       MS. SALTZ: No further questions, Your

20  Honor.

21       THE COURT: And I have no questions,

22  Mr. Shaw.  You may step down.  Mr. Russo, your

23  next witness?

24       MR. RUSSO: We call Mr. Kern.

25       THE WITNESS: I need to sit down over there.

1    THE COURT: All right, we'll switch the

2    chairs out.  We'll take a short break, I also

3    want to speak with counsel briefly about our

4    schedule.  Ladies and gentlemen, I don't believe

5    that the case will be in your hands today.  I'm

6    pretty sure it will be in your hands tomorrow,

7    but let me get a better handle on the schedule,

8    we'll come back, and at the end of today's

9    proceedings I'll try to give you an indication

10   as to when we will ultimately provide the case

11   to you for final deliberations.  We'll take a

12   15-minute, let's make it a 10-minute break, a

13   shorter break.  Let's reconvene at twenty of

14   3:00, and, Ms. McKinney, you may escort the

15   jury.

16        (Jury recessed at 2:26 p.m.)

17        THE COURT: Please be seated.  I have only

18   gotten partway through the objections to the

19   Oplinger deposition.  When is that going to be

20   played, in the defendant's case?

21        MS. SALTZ: Yes, Your Honor.

22        THE COURT: How much more do you have

23   Mr. Russo and Mr. Crocenzi?

24        MR. CROCENZI: Just Mr. Kern.

25        THE COURT: All right, and what do you have

1      first up?

2          MS. SALTZ: I'll be moving for a directed

3      verdict obviously, Your Honor, and then after

4      that depending on the court's ruling I have just

5      two witnesses.  Well, Oplinger's video, which I

6      would then play, and then Mr. Staller, who's our

7      economist.

8          THE COURT: Is Mr. Staller here?

9          MS. SALTZ: Yes, he is.  He'll be here today

10     into tomorrow, or he'll be available tomorrow

11     morning if necessary.

12         THE COURT: Could we take him before we do

13     the Oplinger deposition?

14         MS. SALTZ: Oh, we certainly can.

15         THE COURT: To give me a little additional

16     time to rule on those objections?  Unfortunately

17     I didn't have the benefit of a transcript, so I

18     literally have to watch the entire deposition to

19     make those rulings.

20         MS. SALTZ: And I apologize for that, Your

21     Honor.  The court reporter for whatever reason

22     did not think that she needed to produce one

23     immediately and was not very friendly, and we

24     were forced to have to work quickly.  So I

25     apologize to the court for that.

1      THE COURT: All right.

2      MR. SEMBROT: I'm running through it right

3  now, and I've pinpointed all the objectionaries.

4  I've got about maybe twenty minutes left, so I

5  can give you a list of where all the objections

6  exist and make it a quicker process.

7      THE COURT: Perfect.  All right.  Well, then

8  we should be able to play that first if you want

9  to.  As I said, I've made rulings to the extent

10  that I've been able to get through I think the

11  first twenty minutes, so --

12      MS. SALTZ: And again, Your Honor, I

13  apologize, it came as a surprise to me

14  yesterday.

15      THE COURT: Ms. Saltz, not a problem at all.

16  All right, let's take a short break.  We'll be

17  back at twenty of 3:00.

18      (Recess taken from 2:29 to 2:43 p.m.)

19      THE COURT: Please be seated.  Mr. Crocenzi,

20  would you call your next witness?

21      MR. CROCENZI: Yes, Your Honor, thank you

22  Charles Kern.

23      THE COURT: I see that you already have.

24      MR. CROCENZI: We're ready to go.

25      (Charles Kern was called to testify and was

1    sworn by the courtroom deputy.)

2         COURTROOM DEPUTY: Please be seated and

3    state your full name for the record.

4         THE WITNESS: My name is Charles Kern.

5    Charles L. Kern.

6         DIRECT EXAMINATION BY MR. CROCENZI:

7    Q. Thank you, Your Honor.  Mr. Kern, can you

8    tell us who you're employed with?

9    A. Kern & Company, P.C.

10   Q. And how are you affiliated with that

11   company?

12   A. I'm the chairman and CEO.

13   Q. I'm going to ask you some questions now

14   about your background, Mr. Kern.  Can you tell

15   us where you went to college?

16   A. I got a bachelors degree from Penn State in

17   1967.  I received an MBA from Penn State in

18   1969.

19   Q. What were your degrees in from Penn State?

20   A. My bachelors degree was in accounting, and

21   my masters degree was in business

22   administration.

23   Q. Have you received any additional training,

24   degrees or anything of that sort since your MBA?

25   A. I have multiple professional

1    certifications.  I have two in the area of

2    valuing businesses, I have two in the area of

3    forensic accounting, and I have a certification

4    in estate planning.

5        Q. Okay.  Can you describe forensic accounting

6    for us, please?

7        A. There are many definitions floating around.

8    The one I use that I like best at least is that

9    you're trying to draw reasonable conclusions

10   from incomplete data.  For example, if a company

11   had business interruption insurance and the

12   facility burned to the ground, then along with

13   their records and their insurance provided for

14   lost profits how would you estimate those

15   profits.  That's dealing with things like

16   embezzlement, usually a person who commits such

17   a crime makes some effort that all the

18   documentation and information is not there.

19       Q. Can you tell the jury what kind of

20   employment you have had since your college?

21       A. Yes.  When I was in college and graduate

22   school at Penn State I worked for the summers in

23   Philadelphia for an accounting firm that was

24   then called Ernst & Ernst.  It's now Ernst &

25   Young.  I started and worked full-time with

1  Ernst & Young when I got out of graduate school.

2   Q. What did you do when you first started at

3  Ernst & Young?

4   A. I was an auditor.  Then in the last several

5  year I was there I was on there management

6  consulting staff and I dealt with designing

7  accounting and reporting systems.  After Ernst &

8  Ernst I moved back to this area, I was

9  originally from the Harrisburg area and moved

10  back in this area in 1977.  I worked for three

11  years as the controller at Lemoyne Sleeper

12  Company, a local manufacturing firm.  I then

13  started Kern & Company.  When I started Kern &

14  Company I was on my own, and I also managed to

15  have employment at that time that could pay the

16  bills until the firm grew.  I worked as

17  full-time instructor at Penn State Harrisburg

18  campus.

19   Q. What did you teach at Penn State?

20   A. At Penn State I taught intermediate

21  accounting.  I taught advanced accounting.  I

22  taught auditing.  I taught advanced auditing.

23  I taught corporate taxes.  Those type of

24  courses.  I also when I was in graduate school

25  I taught as part of my graduate assistantship,

1   I was teaching there.

2      Q. Now, since starting your own company what

3   have you done at work?

4      A. Well, the firm is now 31 years old.

5   Fortunately it has grown over the years.

6   Probably today about 10 percent of our revenue

7   comes from the once a year individual tax

8   return.  About half of the revenue comes from

9   small closely held business systems, helping

10   them with their financial systems, their taxes,

11   audit them for not for profit organizations.

12   The years of business valuation, litigation

13   support, forensic accounting, depending from

14   year to year the percentage varies, but it's

15   about between a third and 40 percent of our

16   business.  I also taught courses for the

17   Pennsylvania Institute of CPA's, and I also

18   have taught courses for the Pennsylvania Bar

19   Institute.

20      Q. Now, you described for us what your company

21   does.  What do you do on an individual basis at

22   Kern & Company?

23      A. Probably half my time or maybe more than

24   half of my time is the management of the

25   company.  Most of my working time, billable time

1    if you will, has to do with the areas of

2    business valuations, forensic and litigation

3    support.

4      Q. Well, let's talk about litigation support.

5    Have you ever testified before today in a trial?

6      A. Yes.

7      Q. How many times?

8      A. I can't remember because even in the early

9    days of my career when I was at Ernst there were

10   trials in which I testified.  So I can't, it's

11   forty years ago, so I can't remember.

12     Q. We're not going to fault you for that,

13   Mr. Kern.

14     A. Probably --

15     Q. How about within the last five years?

16     A. The last five or ten years I believe it's

17   three or four times.

18     Q. Do you also stay current with the

19   accounting business by reading periodicals and

20   publications?

21     A. Well, the certifications that I have all

22   have with them requirements for continuing

23   professional education.  The requirements vary,

24   but I would estimate that on average we need to

25   keep about forty, at least forty hours a year

1    continuing education in different areas.  I

2    personally usually have about sixty or seventy

3    hours a year.

4      Q. Do you also publish any articles in

5    accounting or --

6      A. Yes, I have over the years published a lot

7    of articles.  Some were for a local regional

8    construction magazine called *Builder Architect*.

9    I have published lot of the articles in the

10   *Central Penn Business Journal*, which is a

11   regional business publication.  I have published

12   articles in a national publication called *Value*

13   *Examiner* mostly to do with business valuations,

14   and I have coauthored an article in what's

15   called the *Journal of Forensic Accounting*.

16     Q. I'm going to show you a list of articles

17   published.  Did you produce this list as part of

18   the report in this case?

19     A. I supplied you with the list.  I don't

20   think it was actually included in the report.

21     Q. All right, and does that list accurately

22   spell out the publications you just testified

23   about?

24     A. Yes.

25     Q. Do you go up to Penn State games?

1    **A.** Well, I did until this year when they

2    decided to double the price.  I have my limits.

3    **Q.** All right.  Now that you've explained to

4    the jury who you are and what you do, I would

5    like to talk to you or ask you some questions

6    about your role in this case.  Were you hired to

7    look at or analyze Mr. Shaw's damages in this

8    case?

9    **A.** Yes.

10   **Q.** And as part of that work what records or

11   information did you review as part of your

12   project?

13   **A.** We looked at -- do you have the report, a

14   copy of it here?

15   **Q.** Sure.

16   **A.** Of course we reviewed the initial letter

17   from you just providing information about the

18   case.  We read the complaint that was filed in

19   the Middle District.  We read the economic, the

20   EEOC's dismissal of notice of rights for

21   Mr. Shaw to litigate.  We went through the

22   website for the Social Security Administration

23   to look at information about retirement dates

24   and times.  We went to the Federal Reserve

25   Bank's website to get some information about

1  securities and investments.  We had a work

2  history for Mr. Shaw which he had provided to

3  us.  We looked at the payment, the checks,

4  copies for the disability payments that Mr. Shaw

5  received, and then we looked at the, what was

6  called the personnel report for Mr. Shaw from

7  the Cumberland Truck Equipment Company.

8    Q. Thank you.  Now, Mr. Kern, after you

9  reviewed that information can you explain to the

10  jury what process you went through to analyze

11  the potential damages for Mr. Shaw as a result

12  of this case?

13    A. We looked at, we started with the data that

14  was in the work history from the point of

15  termination.  We looked at the personnel report,

16  which told us how much money per hour Mr. Shaw

17  was making.  We also I believe in the deposition

18  of Mr. Sheldon and Mr. Whitmire there was

19  discussion of types of cost of living

20  adjustments and the rates that were given in the

21  warehouse, and the years around the date of

22  Mr. Shaw's termination, is it like 3 percent,

23  3.8 percent.

24      So what we did, also Mr. Shaw was making

25  voluntary contributions into his 401-K plan, or

1   6 percent, and Cumberland Truck Company was

2   matching half of that.  So we took Mr. Shaw's

3   basic wage at the time, which was I think

4   $11.65.  We did increase it for cost of living

5   each year and calculated what he would be making

6   each year in total from the date of his

7   termination until the anticipated date of this

8   trial.  We also added to that the amount of the

9   matching contribution for the 401-K, and then of

10  course up to the point of today's trial he had

11  received some short-term disability payment and

12  we did subtract that from the amount that he

13  would have earned.

14      From this point, meaning the approximate

15  date of trial, we in a very similar way, in fact

16  in an identical way calculated what Mr. Shaw

17  would have earned with the annual 3 percent

18  increase and the matching up to the point of his

19  normal retirement date for social security

20  purposes, which was I believe in April of 2018.

21  Now, that represents the wages and the 401-K

22  matches, the money that was, would have been put

23  into the 401-K, both Mr. Shaw's contribution and

24  the company's contribution, would have earned

25  income filed in the 401-K, interest is earned

1   and that accumulates, so that was in both

2   calculations as well.

3        From this point of the approximate trial

4   date until the date of retirement, of course

5   it's the future, so the question also comes up

6   that if Mr. Shaw would prevail in these

7   proceedings and receive the award how much money

8   would he perhaps receive now so that he can be

9   in the same economic position he would have been

10   had he been employed through the term of the

11   date, and of course the numbers that we were

12   calculating are wages in the future.  So that

13   introduces the concept of the time value of

14   money.

15   Q. And we're going to get into that a little

16   later, but I just wanted you to give an overview

17   of the methodology you went through.

18   A. That was the methodology, yes.

19   Q. So were there basically four areas that you

20   looked at?

21   A. Yes.

22   Q. Lost earnings through date of trial, lost

23   401-K through date of trial?

24   A. Right, 401-K earnings.

25   Q. Earnings, correct, and then future loss

1    earnings?

2     **A.** And future 401-K earnings.

3     **Q.** All right, great.  Well, let's start with

4    the first area that you testified about.

5     **A.** Okay.

6     **Q.** And before we go there I need you to take a

7    look at that report, because it has been marked

8    as a plaintiff's exhibit in this case, and I

9    believe we're at P-16.  You described your

10   methodology, did you put that methodology in

11   your figures and your computations in that

12   report?

13    **A.** Yes, we did.

14    **Q.** And is it a true and accurate copy of the

15   report that you have in front of you which is

16   marked as P-16?

17    **A.** Yes, it is.

18    **Q.** And as part of that report did you attach

19   exhibits to it that had basically the

20   calculations that you went through to arrive at

21   your final opinion?

22    **A.** Yes, we did.

23    **Q.** And did you have an Exhibit 2 that shows

24   the calculation of lost earnings from date of

25   termination or last day worked through day of

1    trial?

2    **A.** Yes.

3        THE COURT: Ms. Saltz, feel free to move

4    around if you would like to see the exhibit.

5        MS. SALTZ: Thank you, Your Honor.

6        MR. CROCENZI: Mr. Kern, you're free to come

7    down from the witness stand if that's okay with

8    you, Your Honor, to point something out?

9        THE COURT: He has a portable microphone?

10   Terrific.

11       BY MR. CROCENZI:

12   **Q.** Mr. Kern, can you identify this document

13   please?

14   **A.** Let me see if I can get this hooked up

15   first.  Okay, can you hear me, folks?  Thank

16   you.  This document is the calculation of

17   earnings from 2-27-07 through the approximate

18   date of the trial, which is May 15th.  So as I

19   mentioned to you, we took the hourly rate that

20   Mr. Shaw was getting was $11.65 an hour, and

21   that went through both `07 and then we looked at

22   each year, and then here we take the 11 up to

23   the date of trial.

24   **Q.** Now, what was the percentage increase that

25   you used for the hourly rate?

1    **A.** 3 percent. So the $12 is 103 percent of

2    $11.65. This is 103 percent of the $12 and 103

3    percent of $12.63 and the like.

4    **Q.** How many hours did you use in terms of

5    calculating the number of work --

6    **A.** 40. We went to a calendar and determined

7    the number of weeks that there would have been

8    in each of those time periods, and then we

9    calculated the amount of wage that Mr. Shaw

10   would have earned, and the wages for all those

11   periods, most of this, which are for these three

12   or four years, was $107,614.80. Mr. Shaw put 6

13   percent, was putting 6 percent into his 401-K

14   and the company was matching half of that.

15       So this is the 3 percent, we just took 3

16   percent of the total, but it would've been 3

17   percent each year. That's $3,228 roughly. The

18   total was $110,843. As I think you've been

19   informed he received some short-term disability,

20   so we back that out, so we come up with

21   $97,116.54 as the lost wages and lost 401-K

22   contributions through that date.

23   **Q.** Thank you. Now, the second part of your

24   damage was the loss investment, right, for the

25   401-K?

1   **A.** Yes.

2   **Q.** And I do not have a chart for that.  So if

3   you can either stand there if you wish and

4   explain this or you can have a seat.  Can you

5   explain how you arrived at that number and what

6   number you used?

7   **A.** Yes.  Mr. Shaw was being paid as I recall

8   every two weeks.  So every two weeks there was

9   money being withheld from his pay which was the

10  401-K.  Also there was a match.  So you had

11  these moneys that went into his 401-K plan into

12  his account every pay period, and that started

13  to have some kind of earnings as it went in.

14  Now, what we did was we calculated the amount of

15  interest.  We calculated what that 401-K plan

16  would have grown to over this period of years,

17  telling us that in essence how much would have

18  been in the 401-K plan.  Then we subtracted from

19  that the initial contribution, the difference

20  being the amount that was earned over that

21  period of time.

22  **Q.** What percentage did you use for the

23  investment part of it?

24  **A.** Well, in the first part that you have,

25  well, the whole part we used I think it was like

1   6.23 percent.

2      Q. If you need to refer back to your report,

3   please do so.

4      A. Yes, 6.23 percent.

5      Q. Why did you use that number, Mr. Kern?

6      A. Well, Mr. Shaw was hired in July of the

7   year 2000, and my job as I saw it was to come up

8   with a reasonable estimate not only of the wages

9   but also the amount that would have been earned

10  in the 401-K.  At the time Mr. Shaw was in his

11  late 50's.  So I believe that I myself am a

12  little bit over 65, and I think when you get

13  into your late 50's and 60's you start to think

14  about the security of your retirement plan and

15  the security of your investments.

16      At that time in the year 2000 one of the

17  things, one of the types of investments or rates

18  of return that we commonly look at in doing

19  business valuation work, we deem U.S. government

20  securities as being essentially risk free.  In

21  other words, there are all kinds of investments

22  you can make.  You can buy all kinds of stocks

23  and you can buy all kinds of bonds, but

24  everything has to fail before, generally it

25  will fail before the government fails.

1          Now, there are investments that would earn

2     more, and at that time you're talking about the

3     year 2000 there was an economic boom.  Also he

4     was 58, and at that time there were U.S.

5     treasury bonds, twenty year treasury bonds, and

6     those treasury bonds were paying 6.23 percent.

7     So a person could have invested in that kind of

8     an investment, twenty years, and when they're in

9     retirement, assuming they left the money in

10    there, it would continue to grow.

11         Now, if those bonds are still out there and

12    officially they pay 6.23 percent.  Now, you all

13    might think that boy, I'd like to buy one of

14    those today, and you could.  Now, you can't buy

15    it from the government because that 6.23 percent

16    was what the government was paying back on July

17    10th of 2000.  So if you knew somebody that had

18    such a bond and you wanted to buy it from them

19    so you could get the 6.23 percent, if they are

20    knowledgeable about investments, say you wanted

21    to buy for example $10,000 worth, well, they

22    wouldn't sell you a $10,000 bond for $10,000.

23    They'd want perhaps $12,000 or $13,000 for it.

24    So you'd get 6.23 percent from the government,

25    but when that bond matured, you know, you'd get

1   the $10,000, you wouldn't get the $13,000 or

2   whatever you paid for, it so that would equalize

3   the earnings, but that's how we did that.

4      Q. And you have an exhibit in your report, if

5   you want to go back and look at your report,

6   please, Mr. Kern, that details that kind of

7   calculation you have taken us through.

8      A. Yes.

9      Q. What exhibit is that to your report?

10     A. Mr. Crocenzi, you're talking about the

11  earnings on the 401-K calculation?

12     Q. Yes, up through date of trial, correct.

13     A. Let me turn this off.

14     Q. You might -- okay, because you're going to

15  be coming back down, but go ahead.

16     A. I didn't know if it might reverberate or

17  something.

18        THE COURT: It might.

19     A. Now, the exhibit you're talking about is

20  Exhibit 3.

21     Q. Now, this is going to pop up on your

22  computer screen in front of you, Mr. Kern, and I

23  think you're going to -- I am not going to have

24  you read all this, but are those the

25  calculations you went through to arrive at the

1   lost investment return on the 401-K?

2       A. Yes.

3       Q. And can you tell us what that number was

4   after you did all these calculations?

5       A. $1,315.67.

6       Q. Okay.  A lot of calculations on one page.

7       A. Yes.

8       Q. I'm going to show you this board --

9           THE COURT: Mr. Crocenzi, I'm not exactly

10  sure if we've officially offered him as an

11  expert witness in this matter.

12          MR. CROCENZI: Okay.

13          THE COURT: And I want to make sure that

14  Ms. Saltz has an opportunity for cross on

15  qualifications if she would like.

16          MR. CROCENZI: Okay.  I apologize.

17          THE COURT: I noted, you may have been doing

18  that at the end and I just wanted to give her an

19  opportunity to voir dire on qualifications.

20          MS. SALTZ: Your Honor, no voir dire on

21  qualifications.

22          THE COURT: All right.

23          MR. CROCENZI: Thank you.

24          THE COURT: So you -- but if you would

25  offer --

1      MR. CROCENZI: I'm going to offer him as an

2  expert in forensic accounting, accounting for

3  damages purposes.

4      THE COURT: All right.  Any objection?

5      MS. SALTZ: No objections, Your Honor.

6      THE COURT: All right.  The court accepts

7  Mr. Kern as an expert in the fields offered by

8  plaintiff.

9      MR. CROCENZI: Okay.

10      THE COURT: Now, ladies and gentlemen, I

11  believe we'll have another expert witness.  I'll

12  give you more instructions at the end of the

13  case about expert witness opinions, but for

14  purposes of this testimony please be advised

15  that the court has recognized Mr. Kern as an

16  expert in his field of accounting that relates

17  to the report that he is referring to, and I

18  believe defense counsel will also have an expert

19  offering an opinion.  Is that correct?

20      MS. SALTZ: That is correct, Your Honor.

21      THE COURT: Okay.

22      BY MR. CROCENZI:

23  Q. Okay.  We've covered two of the four areas,

24  Mr. Kern, and I want to turn your attention to

25  the third area, and that was the lost future

1   wage lost and 401-K contribution, is that right?

2   A. Yes.

3   Q. Now, did you produce an exhibit to your

4   report detailing the calculations for that part

5   of the damage?

6   A. Yes.  Exhibit 4.

7   MR. CROCENZI: Ms. Saltz, I offer Exhibit 4.

8   MS. SALTZ: Thank you.

9   BY MR. CROCENZI:

10  Q. Mr. Kern, I've put on the board here an

11  exhibit, actually is this a true and correct

12  copy of Exhibit 4 from your report showing your

13  calculations?

14  A. Yes, it is.

15  Q. And it looks very similar to the first

16  exhibit that we went through with the lost

17  earnings through date of trial.  Can you explain

18  to the jury the calculation?

19  A. Yes.  The approach is in fact identical.

20  If you go back to Exhibit 2 you'll see that in

21  the year 2011 it's $13.11 per hour.

22  Q. Okay.

23  A. This exhibit picks up from May 16th on and

24  there is the $13.11 per hour, and we did the

25  same -- I lost my pointer.  We did the same

1   process of increasing the hourly rate at 3

2   percent, counted the number of weeks in the

3   period, thirty-three weeks left this year.

4   Mr. Shaw's retirement date for social security

5   purposes, May 18th -- April 18th, rather, 2018.

6   Forty hours a week.  Did the calculations of the

7   wages, again the 3 percent match, that's $6,273.

8   So the total lost wages, future lost wages, and

9   matching 401-K contributions came to $215,000.

10     Q. Okay.  Now, when I stopped you earlier when

11  you were giving us the overview of your scope of

12  the work you mentioned something about present

13  value calculations.

14     A. Yes.

15     Q. And is this where you did your present

16  value calculations?

17     A. After this, yes, that's correct.  Now, we

18  did a -- I don't want to get ahead of myself,

19  but we did a similar calculation for the lost

20  earnings on the 401-K in that time period.

21     Q. Okay.  Why don't we finish this part of,

22  the third part --

23     A. I'm sorry.

24     Q. No problem.  And before I -- well, why

25  don't we do this.  Put this up here, this is --

1    can you identify this for me, please?

2       **A.** Yes.   That is Exhibit 6 from the report.

3       **Q.** What does this show?

4       **A.** It shows what we called the present value

5    of the $215,000 from the other exhibit.   Now,

6    just to give you an explanation of what we mean

7    by present value, let's talk about what we call

8    future value.   Okay?   I'm going to just give you

9    an example, it's not based on any of these

10   numbers, but for example if you were able to say

11   invest $2,000 today, and let's assume that you

12   could find an investment that would grow or pay

13   7.2 percent per year, and if you would make that

14   investment with your $2,000 and take the

15   earnings and growth each year and left it in

16   there, which means it's going to grow upon

17   itself, which we call compounding, under those

18   conditions, those ten years, in 7.2 percent your

19   $2,000 would have doubled.   It would be $4,000.

20       We call that $4,000 if we're sitting here

21   today on May 18th, or 16th, the $4,000 is the

22   future value of $2,000 invested for ten years at

23   7.2 percent.   Now, the flip side of that coin is

24   if somebody would come to us and say, you know,

25   in ten years I'm going to give you $10,000, and

1   you think gee, ten years is a long time away, I

2   wonder what that's really worth today, because,

3   you know, maybe you would like to have some

4   money sooner.  Well, the question is how much

5   would they have to give you today that would be

6   worth $10,000, I mean $4,000 in ten years.

7   Well, if we made the assumption that a fair

8   return or a discount rate was 7.2 percent, the

9   present value of that $4,000 in ten years is

10  $2,000.

11    Q. Is there some kind of accounting formula

12  that you used to determine that value?

13    A. Well, it's not just for accounting but it's

14  calculation of present value, and you can find

15  formulas that will work the other way to give

16  you the future value.

17    Q. All right.  So let's take us through

18  Exhibit 6 and give us the actual numbers that

19  you were working with for Mr. Shaw.

20    A. Okay.  Well, here's the $215,000, which if

21  you remember was the number on the prior

22  exhibit.  Now, we needed an interest rate, or if

23  you will a discount rate, and I used, we used

24  3,39 percent.  Now, the reason where we got

25  that, we're sitting here in 2011, and Mr. Shaw

1  if he had continued to work, again his normal

2  retirement date is 2018, and again I wanted to

3  say what would an investor if they wanted to,

4  because he's older now and we're older now, and

5  he wants to really secure his principal, where

6  might he go to make an investment.  So I went

7  back to the notion of the treasury bond because

8  they're deemed to be very secure, and I looked

9  at a ten year treasury bond, because that would

10 carry us from today through his retirement date,

11 and now, or at least at the date we had closest

12 to May 16th, the ten year treasury bonds were

13 paying 3.39 percent.

14      So we adjust if you will, calculated the

15 present value or backed down from that $215,000,

16 the theory being that if the present value we

17 came up with was $170.317.  So if one had that

18 amount of money today and decided to put it into

19 treasury bonds, a ten year treasury bond at 3.39

20 percent, they'd end up with roughly that

21 $215,000.

22    Q. Now, you then did the fourth part of your

23 calculation, and that was the lost earnings?

24    A. Earnings on the 401.

25    Q. Future 401-K?

1    A. Yes.

2    Q. Not to belabor the point, but I think we

3  can just take a look at your report, Mr. Kern,

4  in an exhibit that we have that would show that

5  calculation.  Can you identify what exhibit that

6  would be in your report?

7    A. That would be Exhibit 5.

8    Q. And I'm showing you on this screen, is that

9  Exhibit 5 from your report that you just

10  referenced?

11    A. Yes, it is.

12    Q. And again there are quite a few

13  calculations there, but can you at least take

14  us briefly through the steps if they were any

15  different than what you just explained to the

16  jury about the lost future wage loss?

17    A. Well, the approach on this exhibit is

18  exactly the same as the one on Exhibit 3 where

19  we calculated the lost earnings on the lost

20  wages up to the date.

21    Q. Okay.

22    A. So we used the same, actually the same

23  approach, and the, we're saying in this case,

24  this is a little bit fuzzy, but I'll read from

25  my paper document.

1    Q. Yeah, that would be better, thank you.

2    A. The total value in that 401-K at April

3    18th, 2018, we computed an estimate of $23,210,

4    but in that same period of time, you know, the

5    amount that would have been Mr. Shaw's and the

6    company's contribution was $18,819.  So the lost

7    future earnings on the 401-K is the $4,391.

8    Q. And we see that at the bottom of your

9    exhibit?

10   A. Yes.

11   Q. Now, Mr. Kern, based on -- let me ask you

12   this.  I meant to ask you about the last

13   exhibit, and that is why did you use Mr. Shaw's

14   date of retirement based on the information you

15   obtained from the Social Security

16   Administration?

17   A. Well, I made the assumption that he would

18   retire at least from Cumberland Truck at the

19   normal retirement date.  Some people retire

20   early because they can or want to or have to.

21   Other people work longer than that.

22   Q. Okay.

23   A. My retirement date is coming up next year,

24   but I'm going to be working longer.

25   Q. Okay.

1    A. I like it.

2    Q. And, Mr. Kern, did you then reach a

3  conclusion based on a reasonable degree of

4  forensic accounting standards of the lost

5  earnings and investments and wages that you

6  have just explained to us?

7    A. Yes, I did.

8    Q. And is that summary or conclusion contained

9  in your report?

10    A. Yes, it is.

11    Q. What page is that on, please?

12    A. 2.

13    Q. Mr. Kern, I'm showing you the last exhibit

14  here.  Now, does this part of the section pulled

15  from your report that you testified contain the

16  summary of your work?

17    A. Yes, it is.

18    Q. All right, and can you just then go through

19  with the jury what these numbers, how they --

20  where you got them from and how they tie

21  together?

22    A. Well, in the earlier exhibits where we

23  looked at the lost wages up through the trial

24  date, the lost wages and the 401-K from that

25  exhibit was $97,116, and we said that the

1  earnings on the 401-K for that same period was

2  $1,315.  A couple of minutes ago we looked at

3  the calculation of the present value of the

4  $215,000 on that exhibit, it was $170,000, and I

5  just read from exhibit, I forget the number, I

6  think it was 4, the earnings on the 401-K on the

7  future and it was $4,000 something I believe,

8  and the present value of that was the $3,472.

9  So the lost wages and 401-K benefits totalled

10 $267,000.  The lost earnings on the 401-K were

11 $4,007, for a total loss of $272,222.

12      MR. CROCENZI: Thank you.  No further

13 questions.

14      THE COURT: Mr. Crocenzi, if you don't mind

15 moving the easel?  Cross examine?

16      CROSS EXAMINATION BY MS. SALTZ:

17  Q. Thank you, Your Honor.  Mr. Kern, you

18 prepared three reports in this matter, correct?

19  A. Yes, that's right.

20  Q. And your most recent report is dated April

21 29th, 2011?

22  A. Yes.

23  Q. And in that report and as you just advised

24 the jury you calculate a total loss equal to

25 $272,222?

1    A. That's correct.

2    Q. In coming to your estimate of the economic

3    loss you relied on assumptions, isn't that true?

4    A. Yes.

5    Q. And the assumptions you rely on become the

6    foundation of your estimate, correct?

7    A. Yes.

8    Q. Now, you have to make certain assumptions

9    with regard to earning capacity after the

10   separation, which is how much Mr. Shaw would

11   have made each year with Cumberland Truck

12   Equipment.

13   A. Yes.

14   Q. And you have to make certain assumptions

15   about Mr. Shaw's earning capacity given the

16   separation, which is how Mr. Shaw could make an

17   alternate employment.  Do you want me to say

18   that one again, because I'm getting a little

19   tongue tied.

20   A. Yeah, I don't think I understood your

21   question.

22   Q. You have to make certain assumptions about

23   Mr. Shaw's earning capacity given the

24   separation, which is how much he would have

25   earned if he had alternative employment.

1   A. No, my assumption was how much he would

2   have earned if he continued as an employee of

3   Cumberland Truck.

4   Q. Now, you have to make certain assumptions

5   with regards to Mr. Shaw's work life, which is

6   how long he would have expected to work,

7   correct?

8   A. That's correct.

9   Q. Then you have to make assumptions as to how

10  those earnings would have changed over time to

11  account for inflation and present value?

12  A. Not account for inflation, but just account

13  for the increases in his wages, which

14  historically have been 3 percent.

15  Q. And when you make all these assumptions,

16  which are the foundation for your estimate, you

17  want to rely on the most exact data that you

18  can, isn't that true?

19  A. Certainly about his initial wages, yes.

20  Q. So the more exact and precise the data you

21  rely on the more accurate your assessments would

22  be?

23  A. I'm not sure what you mean by accurate

24  data.

25  Q. Correct data.  Data that we know that has

1   been confirmed and verified.

2      **A.** Yes.  Right.

3      **Q.** Okay.  Let's discuss your assumptions

4   regarding Mr. Shaw's work life expectancy.

5      **A.** Uh-huh.

6      **Q.** And you assume that Mr. Shaw would have

7   worked to age 66.  True?

8      **A.** I think that's what it is, yes.

9      **Q.** And you chose this age because it's a the

10  point when Mr. Shaw would be eligible for full

11  social security benefits, isn't that true?

12     **A.** That's correct.

13     **Q.** Now, you would agree with me that not

14  everyone works until the full social security

15  retirement age, isn't that true?

16     **A.** Correct.  Some people work longer, like me.

17     **Q.** And some people work shorter?

18     **A.** Yes.

19     **Q.** Okay.  Now, if I represent to you that

20  Mr. Shaw's statistical work life expectancy is

21  to age 64.2, you wouldn't have any reason to

22  disagree with me, would you?

23     **A.** Repeat that, please.

24     **Q.** Okay.  If I represent to you that his

25  statistical work life expectancy is to age

1   64.2 --

2    **A.** Well, I think the Social Security

3   Administration got their expected numbers from

4   somewhere, so if you gave me a number, if the

5   Social Security Administration thinks a person

6   is going to work until 66 or 67, and your

7   numbers are different, I wouldn't automatically

8   assume that your numbers are correct, no.

9    **Q.** So you're relying solely on what social

10   security says then?

11    **A.** Yes, I did.

12    **Q.** Now, so based on the statistical work life

13   data, by doing what you did in relying solely on

14   social security you've overvalued the economic

15   loss but narrowly two years then.

16    **A.** No, I haven't.  That's a hypothetical

17   situation.  I made my calculation based upon him

18   working until normal retirement age.  You know,

19   he could have died and he would have earned

20   less.  He could have gotten, you know, who

21   knows?  There's all kinds of reasons why a

22   person might work more or less than the normal

23   retirement age.

24    **Q.** Health reasons play into that, too, right?

25    **A.** Of course.

1    Q. Let's discuss your assumptions you relied

2    upon regarding residual earning capacity.  Now,

3    you do not value any residual earning capacity,

4    correct?

5    A. I don't know what you mean by residual

6    earning capacity.

7    Q. Well, the residual, in fact if you make,

8    you don't make any mention.  Do you know what

9    residual earning capacity is, sir?

10   A. I just asked you to explain it to me.

11   Q. Well, I'm not the accountant, sir.

12   A. And that's not an accounting concept.

13   Q. Okay.  Now, your total loss figure of

14   $272,222.16 assumes that Mr. Shaw will never be

15   employed again, isn't that correct?

16   A. I'm sorry?  Repeat that.

17   Q. Your total loss figure of $272,222.16 --

18   A. Yes.

19   Q. -- assumes that Mr. Shaw will never be

20   employed again, isn't that true?

21   A. It's my estimate of what he, yes.  Right.

22   Q. Right, because you didn't take away for

23   anything that he could have earned --

24   A. Correct.

25   Q. -- assuming he got employment?

1    A. That's correct.

2    Q. Okay.  Now, he also, Mr. Shaw receives

3    social security disability benefits, doesn't he?

4    A. Yes.

5    Q. And are you familiar with the social

6    security disability benefits program?

7    A. I know it exists, yes.

8    Q. Are you aware that social security only

9    pays benefits to individuals who are totally

10   disabled?

11   A. I know they have disability payments, yes.

12   Q. And are you aware that in order to be

13   granted social security disability benefits an

14   applicant's condition must interfere with basic

15   work related activity?

16   MR. CROCENZI: Objection, Your Honor.  If we

17   could have a side bar on this I'd appreciate it

18   because I think it's going to --

19   THE COURT: Yes, we should have a side bar.

20   (Side bar at 3:31 p.m.)

21   MR. CROCENZI: My objection is that the

22   questions are assuming that the information is

23   correct.  It's a legal question.  We brought

24   this up in the motion in limine and I think it's

25   unfair to be able to ask this witness legal

1    questions she's posing to him.

2        THE COURT: Well, I'm not sure the last

3    question was a legal question.  What concerns me

4    is confusion on the part of the jury where they

5    may be conflating social security disability

6    benefits with a determination of liability in

7    this case.  So that's my sort of overarching

8    concern.  What is it specifically, Ms. Saltz,

9    that you're going to get into with respect to

10   the expert's opinion about social security

11   disability?

12       MS. SALTZ: Well, we have two problems with

13   the way the two issues come in.  On the first

14   end with social security we now know based on

15   Mr. Shaw's testimony that his disability date

16   goes back to February 22nd, 2007.  So with the

17   assumption being that he is not working and is

18   disabled, then there is no loss.  The second

19   problem is that Mr. Kern didn't take into

20   account for any mitigation of working, you know.

21       THE COURT: Right.  Mitigation is a --

22   you've addressed that and if you want to address

23   it again that's fine, but mitigation is not a

24   problem.  It's the social security disability

25   issue, and your point is that --

1        MS. SALTZ: You can't have it both ways is

2   my point.

3        THE COURT: -- if he is disabled then he

4   would not have been entitled to receive --

5        MS. SALTZ: Correct.

6        THE COURT: -- wages.

7        MS. SALTZ: Correct.  You can't have it both

8   ways, and that's the problem with his report is

9   that all he's have done is he hasn't committed

10  to one or the other but has simply said taking

11  from the date of when he, you know, the

12  separation date and carried it through to age 66

13  and says this is his loss and his 401-K.  So I

14  think it's proper cross examination based on his

15  own assumptions in this report.

16       THE COURT: All right.  Mr. Crocenzi?

17       MR. CROCENZI: Mr. Kern is not a lawyer, and

18  I believe Ms. Saltz is making a legal argument

19  that because social security found him disabled,

20  therefore he's considered totally disabled and

21  not be able to receive any kind of wage loss in

22  this matter, and I think if she asks Mr. Kern

23  why didn't he take into consideration the social

24  security disability determination, he will say

25  that is a legal issue and I am not addressing

1    legal issues, I'm not a lawyer, and I think

2    that's what I had a problem with.  She's cross

3    examining him on legal concepts that this

4    witness is not qualified to answer.

5         MS. SALTZ: The problem, Your Honor, is

6    that --

7         MR. CROCENZI: That's why we brought it up

8    in the motion in limine.

9         MS. SALTZ: Mr. Kern in his report did not

10   take into account social security benefits based

11   on collateral estoppel.  He is not an attorney

12   and that is a legal conclusion, but to leave it

13   out there that Mr. Shaw would be entitled to

14   this income stream from date of separation

15   without a, is in conflict with the fact that

16   he's testified that he was found disabled at the

17   disability date.

18        THE COURT: Well, why can't you simply ask

19   him you have not taken into consideration the

20   fact that he was identified as disabled as of

21   February 27th.  Is that --

22        MR. CROCENZI: Right.

23        MS. SALTZ: And could I do the next question

24   then if he had he taken that he would not have

25   been able to, he would not be recovering --

1      MR. CROCENZI: That goes into the legal

2  issue at that --

3      THE COURT: I think he said that directly

4  impacts on the dollar amount that you've

5  calculated.

6      MS. SALTZ: I'm just not sure the jury is

7  going to get that he then get nothing.

8      THE COURT: I'm not sure that he would get

9  nothing because there certainly is a distinction

10  between the amount of the social security

11  benefits and, you know, there's certainly a

12  difference between what you receive in

13  disability benefits and what you could earn if

14  you were working on a full-time basis as

15  Mr. Shaw was prior to the benefits application.

16  Right?  So I guess it's more the issue --

17      MS. SALTZ: Right.

18      THE COURT: -- that he did not take into

19  consideration in his calculations the fact that

20  there was a, there were social security

21  disability benefits paid.  My concern is that if

22  we --

23      MS. SALTZ: I understand.

24      THE COURT: If you attempt to pigeon hole

25  this witness into his view of whether you can

1   recover both disability benefits and work loss

2   that the jury is going to somehow get confused

3   by this.

4        MS. SALTZ: I think I have a way that I can

5   handle both issues and go into another line of

6   questioning.  I think certainly what I can do is

7   essentially say as I said to Your Honor you

8   didn't take into account social security, and

9   you also didn't take into account the fact that

10  he could be gainfully employed and you can't

11  have it both ways, you just left him going

12  forward, and then leave it at that and then go

13  right into the mitigation issue.

14       MR. CROCENZI: I think you've already

15  addressed the mitigation.

16       MS. SALTZ: I have a ways to go on that.

17       THE COURT: Okay.  It's cross examination,

18  I'm going to give her an opportunity to explore

19  mitigation, but with respect to the piece about

20  social security disability, are you, do you have

21  a comfort level with what she has suggested.

22       MR. CROCENZI: I have a comfort level with

23  asking him did he take into consideration the

24  social security disability determination.  He

25  will say no, and I think that's where it should

1   end, and then she can --

2       THE COURT: She could also ask him so you

3   didn't take into consideration that, and then

4   get into the issue of mitigation.

5       MS. SALTZ: Mitigation.

6       THE COURT: All right.  I think we're good.

7       MS. SALTZ: Thank you.

8       THE COURT: Thank you.

9       (Side bar concluded at 3:38 p.m.)

10      THE COURT: Ladies and gentlemen, I believe

11  that Ms. Saltz is going to rephrase her

12  question, and so we'll start anew.  Ms. Saltz?

13      BY MS. SALTZ:

14   Q. Yes, Mr. Kern.  Thank you, Your Honor.  You

15  did not give any consideration to social

16  security in your assumptions or calculations for

17  your bottom line, is that true?

18   A. I did not reduce the loss calculation --

19   Q. I'm not talking about the benefit, sir.

20  I'm talking about the overall set -- you

21  testified you really didn't give, you didn't

22  consider social security disability in this?

23   A. Well, in my report I cite that we did not

24  offset the amount by, the loss by the social

25  security benefit.

1    Q. And also, sir, you did not in your report

2    take into consideration or make any assumption

3    as to Mr. Shaw's capability of returning to some

4    form of alternative employment, did you?

5    A. I was asked to calculate his loss based

6    upon the assumption that he was not able to

7    return to work because of what happened to him,

8    so --

9    Q. And no other employment?

10   A. Correct.

11   Q. Okay.  I'm going to ask you then, sir, that

12   to assume certain facts, assume that Mr. Shaw

13   was able to return to some form of employment,

14   and further assume that he was capable of

15   working a full forty hour work week at this

16   employment.  Now, you would agree with me that

17   the minimum wage in Pennsylvania is currently

18   $7.25 an hour?

19   A. I believe it is.

20   Q. And assuming a full-time forty hour per

21   week schedule, this would result in earnings of

22   $15,080 per year?

23   A. That sounds approximately right.

24   Q. And your estimate of Mr. Shaw's annual

25   earnings with Cumberland is approximately

1   $25,000 per year, isn't that true?  You can look

2   through your report if you need to, sir.

3     **A.** Yes.

4     **Q.** Okay, and that $15,000 is 60 percent of

5   $25,000, isn't that correct?

6     **A.** Yes.

7     **Q.** So if Mr. Shaw can return to some alternate

8   employment, he would at least generate earnings

9   equal to 60 percent of that which he received at

10   Cumberland?

11     **A.** I consider that hypothetical and

12   speculative.  He may find employment where he

13   could make a lot more or as I've assumed he may

14   not be able to find employment at all.

15     **Q.** Okay, but --

16     **A.** But I calculated the loss based upon the

17   assumptions that I've stated, not some

18   hypothetical situation.

19     **Q.** That's why I'm offering this hypothetical.

20   Then taking what you just said --

21     **A.** Well, hypothetically anything could happen.

22     **Q.** I understand, Mr. Kern, but you just said

23   in fact he could make more.

24     **A.** No, I didn't say he could make more.  I

25   said it's possible, hypothetically it's

1  possible.  Anything is possible.

2    Q. Let's hypothetically then assume that he

3  was able to return to alternate employment and

4  he was making $10 an hour.  This would represent

5  approximately $20,000 a year, and that $20,000

6  is 80 percent of that $25,000, correct?

7    A. Yes.

8    Q. So if Mr. Shaw could return to work at an

9  hourly wage of $10 an hour, he could recoup 80

10  percent of his expected earnings with the

11  company?

12    A. Again you're asking for me to make a

13  conclusion based on a hypothetical situation and

14  I just will not do that.

15    Q. You're comfortable with just simply saying

16  that from the date of employment to age 66 this

17  is what his lost earnings are?

18    A. Correct, under the --

19    Q. With no mitigation?

20    A. Under the assumptions that are in my

21  report, that's correct.

22    Q. And let's discuss another one of your

23  assumptions.  How about the wage inflation

24  present value?  Present value means bringing

25  future dollars back to today's dollars, correct?

1    A. Right.

2    Q. And to do that you have to grow by a

3    certain amount, earnings growth, and then

4    reduced to present value by a certain amount,

5    discount rate, correct?

6    A. That's right.

7    Q. Now, you assume future wage increases of 3

8    percent annually?

9    A. Yes.

10   Q. And you also assume a 3.9 annual discount

11   rate?

12   A. 3.39 I think, but yes.

13   Q. And that results in approximately a .39 net

14   discount rate, correct?

15   A. I'd have to do the math.  That's not

16   necessarily correct because you're looking at

17   different time periods, but that's the

18   difference between those two numbers, yes.

19   Q. Okay, but if you used for example 3 percent

20   wage increase and a 5 percent discount rate,

21   that would result in an approximate 2 percent

22   net discount rate?

23   A. Again if you, and if I used a 5 percent

24   discount rate, if I used a 1 percent discount

25   rate, these are all hypothetical situations.

1  I told you that my 3 percent discount rate is

2  based on investment in ten year U.S. treasury

3  bonds, which I consider to be a risk free

4  investment, and that's why I thought that was

5  the appropriate number to use and that's what I

6  used.

7      Q. Are you finished?

8      A. Yes.

9      Q. If I told you that from 1990 to 2010 the

10  average wage growth in the U.S. economy was 3.17

11  and the average yield on a high grade municipal

12  bond was 5.25 percent for the same time period,

13  you would agree that the result is approximately

14  a net discount rate of 2.02 percent?

15      A. If you're asking me if your math is

16  correct, it sounds correct.

17      Q. But if you're using a .39 net discount rate

18  compared to a 2 percent net discount rate you're

19  yielding --

20      A. I'm not using a 3.9 net discount rate.  At

21  least -- I'm not using a net discount rate.  I

22  used a rate at which his, or a prudent

23  investment, the rate at which a prudent

24  investment could have grown.

25      Q. So in essence --

1   A. Then I calculated the present value of the

2   future loss based upon the rate that again a

3   prudent investment at this time would yield.

4   I didn't net two.

5   Q. So the bottom line is, sir, that you simply

6   accepted the social security age full retirement

7   age and looked at the fact of when Mr. Shaw left

8   employment and would retire at age 66 and

9   carried that through without any mitigation at

10  all for other employment?

11  A. Correct.

12     MS. SALTZ: I have no further questions.

13     THE COURT: Any redirect?

14     REDIRECT BY MR. CROCENZI:

15  Q. Mr. Kern, I do have a couple of questions.

16  I want you to assume for purposes of this

17  question had CTE, Cumberland Truck, not told

18  Ricky to go home and stop working, how would

19  that have affected your calculation?

20  A. Would you repeat your question, sir?

21  Q. If CTE had not separated Ricky from

22  employment --

23  A. Right.

24  Q. -- would that have affected your

25  calculation?

1  A. If they had not separated him from

2  employment?  When I talked to Mr. Shaw he, I do

3  know that he told me that he liked his job there

4  and would work there as long as he could have.

5  Q. And has anything that Ms. Saltz shared with

6  you on cross examination, all these numbers she

7  was throwing at you, change your opinions that

8  you gave during direct examination?

9  A. No.  I think that a wise investment in the

10  year 2000, secure investment, U.S. treasury

11  bonds, paying 6.23 percent, and if he would

12  receive an award from this proceeding, concerned

13  about security of retirement, you know, I'm not

14  a financial planner but I'd say to him this is a

15  risk free investment and that's, if it were me

16  that's where I'd put my money.

17  Q. Mr. Kern, we spent a lot of time going over

18  your qualifications as an expert in this matter.

19  You have no legal education?

20  A. No.

21  Q. Do you have a law degree?

22  A. No.

23  Q. And you were asked why you didn't take into

24  consideration the social security disability

25  determination.  Can you tell the jury why you

1    didn't do that as part of your analysis in this

2    case?

3         MS. SALTZ: Objection, Your Honor.

4         THE COURT: I think we've addressed this at

5    side bar.  I don't think that's necessary.  The

6    objection is sustained.

7         MR. CROCENZI: No further questions. Thank

8    you.

9         THE COURT: And, Mr. Kern, I'm not sure if

10   this was asked, but you're offering all of your

11   opinions to a reasonable degree of accounting

12   certainty, is that correct.

13        THE WITNESS: That is correct, and I did

14   include that in my report.

15        THE COURT: Very well.

16        MR. CROCENZI: Regarding the report, Your

17   Honor, I would move for its admission into

18   evidence, along with all the supporting

19   exhibits, publications, and so forth that were

20   acquired.

21        THE COURT: All right, I'm not sure that

22   would necessarily be admitted for purposes of

23   deliberations, but into the record any

24   objection, Ms. Saltz?

25        MS. SALTZ: Into the record no objections,

1  but I agree not with regard to deliberations.

2      THE COURT: All right, very good. It is

3  admitted.

4      MR. CROCENZI: Thank you.

5      THE COURT: And I have no further questions,

6  Mr. Kern.  You may step down.

7      THE WITNESS: Thank you.

8      THE COURT: Mr. Crocenzi or Mr. Russo, any

9  additional witnesses?

10     MR. CROCENZI: No additional witnesses, Your

11 Honor.  We do have one housekeeping matter

12 regarding the transcript from the deposition of

13 Tim Kline.  If you recall we had to clean up

14 some version before it was read and we do have a

15 copy for the court reporter so he didn't have to

16 type the questions and answers as they were

17 being read on the stand.

18     THE COURT: Very good, and is that marked as

19 an exhibit?  Why don't we mark it --

20     MR. CROCENZI: It's P-17, Your Honor.

21     THE COURT: All right, very good.  Any

22 objection to the admission of P-17?

23     MS. SALTZ: No, Your Honor, no objection.

24     THE COURT: All right.  It is admitted.

25 And with that does the plaintiff rest?

1    MR. CROCENZI: Yes, Your Honor.

2    THE COURT: All right.  Ladies and

3    gentlemen, I have a couple of matters I need to

4    address with counsel.  We will take a short

5    break.  I do except that we may run a little

6    past 5:00 today.  I'm hopeful that we can get at

7    least one defense witness in this afternoon, and

8    so for that purposes stay with us and we'll get

9    back to you as soon as we can.  We're in recess

10   until I think 4:15.  That's my best estimate.

11   Ms. McKinney, you may escort the jury.

12       (Jury recessed at 3:50 p.m.)

13   THE COURT: Please be seated.  Ms. Saltz,

14   you have a Rule 50 motion.

15   MS. SALTZ: Yes, Your Honor.  The defense

16   moves under Rule 50 for a directed verdict at

17   this time.  I would just like to begin with the

18   social security aspect of it that in this case

19   the plaintiff by virtue of his own admissions in

20   the application to social security admitted that

21   he lost his job due to his inability to bend

22   based on his knee and back under OSHA

23   requirements, and as a result of that and also

24   indicating the other areas in which that he's

25   not able to work, and more importantly the fact

1    that he did admit that he lost his job because

2    he was not able to do his job duties, has failed

3    to offer an explanation as to why he falls

4    within the American With Disabilities Act at

5    that point and that judicially estopped him from

6    the protection of the ADA.

7         Putting that aside, recognizing that it is

8    to some degree, there's also another issue with

9    regard to that, and this also goes to the main

10   part of the case as well.  An element of this

11   case requires plaintiff's proof of requesting

12   reasonable accommodation, and understanding the

13   conflict sometimes between the ADA and social

14   security, social security does not take into

15   account whether an individual can work with or

16   without accommodation while the ADA does take

17   that into account.

18        In this case the difficulty here is the

19   fact that there has been no evidence by

20   Mr. Shaw's own admission that he was able to

21   work with accommodation or requested

22   accommodation.  The evidence in the case has

23   been by virtue of medical evidence as well as by

24   his own admission that he is not able to meet

25   the physical requirements of his job and never

1    would have been able to meet the physical

2    requirements even after the knee replacement.

3        Therefore there is no question that for the

4    jury to determine whether or not he requested

5    reasonable accommodation, that was denied to him

6    in one aspect, and further there has been

7    absolutely no evidence of retaliation in this

8    case, which is also one of Mr. Shaw's claims.

9    In addition to that this case was brought by

10   Mr. Shaw as a regarded as case, and under a

11   regarded as disabled case it's not enough that

12   Mr. Shaw has, and I'm trying to just find my

13   paperwork here, it's not enough that he, you

14   know, it's not enough for an employer to observe

15   an employee that has an impairment.

16       It requires that the employee -- I found it

17   here -- has to establish in this case the two

18   elements, the two activities, life activities

19   that plaintiff has brought this case under is

20   walking and working.  Now, the working activity,

21   it's plaintiff's burden to demonstrate that the

22   employer perceived or regarded him disabled from

23   a broad class of jobs.  Not his particular job.

24   There has been absolutely no evidence in this

25   case by the plaintiff that Cumberland Truck

1    Equipment Company regarded or perceived him as

2    disabled from an entire class of jobs.

3         As to walking, the fact that Cumberland

4    observed Mr. Shaw having some difficulty walking

5    is insufficient to establish a regarded as

6    aspect of the claim.  In fact, when Mr. Shaw

7    testified, his opinion is or his belief was that

8    because the company offered him a company

9    benefit available to him whether he needed it,

10   if he needed it, was their perceiving him as

11   disabled.  There has been no evidence that

12   Cumberland Truck Equipment Company, which is

13   again the perceptions of the people he worked

14   with and management, perceived him as disabled

15   in any way.

16        That evidence has never come out in this

17   case and therefore based on that he does not

18   fall under the protection of the ADA absent that

19   evidence.  There's also the issue of whether

20   he's qualified, another element that has to be

21   met, and again qualified with or without

22   accommodation.  Well, in this case we have his

23   own physician as testified to by Mr. Shaw saying

24   that he could not carry, lift, walk, stand, and

25   that he could only do a sedentary sit down only

1   job, is that he was not qualified with or

2   without accommodation, and he can't meet that

3   element of the claim.

4       THE COURT: All right.  I'm comfortable

5   enough on the Rule 50 motion with respect to

6   these other claims.  Speak to the retaliation

7   issue if you would, please.

8       MS. SALTZ: Well, the retaliation issue is

9   based solely on the fact that according to

10  plaintiff that Mr. Shaw made a request for

11  accommodation, and I'm not exactly sure how

12  plaintiff takes this out and I'm going to make

13  this assumption that because he requested

14  accommodation and the company didn't accommodate

15  him and then retaliated against him by not

16  allowing him to come back to work and then

17  terminating his employment.  That's my

18  understanding of where the retaliation claim

19  comes in based on plaintiff's pretrial memo

20  and --

21      THE COURT: And where does it fail in your

22  mind?

23      MS. SALTZ: It fails in my find in that

24  first of all Mr. Shaw by his own admission did

25  not make a request for accommodation.  He never

1   requested it.  The one area that plaintiff has

2   brought out in this case is that he requested to

3   have his job modified, but then admitted that

4   there was nothing to modify as far as the

5   duties, admitted that the physical requirements

6   were what the physical requirements were, and

7   further admitted that, you know, he never asked

8   them to modify any of the physical requirements,

9   he never asked them to modify anything, for them

10  to consider him to allow him to continue in his

11  job based on their judgment that he could not do

12  his job, which was based on a medical opinion

13  for which there is also case law, and my trial

14  brief certainly lists also law that I'm relying

15  on in this case, and I'll refer to that.

16      So the problem here is that if you have

17  plaintiff himself admitting that no, he did not

18  specifically ask -- well, first of all we have

19  two aspects to this.  We have to look at just

20  before the exam and after the exam.  The

21  testimony is clear by Mr. Shaw.  He never

22  advised them of any medical condition and never

23  requested any accommodation.  We now have him

24  submit to a medical exam to determine, which at

25  that point based on the unrefuted testimony no

1   one knew what his condition was and whether he

2   could do the job or not do the job, which is why

3   he was sent to the medical exam.  After he went

4   to the medical exam and he failed that medical

5   exam, he came back and requested that he be

6   fired, laid off, left to do his job

7   notwithstanding the medical opinion, and to

8   modify his job description to what he really

9   did.

10       That was what plaintiff's focus was on,

11   that that was the "accommodation" he was

12   requesting.  The problem is that to support both

13   his direct testimony and on cross examination

14   Mr. Shaw admitted that there was nothing to

15   modify.  Those were his assigned duties.  Those

16   were the physical requirements of his duties,

17   and that he never went to Cumberland Truck

18   Equipment at any point after that exam with

19   either restrictions from his own physician, with

20   either requesting that he be given time to take

21   a break throughout the day, not have to lift a

22   certain amount of weight, whatever, something

23   concrete on which the company could determine

24   whether that was reasonable or not.

25       THE COURT: Okay.  I think I understand the

1   basis of your motion.  Who would like to

2   respond?  I think the one distinction that I

3   would like between your argument in support of a

4   Rule 50 motion in favor of the defendants and

5   the request for accommodations is the job

6   analysis and what you're describing is the

7   admissions of Mr. Shaw is that there's clearly

8   two different interpretations of the job

9   analysis and the physical requirements of the

10  job.

11      Mr. Whitmire on the stand specifically said

12  that the lifting of 150 pounds occasionally was

13  with assistance and that the frequent lifting of

14  75 pounds was with assistance, and it's also

15  clear to me that Dr. Walker and those who were

16  evaluating Mr. Shaw in the context of those job

17  descriptions and the nature of the specific

18  duties that a warehouseman is required to

19  perform, we have a major distinction.

20  Dr. Walker is operating under an assumption that

21  is materially different than a supervisor at the

22  defendant's employer.

23      So your argument would be an excellent

24  argument but for the fact that we have a very

25  clear factual issue about what this job really

1    entailed and was Mr. Shaw, was he able to do the

2    job that was required of him pursuant to the

3    company's job description.  So in other words

4    it's that interpretation of the job.  If you

5    want to speak to that?

6        MS. SALTZ: Just very briefly.  The problem

7    with that, Your Honor, is while I understand

8    Your Honor's position that there is, there could

9    be an issue of fact with regard to that, I think

10   Mr. Shaw's testimony was very clear.  But

11   putting that aside, we don't get to

12   accommodation until Mr. Shaw can establish the

13   first element that he is a disabled individual

14   under the Americans With Disabilities Act, and

15   we don't have the evidence there to get him

16   there because under that he has to be either

17   disabled or regarded as disabled, and there's no

18   evidence that anyone regarded him as disabled.

19       THE COURT: All right, and there we just

20   plainly disagree with respect to the scope of

21   the evidence.  I think there's plenty of

22   evidence in here that he was regarded as

23   disabled by virtue of the manner in which he was

24   treated both before and after the initial

25   examination.  I'm going to deny the Rule 50 in

1    all respects for the reasons that I have stated

2    on the record.  I believe that in order to

3    prevail on his first claim he must prove that

4    CTE prevented him from working because it

5    regarded him as disabled, requiring him to prove

6    by a preponderance of the evidence, first that

7    he had a disability within the meaning of the

8    ADA; second, that he was a qualified individual,

9    able to perform the essential functions of the

10   job; and third, that his perceived disability

11   was a motivating factor in CTE's decision to

12   engage in adverse employment action.

13        In order to prevail on his second claim,

14   that is that CTE failed to provide a reasonable

15   accommodation, Mr. Shaw must prove all the

16   following by a preponderance of the evidence.

17   First, that he has a disability within the

18   meaning of the ADA; second, that he is a

19   qualified individual, able to perform the

20   essential functions of the job; third, that CTE

21   was informed of the need for an accommodation

22   for Mr. Shaw due to a disability, and for that

23   specific issue I think that is clear both from

24   the letter of February 28th, 2007 and also from

25   the accommodations that are mentioned within the

1   scope of the medical records; fourth, providing

2   that the accommodation at issue would have been

3   reasonable; and fifth, that CTE failed to

4   provide the accommodation at issue or any other

5   reasonable accommodation.

6       Then finally to prevail on his third claim,

7   that CTE retaliated against him, he must prove

8   by a preponderance of the evidence first that he

9   engaged in a protected activity; and second,

10  that CTE subjected him to a materially adverse

11  employment action at the time or after the

12  protected conduct took place; and third, that

13  there was a causal connection between CTE's

14  adverse employment action and his protected

15  activity.  I have considered the arguments of

16  counsel and all the evidence, and I find that a

17  reasonable jury could have a legally sufficient

18  evidentiary basis to find in favor of Mr. Shaw

19  on all claims.

20      So in light of these evidentiary showings

21  the court will deny defendant's Rule 50 motion

22  for judgment as a matter of law.  I know that

23  we're going to try to get in Dr. Staller this

24  afternoon.  Approximately how long do you

25  anticipate his testimony?  I have the jury

1    prepared to stay a little bit longer.  I'm

2    hoping that, I know that he's from Philadelphia

3    and he probably would like to get back to

4    Philadelphia, but I obviously want to give you

5    sufficient time to place your case into the

6    record.

7        MS. SALTZ: His testimony is not very

8    long.  Well, the problem is time to get through

9    qualifications.  I mean, we could probably --

10   then we have cross examination.  Is there any

11   chance we could do Dr. Oplinger at this point,

12   or is that, does Your Honor need more time with

13   regard to the objections?  Because we're ready

14   to move with that depending on the

15   court's ruling.

16       THE COURT: I'm sorry, I just need more time

17   to review the objections.  I was inclined to

18   rule in favor of some and against others, and

19   in order to have that properly organized I think

20   we need to start with Dr. Staller, and then to

21   the extent that he's not finished, well,

22   unfortunately, Dr. Staller, we'll have to bring

23   you back, but let's see how far we can get with

24   him.  All right?

25       MS. SALTZ: All right.  Thank you.

1      MR. CROCENZI: My cross should not be very

2  long, Your Honor.

3      THE COURT: All right, let's take a break

4  until 4:15.  If you need a little more time than

5  that, that's fine.

6      MS. SALTZ: Thank you.

7      THE COURT: Thank you.

8      (Recess taken from 4:05 to 4:20 p.m.)

9      THE COURT: Please be seated.  Ladies and

10  gentlemen, we've finished the plaintiff's case

11  in chief, and now it's time to turn to the

12  defense and ask if you have any witnesses that

13  you would like to present on behalf of

14  Cumberland Truck Equipment Company.  Ms. Saltz?

15      MS. SALTZ: I do, Your Honor, and thank you.

16  I would like to call at this time Chad Staller

17  to the stand.

18      THE COURT: Good afternoon, Mr. Staller.

19  If you would please step forward, and the

20  courtroom deputy will administer the oath.

21      (Chad Staller was called to testify and was

22  sworn by the courtroom deputy.)

23      COURTROOM DEPUTY: Please be seated and

24  state your full name for the record.

25      THE WITNESS: Chad Lawrence Staller,

1    S-T-A-L-L-E-R.

2         DIRECT EXAMINATION BY MS. SALTZ:

3    Q. Do you happen to have your CV in front of

4    you or do you need a copy?

5    A. I don't, but I know it pretty well.

6    Q. I'll give you an extra one.  Where do you

7    work?

8    A. I work at the Center For Forensic Economic

9    Studies.

10   Q. And could you please describe to the court

11   and the jury what is your occupation, sir?

12   A. I'm a forensic economist.

13   Q. And, Mr. Staller, in today's society we

14   hear a lot about forensics, *CSI* especially.

15   Could you please describe what is a forensic

16   economist?

17   A. Yes, from *CSI* and *Law & Order* there's a

18   funny vision of today of what forensics is.

19   Lab coats, blue lights.  I don't have any of

20   that.  Really the term "forensic" comes from the

21   Latin *foren*.  *Foren* just means public forum.  So

22   what I do is apply economics in the public

23   forum, which is here at the courthouse.

24   Q. Now, what does your daily work consist of,

25   sir?

1    **A.** I provide economic analysis in different

2    types of legal matters.  So such as an

3    employment case as we're here today, motor

4    vehicle accidents, professional liability, any

5    time there's been some type of claimed

6    interruption to future losses, I provide

7    analysis as to what that economic impact is.

8    **Q.** And who do you provide these services for?

9    **A.** Both plaintiff and defense law firms.

10   **Q.** And would you please describe to the jury

11   your educational background, sir?

12   **A.** Yes.  I received my bachelors in economics

13   from Lehigh University.  After Lehigh I then

14   went to Temple University and received my J.D.

15   with honors, my law degree with honors.  A few

16   years later I went back to the Fox School of

17   Business at Temple University and I received my

18   masters of business administration with honors.

19   At that time Temple's basketball program was not

20   that good, so I went over to Villanova and

21   received a masters of accounting degree.  At

22   that time they had the better basketball

23   program, and now both are just in the pits.  So

24   I did a little tour of the Delaware Valley

25   schools.

1   Q. Now, sir, are you a member of any

2   professional societies?

3   A. Yes, I am.

4   Q. Could you tell the jury which ones?

5   A. I'm a member of NACVA, which stands for the

6   National Association of Certified Valuation

7   Analysts. It's a private organization that gives

8   expert types additional training in business

9   valuations.

10   Q. And can you describe any teaching or

11   lecturing you have done?

12   A. I lecture at Temple University School of

13   Law, also Villanova School of Law, and one of

14   the requirements in many states for practicing

15   lawyers is to get continuing legal education.

16   Each year they have to get so many credits of

17   current updates or continuing education with

18   regard to current issues in the law.  I'm a

19   frequent lecturer to various law firms and

20   lawyers with regard to the calculation of

21   damages in various types of cases.

22   Q. Are those legal societies that you've

23   addressed on economics?

24   A. Yes, correct.

25   Q. And have you published any articles in

1  professional journals?

2    **A.** Yes, I have.

3    **Q.** Can you tell the jury which ones?

4    **A.** I've published, I can't recall the exact

5  ones, various articles with regard to the

6  calculation of damages in various legal

7  journals.

8    **Q.** And have you been called upon before to

9  testify in court as an expert?

10   **A.** Yes, I have.

11   **Q.** And in what courts have you testified as an

12  expert?

13   **A.** Various state courts throughout

14  Pennsylvania, Maryland, New Jersey.  Federal

15  courts in Maryland, New Jersey, Pennsylvania,

16  New Hampshire, New York.

17      MS. SALTZ: Your Honor, at this time I would

18  like to offer Mr. Staller as an expert in the

19  area of forensic economics and lost earnings

20  analysis.

21      THE COURT: Any questions of qualifications?

22      MR. CROCENZI: No, Your Honor.

23      THE COURT: Any objections to the offer?

24      MR. CROCENZI: No.

25      THE COURT: All right.  The court will

1    accept Dr. Staller in the fields offered by

2    counsel for the defendant.

3         BY MS. SALTZ:

4    Q. Thank you, Your Honor.  Now, is it Doctor

5    staller?

6    A. It's a J.D., so just mister.  But I like

7    the doctor sound.

8    Q. Now, Mr. Staller, were you retained by my

9    law firm?

10   A. Yes, I was.

11   Q. And completed an assignment for me?

12   A. Yes, I did.

13   Q. Before we get into the specifics of your

14   opinion can you tell the jury what documents you

15   reviewed to conduct your analysis?

16   A. Sure.  I reviewed the complaint, which is

17   just a legal document in the case that gets the

18   case started.  It sets forth the general facts,

19   lay of the land.  I reviewed answers to

20   interrogatories from the plaintiff.  These are

21   just written answers to written questions that

22   are signed under oath by Mr. Shaw.  I reviewed

23   various deposition transcripts from various

24   witnesses that are statements under oath.  The

25   primary one for me was the deposition of

1   Mr. Shaw.  Mr. Shaw's W-2's from the years 2000

2   through the year 2008, and I had an opportunity

3   to review two of Mr. Kern's reports.

4     Q. Through your analysis have you determined

5   the total economic loss as a result of

6   Mr. Shaw's separation of employment on September

7   17th, 2007?

8     A. Yes, I have.

9     Q. Are all the opinions you're about to

10  provide within a reasonable degree of economic

11  certainty?

12    A. They are, yes.

13    Q. And, Mr. Staller, what is the economic loss

14  to Mr. Shaw as a result of his separation of

15  employment in September of 2007?

16    A. The total economic loss would be $9,601.

17    Q. And, Mr. Staller, you were here in the

18  courtroom when Mr. Kern was testifying?

19    A. Yes, I was.

20    Q. And his estimate clearly of loss is quite

21  different than yours.  Could you explain to the

22  jury your analysis and why your figures differ

23  from Mr. Kern's figures?

24    A. Yes.  You heard from Mr. Kern, his loss had

25  quite a few more zeros than my estimate. The

1  primary difference comes from the fact that I

2  analyzed this from Mr. Shaw's ability to work in

3  the labor market.  Going back to September -- or

4  February 26th of 2007, Mr. Shaw went out on

5  short-term disability.  In November 21st, 2007

6  Mr. Shaw sought social security disability.

7  Ultimately that award of social security

8  disability was awarded to Mr. Shaw.  Under the

9  requirements of social security disability there

10  are certain declarations or certain statements

11  being made by Mr. Shaw.

12      He's declared to the Social Security

13  Administration that he can no longer perform his

14  job and he can no longer participate in the

15  labor market.  Once that declaration has been

16  made and it's been reviewed by the Social

17  Security Administration and then was actually

18  ultimately approved, which was Mr. Shaw

19  testified to today that he began receiving

20  disability payments in March of 2008, he's no

21  longer participating in the labor market, and in

22  light of that the earnings stopped.

23      So given the fact that he's been deemed

24  disabled by a government administrative body,

25  they reviewed the documents, he's no longer

1   participating in the labor market.  In light of

2   that my loss stops and that's a significant

3   difference.  Mr. Kern's goes out as he indicated

4   to 2018 and he looks at $11.65 an hour growing

5   at 3 percent. My $9,600 comes from the $11.65,

6   but only from February 26th to November 21st of

7   2007.  At that point Mr. Shaw made that

8   application for disability under the terms of

9   social security, and I can provide them to you

10  today, this is coming from the Social Security

11  Administration, the definition comes from the

12  fact that you cannot do work that you did

13  before.  Your disability has lasted or is

14  expected to last at least one year or result in

15  death.

16      It goes on to state that is your condition

17  severe, your condition must interfere with basic

18  work related activities for your claim to be

19  considered.  His answer goes on to state that if

20  it does not we will find that you are not

21  disabled.  This is the Social Security

22  Administration.  It goes on to say if your

23  condition does interfere with basic work related

24  activities, we proceed and we do an analysis.

25  Once they find that his limitation is severe and

1  it interferes with your ability to do that work,

2  then you're deemed disabled.  In light of their

3  finding the loss stops, and that's why my

4  calculation gets him $9,600.

5    Q. Now, let's assume for the moment, put aside

6  social security.  Now, you heard Mr. Kern

7  testify that all he did was take the time period

8  from the separation and carrying it through to

9  age 66.

10   A. That's correct.

11   Q. Now, do you agree with that assumption of

12 going to age 66 based on social security, simply

13 on social security?

14   A. I do not.

15   Q. And why is that, sir?

16   A. Historically social security actually

17 started at age 65.  Once Congress and the Social

18 Security Administration found out that we were

19 going to run out of funds they have continually

20 shifted the age later and later.  Actually

21 currently you could get your social security

22 benefits starting at age 70 if you do not elect

23 to get them at your social security age of 66 or

24 67.  These ages are almost arbitrarily placed by

25 Congress and the Social Security Administration.

1      In the field of economics and forensic

2  economics there's a concept called statistical

3  work life.  Just like everyone here as a

4  statistical life expectancy which is based upon

5  certain probabilities, there's something called

6  statistical work life based on certain

7  probabilities, and one of the things that

8  Mr. Kern mentioned today was, you know, work

9  life to age 66 does not account for the

10 probability of death or disability.

11     That's exactly what statistical work life

12 does. These are private studies that examine

13 individuals' participation in the labor market

14 based upon their age and education level and

15 sex.  For Mr. Shaw he would have a statistical

16 life age 64.  So in essence by relying upon a

17 generic age of 66 for social security, you're

18 statistically overstating the economic loss.

19 Again as Mr. Kern said you could go longer, you

20 could go shorter, and that would be guessing,

21 but we have data, we have empirical data that

22 says if you go on statistical data you're going

23 to age 64.

24    Q.  Okay.  Now, let's take a looked at, let's

25 put aside society security now for the time

1    being, all right?  I'm going to ask you to

2    assume a hypothetical assuming facts.  Assume

3    that Mr. Shaw did not apply for social security.

4    In taking that assumption, and you heard

5    Mr. Kern's testimony, is there some mitigation

6    of damages in terms that have to take place as

7    far as his finding other employment and how that

8    works with the numbers?

9      **A.** Yes.  From an economic concept that's

10   called mitigation.  Mitigation is reducing your

11   damages or, you know, if you have exposure of a

12   hundred dollars, how do you go make sure that

13   hundred dollar loss is not complete, how do you

14   get back in this case, in this sense, how do you

15   get back into the labor market and how do you

16   recover some earnings, and we do that here by

17   getting other employment.

18        So if we hold aside for the second that he

19   did not get or seek social security disability

20   benefits, he should have at that time been

21   seeking other employment, and that other

22   employment would be able to reduce the damages

23   that were presented by Mr. Kern.

24     Q. And based on your review of the records, if

25   he could work, do you know when he stopped

1  searching for a job?

2    **A.** I do.  In his deposition he stated he has

3  not sought any employment since January of 2008.

4    **Q.** And, sir, are you referring to your report?

5    **A.** Yes, I am.

6      MS. SALTZ: Just for the court's

7  verification that's Defendant's Exhibit 44.

8      THE COURT: Thank you.

9      BY MS. SALTZ:

10    **Q.** You also heard during my examination my

11  presenting some numbers to Mr. Kern.

12    **A.** I did, yes.

13    **Q.** So assume that Mr. Shaw can work and he's

14  earning at least minimum wage.  How would

15  Mr. Kern's estimate change based on that?

16    **A.** At minimum wage that accounts for earnings

17  of $15,080 a year.  Assuming that Mr. Shaw would

18  have not sought social security disability and

19  removed himself from the labor market but got a

20  minimum wage job, and I start this in January

21  1st of 2009, the economic loss would change from

22  that 269 figure to $129,517.

23    **Q.** And how about if he started work and earned

24  $10 per hour?

25    **A.** $10 an hour the earning projection would be

1   $20,800 per year.  That further reduces what the

2   total economic loss would be.  In that case the

3   total economic would be $76,607.

4     Q. All right.  Now, also with regard to growth

5   rates for 401-K, you heard Mr. Kern's testimony

6   in that regard.  Do you agree with him?

7     A. I do not.  I would disagree.

8     Q. And why is that?

9     A. During Mr. Kern's testimony he said he went

10  back to the twenty year treasury bond that was

11  in effect in 2000.  2000, or July of 2000 is

12  right before the first recession of this, or the

13  former decade, and he came up with a twenty year

14  treasury bond of 6.23 percent.  If we're looking

15  at contributions, and Mr. Kern went all through

16  the fact that in each year 2011, 2012, each year

17  that Mr. Shaw would have worked he would have

18  made contributions to his 401-K.

19      I agree with that.  However, what I

20  disagree with is the rate of return those

21  dollars would have gotten.  Those figures

22  projected by Mr. Kern were based upon

23  investments as he stated in 2000.  If you look

24  at exact same piece of data that Mr. Kern relied

25  on but using current investment rates the twenty

1   year treasury as of January of 2011, four months

2   ago, five months ago, it's two points less.  So

3   it would be 4.37 percent.  And what that does is

4   it changes the projection of loss 401-K benefits

5   or lost interest income because now we're

6   growing the principal, how much money that's

7   growing into the future, at 4.2 percent versus

8   6.23 percent, which is more realistic of the

9   economic horizons.

10     Q.  Now, the fact is, and again just very

11  briefly, but assuming based on the facts of loss

12  that, you know, Mr. Shaw has deemed under the

13  social security as being disabled.

14     A.  Yes.

15     Q.  Using that as the assumption, he would not

16  then not have sustained a loss, correct?

17     A.  Correct.  So ultimately his determination

18  of disability from the Social Security

19  Administration goes back to February 26th of

20  2007, and getting those funds from that date and

21  time there really would be zero economic loss.

22     Q.  And my question to you, sir, is and there's

23  of course nothing to determine based on

24  mitigation of damages other than the fact of the

25  minimum wage of $10 to say that he would then be

1   working or having to look for work?

2   **A.** Correct.  If he happened to look for work,

3   which again is different from the facts because

4   he sought disability instead of looking for

5   work, but if he looked for work at a minimum

6   getting reemployed based upon the term minimum

7   wage, we know he'd be making $15,000 a year

8   approximately.

9   **Q.** So my question to you, Mr. Staller, is you

10  still came up with this loss of $9,601?

11  **A.** Yes.

12  **Q.** Could you explain to the jury how you

13  arrived at that based on your explanation just

14  now?

15  **A.** Really it was a generous projection to

16  suggest the fact that maybe he wasn't disabled

17  until the time he sought disability, and he

18  sought the disability application on November

19  21st of 2007, which is then his ultimate

20  declaration or statement through his paperwork

21  that "I'm disabled, I'm not able to do my job or

22  able to participate in the labor market."  What

23  social security ultimately found was his

24  disability goes back to the day, what the

25  initial report of Dr. Walker, which goes back to

1   February 26th of 2007.  If he was deemed

2   disabled from that date there really is no

3   economic loss in this case, but in an event of

4   conservatism I provided an estimate for those

5   seven months.

6      Q. That covers that from --

7      A. February.

8      Q. -- February 26th to November 21, less

9   short-term disability payments?

10     A. That is correct.

11     Q. Now, Mr. Staller, are all the opinions that

12  you have given to a reasonable degree of

13  economic certainty?

14     A. Yes, they are.

15        MS. SALTZ: I have no further questions,

16  Your Honor.

17        THE COURT: Okay. Thank you, Ms. Saltz.

18  Cross examine?

19        MR. CROCENZI: Thank you, Your Honor.

20        CROSS EXAMINATION BY MR. CROCENZI:

21     Q. Mr. Staller, you're in the business of

22  providing expert reports, is that correct?

23     A. Yes.

24     Q. That's what your company does, that's how

25  it earns revenue?

1    **A.** We provide analysis and often times the

2    results in writing reports, yes.

3    **Q.** And you have other people in your firm that

4    do the same thing as you do, provide expert

5    reports for attorneys?

6    **A.** That's correct.

7    **Q.** You also testified that you have testified

8    in other cases before.  Do you remember

9    providing a list of the cases you have testified

10   in in the last five years prior to providing

11   your report in this case?

12   **A.** I think it would be to the last four years.

13   **Q.** Four years, okay.  Do you remember

14   providing that report of the cases?

15   **A.** In this matter?

16   **Q.** Yes.

17   **A.** I believe I did.  I don't have a strong

18   recollection, but I'm sure I did it.

19   **Q.** All right.  I counted the cases and you

20   testified in fifty trials.  Does that sound

21   right?

22   **A.** In the last four years?

23   **Q.** Yes.

24   **A.** That sounds about right.

25   **Q.** And you also gave a deposition thirty-three

1  time, is that right?

2    **A.** If your math is correct on the sheet I have

3  no reason to disagree.

4    **Q.** All right, and a deposition is when as you

5  said somebody, a witness like yourself, an

6  expert witness is put under oath and there's a

7  court reporter taking down testimony and there's

8  a transcript like this made of your testimony,

9  is that right?

10   **A.** Well, yes, with the exception I don't think

11  it's limited to experts.  I think it's with any

12  witness in a case.

13   **Q.** And when you gave a deposition you were

14  testifying as an expert based on a report you

15  produced for an attorney, is that right?

16   **A.** That's correct.

17   **Q.** You also gave two affidavits during that

18  same time period regarding the expert matter, is

19  that correct?

20   **A.** If that's what my list says I have no

21  reason to disagree with you.

22   **Q.** And an affidavit is a written document

23  where you are indicating that you are giving the

24  information to the best of your knowledge based

25  on the penalties of perjury, is that right?

1   A. I think that's a fair definition, yes.

2   Q. Thank you, and you were hired by Ms.

3   Saltz's law firm in this case to provide an

4   expert report for her?

5   A. Yes, I was.

6   Q. Did you charge Ms. Saltz's law firm a fee

7   for your services?

8   A. I'm sure I did.

9   Q. Do you know how much that was?

10   A. I don't know the total fee but I could tell

11   you my hourly rate.

12   Q. What is your hourly rate?

13   A. It's $350 an hour.

14   Q. And do you also charge to be in court today

15   to give your testimony?

16   A. Yes, I do.

17   Q. Is that separate from the hourly rate?

18   A. It is, yes.

19   Q. What is that rate?

20   A. That's a $2,500 for the day.

21   Q. Do you know how many hours you've put in in

22   this case?

23   A. I don't know.

24   Q. You didn't check before you came here?

25   A. I did not.

1    Q. So you put some time into reviewing all

2    those documents you talked about earlier,

3    correct?

4    A. Yes.

5    Q. And you put some time into formulating your

6    analysis of the case, correct?

7    A. I did.

8    Q. And you put some time into drafting your

9    report, right?

10   A. Yes, I did.

11   Q. Did you also take time to prepare to

12   testify today?

13   A. Yes, I did.

14   Q. Any estimate based on what we've gone

15   through now of how many hours you may have put

16   into this case leading up to today's trial?

17   A. I couldn't give you an estimate, but I can

18   let Ms. Saltz know.  I'm sure it's a fair and

19   reasonable time.

20   Q. An economist is different from an

21   accountant, is that correct?

22   A. I would agree so.

23   Q. Right.  You have different educational

24   backgrounds, an accountant has a certain set of

25   educational requirements and an economist has

1    another set of educational requirements?

2      **A.** Possibly.  It depends if the accountants

3    are getting their CPA's and depending, but I'm

4    sure there's some overlap but there would be

5    also some distinction, yes.

6      **Q.** I read your report and listened to your

7    testimony today, and your conclusion is that

8    since Social Security Administration found that

9    Mr. Shaw would qualify for social security

10   disability benefits, that his wage loss in this

11   case should stop.  Is that right?0  that's

12   basically the guts of your opinion today?

13     **A.** That would be my primary opinion, yes.

14     **Q.** In looking at your report the definition

15   that you gave to the jury for the Social

16   Security Administration determination is from

17   the Social Security Administration website, is

18   that correct?

19     **A.** It is, yes.

20     **Q.** I don't see anything else in your report

21   that you cited to such as a regulation, is that

22   right?

23     **A.** I did not cite to a regulation.

24     **Q.** Can you explain to the jury what a

25   regulation is?

1    **A.** Generally, you can probably correct me, but

2    my definition of a regulation would be a

3    promulgation or a rule set forth by an

4    administrative body.

5    **Q.** And since you're a lawyer wouldn't you

6    agree that a regulation is legally binding and

7    that courts and parties can cite to a regulation

8    for support in their position, is that right?

9    **A.** I can't say that it would be legally

10   binding, but I can say that again it's an

11   issuance by an administrative body.

12   **Q.** And wouldn't you agree based on your legal

13   training, Mr. Staller, that lawyers can cite to

14   regulations in support of their legal positions.

15   That's an acceptable resource to consult, is

16   that right?

17       MS. SALTZ: Objection, Your Honor.  I'm not

18   sure exactly where this line of questioning is

19   going.  I mean, he's here as an economic expert,

20   not here as an attorney.

21       MR. CROCENZI: Your Honor, he has given

22   basically a legal opinion and I'm I think

23   entitled to --

24       THE COURT: It is cross examination.  I'm

25   going to give him some leeway on this.  The

1    objection is overruled.

2        MR. CROCENZI:

3     Q. And, Mr. Staller, I don't see anything in

4    your report where you cited to any cases from

5    judges in support of your opinion, is that

6    right?

7     A. I did not provide any case law for my

8    opinions, no.

9     Q. All right, and as a lawyer you're aware

10   that courts issue decisions, right?

11    A. That's part of their role and job, yes.

12    Q. Okay, and lawyers rely upon those court

13   decisions to support their legal positions, is

14   that right?

15    A. I would agree with that, sure.

16    Q. And it's what we call precedent, meaning

17   that when a court issues a decision we're to be

18   bound by that decision unless there's some

19   difference that we can cite, is that right?

20    A. That's an accepted definition of

21   precedence.

22    Q. And I didn't see any statute that you cited

23   in your report for your opinion.  Can you tell

24   the jury what a statute is?

25    A. It's a law that has been codified into --

1   that's probably a bad definition.  Codified law

2   that has been set forth by the legislature and

3   that has been approved.

4     Q. So it's a law passed by Congress or a state

5   legislature, is that right?

6     A. I'd agree with that.

7     Q. Okay.  Good.  So the only support you have

8   in your report for your opinion is a website, is

9   that right?

10    A. Right, that's created and maintain by the

11   administrative body, the Social Security

12   Administration, yes.

13    Q. And is your opinion that because the Social

14   Security Administration found Mr. Shaw to

15   qualify for social security disability that he

16   is therefore I think you said totally disabled

17   based on your review of this website?  Is that

18   my understanding?

19    A. Well, my review would be that social

20   security has deemed Mr. Shaw totally disabled

21   and it's not my finding.

22    Q. Okay, but you're basing it upon that

23   website that you cited to, right?

24    A. Right, again the administrative agency's

25   website that publishes for the American public.

1      Q. And are you aware that the United States

2   Supreme Court is the highest court in the land?

3   You learned that in law school?

4      A. I remember that fact.

5      Q. Okay, good, and have you ever read a case

6   from the United States Supreme Court called

7   Cleveland vs. Policy Management Systems

8   Corporation?

9         MS. SALTZ: Objection, Your Honor.

10        THE COURT: Basis?

11        MS. SALTZ: Again it's -- I mean, this is a

12   determination for in terms of the law, he's

13   testified as to an assumption with regard to

14   what disability provides in the social security

15   in a calculation as to economics.  Now we're

16   going into --

17        THE COURT: He's addressing I think one of

18   the foundations for that opinion.  I think it's

19   fair cross examination.  I'll allow it and I'm

20   also going to give you an instruction on the

21   relationship between social security disability

22   benefits and the Americans With Disabilities Act

23   that will hopefully clarify this.  I'm going to

24   allow some of this, Mr. Crocenzi, but really the

25   determination of law is for the court.  The jury

1   is to determine the facts.  You can attack this

2   presumption, but, ladies and gentlemen,

3   recognize that anything that's related to

4   statements of law have to ultimately come from

5   the court, and the court's description of the

6   law is what controls and should control your

7   deliberations when you apply that law to the

8   facts as you find them to be.  Mr. Crocenzi,

9   I'll give you a little more leeway.

10   BY MR. CROCENZI:

11   Q. Thank you.  Have you read the Cleveland

12   case?

13   A. I have not.

14   Q. Are you aware of the Cleveland case in

15   general?

16   A. Not beyond the last ten seconds when you

17   just presented the case name to me.

18   Q. Okay, and are you aware that the United

19   States Supreme Court in that case said that just

20   because the Social Security Administration deems

21   a person disabled for social security disability

22   purposes doesn't mean that they're disabled for

23   purposes of the Americans With Disabilities Act?

24   Would you like to read the case?  Would you like

25   me to cite to you where court said that?

1    A. Well, if you read it correctly I would not

2    disagree with your reading of it if you did it

3    correctly.

4    Q. Okay.  Have you read any cases from the

5    United States Third Circuit on this issue?

6    A. I have not.

7    Q. And can you tell the jury if you know how

8    the United States Third Circuit fits into the

9    judicial system?

10   A. In the federal court system, I'd have to

11   defer to Your Honor, there's nine circuits, ten.

12   The states are divided into various circuits.

13   The third circuit is, Pennsylvania sits in the

14   Third Circuit along with New Jersey, and

15   Delaware I believe also set sits in the Third

16   Circuit.  After the Third Circuit then you go

17   up to the Supreme Court and those other

18   circumstances.

19       THE COURT: We also claim the Virgin

20   Islands.

21   A. Oh, that's right.

22       THE COURT: Believe it or not.

23   Q. And have you read an opinion from the Third

24   Circuit called Turner vs. Hershey Chocolate?

25   A. I have not.

1    Q. Are you aware of that case in general based

2    on your experience as an expert testifying in

3    these matters?

4    A. I am not.

5    Q. Do you know what employment Mr. Shaw looked

6    for after Cumberland Truck told him to stop

7    working on February 26th, 2007?

8    A. According to his deposition from what I

9    recall he went to a couple of temporary job

10   placement organizations.  My recollection of his

11   deposition testimony was that he went to two or

12   the three I believe temporary job placements.

13   One was JTC maybe, and then I think there was

14   one or two others that he applied with.

15   Q. Okay.  So you're aware that Mr. Shaw did

16   look for employment, correct?

17   A. Minimally, yes.  I mean, according to the

18   deposition, his deposition was in January of

19   2010, sought disability or was put on short-term

20   disability in February of 2007.  February, so in

21   three years two or three places is minimal

22   search effort.

23   Q. Well, do you know when he applied for those

24   jobs after Cumberland Truck told him to stop

25   working?

1    A. I don't recall the specifics in the

2    deposition, but by virtue of fact it would be

3    between February of 2007 and January 10th of

4    2010.

5    Q. And isn't it true based on your review of

6    the deposition transcript that Mr. Shaw was not

7    offered any employment, correct?

8    A. From the two entities that he put his name

9    with that is correct, he did not secure

10   employment.

11   Q. And you also read from his deposition

12   transcript that he was told that it was a

13   difficult work climate for him in the area?

14   A. I can't say if he was told that.  That's

15   what he stated in his deposition, and also when

16   you apply for social security disability you

17   can't secure earnings over a $1,000 a month.

18   So it becomes an economic disincentive to

19   continue to look for work when you're gaining

20   disability because you can't have your cake and

21   eat it, too.

22   Q. Well, let me ask you about that.  Isn't it

23   true that social security has what's called a

24   ticket to work program?  Are you aware of that?

25   A. Yes.

1    Q. So a person can receive social security

2    disability benefits and also work at the same

3    time?

4    A. Well, there's an explanation to that.  Up

5    to a certain dollar level and then the social

6    security disability fades out.

7    Q. Okay, but again you're allowed to work and

8    receive social security disability at the same

9    time, isn't that true?

10   A. At a low threshold level, that is correct.

11   Q. Did you perform any vocational work in

12   this case to determine if there were jobs in

13   Mr. Shaw's geographic area that he would be

14   qualified to perform?

15   A. I did not.

16   Q. Do you have any training as a vocational

17   expert?

18   A. I am not a vocational expert.

19   Q. Are you aware that the Social Security

20   Administration finds that someone Mr. Shaw's

21   age, about mid fifties, can even qualify for

22   social security disability benefits without a

23   finding of total disability?

24   A. I'm sorry, could you restate that question?

25   Q. Sure.  Are you aware that the Social

1    Security Administration has what's called a grid

2    system where somebody can qualify for social

3    security disable without showing that they're

4    totally disabled?

5       A. I'm not familiar with that.

6       Q. Are you aware that the Social Security

7    Administration believes, has found that persons

8    in the mid fifties are, have limited work

9    capability because of their age?

10      A. I don't know if I can answer that.  It's

11   kind of a vague question and it would have to go

12   to a specific person and the Social Security

13   Administration's examination based upon the

14   person's background, training, experience, and

15   the job they're working, or they had previously

16   worked at, so --

17      Q. So you're not aware of that kind of

18   standard from social security that somebody mid

19   fifties is deemed to be already at a

20   disadvantage in the work place?

21      A. I don't think the Social Security

22   Administration deems just because of age a

23   finding of disability.  I think that would be a

24   scary thought for society, but I think they've

25   examined a person in their total presentation

1  with regard to their previous employment,

2  alleged injuries, training and background.

3     Q. Would you agree that using the social

4  security retirement age is an acceptable

5  standard in determining how long a person could

6  work?

7     A. It's one metric.  I don't think it's the

8  most accurate metric.

9     Q. Okay, but it's an acceptable metric?

10  You might not use it, but it's an accepted

11  measurement in your field, is that right?

12     A. Economists will use it, yes.

13     Q. And it's true that the Social Security

14  Administration uses its own standards rather

15  than these private studies that you use, is

16  that right?

17     A. Their standards for what?

18     Q. For retirement.

19     A. I don't think they have standards.  I think

20  actually the retirement age is set forth by the

21  administrative agency itself and it's not based

22  upon statistical data.

23     Q. And if I were to say to the Social Security

24  Administration that I wanted to retire a year

25  before the age they have set for retirement, are

1    they going to give me the full benefits?

2       A.  They will not.  Full benefits of

3    retirement?

4       Q.  Yes.

5       A.  Okay.  They will not.  You can get benefits

6    before your social security age, but they will

7    not be the full benefit.

8          MR. CROCENZI: That's all I have.  Thank

9    you.

10         THE COURT: Any redirect?

11         REDIRECT BY MS. SALTZ:

12      Q.  Just very, very brief.  Mr. Staller, I

13   believe when counsel was asking you questions as

14   to the period of time that Mr. Shaw was looking

15   for employment --

16      A.  Yes.

17      Q.  -- you testified it would have been

18   probably sometime between February 27th, 2007

19   to 2010?

20      A.  To the day of his deposition -- well, that

21   would be the most it could be, but in his

22   deposition he said he really stopped looking for

23   work as of 2008.

24         MS. SALTZ: That's all I wanted to clarify.

25   Thank you.  I have no further questions, Your

1  Honor.

2      THE COURT: All right, I have no questions,

3  Mr. Staller.  You may step down.

4      THE WITNESS: Thank you.

5      THE COURT: Ladies and gentlemen, I do want

6  to give you a little instruction while it's

7  fresh in your mind with respect to the

8  distinction between the Americans With

9  Disabilities Act and a determination of

10  disability under the act and a determination of

11  disability under the auspices of the Social

12  Security Administration.  As you know, there

13  has been evidence in this case that in his

14  application for social security disability

15  benefits Mr. Shaw represented that he was

16  disabled and unable to work.

17      The fact that a person is unable to work

18  for purposes of receiving social security

19  disability benefits does not necessarily mean

20  that he is not a qualified individual under the

21  Americans With Disabilities Act.  Under the

22  Americans With Disabilities Act -- excuse me,

23  unlike the Americans With Disabilities Act a

24  finding of disability by the Social Security

25  Administration does not take into account

1   whether a person may be able to perform the

2   essential functions of a job with reasonable

3   accommodation.

4        However, you may consider Mr. Shaw's

5   statements in the social security disability

6   application in determining whether he was a

7   qualified individual, and I'll give you

8   additional information about a qualified

9   individual under the Americans With Disabilities

10  Act in my final instructions.  Ladies and

11  gentlemen, it is 5:00.  You may have heard some

12  thunder outside, the weather is very bad, so

13  please drive carefully home.  Hopefully this is

14  just a passing storm.

15       Get a good night's sleep, come back

16  refreshed, we'll have some additional testimony

17  tomorrow.  I am confident that the case will be

18  in your hands sometime by late morning.  Please

19  refrain from any independent research, please

20  refrain from any conversations among yourselves

21  or with anyone else about what you have seen and

22  heard so far regarding this case.  You will have

23  that opportunity tomorrow during the course of

24  your final deliberations.  We're in recess until

25  9:00 tomorrow morning.  Ms. McKinney, you may

1    escort the jury.

2         (Jury recessed at 5:00 p.m.)

3         THE COURT: Ladies and gentlemen, please be

4    seated.  Logistically, counsel, if I could have

5    the identity of the time frame for when each of

6    the objections is, if you could, each of the

7    objections are noted on the testimony, on the CD

8    of the testimony of Dr. Oplinger.  We'll make

9    those rulings later on this evening and provide

10   them to you first thing tomorrow morning.

11   Ms. Saltz, my understanding is that deposition

12   is the only thing you have left?

13        MS. SALTZ: Correct, and I believe it is

14   fifty --

15        THE COURT: It's fifty minutes.

16        MR. CROCENZI: Fifty minutes, yes.

17        MS. SALTZ: Yes.

18        THE COURT: All right.  Then you rest, do

19   you anticipate any rebuttal testimony?

20        MR. CROCENZI: Not right now.  We'll think

21   about it overnight, Your Honor.

22        THE COURT: All right.

23        MR. CROCENZI: If there is it's going to be

24   very limited.

25        THE COURT: Okay.  Then I think we'll be

```
 1    able to close and charge tomorrow morning.  I
 2    have a draft of the jury instructions prepared.
 3    I don't believe I'm going to be -- unfortunately
 4    I don't believe I'm going to be able to get
 5    those to you immediately.  If you want to stick
 6    around for a little while we may be able to get
 7    copies to you.  Let me get with my staff and
 8    find out where we are in terms of that draft,
 9    but maybe it would help if you could take a
10    quick look at them before we get started
11    tomorrow.  That way our charge conference can
12    move forward rather quickly.  Does that sound
13    acceptable?
14        MS. SALTZ: Absolutely, especially
15    considering closings are going to be coming
16    shortly afterwards.
17        THE COURT: Right.  Well, why don't we do
18    this.  Let's take a break for fifteen minutes.
19    Let me see if I can get you the charge, a draft
20    of the charge in that period of time, I think I
21    can, and then we'll have our charge conference
22    after Dr. Oplinger's deposition is played
23    tomorrow.  That will give you the evening to
24    look it over and you can raise any objections
25    that you have and we can address them after
```

1   Dr. Oplinger's deposition is played.  Okay?

2   Thank you.  We are in recess until 9:00 tomorrow

3   morning.  Just stick around for fifteen minutes

4   and we'll get you that draft.

5         (Trial adjourned at 5:03 p.m.)

Ricky A. Shaw vs. Cumberland Truck Equipment Co.

1:09-CV-00359

Jury Trial Proceedings, Day 3

18 May 2011

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above case, and that this copy is a correct transcript of the same.

s/ Wesley J. Armstrong

_____

Wesley J. Armstrong

Registered Merit Reporter

The foregoing certification of this transcript does not apply to any reproduction by any means unless under the direct control and/or supervision of the certifying reporter.

# #

**#412** [1] - 1:20

# $

**$1,000** [1] - 250:17
**$1,315** [1] - 187:2
**$1,315.67** [1] - 177:5
**$10** [5] - 202:4, 202:9, 233:24, 233:25, 235:25
**$10,000** [6] - 175:21, 175:22, 176:1, 181:25, 182:6
**$107,614.80** [1] - 172:12
**$11.65** [5] - 168:4, 171:20, 172:2, 229:4, 229:5
**$110,843** [1] - 172:18
**$12** [2] - 172:1, 172:2
**$12,000** [1] - 175:23
**$12.63** [1] - 172:3
**$129,517** [1] - 233:22
**$13,000** [2] - 175:23, 176:1
**$13.11** [2] - 179:21, 179:24
**$15,000** [2] - 201:4, 236:7
**$15,080** [2] - 200:22, 233:17
**$170,000** [1] - 187:4
**$170.317** [1] - 183:17
**$18,819** [1] - 185:6
**$2,000** [5] - 181:11, 181:14, 181:19, 181:22, 182:10
**$2,500** [1] - 240:20
**$20,000** [2] - 202:5
**$20,800** [1] - 234:1
**$215,000** [6] - 180:9, 181:5, 182:20, 183:15, 183:21, 187:4
**$23,210** [1] - 185:3
**$25,000** [3] - 201:1, 201:5, 202:6
**$267,000** [1] - 187:10
**$272,222** [2] - 187:11, 187:25
**$272,222.16** [2] - 192:14, 192:17
**$3,228** [1] - 172:17
**$3,472** [1] - 187:8
**$350** [1] - 240:13
**$4,000** [6] - 181:19, 181:20, 181:21, 182:6, 182:9, 187:7
**$4,007** [1] - 187:11

**$4,391** [1] - 185:7
**$6,273** [1] - 180:7
**$7.25** [1] - 200:18
**$76,607** [1] - 234:3
**$9,600** [2] - 229:5, 230:4
**$9,601** [2] - 227:16, 236:10
**$97,116** [1] - 186:25
**$97,116.54** [1] - 172:21

# 0

**07** [4] - 10:25, 13:14, 42:3, 171:21

# 1

**1** [5] - 10:5, 44:11, 125:12, 125:13, 203:24
**1.5** [1] - 10:5
**10** [4] - 123:22, 139:2, 139:8, 163:6
**10-06** [1] - 35:6
**10-minute** [1] - 157:12
**100** [1] - 1:16
**103** [3] - 172:1, 172:2
**10th** [2] - 175:17, 250:3
**11** [3] - 106:9, 147:7, 171:22
**11:17** [1] - 74:4
**11:35** [1] - 74:2
**11:37** [1] - 74:4
**11th** [1] - 151:10
**12:06** [1] - 101:22
**12:08** [1] - 103:11
**12:30** [1] - 102:6
**12:47** [1] - 136:17
**12th** [1] - 97:24
**13** [6] - 98:4, 98:11, 98:12, 132:1, 145:19, 151:12
**14** [2] - 47:20, 68:4
**14-A** [1] - 132:10
**140** [2] - 75:16, 139:17
**143** [1] - 2:11
**15-minute** [1] - 157:12
**150** [8] - 44:12, 64:16, 64:21, 65:14, 68:22, 116:12, 134:20, 216:12
**152** [1] - 2:12
**155** [1] - 2:11
**15th** [1] - 171:18

**16** [1] - 98:5
**160** [1] - 2:14
**16th** [3] - 179:23, 181:21, 183:12
**17** [2] - 115:13, 115:16
**17050** [1] - 1:16
**17101** [1] - 1:13
**17108** [1] - 1:25
**17th** [4] - 49:1, 70:19, 71:3, 227:7
**18** [5] - 1:5, 2:3, 152:5, 153:4, 260:4
**18-C** [1] - 133:13
**187** [1] - 2:14
**18th** [4] - 180:5, 181:21, 185:3
**19** [2] - 4:12, 48:6
**19087** [1] - 2:14
**1967** [1] - 160:17
**1969** [1] - 160:18
**1977** [1] - 162:10
**1986** [1] - 88:15, 88:16, 124:20
**1990** [2] - 4:9, 204:9
**1:00** [2] - 102:6, 118:24
**1:09-CV-00359** [3] - 1:3, 2:2, 260:2
**1st** [1] - 233:21

# 2

**2** [10] - 23:14, 30:11, 30:16, 44:12, 125:11, 170:23, 179:20, 186:12, 203:21, 204:18
**2-24-07** [1] - 42:3
**2-26** [3] - 32:17, 42:3, 42:14
**2-26-07** [1] - 14:18, 14:22, 16:7, 17:21, 20:18, 22:20, 22:23, 27:21, 31:6, 32:11, 35:8
**2-27-07** [1] - 171:17
**2-28** [1] - 119:6
**2.02** [1] - 204:14
**2000** [13] - 74:16, 89:22, 150:11, 174:7, 174:16, 175:3, 175:17, 206:10, 227:1, 234:11, 234:23
**2003** [2] - 4:13, 4:25
**2006** [13] - 74:16, 74:17, 81:25, 90:20, 90:25, 91:1, 92:1, 94:10, 95:17, 99:20, 124:21

**2006/2007** [1] - 93:19
**2007** [40] - 9:24, 10:15, 13:23, 14:4, 20:23, 63:8, 64:10, 68:2, 71:3, 74:17, 90:10, 90:14, 93:22, 94:11, 95:17, 121:10, 130:4, 130:17, 130:25, 131:6, 131:8, 142:22, 144:24, 149:12, 150:14, 151:4, 194:16, 218:24, 227:7, 227:15, 228:4, 228:5, 229:7, 235:20, 236:19, 237:1, 249:7, 249:20, 250:3, 254:18
**2008** [15] - 93:22, 122:2, 122:5, 130:23, 131:1, 131:12, 144:24, 149:16, 150:15, 151:10, 152:12, 227:2, 228:20, 233:3, 254:23
**2009** [1] - 233:21
**2010** [5] - 97:24, 204:9, 249:19, 250:4, 254:19
**2011** [8] - 1:5, 2:3, 179:21, 182:25, 187:21, 234:16, 235:1, 260:4
**2012** [1] - 234:16
**2018** [5] - 168:20, 180:5, 183:2, 185:3, 229:4
**205** [1] - 2:15
**207** [1] - 2:15
**209** [1] - 2:17
**21** [3] - 130:17, 135:5, 237:8
**21st** [4] - 130:4, 228:5, 229:6, 236:19
**22** [5] - 77:20, 98:4, 98:9, 145:15, 145:16
**221** [1] - 2:20
**228** [1] - 1:24
**22nd** [1] - 194:16
**23** [1] - 146:17
**234-4161** [1] - 1:14
**237** [1] - 2:20
**249-9058** [1] - 16:13
**250** [1] - 98:25
**254** [1] - 2:21
**269** [1] - 233:22
**26th** [16] - 13:14, 13:23, 14:4, 57:11, 63:8, 64:10, 66:21, 90:10, 90:14, 150:14, 228:4, 229:6, 235:19,

**237:1, 237:8, 249:7**
**27th** [4] - 142:22, 150:15, 196:21, 254:18
**28th** [1] - 218:24
**29th** [1] - 187:21
**2:00** [3] - 136:12, 136:15, 136:16
**2:03** [1] - 136:17
**2:07** [1] - 141:18
**2:09** [1] - 142:11
**2:26** [1] - 157:16
**2:29** [1] - 159:18
**2:43** [1] - 159:18

# 3

**3** [23] - 1:7, 2:2, 2:8, 22:8, 31:12, 44:13, 95:3, 167:22, 168:17, 172:1, 172:15, 172:16, 176:20, 180:1, 180:7, 184:18, 189:14, 203:7, 203:19, 204:1, 229:5, 260:3
**3,39** [1] - 182:24
**3.17** [1] - 204:10
**3.39** [3] - 183:13, 183:19, 203:12
**3.8** [1] - 167:23
**3.9** [2] - 203:10, 204:20
**30** [2] - 24:16, 99:14
**30th** [1] - 131:5
**31** [1] - 163:4
**320** [1] - 1:13
**36** [8] - 131:14, 131:15, 136:24, 151:6, 152:14, 152:15, 153:1, 153:3
**39** [2] - 203:13, 204:17
**3:00** [2] - 157:14, 159:17
**3:31** [1] - 193:20
**3:38** [1] - 199:9
**3:50** [1] - 209:12

# 4

**4** [11] - 27:8, 44:14, 57:15, 57:20, 69:17, 124:14, 124:15, 179:6, 179:7, 179:12, 187:6
**4-05** [1] - 32:17
**4-5-07** [10] - 33:2, 33:14, 34:4, 34:13, 41:4, 41:8, 45:14, 48:15, 48:19, 48:21

**4.2** [1] - 235:7
**4.37** [1] - 235:3
**40** [3] - 99:14,
163:15, 172:6
**400** [1] - 5:20
**401** [1] - 183:24
**401-K** [33] - 167:25,
168:9, 168:21,
168:23, 168:25,
169:23, 169:24,
170:2, 172:13,
172:21, 172:25,
173:10, 173:11,
173:15, 173:18,
174:10, 176:11,
177:1, 179:1, 180:9,
180:20, 183:25,
185:2, 185:7, 186:24,
187:1, 187:6, 187:9,
187:10, 195:13,
234:5, 234:18, 235:4
**44** [1] - 233:7
**45** [2] - 5:21, 138:6
**450** [1] - 5:20
**4:05** [1] - 221:8
**4:15** [2] - 209:10,
221:4
**4:20** [1] - 221:8

## 5

**5** [13] - 44:15,
109:11, 113:4, 113:9,
123:23, 125:24,
125:25, 152:5, 184:7,
184:9, 203:20, 203:23
**5-C** [2] - 126:1, 126:2
**5.25** [1] - 204:12
**50** [11] - 2:17, 94:25,
99:12, 115:12,
115:16, 209:14,
209:16, 213:5, 216:4,
217:25, 219:21
**50's** [2] - 174:11,
174:13
**5006** [1] - 1:16
**54** [1] - 2:8
**542-5569** [1] - 1:25
**58** [1] - 175:4
**591-1755** [1] - 1:17
**5:00** [3] - 209:6,
256:11, 257:2
**5:03** [1] - 259:5
**5th** [1] - 68:2

## 6

**6** [7] - 44:16, 76:7,
168:1, 172:12,
172:13, 181:2, 182:18
**6.23** [10] - 174:1,

**174:4, 175:6, 175:12,**
175:15, 175:19,
175:24, 206:11,
234:14, 235:8
**60** [2] - 201:4, 201:9
**60's** [1] - 174:13
**610** [1] - 1:21
**64** [2] - 231:16,
231:23
**64.2** [1] - 190:21,
191:1
**65** [2] - 174:12,
230:17
**66** [10] - 190:7,
191:6, 195:12,
202:16, 205:8, 230:9,
230:12, 230:23,
231:9, 231:17
**67** [2] - 191:6, 230:24

## 7

**7** [1] - 9:6
**7.2** [4] - 181:13,
181:18, 181:23, 182:8
**70** [2] - 116:12,
230:22
**717** [3] - 1:14, 1:17,
1:25
**72** [1] - 2:9
**74** [1] - 2:11
**75** [3] - 44:13, 68:23,
216:14

## 8

**8** [1] - 58:2
**8-hour** [1] - 58:2
**80** [2] - 202:6, 202:9
**8:00** [2] - 39:11

## 9

**9** [2] - 57:14, 69:15
**9-17** [2] - 46:23, 49:6
**9-17-07** [7] - 47:3,
47:10, 47:15, 51:11,
52:16, 52:18, 72:5
**964-3333** [1] - 1:21
**993** [1] - 1:20
**9:00** [2] - 256:25,
259:2
**9:32** [1] - 1:6

## A

**a.m** [3] - 1:6, 39:11,
74:4
**abilities** [4] - 24:10,
133:23, 151:23,
152:11

**ability** [11] - 21:11,
21:16, 30:24, 31:1,
36:17, 36:24, 64:13,
102:18, 109:2, 228:2,
230:1
**able** [65] - 24:2, 24:5,
24:14, 25:15, 29:6,
29:10, 29:12, 39:8,
42:18, 49:21, 50:17,
50:19, 51:3, 54:24,
60:17, 64:16, 64:21,
65:14, 66:2, 71:3,
71:7, 71:8, 71:9,
71:17, 75:16, 76:3,
97:21, 98:16, 98:20,
98:23, 98:25, 99:25,
106:24, 119:22,
126:12, 132:12,
146:1, 150:12, 159:8,
159:10, 181:10,
193:25, 195:21,
196:25, 200:6,
200:13, 201:14,
202:3, 209:25, 210:2,
210:20, 210:24,
211:1, 217:1, 218:9,
218:19, 232:22,
236:21, 236:22,
256:1, 258:1, 258:4,
258:6
**absent** [1] - 212:18
**absolutely** [3] -
211:7, 211:24, 258:14
**Academy** [1] - 4:17
**accept** [2] - 226:1
**acceptable** [4] -
243:15, 253:4, 253:9,
258:13
**accepted** [4] - 63:22,
205:6, 244:20, 253:10
**accepts** [1] - 178:6
**accident** [1] - 86:12
**accidents** [1] - 223:4
**accommodate** [2] -
123:17, 213:14
**accommodation** [24]
- 44:11, 111:16,
117:12, 117:14,
152:20, 210:12,
210:16, 210:21,
210:22, 211:5,
212:22, 213:2,
213:11, 213:14,
213:25, 214:23,
215:11, 217:12,
218:15, 218:21,
219:2, 219:4, 219:5,
256:3
**accommodations**
[18] - 31:14, 31:17,

38:7, 48:22, 51:5,
51:15, 51:20, 68:20,
68:21, 89:7, 90:3,
111:10, 111:11,
111:12, 111:14,
152:16, 216:5, 218:25
**accomplished** [1] -
82:21
**according** [6] -
25:18, 26:3, 126:22,
213:9, 249:8, 249:17
**account** [13] - 68:12,
173:12, 189:11,
189:12, 194:20,
196:10, 198:8, 198:9,
210:15, 210:17,
231:9, 255:25
**accountant** [3] -
192:11, 241:21,
241:24
**accountants** [1] -
242:2
**Accounting** [1] -
165:15
**accounting** [19] -
160:20, 161:3, 161:5,
161:23, 162:7,
162:21, 163:13,
164:19, 165:5, 178:2,
178:16, 182:11,
182:13, 186:4,
192:12, 207:11,
223:21
**accounts** [1] -
233:16
**accumulates** [1] -
169:1
**accurate** [6] - 40:18,
67:22, 170:14,
189:21, 189:23, 253:8
**accurately** [4] -
82:19, 95:4, 165:21,
260:9
**acquired** [1] - 207:20
**act** [1] - 255:10
**Act** [9] - 210:4,
217:14, 246:22,
247:23, 255:9,
255:21, 255:22,
255:23, 256:10
**action** [4] - 86:8,
218:12, 219:11,
219:14
**activities** [11] -
67:11, 126:20,
133:15, 140:11,
152:6, 152:7, 153:15,
211:18, 229:18,
229:24
**activity** [9] - 21:17,

93:7, 93:10, 140:10,
153:22, 193:15,
211:20, 219:9, 219:15
**actual** [9] - 18:11,
36:19, 96:4, 105:5,
105:7, 125:22, 128:3,
128:5, 182:18
**acute** [4] - 35:21,
39:14, 72:21, 73:2
**ADA** [7] - 101:11,
210:6, 210:13,
210:16, 212:18,
218:8, 218:18
**added** [2] - 85:13,
168:8
**addition** [2] - 6:8,
211:9
**additional** [10] - 7:1,
63:4, 69:25, 158:15,
160:23, 208:9,
208:10, 224:8, 256:8,
256:16
**address** [3] - 194:22,
209:4, 258:25
**addressed** [7] - 70:4,
70:5, 194:22, 198:15,
207:4, 224:23
**addressing** [2] -
195:25, 246:17
**adjourned** [1] -
259:5
**adjust** [1] - 183:14
**adjustments** [1] -
167:20
**administer** [1] -
221:20
**Administration** [27] -
141:14, 142:17,
166:22, 185:16,
191:3, 191:5, 228:13,
228:17, 229:11,
229:22, 230:18,
230:25, 235:19,
242:8, 242:16,
242:17, 245:12,
245:14, 247:20,
251:20, 252:1, 252:7,
252:22, 253:14,
253:24, 255:12,
255:25
**administration** [2] -
160:22, 223:18
**Administration's** [1]
- 252:13
**administrative** [6] -
228:24, 243:4,
243:11, 245:11,
245:24, 253:21
**admission** [15] -
23:16, 41:11, 47:17,

49:8, 69:9, 70:10,
70:12, 72:1, 73:11,
141:2, 207:17,
208:22, 210:20,
210:24, 213:24
   **admissions** [2] -
209:19, 216:7
   **admit** [2] - 141:21,
210:1
   **admitted** [26] - 9:6,
23:21, 41:15, 48:4,
49:12, 69:11, 69:16,
69:18, 69:19, 69:20,
70:14, 72:2, 72:6,
73:10, 73:17, 76:7,
106:8, 141:6, 207:22,
208:3, 208:24,
209:20, 214:3, 214:5,
214:7, 215:14
   **admitting** [1] -
214:17
   **adulthood** [1] - 6:22
   **advanced** [2] -
162:21, 162:22
   **adverse** [3] - 218:12,
219:10, 219:14
   **advice** [1] - 20:5
   **advise** [1] - 32:12
   **advised** [3] - 178:14,
187:23, 214:22
   **affect** [3] - 110:13,
110:14, 134:1
   **affected** [4] - 110:10,
110:11, 205:19,
205:24
   **affidavit** [1] - 239:22
   **affidavits** [1] -
239:17
   **affiliated** [1] - 160:10
   **afield** [1] - 54:1
   **afraid** [1] - 120:3
   **afternoon** [7] - 94:3,
95:14, 136:11, 143:5,
209:7, 219:24, 221:18
   **afterwards** [1] -
258:16
   **age** [30] - 190:7,
190:9, 190:15,
190:21, 190:25,
191:18, 191:23,
195:12, 202:16,
205:6, 205:7, 205:8,
230:9, 230:12,
230:17, 230:20,
230:22, 230:23,
231:9, 231:14,
231:16, 231:17,
231:23, 251:21,
252:9, 252:22, 253:4,
253:20, 253:25, 254:6

   **agency** [1] - 253:21
   **agency's** [1] - 245:24
   **ages** [1] - 230:24
   **aggravated** [1] -
129:8
   **ago** [5] - 107:21,
164:11, 187:2, 235:2
   **agree** [20] - 24:6,
24:19, 63:20, 66:10,
69:7, 75:12, 130:25,
190:13, 200:16,
204:13, 208:1,
230:11, 234:6,
234:19, 241:22,
243:6, 243:12,
244:15, 245:6, 253:3
   **agreed** [3] - 3:7,
44:20, 120:4
   **agreement)** [1] -
44:17
   **agrees** [1] - 117:4
   **ahead** [3] - 154:23,
176:15, 180:18
   **aids** [1] - 135:11
   **air** [2] - 78:25, 144:8
   **aisle** [1] - 77:5
   **aisles** [4] - 76:22,
76:23, 77:3, 77:7
   **allegation** [3] -
100:1, 100:10, 102:11
   **alleged** [1] - 253:2
   **allow** [5] - 21:15,
142:4, 214:10,
246:19, 246:24
   **allowed** [1] - 251:7
   **allowing** [1] - 213:16
   **almost** [2] - 72:18,
230:24
   **alone** [1] - 155:16
   **alternate** [3] -
188:17, 201:7, 202:3
   **alternative** [3] -
144:6, 188:25, 200:4
   **ambulation** [1] -
25:25
   **American** [2] - 210:4,
245:25
   **Americans** [8] -
217:14, 246:22,
247:23, 255:8,
255:21, 255:22,
255:23, 256:9
   **amount** [14] - 168:8,
168:12, 172:9,
173:14, 173:20,
174:9, 183:18, 185:5,
197:4, 197:10,
199:24, 203:3, 203:4,
215:22
   **amounts** [1] - 142:6

   **analysis** [42] - 20:17,
20:21, 22:19, 22:22,
22:24, 23:2, 23:6,
23:15, 27:24, 28:4,
31:12, 31:23, 32:3,
33:9, 37:6, 40:17,
40:25, 41:2, 41:7,
42:14, 44:2, 47:24,
48:24, 62:4, 115:18,
115:25, 123:11,
150:4, 150:9, 150:11,
207:1, 216:6, 216:9,
223:1, 223:7, 225:20,
226:15, 227:4,
227:22, 229:24,
238:1, 241:6
   **Analysts** [1] - 224:7
   **analyze** [5] - 21:10,
21:16, 21:22, 166:7,
167:10
   **analyzed** [1] - 228:2
   **Andrew** [2] - 2:7,
3:14
   **andrew** [1] - 3:18
   **anew** [1] - 199:12
   **annual** [4] - 8:13,
17:11, 168:17,
200:24, 203:10
   **annually** [2] - 52:24,
203:8
   **answer** [29] - 6:12,
15:4, 21:18, 31:16,
39:20, 59:3, 63:16,
64:5, 66:6, 66:7,
67:22, 72:15, 87:19,
88:1, 98:6, 98:14,
98:17, 104:21, 113:2,
120:1, 125:7, 145:21,
146:16, 151:18,
154:13, 154:17,
196:4, 229:19, 252:10
   **answered** [3] -
65:20, 112:22, 113:1
   **answers** [3] -
208:16, 226:19,
226:21
   **anticipate** [2] -
219:25, 257:19
   **anticipated** [1] -
168:7
   **anticipating** [1] -
87:21
   **antiinflammatory** [3]
- 91:6, 91:10, 103:22
   **antiinflammatory/
pain** [1] - 91:14
   **anyway** [1] - 150:20
   **aortas** [1] - 6:5
   **AP** [1] - 56:2
   **apologize** [7] - 19:2,

125:18, 154:19,
158:20, 158:25,
159:13, 177:16
   **Appalachian** [2] -
33:4, 150:22
   **appear** [2] - 26:17,
71:20
   **APPEARANCES** [1] -
1:10
   **appearing** [2] - 62:8,
64:10
   **applicant's** [1] -
193:14
   **application** [7] -
130:18, 197:15,
209:20, 229:8,
236:18, 255:14, 256:6
   **applied** [5] - 124:11,
129:25, 130:3,
249:14, 249:23
   **apply** [7] - 118:13,
148:15, 222:22,
232:3, 247:7, 250:16,
260:23
   **appointment** [6] -
7:23, 8:2, 14:5, 15:19,
16:7, 50:11
   **appointments** [1] -
6:10
   **appreciate** [2] -
55:23, 193:17
   **approach** [6] - 11:17,
101:21, 141:17,
179:19, 184:17,
184:23
   **appropriate** [1] -
204:5
   **approved** [2] -
228:18, 245:3
   **approximate** [4] -
168:14, 169:3,
171:17, 203:21
   **April** [9] - 67:25,
68:1, 109:15, 121:10,
149:12, 168:20,
180:5, 185:2, 187:20
   **arbitrarily** [1] -
230:24
   **Architect** [1] - 165:8
   **area** [16] - 7:8, 8:7,
35:25, 84:5, 103:4,
161:1, 161:2, 162:8,
162:9, 162:10, 170:4,
178:25, 214:1,
225:19, 250:13,
251:13
   **areas** [6] - 53:18,
164:1, 165:1, 169:19,
178:23, 209:24
   **argument** [4] -

195:18, 216:3,
216:23, 216:24
   **arguments** [1] -
219:15
   **arm** [1] - 102:20
   **Armstrong** [4] - 1:23,
142:13, 260:15,
260:17
   **arrive** [2] - 170:20,
176:25
   **arrived** [2] - 173:5,
236:13
   **arthritis** [1] - 36:14
   **article** [1] - 165:14
   **articles** [7] - 165:4,
165:7, 165:9, 165:12,
165:16, 224:25, 225:5
   **aside** [6] - 89:19,
210:7, 217:11, 230:5,
231:25, 232:18
   **aspect** [4] - 35:13,
209:18, 211:6, 212:6
   **aspects** [2] - 126:24,
214:19
   **aspirin** [1] - 104:24
   **assessment** [3] -
66:1, 120:10, 152:11
   **assessments** [1] -
189:21
   **assigned** [3] - 76:8,
95:4, 215:15
   **assignment** [1] -
226:11
   **assist** [3] - 43:24,
98:15, 145:25
   **assistance** [5] -
111:17, 146:25,
147:5, 216:13, 216:14
   **assistant** [30] - 10:9,
10:16, 11:20, 12:24,
13:20, 13:22, 17:20,
17:24, 19:2, 19:6,
19:7, 22:7, 22:14,
25:11, 26:16, 31:13,
42:2, 56:2, 56:4, 56:5,
61:22, 62:14, 62:16,
62:18, 63:3, 63:10,
63:21, 64:3, 65:4,
105:21
   **assistant's** [4] -
18:6, 19:4, 60:12,
64:7
   **assistants** [2] -
10:12, 11:10
   **assistantship** [1] -
162:25
   **assisting** [2] - 97:14,
98:22
   **Association** [1] -
224:6

**assume** [15] - 50:1,
181:11, 190:6, 191:8,
200:12, 200:14,
202:2, 203:7, 203:10,
205:16, 230:5, 232:2,
233:13
**assumed** [1] -
201:13
**assumes** [2] -
192:14, 192:19
**assuming** [7] -
175:9, 192:25,
193:22, 200:20,
232:2, 233:17, 235:11
**assumption** [12] -
182:7, 185:17, 189:1,
194:17, 200:2, 200:6,
213:13, 216:20,
230:11, 232:4,
235:15, 246:13
**assumptions** [15] -
188:3, 188:5, 188:8,
188:14, 188:22,
189:4, 189:9, 189:15,
190:3, 192:1, 195:15,
199:16, 201:17,
202:20, 202:23
**ate** [2] - 76:19, 104:3
**attach** [1] - 170:18
**attack** [1] - 247:1
**attacks** [1] - 6:4
**attempt** [4] - 40:19,
40:23, 45:10, 197:24
**attend** [1] - 126:18
**attention** [4] -
146:24, 151:11,
152:4, 178:24
**attorney** [3] - 196:11,
239:15, 243:20
**attorneys** [2] - 67:8,
238:5
**audio** [1] - 142:13
**audit** [1] - 163:11
**auditing** [1] - 162:22
**auditor** [1] - 162:4
**August** [1] - 122:5
**auspices** [1] -
255:11
**authenticated** [1] -
26:15
**authority** [1] - 11:20
**authorization** [5] -
15:9, 15:11, 16:21,
17:2, 33:13
**authorized** [2] - 93:5,
107:24
**automatically** [1] -
191:7
**available** [8] - 14:16,
21:25, 43:24, 45:14,

45:15, 85:6, 158:10,
212:9
**average** [7] - 29:19,
29:20, 30:9, 78:14,
164:24, 204:10,
204:11
**award** [4] - 141:20,
169:7, 206:12, 228:7
**awarded** [2] -
142:17, 228:8
**aware** [4] - 114:2,
193:8, 193:12, 244:9,
246:1, 247:14,
247:18, 249:1,
249:15, 250:24,
251:19, 251:25,
252:6, 252:17

# B

**bachelors** [3] -
160:16, 160:20,
223:12
**backed** [1] - 183:15
**background** [5] -
4:1, 160:14, 223:11,
252:14, 253:2
**backgrounds** [1] -
241:24
**bad** [7] - 134:8,
134:10, 135:13,
138:7, 245:1, 256:12
**bags** [1] - 78:25
**balance** [2] - 92:18,
135:13
**bandage** [1] - 137:14
**Bank's** [1] - 166:25
**bar** [1] - 55:12, 65:7,
101:22, 103:11,
141:18, 142:11,
193:17, 193:19,
193:20, 199:9, 207:5
**Bar** [1] - 163:18
**baseball** [1] - 107:18
**based** [75] - 6:25,
13:18, 14:14, 24:6,
24:9, 25:2, 38:5,
38:10, 38:17, 39:20,
54:9, 54:11, 54:18,
54:21, 55:5, 57:20,
60:4, 60:11, 61:8,
64:1, 64:18, 65:17,
65:23, 66:3, 66:19,
67:16, 68:17, 70:24,
99:16, 99:17, 106:23,
128:7, 142:19, 181:9,
185:11, 185:14,
186:3, 191:12,
191:17, 194:14,
195:14, 196:10,
200:5, 201:16,

202:13, 204:2, 205:2,
209:22, 212:17,
213:9, 213:19,
214:11, 214:12,
214:25, 230:12,
231:4, 231:6, 231:14,
232:24, 233:15,
234:22, 235:11,
235:23, 236:6,
236:13, 239:14,
239:24, 241:14,
243:12, 245:17,
249:1, 250:5, 252:13,
253:21
**basic** [4] - 168:3,
193:14, 229:17,
229:23
**basing** [1] - 245:22
**basis** [10] - 45:16,
91:7, 111:19, 145:3,
155:16, 163:21,
197:14, 216:1,
219:18, 246:10
**basketball** [2] -
223:19, 223:22
**bears** [1] - 55:19
**became** [2] - 95:11,
142:20
**become** [2] - 93:21,
188:5
**becomes** [1] -
250:18
**BEFORE** [1] - 1:8
**began** [4] - 132:5,
133:17, 153:16,
228:19
**begin** [5] - 56:7,
57:16, 88:1, 94:15,
209:17
**beginning** [2] - 4:2,
87:9
**begins** [1] - 37:18
**behalf** [1] - 221:13
**behind** [2] - 88:6,
143:15
**belabor** [2] - 68:6,
184:2
**belief** [5] - 128:7,
128:8, 128:11,
128:13, 212:7
**believes** [1] - 252:7
**belonged** [1] - 81:5
**below** [3] - 28:12,
30:17, 64:14
**bend** [7] - 12:9,
20:20, 43:9, 44:15,
68:25, 80:18, 80:19,
83:5, 83:8, 83:13,
139:19, 145:5, 209:21
**bending** [13] - 30:12,

30:16, 43:4, 64:21,
75:21, 81:9, 86:5,
92:23, 116:17, 134:3,
134:11, 138:9, 140:13
**benefit** [7] - 155:12,
155:13, 158:17,
199:19, 199:25,
212:9, 254:7
**benefits** [35] - 118:7,
118:8, 118:10,
118:18, 127:11,
130:1, 130:3, 130:19,
142:3, 142:17, 187:9,
190:11, 193:3, 193:6,
193:9, 193:13, 194:6,
196:10, 197:11,
197:13, 197:15,
197:21, 198:1,
230:22, 232:20,
235:4, 242:10,
246:22, 251:2,
251:22, 254:1, 254:2,
254:5, 255:15, 255:19
**bent** [1] - 82:5
**best** [3] - 161:8,
209:10, 239:24
**better** [6] - 7:4, 38:2,
121:25, 157:7, 185:1,
223:22
**between** [18] - 11:2,
29:13, 39:11, 39:12,
50:2, 116:6, 144:24,
163:15, 197:10,
197:12, 203:18,
210:13, 216:3,
219:13, 246:21,
250:3, 254:18, 255:8
**beyond** [1] - 247:16
**bicycle** [1] - 150:18
**big** [5] - 76:25, 80:9,
84:1, 84:4, 84:9
**bigger** [1] - 76:23
**bike** [1] - 156:10
**bilateral** [1] - 92:13
**billable** [1] - 163:25
**bills** [1] - 162:16
**bin** [1] - 79:25
**binding** [2] - 243:6,
243:10
**birdhouses** [1] -
150:24
**bit** [17] - 37:21,
65:10, 91:20, 93:2,
103:13, 103:18,
107:21, 108:24,
114:13, 136:14,
145:4, 145:5, 150:22,
174:12, 184:24, 220:1
**block** [6] - 22:8,
22:12, 25:8, 33:17,

44:7, 51:1
**blow** [1] - 37:21
**blowing** [1] - 85:22
**blue** [1] - 222:19
**board** [3] - 4:9,
177:8, 179:10
**body** [8] - 29:16,
35:20, 60:21, 64:13,
228:24, 243:4,
243:11, 245:11
**bond** [4] - 175:18,
175:22, 175:25,
183:7, 183:9, 183:19,
204:12, 234:10,
234:14
**bonds** [9] - 174:23,
175:5, 175:6, 175:11,
183:12, 183:19,
204:3, 206:11
**boom** [1] - 175:3
**bother** [1] - 123:16
**bottom** [12] - 18:9,
18:21, 28:2, 33:16,
33:18, 135:5, 139:1,
139:7, 140:18, 185:8,
199:17, 205:5
**bound** [1] - 244:18
**box** [12] - 82:25,
83:14, 84:1, 84:4,
84:6, 84:8, 84:9,
84:10, 85:16, 143:19
**boxes** [5] - 83:24,
108:10, 147:19,
148:7, 151:2
**boy** [1] - 175:13
**brake** [10] - 75:16,
95:25, 101:8, 101:9,
101:14, 108:10,
139:18, 146:19,
147:19, 148:8
**brakes** [1] - 108:11
**branch** [1] - 82:20
**branches** [1] - 95:5
**break** [12] - 102:7,
103:13, 103:14,
135:20, 157:2,
157:12, 157:13,
159:16, 209:5,
215:21, 221:3, 258:18
**breakfast** [1] -
137:22
**breaks** [2] - 93:5,
107:24
**breeze** [1] - 85:23
**Brenda** [11] - 44:18,
45:1, 45:7, 45:10,
51:13, 52:2, 88:25,
105:12, 117:15,
119:4, 124:1
**Brief** [9] - 18:3,

24:18, 25:6, 27:25, 41:17, 47:22, 63:15, 96:21, 130:12
**brief** [3] - 152:24, 214:14, 254:12
**briefly** [5] - 153:4, 157:3, 184:14, 217:6, 235:11
**bring** [12] - 36:2, 56:9, 79:6, 102:15, 109:10, 109:19, 111:1, 112:12, 112:16, 112:19, 142:4, 220:22
**bringing** [2] - 103:2, 202:24
**broad** [2] - 6:3, 211:23
**broken** [1] - 85:21
**broom** [1] - 133:1
**brought** [10] - 13:10, 86:24, 102:16, 109:11, 112:17, 193:23, 196:7, 211:9, 211:19, 214:2
**Bryan** [2] - 88:25, 119:4
**Builder** [1] - 165:8
**bullet** [3] - 137:9, 137:13, 137:25
**burden** [1] - 211:21
**burned** [1] - 161:12
**Business** [3] - 10:3, 165:10, 223:17
**business** [14] - 104:6, 160:21, 161:11, 163:9, 163:12, 163:16, 164:2, 164:19, 165:11, 165:13, 174:19, 223:18, 224:8, 237:21
**businesses** [1] - 161:2
**busy** [1] - 81:23
**button** [2] - 143:12, 143:17
**buy** [6] - 174:22, 174:23, 175:13, 175:14, 175:18, 175:21
**BY** [41] - 3:19, 23:23, 24:24, 27:18, 35:2, 41:18, 46:25, 48:11, 49:16, 54:6, 55:24, 61:6, 62:2, 66:16, 70:16, 72:7, 74:11, 88:4, 89:18, 103:19, 119:2, 126:3, 136:22, 141:7, 142:15, 143:4,

152:25, 155:21, 160:6, 171:11, 178:22, 179:9, 187:16, 199:13, 205:14, 222:2, 226:3, 233:9, 237:20, 247:10, 254:11

**C**

**cake** [1] - 250:20
**calculate** [2] - 187:24, 200:5
**calculated** [10] - 168:5, 168:16, 172:9, 173:14, 173:15, 183:14, 184:19, 197:5, 201:16, 205:1
**calculating** [2] - 169:12, 172:5
**calculation** [18] - 170:24, 171:16, 176:7, 176:11, 179:18, 180:19, 182:14, 183:23, 184:5, 187:3, 191:17, 199:18, 205:19, 205:25, 224:20, 225:6, 230:4, 246:15
**calculations** [13] - 169:2, 170:20, 176:25, 177:4, 177:6, 179:4, 179:13, 180:6, 180:13, 180:16, 184:13, 197:19, 199:16
**calendar** [1] - 172:6
**campus** [1] - 162:18
**cane** [17] - 35:22, 90:23, 90:24, 94:4, 100:3, 100:11, 100:14, 101:2, 101:8, 101:13, 102:9, 122:15, 122:17, 122:21, 135:7, 135:15, 138:1
**cannot** [10] - 26:6, 65:2, 67:11, 67:15, 106:20, 107:6, 139:19, 139:20, 139:22, 229:12
**capability** [2] - 200:3, 252:9
**capable** [1] - 200:14
**capacity** [22] - 21:25, 31:1, 31:2, 31:6, 31:10, 35:8, 45:13, 45:20, 45:23, 45:24, 46:1, 52:15, 60:21, 67:4, 67:5, 188:9, 188:15, 188:23,

192:2, 192:3, 192:6, 192:9
**care** [10] - 3:9, 4:14, 5:1, 5:8, 5:24, 6:8, 6:14, 6:25, 124:19, 153:25
**career** [2] - 86:13, 164:9
**carefully** [1] - 256:13
**Carlisle** [1] - 52:7
**carried** [2] - 195:12, 205:9
**carry** [14] - 21:5, 21:6, 29:24, 30:4, 30:24, 44:11, 44:12, 50:6, 68:22, 68:23, 79:8, 114:8, 183:10, 212:24
**carrying** [6] - 29:22, 30:8, 41:24, 46:8, 49:23, 230:8
**cart** [8] - 80:6, 80:11, 80:12, 80:13, 82:6, 85:4, 85:5, 138:3
**carts** [1] - 85:3
**case** [77] - 6:12, 7:18, 9:3, 9:15, 12:9, 16:17, 20:9, 57:7, 59:7, 62:13, 62:18, 63:9, 68:1, 102:11, 102:15, 128:22, 129:24, 157:5, 157:10, 157:20, 165:18, 166:6, 166:8, 166:18, 167:12, 170:8, 178:13, 184:23, 194:7, 207:2, 209:18, 210:10, 210:11, 210:18, 210:22, 211:8, 211:9, 211:10, 211:11, 211:17, 211:19, 211:25, 212:17, 212:22, 214:2, 214:13, 214:15, 220:5, 221:10, 223:3, 226:17, 226:18, 232:14, 234:2, 237:3, 238:11, 239:12, 240:3, 240:22, 241:6, 241:16, 242:11, 244:7, 246:5, 247:12, 247:14, 247:17, 247:19, 247:24, 249:1, 251:12, 255:13, 256:17, 256:22, 260:11
**CASE** [1] - 1:3
**cases** [12] - 6:11, 12:9, 62:10, 83:9,

83:10, 224:21, 238:8, 238:9, 238:14, 238:19, 244:4, 248:4
**catcher's** [1] - 107:18
**categories** [1] - 24:25
**category** [11] - 23:24, 24:3, 24:4, 24:12, 28:1, 28:17, 41:19, 41:21, 41:24, 42:17, 49:17
**causal** [1] - 219:13
**caused** [1] - 140:11
**CD** [1] - 257:7
**center** [7] - 4:21, 5:1, 5:4, 5:10, 7:5, 39:5, 72:20
**Center** [1] - 5:5, 10:3, 33:5, 35:9, 222:8
**centers** [2] - 6:24, 46:4
**central** [4] - 11:5, 53:10, 53:16, 99:3
**Central** [1] - 165:10
**CEO** [1] - 160:12
**certain** [2] - 7:3, 10:7, 29:7, 31:19, 54:24, 67:11, 112:2, 121:8, 188:8, 188:14, 188:22, 189:4, 200:12, 203:3, 203:4, 215:22, 228:10, 231:5, 231:6, 241:24, 251:5
**certainly** [8] - 77:10, 143:3, 158:14, 189:19, 197:9, 197:11, 198:6, 214:14
**certainty** [3] - 207:12, 227:11, 237:13
**certification** [4] - 8:14, 112:12, 161:3, 260:22
**certifications** [4] - 8:14, 8:15, 161:1, 164:21
**Certified** [1] - 224:6
**certified** [1] - 4:9
**certify** [2] - 148:23, 260:8
**certifying** [1] - 260:25
**Chad** [4] - 2:19, 221:16, 221:21, 221:25
**chair** [1] - 134:14
**chairman** [1] -

160:12
**chairs** [1] - 157:2
**chance** [1] - 220:11
**change** [12] - 35:11, 39:20, 48:15, 48:17, 48:18, 48:20, 48:21, 62:24, 151:22, 206:7, 233:15, 233:21
**changed** [6] - 74:22, 74:23, 99:16, 137:14, 150:14, 189:10
**changes** [8] - 132:3, 132:6, 133:15, 151:18, 151:19, 152:6, 153:15, 235:4
**charge** [7] - 240:6, 240:14, 258:1, 258:11, 258:19, 258:20, 258:21
**Charles** [5] - 2:13, 159:22, 159:25, 160:4, 160:5
**chart** [1] - 173:2
**check** [7] - 17:3, 28:8, 95:6, 95:9, 96:17, 96:18, 240:24
**check-in** [1] - 95:9
**checked** [6] - 81:4, 84:2, 95:15, 97:11, 134:2, 135:6
**checking** [5] - 80:10, 82:19, 95:4, 96:13, 133:25
**checks** [1] - 167:3
**chest** [1] - 102:21
**chief** [1] - 221:11
**childhood** [1] - 6:21
**Chocolate** [1] - 248:24
**choice** [3] - 94:15, 94:17, 118:12
**choose** [1] - 155:14
**chores** [1] - 132:11
**chose** [1] - 190:9
**CHRISTOPHER** [1] - 1:8
**chronic** [10] - 6:25, 58:21, 124:16, 124:23, 125:1, 125:2, 125:6, 125:9, 125:16, 126:4
**Chuck** [1] - 89:3
**Circuit** [6] - 248:5, 248:8, 248:14, 248:16, 248:24
**circuit** [1] - 248:13
**circuits** [2] - 248:11, 248:12
**circulation** [1] - 36:4
**circumstances** [3] -

19:20, 67:6, 248:18
**cite** [6] - 199:23, 242:23, 243:7, 243:13, 244:19, 247:25
**cited** [4] - 242:21, 244:4, 244:22, 245:23
**CIVIL** [1] - 1:7
**Civil** [1] - 2:2
**claim** [8] - 212:6, 213:3, 213:18, 218:3, 218:13, 219:6, 229:18, 248:19
**claimed** [1] - 223:5
**claiming** [2] - 51:24, 128:25
**claims** [4] - 36:19, 211:8, 213:6, 219:19
**clarification** [3] - 40:16, 40:23, 40:24
**clarify** [6] - 17:5, 66:17, 96:9, 99:24, 246:23, 254:24
**class** [2] - 211:23, 212:2
**clean** [2] - 144:20, 208:13
**clear** [10] - 32:7, 61:17, 116:22, 151:8, 153:7, 214:21, 216:15, 216:25, 217:10, 218:23
**cleared** [1] - 112:21
**clearly** [4] - 59:3, 102:18, 216:7, 227:20
**Cleveland** [3] - 246:7, 247:11, 247:14
**climate** [1] - 250:13
**climb** [10] - 21:10, 21:11, 25:20, 25:21, 26:3, 28:14, 43:17, 50:22, 71:10, 92:25
**climbed** [1] - 82:3
**climbing** [15] - 25:18, 28:12, 43:11, 43:14, 44:16, 50:18, 66:12, 69:2, 75:21, 105:22, 108:15, 116:18, 134:4, 134:13, 144:9
**clinic** [2] - 4:12, 6:6
**clinical** [2] - 4:10, 5:8
**clinics** [1] - 5:20
**close** [1] - 258:1
**closely** [1] - 163:9
**closest** [1] - 183:11
**closings** [1] - 258:15
**Co** [2] - 2:1, 260:1
**coats** [1] - 222:19
**coauthored** [1] -

165:14
**codified** [2] - 244:25, 245:1
**coffin** [4] - 84:1, 84:3, 84:6, 84:10
**coin** [1] - 181:23
**coincides** [1] - 83:6
**collateral** [1] - 196:11
**collecting** [1] - 151:2
**college** [6] - 4:3, 4:5, 4:7, 160:15, 161:20, 161:21
**combination** [5] - 24:8, 25:4, 38:16, 50:13, 134:11
**comfort** [2] - 198:21, 198:22
**comfortable** [4] - 123:19, 150:6, 202:15, 213:4
**coming** [8] - 72:22, 102:21, 113:14, 176:15, 185:23, 188:2, 229:10, 258:15
**comment** [2] - 43:5, 117:20
**commentation** [1] - 32:16
**comments** [4] - 25:1, 25:2, 38:8, 42:22
**commit** [1] - 120:20
**commits** [1] - 161:16
**committed** [1] - 195:9
**committing** [3] - 127:15, 127:18, 129:5
**common** [1] - 147:2, 147:3
**commonly** [1] - 174:18
**Commonwealth** [1] - 5:13
**communicated** [2] - 26:22, 26:25
**communication** [3] - 15:5, 17:14, 26:24
**community** [1] - 6:20
**comp** [8] - 89:9, 128:21, 128:23, 128:24, 129:6, 129:10, 129:11, 129:18
**companies** [7] - 7:7, 7:20, 8:7, 8:12, 67:8, 67:20, 72:19
**company** [35] - 5:19, 7:16, 8:25, 9:12, 13:2, 15:2, 15:6, 16:15, 27:1, 33:20, 66:19,

66:23, 72:17, 73:4, 85:7, 88:5, 88:17, 90:11, 111:25, 118:18, 121:1, 129:23, 160:11, 161:10, 163:2, 163:20, 163:25, 172:14, 202:11, 212:8, 213:14, 215:23, 237:24
**Company** [14] - 9:1, 15:1, 40:16, 155:11, 160:9, 162:12, 162:13, 162:14, 163:22, 167:7, 168:1, 212:1, 212:12, 221:14
**COMPANY** [1] - 1:5
**company's** [4] - 118:7, 168:24, 185:6, 217:3
**compared** [4] - 28:25, 53:17, 76:23, 204:18
**complain** [1] - 110:9
**complaint** [9] - 35:19, 57:23, 59:14, 101:11, 101:12, 110:5, 110:8, 166:18, 226:16
**complaints** [3] - 48:18, 59:13, 92:15
**complete** [5] - 20:17, 20:20, 49:3, 60:8, 232:13
**completed** [13] - 23:2, 26:21, 33:19, 34:13, 41:7, 42:2, 49:6, 56:19, 56:23, 56:25, 130:18, 151:9, 226:11
**completely** [2] - 112:1, 112:4
**completes** [2] - 12:24, 87:18
**completing** [3] - 19:25, 20:5, 56:17
**compounding** [1] - 181:17
**computations** [1] - 170:11
**computed** [1] - 185:3
**computer** [5] - 108:9, 138:19, 147:18, 148:1, 176:22
**Concentra** [50] - 5:5, 5:7, 5:9, 5:15, 5:19, 6:19, 6:24, 7:7, 7:19, 7:25, 8:22, 9:22, 9:25, 11:4, 11:13, 11:22, 14:17, 14:21, 14:25,

15:14, 15:20, 16:4, 16:14, 16:19, 16:21, 19:8, 20:16, 20:23, 22:20, 22:23, 26:8, 26:21, 32:4, 32:8, 32:20, 34:11, 35:9, 39:5, 45:14, 45:20, 47:2, 52:19, 53:7, 67:17, 72:11, 72:22, 90:9, 105:7, 106:24, 109:23
**Concentra's** [1] - 66:19
**concept** [5] - 78:2, 169:13, 192:12, 231:2, 232:9
**concepts** [1] - 196:3
**concern** [3] - 142:5, 194:8, 197:21
**concerned** [2] - 102:8, 206:12
**concerning** [1] - 37:2
**concerns** [1] - 194:3
**concise** [1] - 137:7
**concluded** [3] - 103:11, 142:11, 199:9
**conclusion** [7] - 31:25, 32:5, 186:3, 186:8, 196:12, 202:13, 242:7
**conclusions** [1] - 161:9
**concrete** [2] - 94:3, 215:23
**concur** [4] - 63:19, 63:22, 64:6, 65:3
**concurred** [1] - 63:10
**condition** [38] - 29:14, 54:19, 55:6, 59:24, 60:5, 60:22, 64:9, 65:18, 93:24, 106:21, 108:21, 120:24, 121:2, 121:4, 124:23, 125:1, 125:2, 125:6, 125:9, 125:10, 125:16, 126:4, 129:8, 139:11, 139:16, 150:14, 153:16, 153:21, 155:15, 193:14, 214:22, 215:1, 229:16, 229:17, 229:23
**condition..** [1] - 125:17
**conditions** [8] - 65:14, 124:17, 126:20, 129:9, 132:4, 133:16, 134:1, 181:18

**conduct** [4] - 13:15, 32:22, 219:12, 226:15
**conducted** [1] - 17:21
**conducting** [1] - 11:21
**conference** [2] - 258:11, 258:21
**confident** [1] - 256:17
**confirm** [1] - 100:1
**confirmed** [1] - 190:1
**conflating** [1] - 194:5
**conflict** [2] - 196:15, 210:13
**confused** [2] - 113:7, 198:2
**confusion** [2] - 44:6, 194:4
**Congress** [3] - 230:17, 230:25, 245:4
**connection** [1] - 219:13
**CONNER** [1] - 1:8
**conscious** [1] - 35:21
**conservatism** [1] - 237:4
**consider** [5] - 199:22, 201:11, 204:3, 214:10, 256:4
**consideration** [10] - 37:12, 42:22, 195:23, 196:19, 197:19, 198:23, 199:3, 199:15, 200:2, 206:24
**considered** [6] - 90:11, 148:16, 155:17, 195:20, 219:15, 229:19
**considering** [2] - 40:17, 258:15
**considers** [1] - 148:12
**consist** [1] - 222:24
**consisted** [1] - 71:7
**consolidate** [1] - 146:13
**constant** [4] - 93:15, 93:20, 93:21, 140:9
**constantly** [2] - 81:20, 140:25
**constitute** [1] - 43:6
**construction** [1] - 165:8
**consult** [1] - 243:15
**consulting** [1] - 162:6
**consuming** [1] - 46:9

**contact** [6] - 14:25, 16:10, 27:19, 32:16, 40:15, 45:10
**contacted** [2] - 14:21, 32:12
**contacting** [1] - 15:6
**contain** [1] - 186:15
**contained** [3] - 65:24, 186:8, 260:9
**contains** [1] - 69:24
**context** [2] - 123:1, 216:16
**continually** [1] - 230:19
**continue** [12] - 44:10, 55:10, 55:13, 68:19, 109:3, 117:9, 118:23, 136:20, 146:16, 175:10, 214:10, 250:19
**Continued** [1] - 2:11
**continued** [4] - 35:7, 142:14, 183:1, 189:2
**continues** [1] - 146:17
**continuing** [5] - 55:14, 164:22, 165:1, 224:15, 224:17
**contraindication** [1] - 59:12
**contribution** [6] - 168:9, 168:23, 168:24, 173:19, 179:1, 185:6
**contributions** [5] - 167:25, 172:22, 180:9, 234:15, 234:18
**control** [3] - 21:21, 247:6, 260:24
**controller** [1] - 162:11
**controls** [4] - 21:21, 100:16, 116:18, 247:6
**controversy** [1] - 116:23
**conversation** [3] - 17:17, 148:22, 149:14
**conversations** [3] - 73:25, 135:23, 256:20
**cooked** [2] - 151:24, 152:1
**cooking** [3] - 132:3, 151:21, 151:22
**copies** [2] - 167:4, 258:7
**copy** [8] - 26:13, 33:3, 166:14, 170:14, 179:12, 208:15, 222:4, 260:11
**core** [1] - 59:22

**cores** [1] - 95:25
**corner** [1] - 33:16
**corporate** [1] - 162:23
**Corporation** [1] - 246:8
**corporation** [1] - 7:16
**correct** [210] - 3:24, 3:25, 5:2, 5:3, 5:14, 6:23, 7:10, 8:21, 9:2, 9:3, 9:4, 9:19, 10:18, 11:9, 13:9, 13:11, 15:11, 15:16, 15:17, 15:23, 16:2, 16:5, 16:8, 17:23, 18:1, 18:8, 18:17, 18:22, 19:7, 19:9, 19:17, 20:19, 20:22, 21:7, 21:12, 22:3, 22:4, 23:5, 26:11, 27:2, 28:3, 28:11, 29:1, 30:6, 30:13, 32:21, 32:24, 33:7, 33:11, 33:15, 34:6, 34:8, 34:12, 34:14, 34:15, 35:16, 36:8, 36:11, 36:18, 36:25, 37:1, 38:18, 38:19, 39:3, 40:5, 41:5, 41:9, 42:11, 42:15, 43:10, 43:18, 43:22, 44:4, 47:6, 47:9, 47:13, 48:25, 49:2, 49:4, 49:7, 50:25, 53:4, 53:8, 55:1, 55:7, 56:18, 57:19, 59:16, 59:17, 60:1, 60:10, 60:14, 60:18, 60:19, 60:23, 62:6, 68:3, 68:10, 68:15, 68:16, 69:4, 69:8, 70:1, 70:7, 70:23, 71:1, 71:4, 71:5, 71:12, 71:18, 71:19, 71:22, 71:24, 74:20, 74:21, 75:10, 77:9, 82:1, 90:19, 90:21, 92:20, 96:15, 98:2, 99:18, 100:5, 106:25, 107:6, 111:23, 113:10, 113:17, 114:17, 115:17, 116:1, 119:7, 119:10, 123:5, 124:13, 126:13, 127:12, 128:18, 129:12, 132:16, 137:7, 140:15, 140:16, 142:17, 142:18, 146:25,

151:15, 153:9, 153:22, 155:6, 169:25, 176:12, 178:19, 178:20, 179:11, 180:17, 187:18, 188:1, 188:6, 189:7, 189:8, 189:25, 190:12, 190:16, 191:8, 192:4, 192:15, 192:24, 193:1, 193:23, 195:5, 195:7, 200:10, 201:5, 202:6, 202:18, 202:21, 202:25, 203:5, 203:14, 203:16, 204:16, 205:11, 207:12, 207:13, 224:24, 230:10, 235:16, 235:17, 236:2, 237:10, 237:22, 238:6, 239:2, 239:16, 239:19, 241:3, 241:6, 241:21, 242:18, 243:1, 249:16, 250:7, 250:9, 251:10, 257:13, 260:11
**correcting** [1] - 19:12
**correction** [3] - 17:5, 18:25, 148:14
**correctly** [2] - 248:1, 248:3
**correspond** [1] - 36:20
**cortisone** [1] - 92:7
**cost** [2] - 167:19, 168:4
**counsel** [13] - 3:5, 117:7, 135:23, 141:16, 142:1, 142:4, 157:3, 178:18, 209:4, 219:16, 226:2, 254:13, 257:4
**Counsel** [1] - 101:20
**counsel's** [1] - 66:3
**count** [7] - 82:23, 83:9, 84:14, 84:15, 95:7, 95:10, 96:20
**counted** [3] - 77:21, 180:2, 238:19
**counting** [3] - 108:11, 147:20, 148:8
**country** [1] - 5:21
**County** [1] - 53:11
**couple** [9] - 27:15, 72:8, 85:14, 143:2, 155:22, 187:2, 205:15, 209:3, 249:9
**course** [8] - 29:18,

166:16, 168:10, 169:4, 169:11, 191:25, 235:23, 256:23
**courses** [3] - 162:24, 163:16, 163:18
**Court** [7] - 1:22, 1:23, 2:15, 246:2, 246:6, 247:19, 248:17
**court** [19] - 87:19, 158:21, 158:25, 178:6, 178:15, 208:15, 219:21, 222:10, 225:9, 225:25, 239:7, 240:14, 244:12, 244:17, 246:2, 246:25, 247:5, 247:25, 248:10
**COURT** [197] - 1:1, 3:2, 10:2, 10:22, 14:10, 14:13, 16:23, 23:19, 23:21, 24:15, 24:21, 24:23, 26:1, 27:3, 27:11, 27:17, 34:23, 34:25, 37:20, 37:24, 38:2, 39:1, 41:13, 41:15, 46:20, 46:24, 47:19, 48:4, 49:10, 49:12, 49:15, 53:25, 54:4, 55:16, 61:4, 61:14, 61:23, 63:14, 63:16, 65:9, 65:21, 66:9, 66:15, 67:3, 69:11, 69:16, 69:22, 69:24, 70:3, 70:11, 70:14, 72:3, 72:6, 72:14, 73:6, 73:15, 73:17, 73:19, 73:22, 74:5, 74:8, 87:16, 87:25, 89:14, 89:16, 101:20, 101:23, 102:5, 102:23, 102:25, 103:6, 103:8, 103:12, 104:17, 104:21, 105:4, 112:24, 115:14, 116:5, 117:6, 118:23, 119:1, 122:25, 125:5, 125:18, 125:24, 126:1, 128:9, 128:15, 130:13, 135:18, 136:1, 136:4, 136:9, 136:19, 139:13, 139:15, 141:4, 141:6, 141:16, 141:19, 142:1, 142:10, 142:12, 142:25, 143:3, 143:20, 143:23, 152:23,

154:12, 154:15, 154:20, 154:22, 154:24, 156:21, 157:1, 157:17, 157:22, 157:25, 158:8, 158:12, 158:15, 159:1, 159:7, 159:15, 159:19, 159:23, 171:3, 171:9, 176:18, 177:9, 177:13, 177:17, 177:22, 177:24, 178:4, 178:6, 178:10, 178:21, 187:14, 193:19, 194:2, 194:21, 195:3, 195:6, 195:16, 196:18, 197:3, 197:8, 197:18, 197:24, 198:17, 199:2, 199:6, 199:8, 199:10, 205:13, 207:4, 207:9, 207:15, 207:21, 208:2, 208:5, 208:8, 208:18, 208:21, 208:24, 209:2, 209:13, 213:4, 213:21, 215:25, 217:19, 220:16, 221:3, 221:7, 221:9, 221:18, 225:21, 225:23, 225:25, 233:8, 237:17, 243:24, 246:10, 246:17, 248:19, 248:22, 254:10, 255:2, 255:5, 257:3, 257:15, 257:18, 257:22, 257:25, 258:17
**court's** [4] - 158:4, 220:15, 233:6, 247:5
**Courthouse** [1] - 1:24
**courthouse** [1] - 222:23
**courtroom** [7] - 3:15, 100:5, 100:8, 160:1, 221:20, 221:22, 227:18
**COURTROOM** [4] - 3:16, 69:20, 160:2, 221:23
**courts** [5] - 225:11, 225:13, 225:15, 243:7, 244:10
**cover** [1] - 16:2
**covered** [4] - 128:9, 128:10, 128:16, 178:23
**covers** [1] - 237:6

**coworker** [2] - 110:12, 110:14
**CPA's** [2] - 163:17, 242:3
**crates** [1] - 80:9
**create** [3] - 29:1, 41:25, 59:5
**created** [1] - 245:10
**creates** [1] - 30:6
**credentials** [1] - 3:23
**credits** [1] - 224:16
**crew** [1] - 99:1
**crime** [1] - 161:17
**Crocenzi** [18] - 1:12, 2:8, 2:9, 2:14, 2:20, 46:20, 55:21, 65:11, 65:21, 157:23, 159:19, 176:10, 177:9, 187:14, 195:16, 208:8, 246:24, 247:8
**crocenzi** [1] - 2:15
**CROCENZI** [86] - 3:19, 23:14, 23:23, 24:24, 27:5, 27:9, 27:14, 27:18, 34:16, 35:1, 35:2, 37:25, 38:3, 41:10, 41:18, 46:22, 46:25, 47:14, 48:3, 48:10, 48:11, 49:8, 49:13, 49:16, 54:2, 55:9, 55:22, 60:24, 61:10, 61:16, 63:12, 64:4, 64:23, 65:1, 66:13, 69:13, 70:8, 70:13, 72:5, 72:7, 73:5, 73:9, 73:18, 89:8, 157:24, 159:21, 159:24, 160:6, 171:6, 171:11, 177:12, 177:16, 177:23, 178:1, 178:9, 178:22, 179:7, 179:9, 187:12, 193:16, 193:21, 195:17, 196:7, 196:22, 197:1, 198:14, 198:22, 205:14, 207:7, 207:16, 208:4, 208:10, 208:20, 209:1, 221:1, 225:22, 225:24, 237:19, 237:20, 243:21, 244:2, 247:10, 254:8, 257:16, 257:20, 257:23
**CROSS** [4] - 54:6, 74:11, 187:16, 237:20
**Cross** [3] - 2:8, 2:14, 2:20

**cross** [19] - 2:11, 54:4, 72:13, 74:8, 135:21, 136:4, 144:23, 177:14, 187:15, 195:14, 196:2, 198:17, 206:6, 215:13, 220:10, 221:1, 237:18, 243:24, 246:19
**crossed** [1] - 134:20
**CSI** [2] - 222:14, 222:17
**CTE** [18] - 86:13, 90:7, 104:4, 109:5, 111:25, 114:22, 115:3, 117:11, 123:4, 148:12, 205:17, 205:21, 218:4, 218:14, 218:20, 219:3, 219:7, 219:10
**CTE's** [2] - 218:11, 219:13
**cubicle** [3] - 143:11, 143:12
**Cumberland** [55] - 2:1, 8:25, 13:3, 14:25, 16:10, 16:23, 16:24, 16:25, 20:16, 26:9, 27:19, 28:5, 31:8, 31:22, 31:25, 32:4, 32:12, 32:14, 37:7, 40:15, 41:3, 43:8, 43:16, 43:24, 45:8, 45:18, 48:23, 50:5, 50:21, 51:11, 51:25, 52:7, 52:12, 53:11, 72:11, 133:9, 144:15, 149:25, 155:11, 167:7, 168:1, 185:18, 188:11, 189:3, 200:25, 201:10, 205:17, 211:25, 212:3, 212:12, 215:17, 221:14, 249:6, 249:24, 260:1
**CUMBERLAND** [1] - 1:4
**curiosity** [1] - 84:21
**current** [7] - 8:17, 19:21, 58:13, 164:18, 224:17, 224:18, 234:25
**customer** [3] - 76:10, 76:17, 99:10
**cut** [1] - 85:23
**cuts** [1] - 6:4
**CV** [1] - 222:3

**D**

**D-1** [4] - 115:25,

116:7, 116:8, 126:12
**D-14** [2] - 69:10, 69:16
**D-22** [4] - 48:1, 72:2, 72:4, 72:6
**D-35** [3] - 130:6, 130:8, 130:9
**D-36** [2] - 141:3, 152:10
**D-37** [2] - 141:8, 141:11
**D-4** [6] - 69:15, 69:23, 69:24, 70:6, 70:12
**D-5** [2] - 124:4, 124:5
**D-7** [3] - 106:10, 106:12
**daily** [9] - 5:8, 91:7, 111:19, 126:19, 135:12, 140:18, 140:23, 145:3, 222:24
**damage** [2] - 172:24, 179:5
**damages** [10] - 55:20, 166:7, 167:11, 178:3, 224:21, 225:6, 232:6, 232:11, 232:22, 235:24
**danger** [2] - 119:23, 120:2
**dangerous** [1] - 59:6
**data** [13] - 161:10, 167:13, 189:17, 189:20, 189:24, 189:25, 191:13, 231:21, 231:22, 234:24, 253:22
**date** [42] - 13:16, 32:18, 32:23, 35:4, 47:5, 119:5, 131:3, 142:20, 151:9, 167:21, 168:6, 168:7, 168:15, 168:19, 169:4, 169:11, 169:22, 169:23, 170:24, 171:18, 171:23, 172:22, 176:12, 179:17, 180:4, 183:2, 183:10, 183:11, 184:20, 185:14, 185:19, 185:23, 186:24, 194:15, 195:11, 195:12, 196:14, 196:17, 202:16, 235:20, 237:2
**dated** [1] - 187:20
**dates** [1] - 166:23
**DAY** [1] - 1:7
**day-to-day** [1] - 5:18

**days** [7] - 78:18, 78:20, 99:15, 119:3, 164:9
**dealing** [3] - 9:23, 75:12, 161:15
**deals** [2] - 57:18, 151:12
**dealt** [1] - 162:6
**death** [2] - 229:15, 231:10
**decade** [1] - 234:13
**decide** [3] - 95:1, 95:3, 117:2
**decided** [4] - 107:13, 121:18, 166:2, 183:18
**decision** [11] - 12:10, 12:13, 24:8, 38:4, 38:9, 38:10, 56:16, 62:21, 218:11, 244:17, 244:18
**decisions** [2] - 244:10, 244:13
**declaration** [2] - 228:15, 236:20
**declarations** [1] - 228:10
**declared** [1] - 228:12
**deem** [1] - 174:19
**deemed** [8] - 141:23, 183:8, 228:23, 230:2, 235:12, 237:1, 245:20, 252:19
**deems** [2] - 247:20, 252:22
**Defendant** [2] - 1:5, 1:18
**defendant** [1] - 226:2
**Defendant's** [11] - 2:17, 27:8, 57:14, 68:4, 69:17, 106:9, 123:22, 131:14, 136:23, 151:5, 233:7
**defendant's** [9] - 27:7, 34:17, 47:15, 48:7, 48:9, 131:15, 157:20, 216:22, 219:21
**defendants** [1] - 216:4
**Defense** [2] - 152:14, 153:1
**DEFENSE** [1] - 2:18
**defense** [7] - 3:5, 142:4, 178:18, 209:7, 209:15, 221:12, 223:9
**defer** [1] - 248:11
**defined** [1] - 126:18
**definition** [7] - 39:21, 229:11, 240:1, 242:14, 243:2,

244:20, 245:1
**definitions** [1] - 161:7
**degree** [11] - 160:16, 160:20, 160:21, 186:3, 206:21, 207:11, 210:8, 223:15, 223:21, 227:10, 237:12
**degrees** [2] - 160:19, 160:24
**Delaware** [2] - 223:24, 248:15
**deliberations** [5] - 157:11, 207:23, 208:1, 247:7, 256:24
**deliver** [1] - 85:7
**delivery** [1] - 78:1
**demonstrate** [1] - 211:21
**denied** [3] - 129:11, 129:24, 211:5
**deny** [2] - 217:25, 219:21
**department** [2] - 144:16, 144:17
**deposition** [28] - 97:23, 115:12, 145:15, 146:24, 157:19, 158:13, 158:18, 167:17, 208:12, 226:23, 226:25, 233:2, 238:25, 239:4, 239:13, 249:8, 249:11, 249:18, 250:2, 250:6, 250:11, 250:15, 254:20, 254:22, 257:11, 258:22, 259:1
**deputy** [4] - 3:15, 160:1, 221:20, 221:22
**DEPUTY** [4] - 3:16, 69:20, 160:2, 221:23
**describe** [16] - 7:11, 9:24, 11:11, 11:19, 17:24, 32:25, 45:23, 102:18, 133:15, 150:13, 152:6, 161:5, 222:10, 222:15, 223:10, 224:10
**described** [6] - 6:9, 8:24, 31:23, 146:23, 163:20, 170:9
**describing** [4] - 101:5, 151:20, 153:14, 216:6
**description** [25] - 25:19, 26:4, 36:21, 37:9, 37:10, 38:5,

38:11, 38:12, 38:14, 38:18, 38:23, 38:24, 40:7, 48:16, 51:25, 54:14, 83:20, 102:21, 114:14, 129:9, 152:7, 215:8, 217:3, 247:5

**descriptions** [5] - 40:14, 53:5, 53:19, 68:8, 216:17

**designing** [1] - 162:6

**desk** [2] - 29:11, 138:19

**despite** [1] - 59:8

**detail** [4] - 20:12, 42:12, 50:4, 66:7

**detailed** [4] - 40:14, 46:9, 57:6, 72:16

**detailing** [1] - 179:4

**details** [3] - 28:20, 38:8, 176:6

**determination** [14] - 11:16, 12:25, 42:23, 67:9, 194:6, 195:24, 198:24, 206:25, 235:17, 242:16, 246:12, 246:25, 255:9, 255:10

**determine** [11] - 21:6, 21:11, 46:12, 54:24, 182:12, 211:4, 214:24, 215:23, 235:23, 247:1, 251:12

**determined** [7] - 68:18, 71:2, 71:17, 120:22, 120:23, 172:6, 227:4

**determining** [3] - 36:24, 253:5, 256:9

**developed** [1] - 108:21

**developments** [1] - 123:1

**devices** [2] - 30:23, 43:23

**diagnosis** [1] - 36:13

**died** [1] - 191:19

**diet** [3] - 154:6, 155:5, 155:22

**diets** [1] - 156:1

**differ** [1] - 227:22

**difference** [13] - 28:23, 29:2, 29:3, 29:13, 30:3, 30:6, 30:7, 173:19, 197:12, 203:18, 228:1, 229:3, 244:19

**different** [18] - 6:19, 8:10, 29:9, 39:13, 52:1, 133:11, 146:14, 165:1, 184:15, 191:7,

203:17, 216:8, 216:21, 223:1, 227:21, 236:3, 241:20, 241:23

**difficult** [5] - 30:10, 64:20, 92:25, 150:20, 250:13

**difficulties** [2] - 25:17, 46:13

**difficulty** [6] - 43:13, 44:16, 69:2, 99:19, 210:18, 212:4

**diploma** [2] - 4:8, 4:15

**dire** [2] - 177:19, 177:20

**Direct** [3] - 2:8, 2:14, 2:20

**direct** [6] - 61:3, 102:10, 137:9, 206:8, 215:13, 260:24

**DIRECT** [3] - 3:19, 160:6, 222:2

**directed** [6] - 7:18, 9:11, 35:9, 141:14, 158:2, 209:16

**direction** [3] - 16:20, 16:25, 20:5

**directions** [1] - 15:6

**directly** [3] - 31:16, 55:19, 197:3

**director** [4] - 4:13, 5:1, 5:6, 9:23

**dirt** [1] - 85:24

**Disabilities** [9] - 210:4, 217:14, 246:22, 247:23, 255:9, 255:21, 255:22, 255:23, 256:9

**disability** [76] - 109:13, 113:9, 117:23, 118:7, 118:8, 118:10, 118:13, 118:18, 127:6, 127:10, 127:11, 128:18, 142:3, 148:15, 155:13, 167:4, 168:11, 172:19, 193:3, 193:6, 193:11, 193:13, 194:5, 194:11, 194:15, 194:24, 196:14, 196:17, 197:13, 197:21, 198:1, 198:20, 198:24, 199:22, 206:24, 218:7, 218:10, 218:17, 218:22, 228:5, 228:6, 228:8, 228:9, 228:20,

229:8, 229:13, 231:10, 232:19, 233:18, 235:18, 236:4, 236:17, 236:18, 236:24, 237:9, 242:10, 245:15, 246:14, 246:21, 247:20, 249:19, 249:20, 250:16, 250:20, 251:2, 251:6, 251:8, 251:22, 251:23, 252:23, 255:10, 255:11, 255:14, 255:19, 255:24, 256:5

**disable** [1] - 252:3

**disabled** [38] - 90:11, 117:21, 142:20, 148:13, 148:16, 155:17, 193:10, 194:18, 195:3, 195:19, 195:20, 196:16, 196:20, 211:11, 211:22, 212:2, 212:11, 212:14, 217:13, 217:17, 217:18, 217:23, 218:5, 228:24, 229:21, 230:2, 235:13, 236:16, 236:21, 237:2, 245:16, 245:20, 247:21, 247:22, 252:4, 255:16

**disadvantage** [1] - 252:20

**disagree** [13] - 62:24, 62:25, 69:7, 107:5, 120:6, 190:22, 217:20, 234:7, 234:20, 239:3, 239:21, 248:2

**disagreed** [4] - 68:7, 107:1, 110:20, 112:6

**disagreement** [1] - 37:13

**discharged** [1] - 6:6

**discount** [15] - 182:8, 182:23, 203:5, 203:10, 203:14, 203:20, 203:22, 203:24, 204:1, 204:14, 204:17, 204:18, 204:20, 204:21

**discovered** [1] - 47:24

**discrepancy** [1] - 63:5

**discriminated** [1] -

90:16

**discuss** [9] - 11:18, 22:18, 23:6, 52:2, 105:19, 105:22, 190:3, 192:1, 202:22

**Discussed** [1] - 51:13

**discussed** [11] - 20:9, 20:11, 23:9, 36:21, 44:16, 45:6, 51:15, 51:20, 51:24, 61:21, 63:9

**discussing** [1] - 12:12

**Discussion** [1] - 141:25

**discussion** [6] - 50:2, 55:12, 56:12, 65:8, 149:11, 167:19

**discussions** [1] - 70:24

**disincentive** [1] - 250:18

**dismissal** [1] - 166:20

**disposition** [1] - 52:20

**disregarding** [1] - 9:8

**distance** [4] - 30:5, 30:8, 30:10, 134:21

**distinction** [5] - 197:9, 216:2, 216:19, 242:5, 255:8

**distress** [1] - 35:21

**District** [1] - 166:19

**DISTRICT** [3] - 1:1, 1:1, 1:8

**divided** [1] - 248:12

**DIVISION** [1] - 1:2

**dizzy** [1] - 59:10

**doctor** [53] - 3:6, 3:13, 3:23, 6:20, 7:5, 7:6, 9:7, 9:9, 13:7, 15:24, 18:4, 23:24, 26:7, 28:22, 30:2, 30:7, 35:3, 39:4, 41:2, 41:20, 45:12, 48:13, 49:18, 51:7, 57:8, 59:19, 60:23, 61:7, 62:3, 65:2, 65:22, 66:2, 66:10, 66:17, 67:1, 68:5, 73:7, 73:8, 73:19, 107:5, 109:3, 109:17, 110:15, 110:17, 110:18, 111:11, 129:14, 148:18, 148:23, 149:5, 154:3, 226:7

**Doctor** [2] - 9:20,

226:4

**doctor's** [5] - 86:21, 86:22, 107:1, 112:12, 128:13

**doctors** [2] - 87:10, 87:13

**document** [11] - 12:16, 17:9, 109:8, 125:23, 151:9, 171:12, 171:16, 184:25, 226:17, 239:22

**documentation** [3] - 51:17, 56:22, 161:18

**documented** [1] - 27:1

**documents** [6] - 31:24, 32:4, 102:1, 226:14, 228:25, 241:2

**dollar** [4] - 142:6, 197:4, 232:13, 251:5

**dollars** [4] - 202:25, 232:12, 234:21

**dollies** [1] - 99:1

**done** [15] - 46:2, 53:20, 60:7, 73:13, 76:13, 76:14, 89:19, 101:19, 103:7, 132:13, 144:13, 163:3, 195:9, 224:11

**door** [3] - 99:11, 138:14, 138:16

**DOT/CDL** [1] - 8:13

**double** [2] - 17:3, 166:2

**doubled** [1] - 181:19

**down** [42] - 8:1, 28:10, 29:12, 73:8, 80:18, 80:19, 81:19, 82:5, 83:5, 83:8, 83:13, 83:16, 83:17, 83:18, 83:21, 86:6, 87:20, 91:19, 93:3, 100:17, 100:22, 107:17, 114:9, 120:5, 120:11, 132:7, 132:10, 133:18, 137:17, 138:18, 143:13, 156:13, 156:22, 156:25, 171:7, 176:15, 183:15, 208:6, 212:25, 239:7, 255:3

**dozen** [2] - 84:16, 84:17

**Dr** [65] - 2:7, 3:14, 3:20, 27:19, 28:16, 33:6, 33:12, 33:23, 34:21, 36:7, 36:14, 47:18, 47:25, 54:7,

61:11, 61:18, 65:6,
70:9, 70:17, 72:9,
73:12, 92:3, 92:4,
92:9, 106:20, 106:23,
109:9, 109:18,
109:23, 110:20,
111:2, 111:6, 112:4,
112:6, 112:8, 112:15,
112:16, 112:17,
112:20, 113:3,
118:15, 120:4,
120:10, 120:19,
120:22, 121:9,
121:14, 122:11,
122:12, 124:22,
127:3, 149:12, 155:2,
216:15, 216:20,
219:23, 220:11,
220:20, 220:22,
226:1, 236:25, 257:8,
258:22, 259:1

**draft** [4] - 258:2,
258:8, 258:19, 259:4
**drafting** [1] - 241:8
**draw** [1] - 161:9
**drive** [1] - 256:13
**Drive** [2] - 5:11, 10:3
**driver** [1] - 8:14
**driving** [3] - 59:1,
100:20, 116:19
**dropped** [1] - 119:5
**drowsiness** [1] -
59:5
**drowsy** [1] - 59:10
**drug** [1] - 8:19
**drum** [2] - 75:17,
146:19
**drums** [4] - 108:11,
139:18, 147:19, 148:8
**due** [5] - 25:17, 26:2,
126:20, 209:21,
218:22
**dumbwaiter** [1] -
143:21
**Dunkelberger** [1] -
109:9
**dunkelberger** [1] -
112:17
**duration** [1] - 126:6
**during** [24] - 12:2,
13:21, 14:4, 14:17,
14:22, 25:3, 42:20,
53:6, 70:25, 87:15,
88:5, 89:19, 89:25,
94:10, 101:10,
103:25, 107:24,
137:25, 145:6, 206:8,
233:10, 234:9,
239:17, 256:23
**duties** [40] - 5:6,

11:12, 25:16, 26:2,
31:19, 43:25, 51:3,
54:25, 58:2, 62:22,
66:12, 71:4, 71:6,
71:18, 71:20, 75:6,
76:8, 82:14, 85:20,
94:12, 94:21, 95:4,
97:15, 97:20, 98:16,
98:20, 99:17, 112:2,
114:19, 115:21,
133:8, 145:25,
147:24, 148:2, 148:5,
210:2, 214:5, 215:15,
215:16, 216:18
**duty** [17] - 12:19,
17:8, 17:13, 33:22,
36:19, 39:19, 39:22,
40:9, 54:8, 56:1, 56:9,
67:10, 87:1, 87:6,
87:8, 87:12, 139:17

---

# E

**Eagle** [1] - 1:20
**early** [6] - 74:17,
86:12, 89:10, 93:22,
164:8, 185:20
**earn** [2] - 175:1,
197:13
**earned** [12] - 168:13,
168:17, 168:24,
168:25, 172:10,
173:20, 174:9,
188:25, 189:2,
191:19, 192:23,
233:23
**earning** [9] - 188:9,
188:15, 188:23,
192:2, 192:3, 192:6,
192:9, 233:14, 233:25
**earnings** [33] -
169:22, 169:24,
169:25, 170:1, 170:2,
170:24, 171:17,
173:13, 176:3,
176:11, 179:17,
180:20, 181:15,
183:23, 183:24,
184:19, 185:7, 186:5,
187:1, 187:6, 187:10,
189:10, 200:21,
200:25, 201:8,
202:10, 202:17,
203:3, 225:19,
228:22, 232:16,
233:16, 250:17
**earns** [1] - 237:25
**ease** [1] - 87:9
**easel** [1] - 187:15
**easier** [5] - 29:16,
29:20, 99:5, 99:10,

146:12
**East** [1] - 1:16
**easy** [3] - 44:5,
80:24, 94:22
**eat** [1] - 250:21
**economic** [22] -
166:19, 169:9, 175:3,
188:2, 191:14, 223:1,
223:7, 227:5, 227:10,
227:13, 227:16,
231:18, 232:9,
233:21, 234:2, 234:3,
235:9, 235:21, 237:3,
237:13, 243:19,
250:18
**Economic** [1] - 222:8
**economics** [7] -
222:22, 223:12,
224:23, 225:19,
231:1, 231:2, 246:15
**economist** [5] -
158:7, 222:12,
222:16, 241:20,
241:25
**economists** [1] -
253:12
**economy** [1] -
204:10
**edema** [1] - 59:21
**edge** [3] - 79:12,
79:18
**editorialize** [1] -
117:8
**editorializing** [1] -
117:7
**educated** [2] - 39:23,
46:18
**education** [7] - 4:2,
164:23, 165:1,
206:19, 224:15,
224:17, 231:14
**educational** [4] -
223:11, 241:23,
241:25, 242:1
**EEOC** [1] - 101:11
**EEOC's** [1] - 166:20
**effect** [2] - 59:7,
234:11
**effects** [1] - 59:4
**effort** [3] - 138:9,
161:17, 249:22
**eight** [6] - 75:20,
75:23, 75:24, 79:11,
94:8, 113:25
**eighteen** [2] - 78:16,
143:14
**eighty** [2] - 146:11,
150:16
**either** [11] - 10:6,
16:16, 26:6, 63:2,

67:7, 79:5, 83:3,
173:3, 215:19,
215:20, 217:16
**elaborate** [1] - 46:9
**elect** [1] - 230:22
**electronically** [1] -
16:17
**element** [4] - 210:10,
212:20, 213:3, 217:13
**elements** [1] -
211:18
**elevation** [1] - 29:21
**eligible** [1] - 190:10
**ELMO** [1] - 57:12
**embezzlement** [1] -
161:16
**emergencies** [1] -
6:2
**emergency** [4] -
5:25, 7:1, 8:4, 8:15
**empirical** [1] -
231:21
**employed** [9] - 9:25,
10:25, 19:8, 38:6,
160:8, 169:10,
192:15, 192:20,
198:10
**employee** [14] - 7:18,
7:23, 7:25, 8:3, 8:18,
15:19, 28:5, 60:9,
67:15, 98:15, 147:4,
189:2, 211:15, 211:16
**employees** [11] -
5:17, 7:9, 7:15, 13:5,
72:10, 72:20, 97:14,
97:19, 98:19, 145:24,
155:12
**employer** [13] -
12:20, 26:23, 33:25,
37:11, 37:14, 38:15,
38:24, 39:17, 42:7,
67:13, 211:14,
211:22, 216:22
**employer's** [1] -
33:13
**employers** [7] - 7:15,
9:18, 40:6, 40:11,
40:13, 67:18, 72:25
**employment** [45] -
44:10, 48:21, 52:25,
53:6, 68:19, 89:11,
89:13, 114:9, 161:20,
162:15, 188:17,
188:25, 192:25,
200:4, 200:9, 200:13,
200:16, 201:8,
201:12, 201:14,
202:3, 202:16, 205:8,
205:10, 205:22,
206:2, 213:17,

218:12, 219:11,
219:14, 223:3, 227:6,
227:15, 232:7,
232:17, 232:21,
232:22, 233:3, 249:5,
249:16, 250:7,
250:10, 253:1, 254:15
**enclosed** [1] -
143:11
**encounter** [1] -
52:21
**end** [14] - 12:6,
18:13, 36:13, 42:23,
94:6, 111:21, 143:8,
155:9, 157:8, 177:18,
178:12, 183:20,
194:14, 199:1
**engage** [1] - 218:12
**engaged** [1] - 219:9
**entailed** [1] - 217:1
**entire** [3] - 85:16,
158:18, 212:2
**entities** [1] - 250:8
**entitled** [3] - 195:4,
196:13, 243:23
**entry** [2] - 151:14,
151:17
**environment** [1] -
46:7
**episodes** [1] - 126:7
**equal** [2] - 187:24,
201:9
**equalize** [1] - 176:2
**EQUIPMENT** [1] -
1:5
**Equipment** [11] - 2:1,
8:25, 15:1, 40:15,
167:7, 188:12, 212:1,
212:12, 215:18,
221:14, 260:1
**equivalent** [1] - 4:8
**Ernst** [8] - 161:24,
162:1, 162:3, 162:7,
162:8, 164:9
**escort** [4] - 74:2,
157:14, 209:11, 257:1
**especially** [2] -
222:14, 258:14
**Esq** [3] - 1:12, 1:15,
1:19
**essence** [3] - 173:17,
204:25, 231:16
**essential** [3] - 218:9,
218:20, 256:2
**essentially** [3] -
118:20, 174:20, 198:7
**establish** [3] -
211:17, 212:5, 217:12
**estate** [1] - 161:4
**estimate** [17] - 39:9,

161:14, 164:24, 174:8, 185:3, 188:2, 188:6, 189:16, 192:21, 200:24, 209:10, 227:20, 227:25, 233:15, 237:4, 241:14, 241:17

**estopped** [1] - 210:5

**estoppel** [1] - 196:11

**evaluating** [1] - 216:16

**evaluation** [20] - 21:25, 31:2, 31:6, 31:10, 38:4, 38:10, 45:13, 45:20, 46:1, 48:14, 52:15, 54:22, 56:8, 57:17, 58:1, 63:8, 64:19, 65:23, 65:25, 67:5

**evaluations** [2] - 45:15, 45:23

**evening** [2] - 257:9, 258:23

**event** [1] - 237:23

**eventually** [4] - 92:24, 121:17, 127:8, 128:19

**evidence** [24] - 102:12, 117:1, 117:2, 125:3, 141:22, 207:18, 210:19, 210:22, 210:23, 211:7, 211:24, 212:11, 212:16, 212:19, 217:15, 217:18, 217:21, 217:22, 218:6, 218:16, 219:8, 219:16, 255:13, 260:9

**evidentiary** [2] - 219:18, 219:20

**evidently** [1] - 131:8

**evolved** [2] - 94:18, 94:19

**exact** [4] - 189:17, 189:20, 225:4, 234:24

**exactly** [9] - 21:23, 45:24, 114:11, 143:14, 177:9, 184:18, 213:11, 231:11, 243:18

**exam** [27] - 16:10, 26:9, 26:21, 46:22, 56:9, 60:7, 66:21, 67:25, 70:21, 70:24, 70:25, 90:9, 90:14, 105:5, 105:7, 105:17, 106:3, 109:22, 117:18, 214:20, 214:24, 215:3, 215:4,

215:5, 215:18

**Examination** [1] - 2:15

**examination** [122] - 2:8, 2:8, 2:14, 2:14, 2:20, 2:20, 3:8, 8:17, 9:16, 11:15, 11:16, 11:21, 11:24, 12:3, 12:4, 12:6, 12:17, 12:18, 12:19, 12:24, 13:1, 13:2, 13:15, 14:1, 14:17, 14:23, 15:3, 15:7, 15:12, 15:15, 16:22, 17:1, 17:7, 17:10, 17:11, 17:21, 17:25, 19:11, 19:19, 19:25, 20:6, 20:18, 21:3, 21:8, 21:13, 21:19, 21:24, 22:1, 24:11, 25:3, 25:5, 26:22, 27:20, 32:1, 32:5, 32:23, 33:2, 33:14, 34:1, 34:11, 35:10, 35:15, 35:18, 35:20, 35:23, 37:10, 39:18, 40:2, 42:21, 45:3, 46:2, 46:4, 47:4, 47:8, 50:3, 50:15, 51:11, 54:9, 54:10, 54:14, 56:1, 56:14, 57:11, 57:18, 57:21, 59:18, 60:3, 61:8, 61:12, 61:19, 61:21, 62:9, 62:20, 63:6, 63:18, 63:20, 64:1, 65:3, 65:19, 66:5, 66:8, 66:20, 66:25, 68:15, 72:24, 73:1, 74:9, 135:21, 136:5, 144:23, 195:14, 198:17, 206:6, 206:8, 215:13, 217:25, 220:10, 233:10, 243:24, 246:19, 252:13

**EXAMINATION** [7] - 3:19, 54:6, 74:11, 160:6, 187:16, 222:2, 237:20

**examinations** [13] - 8:13, 12:1, 12:23, 13:5, 15:18, 16:15, 39:6, 39:13, 39:15, 39:25, 57:3, 57:9, 72:10

**examine** [5] - 54:4, 54:5, 187:15, 231:12, 237:18

**examined** [3] - 13:13, 41:3, 252:25

**Examiner** [1] - 165:13

**examining** [1] - 196:3

**example** [7] - 6:15, 29:11, 161:10, 175:21, 181:9, 181:10, 203:19

**excellent** [1] - 216:23

**except** [2] - 101:3, 209:5

**exception** [1] - 239:10

**excess** [1] - 85:24

**excuse** [6] - 37:20, 87:16, 112:7, 113:7, 126:16, 255:22

**Excuse** [1] - 89:15

**excused** [2] - 73:8, 73:20

**exercise** [2] - 154:4, 155:5

**exercises** [1] - 46:6

**exhaust** [1] - 84:2

**Exhibit** [30] - 9:6, 27:8, 47:20, 48:1, 48:6, 57:14, 57:15, 68:4, 76:7, 106:9, 106:10, 123:22, 123:23, 131:14, 136:24, 151:5, 152:14, 152:15, 153:1, 170:23, 176:20, 179:7, 179:12, 179:20, 181:2, 182:18, 184:7, 184:9, 184:18, 233:7

**exhibit** [30] - 27:3, 34:17, 47:15, 47:21, 116:5, 141:22, 142:5, 142:6, 170:8, 171:4, 176:4, 176:9, 176:19, 179:3, 179:6, 179:11, 179:16, 179:23, 181:5, 182:22, 184:4, 184:5, 184:17, 185:9, 185:13, 186:13, 186:25, 187:4, 187:5, 208:19

**exhibits** [5] - 48:9, 73:10, 170:19, 186:22, 207:19

**exist** [1] - 159:6

**existing** [1] - 129:8

**exists** [1] - 193:7

**exit** [1] - 144:7

**exiting** [1] - 144:10

**expectancy** [4] - 190:4, 190:20,

190:25, 231:4

**expected** [4] - 189:6, 191:3, 202:10, 229:14

**expedite** [1] - 55:18

**experience** [3] - 53:15, 249:2, 252:14

**expert** [22] - 177:11, 178:2, 178:7, 178:11, 178:13, 178:16, 178:18, 206:18, 224:8, 225:9, 225:12, 225:18, 237:22, 238:4, 239:6, 239:14, 239:18, 240:4, 243:19, 249:2, 251:17, 251:18

**expert's** [1] - 194:10

**experts** [1] - 239:11

**explain** [12] - 42:24, 62:16, 132:21, 146:3, 167:9, 173:4, 173:5, 179:17, 192:10, 227:21, 236:12, 242:24

**explained** [4] - 148:20, 166:3, 184:15, 186:6

**explanation** [6] - 72:15, 134:6, 181:6, 210:3, 236:13, 251:4

**explore** [1] - 198:18

**exposure** [1] - 232:11

**expression** [1] - 38:12

**extent** [3] - 55:18, 159:9, 220:21

**extra** [1] - 222:6

**extremely** [4] - 92:22, 92:24, 138:10, 146:18

**extremes** [1] - 140:14

**extremities** [1] - 59:22

**eye** [2] - 134:14, 134:15

## F

**facility** [1] - 161:12

**facing** [1] - 46:13

**fact** [52] - 7:2, 15:8, 20:20, 38:15, 51:24, 59:9, 63:7, 65:17, 65:23, 69:18, 75:1, 77:16, 91:24, 92:22, 102:12, 107:21, 108:3, 122:8, 128:3, 128:5, 128:17, 142:2,

147:13, 147:15, 154:8, 155:18, 168:15, 179:19, 192:7, 196:15, 196:20, 197:19, 198:9, 201:23, 205:7, 209:25, 210:19, 212:3, 212:6, 213:9, 216:24, 217:9, 228:1, 228:23, 229:12, 234:16, 235:10, 235:24, 236:16, 246:4, 250:2, 255:17

**factor** [1] - 218:11

**facts** [7] - 200:12, 226:18, 232:2, 235:11, 236:3, 247:1, 247:8

**factual** [1] - 216:25

**fades** [1] - 251:6

**fail** [3] - 174:24, 174:25, 213:21

**failed** [8] - 106:3, 109:23, 111:6, 113:19, 210:2, 215:4, 218:14, 219:3

**fails** [2] - 174:25, 213:23

**fair** [7] - 63:25, 83:15, 152:10, 182:7, 240:1, 241:18, 246:19

**fairly** [1] - 44:5

**fall** [2] - 91:1, 212:18

**falls** [2] - 129:9, 210:3

**familiar** [2] - 193:5, 252:5

**family** [3] - 6:20, 7:5

**fan** [1] - 134:22

**far** [19] - 19:1, 28:5, 28:9, 29:23, 30:19, 43:8, 43:20, 50:5, 54:1, 60:16, 74:1, 99:22, 134:10, 134:17, 150:23, 214:4, 220:23, 232:7, 256:22

**faster** [1] - 99:9

**fault** [1] - 164:12

**favor** [3] - 216:4, 219:18, 220:18

**fax** [1] - 16:14

**faxed** [6] - 16:12, 16:16, 16:18, 31:22, 31:24, 32:4

**FCE** [3] - 67:2, 67:7

**February** [26] - 13:14, 13:23, 14:4, 20:23, 57:11, 63:7, 64:10, 66:20, 90:10,

90:14, 142:22,
150:14, 194:16,
196:21, 218:24,
228:4, 229:6, 235:19,
237:1, 237:7, 237:8,
249:7, 249:20, 250:3,
254:18
**Federal** [2] - 166:24,
225:14
**federal** [1] - 248:10
**fee** [2] - 240:6,
240:10
**feet** [4] - 30:4, 80:15,
134:20, 143:14
**felt** [9] - 90:15,
90:18, 90:19, 107:8,
119:22, 119:24,
123:19, 150:5, 155:16
**female** [1] - 11:9
**few** [6] - 30:4, 53:14,
95:5, 184:12, 223:15,
227:25
**field** [5] - 134:22,
139:24, 178:16,
231:1, 253:11
**fields** [2] - 178:7,
226:1
**fifteen** [5] - 39:12,
40:3, 143:13, 258:18,
259:3
**fifth** [3] - 30:11,
98:24, 219:3
**fifties** [3] - 251:21,
252:8, 252:19
**fifty** [5] - 81:16,
238:20, 257:14,
257:15, 257:16
**figure** [5] - 106:17,
107:12, 192:13,
192:17, 233:22
**figures** [4] - 170:11,
227:22, 227:23,
234:21
**filed** [3] - 12:19,
166:18, 168:25
**fill** [11] - 83:21,
83:23, 113:3, 113:22,
113:24, 120:12,
120:14, 124:10,
127:10, 127:12,
127:17
**filled** [8] - 113:25,
114:5, 126:10,
126:25, 127:6,
128:18, 128:20, 131:8
**filling** [3] - 56:23,
129:6, 152:16
**final** [7] - 37:18,
38:4, 38:10, 157:11,
170:21, 256:10,

256:24
**finally** [3] - 123:7,
127:17, 219:6
**financial** [2] -
163:10, 206:14
**findings** [18] - 11:15,
12:11, 12:12, 17:25,
18:6, 26:22, 35:17,
48:20, 57:24, 59:18,
62:19, 62:20, 63:11,
63:19, 63:22, 63:23,
64:7, 65:3
**fine** [8] - 102:4,
116:16, 118:25,
149:19, 149:21,
149:22, 194:23, 221:5
**finish** [2] - 46:23,
180:21
**finished** [5] - 154:12,
154:17, 204:7,
220:21, 221:10
**finishes** [1] - 88:1
**fired** [1] - 215:6
**firm** [8] - 161:23,
162:12, 162:16,
163:4, 226:9, 238:3,
240:3, 240:6
**firms** [2] - 223:9,
224:19
**first** [52] - 3:22,
13:12, 18:23, 25:8,
26:5, 28:17, 35:10,
41:19, 46:10, 56:8,
56:11, 57:12, 61:17,
65:24, 69:16, 76:20,
77:5, 79:2, 81:2,
81:17, 101:10, 105:8,
105:9, 106:16,
106:18, 111:21,
113:15, 122:16,
122:20, 125:21,
125:22, 130:10,
150:11, 151:17,
158:1, 159:8, 159:11,
162:2, 170:4, 171:15,
173:24, 179:15,
194:13, 213:24,
214:18, 217:13,
218:3, 218:6, 218:17,
219:8, 234:12, 257:10
**fit** [4] - 54:8, 56:1,
56:9, 114:15
**fitness** [9] - 12:18,
17:8, 17:12, 33:21,
39:19, 39:22, 40:9,
67:10, 156:7
**fits** [1] - 248:8
**five** [18] - 42:18,
42:25, 44:14, 50:9,
52:25, 68:25, 71:8,

78:19, 78:20, 85:18,
96:12, 135:2, 138:17,
156:1, 164:15,
164:16, 235:2, 238:10
**flat** [3] - 122:15,
122:17, 122:21
**flatbed** [2] - 85:4,
85:5
**flexion** [1] - 36:1
**flip** [2] - 131:18,
181:23
**floating** [2] - 11:2,
161:7
**floor** [20] - 28:19,
28:24, 29:7, 29:13,
29:17, 29:21, 76:19,
76:20, 77:11, 77:14,
78:25, 79:2, 79:13,
79:16, 85:22, 86:1,
97:7, 97:9, 97:10,
97:11
**flow** [2] - 31:21,
73:12
**fluid** [1] - 108:25
**FMLA** [3] - 118:17,
124:2, 126:17
**focus** [4] - 37:21,
74:14, 90:25, 215:10
**folks** [1] - 171:15
**follow** [4] - 7:3,
23:18, 27:15, 72:8
**follow-up** [2] - 27:15,
72:8
**follow-ups** [1] - 7:3
**followed** [3] - 56:13,
56:15, 125:22
**following** [6] - 44:11,
68:20, 125:19,
133:25, 135:6, 218:16
**foot** [5] - 21:21,
79:11, 80:23, 85:5,
116:18
**football** [3] - 134:22,
139:23
**FOR** [1] - 1:1
**forced** [1] - 158:24
**foregoing** [1] -
260:22
**foren** [1] - 222:21
**Foren** [1] - 222:21
**Forensic** [2] -
165:15, 222:8
**forensic** [11] - 161:3,
161:5, 163:13, 164:2,
178:2, 186:4, 222:12,
222:15, 222:20,
225:19, 231:1
**forensics** [2] -
222:14, 222:18
**forget** [2] - 103:17,

187:5
**forklift** [29] - 58:2,
71:11, 77:4, 77:8,
78:4, 79:6, 79:15,
85:10, 94:16, 94:21,
94:25, 96:16, 96:19,
97:2, 97:3, 99:12,
99:22, 100:2, 100:11,
100:14, 100:23,
101:2, 101:14, 102:9,
104:11, 107:22,
108:8, 147:18, 147:21
**forklifts** [5] - 85:10,
85:12, 85:15, 85:18,
143:9
**forks** [5] - 100:17,
100:19, 100:22,
143:15, 143:19
**form** [63] - 9:8, 9:9,
9:10, 9:12, 16:4, 16:6,
16:9, 16:21, 17:2,
20:17, 20:21, 22:16,
22:19, 22:22, 23:4,
23:6, 23:15, 25:12,
26:18, 26:20, 27:1,
27:24, 28:4, 28:13,
28:17, 29:23, 30:14,
30:18, 31:21, 32:3,
32:9, 33:10, 37:6,
40:25, 41:2, 41:7,
42:1, 42:5, 43:2, 43:8,
44:19, 48:24, 49:3,
49:6, 51:5, 56:10,
56:17, 56:19, 56:21,
95:9, 109:12, 109:13,
113:9, 113:12,
113:15, 113:24,
114:3, 125:12,
126:25, 127:6, 200:4,
200:13
**former** [2] - 4:21,
234:13
**forms** [1] - 9:17
**formula** [1] - 182:11
**formulas** [1] - 182:15
**formulating** [1] -
241:5
**forth** [9] - 4:4, 30:25,
34:22, 115:24,
207:19, 226:18,
243:3, 245:2, 253:20
**fortunately** [1] -
163:5
**forty** [6] - 164:11,
164:25, 180:6,
200:15, 200:20
**forum** [2] - 222:21,
222:23
**forward** [6] - 89:22,
91:1, 121:16, 198:12,

221:19, 258:12
**foundation** [6] -
53:23, 61:15, 61:16,
61:24, 188:6, 189:16
**foundations** [1] -
246:18
**four** [26] - 11:4,
52:24, 78:14, 78:19,
78:20, 80:23, 83:9,
83:10, 83:11, 85:18,
98:7, 98:25, 99:5,
107:17, 115:10,
135:2, 138:17,
146:13, 164:17,
169:19, 172:12,
178:23, 235:1,
238:12, 238:13,
238:22
**four-man** [1] - 98:25
**fourth** [3] - 28:2,
183:22, 219:1
**Fox** [1] - 223:16
**frame** [5] - 9:23,
35:20, 89:9, 122:24,
257:5
**fraud** [4] - 120:20,
127:15, 127:18, 129:5
**free** [5] - 171:3,
171:6, 174:20, 204:3,
206:15
**freight** [1] - 147:20
**frequency** [1] - 126:6
**frequent** [11] -
116:12, 116:13,
116:14, 116:15,
116:16, 216:13,
224:19
**frequently** [8] - 28:8,
44:13, 44:15, 50:17,
68:23, 68:25, 71:9,
87:22
**fresh** [1] - 255:7
**friendly** [1] - 158:23
**friends** [1] - 150:25
**front** [13] - 13:8,
14:15, 18:7, 20:14,
34:4, 47:7, 72:16,
140:5, 145:17, 151:6,
170:15, 176:22, 222:3
**full** [22] - 3:17, 8:10,
35:8, 84:1, 87:1, 87:4,
87:6, 107:18, 151:2,
160:3, 161:25,
162:17, 190:10,
190:14, 197:14,
200:15, 200:20,
205:6, 221:24, 254:1,
254:2, 254:7
**full-time** [5] - 87:4,
161:25, 162:17,

197:14, 200:20
**fully** [1] - 260:9
**Functional** [1] - 67:5
**functional** [12] -
21:24, 31:1, 31:2,
31:5, 31:9, 45:13,
45:19, 45:22, 45:24,
46:1, 52:15, 67:3
**functions** [3] - 218:9,
218:20, 256:2
**funds** [2] - 230:19,
235:20
**funny** [1] - 222:18
**future** [19] - 149:13,
169:5, 169:12,
169:25, 170:2,
178:25, 180:8, 181:8,
181:22, 182:16,
183:25, 184:16,
185:7, 187:7, 202:25,
203:7, 205:2, 223:6,
235:7
**fuzzy** [1] - 184:24

## G

**Gabapentin** [2] -
58:16, 58:21
**gained** [1] - 150:10
**gainfully** [1] - 198:10
**gaining** [1] - 250:19
**gait** [5] - 25:18,
25:20, 25:21, 25:24,
26:6
**gallons** [1] - 83:13
**games** [1] - 165:25
**garden** [2] - 133:5,
133:6
**gate** [2] - 79:11,
79:14
**gather** [1] - 63:3
**gee** [1] - 182:1
**general** [7] - 6:23,
53:10, 129:20,
129:22, 226:18,
247:15, 249:1
**generally** [2] -
174:24, 243:1
**generate** [1] - 201:8
**generic** [1] - 231:17
**generous** [1] -
236:15
**gentleman** [2] - 3:8,
11:2
**gentlemen** [14] - 3:3,
73:22, 103:12, 136:9,
142:12, 157:4,
178:10, 199:10,
209:3, 221:10, 247:2,
255:5, 256:11, 257:3

**geographic** [1] -
251:13
**given** [8] - 93:6,
167:20, 188:15,
188:23, 215:20,
228:23, 237:12,
243:21
**glad** [1] - 132:19
**goal** [1] - 7:13
**Goldberg** [1] - 1:12
**government** [6] -
174:19, 174:25,
175:15, 175:16,
175:24, 228:24
**grabber** [1] - 137:18
**grade** [1] - 204:11
**gradual** [1] - 89:12
**graduate** [4] -
161:21, 162:1,
162:24, 162:25
**granted** [1] - 193:13
**grasping** [1] - 116:15
**great** [5] - 122:8,
122:12, 122:14,
124:8, 170:3
**grew** [1] - 162:16
**grid** [1] - 252:1
**ground** [5] - 29:6,
80:14, 128:10,
128:16, 161:12
**grouping** [1] - 84:24
**groupings** [1] -
84:22
**grow** [4] - 175:10,
181:12, 181:16, 203:2
**growing** [3] - 229:4,
235:6, 235:7
**grown** [3] - 163:5,
173:16, 204:24
**growth** [5] - 116:15,
181:15, 203:3,
204:10, 234:4
**guarantee** [1] -
121:24
**guess** [4] - 39:23,
46:19, 105:2, 197:16
**guessing** [1] -
231:20
**guts** [1] - 242:12
**guys** [2] - 95:7,
146:13

## H

**H-O-L-L-E-N-B-A-C
-K** [1] - 19:5
**habits** [1] - 132:3
**half** [8] - 84:16,
103:15, 139:23,
163:8, 163:23,

163:24, 168:2, 172:14
**Hampshire** [1] -
225:16
**hand** [15] - 33:16,
35:22, 76:6, 78:6,
79:5, 79:16, 80:6,
80:9, 80:11, 83:1,
83:2, 100:15, 100:16,
101:6, 101:7
**handed** [2] - 17:9,
20:13
**handle** [2] - 157:7,
198:5
**hands** [3] - 157:5,
157:6, 256:18
**handwriting** [11] -
22:2, 22:5, 22:6, 25:8,
25:10, 25:12, 26:14,
34:7, 44:3, 44:7,
131:19
**handwritten** [2] -
9:8, 23:3
**hang** [1] - 150:24
**hard** [2] - 75:9, 75:13
**harder** [1] - 29:16
**HARRISBURG** [1] -
1:2
**Harrisburg** [5] - 1:5,
1:13, 1:25, 162:9,
162:17
**heads** [1] - 98:24
**health** [5] - 110:11,
110:13, 124:19,
126:20, 191:24
**healthy** [1] - 29:19
**hear** [4] - 53:17,
55:20, 171:15, 222:14
**heard** [11] - 74:1,
99:24, 100:4, 100:7,
227:24, 230:6, 232:4,
233:10, 234:5,
256:11, 256:22
**heart** [1] - 64:4
**heavy** [4] - 75:12,
81:18, 139:16, 146:19
**heavy..** [1] - 139:12
**height** [2] - 29:17,
143:15
**held** [1] - 163:9
**help** [6] - 35:7, 99:4,
146:14, 146:20,
146:22, 258:9
**helped** [3] - 121:22,
145:12, 145:13
**helping** [2] - 12:13,
163:9
**helps** [1] - 135:14
**hereby** [1] - 260:8
**herring** [1] - 102:25
**Hershey** [1] - 248:24

**high** [8] - 4:7, 28:25,
80:13, 80:21, 85:6,
104:23, 134:14,
204:11
**higher** [2] - 29:11,
80:25
**highest** [1] - 246:2
**himself** [3] - 72:21,
214:17, 233:19
**hip** [1] - 35:23
**hired** [5] - 74:16,
74:19, 166:6, 174:6,
240:2
**historically** [2] -
189:14, 230:16
**history** [14] - 13:22,
17:22, 18:6, 35:3,
48:12, 48:15, 56:11,
56:22, 57:23, 58:3,
58:7, 62:19, 167:2,
167:14
**hit** [1] - 156:12
**hobbies** [2] - 153:5,
153:9
**Hoffman** [15] - 44:18,
45:1, 45:8, 45:11,
51:13, 51:14, 51:21,
52:3, 57:3, 105:12,
108:14, 109:1,
117:16, 119:4, 124:1
**Hoffman's** [1] -
105:25
**hold** [5] - 112:24,
121:18, 126:16,
150:19, 232:18
**hole** [1] - 197:24
**Hollenback** [14] -
19:5, 19:24, 20:4,
20:10, 22:17, 23:3,
23:7, 24:2, 24:7, 25:1,
25:11, 25:24, 26:16,
32:11
**Hollenback's** [1] -
19:16
**home** [3] - 138:13,
205:18, 256:13
**Honor** [83] - 10:4,
23:15, 23:20, 27:5,
34:16, 41:10, 47:14,
49:14, 53:22, 54:3,
54:7, 55:11, 55:22,
55:25, 60:24, 62:1,
64:4, 64:8, 65:1,
65:17, 69:10, 69:21,
70:1, 70:8, 70:15,
72:1, 72:12, 73:18,
89:8, 89:13, 103:20,
116:25, 118:21,
124:24, 125:20,
130:16, 136:21,

141:1, 141:5, 142:24,
143:2, 152:22,
152:24, 156:18,
156:20, 157:21,
158:3, 158:21,
159:12, 159:21,
160:7, 171:5, 171:8,
177:20, 178:5,
178:20, 187:17,
193:16, 196:5, 198:7,
199:14, 207:3,
207:17, 208:11,
208:20, 208:23,
209:1, 209:15, 217:7,
220:12, 221:2,
221:15, 225:17,
225:22, 226:4,
237:16, 237:19,
243:17, 243:21,
246:9, 248:11, 255:1,
257:21
**Honor's** [1] - 217:8
**HONORABLE** [1] -
1:8
**honors** [3] - 223:15,
223:18
**hooked** [1] - 171:14
**hopeful** [1] - 209:6
**hopefully** [2] -
246:23, 256:13
**hoping** [1] - 220:2
**horizons** [1] - 235:9
**hospital** [2] - 6:1, 6:7
**hospitalist** [1] - 4:12
**hour** [18] - 46:17,
46:18, 94:8, 103:15,
136:10, 167:16,
171:20, 179:21,
179:24, 200:15,
200:18, 200:20,
202:4, 202:9, 229:4,
233:24, 233:25,
240:13
**hourly** [7] - 171:19,
171:25, 180:1, 202:9,
240:11, 240:12,
240:17
**hours** [11] - 58:2,
75:20, 75:23, 75:24,
75:25, 164:25, 165:3,
172:4, 180:6, 240:21,
241:15
**house** [1] - 132:21
**household** [1] -
132:10
**housekeeping** [3] -
69:14, 85:20, 208:11
**human** [1] - 29:16
**hundred** [4] - 67:22,
81:13, 232:12, 232:13

**hurt** [6] - 88:23, 93:13, 119:24, 119:25, 120:2, 120:3
**hypothetical** [9] - 64:24, 64:25, 191:16, 201:11, 201:18, 201:19, 202:13, 203:25, 232:2
**hypothetically** [3] - 201:21, 201:25, 202:2

**I**

**i.e** [2] - 7:15, 56:11
**idea** [2] - 144:11, 144:14
**identical** [3] - 69:22, 168:16, 179:19
**identification** [1] - 15:25
**identified** [3] - 59:23, 73:13, 196:20
**identify** [9] - 9:9, 16:1, 22:11, 25:8, 27:9, 130:14, 171:12, 181:1, 184:5
**identity** [1] - 257:5
**ignore** [2] - 112:1, 112:4
**illness** [3] - 132:4, 134:1, 153:16
**illnesses** [1] - 133:16
**imagine** [1] - 33:25
**immediately** [4] - 7:24, 87:5, 158:23, 258:5
**impact** [1] - 223:7
**impacts** [1] - 197:4
**impairment** [1] - 211:15
**implements** [1] - 30:23
**important** [1] - 45:16
**importantly** [1] - 209:25
**imposed** [1] - 36:15
**improve** [1] - 121:5
**improved** [1] - 121:2
**IN** [1] - 1:1
**inability** [5] - 26:2, 31:18, 107:10, 126:18, 209:21
**incapacitated** [4] - 126:6, 126:11, 126:17, 126:22
**incapacity** [2] - 126:7, 126:17
**inches** [1] - 107:17
**inclined** [1] - 220:17
**include** [2] - 53:2,

207:14
**included** [2] - 47:25, 165:20
**including** [4] - 82:10, 94:20, 96:8, 96:10
**income** [2] - 168:25, 196:14, 235:5
**incoming** [1] - 147:20
**incomplete** [1] - 161:10
**increase** [6] - 93:8, 93:9, 168:4, 168:18, 171:24, 203:20
**increases** [2] - 189:13, 203:7
**increasing** [1] - 180:1
**independent** [1] - 256:19
**independently** [1] - 70:22
**indicate** [8] - 14:20, 16:9, 28:4, 28:9, 28:18, 29:23, 31:13, 45:10
**indicated** [9] - 17:8, 17:14, 19:14, 44:25, 52:20, 63:17, 142:1, 145:11, 229:3
**indicates** [7] - 20:9, 28:13, 35:5, 36:18, 40:22, 57:25, 62:13
**indicating** [4] - 28:8, 44:20, 209:24, 239:23
**indication** [7] - 9:13, 9:15, 16:18, 19:23, 31:15, 63:8, 157:9
**individual** [18] - 29:19, 30:9, 64:19, 65:13, 66:20, 76:16, 82:22, 83:12, 83:14, 163:7, 163:21, 210:15, 217:13, 218:8, 218:19, 255:20, 256:7, 256:9
**individually** [1] - 79:24
**individuals** [1] - 193:9
**individuals'** [1] - 231:13
**indoors** [1] - 132:11
**infections** [1] - 6:4
**inflation** [3] - 189:11, 189:12, 202:23
**influence** [1] - 59:1
**information** [54] - 12:19, 12:21, 16:11, 25:2, 30:19, 31:16,

31:18, 31:21, 33:1, 33:8, 33:20, 36:23, 37:13, 37:15, 40:12, 40:19, 41:22, 42:6, 42:9, 43:2, 43:7, 43:15, 43:19, 45:7, 45:17, 50:12, 50:20, 51:6, 52:4, 53:9, 53:24, 54:15, 63:4, 64:18, 66:18, 66:23, 69:25, 72:17, 101:15, 101:17, 127:11, 131:20, 133:23, 161:18, 166:11, 166:17, 166:23, 166:25, 167:9, 185:14, 193:22, 239:24, 256:8
**informed** [2] - 172:19, 218:21
**initial** [6] - 101:11, 166:16, 173:19, 189:19, 217:24, 236:25
**injection** [1] - 48:17
**injections** [1] - 35:7
**injured** [5] - 7:18, 7:23, 8:3, 8:7, 72:21
**injuries** [7] - 6:18, 39:14, 73:2, 132:4, 133:16, 134:1, 253:2
**injury** [6] - 7:19, 7:22, 72:21, 89:10, 89:20, 153:16
**inputted** [1] - 42:6
**inserted** [1] - 37:14
**instance** [2] - 54:20, 57:15
**instances** [1] - 76:13
**instead** [1] - 236:4
**Institute** [1] - 163:17, 163:19
**instruction** [1] - 135:22, 136:2, 246:20, 255:6
**instructions** [5] - 73:24, 136:13, 178:12, 256:10, 258:2
**instructor** [1] - 162:17
**insufficient** [1] - 212:5
**insurance** [11] - 67:8, 67:19, 109:12, 117:23, 129:23, 148:15, 154:11, 154:25, 155:1, 161:11, 161:13
**intend** [1] - 27:12
**intention** [1] - 27:14

**interest** [5] - 156:14, 168:25, 173:15, 182:22, 235:5
**interested** [1] - 145:9
**interesting** [2] - 99:23, 101:1
**interests** [2] - 153:5, 153:9
**interfere** [3] - 193:14, 229:17, 229:23
**interferes** [1] - 230:1
**intermediate** [1] - 162:20
**internal** [2] - 4:10, 4:24
**interpretation** [4] - 121:7, 121:23, 122:14, 217:4
**interpretations** [1] - 216:8
**interrogatories** [1] - 226:20
**interrupt** [2] - 87:17, 154:19
**interruption** [2] - 161:11, 223:6
**intervals** [1] - 24:14
**interviewed** [1] - 75:8
**introduce** [1] - 27:12
**introduces** [1] - 169:13
**introducing** [1] - 142:8
**invest** [1] - 181:11
**invested** [2] - 175:7, 181:22
**investment** [16] - 172:24, 173:23, 175:8, 177:1, 181:12, 181:14, 183:6, 204:2, 204:4, 204:23, 204:24, 205:3, 206:9, 206:10, 206:15, 234:25
**investments** [8] - 167:1, 174:15, 174:17, 174:21, 175:1, 175:20, 186:5, 234:23
**investor** [1] - 183:3
**invoice** [3] - 82:25, 83:2, 84:18
**involved** [1] - 60:22
**irrelevant** [1] - 103:1
**Islands** [1] - 248:20
**issuance** [1] - 243:11
**issue** [22] - 37:3,

55:19, 61:1, 102:10, 141:19, 194:25, 195:25, 197:2, 197:16, 198:13, 199:4, 210:8, 212:19, 213:7, 213:8, 216:25, 217:9, 218:23, 219:2, 219:4, 244:10, 248:5
**issues** [7] - 7:3, 42:6, 194:13, 196:1, 198:5, 224:18, 244:17
**item** [5] - 29:18, 29:24, 76:16, 82:22, 95:3
**items** [7] - 76:18, 82:23, 82:24, 83:9, 83:24, 98:23, 133:25
**itself** [2] - 181:17, 253:21

**J**

**J.D** [2] - 223:14, 226:6
**jack** [3] - 78:7, 79:16
**janitorial** [1] - 144:16
**January** [13] - 97:24, 130:23, 131:2, 131:12, 150:15, 151:10, 152:2, 152:12, 233:3, 233:20, 235:1, 249:18, 250:3
**Jeff** [1] - 26:16
**Jeffrey** [4] - 19:5, 19:24, 22:17, 25:11
**Jersey** [3] - 225:14, 225:15, 248:14
**job** [137] - 20:17, 20:21, 22:18, 22:22, 22:24, 23:2, 23:6, 23:15, 25:16, 25:19, 26:2, 26:3, 27:23, 28:4, 28:7, 31:12, 31:22, 32:3, 33:9, 36:17, 36:21, 37:6, 37:11, 38:5, 38:11, 38:12, 38:14, 38:18, 38:23, 38:24, 40:7, 40:14, 40:16, 40:25, 41:2, 41:7, 42:13, 42:14, 43:21, 43:25, 44:2, 46:12, 48:24, 51:25, 52:2, 52:12, 53:5, 53:19, 54:12, 54:14, 54:17, 60:4, 62:4, 68:7, 68:9, 68:14, 69:3, 75:6, 75:9, 75:22, 81:20, 86:8, 86:9, 89:23, 94:12, 94:22, 96:4,

97:15, 98:15, 98:21, 98:22, 105:20, 106:21, 109:20, 110:3, 110:4, 110:5, 110:22, 111:2, 111:13, 112:2, 114:14, 114:23, 115:4, 115:18, 115:24, 116:2, 116:20, 117:5, 118:16, 123:4, 123:11, 127:23, 128:1, 128:12, 133:8, 139:21, 145:25, 150:3, 150:9, 150:10, 174:7, 206:3, 209:21, 210:1, 210:2, 210:25, 211:23, 213:1, 214:3, 214:11, 214:12, 215:2, 215:6, 215:8, 216:5, 216:8, 216:10, 216:16, 216:25, 217:2, 217:3, 217:4, 218:10, 218:20, 228:14, 233:1, 233:20, 236:21, 244:11, 249:9, 249:12, 252:15, 256:2

**jobs** [9] - 53:10, 53:13, 53:21, 137:18, 152:17, 211:23, 212:2, 249:24, 251:12

**joke** [1] - 4:5

**Journal** [2] - 165:10, 165:15

**journals** [2] - 225:1, 225:7

**JTC** [1] - 249:13

**JUDGE** [1] - 1:8

**judges** [1] - 244:5

**judgment** [2] - 214:11, 219:22

**judicial** [1] - 248:9

**judicially** [1] - 210:5

**July** [3] - 174:6, 175:16, 234:11

**jump** [1] - 4:7

**jumped** [1] - 87:5

**June** [1] - 122:2

**jury** [61] - 4:1, 5:15, 7:11, 9:24, 11:11, 11:19, 23:17, 23:22, 32:25, 33:1, 34:18, 41:12, 43:5, 45:24, 47:17, 48:5, 49:14, 57:22, 74:3, 110:2, 117:2, 135:9, 139:3, 140:3, 142:19, 150:13, 153:7, 157:15, 157:16,

161:19, 166:4, 167:10, 179:18, 184:16, 186:19, 187:24, 194:4, 197:6, 198:2, 206:25, 209:11, 209:12, 211:4, 219:17, 219:25, 222:11, 223:10, 224:4, 225:3, 226:14, 227:22, 236:12, 242:15, 242:24, 244:24, 246:25, 248:7, 257:1, 257:2, 258:2

**Jury** [2] - 2:2, 260:3

**JURY** [1] - 1:7

# K

**Katzman** [1] - 1:12

**keep** [9] - 17:21, 34:10, 70:17, 103:9, 103:10, 103:16, 103:17, 106:11, 164:25

**keeping** [2] - 85:21, 85:22

**Kern** [14] - 156:24, 157:24, 159:22, 159:25, 160:4, 160:5, 160:7, 160:9, 160:14, 162:13, 163:22, 184:3, 196:9

**kern** [35] - 2:13, 164:13, 167:8, 171:6, 171:12, 174:5, 176:6, 176:22, 178:7, 178:15, 178:24, 179:10, 185:11, 186:2, 186:13, 187:17, 194:19, 195:17, 195:22, 199:14, 201:22, 205:15, 206:17, 207:9, 208:6, 227:18, 227:24, 230:6, 231:8, 231:19, 232:23, 233:11, 234:15, 234:22, 234:24

**kern's** [7] - 227:3, 227:23, 229:3, 232:5, 233:15, 234:5, 234:9

**kids** [3] - 132:14, 132:18, 150:25

**kind** [27] - 6:2, 8:23, 9:17, 9:24, 28:20, 34:9, 39:18, 40:12, 51:15, 80:4, 89:5, 90:1, 90:3, 102:7, 103:15, 117:12, 127:22, 133:11,

155:5, 161:19, 173:13, 175:7, 176:6, 182:11, 195:21, 252:11, 252:17

**kinds** [6] - 15:18, 89:7, 174:21, 174:22, 174:23, 191:21

**Kline** [2] - 75:8, 82:11, 82:13, 94:20, 208:13

**knee** [63] - 35:6, 35:13, 35:19, 35:24, 36:14, 54:21, 54:22, 58:8, 58:11, 59:15, 59:21, 64:11, 64:14, 88:14, 88:18, 88:22, 88:25, 89:2, 89:5, 90:2, 90:20, 91:22, 92:7, 92:10, 92:13, 92:16, 92:19, 92:23, 93:8, 93:10, 93:13, 93:15, 94:4, 121:11, 121:13, 121:16, 121:18, 121:21, 121:24, 122:2, 122:5, 122:9, 122:13, 123:3, 123:12, 124:19, 124:20, 124:22, 125:6, 125:9, 127:4, 129:1, 138:7, 138:10, 140:5, 140:9, 149:8, 149:12, 149:17, 149:23, 149:24, 209:22, 211:2

**kneeling** [2] - 134:4, 134:9

**knees** [10] - 60:22, 92:5, 92:14, 129:1, 133:7, 134:8, 135:13, 138:19, 138:24, 139:19

**knowledge** [2] - 67:20, 239:24

**knowledgeable** [1] - 175:20

**knows** [1] - 191:21

**Krakow** [1] - 4:17

# L

**lab** [1] - 222:19

**labor** [8] - 228:3, 228:15, 228:21, 229:1, 231:13, 232:15, 233:19, 236:22

**lack** [1] - 153:21

**ladders** [1] - 108:15

**Ladies** [1] - 103:12

**ladies** [13] - 3:3, 73:22, 136:9, 142:12,

157:4, 178:10, 199:10, 209:2, 221:9, 247:2, 255:5, 256:10, 257:3

**laid** [1] - 215:6

**land** [2] - 226:19, 246:2

**large** [2] - 35:20, 52:25

**lasix** [1] - 58:15

**last** [30] - 18:13, 18:24, 44:2, 46:22, 50:24, 52:18, 52:21, 66:17, 70:4, 70:5, 70:6, 108:21, 111:20, 123:25, 124:6, 140:24, 151:14, 156:2, 162:4, 164:15, 164:16, 170:25, 185:12, 186:13, 194:2, 229:14, 238:10, 238:12, 238:22, 247:16

**lasted** [1] - 229:13

**late** [8] - 74:16, 74:17, 93:22, 94:10, 103:14, 174:11, 174:13, 256:18

**lateral** [2] - 35:13, 35:25

**Latin** [1] - 222:21

**Latsha** [2] - 10:20, 13:19

**LATSHA** [1] - 10:22

**Law** [4] - 1:15, 222:17, 224:13

**law** [21] - 206:21, 214:13, 214:14, 219:22, 223:9, 223:15, 224:18, 224:19, 226:9, 240:3, 240:6, 244:7, 244:25, 245:1, 245:4, 246:3, 246:12, 246:25, 247:4, 247:6, 247:7

**Lawrence** [1] - 221:25

**lawsuit** [2] - 123:18, 150:5

**lawyer** [4] - 195:17, 196:1, 243:5, 244:9

**lawyers** [4] - 224:15, 224:20, 243:13, 244:12

**laxity** [1] - 36:3

**lay** [3] - 61:24, 146:10, 226:19

**layer** [1] - 146:10

**laying** [1] - 93:12

**leading** [5] - 55:11,

60:25, 63:12, 75:2, 241:16

**leads** [1] - 115:23

**lean** [1] - 138:20

**leaning** [1] - 133:19

**learned** [1] - 246:3

**least** [12] - 34:18, 130:24, 161:8, 164:25, 183:11, 184:13, 185:18, 201:8, 204:21, 209:7, 229:14, 233:14

**leave** [14] - 57:4, 86:15, 88:8, 88:9, 88:12, 111:22, 113:17, 117:25, 118:3, 118:5, 138:2, 153:20, 196:12, 198:12

**leaving** [1] - 22:23

**lecture** [1] - 224:12

**lecturer** [1] - 224:19

**lecturing** [1] - 224:11

**leeway** [4] - 55:16, 55:17, 243:25, 247:9

**left** [38] - 22:19, 23:1, 32:7, 32:9, 33:16, 33:18, 35:6, 35:13, 35:19, 35:23, 35:24, 36:13, 44:17, 44:25, 54:21, 54:22, 58:11, 59:15, 59:21, 64:11, 64:14, 85:15, 92:23, 108:23, 121:15, 122:5, 134:15, 136:24, 138:9, 146:7, 159:4, 175:9, 180:3, 181:15, 198:11, 205:7, 215:6, 257:12

**left-hand** [1] - 33:16

**leg** [3] - 64:15, 108:23, 137:15

**legal** [20] - 127:19, 193:23, 193:25, 194:3, 195:18, 195:25, 196:1, 196:3, 196:12, 197:1, 206:19, 223:2, 224:15, 224:22, 225:6, 226:17, 243:12, 243:14, 243:22, 244:13

**legally** [3] - 219:17, 243:6, 243:9

**legislature** [2] - 245:2, 245:5

**legs** [11] - 59:15, 60:22, 64:12, 99:1, 107:10, 129:1, 146:5, 146:6, 146:11, 146:13

**Lehigh** [2] - 223:13
**Lemoyne** [1] - 162:11
**length** [1] - 139:23
**lengthy** [1] - 65:8
**less** [6] - 39:9, 82:13, 191:20, 191:22, 235:2, 237:8
**lessen** [1] - 121:25
**lessened** [2] - 93:11
**letter** [19] - 106:5, 106:17, 106:19, 107:5, 108:20, 117:10, 117:11, 119:6, 124:1, 125:21, 125:22, 130:11, 130:14, 131:3, 141:13, 142:16, 166:16, 218:24
**level** [17] - 10:10, 28:25, 29:7, 29:8, 29:11, 77:5, 80:22, 81:3, 81:17, 143:25, 144:2, 144:10, 198:21, 198:22, 231:14, 251:5, 251:10
**liability** [4] - 55:19, 60:25, 194:6, 223:4
**licensed** [1] - 5:12
**life** [13] - 122:24, 189:5, 190:4, 190:20, 190:25, 191:12, 211:18, 231:3, 231:4, 231:6, 231:9, 231:11, 231:16
**lift** [28] - 20:25, 25:22, 26:3, 28:18, 28:24, 29:6, 29:10, 29:16, 29:20, 30:24, 60:21, 61:9, 64:3, 64:16, 64:21, 65:14, 75:16, 79:7, 79:14, 107:10, 107:13, 114:8, 139:17, 139:20, 146:19, 146:22, 212:24, 215:21
**lifting** [23] - 25:18, 25:20, 25:22, 28:16, 28:25, 41:19, 46:8, 49:17, 49:19, 49:22, 60:17, 61:7, 66:12, 81:10, 98:23, 100:16, 107:9, 116:11, 116:12, 134:3, 134:12, 216:12, 216:13
**light** [6] - 87:8, 87:12, 219:20, 228:22, 229:1, 230:2

**lights** [1] - 222:19
**likely** [3] - 63:1, 126:6, 154:7
**limine** [2] - 193:24, 196:8
**limitation** [2] - 59:20, 229:25
**limited** [7] - 24:5, 24:10, 24:14, 24:15, 239:11, 252:8, 257:24
**limits** [4] - 35:24, 36:1, 36:5, 166:2
**line** [14] - 25:21, 26:5, 57:21, 57:22, 98:4, 98:11, 98:12, 115:13, 115:16, 145:19, 198:5, 199:17, 205:5, 243:18
**Lipitor** [1] - 58:15
**Lisinoparil** [1] - 58:15
**list** [11] - 76:8, 83:21, 96:5, 132:10, 159:5, 165:16, 165:17, 165:19, 165:21, 238:9, 239:20
**listed** [4] - 33:24, 58:10, 116:1, 116:11
**listened** [1] - 242:6
**listening** [1] - 96:22
**lists** [1] - 214:14
**literally** [1] - 158:18
**literature** [1] - 59:9
**litigate** [1] - 166:21
**litigation** [3] - 163:12, 164:2, 164:4
**lived** [1] - 150:21
**living** [2] - 167:19, 168:4
**load** [1] - 78:1
**loading** [1] - 78:3
**local** [7] - 7:20, 132:14, 132:18, 145:10, 150:25, 162:12, 165:7
**located** [6] - 5:9, 5:10, 35:12, 53:12, 140:2, 140:5
**location** [4] - 8:23, 10:3, 20:24, 31:3
**lock** [1] - 138:19
**Lodine** [7] - 58:16, 58:19, 58:20, 91:9, 91:14, 104:10, 104:11
**logistically** [1] - 257:4
**long-term** [1] - 43:6
**look** [42] - 24:20, 42:4, 48:24, 54:23, 57:10, 67:24, 67:25,

70:18, 71:12, 71:15, 82:22, 83:13, 83:20, 106:7, 106:18, 108:1, 110:7, 115:11, 124:14, 125:14, 125:21, 130:10, 131:13, 132:1, 133:12, 134:17, 151:14, 166:7, 166:23, 170:7, 174:18, 176:5, 184:3, 201:1, 214:19, 234:23, 236:1, 236:2, 249:16, 250:19, 258:10, 258:24
**looked** [14] - 166:13, 167:3, 167:5, 167:13, 167:15, 169:20, 171:21, 183:8, 186:23, 187:2, 205:7, 231:24, 236:5, 249:5
**looking** [21] - 18:16, 31:21, 41:19, 49:17, 54:16, 55:2, 55:4, 68:18, 71:12, 98:8, 98:9, 103:10, 106:12, 114:18, 140:19, 203:16, 234:14, 236:4, 242:14, 254:14, 254:22
**looks** [6] - 18:10, 24:16, 26:1, 37:8, 179:15, 229:4
**loose** [4] - 83:24, 84:11, 84:19, 84:20
**loss** [36] - 169:25, 172:24, 184:16, 187:11, 187:24, 188:3, 191:15, 192:13, 192:17, 194:18, 195:13, 195:21, 198:1, 199:18, 199:24, 200:5, 201:16, 205:2, 225:7, 227:13, 227:16, 227:20, 227:24, 229:2, 230:3, 231:18, 232:13, 233:21, 234:2, 235:4, 235:11, 235:16, 235:21, 236:10, 237:3, 242:10
**losses** [1] - 223:6
**lost** [30] - 139:21, 161:14, 169:22, 170:24, 172:21, 177:1, 178:25, 179:1, 179:16, 179:25, 180:8, 180:19, 183:23, 184:16,

184:19, 185:6, 186:4, 186:23, 186:24, 187:9, 187:10, 202:17, 209:21, 210:1, 225:19, 235:5
**low** [1] - 251:10
**lower** [5] - 17:8, 59:15, 59:22, 129:1, 140:6
**lunch** [4] - 102:8, 103:17, 104:2, 135:20
**Lunch** [1] - 136:17

**M**

**M.D** [2] - 2:7, 3:14
**ma'am** [26] - 74:18, 75:7, 89:24, 90:4, 97:17, 97:25, 98:3, 104:15, 109:14, 111:13, 113:18, 116:21, 117:19, 118:1, 122:14, 126:11, 126:23, 127:2, 128:5, 131:22, 132:18, 133:10, 133:24, 153:6, 153:23, 155:19
**ma`am** [1] - 124:3
**machinery** [2] - 59:1, 104:13
**machinery"** [1] - 59:6
**magazine** [1] - 165:8
**mail** [1] - 57:4
**main** [1] - 210:9
**maintain** [3] - 83:22, 83:23, 245:10
**maintenance** [1] - 144:16
**major** [1] - 216:19
**majority** [1] - 40:1
**man** [9] - 11:8, 85:15, 85:18, 95:25, 98:25, 99:6, 143:9, 144:8
**man-up** [5] - 85:15, 85:18, 143:9, 144:8
**manage** [1] - 6:16
**managed** [2] - 6:6, 162:14
**Management** [1] - 246:7
**management** [4] - 58:22, 162:5, 163:24, 212:14
**manager** [1] - 95:23
**manipulation** [1] - 116:16
**manner** [1] - 217:23

**manufacturing** [1] - 162:12
**March** [1] - 228:20
**marine** [1] - 8:14
**mark** [2] - 28:8, 208:19
**marked** [11] - 15:25, 18:2, 41:6, 48:6, 48:8, 106:8, 123:21, 133:13, 170:7, 170:16, 208:18
**market** [8] - 228:3, 228:15, 228:21, 229:1, 231:13, 232:15, 233:19, 236:22
**Market** [1] - 1:13
**Maryland** [2] - 225:14, 225:15
**mast** [2] - 143:11, 143:13
**masters** [3] - 160:21, 223:18, 223:21
**match** [3] - 47:11, 173:10, 180:7
**matches** [1] - 168:22
**matching** [5] - 168:2, 168:9, 168:18, 172:14, 180:9
**materially** [2] - 216:21, 219:10
**math** [3] - 203:15, 204:15, 239:2
**matter** [12] - 69:14, 83:19, 110:10, 135:24, 177:11, 187:18, 195:22, 206:18, 208:11, 219:22, 238:15, 239:18
**matters** [3] - 209:3, 223:2, 249:3
**matured** [1] - 175:25
**MBA** [2] - 160:17, 160:24
**McKinney** [6] - 3:12, 69:19, 74:2, 157:14, 209:11, 256:25
**meals** [1] - 151:12
**mean** [29] - 16:23, 39:15, 39:16, 49:20, 51:7, 57:5, 67:3, 72:22, 83:17, 83:22, 87:5, 96:13, 101:4, 126:18, 136:5, 147:13, 149:21, 151:24, 154:19, 181:6, 182:6, 189:23, 192:5, 220:9, 243:19, 246:11, 247:22,

249:17, 255:19

**meaning** [10] - 5:16, 23:2, 28:19, 72:11, 87:4, 90:18, 168:14, 218:7, 218:18, 244:16

**means** [7] - 77:24, 85:16, 136:6, 181:16, 202:24, 222:21, 260:24

**meant** [4] - 25:24, 62:17, 78:3, 185:12

**measure** [1] - 30:24

**measurement** [1] - 253:11

**Mechanicsburg** [7] - 1:16, 5:11, 8:23, 10:16, 20:24, 31:3, 32:8

**medial** [2] - 35:13, 35:25

**medical** [57] - 3:6, 3:23, 4:3, 4:5, 4:8, 4:13, 4:15, 4:21, 5:1, 5:6, 6:24, 9:22, 10:12, 14:16, 28:22, 29:4, 29:9, 29:15, 30:2, 34:3, 48:12, 54:10, 55:6, 56:7, 57:16, 57:23, 58:3, 59:23, 60:2, 60:4, 60:7, 60:11, 61:8, 64:1, 65:18, 86:15, 88:8, 88:9, 88:12, 112:1, 113:17, 117:25, 118:3, 118:5, 153:20, 154:11, 154:24, 155:1, 210:23, 214:12, 214:22, 214:24, 215:3, 215:4, 215:7, 219:1

**Medical** [3] - 4:17, 5:5, 35:9

**medication** [12] - 59:4, 59:11, 91:6, 91:10, 91:13, 91:15, 91:16, 103:22, 103:23, 104:5, 104:8, 104:14

**medications** [5] - 35:12, 58:9, 58:14, 58:17, 58:23

**medicine** [11] - 4:10, 4:11, 4:14, 4:24, 5:12, 5:23, 6:16, 6:17, 7:1, 7:13, 58:18

**meet** [4] - 118:15, 210:24, 211:1, 213:2

**meeting** [6] - 12:8, 119:4, 119:12, 119:15, 119:18,

119:20

**member** [2] - 224:1, 224:5

**memo** [1] - 213:19

**memory** [2] - 19:21, 51:19

**men** [1] - 99:5

**mention** [2] - 36:22, 192:8

**mentioned** [11] - 30:22, 31:20, 38:23, 52:22, 58:18, 140:12, 143:8, 171:19, 180:12, 218:25, 231:8

**Merit** [1] - 260:18

**message** [4] - 44:17, 44:25, 57:4, 57:6

**met** [2] - 117:15, 212:21

**methodology** [4] - 169:17, 169:18, 170:10

**metric** [3] - 253:7, 253:8, 253:9

**metropolitan** [1] - 53:18

**mezzanine** [5] - 79:13, 81:8, 81:15, 144:3, 144:10

**Michael** [1] - 1:12

**microphone** [1] - 171:9

**mid** [4] - 10:10, 251:21, 252:8, 252:18

**mid-level** [1] - 10:10

**MIDDLE** [1] - 1:1

**Middle** [1] - 166:19

**middle** [2] - 9:13, 146:10

**might** [19] - 10:8, 10:9, 17:13, 17:17, 24:19, 27:6, 30:9, 59:11, 120:3, 121:25, 142:12, 149:13, 175:13, 176:14, 176:16, 176:18, 183:6, 191:22, 253:10

**mind** [5] - 78:2, 120:9, 187:14, 213:22, 255:7

**mine** [3] - 5:21, 18:25, 104:6

**minimal** [1] - 249:21

**minimally** [1] - 249:17

**minimum** [7] - 200:17, 233:14, 233:16, 233:20, 235:25, 236:5, 236:6

**minute** [2] - 24:14,

24:16

**minutes** [13] - 24:5, 24:17, 50:9, 71:8, 135:2, 138:7, 159:4, 159:11, 187:2, 257:15, 257:16, 258:18, 259:3

**mistake** [1] - 19:13

**mister** [1] - 226:6

**mitigation** [14] - 194:20, 194:21, 194:23, 198:13, 198:15, 198:19, 199:4, 199:5, 202:19, 205:9, 232:5, 232:10, 235:24

**mixed** [2] - 84:16, 116:6

**model** [1] - 6:25

**modifications** [1] - 114:13

**modified** [3] - 114:24, 115:8, 214:3

**modify** [10] - 114:14, 114:19, 114:22, 115:3, 115:20, 214:4, 214:8, 214:9, 215:8, 215:15

**moisture** [1] - 108:24

**moment** [4] - 7:21, 8:3, 14:19, 230:5

**money** [12] - 132:19, 154:9, 167:16, 168:22, 169:7, 169:14, 173:9, 175:9, 182:4, 183:18, 206:16, 235:6

**moneys** [1] - 173:11

**month** [2] - 120:12, 250:17

**months** [6] - 86:18, 113:25, 118:4, 235:1, 235:2, 237:5

**mop** [1] - 133:1

**mopping** [4] - 132:13, 132:15, 132:17, 133:3

**morning** [4] - 3:2, 3:20, 3:21, 19:4, 73:23, 74:12, 74:13, 103:14, 158:11, 256:18, 256:25, 257:10, 258:1, 259:3

**mornings** [1] - 93:12

**most** [18] - 15:21, 24:4, 40:13, 46:4, 57:5, 62:10, 63:1, 132:7, 133:18, 137:18, 145:9, 150:23, 163:25,

172:11, 187:20, 189:17, 253:8, 254:21

**mostly** [2] - 95:23, 165:13

**motion** [11] - 2:17, 35:23, 35:25, 59:21, 193:24, 196:8, 209:14, 213:5, 216:1, 216:4, 219:21

**motivating** [1] - 218:11

**motor** [1] - 223:3

**move** [19] - 23:16, 41:11, 47:16, 49:8, 57:9, 69:9, 70:2, 70:9, 72:1, 73:14, 81:21, 128:16, 133:4, 141:2, 171:3, 207:17, 220:14, 258:12

**moved** [2] - 162:8, 162:9

**moves** [3] - 143:12, 143:13, 209:16

**moving** [10] - 73:11, 89:12, 89:22, 97:4, 100:22, 102:24, 145:11, 145:13, 158:2, 187:15

**mow** [2] - 133:4, 133:6

**MR** [104] - 3:19, 23:14, 23:23, 24:24, 27:5, 27:9, 27:14, 27:18, 34:16, 35:1, 35:2, 37:25, 38:3, 41:10, 41:18, 46:22, 46:25, 47:14, 48:3, 48:10, 48:11, 49:8, 49:13, 49:16, 54:2, 55:9, 55:22, 60:24, 61:10, 61:16, 63:12, 64:4, 64:23, 65:1, 66:13, 69:13, 70:8, 70:13, 72:5, 72:7, 73:5, 73:9, 73:18, 89:8, 102:20, 104:16, 104:19, 112:22, 116:25, 122:22, 122:24, 123:2, 124:24, 125:8, 141:5, 143:2, 143:4, 152:22, 155:21, 156:18, 156:24, 157:24, 159:2, 159:21, 159:24, 160:6, 171:6, 171:11, 177:12, 177:16, 177:23, 178:1, 178:9, 178:22, 179:7, 179:9, 187:12, 193:16, 193:21,

195:17, 196:7, 196:22, 197:1, 198:14, 198:22, 205:14, 207:7, 207:16, 208:4, 208:10, 208:20, 209:1, 221:1, 225:22, 225:24, 237:19, 237:20, 243:21, 244:2, 247:10, 254:8, 257:16, 257:20, 257:23

**MS** [111] - 23:20, 27:8, 34:24, 41:14, 47:21, 47:23, 49:11, 53:22, 54:6, 55:24, 61:2, 61:6, 62:1, 62:2, 64:25, 65:7, 65:16, 66:10, 66:16, 69:9, 69:14, 69:23, 70:1, 70:15, 70:16, 71:25, 72:12, 73:16, 74:11, 88:4, 89:12, 89:15, 89:18, 101:25, 102:14, 102:24, 103:4, 103:7, 103:10, 103:19, 118:21, 118:25, 119:2, 125:20, 125:25, 126:3, 136:21, 136:22, 141:1, 141:7, 141:21, 142:7, 142:15, 142:23, 152:24, 152:25, 155:20, 156:19, 157:21, 158:2, 158:9, 158:14, 158:20, 159:12, 171:5, 177:20, 178:5, 178:20, 179:8, 187:16, 194:12, 195:1, 195:5, 195:7, 196:5, 196:9, 196:23, 197:6, 197:17, 197:23, 198:4, 198:16, 199:5, 199:7, 199:13, 205:12, 207:3, 207:25, 208:23, 209:15, 213:8, 213:23, 217:6, 220:7, 220:25, 221:6, 221:15, 222:2, 225:17, 226:3, 233:6, 233:9, 237:15, 243:17, 246:9, 246:11, 254:11, 254:24, 257:13, 257:17, 258:14

**multiple** [1] - 160:25

**municipal** [1] - 204:11

**musculoskeletal** [2] - 29:9, 35:22

**must** [6] - 131:8, 193:14, 218:3, 218:15, 219:7, 229:17

## N

**NACVA** [1] - 224:5
**name** [14] - 3:17, 5:4, 10:19, 11:6, 19:4, 33:23, 67:9, 84:7, 95:9, 160:3, 160:4, 221:24, 247:17, 250:8
**narcotic** [3] - 104:15, 104:22, 104:23
**narrowly** [1] - 191:15
**National** [1] - 224:6
**national** [2] - 5:19, 165:12
**nature** [3] - 11:25, 59:8, 216:17
**near** [1] - 94:6
**necessarily** [3] - 203:16, 207:22, 255:19
**necessary** [10] - 7:3, 86:8, 89:1, 89:4, 109:21, 111:18, 112:11, 113:22, 158:11, 207:5
**need** [27] - 7:22, 15:19, 28:18, 39:17, 90:8, 93:3, 111:4, 111:11, 123:14, 128:15, 135:10, 135:12, 137:10, 138:12, 138:19, 156:25, 164:24, 170:6, 174:2, 201:2, 209:3, 218:21, 220:12, 220:16, 220:20, 221:4, 222:4
**needed** [17] - 28:24, 82:4, 82:18, 86:21, 86:22, 94:4, 99:8, 103:21, 105:15, 120:16, 121:10, 121:13, 155:15, 158:22, 182:22, 212:9, 212:10
**needing** [2] - 92:10, 134:18
**needs** [2] - 28:9, 147:11
**negative** [23] - 13:17, 13:24, 14:2, 14:8, 17:19, 20:2, 22:21, 26:19, 27:22, 28:15, 28:21, 30:1, 30:21, 31:7, 31:11, 41:1,

44:1, 45:21, 50:7, 50:23, 51:22, 52:14, 52:17
**Negative** [1] - 20:7
**negatively** [2] - 110:11, 110:13
**net** [8] - 203:13, 203:22, 204:14, 204:17, 204:18, 204:20, 204:21, 205:4
**never** [34] - 74:22, 74:23, 88:17, 88:21, 89:6, 89:25, 90:2, 90:7, 90:15, 90:18, 90:19, 109:5, 117:11, 118:3, 120:9, 121:4, 123:3, 123:10, 129:13, 129:22, 134:15, 149:7, 150:8, 150:12, 192:14, 192:19, 210:25, 212:16, 213:25, 214:7, 214:9, 214:21, 214:22, 215:17
**nevertheless** [1] - 128:17
**new** [1] - 108:21
**New** [5] - 225:14, 225:15, 225:16, 248:14
**next** [24] - 3:6, 19:15, 32:19, 47:1, 47:3, 70:5, 95:13, 106:6, 106:7, 109:16, 109:17, 132:20, 133:12, 133:21, 133:22, 135:3, 135:17, 137:21, 139:25, 141:11, 156:23, 159:20, 185:23, 196:23
**night** [1] - 93:12
**night's** [1] - 256:15
**nine** [1] - 248:11
**ninety** [1] - 146:12
**NO** [1] - 1:3
**nobody** [5] - 108:13, 109:21, 111:3, 111:18, 112:16
**nobody's** [1] - 127:20
**nonemergency** [1] - 6:11
**nonhealing** [1] - 137:14
**normal** [9] - 35:24, 36:1, 36:4, 134:13, 168:19, 183:1, 185:19, 191:18, 191:22

**notation** [6] - 19:23, 26:7, 32:13, 36:9, 47:10, 51:12
**note** [12] - 26:21, 34:4, 34:9, 35:17, 36:12, 36:18, 36:22, 37:15, 47:7, 47:16, 51:4, 57:25
**noted** [5] - 47:23, 60:16, 114:2, 177:17, 257:7
**notes** [6] - 17:16, 17:21, 17:25, 33:3, 45:5, 260:10
**nothing** [12] - 82:1, 88:11, 108:12, 111:9, 121:15, 152:22, 156:18, 197:7, 197:9, 214:4, 215:14, 235:23
**notice** [2] - 148:19, 166:20
**notion** [1] - 183:7
**notwithstanding** [1] - 215:7
**November** [9] - 130:4, 130:17, 130:25, 131:5, 131:8, 228:5, 229:6, 236:18, 237:8
**number** [30] - 3:5, 16:12, 24:16, 27:3, 82:24, 82:25, 83:12, 95:3, 99:2, 113:4, 124:14, 124:15, 125:14, 132:1, 139:2, 139:8, 150:2, 172:5, 172:7, 173:5, 173:6, 174:5, 177:3, 180:2, 182:21, 187:5, 191:4, 204:5
**Number** [4] - 147:7, 151:6, 152:14, 152:15
**numbers** [11] - 169:11, 181:10, 182:18, 186:19, 191:3, 191:7, 191:8, 203:18, 206:6, 232:8, 233:11
**nurse** [3] - 10:10, 10:24, 11:1
**nurses** [1] - 10:12
**nutritionist** [2] - 154:10, 155:4
**nutritionists** [1] - 154:5

## O

**oath** [6] - 74:6, 98:1, 221:20, 226:22, 226:24, 239:6

**object** [3] - 55:14, 61:11, 65:4
**objecting** [1] - 65:22
**Objection** [1] - 122:22
**objection** [52] - 23:19, 23:20, 34:19, 34:23, 34:24, 41:13, 41:14, 48:3, 49:10, 49:11, 53:22, 55:10, 60:24, 61:4, 61:10, 61:14, 61:23, 63:12, 64:4, 64:23, 65:10, 65:11, 66:13, 69:12, 69:13, 70:11, 72:4, 72:12, 73:15, 73:16, 89:8, 104:16, 104:18, 104:19, 112:22, 112:25, 113:1, 116:25, 124:24, 141:4, 141:5, 178:4, 193:16, 193:21, 207:3, 207:6, 207:24, 208:22, 208:23, 243:17, 244:1, 246:9
**objectionaries** [1] - 159:3
**objections** [11] - 157:18, 158:16, 159:5, 178:5, 207:25, 220:13, 220:17, 225:23, 257:6, 257:7, 258:24
**observation** [3] - 60:12, 60:13, 61:9
**observations** [1] - 68:15
**observe** [1] - 211:14
**observed** [1] - 212:4
**obtained** [2] - 4:9, 185:15
**obviously** [6] - 9:22, 37:12, 69:6, 88:2, 158:3, 220:4
**occasional** [7] - 116:11, 116:12, 116:15, 116:17, 116:18, 116:19
**occasionally** [15] - 10:9, 11:3, 35:11, 44:12, 64:17, 68:22, 71:11, 88:23, 90:6, 90:24, 91:23, 94:6, 99:9, 104:2, 216:12
**occupation** [1] - 222:11
**occupational** [5] - 4:14, 5:22, 6:16, 6:17, 7:13
**occur** [2] - 140:17,

140:20
**occurred** [1] - 17:18
**October** [2] - 91:25, 92:8
**OF** [2] - 1:1, 1:7
**offer** [6] - 177:25, 178:1, 179:7, 210:3, 225:18, 225:23
**offered** [6] - 155:11, 177:10, 178:7, 212:8, 226:1, 250:7
**offering** [3] - 178:19, 201:19, 207:10
**offers** [1] - 118:18
**office** [12] - 4:11, 7:5, 9:11, 10:17, 11:4, 13:10, 13:12, 33:3, 33:4, 47:16, 82:14, 105:25
**offices** [2] - 11:3, 11:5
**Offices** [1] - 1:15
**Official** [1] - 1:23
**official** [2] - 75:3, 75:5
**officially** [2] - 175:12, 177:10
**offset** [1] - 199:24
**often** [10] - 50:22, 67:17, 98:18, 140:17, 140:20, 140:22, 144:4, 146:2, 153:11, 238:1
**old** [1] - 163:4
**Old** [1] - 1:20
**older** [2] - 183:4
**once** [5] - 81:3, 163:7, 228:15, 229:25, 230:17
**one** [91] - 10:6, 10:25, 11:4, 14:19, 22:14, 28:12, 29:13, 29:23, 30:11, 31:24, 32:3, 37:20, 38:20, 39:1, 39:22, 42:18, 44:14, 46:17, 46:18, 52:10, 57:2, 59:25, 63:14, 66:17, 68:6, 68:24, 75:17, 79:18, 84:17, 85:6, 85:9, 85:15, 87:16, 91:9, 95:12, 99:2, 99:6, 99:25, 100:15, 100:16, 101:1, 101:6, 101:7, 102:18, 104:2, 105:8, 105:9, 111:6, 112:17, 114:4, 116:3, 124:25, 133:8, 136:10, 139:18, 139:23, 140:14,

142:7, 146:6, 146:9, 147:8, 147:13, 150:2, 158:22, 161:8, 174:16, 174:17, 175:13, 177:6, 183:17, 184:18, 188:18, 195:10, 202:22, 208:11, 209:7, 211:6, 211:8, 214:1, 215:1, 216:2, 222:6, 224:13, 226:25, 229:14, 231:7, 246:17, 249:13, 249:14, 253:7

**one-half** [1] - 139:23

**ones** [7] - 71:23, 80:25, 85:6, 97:17, 224:4, 225:3, 225:5

**open** [4] - 61:3, 79:14, 121:7, 121:23

**opened** [2] - 86:2, 106:12

**operate** [5] - 59:6, 71:11, 100:14, 101:8, 104:13

**operated** [3] - 100:2, 100:10, 101:2

**operates** [1] - 5:16

**operating** [10] - 5:20, 58:25, 85:10, 94:15, 99:22, 100:19, 100:23, 102:9, 104:11, 216:20

**operation** [3] - 5:22, 5:23, 122:23

**operations** [2] - 5:8, 5:18

**operator** [4] - 58:3, 143:10, 143:15, 143:16

**operator's** [1] - 85:16

**opinion** [30] - 28:22, 30:2, 106:20, 107:2, 107:9, 112:1, 112:8, 112:9, 120:23, 126:13, 126:14, 127:21, 128:2, 128:4, 170:21, 178:19, 194:10, 212:7, 214:12, 215:7, 226:14, 242:12, 242:13, 243:22, 244:5, 244:23, 245:8, 245:13, 246:18, 248:23

**opinions** [6] - 178:13, 206:7, 207:11, 227:9, 237:11, 244:8

**Oplinger** [23] - 33:6, 36:7, 36:14, 92:3, 92:4, 92:9, 111:2, 112:15, 112:16, 112:20, 113:3, 120:4, 120:19, 120:22, 121:14, 124:22, 127:3, 149:12, 155:2, 157:19, 158:13, 257:8

**oplinger** [6] - 109:18, 111:6, 121:9, 122:11, 122:12, 220:11

**Oplinger's** [4] - 120:10, 158:5, 258:22, 259:1

**opportunity** [8] - 36:6, 149:3, 149:5, 177:14, 177:19, 198:18, 227:2, 256:23

**opposite** [1] - 15:5

**option** [1] - 121:12

**order** [11] - 3:7, 55:17, 76:14, 76:17, 77:13, 85:13, 95:5, 193:12, 218:2, 218:13, 220:19

**Order** [1] - 222:17

**orders** [8] - 76:10, 77:24, 82:16, 82:20, 95:13, 96:13, 96:17, 96:18

**organization** [1] - 224:7

**organizations** [2] - 163:11, 249:10

**organize** [1] - 84:21

**organized** [3] - 95:11, 102:3, 220:19

**oriented** [1] - 35:21

**originally** [1] - 162:9

**ortho** [3] - 35:6, 36:13, 48:16

**orthopaedic** [8] - 58:9, 91:25, 110:23, 129:14, 129:15, 129:17, 129:21, 155:3

**Orthopaedic** [1] - 33:4

**OSHA** [5] - 134:12, 134:13, 139:20, 146:21, 209:22

**outdoors** [1] - 132:11

**outright** [1] - 111:18

**outside** [3] - 72:13, 140:5, 256:12

**overall** [1] - 199:20

**overarching** [1] - 194:7

**overhead** [1] - 28:20

**overlap** [2] - 72:4, 242:4

**overnight** [1] - 257:21

**overruled** [5] - 63:16, 72:14, 104:21, 113:1, 244:1

**overstating** [1] - 231:18

**overtime** [1] - 75:25

**overvalued** [1] - 191:14

**overview** [2] - 169:16, 180:11

**own** [15] - 12:2, 12:5, 68:14, 68:15, 112:12, 162:14, 163:2, 195:15, 209:19, 210:20, 210:24, 212:23, 213:24, 215:19, 253:14

**owner** [1] - 7:16

**P**

**P-13** [2] - 41:6, 41:11

**P-14** [2] - 49:5, 49:9

**P-16** [2] - 170:9, 170:16

**P-17** [2] - 208:20, 208:22

**P-7** [1] - 15:9

**P-8** [4] - 15:25, 16:1, 73:12, 73:17

**P-9** [12] - 18:2, 18:4, 18:11, 20:13, 22:3, 23:16, 27:24, 31:23, 32:3, 69:18, 69:19, 69:20

**P.C** [4] - 1:12, 1:15, 1:19, 160:9

**p.m** [14] - 39:11, 101:22, 103:11, 136:18, 141:18, 142:11, 157:16, 159:18, 193:20, 199:9, 209:12, 221:8, 257:2, 259:5

**PA** [8] - 1:5, 1:13, 1:16, 1:20, 1:25, 13:19, 56:2, 56:4

**page** [58] - 2:5, 18:13, 22:8, 22:10, 22:11, 23:14, 25:7, 26:12, 27:23, 28:17, 30:11, 30:16, 31:12, 44:2, 50:24, 51:12, 57:20, 62:3, 62:5, 68:18, 70:5, 70:6, 70:10, 71:12, 71:15,

71:21, 98:4, 98:9, 106:10, 106:13, 106:16, 111:20, 115:12, 115:16, 123:25, 124:3, 124:4, 124:6, 125:11, 125:12, 125:13, 125:21, 125:22, 131:23, 132:20, 133:12, 133:21, 133:22, 135:3, 135:17, 137:21, 139:25, 145:15, 145:16, 146:17, 152:5, 177:6, 186:11

**pages** [2] - 70:4, 98:7, 131:19

**paid** [2] - 173:7, 176:2, 197:21

**pain** [44] - 35:6, 35:12, 35:19, 35:24, 36:1, 36:2, 36:4, 58:11, 58:18, 58:21, 59:14, 64:11, 88:14, 88:18, 88:25, 89:2, 89:5, 90:2, 90:20, 91:13, 91:22, 93:8, 93:10, 93:11, 93:15, 103:22, 104:5, 104:8, 104:14, 122:1, 137:23, 138:7, 140:2, 140:4, 140:5, 140:6, 140:9, 140:11, 140:17, 140:20, 140:24

**painful** [1] - 92:23, 108:18, 138:10

**painkillers** [2] - 58:18, 58:24

**paired** [1] - 99:4

**pallet** [4] - 75:17, 78:11, 83:3, 139:18

**pallets** [1] - 96:20

**panel** [4] - 7:17, 7:20, 129:19, 129:21

**paper** [1] - 184:25

**paperwork** [11] - 12:7, 56:23, 118:6, 118:17, 124:2, 128:18, 128:20, 129:6, 211:13, 236:20

**paragraph** [8] - 107:4, 108:1, 108:2, 108:22, 111:21, 139:9, 147:8, 147:10

**paragraphs** [1] - 42:10

**pardon** [8] - 79:21, 100:6, 110:16, 119:16, 122:19,

141:10, 154:14, 156:4

**parentheses** [1] - 37:17

**park** [1] - 150:21

**Park** [1] - 5:10

**part** [40] - 5:22, 5:23, 13:25, 20:17, 21:2, 21:7, 21:12, 21:18, 21:24, 22:1, 23:10, 27:6, 27:8, 47:19, 47:24, 48:1, 48:8, 75:6, 99:2, 115:21, 139:7, 162:25, 165:17, 166:10, 166:11, 170:18, 172:23, 173:23, 173:24, 173:25, 179:4, 180:21, 180:22, 183:22, 186:14, 194:4, 207:1, 210:10, 244:11

**participate** [2] - 228:14, 236:22

**participating** [1] - 228:21, 229:1

**participation** [1] - 231:13

**particular** [23] - 9:12, 9:15, 10:7, 11:2, 16:17, 17:10, 29:5, 29:8, 37:8, 38:13, 45:9, 46:11, 46:14, 52:10, 54:17, 59:7, 59:8, 59:11, 70:10, 72:17, 73:4, 117:13, 211:23

**parties** [1] - 243:7

**parts** [6] - 23:3, 75:13, 84:2, 84:16, 85:7, 139:17

**partway** [1] - 157:18

**pass** [3] - 29:7, 126:12, 150:8

**passed** [2] - 123:13, 150:3, 150:10, 245:4

**passing** [1] - 256:14

**past** [2] - 156:15, 209:6

**pat** [1] - 89:3

**patient** [34] - 8:1, 9:10, 9:16, 12:8, 20:25, 21:5, 21:6, 24:9, 25:5, 29:5, 36:3, 36:15, 36:21, 37:14, 37:17, 38:6, 38:14, 38:25, 44:10, 44:17, 46:14, 48:16, 50:3, 54:10, 54:11, 54:13, 54:19, 56:20, 56:24, 59:10, 60:13, 63:24,

67:10, 126:5
**Patient** [2] - 36:19, 57:25
**patient's** [1] - 37:9
**patient)** [1] - 49:19
**patients** [7] - 3:11, 5:16, 6:9, 6:13, 7:2, 29:8
**pause** [10] - 18:3, 24:18, 25:6, 27:25, 41:17, 47:22, 63:15, 87:25, 96:21, 130:12
**pay** [5] - 162:15, 173:9, 173:12, 175:12, 181:12
**paying** [4] - 175:6, 175:16, 183:13, 206:11
**payment** [2] - 167:3, 168:11
**payments** [4] - 167:4, 193:11, 228:20, 237:9
**pays** [1] - 193:9
**penalties** [1] - 239:25
**Penn** [9] - 160:16, 160:17, 160:19, 161:22, 162:17, 162:19, 162:20, 165:10, 165:25
**Pennsylvania** [12] - 5:13, 7:15, 11:5, 53:11, 53:16, 67:15, 163:17, 163:18, 200:17, 225:14, 225:15, 248:13
**PENNSYLVANIA** [1] - 1:1
**people** [13] - 6:21, 95:6, 96:13, 99:4, 99:7, 111:15, 145:10, 185:19, 185:21, 190:16, 190:17, 212:13, 238:3
**per** [19] - 36:13, 39:6, 39:8, 39:9, 39:22, 40:4, 49:19, 134:12, 139:20, 146:21, 167:16, 179:21, 179:24, 181:13, 200:20, 200:22, 201:1, 233:24, 234:1
**perceived** [4] - 211:22, 212:1, 212:14, 218:10
**perceiving** [1] - 212:10
**percent** [57] - 67:22, 94:25, 99:13, 99:14,

99:15, 163:6, 163:15, 167:22, 167:23, 168:1, 168:17, 172:1, 172:2, 172:3, 172:13, 172:15, 172:16, 172:17, 174:1, 174:4, 175:6, 175:12, 175:15, 175:19, 175:24, 180:2, 180:7, 181:13, 181:18, 181:23, 182:8, 182:24, 183:13, 183:20, 189:14, 201:4, 201:9, 202:6, 202:10, 203:8, 203:19, 203:20, 203:21, 203:23, 203:24, 204:1, 204:12, 204:14, 204:18, 206:11, 229:5, 234:14, 235:3, 235:7, 235:8
**percentage** [5] - 40:11, 53:20, 163:14, 171:24, 173:22
**perceptions** [1] - 212:13
**perfect** [1] - 159:7
**perform** [43] - 11:23, 25:16, 26:2, 31:2, 31:5, 31:9, 31:18, 35:14, 36:20, 39:11, 40:8, 43:13, 47:4, 49:21, 50:17, 51:3, 54:24, 56:1, 60:17, 62:8, 66:5, 66:11, 67:11, 68:1, 71:3, 71:7, 71:18, 98:16, 98:20, 98:23, 99:17, 106:20, 112:2, 126:19, 128:12, 146:1, 216:19, 218:9, 218:19, 228:13, 251:11, 251:14, 256:1
**performance** [2] - 58:1, 62:22
**performed** [8] - 33:22, 34:2, 56:7, 60:2, 63:17, 64:1, 66:8, 70:22
**performing** [6] - 15:2, 34:10, 52:12, 147:24, 148:2, 148:5
**performs** [1] - 39:5
**perhaps** [2] - 169:8, 175:23
**period** [16] - 74:15, 87:15, 88:5, 89:25, 173:12, 173:16, 173:21, 180:3,

180:20, 185:4, 187:1, 204:12, 230:7, 239:18, 254:14, 258:20
**periodic** [1] - 124:18
**periodicals** [1] - 164:19
**periods** [7] - 108:4, 134:9, 134:11, 147:16, 172:8, 172:11, 203:17
**perjury** [1] - 239:25
**permission** [1] - 15:15
**permitted** [1] - 31:9
**person** [18] - 21:9, 21:15, 21:21, 22:15, 28:9, 28:23, 84:10, 161:16, 175:7, 191:5, 191:22, 247:21, 251:1, 252:12, 252:25, 253:5, 255:17, 256:1
**person's** [3] - 21:11, 30:24, 252:14
**personally** [2] - 32:8, 165:2
**personnel** [5] - 8:15, 9:21, 9:25, 167:6, 167:15
**persons** [1] - 252:7
**perspective** [2] - 29:15, 38:22
**pertains** [1] - 38:13
**Peter** [2] - 1:15, 1:15
**Philadelphia** [3] - 161:23, 220:2, 220:4
**phone** [2] - 17:13, 17:17
**physical** [103] - 8:12, 8:13, 8:16, 9:16, 10:13, 11:21, 11:24, 12:1, 12:3, 12:4, 12:6, 12:23, 12:24, 13:25, 15:2, 15:12, 16:15, 16:22, 17:10, 17:11, 17:25, 19:19, 19:25, 20:6, 24:10, 25:4, 32:22, 34:10, 35:10, 35:15, 35:18, 35:20, 37:10, 39:5, 39:13, 39:15, 39:24, 40:1, 40:9, 46:3, 46:5, 46:6, 46:11, 47:4, 50:3, 54:8, 54:12, 54:13, 54:17, 54:23, 55:3, 56:2, 56:14, 56:20, 60:3, 60:8, 60:15, 61:12, 61:19, 61:21, 62:4, 62:20, 63:18,

63:23, 64:7, 64:12, 65:3, 66:5, 68:8, 68:13, 72:10, 72:24, 73:1, 76:4, 86:9, 106:21, 110:22, 111:7, 111:9, 113:19, 114:23, 114:25, 115:4, 115:7, 115:17, 115:25, 116:10, 116:19, 118:16, 123:14, 127:22, 127:25, 128:6, 150:3, 150:13, 210:25, 211:1, 214:5, 214:6, 214:8, 215:16, 216:9
**physically** [9] - 76:14, 78:9, 79:7, 80:1, 80:11, 81:6, 96:24, 97:16, 97:20
**physician** [34] - 10:7, 10:8, 10:9, 10:15, 11:20, 12:23, 13:19, 19:2, 19:4, 19:7, 22:6, 22:13, 25:10, 26:15, 34:2, 38:7, 56:4, 56:5, 60:12, 61:22, 62:14, 62:16, 62:17, 63:3, 63:10, 63:20, 64:2, 64:7, 65:4, 105:20, 127:1, 127:2, 212:23, 215:19
**physician's** [11] - 11:10, 13:22, 17:20, 17:24, 18:5, 18:9, 19:6, 22:9, 31:13, 42:2, 129:21
**physicians** [2] - 7:17, 14:22
**pick** [6] - 29:12, 30:20, 80:19, 82:5, 85:25, 137:18
**picker** [1] - 85:13
**picking** [3] - 86:6, 87:23, 136:1
**picks** [1] - 179:23
**pictures** [1] - 101:18
**piece** [2] - 198:19, 234:24
**pieces** [1] - 85:21
**pigeon** [1] - 197:24
**pill** [1] - 137:23
**pinpointed** [1] - 159:3
**pits** [1] - 223:23
**place** [11] - 29:25, 42:18, 44:14, 55:9, 68:24, 91:4, 140:14, 219:12, 220:5, 232:6, 252:20
**placed** [1] - 230:24

**placement** [1] - 249:10
**placements** [1] - 249:12
**places** [2] - 52:9, 249:21
**plainly** [1] - 217:20
**plaintiff** [11] - 178:8, 208:25, 209:19, 211:19, 211:25, 213:10, 213:12, 214:1, 214:17, 223:9, 226:20
**PLAINTIFF** [1] - 2:6
**Plaintiff** [2] - 1:3, 1:11
**plaintiff's** [7] - 116:5, 170:8, 210:11, 211:21, 213:19, 215:10, 221:10
**Plaintiff's** [9] - 9:6, 47:19, 48:6, 57:14, 69:15, 76:7, 106:9, 123:22, 147:7
**plan** [5] - 167:25, 173:11, 173:15, 173:18, 174:14
**planner** [1] - 206:14
**planning** [1] - 161:4
**plastic** [1] - 85:22
**play** [3] - 158:6, 159:8, 191:24
**played** [3] - 157:20, 258:22, 259:1
**plentiful** [1] - 53:14
**plenty** [1] - 217:21
**plus** [11] - 39:13, 46:18, 53:25, 54:13, 54:14, 75:16, 75:23, 75:24, 92:25, 139:18, 140:14
**point** [34] - 23:16, 34:18, 45:2, 59:25, 61:11, 71:10, 75:15, 91:19, 91:24, 92:6, 93:1, 101:24, 115:23, 118:22, 120:8, 137:10, 137:13, 137:25, 152:15, 167:14, 168:10, 168:14, 168:18, 169:3, 171:8, 184:2, 190:10, 194:25, 195:2, 210:5, 214:25, 215:18, 220:11, 229:7
**pointer** [1] - 179:25
**points** [2] - 10:8, 235:2
**Poland** [3] - 4:6, 4:18, 4:20

**policy** [1] - 246:7
**Polisher** [1] - 1:19
**polyclinic** [1] - 4:21
**pop** [1] - 176:21
**portable** [2] - 143:20, 171:9
**portion** [7] - 17:9, 40:2, 48:7, 48:12, 68:5, 124:25, 131:20
**pose** [1] - 116:25
**posing** [1] - 194:1
**position** [5] - 74:19, 75:2, 169:9, 217:8, 243:8
**positions** [4] - 53:3, 53:6, 243:14, 244:13
**possibility** [2] - 24:20, 92:12
**possible** [6] - 48:22, 100:14, 137:7, 201:25, 202:1
**possibly** [3] - 150:10, 155:7, 242:2
**potential** [1] - 167:11
**pound** [3] - 81:13, 139:18, 146:12
**pounds** [14] - 44:12, 44:13, 64:16, 64:22, 65:15, 68:22, 68:23, 75:16, 81:13, 81:16, 98:25, 150:16, 216:12, 216:14
**powered** [1] - 104:23
**practice** [2] - 4:10, 5:12
**practicing** [1] - 224:14
**practitioner** [6] - 10:10, 10:24, 11:1, 56:3, 129:20, 129:22
**precedence** [1] - 244:21
**precedent** [1] - 244:16
**precise** [1] - 189:20
**preemployment** [9] - 8:12, 17:12, 39:18, 39:24, 40:8, 72:9, 72:23, 73:1, 123:14
**premises** [4] - 23:1, 45:25, 52:7, 56:24
**prepare** [1] - 241:11
**prepared** [3] - 187:18, 220:1, 258:2
**preponderance** [3] - 218:6, 218:16, 219:8
**prescribe** [1] - 154:4
**presence** [2] - 20:8, 62:12
**present** [25] - 13:21,

35:19, 46:4, 47:18, 57:23, 59:13, 102:12, 106:21, 149:1, 180:12, 180:15, 181:4, 181:7, 182:9, 182:14, 183:15, 183:16, 187:3, 187:8, 189:11, 202:24, 203:4, 205:1, 221:13
**presentation** [1] - 252:25
**presented** [5] - 33:10, 62:14, 62:15, 232:23, 247:17
**presenting** [1] - 233:11
**presently** [1] - 126:5
**presents** [1] - 62:18
**press** [1] - 143:12
**presses** [1] - 143:17
**presumption** [3] - 7:24, 32:6, 247:2
**pretrial** [1] - 213:19
**pretty** [5] - 10:13, 10:23, 151:3, 157:6, 222:5
**prevail** [4] - 169:6, 218:3, 218:13, 219:6
**prevent** [1] - 134:8
**prevented** [2] - 113:14, 218:4
**preventing** [2] - 127:23, 127:25
**prevents** [2] - 134:10, 134:12
**previous** [3] - 19:1, 153:19, 253:1
**previously** [2] - 48:8, 252:15
**price** [1] - 166:2
**primary** [4] - 75:3, 226:25, 228:1, 242:13
**principal** [2] - 183:5, 235:6
**principles** [1] - 6:14
**private** [3] - 224:7, 231:12, 253:15
**probabilities** [2] - 231:5, 231:7
**probability** [1] - 231:10
**problem** [30] - 27:17, 29:4, 41:22, 41:25, 43:6, 58:8, 59:5, 64:15, 87:14, 103:8, 107:15, 108:4, 108:13, 108:15, 129:1, 129:2, 139:15, 147:16, 154:20, 159:15, 180:24,

194:19, 194:24, 195:8, 196:2, 196:5, 214:16, 215:12, 217:6, 220:8
**problems** [13] - 6:22, 29:9, 29:10, 54:21, 82:8, 82:9, 90:5, 92:19, 92:20, 124:20, 142:13, 142:14, 194:12
**proceed** [2] - 3:3, 229:24
**proceeding** [1] - 206:12
**proceedings** [3] - 157:9, 169:7, 260:8
**PROCEEDINGS** [1] - 2:5
**Proceedings** [1] - 260:3
**process** [5] - 11:15, 130:24, 159:6, 167:10, 180:1
**produce** [3] - 158:22, 165:17, 179:3
**produced** [1] - 239:15
**product** [8] - 78:10, 78:23, 79:5, 79:23, 81:3, 81:6, 81:12, 99:8
**professional** [5] - 160:25, 164:23, 223:4, 224:2, 225:1
**profit** [1] - 163:11
**profits** [2] - 161:14, 161:15
**program** [8] - 4:22, 4:23, 154:4, 155:6, 193:6, 223:19, 223:23, 250:24
**progressively** [2] - 93:23, 93:25
**project** [1] - 166:12
**projected** [1] - 234:22
**projection** [3] - 233:25, 235:4, 236:15
**projects** [1] - 145:10
**prolonged** [3] - 93:7, 93:10, 140:10
**promptly** [1] - 136:15
**promulgation** [1] - 243:3
**prong** [2] - 124:25, 125:4
**proof** [1] - 210:11
**proper** [5] - 84:5, 87:14, 116:19, 195:14

**properly** [3] - 95:11, 139:20, 220:19
**prospective** [1] - 8:17
**protected** [3] - 219:9, 219:12, 219:14
**protection** [2] - 210:6, 212:18
**prove** [4] - 218:3, 218:5, 218:15, 219:7
**provide** [22] - 6:24, 8:6, 8:11, 9:17, 30:18, 35:3, 40:6, 40:12, 40:13, 157:10, 218:14, 219:4, 223:1, 223:6, 223:8, 227:10, 229:9, 238:1, 238:4, 240:3, 244:7, 257:9
**provided** [17] - 12:20, 17:22, 25:3, 36:20, 37:11, 37:13, 38:15, 38:24, 38:25, 50:5, 52:1, 66:19, 66:23, 131:21, 161:13, 167:2, 237:4
**provider** [2] - 10:6, 124:19
**provides** [1] - 246:14
**providing** [6] - 166:17, 219:1, 237:22, 238:9, 238:10, 238:14
**prudent** [3] - 204:22, 204:23, 205:3
**public** [3] - 222:21, 222:22, 245:25
**publication** [2] - 165:11, 165:12
**publications** [3] - 164:20, 165:22, 207:19
**publish** [4] - 34:25, 47:17, 49:13, 165:4
**published** [11] - 23:17, 23:22, 41:12, 41:16, 48:5, 165:6, 165:9, 165:11, 165:17, 224:25, 225:4
**publishes** [1] - 245:25
**pull** [6] - 21:15, 76:16, 78:8, 79:17, 82:16, 99:8
**pulled** [2] - 95:19, 186:14
**pulling** [5] - 46:7, 76:10, 77:24, 116:14
**purpose** [4] - 9:14, 17:7, 52:19, 62:7
**purposes** [11] -

126:17, 168:20, 178:3, 178:14, 180:5, 205:16, 207:22, 209:8, 247:22, 247:23, 255:18
**pursuant** [1] - 217:2
**pursue** [1] - 103:3
**push** [1] - 21:15
**pushed** [1] - 103:15
**pushing** [2] - 46:7, 116:14
**put** [43] - 8:16, 77:8, 78:10, 78:25, 79:18, 79:24, 80:7, 80:9, 80:12, 80:19, 81:6, 82:4, 84:4, 84:24, 89:19, 95:6, 95:10, 96:23, 97:9, 97:11, 99:3, 129:3, 134:21, 135:7, 145:7, 146:9, 168:22, 170:10, 172:12, 179:10, 180:25, 183:18, 206:16, 230:5, 231:25, 239:6, 240:21, 241:1, 241:5, 241:8, 241:15, 249:19, 250:8
**puts** [1] - 143:18
**putting** [5] - 97:4, 97:5, 172:13, 210:7, 217:11

## Q

**qualifications** [6] - 177:15, 177:19, 177:21, 206:18, 220:9, 225:21
**qualified** [11] - 46:2, 196:4, 212:20, 212:21, 213:1, 218:8, 218:19, 251:14, 255:20, 256:7, 256:8
**qualify** [4] - 242:9, 245:15, 251:21, 252:2
**quarter** [2] - 102:6, 118:24
**questioned** [1] - 134:16
**questioning** [2] - 198:6, 243:18
**questions** [39] - 3:5, 9:21, 11:14, 12:10, 12:14, 19:24, 20:8, 27:16, 55:11, 64:5, 65:19, 66:3, 71:25, 72:8, 73:5, 73:6, 105:3, 142:24, 145:21, 148:17, 155:20, 156:19,

156:21, 160:13, 166:5, 187:13, 193:22, 194:1, 205:12, 205:15, 207:7, 208:5, 208:16, 225:21, 226:21, 237:15, 254:13, 254:25, 255:2

**quick** [1] - 258:10
**quicker** [1] - 159:6
**quickly** [4] - 57:9, 147:11, 158:24, 258:12
**quit** [1] - 54:2
**quite** [7] - 17:10, 24:22, 98:18, 146:2, 184:12, 227:20, 227:25
**quote** [2] - 37:19, 48:14

## R

**rack** [1] - 144:1
**racks** [1] - 143:25
**radiologist** [1] - 10:12
**raise** [1] - 258:24
**range** [3] - 35:23, 35:25, 59:20
**rate** [27] - 171:19, 171:25, 180:1, 182:8, 182:22, 182:23, 203:5, 203:11, 203:14, 203:20, 203:22, 203:24, 203:25, 204:1, 204:14, 204:17, 204:18, 204:20, 204:21, 204:22, 204:23, 205:2, 234:20, 240:11, 240:12, 240:17, 240:19
**rates** [4] - 167:20, 174:17, 234:5, 234:25
**rather** [4] - 82:13, 180:5, 253:14, 258:12
**rays** [4] - 14:3, 14:7, 14:11, 14:12
**reach** [5] - 57:3, 80:25, 143:24, 144:1, 186:2
**reaching** [2] - 75:21, 116:15
**read** [37] - 24:2, 24:12, 25:15, 37:16, 41:23, 42:16, 43:4, 43:11, 44:5, 44:6, 44:21, 45:7, 48:12, 66:4, 68:5, 124:16,

124:25, 135:9, 139:2, 140:3, 145:15, 147:8, 166:18, 166:19, 176:24, 184:24, 187:5, 208:14, 208:17, 242:6, 246:5, 247:11, 247:24, 248:1, 248:4, 248:23, 250:11

**reading** [5] - 57:21, 58:5, 132:5, 164:19, 248:2
**ready** [2] - 159:24, 220:13
**realistic** [1] - 235:8
**really** [21] - 65:12, 65:15, 86:9, 95:7, 97:23, 103:1, 114:15, 131:11, 134:23, 153:25, 182:2, 183:5, 199:21, 215:8, 216:25, 222:20, 235:11, 236:16, 237:2, 246:24, 254:22
**reapplied** [1] - 123:4
**reapply** [3] - 123:6, 123:15, 149:25
**reason** [13] - 9:12, 51:4, 92:17, 107:21, 112:18, 128:24, 129:4, 150:2, 158:21, 182:24, 190:21, 239:3, 239:21
**reasonable** [15] - 161:9, 174:8, 186:3, 207:11, 210:12, 211:5, 215:24, 218:14, 219:3, 219:5, 219:17, 227:10, 237:12, 241:19, 256:2
**reasons** [3] - 191:21, 191:24, 218:1
**rebuttal** [3] - 101:10, 101:12, 257:19
**receive** [12] - 4:15, 16:19, 33:9, 50:20, 169:7, 169:8, 195:4, 195:17, 197:12, 206:12, 251:1, 251:8
**received** [18] - 15:8, 15:13, 33:1, 36:7, 37:7, 40:22, 40:24, 142:3, 160:17, 160:23, 167:5, 168:11, 172:19, 201:9, 223:12, 223:14, 223:17, 223:21
**receiver** [3] - 75:2, 75:3, 114:15

**receives** [1] - 193:2
**receiving** [2] - 228:19, 255:18
**recent** [2] - 123:1, 187:20
**recess** [12] - 73:23, 74:1, 74:4, 136:10, 136:12, 136:16, 136:17, 159:18, 209:9, 221:8, 256:24, 259:2
**recessed** [3] - 157:16, 209:12, 257:2
**recession** [1] - 234:12
**recognize** [4] - 22:15, 26:14, 72:3, 247:3
**recognized** [1] - 178:15
**recognizing** [1] - 210:7
**recollection** [7] - 13:6, 19:18, 23:13, 52:8, 61:17, 238:18, 249:10
**recommendation** [1] - 149:15
**reconvene** [2] - 136:11, 157:13
**record** [29] - 3:17, 14:20, 16:11, 17:16, 18:5, 18:7, 18:12, 18:18, 19:12, 23:10, 26:7, 27:13, 32:13, 35:5, 40:21, 45:4, 45:5, 47:11, 52:20, 65:24, 66:4, 141:25, 151:8, 160:3, 207:23, 207:25, 218:2, 220:6, 221:24
**records** [14] - 13:7, 14:14, 14:16, 16:3, 19:3, 36:7, 36:14, 45:9, 47:25, 52:5, 161:13, 166:10, 219:1, 232:24
**recoup** [1] - 202:9
**recover** [2] - 198:1, 232:16
**recovering** [1] - 196:25
**recovery** [1] - 126:21
**recross** [1] - 152:23
**Recross** [1] - 2:12
**RECROSS** [1] - 152:25
**red** [1] - 102:25
**REDIRECT** [5] - 72:7, 143:4, 155:21,

205:14, 254:11
**redirect** [3] - 143:1, 205:13, 254:10
**Redirect** [4] - 2:9, 2:11, 2:15, 2:21
**reduce** [2] - 199:18, 232:22
**reduced** [1] - 203:4
**reduces** [1] - 234:1
**reducing** [1] - 232:10
**reemployed** [1] - 236:6
**reevaluation** [1] - 33:21
**refer** [4] - 18:19, 84:8, 174:2, 214:15
**referenced** [1] - 184:10
**referred** [2] - 128:22, 129:20
**referring** [5] - 24:15, 97:17, 118:4, 178:17, 233:4
**refrain** [4] - 73:24, 135:22, 256:19, 256:20
**refreshed** [1] - 256:16
**regard** [17] - 58:23, 59:13, 61:7, 86:12, 105:19, 188:9, 208:1, 210:9, 217:9, 220:13, 224:18, 224:20, 225:5, 234:4, 234:6, 246:13, 253:1
**regarded** [9] - 211:10, 211:11, 211:22, 212:1, 212:5, 217:17, 217:18, 217:22, 218:5
**regarding** [15] - 7:8, 11:15, 16:9, 16:22, 28:16, 42:12, 43:3, 62:21, 117:21, 190:4, 192:2, 207:16, 208:12, 239:18, 256:22
**regards** [1] - 189:5
**regional** [2] - 165:7, 165:11
**Registered** [1] - 260:18
**regular** [1] - 126:19
**regulation** [6] - 242:21, 242:23, 242:25, 243:2, 243:6, 243:7
**regulations** [1] - 243:14
**related** [7] - 6:17,

7:19, 193:15, 229:18, 229:23, 247:3
**relates** [1] - 178:16
**relationship** [4] - 7:7, 7:12, 8:24, 246:21
**relationships** [1] - 9:18
**relatively** [1] - 3:9
**release** [1] - 86:21
**released** [1] - 87:10
**releases** [1] - 86:22
**relevance** [1] - 65:12
**Reliance** [2] - 109:11, 113:4
**relied** [4] - 37:9, 188:3, 192:1, 234:24
**rely** [5] - 37:5, 188:5, 189:17, 189:21, 244:12
**relying** [5] - 38:20, 191:9, 191:13, 214:14, 234:16
**remain** [1] - 135:14
**remember** [22] - 10:19, 11:6, 20:3, 20:10, 23:11, 101:3, 107:20, 119:11, 119:14, 119:17, 131:11, 145:1, 148:21, 149:6, 152:15, 164:8, 164:11, 182:21, 238:8, 238:13, 246:4
**remind** [1] - 74:6
**reminder** [1] - 62:13
**removed** [1] - 233:19
**render** [1] - 11:17
**repeat** [5] - 32:2, 60:6, 71:16, 190:23, 192:16, 205:20
**rephrase** [5] - 37:4, 89:14, 89:16, 89:17, 199:11
**replace** [1] - 123:7
**replaced** [1] - 85:14
**replacement** [17] - 92:11, 92:13, 121:11, 121:13, 121:16, 121:19, 121:21, 121:24, 122:3, 122:6, 123:3, 149:9, 149:13, 149:17, 149:23, 149:24, 211:2
**replacements** [3] - 122:9, 122:13, 123:12
**report** [46] - 165:18, 165:20, 166:13, 167:6, 167:15, 170:7, 170:12, 170:15,

170:18, 174:2, 176:4, 176:5, 176:9, 178:17, 179:4, 179:12, 181:2, 184:3, 184:6, 184:9, 186:9, 186:15, 187:20, 187:23, 195:8, 195:15, 196:9, 199:23, 200:1, 201:2, 202:21, 207:14, 207:16, 233:4, 236:25, 238:11, 238:14, 239:14, 240:4, 241:9, 242:6, 242:14, 242:20, 244:4, 244:23, 245:8

**reported** [2] - 59:8, 59:9

**Reporter** [3] - 1:22, 1:23, 260:18

**reporter** [6] - 87:20, 147:11, 158:21, 208:15, 239:7, 260:25

**reporting** [1] - 162:7

**reports** [5] - 187:18, 227:3, 237:22, 238:2, 238:5

**represent** [3] - 190:19, 190:24, 202:4

**representative** [1] - 15:1

**represented** [1] - 255:15

**represents** [1] - 168:21

**reproduction** [1] - 260:23

**request** [8] - 31:8, 67:15, 114:1, 118:10, 213:10, 213:25, 216:5

**requested** [20] - 12:20, 20:16, 21:13, 21:19, 22:1, 31:4, 31:7, 34:1, 67:7, 67:12, 67:18, 67:19, 128:22, 210:21, 211:4, 213:13, 214:1, 214:2, 214:23, 215:5

**requesting** [5] - 15:7, 33:21, 210:11, 215:12, 215:20

**requests** [1] - 67:21

**required** [10] - 44:22, 51:3, 62:12, 71:4, 71:6, 71:18, 71:20, 85:7, 216:18, 217:2

**requirement** [4] - 12:22, 13:4, 29:22, 54:17

**requirements** [39] - 42:13, 54:12, 54:18,

54:23, 55:3, 56:21, 60:4, 60:8, 60:16, 68:9, 68:14, 76:4, 110:22, 114:23, 114:25, 115:4, 115:8, 115:17, 115:25, 116:1, 116:11, 116:20, 117:4, 117:5, 118:16, 164:22, 164:23, 209:23, 210:25, 211:2, 214:5, 214:6, 214:8, 215:16, 216:9, 224:14, 228:9, 241:25, 242:1

**requires** [4] - 46:10, 124:18, 210:11, 211:16

**requiring** [2] - 124:17, 218:5

**research** [1] - 256:19

**Reserve** [1] - 166:24

**residency** [5] - 4:4, 4:11, 4:19, 4:21, 4:23

**residual** [5] - 192:2, 192:3, 192:5, 192:7, 192:9

**resource** [1] - 243:15

**respect** [5] - 69:17, 117:8, 194:9, 198:19, 213:5, 217:20, 255:7

**respects** [1] - 218:1

**respond** [3] - 66:3, 128:15, 216:2

**responsibilities** [2] - 46:13, 105:20

**responsibility** [3] - 95:8, 95:12, 95:22

**responsible** [1] - 94:11

**rest** [8] - 24:25, 93:4, 134:18, 134:24, 138:24, 139:24, 208:25, 257:18

**restate** [1] - 251:24

**restrictions** [5] - 36:15, 127:23, 127:25, 128:6, 215:19

**result** [9] - 50:1, 167:11, 200:21, 203:21, 204:13, 209:23, 227:5, 227:14, 229:14

**results** [7] - 16:14, 26:10, 32:13, 32:15, 50:14, 203:13, 238:2

**resume** [1] - 134:25

**retained** [1] - 226:8

**retaining** [1] - 108:24

**retaliated** [2] - 213:15, 219:7

**retaliation** [4] - 211:7, 213:6, 213:8, 213:18

**retire** [4] - 185:18, 185:19, 205:8, 253:24

**retirement** [21] - 166:23, 168:19, 169:4, 174:14, 175:9, 180:4, 183:2, 183:10, 185:14, 185:19, 185:23, 190:15, 191:18, 191:23, 205:6, 206:13, 253:4, 253:18, 253:20, 253:25, 254:3

**return** [17] - 3:11, 35:10, 48:14, 86:20, 86:21, 112:13, 138:13, 163:8, 174:18, 177:1, 182:8, 200:7, 200:13, 201:7, 202:3, 202:8, 234:20

**returning** [3] - 6:13, 6:15, 200:3

**revenue** [3] - 163:6, 163:8, 237:25

**reverberate** [1] - 176:16

**review** [13] - 13:18, 14:14, 18:5, 22:22, 36:6, 36:10, 166:11, 220:17, 227:3, 232:24, 245:17, 245:19, 250:5

**reviewed** [13] - 22:24, 23:4, 25:13, 53:5, 59:25, 166:16, 167:9, 226:15, 226:16, 226:19, 226:22, 228:16, 228:25

**reviewing** [3] - 12:7, 19:3, 240:11

**RICKY** [1] - 1:3

**Ricky** [12] - 2:1, 2:10, 143:5, 144:15, 146:23, 149:2, 152:14, 155:22, 156:8, 205:18, 205:21, 260:1

**ride** [1] - 150:17

**riding** [1] - 156:9

**right?0** [1] - 242:11

**rights** [1] - 166:20

**risk** [3] - 174:20, 204:3, 206:15

**RMR** [1] - 1:23

**Road** [2] - 1:16, 1:20

**role** [4] - 11:11, 12:7, 166:6, 244:11

**roll** [1] - 80:10

**room** [2] - 5:25, 8:4

**Rosemont** [1] - 5:10

**Rossmoyne** [1] - 10:3

**roughly** [2] - 172:17, 183:20

**routine** [1] - 156:7

**rule** [3] - 158:16, 220:18, 243:3

**Rule** [7] - 2:17, 209:14, 209:16, 213:5, 216:4, 217:25, 219:21

**rules** [2] - 141:23, 142:21

**ruling** [2] - 158:4, 220:15

**rulings** [3] - 158:19, 159:9, 257:9

**run** [3] - 78:6, 209:5, 230:19

**running** [2] - 4:11, 159:2

**rupture** [1] - 6:5

**RUSSO** [17] - 102:20, 104:16, 104:19, 112:22, 116:25, 122:22, 122:24, 123:2, 124:24, 125:8, 141:5, 143:2, 143:4, 152:22, 155:21, 156:18, 156:24

**Russo** [7] - 1:15, 1:15, 2:11, 143:1, 156:22, 157:23, 208:8

**S**

**S-T-A-L-L-E-R** [1] - 222:1

**SALTZ** [111] - 23:20, 27:8, 34:24, 41:14, 47:21, 47:23, 49:11, 53:22, 54:6, 55:24, 61:2, 61:6, 62:1, 62:2, 64:25, 65:7, 65:16, 66:10, 66:16, 69:9, 69:14, 69:23, 70:1, 70:15, 70:16, 71:25, 72:12, 73:16, 74:11, 88:4, 89:12, 89:15, 89:18, 101:25, 102:14, 102:24, 103:4, 103:7, 103:10, 103:19, 118:21, 118:25, 119:2, 125:20, 125:25, 126:3, 136:21, 136:22, 141:1, 141:7, 141:21, 142:7,

142:15, 142:23, 152:24, 152:25, 155:20, 156:19, 157:21, 158:2, 158:9, 158:14, 158:20, 159:12, 171:5, 177:20, 178:5, 178:20, 179:8, 187:16, 194:12, 195:1, 195:5, 195:7, 196:5, 196:9, 196:23, 197:6, 197:17, 197:23, 198:4, 198:16, 199:5, 199:7, 199:13, 205:12, 207:3, 207:25, 208:23, 209:15, 213:8, 213:23, 217:6, 220:7, 220:25, 221:6, 221:15, 222:2, 225:17, 226:3, 233:6, 233:9, 237:15, 243:17, 246:9, 246:11, 254:11, 254:24, 257:13, 257:17, 258:14

**Saltz** [31] - 1:19, 1:19, 2:8, 2:11, 35:1, 55:17, 74:9, 87:18, 88:2, 103:18, 136:19, 142:25, 145:19, 146:24, 148:17, 149:24, 151:11, 152:4, 159:15, 171:3, 177:14, 179:7, 194:8, 195:18, 199:11, 199:12, 206:5, 207:24, 209:13, 237:17, 241:18

**saltz** [6] - 2:12, 2:14, 2:20, 2:21, 221:14, 257:11

**saltz's** [1] - 240:3

**Saltz's** [1] - 240:6

**sat** [1] - 107:24

**saw** [6] - 16:20, 17:2, 91:25, 121:9, 151:19, 174:7

**scary** [1] - 252:24

**schedule** [4] - 73:3, 157:4, 157:7, 200:21

**scheduled** [4] - 6:15, 7:22, 8:2, 48:16

**scheduling** [1] - 7:2

**school** [8] - 4:4, 4:6, 4:8, 126:19, 161:22, 162:1, 162:24, 246:3

**School** [4] - 1:20, 223:16, 224:12, 224:13

**schooling** [1] - 11:25
**schools** [1] - 223:25
**scope** [4] - 72:13,
180:11, 217:20, 219:1
**Scott** [1] - 11:7
**scrap** [2] - 86:3,
151:1
**screen** [5] - 9:7,
24:1, 37:22, 176:22,
184:8
**se** [1] - 140:4
**search** [1] - 249:22
**searching** [1] - 233:1
**seat** [2] - 150:18,
173:4
**seated** [11] - 3:2,
3:16, 74:5, 136:19,
157:17, 159:19,
160:2, 209:13, 221:9,
221:23, 257:4
**second** [41] - 22:14,
27:23, 29:23, 37:20,
51:12, 63:14, 71:12,
71:15, 71:21, 76:18,
77:11, 77:13, 78:25,
79:12, 79:15, 80:22,
87:16, 97:7, 97:9,
97:10, 97:11, 106:10,
106:13, 107:4,
111:20, 112:7, 114:1,
126:16, 132:12,
137:23, 137:25,
143:25, 144:2,
172:23, 194:18,
218:8, 218:13,
218:18, 219:9, 232:18
**secondary** [1] - 36:4
**secondly** [1] - 66:1
**seconds** [5] - 42:19,
42:25, 44:14, 68:25,
247:16
**Section** [6] - 109:11,
125:25, 134:17,
151:11, 152:5, 153:4
**section** [14] - 9:13,
44:21, 57:17, 81:7,
113:4, 113:9, 124:11,
133:13, 133:23,
136:25, 139:2, 139:7,
140:2, 186:14
**secure** [5] - 183:5,
183:8, 206:10, 250:9,
250:17
**secured** [2] - 7:4
**securities** [2] -
167:1, 174:20
**security** [82] - 130:1,
130:11, 130:18,
130:22, 131:4,
131:21, 134:19,

137:22, 138:5,
138:12, 142:3,
142:20, 168:19,
174:14, 174:15,
180:4, 190:11,
190:14, 191:10,
191:14, 193:3, 193:6,
193:8, 193:13, 194:5,
194:10, 194:14,
194:24, 195:19,
195:24, 196:10,
197:10, 197:20,
198:8, 198:20,
198:24, 199:16,
199:22, 199:25,
205:6, 206:13,
206:24, 209:18,
209:20, 210:14,
228:6, 228:7, 228:9,
229:9, 230:6, 230:12,
230:13, 230:16,
230:21, 230:23,
231:17, 231:25,
232:3, 232:19,
233:18, 235:13,
236:23, 242:9,
245:15, 245:20,
246:14, 246:21,
247:21, 250:16,
250:23, 251:1, 251:6,
251:8, 251:22, 252:3,
252:18, 253:4, 254:6,
255:14, 255:18, 256:5
**Security** [28] -
141:14, 142:16,
166:22, 185:15,
191:2, 191:5, 228:12,
228:17, 229:10,
229:21, 230:18,
230:25, 235:18,
242:8, 242:16,
242:17, 245:11,
245:14, 247:20,
251:19, 252:1, 252:6,
252:12, 252:21,
253:13, 253:23,
255:12, 255:24
**sedentary** [2] -
114:9, 212:25
**see** [39] - 3:10, 5:16,
6:2, 8:9, 14:19, 18:6,
18:21, 18:23, 22:2,
22:9, 23:25, 28:1,
30:12, 30:17, 33:17,
37:22, 38:7, 48:15,
57:13, 95:3, 98:10,
105:11, 123:16,
124:22, 129:22,
136:14, 137:11,
137:12, 140:21,
159:23, 171:4,

171:14, 179:20,
185:8, 220:23,
242:20, 244:3,
244:22, 258:19
**seeing** [1] - 134:5
**seek** [1] - 232:19
**seeking** [1] - 232:21
**select** [1] - 7:17
**sell** [2] - 146:7,
175:22
**SEMBROT** [1] -
159:2
**send** [1] - 63:3
**sending** [5] - 72:19,
72:23, 72:24, 72:25,
73:2
**sense** [8] - 5:18,
10:6, 26:25, 49:21,
56:22, 57:25, 127:19,
232:14
**sent** [3] - 7:23,
39:17, 215:3
**sentence** [3] -
106:19, 132:12, 142:8
**separate** [2] - 99:1,
240:17
**separated** [2] -
205:21, 206:1
**separately** [1] - 55:4
**separation** [8] -
188:10, 188:16,
188:24, 195:12,
196:14, 227:6,
227:14, 230:8
**September** [9] -
47:24, 49:1, 57:10,
70:18, 71:2, 99:20,
227:6, 227:15, 228:3
**serious** [1] - 126:20
**service** [1] - 4:12
**services** [4] - 8:6,
8:11, 223:8, 240:7
**session** [1] - 136:11
**set** [12] - 46:6, 77:14,
79:15, 138:18,
199:20, 241:24,
242:1, 243:3, 245:2,
248:15, 253:20,
253:25
**sets** [4] - 77:17,
146:8, 146:10, 226:18
**seven** [4] - 95:21,
96:7, 138:20, 237:5
**seventy** [1] - 165:2
**Several** [1] - 35:5
**several** [1] - 162:4
**severe** [2] - 229:17,
229:25
**sex** [1] - 231:15
**shared** [1] - 206:5

**SHAW** [1] - 1:3
**shaw** [2] - 74:5,
254:14
**Shaw** [172] - 2:1,
2:10, 3:11, 13:8,
13:13, 13:15, 14:4,
14:16, 15:14, 16:22,
17:22, 19:20, 20:1,
20:6, 20:18, 22:19,
22:23, 22:25, 24:7,
25:2, 27:20, 28:6,
28:14, 28:18, 29:24,
30:19, 31:6, 31:10,
31:14, 32:7, 32:9,
32:19, 32:23, 33:2,
35:3, 36:16, 39:17,
40:17, 41:3, 42:20,
42:24, 43:9, 43:23,
44:19, 45:12, 45:19,
47:1, 49:25, 50:2,
50:6, 50:10, 50:14,
50:21, 51:16, 51:24,
52:11, 52:16, 52:18,
54:20, 57:16, 60:17,
61:8, 64:3, 64:10,
65:15, 68:7, 68:13,
68:19, 69:5, 69:6,
70:25, 71:3, 74:12,
74:14, 87:17, 93:14,
97:13, 97:23, 103:21,
106:11, 109:22,
110:15, 111:15,
112:18, 117:4,
120:19, 123:16,
126:15, 127:9,
129:25, 131:13,
132:23, 135:20,
136:23, 141:1, 141:8,
153:2, 153:24, 154:6,
155:10, 156:22,
166:21, 167:2, 167:4,
167:6, 167:11,
167:16, 167:24,
168:16, 169:6,
171:20, 172:9,
172:12, 173:7, 174:6,
174:10, 182:19,
182:25, 188:10,
188:16, 190:6,
190:10, 192:14,
192:19, 193:2,
196:13, 197:15,
200:12, 201:7, 202:8,
205:7, 206:2, 211:10,
211:12, 212:4, 212:6,
212:23, 213:10,
213:24, 214:21,
215:14, 216:7,
216:16, 217:1,
217:12, 218:15,
218:22, 219:18,

226:22, 227:1,
227:14, 228:4, 228:6,
228:8, 228:11,
228:18, 229:7,
231:15, 232:3,
233:13, 233:17,
234:17, 235:12,
242:9, 245:14,
245:20, 249:5,
249:15, 250:6,
255:15, 260:1
**Shaw's** [30] - 3:4,
14:21, 16:7, 36:24,
37:5, 65:18, 166:7,
167:22, 168:2,
168:23, 180:4, 185:5,
185:13, 188:15,
188:23, 189:5, 190:4,
190:20, 194:15,
200:3, 200:24,
210:20, 211:8,
217:10, 227:1, 227:6,
228:2, 251:13,
251:20, 256:4
**sheet** [5] - 16:2,
26:24, 31:21, 73:12,
239:2
**Sheldon** [3] - 119:4,
148:22, 167:18
**Sheldon's** [1] - 149:1
**shelf** [1] - 76:15,
76:17, 79:25, 80:7,
80:11, 80:12, 80:19,
81:4, 81:6, 84:5,
143:18
**Shelley** [5] - 10:20,
11:8, 11:9, 13:19,
19:11
**shelves** [13] - 76:11,
79:20, 79:22, 80:21,
80:23, 82:5, 83:22,
83:23, 84:25, 85:2,
97:5, 150:25
**shift** [3] - 94:6, 94:8,
95:19
**shifted** [1] - 230:20
**shifting** [1] - 85:17
**shifts** [1] - 58:2
**shoes** [1] - 95:25
**shop** [2] - 145:9,
150:24
**shopping** [3] - 138:1,
138:3, 138:23
**short** [12] - 3:9, 58:7,
58:11, 102:7, 157:2,
159:16, 168:11,
172:19, 209:4, 228:5,
237:9, 249:19
**short-term** [5] -
168:11, 172:19,

228:5, 237:9, 249:19
**shorter** [6] - 30:10, 81:7, 135:15, 157:13, 190:17, 231:20
**shortly** [1] - 258:16
**shot** [1] - 92:7
**shots** [1] - 92:5
**show** [15] - 9:5, 15:22, 15:24, 18:2, 18:15, 33:12, 34:18, 36:14, 41:6, 49:5, 101:18, 165:16, 177:8, 181:3, 184:4
**showed** [1] - 15:8
**showing** [5] - 47:10, 179:12, 184:8, 186:13, 252:3
**showings** [1] - 219:20
**shows** [3] - 15:14, 170:23, 181:4
**Side** [6] - 101:22, 103:11, 141:18, 142:11, 193:20, 199:9
**side** [12] - 55:12, 59:4, 59:7, 65:7, 85:17, 146:6, 146:7, 181:23, 193:17, 193:19, 207:5
**sides** [1] - 117:8
**sign** [3] - 13:4, 44:19, 62:23
**signature** [20] - 18:9, 18:23, 18:24, 19:15, 19:16, 20:8, 22:9, 22:13, 22:14, 22:17, 25:9, 26:17, 44:18, 50:24, 51:2, 62:4, 62:7, 62:11, 62:12, 106:13
**signatures** [3] - 18:10, 18:21, 22:12
**signed** [5] - 22:15, 23:7, 59:24, 63:7, 226:22
**significant** [2] - 63:5, 229:2
**signing** [4] - 12:16, 12:22, 66:11, 95:9
**similar** [5] - 82:23, 83:9, 168:15, 179:15, 180:19
**simple** [3] - 6:3, 6:12, 15:4
**simply** [5] - 195:10, 196:18, 202:15, 205:5, 230:12
**simulating** [1] - 46:7
**simulation** [1] - 21:23

**single** [1] - 77:5
**sinus** [1] - 6:4
**sit** [25] - 19:18, 20:3, 23:11, 51:19, 81:19, 83:17, 83:18, 93:3, 94:25, 96:16, 107:23, 108:5, 114:9, 120:5, 120:11, 132:7, 133:18, 134:13, 138:23, 147:17, 147:18, 147:19, 156:25, 212:25
**site** [7] - 20:25, 21:4, 21:9, 21:14, 21:20, 46:11, 53:20
**sites** [2] - 7:20, 53:1
**sits** [2] - 248:13, 248:15
**sitting** [19] - 52:11, 83:16, 95:13, 96:19, 108:8, 108:9, 108:10, 110:1, 116:13, 134:4, 137:18, 140:14, 144:10, 147:21, 148:1, 148:4, 148:7, 181:20, 182:25
**situation** [12] - 37:8, 38:13, 62:10, 62:11, 63:2, 101:6, 111:22, 124:12, 191:17, 201:18, 202:13
**situations** [1] - 203:25
**six** [11] - 80:23, 95:19, 95:21, 95:22, 96:6, 96:8, 96:12, 101:13, 138:20, 156:1
**sixteen** [2] - 83:10
**sixth** [1] - 137:13
**sixty** [2] - 83:11, 165:2
**skid** [16] - 78:7, 78:11, 79:14, 79:17, 82:24, 83:3, 83:6, 85:21, 85:23, 86:2, 99:2, 99:3, 99:4, 143:16, 143:19, 146:9
**skids** [2] - 146:4, 146:14
**sleep** [1] - 256:15
**Sleeper** [1] - 162:11
**slide** [2] - 78:7, 79:17
**slower** [2] - 93:2, 135:16
**slowing** [2] - 91:19, 156:13
**slowly** [1] - 139:13
**Slowly** [1] - 139:13
**small** [4] - 5:24, 52:25, 76:22, 163:9

**smaller** [1] - 106:18
**smorgasbord** [1] - 72:19
**social** [78] - 129:25, 130:11, 130:18, 130:22, 131:3, 131:21, 134:19, 137:22, 138:5, 138:12, 142:3, 142:20, 168:19, 180:4, 190:11, 190:14, 191:9, 191:14, 193:3, 193:5, 193:8, 193:13, 194:5, 194:10, 194:14, 194:24, 195:19, 195:23, 196:10, 197:10, 197:20, 198:8, 198:20, 198:24, 199:15, 199:22, 199:24, 205:6, 206:24, 209:18, 209:20, 210:13, 210:14, 228:6, 228:7, 228:9, 229:9, 230:6, 230:12, 230:13, 230:16, 230:21, 230:23, 231:17, 232:3, 232:19, 233:18, 235:13, 236:23, 242:9, 245:15, 245:19, 246:14, 246:21, 247:21, 250:16, 250:23, 251:1, 251:5, 251:8, 251:22, 252:2, 252:18, 253:3, 254:6, 255:14, 255:18, 256:5
**Social** [28] - 141:13, 142:16, 166:22, 185:15, 191:2, 191:5, 228:12, 228:16, 229:10, 229:21, 230:17, 230:25, 235:18, 242:8, 242:15, 242:17, 245:11, 245:13, 247:20, 251:19, 251:25, 252:6, 252:12, 252:21, 253:13, 253:23, 255:11, 255:24
**societies** [2] - 224:2, 224:22
**society** [3] - 222:13, 231:25, 252:24
**solely** [8] - 38:5, 38:11, 38:17, 38:23, 66:3, 191:9, 191:13,

213:9
**solo** [1] - 10:6
**someone** [6] - 30:3, 55:5, 64:9, 110:9, 111:4, 251:20
**sometime** [2] - 254:18, 256:18
**sometimes** [4] - 78:9, 85:8, 108:19, 210:13
**somewhere** [2] - 72:25, 191:4
**soon** [3] - 106:17, 121:2, 209:9
**sooner** [1] - 182:4
**Sorry** [1] - 72:11
**sorry** [26] - 7:15, 14:9, 14:10, 16:24, 19:22, 30:15, 42:3, 43:5, 57:11, 66:22, 82:2, 87:16, 104:17, 105:1, 106:11, 116:4, 116:17, 124:3, 125:18, 139:14, 140:19, 146:18, 180:23, 192:16, 220:16, 251:24
**sort** [3] - 143:20, 160:24, 194:7
**sought** [7] - 228:6, 233:3, 233:18, 236:4, 236:17, 236:18, 249:19
**sound** [4] - 120:16, 226:7, 238:20, 258:12
**sounds** [3] - 200:23, 204:16, 238:24
**spasms** [1] - 135:15
**speaking** [2] - 26:8, 65:10, 87:20
**specialist** [1] - 58:9
**specially** [1] - 46:2
**specialty** [1] - 96:2
**specific** [6] - 10:2, 54:16, 60:9, 216:17, 218:23, 252:12
**specifically** [5] - 28:6, 120:14, 194:8, 214:18, 216:11
**specifics** [2] - 226:13, 250:1
**specified** [2] - 38:7, 101:13
**spectrum** [2] - 6:3, 8:10
**Speculation** [1] - 104:16
**speculation** [1] - 104:20
**speculative** [1] -

201:12
**spell** [1] - 165:22
**spend** [1] - 154:9
**spent** [2] - 150:23, 206:17
**spill** [1] - 144:19
**spread** [1] - 140:7
**spreads** [1] - 140:9
**spring** [1] - 151:3
**squat** [16] - 26:3, 26:6, 28:6, 28:10, 36:3, 43:20, 44:15, 64:20, 69:1, 71:9, 80:18, 107:10, 107:14, 107:16, 107:19, 150:12
**squatted** [1] - 107:17
**squatting** [9] - 28:1, 43:19, 66:12, 75:21, 81:10, 86:6, 116:17, 134:3, 134:8
**stack** [1] - 82:23
**staff** [4] - 10:11, 162:6, 258:7
**stage** [1] - 36:13
**stair** [2] - 134:4, 134:13
**staircase** [1] - 76:19
**stairs** [8] - 21:10, 21:11, 50:22, 82:3, 93:1, 105:23, 108:15, 144:6
**Staller** [7] - 2:19, 221:16, 221:21, 221:25, 225:18, 226:8, 236:9
**staller** [17] - 158:6, 158:8, 219:23, 220:20, 220:22, 221:18, 222:13, 226:1, 226:5, 227:13, 227:17, 237:11, 237:21, 243:13, 244:3, 254:12, 255:3
**stand** [19] - 24:5, 42:18, 44:13, 68:24, 71:8, 73:11, 83:8, 83:17, 83:18, 108:3, 133:19, 145:5, 147:15, 171:7, 173:3, 208:17, 212:24, 216:11, 221:17
**standard** [6] - 109:12, 113:5, 134:12, 136:2, 252:18, 253:5
**standards** [5] - 139:20, 186:4, 253:14, 253:17, 253:19

**standing** [13] - 23:25, 24:3, 24:4, 42:17, 43:1, 50:8, 75:20, 83:16, 116:13, 134:3, 134:9, 134:11, 140:13

**stands** [3] - 143:10, 143:17, 224:5

**standup** [1] - 85:13

**start** [12] - 57:20, 106:10, 131:1, 136:11, 136:15, 145:19, 156:13, 170:3, 174:13, 199:12, 220:20, 233:20

**started** [23] - 4:6, 88:16, 90:20, 90:23, 91:19, 99:19, 108:23, 118:4, 123:18, 124:21, 130:24, 150:4, 150:11, 161:25, 162:2, 162:13, 167:13, 173:12, 226:18, 230:17, 233:23, 258:10

**starting** [3] - 93:3, 163:2, 230:22

**starts** [1] - 147:13

**state** [10] - 3:17, 7:14, 67:14, 126:5, 160:3, 221:24, 225:13, 229:16, 229:19, 245:4

**State** [8] - 160:16, 160:17, 160:19, 161:22, 162:17, 162:19, 162:20, 165:25

**statement** [13] - 19:1, 24:6, 37:2, 37:6, 88:19, 88:20, 109:2, 109:5, 125:4, 126:23, 148:19, 236:20

**statements** [6] - 25:5, 36:16, 226:24, 228:10, 247:4, 256:5

**STATES** [2] - 1:1, 1:8

**states** [4] - 5:22, 53:18, 224:14, 248:12

**States** [6] - 4:20, 246:1, 246:6, 247:19, 248:5, 248:8

**statistical** [10] - 190:20, 190:25, 191:12, 231:2, 231:4, 231:6, 231:11, 231:15, 231:22, 253:22

**statistically** [1] - 231:18

**statute** [2] - 244:22, 244:24

**stay** [3] - 164:18, 209:8, 220:1

**steering** [2] - 100:15, 101:7

**step** [5] - 73:7, 156:22, 208:6, 221:19, 255:3

**steps** [1] - 28:14, 77:14, 77:17, 77:19, 79:8, 82:4, 99:20, 138:14, 138:16, 138:21, 184:14

**steroid** [1] - 35:7

**stick** [11] - 92:18, 94:5, 100:3, 135:7, 135:12, 137:10, 138:1, 138:13, 138:20, 258:5, 259:3

**stiff** [1] - 93:13

**still** [16] - 6:13, 7:2, 22:25, 42:12, 56:20, 56:24, 74:6, 82:16, 94:11, 121:12, 136:23, 145:16, 151:5, 153:3, 175:11, 236:10

**stipulate** [3] - 50:13, 141:23, 142:2

**stock** [1] - 77:13, 82:19, 83:22, 83:23, 95:5, 97:4

**stocks** [1] - 174:22

**stood** [1] - 88:6

**stools** [1] - 133:20

**stop** [7] - 102:2, 134:18, 139:24, 205:18, 242:11, 249:6, 249:24

**stopped** [4] - 180:10, 228:22, 232:25, 254:22

**stopping** [2] - 101:24, 118:22

**stops** [2] - 229:2, 230:3

**storm** [1] - 256:14

**stream** [1] - 196:14

**Street** [2] - 1:13, 1:24

**street** [1] - 39:16

**strict** [1] - 127:19

**strike** [1] - 64:17

**strong** [1] - 238:17

**Studies** [1] - 222:9

**studies** [2] - 231:12, 253:15

**stuff** [15] - 81:14,

81:18, 82:4, 82:5, 82:14, 85:25, 86:6, 95:6, 95:10, 95:20, 97:9, 97:10, 102:17, 143:18, 151:1

**subject** [2] - 135:24, 148:23

**subjected** [1] - 219:10

**submit** [1] - 214:24

**substance** [1] - 136:7

**subtract** [1] - 168:12

**subtracted** [1] - 173:18

**success** [1] - 156:16

**sufficient** [2] - 219:17, 220:5

**suggest** [1] - 236:16

**suggested** [1] - 198:21

**suggests** [1] - 62:12

**Suite** [1] - 1:16

**summarize** [5] - 57:22, 58:5, 58:6, 59:19, 59:20

**summary** [3] - 58:7, 186:8, 186:16

**summer** [1] - 151:4

**summers** [1] - 161:22

**supervise** [1] - 46:19

**supervising** [1] - 11:12

**supervision** [1] - 260:25

**supervisor** [3] - 82:11, 88:22, 216:21

**supervisor's** [1] - 104:7

**supplied** [1] - 165:19

**support** [16] - 5:25, 10:11, 94:4, 138:3, 138:6, 138:13, 163:13, 164:3, 164:4, 215:12, 216:3, 243:8, 243:14, 244:5, 244:13, 245:7

**supporting** [1] - 207:18

**supposed** [8] - 17:15, 58:25, 104:13, 111:19, 144:5, 144:7, 146:21, 146:22

**Supreme** [4] - 246:2, 246:6, 247:19, 248:17

**surfaces** [3] - 122:15, 122:17, 122:21

**surgeon** [7] - 91:25,

110:24, 129:14, 129:16, 129:18, 129:21, 155:3

**surgery** [1] - 149:18

**surprise** [1] - 159:13

**surprised** [1] - 102:17

**surrounding** [2] - 7:8, 19:20

**sustained** [6] - 53:25, 61:5, 61:24, 66:15, 207:6, 235:16

**swear** [1] - 3:12

**Sweeping** [1] - 132:13

**sweeping** [6] - 85:24, 132:15, 132:17, 133:3, 133:8, 133:11

**swelling** [4] - 59:15, 59:21, 64:11, 64:15

**switch** [1] - 157:1

**sworn** [3] - 3:15, 160:1, 221:22

**symptoms** [1] - 48:17

**Synvisc** [1] - 48:17

**system** [5] - 4:7, 4:14, 248:9, 248:10, 252:2

**Systems** [1] - 246:7

**systems** [3] - 162:7, 163:9, 163:10

# T

**tab** [1] - 141:11

**tables** [1] - 133:19

**talks** [2] - 153:8, 153:11

**taught** [8] - 162:20, 162:21, 162:22, 162:23, 162:25, 163:16, 163:18

**tax** [1] - 163:7

**taxes** [2] - 162:23, 163:10

**teach** [1] - 162:19

**teaching** [2] - 163:1, 224:10

**technician** [1] - 10:13

**telephone** [3] - 108:10, 147:19, 148:5

**temperature** [1] - 140:13

**Temple** [3] - 223:14, 223:17, 224:12

**Temple's** [1] - 223:19

**temporary** [2] - 249:9, 249:12

**ten** [14] - 84:17, 164:16, 181:18, 181:22, 181:25, 182:1, 182:6, 182:9, 183:9, 183:12, 183:19, 204:2, 247:16, 248:11

**tender** [1] - 35:24

**term** [11] - 30:25, 43:6, 118:3, 168:11, 169:10, 172:19, 222:20, 228:5, 236:6, 237:9, 249:19

**terminating** [1] - 213:17

**termination** [4] - 167:15, 167:22, 168:7, 170:25

**terms** [8] - 4:2, 6:23, 53:19, 172:4, 229:8, 232:6, 246:12, 258:8

**terrific** [2] - 102:5, 171:10

**Terrific** [1] - 103:6

**test** [5] - 46:9, 46:15, 67:9, 124:25, 125:4

**tested** [1] - 127:20

**testified** [44] - 19:10, 39:4, 57:2, 61:18, 61:19, 63:13, 64:2, 64:5, 65:2, 68:9, 68:12, 86:11, 91:4, 91:12, 94:2, 99:18, 100:13, 101:1, 103:20, 114:18, 124:9, 124:19, 127:9, 137:5, 144:23, 153:18, 155:10, 164:5, 164:10, 165:22, 170:4, 186:15, 196:16, 199:21, 212:7, 212:23, 225:11, 228:19, 238:7, 238:9, 238:20, 246:13, 254:17

**testify** [6] - 3:15, 159:25, 221:21, 225:9, 230:7, 241:12

**testifying** [4] - 75:1, 227:18, 239:14, 249:2

**testimony** [36] - 3:4, 23:18, 30:22, 65:5, 65:6, 99:25, 100:4, 100:7, 117:3, 117:9, 121:14, 122:11, 135:24, 136:7, 143:5, 149:2, 178:14,

194:15, 214:21,
214:25, 215:13,
217:10, 219:25,
220:7, 232:5, 234:5,
234:9, 239:7, 239:8,
240:15, 242:7,
249:11, 256:16,
257:7, 257:8, 257:19
  **testing** [1] - 8:19
  **tests** [1] - 36:2
  **THE** [220] - 1:1, 1:1,
1:8, 3:2, 3:18, 10:2,
10:22, 14:10, 14:13,
16:23, 23:19, 23:21,
24:15, 24:19, 24:21,
24:22, 24:23, 26:1,
27:3, 27:11, 27:17,
34:23, 34:25, 37:20,
37:23, 37:24, 38:1,
38:2, 38:4, 39:1,
41:13, 41:15, 46:20,
46:24, 47:19, 48:4,
49:10, 49:12, 49:15,
53:25, 54:4, 55:16,
61:4, 61:14, 61:23,
63:14, 63:16, 65:9,
65:21, 66:6, 66:9,
66:15, 67:3, 69:11,
69:16, 69:22, 69:24,
70:3, 70:11, 70:14,
72:3, 72:6, 72:14,
73:6, 73:15, 73:17,
73:19, 73:21, 73:22,
74:5, 74:7, 74:8,
87:16, 87:24, 87:25,
88:3, 89:14, 89:16,
101:20, 101:23,
102:5, 102:23,
102:25, 103:6, 103:8,
103:12, 104:17,
104:21, 105:4,
112:24, 115:14,
116:5, 117:6, 118:23,
119:1, 122:25, 125:5,
125:18, 125:24,
126:1, 126:2, 128:9,
128:15, 130:13,
135:18, 135:25,
136:1, 136:3, 136:4,
136:8, 136:9, 136:19,
139:13, 139:15,
141:4, 141:6, 141:16,
141:19, 142:1,
142:10, 142:12,
142:25, 143:3,
143:20, 143:23,
152:23, 154:12,
154:15, 154:20,
154:22, 154:24,
156:21, 156:25,
157:1, 157:17,

157:22, 157:25,
158:8, 158:12,
158:15, 159:1, 159:7,
159:15, 159:19,
159:23, 160:4, 171:3,
171:9, 176:18, 177:9,
177:13, 177:17,
177:22, 177:24,
178:4, 178:6, 178:10,
178:21, 187:14,
193:19, 194:2,
194:21, 195:3, 195:6,
195:16, 196:18,
197:3, 197:8, 197:18,
197:24, 198:17,
199:2, 199:6, 199:8,
199:10, 205:13,
207:4, 207:9, 207:13,
207:15, 207:21,
208:2, 208:5, 208:7,
208:8, 208:18,
208:21, 208:24,
209:2, 209:13, 213:4,
213:21, 215:25,
217:19, 220:16,
221:3, 221:7, 221:9,
221:18, 221:25,
225:21, 225:23,
225:25, 233:8,
237:17, 243:24,
246:10, 246:17,
248:19, 248:22,
254:10, 255:2, 255:4,
255:5, 257:3, 257:15,
257:18, 257:22,
257:25, 258:17
  **theory** [1] - 183:16
  **therapist** [1] - 46:11
  **therapists** [3] -
10:13, 46:3, 46:5
  **therefore** [5] -
126:21, 195:20,
211:3, 212:17, 245:16
  **therefrom** [1] -
126:21
  **they've** [1] - 252:24
  **thinks** [1] - 191:5
  **Third** [7] - 48:14,
248:5, 248:8, 248:14,
248:15, 248:16,
248:23
  **third** [23] - 22:10,
22:11, 25:7, 25:21,
26:5, 62:3, 68:18,
102:20, 108:1, 108:2,
131:23, 137:9,
137:23, 147:7,
147:10, 163:15,
178:25, 180:22,
218:10, 218:20,

219:6, 219:12, 248:13
  **thirty** [2] - 180:3,
238:25
  **thirty-three** [2] -
180:3, 238:25
  **three** [17] - 78:14,
80:15, 85:5, 85:12,
86:18, 107:17,
124:25, 125:4,
162:10, 164:17,
172:11, 180:3,
187:18, 238:25,
249:12, 249:21
  **threshold** [1] -
251:10
  **throughout** [3] -
89:10, 215:21, 225:13
  **throw** [1] - 86:4
  **throwing** [1] - 206:7
  **thunder** [1] - 256:12
  **ticket** [1] - 250:24
  **tie** [1] - 186:20
  **tied** [2] - 56:6,
188:19
  **Tim** [5] - 82:13,
88:22, 88:24, 90:1,
208:13
  **title** [3] - 74:22, 75:4,
75:5
  **today** [32] - 13:10,
19:19, 20:3, 23:12,
45:6, 47:12, 51:20,
52:12, 103:13,
119:14, 119:17,
157:5, 158:9, 163:6,
164:5, 175:14,
181:11, 181:21,
182:2, 182:5, 183:10,
183:18, 209:6,
222:18, 223:3,
228:19, 229:10,
231:8, 240:14,
241:12, 242:7, 242:12
  **today's** [5] - 157:8,
168:10, 202:25,
222:13, 241:16
  **together** [2] - 124:9,
186:21
  **tomorrow** [11] -
157:6, 158:10,
256:17, 256:23,
256:25, 257:10,
258:1, 258:11,
258:23, 259:2
  **tongue** [2] - 56:6,
188:19
  **took** [11] - 68:12,
75:20, 93:5, 98:1,
101:18, 102:6, 104:8,
168:2, 171:19,

172:15, 219:12
  **tools** [1] - 46:3
  **top** [4] - 23:24,
29:11, 132:25, 144:1
  **toss** [2] - 75:17,
139:17
  **total** [16] - 168:6,
172:16, 172:18,
180:8, 185:2, 187:11,
187:24, 192:13,
192:17, 227:5,
227:16, 234:2, 234:3,
240:10, 251:23,
252:25
  **totalled** [1] - 187:9
  **totally** [5] - 193:9,
195:20, 245:16,
245:20, 252:4
  **tour** [2] - 52:9,
223:24
  **toured** [4] - 52:6,
52:10, 52:22, 52:23
  **towards** [1] - 146:11
  **traditional** [1] - 5:24
  **trailer** [4] - 99:1,
146:6, 146:7, 150:21
  **trained** [1] - 11:24
  **training** [7] - 4:19,
160:23, 224:8,
243:13, 251:16,
252:14, 253:2
  **TRANSCRIPT** [1] -
1:7
  **transcript** [8] -
145:15, 158:17,
208:12, 239:8, 250:6,
250:12, 260:12,
260:23
  **transcripts** [1] -
226:23
  **transferred** [2] - 6:7,
16:16
  **transport** [1] - 80:8
  **treasury** [13] - 175:5,
175:6, 183:7, 183:9,
183:12, 183:19,
204:2, 206:10,
234:10, 234:14, 235:1
  **treated** [3] - 35:6,
58:8, 217:24
  **treating** [5] - 6:21,
8:7, 14:22, 87:13,
127:3
  **treatment** [13] - 6:10,
7:1, 7:8, 15:10, 15:12,
16:21, 18:11, 33:13,
72:20, 87:12, 124:17,
124:18, 126:21
  **trees** [1] - 150:24
  **Trial** [4] - 2:2,

150:22, 259:5, 260:3
  **trial** [16] - 164:5,
168:8, 168:10,
168:15, 169:3,
169:22, 169:23,
171:1, 171:18,
171:23, 176:12,
179:17, 186:23,
214:13, 241:16,
260:10
  **TRIAL** [1] - 1:7
  **trials** [2] - 164:10,
238:20
  **tried** [2] - 150:17,
156:9
  **Trindle** [1] - 1:16
  **trip** [2] - 138:1,
138:23
  **trouble** [1] - 125:19
  **truck** [11] - 8:13,
75:13, 78:5, 78:10,
78:24, 79:4, 79:5,
80:4, 80:10, 138:2,
138:10
  **TRUCK** [1] - 1:4
  **Truck** [48] - 2:1, 8:25,
13:3, 14:25, 16:10,
16:23, 16:25, 20:16,
26:9, 27:20, 28:5,
31:8, 31:22, 31:25,
32:5, 32:12, 32:14,
37:7, 40:15, 41:3,
43:8, 43:16, 43:24,
45:8, 45:18, 48:23,
50:5, 50:21, 51:11,
51:25, 52:13, 72:11,
144:15, 150:1,
155:11, 167:7, 168:1,
185:18, 188:11,
189:3, 205:17,
211:25, 212:12,
215:17, 221:14,
249:6, 249:24, 260:1
  **Truck's** [1] - 52:7
  **trucks** [4] - 78:1,
78:13, 78:23, 82:17
  **true** [26] - 78:22,
93:14, 93:16, 97:13,
108:7, 112:18,
138:21, 138:22,
138:25, 153:24,
154:5, 155:17,
170:14, 179:11,
188:3, 189:18, 190:7,
190:11, 190:15,
192:20, 199:17,
201:1, 250:5, 250:23,
251:9, 253:13
  **truly** [3] - 46:12,
46:18, 67:11

**truth** [1] - 98:2
**try** [11] - 57:9, 64:9, 88:3, 123:10, 136:15, 148:18, 155:22, 156:7, 156:15, 157:9, 219:23
**trying** [4] - 65:16, 78:2, 161:9, 211:12
**turn** [23] - 23:14, 25:7, 32:18, 57:17, 62:3, 98:4, 106:15, 115:12, 123:25, 125:11, 130:6, 131:23, 132:20, 133:12, 133:21, 135:3, 135:17, 137:21, 139:25, 141:8, 176:13, 178:24, 221:11
**turned** [2] - 8:1, 118:11
**Turner** [1] - 248:24
**turning** [3] - 27:23, 30:11, 34:3
**twelve** [2] - 78:16, 156:2
**twenty** [16] - 39:12, 40:4, 78:16, 146:5, 146:6, 146:9, 157:13, 159:4, 159:11, 159:17, 175:5, 175:8, 234:10, 234:13, 234:25
**twice** [1] - 127:8
**twisting** [1] - 116:16
**two** [40] - 18:10, 39:22, 42:10, 70:4, 77:17, 78:14, 81:13, 85:15, 86:22, 116:7, 119:3, 123:12, 143:9, 146:4, 146:10, 146:14, 150:2, 151:17, 158:5, 161:1, 161:2, 173:8, 178:23, 191:15, 194:12, 194:13, 203:18, 205:4, 211:17, 211:18, 214:19, 216:8, 227:3, 235:2, 239:17, 249:11, 249:14, 249:21, 250:8
**type** [16] - 5:16, 12:17, 13:1, 29:4, 31:5, 39:13, 51:17, 51:18, 52:4, 53:21, 85:4, 85:5, 162:23, 208:16, 223:5
**typed** [2] - 131:20, 137:6
**types** [5] - 167:19,

174:17, 223:2, 224:8, 224:21
**typewritten** [1] - 136:24
**typical** [1] - 16:4
**typically** [4] - 16:14, 26:20, 34:10, 40:6

## U

**U.S** [6] - 1:24, 174:19, 175:4, 204:2, 204:10, 206:10
**ulcer** [1] - 137:15
**ultimate** [1] - 236:19
**ultimately** [7] - 125:2, 157:10, 228:7, 228:18, 235:17, 236:23, 247:4
**umbrella** [1] - 8:16
**unable** [16] - 25:16, 36:3, 44:11, 44:12, 44:13, 44:14, 44:15, 61:9, 64:3, 64:20, 66:11, 97:15, 108:3, 147:15, 255:16, 255:17
**Unable** [1] - 26:1
**unbox** [2] - 79:24, 80:8
**under** [48] - 6:13, 8:16, 24:12, 41:23, 42:16, 42:22, 43:4, 49:23, 50:8, 50:18, 51:1, 59:1, 67:5, 74:6, 78:7, 79:17, 84:19, 104:14, 125:4, 125:25, 129:9, 141:23, 142:21, 144:23, 153:4, 181:17, 202:18, 202:20, 209:16, 209:22, 211:10, 211:19, 212:18, 216:20, 217:14, 217:16, 226:22, 226:24, 228:8, 229:8, 235:12, 239:6, 255:10, 255:11, 255:20, 255:21, 256:9, 260:24
**undergo** [1] - 45:19
**underlined** [1] - 33:24
**underneath** [2] - 81:8, 81:14
**understood** [1] - 188:20
**unfair** [1] - 193:25
**unfortunately** [3] - 158:16, 220:22, 258:3

**United** [6] - 4:20, 246:1, 246:6, 247:18, 248:5, 248:8
**UNITED** [2] - 1:1, 1:8
**University** [5] - 4:17, 223:13, 223:14, 223:17, 224:12
**unless** [4] - 103:2, 144:8, 244:18, 260:24
**unlike** [1] - 255:23
**unload** [4] - 78:1, 78:4, 79:4, 82:17
**unloaded** [1] - 78:24
**unloading** [2] - 78:3, 97:2
**unrefuted** [1] - 214:25
**unsure** [3] - 24:21, 24:22
**unwieldy** [1] - 34:20
**up** [101] - 4:11, 9:7, 15:14, 15:22, 27:15, 29:12, 30:11, 30:20, 37:21, 44:11, 44:13, 46:23, 68:22, 68:23, 72:8, 74:16, 75:16, 76:17, 76:19, 77:14, 78:7, 78:25, 79:7, 79:8, 79:15, 79:18, 79:19, 79:22, 80:7, 80:19, 80:21, 81:6, 82:4, 83:19, 84:7, 85:15, 85:17, 85:18, 85:24, 85:25, 86:2, 86:6, 93:12, 97:7, 97:9, 97:10, 98:23, 99:4, 99:20, 100:17, 100:22, 102:10, 103:2, 106:12, 116:6, 116:11, 116:12, 118:3, 118:9, 137:6, 137:19, 138:14, 138:19, 143:9, 143:13, 143:17, 144:8, 144:20, 146:11, 150:19, 150:22, 151:3, 155:13, 158:1, 165:25, 168:10, 169:5, 171:14, 171:22, 172:20, 174:7, 176:12, 176:21, 179:23, 180:25, 183:17, 183:20, 184:20, 185:23, 186:23, 193:24, 196:7, 208:13, 234:13, 236:10, 241:16, 248:17, 251:4

**updates** [1] - 224:17
**upper** [2] - 60:21, 64:13
**upright** [1] - 135:14
**ups** [1] - 7:3
**upset** [1] - 119:8
**upstairs** [3] - 79:10, 81:14, 99:7
**upward** [1] - 140:10
**upwards** [1] - 98:24
**urgent** [5] - 4:14, 5:1, 5:24, 6:8, 6:14
**uses** [2] - 16:4, 253:14
**utilize** [1] - 101:14

## V

**vacuum** [1] - 55:3
**vague** [1] - 252:11
**valgus** [1] - 36:1
**Valley** [1] - 223:24
**Valuation** [1] - 224:6
**valuation** [2] - 163:12, 174:19
**valuations** [3] - 164:2, 165:13, 224:9
**Value** [1] - 165:12
**value** [22] - 169:13, 180:13, 180:16, 181:4, 181:7, 181:8, 181:22, 182:9, 182:12, 182:14, 182:16, 183:15, 183:16, 185:2, 187:3, 187:8, 189:11, 192:3, 202:24, 203:4, 205:1
**valuing** [1] - 161:2
**varies** [6] - 12:9, 13:1, 40:10, 46:17, 57:7, 163:14
**variety** [1] - 6:22
**various** [8] - 224:19, 224:21, 225:5, 225:6, 225:13, 226:23, 248:12
**varus** [1] - 36:2
**VARUS** [1] - 36:2
**vary** [1] - 164:23
**vehicle** [3] - 85:8, 143:10, 223:4
**vendors** [3] - 82:20, 95:5, 95:20
**verbatim** [1] - 58:5
**verdict** [2] - 158:3, 209:16
**verification** [1] - 233:7
**verified** [1] - 190:1
**Veronica** [1] - 1:19

**version** [2] - 58:11, 208:14
**versus** [2] - 30:4, 235:7
**video** [1] - 158:5
**view** [2] - 107:5, 197:25
**Villanova** [2] - 223:20, 224:13
**Virgin** [1] - 248:19
**virtue** [4] - 209:19, 210:23, 217:23, 250:2
**vision** [2] - 134:14, 222:18
**visit** [8] - 9:14, 16:3, 35:11, 39:14, 45:9, 46:10, 47:3, 52:24
**visits** [3] - 39:14, 53:20, 124:18
**vocational** [3] - 251:11, 251:16, 251:18
**voice** [1] - 57:4
**voir** [2] - 177:19, 177:20
**voluntary** [1] - 167:25
**vs** [5] - 1:4, 2:1, 246:7, 248:24, 260:1

## W

**W-2's** [1] - 227:1
**wage** [17] - 168:3, 172:9, 179:1, 184:16, 195:21, 200:17, 202:9, 202:23, 203:7, 203:20, 204:10, 233:14, 233:16, 233:20, 235:25, 236:7, 242:10
**wages** [16] - 168:21, 169:12, 172:10, 172:21, 174:8, 180:7, 180:8, 184:20, 186:5, 186:23, 186:24, 187:9, 189:13, 189:19, 195:6
**waist** [4] - 28:19, 28:25, 29:17, 64:14
**wait** [2] - 87:18, 149:16
**waiting** [1] - 99:10
**walk** [12] - 24:14, 45:16, 71:8, 108:4, 114:8, 134:18, 135:15, 138:6, 139:23, 145:4, 147:16, 212:24
**walk-in** [1] - 45:16

**walker** [25] - 3:20, 27:19, 28:16, 33:12, 33:23, 34:21, 47:18, 47:25, 54:7, 61:11, 61:18, 70:9, 70:17, 72:9, 73:12, 106:20, 106:23, 109:23, 110:20, 112:4, 112:6, 118:15, 216:15, 216:20, 236:25
**Walker** [3] - 2:7, 3:14, 3:18
**walker's** [2] - 65:6, 112:8
**walking** [27] - 24:12, 25:25, 50:16, 75:21, 86:5, 92:17, 94:3, 94:5, 100:3, 116:13, 122:15, 122:17, 122:20, 134:4, 134:10, 134:25, 135:7, 135:12, 137:10, 138:1, 138:13, 138:20, 140:13, 156:9, 211:20, 212:3, 212:4
**walks** [4] - 35:21, 139:22, 150:17, 150:20
**Walnut** [1] - 1:24
**wants** [2] - 65:5, 183:5
**warehouse** [37] - 28:7, 53:2, 53:6, 53:10, 53:13, 53:21, 74:20, 75:9, 76:24, 76:25, 77:1, 77:16, 79:6, 81:8, 81:23, 82:10, 84:9, 86:1, 93:6, 94:12, 94:20, 94:24, 95:18, 95:23, 95:24, 96:1, 97:14, 98:15, 114:15, 119:23, 133:9, 139:17, 143:6, 144:18, 144:22, 145:25, 167:21
**Warehouse** [1] - 52:6
**warehouseman** [1] - 216:18
**warehouses** [2] - 52:9, 52:23
**watch** [1] - 158:18
**water** [1] - 108:24
**Wayne** [1] - 1:20
**ways** [4] - 195:1, 195:8, 198:11, 198:16
**weather** [1] - 256:12
**website** [7] - 166:22,

166:25, 242:17, 245:8, 245:17, 245:23, 245:25
**week** [4] - 109:16, 180:6, 200:15, 200:21
**weeks** [5] - 172:7, 173:8, 180:2, 180:3
**weigh** [1] - 81:12
**weighed** [1] - 146:11
**weighs** [1] - 29:18
**weight** [2] - 81:15, 215:22
**weights** [1] - 21:5
**Wellbutrin** [1] - 58:15
**Wesley** [5] - 1:23, 5:11, 10:3, 260:15, 260:17
**wheel** [3] - 98:24, 100:15, 101:7
**whichever** [1] - 85:6
**Whitmire** [2] - 167:18, 216:11
**whole** [7] - 18:13, 102:9, 139:4, 139:6, 139:9, 151:2, 173:25
**wide** [2] - 77:3, 79:11
**wife** [1] - 156:1
**Winter** [1] - 1:19
**wise** [1] - 206:9
**wish** [2] - 55:12, 173:3
**withdraw** [2] - 61:2, 64:8
**withheld** [1] - 173:9
**witness** [17] - 3:6, 34:21, 53:23, 73:10, 156:23, 159:20, 171:7, 177:11, 178:11, 178:13, 193:25, 196:4, 197:25, 209:7, 239:5, 239:6, 239:12
**WITNESS** [21] - 3:18, 24:19, 24:22, 37:23, 38:1, 38:4, 66:6, 73:21, 74:7, 87:24, 88:3, 126:2, 135:25, 136:3, 136:8, 156:25, 160:4, 207:13, 208:7, 221:25, 255:4
**witnesses** [7] - 102:17, 136:4, 158:5, 208:9, 208:10, 221:12, 226:24
**WITNESSES** [2] - 2:6, 2:18
**woman** [1] - 11:8
**wonder** [1] - 182:2
**wondered** [1] -

154:16
**wood** [3] - 145:10, 150:24, 151:1
**woods** [1] - 139:22
**word** [1] - 26:5
**words** [6] - 39:1, 147:12, 151:17, 151:19, 174:21, 217:3
**worker** [8] - 28:7, 59:6, 74:20, 94:24, 95:23, 95:24, 96:1, 144:22
**worker's** [6] - 89:9, 128:21, 128:23, 128:24, 129:6, 129:18
**workers** [5] - 8:8, 82:10, 94:20, 95:17, 95:21
**workman's** [-] - 129:10, 129:11
**works** [4] - 7:21, 58:2, 190:14, 232:8
**worse** [8] - 90:21, 91:22, 93:23, 93:25, 124:21, 144:24, 145:2, 153:21
**worth** [3] - 175:21, 182:2, 182:6
**would've** [1] - 172:16
**wrap** [1] - 85:22
**write** [10] - 49:18, 49:23, 50:8, 50:16, 50:18, 132:22, 133:17, 134:7, 135:1, 140:8
**writing** [1] - 238:2
**written** [5] - 40:7, 40:14, 226:21, 239:22
**wrote** [16] - 24:3, 37:16, 41:20, 42:16, 106:5, 106:19, 106:22, 108:6, 111:21, 117:10, 112:13, 135:10, 139:3, 140:3, 140:12, 140:18

### X

**x-rays** [4] - 14:3, 14:7, 14:11, 14:12

### Y

**yard** [4] - 132:14, 132:15, 132:18, 132:21
**yards** [1] - 134:21
**year** [43] - 39:6, 39:8, 162:5, 163:7, 163:14, 164:25, 165:3, 166:1,

168:5, 168:6, 171:22, 172:17, 174:7, 174:16, 175:3, 175:5, 179:21, 180:3, 181:13, 181:15, 183:9, 183:12, 183:19, 185:23, 188:11, 200:22, 201:1, 202:5, 204:2, 206:10, 224:16, 227:2, 229:14, 233:17, 234:1, 234:10, 234:13, 234:16, 235:1, 236:7, 253:24
**years** [31] - 35:5, 115:10, 132:18, 133:3, 156:2, 162:11, 163:4, 163:5, 163:12, 164:11, 164:15, 164:16, 165:6, 167:21, 172:12, 173:16, 175:8, 181:18, 181:22, 181:25, 182:1, 182:6, 182:9, 191:15, 223:16, 227:1, 238:10, 238:12, 238:13, 238:22, 249:21
**yesterday** [13] - 75:2, 86:11, 91:5, 91:12, 94:2, 99:23, 100:13, 102:22, 103:21, 114:18, 124:10, 127:9, 159:14
**yield** [2] - 204:11, 205:3
**yielding** [1] - 204:19
**York** [1] - 225:16
**Young** [3] - 161:25, 162:1, 162:3
**yourself** [3] - 70:22, 154:1, 239:5
**yourselves** [2] - 73:25, 256:20

### Z

**zero** [2] - 29:6, 235:21
**zeros** [1] - 227:25